No. 2020-1812

# United States Court of Appeals
# for the Federal Circuit

**MONDIS TECHNOLOGY LTD., HITACHI MAXELL, LTD., nka
Maxell Holdings, Ltd., MAXELL, LTD.,**

*Plaintiffs-Appellees,*

*v.*

**LG ELECTRONICS INC., LG ELECTRONICS U.S.A., INC.,**

*Defendants-Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW
JERSEY, CASE NO. 2:15-CV-04431-SRC-CLW, JUDGE STANLEY R. CHESLER

## CORRECTED NONCONFIDENTIAL JOINT APPENDIX

Martin J. Black
Jeffrey S. Edwards
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, Pennsylvania 19104
(215) 994-4000
martin.black@dechert.com
jeffrey.edwards@dechert.com

Jeffrey B. Plies
DECHERT LLP
515 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 394-3000
jeff.plies@dechert.com
*Counsel for Plaintiffs-Appellees*

February 24, 2021

Michael J. McKeon
Christian A. Chu
R. Andrew Schwentker
Michael J. Ballanco
FISH & RICHARDSON P.C.
1000 Maine Ave. SW, Suite 1000
Washington, DC 20024
(202) 783-5070
mckeon@fr.com
chu@fr.com
schwentker@fr.com
ballanco@fr.com

*Counsel for LG Electronics Inc. and
LG Electronics U.S.A., Inc.*

**Table of Contents**

| Docket Entry | Date | Description | Appendix Page Nos. |
|---|---|---|---|
| 369 | 01/07/2019 | Order Denying as Moot LG's Motion to Dismiss for Lack of Subject Matter Jurisdiction | Appx225-Appx225 |
| 393 | 02/27/2019 | Order Denying LG's Motion to Dismiss for Lack of Subject Matter Jurisdiction | Appx227-Appx233 |
| 468 | 04/09/2019 | Jury Verdict | Appx274-Appx275 |
| 482 | 04/12/2019 | Jury Verdict | Appx295-Appx296 |
| 558 | 09/24/2019 | Omnibus Order on Post-Trial Motions | Appx297-Appx329 |
| 607 | 04/22/2020 | Order Denying LG's Motion for JMOL, a New Trial and/or Remittitur regarding Damages and Willfulness | Appx330-Appx338 |
|  | 01/06/2009 | U.S. Patent No. 7,475,180 | Appx339-Appx368 |
|  |  | Docket Sheet for D.N.J. 2:15-cv-04431-SRC-CLW | Appx369-Appx451 |
| 1 | 06/21/2014 | Complaint | Appx1001-Appx1024 |
| 56 | 06/03/2015 | Order Granting LG's Motion to Transfer Venue | Appx1050-Appx1052 |
| 120 | 11/12/2015 | Order Staying Case Pending Outcome of USPTO Proceedings | Appx1053-Appx1067 |
| 121 | 11/12/2015 | Order Granting LG's Motion to Stay Pending USPTO Outcome of USPTO Proceedings | Appx1068-Appx1069 |
| 133 | 07/18/2016 | Ltr to Judges Chesler and Waldor re Status Update | Appx1070-Appx1120 |
| 136 | 07/21/2016 | Order Vacating Stay and Reopening Case | Appx1121-Appx1121 |

| Docket Entry | Date | Description | Appendix Page Nos. |
|---|---|---|---|
| 174 | 01/30/2017 | Mondis Opening Markman Brief | Appx1122-Appx1167 |
| 308 | 10/25/2018 | LG's Motion to Dismiss for Lack of Subject Matter Jurisdiction | Appx1168-Appx1169 |
| 318-1 (sealed) | | Edwards Declaration in Support of Mondis' Opposition to LG's Motion to Dismiss for Lack of Subject Matter Jurisdiction | Appx1170-Appx1314 |
| 345 | 12/12/2018 | Minute Entry for December 12, 2018 Proceedings | Appx1315-Appx1315 |
| 371 | 01/08/2019 | Amended Complaint | Appx1316-Appx1327 |
| 379 | 01/22/2019 | LG's Motion to Dismiss for Lack of Subject Matter Jurisdiction | Appx1328-Appx1329 |
| 386 (sealed) | 02/05/2019 | Plaintiffs' Opposition to LG's Motion to Dismiss for Lack of Subject Matter Jurisdiction | Appx1330-Appx1377 |
| 403 | 03/08/2019 | Plaintiffs' Second Amended Complaint | Appx1378-Appx1389 |
| 485 | 04/30/2019 | Ltr to Judge Chesler re Post-Trial Briefing Schedule | Appx1390-Appx1391 |
| 614 | 05/08/2020 | LG Notice of Appeal | Appx1392-Appx1395 |
| | | Lamm Revised Direct Demonstratives | Appx1396-Appx1402 |
| 319-15 | | Hitachi-Mondis Assignment | Appx1403-Appx1407 |
| 20 | 01/21/2015 | LG's Answer, Affirmative Defenses and Counterclaims | Appx1408-Appx1450 |
| 318 (sealed) | 11/21/2018 | Mondis' Brief in Opposition to LG's Motion to Dismiss for Lack of Subject Matter Jurisdiction | Appx7000-Appx7005 |

| Docket Entry | Date | Description | Appendix Page Nos. |
|---|---|---|---|
| 318-2 (sealed) | 11/21/2018 | Declaration of Michael Spiro in Support of Mondis' Opposition to LG's Motion to Dismiss for Lack of Subject Matter Jurisdiction | Appx7006-Appx7008 |
| LG-271 | | EP 0456923 A1 [LGEMOND00066078] | Appx10226-Appx10234 |
| LG-292 | | LG LM6200 Owner's Manual [LGEMOND00003227] | Appx10675-Appx10716 |
| LG-297 | | Monitor Asset Manager Report [LGEMOND00153187] | Appx10717-Appx10720 |
| LG-410 (sealed) | | Mondis-LG Settlement and Patent License Agreement [LGEMOND00035850] | Appx10862-Appx10892 |
| LG-422 | | Mondis v. LG (2:07-cv-565) Third Amended Complaint [LGEMOND00182971] | Appx10912-Appx10928 |
| LG-504 | | 10/160,022 - Amendment | Appx11038-Appx11049 |
| LG-505 | | 10/160,022 - Amendment | Appx11050-Appx11063 |
| MON-0001 | | U.S. Patent No. 7,475,180 (Certified) | Appx11100-Appx11132 |
| MON-0014 (sealed) | | Patent Sale, Assignment, and License Agreement for U.S. Patent Nos. 6,513,088, 6,549,970, 7,089,342, and 6,639,588 [MONLG 00026275] | Appx11170-Appx11201 |
| MON-0094 | | 10/160,022 Interview Summary [MONLG 00199409] | Appx11202-Appx11203 |
| MON-0506 | | VESA EDID Standard, Release A Rev. 2 [MONLG 00021600] | Appx12301-Appx12426 |
| MON-0507 | | VESA Enhanced Display Data Channel Standard ("E-DDC"), Version 1.1 [MONLG 00021726] | Appx12427-Appx12460 |
| MON-0511 | | Datasheet - Microchip 24C02C 2K 5.0V I2C Serial EEPROM [MONLG 00033292] | Appx12493-Appx12508 |

| Docket Entry | Date | Description | Appendix Page Nos. |
|---|---|---|---|
| MON-3150 (sealed) | | Hitachi-Inpro-Mondis Memorandum of Agreement [MONLG 00566382] | Appx13243-Appx13244 |
| MON-3151 (sealed) | | Hitachi-Inpro-Mondis Memorandum of Agreement [MONLG 00566384] | Appx13245-Appx13246 |
| (sealed) | 04/02/2019 | Transcript of Jury Trial, Day 1 | Appx15001-Appx15039 |
| (sealed) | 04/03/2019 | Transcript of Jury Trial, Day 2 | Appx15040-Appx15105 |
| | 04/05/2019 | Transcript of Jury Trial, Day 3 | Appx15106-Appx15177 |
| | 04/08/2019 | Transcript of Jury Trial, Day 4 | Appx15178-Appx15197 |
| | 04/09/2019 | Transcript of Jury Trial, Day 5 | Appx15198-Appx15240 |
| (sealed) | 04/10/2019 | Transcript of Jury Trial, Day 6 | Appx15241-Appx15297 |
| (sealed) | 04/11/2019 | Transcript of Jury Trial, Day 7 | Appx15298-Appx15336 |

CONFIDENTIAL MATERIAL OMITTED

The material omitted at Appx1170-1173 and Appx7006-7007 describes confidential agreements between Appellees and others; the material omitted at Appx1208 and Appx1210 is Appellees' licensing correspondence; the material omitted at Appx1231-1232 is deposition testimony regarding Appellees' licensing efforts; the material omitted at Appx1339, Appx1355, Appx1367, and Appx7000-7005 describes terms of the Hitachi-Mondis Patent Sale, Assignment, and License Agreement (PSALA); the material omitted at Appx10862-10892 is the 2009 LG-Mondis Settlement Agreement; the material omitted at Appx11170-11201 is the Hitachi-Mondis Patent Sale, Assignment, and License Agreement (PSALA); the material omitted at Appx13243-13246 is the Hitachi-Maxell-Inpro-Mondis Memorandum of Agreement; the material omitted at Appx15027-15031, Appx15047, Appx15050, Appx15067, Appx15244, Appx15255, Appx15259,

Appx15261, Appx15308, Appx15315, Appx15321, and Appx15330-15331 is trial testimony regarding details of LG's and other parties' agreements with Mondis, and LG's sales and business projections. All of these confidential materials are subject to the district court's protective order.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONDIS TECHNOLOGY LTD., | Civil Case No.: 2:15-cv-04431(SRC/CLW) |
| Plaintiff, | |
| v. | **[PROPOSED] ORDER** |
| LG ELECTRONICS, INC. and LG ELECTRONICS U.S.A., INC., | *Electronically Filed* |
| Defendants. | |

**THIS MATTER** having come before the Court upon the motion of Defendants LG

Electronics, Inc., and LG Electronics U.S.A., Inc. (collectively "LG") to dismiss for lack of

subject matter jurisdiction, D.I. 308, and upon consideration of the parties' briefing, and the

arguments made at the hearing on December 12, 2018, and in the interests of justice,

IT IS on this _____ day of December, 2018

ORDERED that:

1.   Plaintiff Mondis Technology, Ltd.'s request in the alternative to permit the

joinder of the relevant Hitachi party under Fed. R. Civ. P. 15, 17(a)(3), 19, 20 and 21 is

GRANTED, and the amended complaint attached to this order shall be filed forthwith.

2.   The parties shall have 30 days from entry of this order to supplement the pretrial

order, exhibit list, and deposition designations to reflect any matters made relevant by the

joinder; and

3.   Defendants' motion to dismiss is DENIED as moot.

Hon. Stanley R. Chesler, U.S.D.J.

Appx225

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| _____ | : | |
| MONDIS TECHNOLOGY LTD, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 15-4431 (SRC) |
| | : | |
| v. | : | |
| | : | **OPINION & ORDER** |
| LG ELECTRONICS, INC. | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**CHESLER**, U.S.D.J.

This matter comes before the Court on the motion to dismiss the First Amended

Complaint ("FAC") for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil

Procedure 12(b)(1), by Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc.

(collectively, "LG").  Plaintiff Mondis Technology Ltd ("Mondis") opposes the motion.  For the

reasons that follow, the motion will be denied.

On October 25, 2018, LG filed a first motion to dismiss the Complaint for lack of subject

matter jurisdiction.  LG argued, in short, that Mondis does not hold legal title to the '180 patent,

pursuant to Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336, 1340 (Fed. Cir. 2006),

and lacks prudential standing to sue LG on its own.  In opposition, Mondis disagreed, but argued

in the alternative that any defect in prudential standing could be easily cured by allowing it to

join putative patent owner Hitachi Maxell, Ltd. ("Hitachi").  On December 12, 2018, the Court

heard oral argument on the motion and gave leave to Mondis to file an amended complaint

which joined Hitachi as a party to the case.  This Court subsequently denied the motion to

dismiss as moot.  The FAC, filed January 8, 2019, added Hitachi as a co-plaintiff.

LG then filed the instant motion to dismiss the FAC for lack of subject matter jurisdiction. LG argues, in short, that Hitachi cannot be a named plaintiff because it lacks constitutional standing to sue LG. LG contends that the FAC should be dismissed because Mondis, alone, does not have both constitutional and prudential standing.[1]

The instant motion builds on the arguments made in the prior motion. LG's argument can be broken into two parts: 1) as previously argued, the Court should recharacterize the October 30, 2007 transaction between Hitachi and Mondis to find that there was no effective transfer of legal title to the '180 patent to Mondis, pursuant to <u>Bell Intercontinental Corp. v. United States</u>, 180 Ct. Cl. 1071, 1077 (1967),[2] and its progeny, and therefore Hitachi retains the legal title; and 2) Hitachi transferred to Mondis its right to sue LG for infringement and therefore lacks constitutional standing to be in this case. LG argues that, because Mondis lacks prudential standing and Hitachi lacks constitutional standing, neither Plaintiff has standing to pursue this case, and this Court lacks subject matter jurisdiction.

For the sake of discussion only, this Court will consider LG's first proposition to be correct: the 2007 transaction, although labeled a sale of the '180 patent, was ineffective as an assignment of the '180 patent, and Hitachi retains legal title. Even if this proposition is taken as true, LG must still demonstrate that the second proposition is true, and it has not done so. The problem for LG is that it has inserted into the law a new requirement that Hitachi fails: the holder

---

[1] Mondis and LG do not dispute that Mondis has constitutional standing to sue LG for patent infringement.

[2] "[I]n order that a transfer constitute a sale, there must be a grant of all substantial rights of value in the patent. The transfer of anything less is a license which conveys no proprietary interest to the licensee." <u>Id.</u>

2

of legal title to the patent must show constitutional standing to be joined, pursuant to Rule 19, to a suit for damages against an infringer.  LG has shown no controlling authority to support this proposed requirement.

LG's proposed new requirement holds that, when a licensee seeks to join, pursuant to Rule 19, the entity holding legal title to a patent as a party to the case to remedy a defect in prudential standing, the Court must first test that owner for constitutional standing.  And not just any constitutional standing, but an infringement injury-in-fact.  The problem for LG is that it has not demonstrated that the Federal Circuit has expressly established this requirement or that it is implicit in its jurisprudence.  This Court finds no controlling authority for the proposition that it must test the patent owner for constitutional standing before allowing joinder under these circumstances.  The cases all but state that no such requirement exists.  Consider the statement of the "general rule" in <u>Prima Tek II, L.L.C. v. A-Roo Co.</u>, 222 F.3d 1372, 1377 (Fed. Cir. 2000) (citations omitted, emphasis added):

> Although an exclusive licensee may have standing to participate in a patent infringement suit, in some cases it must still be joined in suit by the patent owner.  In *Independent Wireless*, the Supreme Court held that, where a patent infringement suit was brought by an exclusive licensee, the patent owner was an indispensable party who was required to be joined, **either voluntarily as a plaintiff or involuntarily (by process) as a defendant**, in order to satisfy the requirements of standing.  The holding of *Independent Wireless* was incorporated into the Federal Rules of Civil Procedure in 1937 with the adoption of Rule 19.

> As a general rule, this court continues to adhere to the principle set forth in *Independent Wireless* that a patentee should be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee.  However, this general rule – which we recognize as being prudential rather than constitutional in nature – is subject to an exception. The exception is that, where the patentee makes an assignment of all substantial rights under the patent, the assignee may be deemed the effective "patentee" under 35 U.S.C. § 281 and thus may have standing to maintain an infringement suit in its own name.

3

Note that the Federal Circuit held that the prudential standing problem could be solved by joining the patent owner **either as a plaintiff or as a defendant**.[3]  This necessarily implies that the joined owner need not meet requirements specific to plaintiffs.

To restate what the Federal Circuit held in <u>Prima Tek</u>: 1) in <u>Independent Wireless</u>,[4] the Supreme Court established the general rule that a patentee should be joined in any infringement suit brought by an exclusive licensee; and 2) this general rule is prudential rather than constitutional in nature.   This makes clear that these principles do not invoke or rely on constitutional requirements, such as the case-or-controversy requirement.  The Supreme Court has described prudential standing requirements as "judicially self-imposed limits on the exercise of federal jurisdiction."  <u>Allen v. Wright</u>, 468 U.S. 737, 751 (1984).  Because they are judicially self-imposed limits, they do not invoke constitutional requirements.[5]

---

[3] The Supreme Court, in <u>Independent Wireless</u>, stated the same.

[4] "The presence of the owner of the patent as a party is indispensable not only to give jurisdiction under the patent laws but also, in most cases, to enable the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in the one action, or by satisfying one adverse decree to bar all subsequent actions."  <u>Indep. Wireless Tel. Co. v. Radio Corp. of Am.</u>, 269 U.S. 459, 468 (1926).

[5] Similarly, in <u>WiAV Sols. LLC v. Motorola, Inc.</u>, 631 F.3d 1257, 1265 n.1 (Fed. Cir. 2010), the Federal Circuit stated: "An exclusive licensee generally must join the patent owner to the suit to satisfy prudential standing constraints . . ."  The Court stated no constitutional requirements or considerations.

In <u>Propat Int'l Corp. v. RPost US, Inc.</u>, 473 F.3d 1187, 1193 (Fed. Cir. 2007), the Federal Circuit characterized the case law as follows:

> We explained that the requirement that the exclusive licensee must normally join the patent owner in any suit on the patent is a "prudential" requirement, not a constitutional requirement based on Article III limitations, and that an action brought by the exclusive licensee alone may be maintained as long as the licensee joins the patent owner in the course of the litigation.

4

This understanding is supported by the Federal Circuit's explanation of the policy rationales underlying the general rule: "principally, from the standpoint of an accused infringer, avoidance of multiple lawsuits and liabilities, and, from the standpoint of the patentee, ensuring that its patent is not invalidated or held unenforceable without its participation." Evident Corp. v. Church & Dwight Co., 399 F.3d 1310, 1314 (Fed. Cir. 2005). Both of these fundamental policy concerns stem from prudential considerations, not constitutional requirements. Constitutional standing permits the exclusive licensee to bring suit for infringement, but not to bring suit alone. As outlined above, the law allows that, under certain circumstances, the holder of legal title to the patent should be joined as an indispensable party, pursuant to Rule 19.

LG has shown no authority for the proposition that the Court, in exercising its authority under Rule 19, must re-apply the constitutional case-or-controversy requirement before allowing joinder. Nor has LG cited any Federal Circuit case in which the Court, examining the joinder of a patent owner, required a showing of an injury-in-fact by the owner. There is no controlling authority for the proposition that a licensee who joins a patent owner to satisfy prudential requirements must demonstrate that the owner has constitutional standing.

In sum, the Court finds that if, for the purpose of consideration of this motion only, we take LG's first proposition as true – that the 2007 transaction failed to transfer legal title in the '180 patent from Hitachi to Mondis, and that the Court casts aside the parties' labels and concludes that, in effect, Hitachi retained legal title and Mondis emerged in the position of an

---

Note that the final clause states only one condition for the maintenance of an action for infringement brought by an exclusive licensee: the patent owner must be joined in the course of the litigation. No constitutional requirement is stated, and the Court affirmatively declared that this is not a constitutional requirement.

exclusive licensee from the 2007 transaction – , there is a well-worn path in Federal Circuit law

to resolve the resultant prudential standing problem: Mondis, pursuant to Rule 19, joins Hitachi

as an indispensable party. LG argues unpersuasively that Mondis is barred from that well-worn

path by a constitutional standing requirement that has gone unmentioned in Federal Circuit

jurisprudence. This Court today does not decide any questions about the theory that the 2007

transaction should be recharacterized, but holds that, even if that theory is correct, Rule 19

authorizes a solution to the potential prudential standing problem. Mondis solved the potential

prudential standing problem when it joined Hitachi as a plaintiff, pursuant to Rule 19. Mondis

has now met the constitutional and prudential requirements for standing. The motion to dismiss

the FAC for lack of subject matter jurisdiction will be denied.

LG argues that, should the Court decline to dismiss the FAC, it should reset the clock on

damages based on the date of filing the FAC, on a theory that Rule 15 requires it. LG is

incorrect. The FAC did not change Mondis' claims for damages.[6] As LG knows well, Hitachi

has no right to sue LG for infringement of the '180 patent. Relation back is not an issue here.

LG's request that this Court reset the damages clock in some way is denied.

For these reasons,

**IT IS** on this 26th day of February, 2019

**ORDERED** that LG's motion to dismiss the FAC for lack of subject matter jurisdiction

---

[6] LG points out that there is one material change related to the damages claim: the factual
allegation regarding the date of notice of infringement. The original Complaint alleges: "LG has
had knowledge of the '180 patent since no later than March 9, 2009." (Compl. ¶ 60.) The FAC
alleges: "LG has had knowledge of the '180 patent since January 15, 2009." (FAC ¶ 30.) The
Court will not permit this modification and Mondis shall file a further amended complaint to
restore the original allegation as to the date of notice.

(Docket Entry No. 379) is **DENIED**; and it is further

      **ORDERED** that Mondis shall file a further amended complaint to restore the original

allegation as to the date of notice.

                                        ____ s/ Stanley R. Chesler ____
                                        Stanley R. Chesler, U.S.D.J.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MONDIS TECHNOLOGY LTD., HITACHI
MAXELL, LTD., n/k/a MAXELL
HOLDINGS, LTD., and MAXELL, LTD.,

     *Plaintiffs,*

v.

     C.A. No. 15-04431 (SRC)(CLW)

LG ELECTRONICS INC. and
LG ELECTRONICS U.S.A., INC.,

     *Defendants.*

---

## VERDICT FORM
## REGARDING LIABILITY

Based on the evidence admitted at trial and in accordance with the instructions given by

the Court, we, the jury, unanimously agree to the answers to the following questions:

1. Did Plaintiffs prove that it is more likely than not that LG infringed the following patent
   claims?

   a. Claim 14 of the '180 patent      Yes $\times$    No ____

   b. Claim 15 of the '180 patent      Yes $\times$    No ____

2. ~~Did LG prove by clear and convincing evidence that the following patent claims are~~
   invalid?

   a. Claim 14 of the '180 patent      Yes ____    No $\times$

   b. Claim 15 of the '180 patent      Yes ____    No $\times$

Signed this __9__ day of __APRIL__, 2019.

*10:29 AM .*
*4/2/19*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MONDIS TECHNOLOGY LTD., HITACHI
MAXELL, LTD., n/k/a MAXELL
HOLDINGS, LTD., and MAXELL, LTD.,

     *Plaintiffs,*

v.

LG ELECTRONICS INC. and
LG ELECTRONICS U.S.A., INC.,

     *Defendants.*

C.A. No. 15-04431 (SRC)(CLW)

---

## VERDICT FORM
## REGARDING REMEDY

---

Based on the evidence admitted at trial and in accordance with the instructions given by

the Court, we, the jury, unanimously agree to the answers to the following questions:

1. What sum of money, if paid today, have Plaintiffs proven to be more likely than not to
   compensate Plaintiffs for LG's infringement?

   Answer in dollars and cents. Do not assess any interest, as the Court will determine
   interest if it deems necessary.

   Total royalty damages: *$45,000,000.00*

2. Have Plaintiffs proven that it is more likely than not that LG's infringement of the '180
   patent was willful?

   Yes ___✗___ No _____

1

Signed this _12_ day of _APRIL_, 2019.

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---
                             :

MONDIS TECHNOLOGY LTD,      :
                             :

        Plaintiff,             :         Civil Action No. 15-4431 (SRC)
                             :

            v.               :
                             :         **OPINION & ORDER**

LG ELECTRONICS, INC.       :
et al.,                          :
                             :

        Defendants.       :

---

**CHESLER**, **U.S.D.J.**

      This matter comes before the Court on six motions: 1) the motion by Defendants LG

Electronics, Inc. and LG Electronics U.S.A., Inc. (collectively, "LG") for judgment as a matter

of law under Rule 50(b), a new trial under Rule 59, and/or remittitur regarding damages and

willfulness; 2) LG's motion for judgment as a matter of law under Rule 50(b) and/or a new trial

under Rule 59 regarding invalidity; 3) LG's motion for judgment as a matter of law under Rule

50(b) and/or a new trial under Rule 59 regarding noninfringement; 4) the motion by Plaintiff

Mondis Technology Ltd ("Mondis") for enhanced damages, pursuant to 35 U.S.C. § 284; 5)

Mondis' motion for attorney fees, pursuant to 35 U.S.C. § 285; and 6) Mondis' motion for pre-

judgment and post-judgment interest.  For the reasons that follow, as to the motion for a new

trial on damages, the Court grants it in part, denies it in part, and reserves decision on it in part,

pending further briefing; the remaining motions are denied.

      This case arises from a dispute between Mondis, owner of U.S. Patent No. 7,475,180

(the "'180 patent"), and LG, a television manufacturer, over allegations that LG manufactured

and sold televisions that infringed claims 14 and 15 of the '180 patent.  A jury trial was held on April 3, 5, 8, 9, 10, 11 and 12, 2019.  At the conclusion of the liability phase of the trial, the jury returned a verdict that claims 14 and 15 of the '180 patent were valid and infringed.  At the conclusion of the damages phase of the trial, the jury returned a verdict that the infringement was willful, and awarded Mondis compensatory damages of $45 million.

## I.      LG's motions regarding patent validity

LG moves for judgment as a matter of law, pursuant to Rule 50(b), and/or a new trial, pursuant to Rule 59, on the issue of the invalidity of claims 14 and 15 of the '180 patent for failure to satisfy the written description requirement.  At the conclusion of the liability phase of the jury trial, the jury returned a verdict stating, *inter alia*, that LG did not prove by clear and convincing evidence that claims 14 and 15 of the '180 patent are invalid.  At trial, LG had argued to the jury that claims 14 and 15 of the '180 patent are invalid for failure to satisfy the written description requirement, pursuant to § 112, paragraph 1.

In moving for judgment as a matter of law and/or a new trial, LG argues that no reasonable jury could have found that the '180 patent meets the written description requirement.  LG contends that there was insufficient evidence for the jury to find in Plaintiff's favor on this issue.

At the outset, the Court notes that the present case presents challenging circumstances for LG to succeed on this motion: 35 U.S.C. § 282(a) states that a "patent shall be presumed valid" and, under Federal Circuit law, "[t]o overcome the presumption of validity of patents, the accused must show that the claims lack a written description by clear and convincing evidence." Hynix Semiconductor Inc. v. Rambus Inc., 645 F.3d 1336, 1351 (Fed. Cir. 2011).  As Mondis notes, the Federal Circuit has held:

<div align="center">2</div>

> [E]ven though a patentee never must submit evidence to support a conclusion by a
> judge or jury that a patent remains valid, once a challenger introduces evidence
> that might lead to a conclusion of invalidity--what we call a prima facie case--the
> patentee would be well advised to introduce evidence sufficient to rebut that of
> the challenger.
>
> However, this requirement does not in substance shift the burden of persuasion,
> because the presumption of validity remains intact and the ultimate burden of
> proving invalidity remains with the challenger throughout the litigation.

Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1360 (Fed. Cir. 2007) (citations omitted).  "Under the

law set by Congress, a jury or a court may reach a conclusion that a patent remains valid *solely*

on the failure of the patent challenger's evidence to convincingly establish the contrary."

Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1570 (Fed. Cir. 1986).  Thus, for

LG to succeed on this motion, it must show that its written description case was so clear and so

convincing that no reasonable jury could have found otherwise.

> LG states its argument on this motion as follows:
>
> LG's expert, Dr. Stevenson, testified from the perspective of a person of ordinary
> skill in the art that the '180 patent failed to comply with the written description
> requirement. Plaintiffs' own expert, Mr. Lamm, conceded that the patent
> specification does not expressly recite claim 14's limitation "an identification
> number for identifying at least a type of said display unit." And contrary to what
> Plaintiffs promised at the summary judgment stage, Mr. Lamm did not provide
> any trial testimony that the inventors were in possession of the claimed invention
> at the time of filing.
>
> Mr. Lamm's failure to provide at trial the very testimony that served as Plaintiffs'
> entire basis for avoiding a judgment as a matter of law at the summary judgment
> stage left Dr. Stevenson's expert testimony that the '180 patent is invalid for lack
> of written description unrebutted and unimpeached. There was no longer a factual
> dispute for the jury to decide, thus requiring entry of JMOL of invalidity.

(D.'s Br. 1.)  There are two crucial flaws in this argument: 1) the assertion that Dr. Stevenson's

testimony was unimpeached; and 2) the unspoken assumption that, in the absence of a rebuttal

case, the jury had no role to perform.  Neither is correct.

3

Mondis points to several examples of how Dr. Stevenson was impeached. For example, on direct examination, Dr. Stevenson testified: "The LG TVs do not claim the -- do not contain the claimed identification number for identifying a type of display unit." (Tr. 533:12-14.) On cross-examination, Dr. Stevenson was shown a test report on an LG television that he had generated (LG-297 at LGEMOND00183157), and he testified:

> Q. You came to Dechert's Austin office and you printed out this report, correct?
>
> A. I printed it out and I spent a fair of amount looking at the raw data just to make sure it printed out something reasonable.
>
> Q. You printed it out and you saw that it said "display type RGB color," right?
>
> A. Yes.

(Tr. 665:10-17) A reasonable jury could have heard this testimony and concluded that Dr. Stevenson's credibility as a witness had been impaired.

Second, LG's implicit assumption that, in the absence of a rebuttal case, there was nothing for the jury to decide, is just wrong. Again, consider Orthokinetics: "Under the law set by Congress, a jury or a court may reach a conclusion that a patent remains valid *solely* on the failure of the patent challenger's evidence to convincingly establish the contrary." 806 F.2d at 1570. The proper role of the jury was to hear Dr. Stevenson's testimony, weigh it, and weigh all relevant evidence to determine whether LG had met its burden of proof, which is what the jury did. The jury reached the conclusion that the claims were valid based on the failure of the patent challenger's evidence to clearly and convincingly establish the contrary. The jury concluded that the clear and convincing standard had not been met, which appears to be a reasonable conclusion, in view of the evidence presented at trial.

This Court is not persuaded that LG's invalidity case was so clear and so convincing that

4

no reasonable jury could have found claims 14 and 15 to be valid.  LG's motion will be denied.

## II.    LG's motions regarding noninfringement

LG moves for judgment as a matter of law, pursuant to Rule 50(b), and/or a new trial, pursuant to Rule 59, on the issue of infringement.  At the conclusion of the liability phase of the jury trial, the jury returned a verdict stating, *inter alia*, that Plaintiffs had proven that it is more likely than not that LG infringed claims 14 and 15 of the '180 patent.  LG challenges the verdict of infringement on two grounds: 1) no evidence supports the inference that LG's televisions contain the claimed communication controller; and 2) no evidence supports the inference that LG's televisions contain the claimed identification number.

As to the communication controller, LG contends, correctly, that Mondis offered no direct evidence that the accused televisions contain one.  LG argues that, therefore, the jury's determination of infringement must be due to improper speculation and conjecture.  LG has, however, overlooked the role of circumstantial evidence: "Although a jury is entitled to draw reasonable inferences from circumstantial evidence, reasonable inferences themselves must be more than speculation and conjecture."  Phillip M. Adams & Assocs., LLC v. Dell Comput. Corp., 519 F. App'x 998, 1004 n.10 (Fed. Cir. 2013).  The question is, then, whether the jury could have drawn a reasonable inference about the presence of a communications controller based on the circumstantial evidence presented to them, or whether it could only be speculation and conjecture.

Mondis, in opposition, lays out the circumstantial evidence presented to the jury on this issue: 1) LG stipulated:

> All of the accused instrumentalities include at least one HDMI input port.
> All of the accused instrumentalities include a memory-storing EDID data that is connected to at least one HDMI port.

(Tr. 269:4-8.) 2) practice of the HDMI standard requires implementation of the VESA DDC

standard (MON-0516 at 9 ("HDMI carries a VESA DDC channel")); 3) LG's televisions

implement the DDC2B and I2C communications protocols, which allow bidirectional

communication and allow a video source to read the television's EDID data (Tr. 342:16-344:11);

4) Lamm explained how use of the DDC2B and I2C protocols enabled an LG television to

communicate the EDID data to the video source (Tr. 345:9-352:21); 5) Lamm stated that, for an

LG television to communicate the EDID data to the video source as required by the DDC2B

protocol, it must have a communications controller to perform six functions that enable the

communication. (Tr. 353:3-354:5.) Having presented this foundation, Lamm then stated his

conclusions:

> Q. In your opinion, is there any way for the accused LG televisions to implement
> the VESA Plug-N-Play EDID and DDC standards without using a bidirectional
> communication controller?
>
> A. No. The standards require that you perform these protocol functions, and that
> requires a communications controller and it's clearly bidirectional.
>
> Q. And same question with respect to the HDMI standard. Could you implement
> an HDMI capability in the television without using a bidirectional
> communication controller to implement the DDC2B protocol?
>
> A. No. The HDMI standard says you have to do it this way, and there is no way
> to not do it this way.
>
> Q. So would it be your opinion that a bidirectional communication controller is
> necessarily present in all the accused products?
>
> A. Yes, it is.

(Tr. 354:6-23.) As Mondis contends, a reasonable jury could have heard this evidence and

concluded that Lamm's conclusions were more likely than not to be correct.

Lamm's conclusions constitute a reasoned inference from the underlying evidence and

6

are not speculative and conjectural.  The Federal Circuit approved similar reasoning in <u>Fujitsu Ltd. v. Netgear Inc</u>., 620 F.3d 1321, 1327 (Fed. Cir. 2010):

> We hold that a district court may rely on an industry standard in analyzing infringement. If a district court construes the claims and finds that the reach of the claims includes any device that practices a standard, then this can be sufficient for a finding of infringement. We agree that claims should be compared to the accused product to determine infringement. However, if an accused product operates in accordance with a standard, then comparing the claims to that standard is the same as comparing the claims to the accused product.

In the present case, Mondis presented evidence that the accused televisions operate in accordance with the DDC2B standard, and then compared the claims to that standard.  The jury's inference that the accused televisions contain a communications controller was reasonable, not speculative and conjectural.

As to the identification number, LG argues: "there was no showing that these two bits actually identify a type of display unit in accordance with the Court's construction of the term."[1] (D.'s Br. 1.)  The Court does not agree.  As already discussed, Dr. Stevenson was cross-examined about a report he generated using a publicly available software program.  The evidence indicates that the program read the two bits in question inside an LG television and correctly identified the type of display unit as "RGB color."  (Tr. 665:10-17.)  The evidence contained a document describing the VESA EDID 1.3 standard, which showed that bits 3 and 4 of Feature Support byte 1 are labeled, "Display Type," with values indicating "monochrome display," "RGB color display," "non-RGB multicolor display," and "undefined."  (MON-0509 at 14, MONLG 00023168.)  Lamm provided testimony that confirmed this understanding of the

---

[1] To be precise, during claim construction, this Court determined that "identification number" has its ordinary meaning.  (Opinion dated September 28, 2017 at 14.)  The Court, in passing, also stated: "The ordinary understanding of "identification number" is that it is for the purpose of identifying something . . ."  (<u>Id.</u> at 13.)

7

EDID standard.  (Tr. 333:19-334:2.)  This evidence constitutes a showing that, in an actual LG

television, those two bits actually identified a type of display unit, which, in the example just

described, was "RGB color."  LG did not explain how this is inconsistent with the Court's

construction of "identification number."  This, along with other evidence, constitutes a

sufficient basis for the jury to have determined that LG's televisions contain the required

identification number.

      LG has not demonstrated that no evidence supports the jury's determination that LG's

televisions contain the claimed communication controller or the claimed identification number.

 To the contrary, substantial evidence supports the finding of infringement.  LG's motion for

judgment as a matter of law, pursuant to Rule 50(b), and/or a new trial, pursuant to Rule 59, on

the issue of infringement, will be denied.

### III.    LG's motion for a new damages trial

      LG challenges the jury's verdict in the damages phase of the trial: the jury awarded $45

million in damages and found that LG's infringement was willful.  LG moves for judgment as a

matter of law under Rule 50(b), a new trial under Rule 59, and/or remittitur regarding damages

and willfulness.  As to the damages verdict only, the jury verdict will be vacated.

      Federal Rule of Civil Procedure 59(a)(1) states:

> Grounds for New Trial. The court may, on motion, grant a new trial on all or
> some of the issues—and to any party—as follows:
> (A)    after a jury trial, for any reason for which a new trial has heretofore been
> granted in an action at law in federal court . . .

When reviewing damages in patent cases, the Federal Circuit applies regional circuit law to

procedural issues and Federal Circuit law to substantive and procedural issues pertaining to

patent law.  Wordtech Sys. v. Integrated Networks Sols., Inc., 609 F.3d 1308, 1318 (Fed. Cir.

2010).  Under Third Circuit law, "[a] new trial should be granted only where the great weight of the evidence cuts against the verdict and where a miscarriage of justice would result if the verdict were to stand."  Springer v. Henry, 435 F.3d 268, 274 (3d Cir. 2006).

     *A.*       *The $45 million damages verdict*

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. § 284.  The Federal Circuit has established two basic methods for determining a reasonable royalty:

> Two alternative categories of infringement compensation are the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining. . . .
>
> The second, more common approach, called the hypothetical negotiation or the "willing licensor-willing licensee" approach, attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.

Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009).

This case involves patents for electronics technology developed by Hitachi and transferred to Mondis.  As Plaintiff's expert Bratic explained in his expert report, and the parties do not dispute, the relevant patents transferred from Hitachi to Mondis are the DDC patents, which form two patent families: 1) the '090 patent family, which relates to DDC/2 and DDC/2B technology; and 2) the '812 patent family, which relates to DDC/CI and later technologies.  (Walsh 11/28/18 Dec. Ex. A at ¶ 10.)  The '180 patent is a member of the '090 patent family; technical expert Lamm testified that there were eight patents in the '090 patent family, and Bratic agreed.  (Tr. 1045:10-12; 1099:18-21.)  Bratic contended as well that his observations, based on

<div align="center">9</div>

review of over 25 relevant license agreements, fit with a document provided by Hitachi to a

California court, which indicates that Hitachi generally applied a "DDC Royalty Norm," which

Bratic explained as follows:

> At the time, the DDC Royalty Norm required licensees of the DDC Patents to pay Hitachi a royalty rate of either: (1)1% for all DDC-compliant monitors, regardless of whether they complied with the DDC/2 and DDC/2B or the DDC/CI standard; or (2) 0.25% for monitors compliant with the DDC/2 and DDC/2B ("Pre-DDC/CI") standard and 1.75% for monitors compliant with the DDC/CI ("Post-DDC/CI") standard (or any smaller or larger percentage for Pre-DDC/CI and Post-DDC/CI compliant monitors so long as the sum of the corresponding royalty percentages was 2%).

(Walsh 11/28/18 Dec. Ex. A at ¶ 48.)  Bratic concluded that the "implicit royalty rate" for a

license for the '090 family of patents was 0.25%.  (Id.; Id. at ¶ 222.)

Mondis contends that its prior licenses were negotiated on a "threshold basis," charging a

royalty for use of the DDC technology, rather than the use of particular patents.  (Tr. 966:7-18.)

The royalty rate did not change according to the number of patents licensed.  (Id.)

Bratic also stated that the past licenses showed a two-tiered rate schedule with a lower

pre-litigation royalty rate and a post-litigation royalty rate that was three times higher.  (Walsh

11/28/18 Dec. Ex. A at ¶¶ 46, 47, 226.)  Bratic characterized these rates as reflecting an

"uncertainty discount," with the pre-litigation rate at one-third of the post-litigation rate as a

discount because of the uncertainty about patent validity and infringement.  (Id.)  Bratic

concluded that, because the hypothetical negotiation rate would not include an uncertainty

discount, the hypothetical negotiation would have resulted in a reasonable royalty rate of 0.75%

of sales for the '180 patent.  (Walsh 11/28/18 Dec. Ex. A at ¶ 228.)  Mondis therefore contends

that it is entitled to a reasonable royalty of 0.75% of the sales revenue for LG's infringing

televisions.  The parties did not dispute that the entire market value of the 19 million infringing

televisions was about $10 billion.  Mondis thus asked for a reasonable royalty of $75 million.  As already stated, at the conclusion of the damages phase, the jury awarded $45 million in compensatory damages and found that LG's infringement was willful.

LG challenges the damages verdict on three grounds: 1) Plaintiff's damages theory violates the apportionment requirement; 2) Plaintiff's threshold theory violates Federal Circuit law; and 3) Plaintiff's use of a damages multiplier is legally improper.

As to the apportionment requirement, LG's argument is straightforward: Federal Circuit law requires that patent damages be apportioned to the incremental value that the patented invention adds to the end product, and the damages case presented to the jury by Mondis did not comply.  The parties do not dispute the first proposition: Federal Circuit law requires that patent damages, pursuant to 35 U.S.C. § 284, be so apportioned.  The post-trial dispute here concerns the question of whether Plaintiff's damages case complies with the apportionment requirement.

At the conclusion of the liability phase of the trial, the jury found that Mondis had proven that LG infringed claims 14 and 15 of the '180 patent.  Pursuant to 35 U.S.C. § 284, therefore, Mondis is entitled to, at a minimum, a reasonable royalty.  During the damages phase of the trial, the jury was tasked with determining that reasonable royalty.  Under Federal Circuit law, "where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more."  Ericsson, Inc. v. D-Link Sys., 773 F.3d 1201, 1226 (Fed. Cir. 2014).  The question presently in dispute, then, is whether Mondis presented a damages case that satisfies this governing rule.

LG begins by pointing to the testimony of Plaintiff's damages expert, Mr. Bratic, who stated that he did not do any apportionment because he believed none was necessary.  (Tr.

1161:19-21.)  Plaintiff's opposition brief does not dispute that he stated this.  Instead, Mondis

contends that it used the approach to apportionment approved by the Federal Circuit in

Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., 809 F.3d 1295, 1303 (Fed.

Cir. 2015) ("CSIRO").  Mondis argues that, in CSIRO:

> the apportionment function was achieved through application of comparable
> licenses or negotiations, which reflected "already built in apportionment." 809
> F.3d at 1303. That is what happened here.

(Pl.'s Opp. Br. 7.)  This the crux of Plaintiff's argument that it did indeed satisfy the

apportionment requirement: the damages analysis was based on comparable licenses which

reflected "already built-in apportionment," just as was done in CSIRO.  This is unpersuasive,

because this case is distinguishable on the facts.

> First, consider the facts and holding of CSIRO, as stated by the Federal Circuit:

> Fundamentally, the smallest salable patent-practicing unit principle states that a
> damages model cannot reliably apportion from a royalty base without that base
> being the smallest salable patent-practicing unit. That principle is inapplicable
> here, however, as the district court did not apportion from a royalty base at all.
> Instead, the district court began with the parties' negotiations. At trial, the district
> court heard evidence that, around the time of the hypothetical negotiations, the
> parties themselves had brief discussions regarding Cisco taking a license to the
> '069 patent. According to the district court's factual finding—which is supported
> by the testimony at trial—Cisco informally suggested $0.90 per unit as a possible
> royalty for the '069 patent. The district court used this rate as a lower bound on a
> reasonable royalty.  For the upper bound, the district court looked to the $1.90 per
> unit rate requested by CSIRO in its public Rate Card license offer. Because the
> parties' discussions centered on a license rate for the '069 patent, this starting
> point for the district court's analysis *already built in apportionment*.  Put
> differently, the parties negotiated over the value of the asserted patent, 'and no
> more.'

809 F.3d at 1302-03 (italics added).  CSIRO concerned infringement of the '069 patent.  During

the damages trial, the court heard evidence that Cisco informally suggested a possible royalty of

$0.90 per unit, and that CSIRO had offered Cisco a license to the '069 patent on terms stated in a

standardized form license offer, termed the "Rate Card." The Federal Circuit found that "this starting point for the district court's analysis already built in apportionment." Id. at 1303. The Court then explained its reasoning: "the parties negotiated over the value of the asserted patent, and no more." Id. The key characteristic of this fact pattern is that the district court used, as a starting point, evidence of negotiations over the same intellectual property that was the subject of the infringement action, the '069 patent. Because the negotiation positions used as a starting point had a scope identical to the property at issue at trial, there was no need to perform additional apportionment: the negotiation positions had the apportionment built in, because they concerned the value of the asserted patent "and no more."[2] Id.

The Federal Circuit has held: "The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." Ericsson at 1226. In CSIRO, the patentee presented evidence of the incremental value of the '069 patent, as reflected in negotiation positions taken by the parties. Crucially, in the instant case, Mondis has not argued that any of the previous licenses on which it based its damages case were limited to the incremental value of the '180 patent.

The facts of the instant case are thus distinguishable from those in CSIRO. Here, the starting point was a set of licenses not limited to the '180 patent, nor to claims 14 and 15 of the

---

[2] The Federal Circuit confirmed this reading of CSIRO in Elbit:

> In *CSIRO*, the district court started with evidence of proposed royalty rates from the parties' prior attempts at negotiating a license for the patent. *Id.* at 1300, 1302-03. We determined that the district court's analysis was not in error because it "already built in apportionment" by starting from "discussions centered on a license rate" for the same patent, those discussions having already informally apportioned the proposed license rates to the value of the patented technology.

Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC, 927 F.3d 1292, 1301 (Fed. Cir. 2019).

'180 patent.  Instead, here is Plaintiff's description of the evidence presented at the damages

trial:

> The evidence at trial was that licensing is on a threshold basis where the licensee
> pays one price for access to the patented technology, rather than on a patent-by-
> patent basis. The price is to use the technology. The number of patents doesn't
> matter. Threshold licensees seek to avoid further exposure on products licensed
> and paid for. So after the agreed threshold royalty is paid, there would be no
> charge for additional patents, even subsequently acquired ones.

(Pl.'s Opp. Br. 9-10.)  Thus, the threshold licenses here were not structured to have a scope

limited to particular patents, but to particular technology.  Plaintiff's opposition brief cites as an

example the 2009 Mondis/LG monitor license agreement, admitted into evidence at trial.  Here is

how that license defined its scope:

> "Licensed Patents" means any and all patents, utility patents and utility models
> that, at any time during the Term or before, are owned or controlled by Mondis
> and its Affiliates, and that would be infringed, or that Mondis contends would be
> infringed, by a Computer Monitor's compliance with any Video Electronics
> Standards Association (VESA) DDC standard, whether the DDC/2B (or prior)
> standard or the DDC/CI (or subsequent) standard, a full list of which patents (so
> far as Mondis is aware) is set out in Annex 2 hereto, together with all divisions,
> continuations, continuations-in-part, reissues and reexaminations thereof, and all
> foreign counterparts of any thereof.

(Walsh Dec. Ex. 4/Ex. 2 § 1.12, Plaintiff's Exhibit MON-0010 at MONLG 00036697.)  The

scope of this licensing agreement is all patents that would be infringed by a monitor's use of the

VESA DDC standard.  The provision states that Annex 2 contains a list of the included patents.

Annex 2 identifies by number 17 United States patents, 4 German patents, and 15 Japanese

patents.  (Walsh Dec. Ex. 4/Annex 2, Plaintiff's Exhibit MON-0010 at MONLG 00036710-12.)

Annex 2 includes the '180 patent in the list.  (Id.)

The scope of this exemplary agreement differs substantially from the scope of the

property found to be infringed at trial, claims 14 and 15 of the '180 patent.  The 2009 license

14

covered 35 other patents insofar as those patents would be infringed by use of the VESA DDC standard. The 2009 license does not have apportionment built in, because the scope of the license is far beyond claims 14 and 15 of the '180 patent. As Mondis explained in its brief, the scope of the license is defined by the infringing use of the VESA DDC standard, without regard for whether claims 14 or 15 of the '180 patent are infringed.

As Mondis contends, the other licenses on which Bratic based his analysis had the same structure. None of these licenses can be said to have apportionment built in. None of these licenses reflects the value attributable to the features of the product which infringe claims 14 and 15 of the '180 patent, and no more. Ericsson, 773 F.3d at 1226.

This leads to LG's second challenge, which focuses on the threshold basis. Mondis built its damages case on evidence of previous licenses which were all structured on a threshold basis. Mondis defined threshold licensing as follows: "Threshold licensing involves a single rate for access to the technology of the patent family being licensed, regardless of the number of patents, and regardless of how many of them block." (Pl.'s Opp. Br. 12.) Mondis now claims that, also, these threshold licenses built in apportionment, but this is paradoxical: a license which is designed so that the underlying patents have no incremental value cannot at the same time be evidence of "the incremental value that the patented invention adds to the end product."[3] Ericsson, 773 F.3d at 1226.

By relying on this "threshold" theory of value, Mondis has truly painted itself into a corner. Having built its damages case on licenses which assigned no value to particular patents,

---

[3] This is not to say that threshold licenses cannot be input for the reasonable royalty analysis. Although the Federal Circuit does not require that comparable licenses show "identity of circumstances," VirnetX, Inc. v. Cisco Sys., 767 F.3d 1308, 1330 (Fed. Cir. 2014), the analysis must account for the differences. Elbit, 927 F.3d at 1300. Mondis did not account for the

but only on access to DDC technology, it cannot now claim that such licenses isolate the

incremental value of the '180 patent to the final product. The problem is not that these licenses

are simply too different from the subject matter of the hypothetical negotiation, but that Mondis

did not account for or adjust for the differences so as to satisfy the apportionment requirement.

The Federal Circuit has stated:

> Prior licenses, however, are almost never perfectly analogous to the infringement
> action. For example, allegedly comparable licenses may cover more patents than
> are at issue in the action, include cross-licensing terms, cover foreign intellectual
> property rights, or, as here, be calculated as some percentage of the value of a
> multi-component product. Testimony relying on licenses must account for such
> distinguishing facts when invoking them to value the patented invention.

Ericsson, 773 F.3d at 1227 (citation omitted). Neither Mondis nor its witnesses accounted for

the distinguishing facts when invoking the threshold licenses to value the patented invention.

LG also argues that Mondis' damages case captured the value of the VESA DDC

standard rather than the incremental value of the '180 patent. Mondis, in opposition, denies this,

but, given Plaintiff's definition of "threshold licensing," as just quoted, it is undeniable:

"Threshold licensing involves a single rate for access to the technology of the patent family

being licensed, regardless of the number of patents, and regardless of how many of them block."

(Pl.'s Opp. Br. 12.) The "single rate for access to the technology of the patent family" is a price

for access to the technology that enables use of the DDC standard. The previous licenses

charged a royalty based on access to the DDC standard; Mondis has pointed to no license which

charged a royalty based on use of the '180 patent alone.

Bratic testified that he relied on the opinions of Mondis' technical expert, Mr. Lamm, as

to all technical questions. (Tr. 1070:18-22.) Lamm testified that four patents in the '090 family

---

differences between the threshold licenses and the conditions of the hypothetical negotiation.

were standard-essential patents.[4]  (Tr. 1050:11-20.)  At trial, LG confirmed that Bratic
understood from Lamm's testimony that four patents could block a manufacturer's use of the
Plug and Play standard.  (Tr. 1165:8-18.)  LG then asked Bratic if that testimony changed
Bratic's opinion that LG would have paid the full threshold rate to get a license to only one
patent of those four, and it did not.  (Tr. 1165:19-1166:2.)  As LG contends, with this point,
Bratic moved into an insupportable position, as he maintained that the result of the hypothetical
negotiation was that LG would have paid top dollar for a license that LG, without licenses to the
three other standard-essential patents, could do nothing with commercially.  No reasonable jury
could accept this proposition, that a business would willingly agree to pay the threshold rate but
receive nothing usable in return.  And, indeed, why would any business pay anything for a
license that did not allow that business to make and sell its product?  If there are four patents that
are essential to the DDC2B standard, of what value is a license to only one of the four?

In the instant case, there is good reason to wonder whether the "threshold licensing"
approach conflicts with the principles of CSIRO.  Consider again Plaintiff's description of the
evidence presented at the damages trial:

> The evidence at trial was that licensing is on a threshold basis where the licensee
> pays one price for access to the patented technology, rather than on a patent-by-
> patent basis. The price is to use the technology. The number of patents doesn't
> matter. Threshold licensees seek to avoid further exposure on products licensed
> and paid for. So after the agreed threshold royalty is paid, there would be no
> charge for additional patents, even subsequently acquired ones.

(Pl.'s Opp. Br. 9-10.)  Mondis states that, with a threshold license, the licensee pays one price
for access to the patented technology.  As already discussed, the 2009 Mondis/LG monitor

---

[4] To be fully accurate, Lamm actually testified that four and one-half patents out of the eight in
the '090 patent family were standard-essential patents: the '088, '970, '342 and the '180 patents
are standard-essential, and the '090 patent is "half standard-essential."  (Tr. 1047:21-1050:10.)

license agreement, admitted into evidence at trial, defined the scope of that license as those patents that would be infringed by a monitor's "compliance" with the VESA DDC standard, whether the DDC/2B (or prior) standard or the DDC/CI (or subsequent) standard. (Walsh Dec. Ex. 4/Ex. 2 § 1.12, Plaintiff's Exhibit MON-0010 at MONLG 00036697.) Such a license does not capture the incremental value of the patented technology apart from "value flowing to the patent from the standard's adoption." CSIRO, 809 F.3d at 1305. Mondis' threshold model rests on the predicate that the constituent (licensed) patents have no value apart from their standard-essential status, which enables them to block unlicensed use of a standard. Does the threshold model assign any value to patents apart from their ability to block? If a threshold license is negotiated without concern for the number of licensed patents, and if the royalty rate for existing licenses does not change when a new patent, such as the '180 patent, issues, is it possible for that royalty rate to capture the incremental value of a particular individual patent?

Mondis argues, in opposition, that LG has cited no case in which a court rejected use of a threshold license. That, of course, does not mean that any court has ever addressed the issue or found that a past threshold license already built in apportionment, nor does it solve the substantial problems with Plaintiff's damages case.

LG is correct that Mondis and Bratic confused the value of the '180 patent with the value of the DDC/Plug and Play standard.[5] The Federal Circuit has stated:

> Just as we apportion damages for a patent that covers a small part of a device, we must also apportion damages for SEPs that cover only a small part of a standard. In other words, a royalty award for a SEP must be apportioned to the value of the patented invention (or at least to the approximate value thereof), not the value of the standard as a whole. A jury must be instructed accordingly. Our decision does

---

[5] At trial and in the post-trial briefing, the parties appeared to use the terms "DDC standard" and "Plug and Play standard" interchangeably. (See Tr. 968:2-3: "DDC2B is the core of the Plug-N-Play Technology.")

not suggest that all SEPs make up only a small part of the technology in the standard. Indeed, if a patentee can show that his invention makes up the entire value of the standard, an apportionment instruction probably would not be appropriate.

Turning to the value of a patent's standardization, we conclude that Supreme Court precedent also requires apportionment of the value of the patented technology from the value of its standardization. . . . In other words, the patent holder should only be compensated for the approximate incremental benefit derived from his invention.

This is particularly true for SEPs. When a technology is incorporated into a standard, it is typically chosen from among different options. Once incorporated and widely adopted, that technology is not always used because it is the best or the only option; it is used because its use is necessary to comply with the standard. In other words, widespread adoption of standard essential technology is not entirely indicative of the added usefulness of an innovation over the prior art. This is not meant to imply that SEPs never claim valuable technological contributions. We merely hold that the royalty for SEPs should reflect the approximate value of that technological contribution, not the value of its widespread adoption due to standardization.

Because SEP holders should only be compensated for the added benefit of their inventions, the jury must be told to differentiate the added benefit from any value the innovation gains because it has become standard essential. Although the jury, as the fact finder, should determine the appropriate value for that added benefit and may do so with some level of imprecision, we conclude that they must be told to consider the difference between the added value of the technological invention and the added value of that invention's standardization.

Ericsson, 773 F.3d at 1232-33 (citations omitted).  This states clearly that, when dealing with a standard-essential patent, the value added by the patented technology must be differentiated from the value added by the standardization of that technology.  At trial, Mondis presented extensive evidence – the licensing history – about the value of the DDC standard and the royalties that various manufacturers agreed to pay in order to manufacture monitors and televisions which incorporated the standard.  No attention was paid to "the difference between the added value of the technological invention and the added value of that invention's standardization."  Id. at 1233.

19

Mondis did not address the question of what value was added by the invention's standardization. This is error under the Federal Circuit's decision in <u>CSIRO</u>: the Federal Circuit found that the district court, which had increased the royalty rate because of the patent's status as standard-essential, had erred. 809 F.3d at 1305. And the Federal Circuit did not stop there: it proceeded to question whether the starting rates (the royalty rate bounds of $.090 and $1.90)[6] for the analysis had been misvalued because of considerations of standardization, and instructed the district court, on remand, to "consider whether the initial rates taken from the parties' discussions should be adjusted for standardization." <u>Id.</u> at 1305-06.

Mondis, in opposition, contends that Mr. Bratic accounted for differences between the comparable licenses and the hypothetical negotiation, and points to the adjustment of a 1% rate to .25%. Mondis does not explain this in the opposition brief, but it appears to refer to Bratic's efforts to separate the royalty rate for the '090 family of patents from the royalty rate for patents from the '812 family. Bratic did thus make some effort to adjust for the difference in scope between the comparable licenses and the hypothetical negotiation: he attempted to carve out the value contributed by the '090 patent family. The problem, of course, is that the entire '090 patent family is not at issue in this case; only one patent from that family, the '180 patent, is at issue. A damages model that begins with previous threshold licenses, and attempts to adjust the royalty based on patent family membership, has taken a step in the right direction, but still has not apportioned to the incremental value added by the '180 patent.

In its opposition, Mondis contends that "Mr. Bratic's opinion about the value of the '180 patent was based on the patent's own technical value." (Pl.'s Opp. Br. 22.) While it is true that

---

[6] Note that these are the same rates that the Federal Circuit determined reflected "already built in apportionment." <u>Id.</u> at 1303.

Bratic did state opinions about the value of the '180 patent, that does not undo the fact that the "threshold license" theory treated the value of each individual patent as equal to the value of the standard, contrary to Ericsson.

LG also argues that Mondis has violated the evidentiary corollary to the Federal Circuit's governing rule:

> Our cases have added to that governing legal rule an important evidentiary principle. The point of the evidentiary principle is to help our jury system reliably implement the substantive statutory requirement of apportionment of royalty damages to the invention's value. The principle, applicable specifically to the choice of a royalty base, is that, where a multi-component product is at issue and the patented feature is not the item which imbues the combination of the other features with value, care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product. It is not that an appropriately apportioned royalty award could never be fashioned by starting with the entire market value of a multi-component product—by, for instance, dramatically reducing the royalty rate to be applied in those cases—it is that reliance on the entire market value might mislead the jury, who may be less equipped to understand the extent to which the royalty rate would need to do the work in such instances.

Ericsson, 773 F.3d at 1226-27. LG argues that Mondis misled the jury during the damages phase by placing undue emphasis on the value of the entire product. The jury's decision here is opaque: we know the verdict, but not the underlying reasoning, and cannot know what rationale led them to their decision. Nonetheless, the Court agrees with LG that Mondis repeatedly emphasized the entire market value of LG's accused televisions, $10 billion, and that this may have skewed the damages horizon for the jury. As the Federal Circuit has held:

> We have articulated that, where multi-component products are accused of infringement, the royalty base should not be larger than the smallest salable unit embodying the patented invention. We have cautioned against reliance on use of the entire market value of a multi-component product that includes a patented component because it cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.

21

Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 894 F.3d 1258, 1270 (Fed. Cir. 2018).  It seems quite possible that Mondis may have placed undue emphasis on the value of the entire product and did not particularly take care to avoid skewing the damages horizon for the jury.  Mondis did not offer the jury a method to estimate the incremental value of the '180 patent from the much broader prior licenses.

The Court finds it possible, even probable, that Mondis' overall approach did skew the damages horizon for the jury, even if it did not mislead the jury.  As already noted, Mondis failed to adjust for the differences between the threshold approach to valuation in the previous licenses from the apportioning approach to patent damages required by the Federal Circuit.  Moreover, Mondis did not attempt to disentangle the incremental value added by the '180 patent to the finished product from the value of the DDC standard captured in the prior licenses.

`      Third, LG argues that Mondis' use of a damages multiplier – which Mondis called the "uncertainty discount" – is legally improper and not supported by substantial evidence.  LG contends that the use of the damages multiplier conflicts with Federal Circuit law, citing ResQNet.com, Inc. v. Lansa, Inc, 594 F.3d 860, 869 (Fed. Cir. 2010) (citation omitted), which held:

> At all times, the damages inquiry must concentrate on compensation for the economic harm caused by infringement of the claimed invention. . . .
>
> Thus, the trial court must carefully tie proof of damages to the claimed invention's footprint in the market place.

LG argues that the use of the damages multiplier allows compensation based not on economic harm caused by infringement of the claimed invention, as well as compensation not carefully tied to the claimed invention's footprint in the marketplace.  LG argues, furthermore, that the damages multiplier is a penalty provision intended to discourage licensees from challenging the

22

validity of any licensed patents.

In opposition, Mondis argues that the tripling of the royalty rate to remove the effect of the uncertainty discount was both supported by substantial evidence and legally proper.[7]  First, Mondis contends that LG's expert Hansen agreed that this was appropriate, which is correct, although Hansen did not testify that he believed that tripling the royalty rate was appropriate in this case.  Hansen testified:

> A.    Uncertainty generally results in a little bit lower royalty rate, so, a patent that's determined to be valid and infringed, there's upward pressure on the rate to pay for such a license.
>
> Q.    Right. And that upward pressure, you criticized Mr. Bratic for saying that the rate would have been three times the DDC norm rate of .25 percent. You thought that was too much upward pressure. Right?
>
> A.    Yes. Nobody's ever paid that.

(Tr. 1230:6-14.)  Furthermore, Hansen also testified:

> Q. So, an upward evaluation is something that's appropriate and it's up to the jury to decide how much that should be in this case based on the facts that they've heard. Correct?
>
> A. Yes. It's the jury's decision.

(Tr. 1232:13-17.)  LG's expert thus conceded that an increase in damages due to the uncertainty discount is a proper matter for the jury to consider.

Moreover, Mondis argues correctly that Hansen's concession is in accord with Federal

---

[7] In short, the theory here is that a patent that is known to be valid and infringed has a greater market value than one for which there is uncertainty about validity and infringement.  As Bratic pointed out, the hypothetical negotiation presumes validity and infringement: "now, under the hypothetical negotiation, we have the ironclad presumption of validity and infringement."  (Tr. 1085:4-6.)  This is correct under Federal Circuit law.  See Lucent, 580 F.3d at 1325 ("The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed.")  Thus, Mondis argues, it is appropriate for the jury to increase the award of compensatory damages to reflect the absence of uncertainty about validity and infringement.

Circuit law. The Federal Circuit has recognized the appropriateness of considering an

uncertainty discount in the damages inquiry. This is shown most clearly in Spectralytics, Inc. v.

Cordis Corp., 649 F.3d 1336, 1347 (Fed. Cir. 2011), in which the Federal Circuit reviewed a

jury verdict awarding a reasonable royalty for compensatory patent infringement damages. In

deciding a post-trial motion, the district court had found that the jury's verdict, which reflected

a "very deep" uncertainty discount, was not unreasonable:

> In this case, the significance of the price paid by Preco to acquire Spectralytics in
> 2003 depends on what that price suggests about the outcome of the hypothetical
> license negotiation in 1998. The jury could reasonably have concluded that the
> former had little to do with the latter. At the time of the 2003 sale, Spectralytics
> knew that the value of the '277 patent ranged from nothing to possibly tens of
> millions of dollars, depending on (among other things) whether Noble and Cordis
> were infringing and whether, if sued for infringement, Noble and Cordis could
> successfully challenge the patent's validity. Spectralytics suspected that Noble
> and Cordis might be infringing the '277 patent and hoped that the patent would
> survive any challenge to its validity, but Spectralytics did not really know for
> certain, and it could not really know for certain without paying millions of dollars
> in legal fees to launch lengthy and risky litigation. Thus, the value assigned to the
> '277 patent in 2003 would have reflected a very deep discount.

Spectralytics, Inc. v. Cordis Corp., 650 F. Supp. 2d 900, 915-16 (D. Minn. 2009). The Federal

Circuit reviewed and affirmed, specifically stating that it agreed with the district court that it

was appropriate for the jury to weigh this "very deep discount" in computing damages. 649

F.3d at 1347. In short, the Federal Circuit agreed that it was reasonable for the jury to apply a

pre-litigation uncertainty discount which deeply reduced the patent's value. LG has not pointed

to any material difference between the uncertainty discount weighed by the jury in

Spectralytics and the uncertainty discount in the instant case.

Similarly, recognition of the uncertainty discount is implicit in this statement in Prism

Techs. LLC v. Sprint Spectrum L.P., 849 F.3d 1360, 1369 (Fed. Cir. 2017): "the earlier suit's

settlement figure may be too low to the extent that it was lowered by the patent owner's

24

discounting of value by a probability of losing on validity or infringement." Discounting the value of a patent to adjust for uncertainty about validity or infringement appears to be uncontroversial in Federal Circuit jurisprudence.

Because LG's expert conceded that it was reasonable for the jury to consider application of the uncertainty discount in determining a reasonable royalty, and because the Federal Circuit recognizes such an adjustment to patent value to be proper, the only remaining question is whether the evidence supports the extent to which the jury adjusted damages. The parties agree that all we have from the jury is the $45 million verdict, with no explanation of the underlying computation. The parties agree that a jury which applied a .25% royalty rate to the $10 billion in revenue would award $25 million. The parties also are in agreement in speculating that the $45 million verdict likely includes a $20 million upward adjustment. (See LG's Br. 26 n.9; Pl.'s Opp. Br. 16.) If this speculation is correct, the jury applied the .25% royalty rate to the $10 billion in revenue, and then adjusted the $25 million upward by 80% ($20 million). The question is, then, whether the evidence supports an 80% upward adjustment.

This Court concludes that it does, for two reasons. First, on cross-examination, LG's expert Hansen admitted that he had testified in a prior case that he had adjusted for the uncertainty discount by tripling the royalty rate:

> Q. Do you recall, sir, testifying in a case in the United States District Court for the Western District of Pennsylvania called University of Pittsburgh of the Commonwealth System of Higher Education vs. Varian?
>
> A. I do.
>
> Q. Did you testify in that case under oath?
>
> A. Yes, I did.

25

MR. BLACK: And could we pull up Page 97 of the transcript of that case, and I'd like you to highlight lines 4 to 13 please.

Q. Did someone, not me, ask you the question:

"And did you, using that provision, did you attempt to demonstrate what the impact of an assumption of validity and infringement would have with respect to the royalty rates at issue in the Stanford license?"

Did you give this answer?

"Yes. For the royalty rates in this particular license, I simply took the effective royalty rates that I calculated, multiplied them by three to reflect validity and infringement. So this would be illustrative of the range of rates after accounting for validity and infringement which would range in the percentages on the far right-hand column."

Do you recall that?

A. Yes.

(Tr. 1230:23-1231:22.)  The jury was entitled to conclude from this evidence that tripling the

royalty to adjust for the uncertainty discount could be reasonable and valid.

Second, Mondis points to the evidence about the Innolux jury verdict.  The jury in this

case heard testimony from both Bratic and Spiro about the 2011 Innolux jury verdict.  Spiro

testified:

Q. All right. So, there are three defendants when the trial started and we're down to one defendant. Who's that defendant?

A. We were left just with Innolux.

Q. And on June 27, 2011, what happened?

A. We got a verdict.

Q. And what was the rate that the jury determined for televisions in that case?

A.That was three-quarters of a percent.

26

Appx322

Q. And which patents did the verdict for televisions cover?

A. They covered the 2B patents. That was the three that I mentioned before, all the 2B patents.

Q. Which just -- do you know the patent numbers that were actually –

A. Yes. Again, based on the last three numbers, it's the '180, the '342 and the '090.

Q. Okay. Did Innolux appeal the award, the jury verdict?

A. Yes, they did. But they eventually settled it.

Q. Did the settlement involve any reduction of the jury's award?

A. No, none at all. They paid the full rate, whatever was determined.

Q. So, under the agreement with Innolux, what royalty rate did Innolux pay Mondis for the DDC patents for its televisions?

A.       It was three-quarters of a percent, 0.75 percent.

(Tr. 989:17-990:19.)

On cross-examination, Mr. Bratic testified:

Q.       All right, sir. Let's move on to another topic you covered in your direct testimony, namely that the Innolux verdict confirmed -- further confirmed your tripling opinion, right?

A.       No, I don't believe I said that.

Q.       Well, you did discuss the Innolux decision as confirmatory of your .75 percent rate, right?

A.       Of the .75 percent rate, but there was no trebling.

Q.       Okay.

A.       That was a verdict that reflected validity and infringement because the jury reached a conclusion of a royalty of .75 percent for TVs.

Q.       I see. So you're saying you're not exactly sure how they got there, but they wound up at the same place you did through tripling. Is that right?

27

A.      No, the point -- no, not quite.

Q.      Okay. Well, at the end of the day, the jury there found a rate of .75 percent applicable for televisions, right?

A.      Correct.

Q.      And that's the same -- same number in that red box in your summary chart, right?

A.      It's consistent with that number.

(Tr. 1146:11 - 1147:8.)  Although Bratic denied that the Innolux jury's .75% royalty rate included a tripling uncertainty adjustment, he admitted that the jury verdict "reflected validity and infringement."

The jury in this case thus heard that the Innolux jury awarded damages using a royalty rate of .75%, and that Innolux eventually settled the case by agreeing to pay that rate.  The jury also heard that Mondis believed that the .25% royalty rate should be tripled to adjust for the uncertainty discount.  The jury had substantial evidence to support a determination that an 80% increase in royalties to adjust for the uncertainty discount was proper and supported by the evidence, since Innolux agreed to a settlement paying triple the .25% rate.

Furthermore, Mondis aptly cites Prism, 849 F.3d at 1369: "a settlement reached after a determination of liability (though subject to appeal) is particularly reliable as evidence of value."  This is entirely on point, since the Innolux settlement was reached after a determination of validity and infringement.  Thus, under Prism, it is particularly reliable as evidence of value.  In this case, the parties agree that the jury seems to have chosen a royalty rate that reflects an 80% upward adjustment for the uncertainty discount, which is somewhere in between the .25% rate that LG thought was reasonable, and the .75% rate Mondis thought

28

was reasonable.  The evidence supports the jury's decision.

In conclusion, while this Court has determined that Plaintiff's damages case is insufficient, as a matter of law, to support the jury's damages verdict, the problem lies in the failure to apportion, not in the use of the uncertainty discount.  In a new trial, Plaintiff may again present the jury with its uncertainty discount theory.

The present case is similar to Wordtech Sys. v. Integrated Networks Sols., Inc., 609 F.3d 1308, 1322 (Fed. Cir. 2010), in which the Federal Circuit, applying the law of the Ninth Circuit, reversed the denial of a Rule 59(a) motion and remanded for a new trial on damages. In short, in Wordtech, the Federal Circuit determined that the plaintiff's comparable license evidence did not support the verdict.  Id.  In the instant case, this Court finds that Mondis failed to present a damages case which satisfies the apportionment requirement fundamental to the law of patent infringement damages:

> When the accused technology does not make up the whole of the accused product, apportionment is required.  The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more.

Finjan, Inc. v. Blue Coat Sys., 879 F.3d 1299, 1309 (Fed. Cir. 2018); Garretson v. Clark, 111 U.S. 120, 121 (1884) ("The patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative.")  In making its case for damages, Mondis failed to remove the value of non-infringing features from its damages estimates.  This Court finds that, as a matter of law, Plaintiff's damages case did not satisfy the apportionment requirement.  As in Finjan, "[f]urther apportionment was required to reflect the value of the patented technology compared

to the value of the unpatented elements." 879 F.3d at 1311.

As already stated, under Third Circuit law, "[a] new trial should be granted only where the great weight of the evidence cuts against the verdict and where a miscarriage of justice would result if the verdict were to stand." Springer, 435 F.3d at 274. This standard has been met here. Plaintiff's damages case, as a matter of law, is insufficient to support the damages verdict, due to the failure to apportion. Because Mondis failed to comply with the apportionment requirement, the jury did not hear evidence sufficient to support the verdict. This Court determines that a miscarriage of justice would occur if the verdict were allowed to stand. The Third Circuit's requirements for granting a motion for a new trial, pursuant to Rule 59, have been met.

The Court concludes that Plaintiff's damages case is insufficient, as a matter of law, to support the jury's damages verdict. The damages verdict will be vacated. The only remaining question is one that has not been briefed: has Plaintiff now waived its right to a damages award? In Promega Corp. v. Life Techs. Corp., 875 F.3d 651, 666 (Fed. Cir. 2017), the Federal Circuit held:

> But, as explained above, a patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory. When a plaintiff deliberately takes a risk by relying at trial exclusively on a damages theory that ultimately proves unsuccessful, and, when challenged, does not dispute that it failed to present an alternative case for damages, a district court does not abuse its discretion by declining to give that plaintiff multiple chances to correct deficiencies in its arguments or the record.

The parties must now have an opportunity to brief this issue, so that this Court may decide whether, having vacated the damages verdict, to grant the motion for a new damages trial. The parties shall confer and present to the Court a briefing schedule for this next phase of hearing the motion for a new trial.

B.  *The willfulness verdict*

LG moves for judgment as a matter of law or, in the alternative, a new trial, on the

ground that no reasonable jury could have found that LG's infringement was willful.  "We

review the denial of a motion for JMOL . . . under the law of the pertinent regional circuit."

Power Integrations, 843 F.3d at 1326.  "A motion for judgment as a matter of law under

Federal Rule of Civil Procedure 50(a) should be granted only if, viewing the evidence in the

light most favorable to the nonmovant and giving it the advantage of every fair and reasonable

inference, there is insufficient evidence from which a jury reasonably could find liability."

Avaya Inc., RP v. Telecom Labs, Inc., 838 F.3d 354, 373 (3d Cir. 2016).

In Halo Elecs., Inc. v. Pulse Elecs., Inc., 136 S. Ct. 1923, 1933 (2016), the Supreme

Court revised the willfulness standard, eliminating the objective prong from the standard, but

leaving the subjective prong intact: "The subjective willfulness of a patent infringer, intentional

or knowing, may warrant enhanced damages, without regard to whether his infringement was

objectively reckless."  Under this revised standard, Mondis bore the burden of proof at trial, by

a preponderance of the evidence, that LG's infringement was subjectively intentional or

knowing.

In brief, this Court cannot conclude that there was insufficient evidence to support the

jury's finding of willfulness.  Ample evidence shows that the parties had been litigating and

negotiating licenses regarding the DDC patents   It is undisputed that Mondis first sued LG,

along with other defendants, for infringement of the '090 and other patents in 2007, and that

LG resolved that litigation by entering into a settlement agreement with Mondis in September

of 2009  It is also undisputed that this original case against LG went to trial after LG settled,

and that, on June 27, 2011, the jury returned a verdict that found that the televisions of

31

defendant Innolux infringed claim 14 of the '180 patent, which is at issue in the present case. The jury in the present case heard extensive testimony about the history of the dispute from Mr. Spiro, among others.  (See, e.g., Tr. 98:9-128:9.)  It is also undisputed that, in the instant case, the period of alleged infringement extended from the date of issuance of the '180 patent in 2009 until the '180 patent expired in February of 2014.  There is ample evidence from which a jury could reasonably conclude that LG's infringement of the '180 patent through the manufacture and sale of televisions was, for at least some of the period of alleged infringement, done with knowledge that LG was infringing asserted claims of the '180 patent.  Substantial evidence supports the jury's determination of willful infringement.  The motion for judgment as a matter of law or, in the alternative, a new trial, on the matter of the jury's finding of willfulness, will be denied.

The decision to vacate the jury's damages verdict impacts several pending motions. Because the issue of the amount of damages is now unresolved, the motion for enhanced damages, pursuant to 35 U.S.C. § 284, is premature: there is no damages award to enhance. Because this case has not reached final judgment, the motion for a declaration of an exceptional case, pursuant to 35 U.S.C. § 285, is also premature.  For the same reason, the motion for prejudgment and post-judgment interest is premature.  These premature motions will be denied.

For these reasons,

**IT IS** on this 24th day of September, 2019

**ORDERED** that LG's motion for judgment as a matter of law under Rule 50(b) and/or a new trial under Rule 59 regarding invalidity (Docket Entry No. 486) is **DENIED**; and it is further

**ORDERED** that LG's motion for judgment as a matter of law under Rule 50(b) and/or

a new trial under Rule 59 regarding noninfringement (Docket Entry No. 487) is **DENIED**; and it is further

  **ORDERED** that LG's motion for judgment as a matter of law under Rule 50(b), a new trial under Rule 59, and/or remittitur regarding damages and willfulness (Docket Entry No. 489) is **GRANTED** in part, **DENIED** in part, and decision is **RESERVED** in part pending further briefing; and it is further

  **ORDERED** that the jury verdict returned on April 12, 2019, finding that LG's infringement was willful and awarding $45 million in compensatory damages, is **VACATED** in part, and the jury's verdict awarding $45 million in compensatory damages is hereby **VACATED**, but the jury verdict of willful infringement is unchanged; and it is further

  **ORDERED** that the parties shall confer and present to the Court a schedule for briefing the issue of the application of <u>Promega</u> to the motion for a new trial on damages; and it is further

  **ORDERED** that Mondis' motion for enhanced damages (Docket Entry No. 493), pursuant to 35 U.S.C. § 284, is **DENIED** without prejudice as premature; and it is further

  **ORDERED** that Mondis' motion for attorney fees (Docket Entry No. 491), pursuant to 35 U.S.C. § 285, is **DENIED** without prejudice as premature; and it is further

  **ORDERED** that Mondis' motion for pre-judgment and post-judgment interest (Docket Entry No. 495) is **DENIED** without prejudice as premature.

       <u> s/ Stanley R. Chesler </u>
       Stanley R. Chesler, U.S.D.J.

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
:
MONDIS TECHNOLOGY LTD,                      :
                                            :
        Plaintiff,                          :        Civil Action No. 15-4431 (SRC)
                                            :
              v.                            :
                                            :        **OPINION & ORDER**
LG ELECTRONICS, INC.                        :
et al.,                                     :
                                            :
        Defendants.                         :
_____:

**CHESLER**, U.S.D.J.

     This matter comes before the Court on the motion by Defendants LG Electronics, Inc.

and LG Electronics U.S.A., Inc. (collectively, "LG") for judgment as a matter of law under

Rule 50(b), a new trial under Rule 59, and/or remittitur regarding damages and willfulness.

This Court had previously considered this motion and, in the Opinion of September 24, 2019,

granted the motion in part, denied it in part, and reserved decision in part, pending further

briefing.  The Court ordered supplementary briefing on the question of the application of the

Promega case.  After the supplementary briefing was completed, the Court held further oral

argument on April 8, 2020.  For the reasons that follow, the Court grants the motion for a new

trial, and denies both the motion for judgment as a matter of law and the motion for remittitur.

     In the Order of September 24, 2019,  this Court held that the jury verdict returned on

April 12, 2019, finding that LG's infringement was willful and awarding $45 million in

compensatory damages, was vacated in part: the Court vacated the jury's verdict awarding $45

million in compensatory damages, but did not alter the jury verdict of willful infringement.

The parties then submitted supplemental briefing on the question of whether Plaintiff had

waived its right to a damages award, pursuant to Promega Corp. v. Life Techs. Corp., 875 F.3d

651, 666 (Fed. Cir. 2017), and argued this question at the telephonic hearing.

      The Court concludes that Plaintiff has not waived its right to a damages award, and that

Promega is distinguishable.  In Promega, the Federal Circuit held:

> But, as explained above, a patent owner may waive its right to a damages award
> when it deliberately abandons valid theories of recovery in a singular pursuit of an
> ultimately invalid damages theory. When a plaintiff deliberately takes a risk by
> relying at trial exclusively on a damages theory that ultimately proves
> unsuccessful, and, when challenged, does not dispute that it failed to present an
> alternative case for damages, a district court does not abuse its discretion by
> declining to give that plaintiff multiple chances to correct deficiencies in its
> arguments or the record.

875 F.3d at 666.  This Court has ruled that the principal damages theory Mondis pursued at trial,

the threshold theory, is not valid under Federal Circuit law, for failure to satisfy the

apportionment requirement.  The Court had queried whether Mondis, in its pursuit of this invalid

damages theory, had abandoned all valid theories, and whether the Promega decision controlled

the outcome of this case.  The Court concludes that Promega does not determine the proper

remedy for the defects in Mondis' damages case at trial.

      At the hearing, Mondis argued persuasively that, under both Federal Circuit and Third

Circuit law, this Court cannot properly grant LG's motion for judgment as a matter of law.  This

is correct.  Under Third Circuit law:

> Entry of judgment as a matter of law is a sparingly invoked remedy, granted only
> if, viewing the evidence in the light most favorable to the nonmovant and giving it
> the advantage of every fair and reasonable inference, there is insufficient evidence
> from which a jury reasonably could find liability.

Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007) (citations omitted).  At trial, LG's

2

expert, Mr. Hansen, based on a theory that apportioned, testified that his expert opinion was that Mondis was entitled to damages in the amount of $1.9 million. Hansen's opinion constitutes sufficient evidence from which a jury might reasonably award damages.

The parties do not dispute that the Federal Circuit reviews JMOL motions under the law of the regional Circuit. SRI Int'l, Inc. v. Cisco Sys., 918 F.3d 1368, 1380 (Fed. Cir. 2019). In SRI, the district court was in the Third Circuit, and the Federal Circuit applied the Marra standard, quoted above. Id. Viewing the evidence in the light most favorable to the nonmovant, Mondis, the Court cannot conclude that there was insufficient evidence from which the jury could reasonably award some amount of damages.[1] This Court may not, therefore, grant LG's Rule 50(b) motion. As Mondis argued, that option is not available. This Court need not strain to apply Promega, because it may not be construed to contradict the Third Circuit law which is controlling on this issue.[2] Promega cannot justify a grant of JMOL under these facts. LG's motion for judgment of no damages, as a matter of law, must be denied.

---

[1] Moreover, LG contends, incorrectly, that this Court, in its Opinion vacating the jury's damages award, "rejected Plaintiffs' reliance on their license agreements." (LG Supp. Br. 17.) This Court found Plaintiff's threshold theory to violate the Federal Circuit's apportionment requirement; it did not reject the use of prior licenses as evidence relevant to the Georgia-Pacific analysis.

[2] The Court observes, however, that Mondis effectively distinguished Promega on the facts: the Federal Circuit found that the patentee had expressly disavowed any claim to reasonable royalty damages, relying exclusively on a lost profits damages theory at both trial and during litigation of the subsequent JMOL motion. 875 F.3d at 661. After an adverse Supreme Court decision invalidated the lost damages approach, the Federal Circuit held that, in essence, the patentee, having waived any reasonable royalty, had run out of options for patent damages. Id. at 666. As the Federal Circuit stated, it was "an unusual case," and it is not analogous. Id. LG has not persuaded this Court that Mondis has run out of options for a patent damages case. Certainly, having put on a case seeking reasonable royalties, Mondis cannot be said to have disavowed a claim to reasonable royalty damages, as Promega had. Mondis may have offered expert testimony for an invalid theory, but that is quite different from waiving an entire category of damage theories, as Promega did.

3

In the alternative, LG moves for a new trial, or remittitur to reduce the amount of damages to $1,904,998 million.  Federal Rule of Civil Procedure 59(a) states:

> The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . .

"The authority to grant a new trial resides in the exercise of sound discretion by the trial court." Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1017 (3d Cir. 1995).  This Court finds that, having already vacated the jury's damages verdict, it is in the interest of justice to grant the motion for a new trial on the amount of damages.  Although, at trial, Mondis relied principally on a theory of damages that did not meet the requirements of Federal Circuit law, the record contains substantial evidence from which a reasonable jury could make a damages determination that would be legally valid.  The best and most just remedy here is a new trial.  Indeed, LG sought a new damages trial as one outcome in its initial motion to vacate the damages verdict.[3]  Although, in its initial response to LG's moving brief, Mondis sought to defend the jury award, once this Court issued its decision to vacate the damages verdict, and Ordered supplementary briefing, Mondis requested a new damages trial.

Mondis now argues that one important reason why there should be a new trial is that 35 U.S.C. § 284 requires the Court to award damages not less than a reasonable royalty.   There is merit to what Mondis contends, even if it may not be as absolute as Mondis would like.  The

---

[3] In the supplemental briefing, LG shifted course and argued that the Court should not allow Mondis to proceed with a new trial premised on an undisclosed theory of damages.  LG here conflates two distinct issues.  The Court today grants LG's motion for a new trial, but does not have before it any application from Mondis to present a new damages theory at that trial.  While this may well be the subject of future litigation in this case, the Court will cross that bridge if and when it comes to it.  Furthermore, LG appears to have forgotten that this Court has before it a motion for a new trial filed by LG, not Mondis.

4

statute says:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 284.  Mondis points out, correctly, that the wording of this provision is mandatory, not discretionary: "the court *shall* award."   As the discussion that follows will show, the Federal Circuit has limited this mandate to a damages award that is reasonably supported by the evidence at trial.

In support of this argument, Mondis points to the Federal Circuit's decision in <u>Dow Chemical</u>, in which it held:

> The statute is unequivocal that the district court must award damages in an amount no less than a reasonable royalty.  Further, section 284 is clear that expert testimony is not necessary to the award of damages, but rather "*may* [be] received . . . as an aid." 35 U.S.C. § 284 (2000) (emphasis added).

> The district court's conclusion that no damages could be awarded, in light of the presumption of damages when infringement is proven, was in error. But, the district court's obligation to award some amount of damages does not mean that a patentee who puts on little or no satisfactory evidence of a reasonable royalty can successfully appeal on the ground that the amount awarded by the court is not 'reasonable' and therefore contravenes section 284.  Should Dow prove infringement of claims 23 and 24 the district court should consider the so-called *Georgia-Pacific* factors in detail, and award such reasonable royalties as the record evidence will support.

<u>Dow Chem. Co. v. Mee Indus.</u>, 341 F.3d 1370, 1381-82 (Fed. Cir. 2003) (citations omitted.)

This indeed supports Mondis' position.  In <u>Dow</u>, the Federal Circuit made clear three key points.  First, after a patentee has proven infringement, § 284 gives rise to a presumption of entitlement to an award of damages.  Second, the absence of admissible expert testimony in support of a damages theory does not alter this presumption.  Third, under such circumstances, the trial court

5

must apply the <u>Georgia-Pacific</u> analysis and award such reasonable royalties as the record evidence will support.

This is not a case in which the exclusion of Bratic's testimony, advancing a legally invalid damages theory, leaves Mondis with no evidence of damages. To the contrary, at trial, Mondis presented a great deal of relevant evidence, particularly the past licensing agreements and the Innolux verdict. The record evidence without Bratic's testimony was sufficient to allow a reasonable jury to award reasonable royalties. Moreover, LG's expert, Mr. Hansen, testified that Mondis was entitled to an award of $1.9 million in damages. As Mondis argues, this in itself provides a basis in evidence to calculate a reasonable royalty.

Mondis argues, persuasively, that, under Federal Circuit law, defects in a patentee's damages case do not mandate an award of zero damages, and that the proper remedy for material and prejudicial defects at trial that require a verdict to be vacated is a new trial without those defects.[4] Mondis also cites the Federal Circuit's decision in <u>Apple</u>, where it held:

> The district court agreed and concluded that Apple was not entitled to any measure of damages because Apple had failed to show that its measure of damages was correct. We disagree and hold that a finding that a royalty estimate may suffer from factual flaws does not, by itself, support the legal conclusion that zero is a reasonable royalty.
>
> Due to the procedural posture in this case, we must assume that the patents at issue are valid and infringed. With infringement assumed, the statute requires the court to award damages "in no event less than a reasonable royalty." 35 U.S.C. § 284. Because no less than a reasonable royalty is required, the fact finder must determine what royalty is supported by the record.

---

[4] LG cites the pre-Federal Circuit decision by the Third Circuit in <u>Devex</u>, but the <u>Devex</u> Court took the same position: "In the absence of any evidence as to what would constitute a reasonable royalty in a given case, a fact finder would have no means of arriving at a reasonable royalty, and none could be awarded." <u>Devex Corp. v. GMC</u>, 667 F.2d 347, 361 (3d Cir. 1981). The <u>Devex</u> Court held that an award of zero damages is appropriate when there is <u>no</u> evidence to support damages, not when a patentee's case has legal defects. <u>Id.</u>

6

> If a patentee's evidence fails to support its specific royalty estimate, the fact finder is still required to determine what royalty is supported by the record. Indeed, if the record evidence does not fully support either party's royalty estimate, the fact finder must still determine what constitutes a reasonable royalty from the record evidence. Certainly, if the patentee's proof is weak, the court is free to award a low, perhaps nominal, royalty, as long as that royalty is supported by the record.
>
> Thus, a fact finder may award no damages only when the record supports a zero royalty award. For example, in a case completely lacking any evidence on which to base a damages award, the record may well support a zero royalty award.

Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1327-28 (Fed. Cir. 2014) (citations omitted).

Mondis argues, persuasively, that this confirms that the trial court has an obligation to award damages in whatever amount is supported by the evidence of record. Furthermore, an award of zero damages is appropriate only when the record supports it. The evidentiary record at trial does not support an award of zero damages. Apple also supports Mondis' position that the proper remedy here is a new trial. See also Info-Hold, Inc. v. Muzak LLC, 783 F.3d 1365, 1372 (Fed. Cir. 2015) ("a patentee's failure to show that its royalty estimate is correct is insufficient grounds for awarding a royalty of zero.")

Another apposite Federal Circuit case is Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 904 F.3d 965, 980 (Fed. Cir. 2018). In Power, in short, the Federal Circuit found that the patentee's damages evidence at trial was insufficient as a matter of law to support the jury's damages award – just as this Court has found in the instant case. Id. The Federal Circuit held that the proper remedy was a new trial: "Because the evidence presented by Power Integrations was insufficient as a matter of law to invoke the entire market value rule, we vacate the award of damages and remand for a new trial." Id. This Court having determined that the patentee's damages evidence at trial was insufficient as a matter of law to support the jury's

7

damages award, and having vacated the award of damages, the proper remedy is a new trial.

There is one subsequent Federal Circuit decision that cites <u>Promega</u> on these issues.  In

<u>Finjan</u>, the Federal Circuit held:

> While it is clear that Finjan failed to present a damages case that can support the jury's verdict, reversal of JMOL could result in a situation in which Finjan receives no compensation for Blue Coat's infringement of the '844 patent. Ordinarily, the district court must award damages in an amount no less than a reasonable royalty when infringement is found, unless the patent holder has waived the right to damages based on alternate theories, *Promega Corp. v. Life Tech. Corp*., 875 F.3d 651, 660 (Fed. Cir. 2017).  We therefore remand to the district court to determine whether Finjan has waived the right to establish reasonable royalty damages under a new theory and whether to order a new trial on damages.

<u>Finjan, Inc. v. Blue Coat Sys.</u>, 879 F.3d 1299, 1312 (Fed. Cir. 2018) (citations omitted).  This

supports Mondis' argument that defects in a patentee's damages case should not foreclose an

award of damages, unless the patentee has waived the right to establish damages under a new

theory.  It also supports the position that proof of infringement gives rise to a presumption of

entitlement to an award of damages.  A new trial is the appropriate remedy in this case.

LG's motion sought, in the alternative, remittitur of the damages award.  The Court

concludes that a new trial is the better remedy.  Were the Court to decide to grant the motion for

remittitur, it would be required to apply the maximum recovery rule.  <u>Shockley v. Arcan</u>, 248

F.3d 1349, 1362 (Fed. Cir. 2001).  This would require a course of briefing, reweighing the

evidence at trial, making factual determinations, and calculation of the maximum damages award

supported by the evidence.  Plaintiff would then have the right to decline the award and obtain a

new trial.  <u>Id.</u>  Mondis has made clear that, at this juncture, it seeks a new trial.  There is no

advantage to anyone to litigate the damages award in post-trial proceedings, only to have Mondis

then assert its right to decline the award and obtain a new trial.  It is a far more efficient use of

<div align="center">8</div>

everyone's resources to proceed directly to a new trial.

   This Court grants LG's motion for a new trial, subject to the following limitations.  At the new trial, the parties may not offer evidence that was not presented at the previous trial, with one potential exception: should Mondis seek to offer the expert testimony of Mr. Bratic, based solely on the evidence presented at the previous trial, Mondis may submit an updated expert report, which this Court will consider in a <u>Daubert</u> hearing.  All expert testimony must reflect the Federal Circuit law on apportionment, as discussed in the Court's Opinion in which it vacated the jury damages verdict.

   For these reasons,

   **IT IS** on this 22nd day of April, 2020

   **ORDERED** that LG's motion for judgment as a matter of law under Rule 50(b), a new trial under Rule 59, and/or remittitur regarding damages and willfulness (Docket Entry No. 489) is **GRANTED** in part and **DENIED** in part; and it is further

   **ORDERED** that LG's motion for judgment as a matter of law and/or remittitur is **DENIED**; and it is further

   **ORDERED** that LG's motion for a new trial is **GRANTED**.


                          s/ Stanley R. Chesler
                          Stanley R. Chesler, U.S.D.J.

US007475180B2

(12) **United States Patent**    (10) **Patent No.:**    **US 7,475,180 B2**

Arai et al.    (45) **Date of Patent:**    **Jan. 6, 2009**

(54) **DISPLAY UNIT WITH COMMUNICATION CONTROLLER AND MEMORY FOR STORING IDENTIFICATION NUMBER FOR IDENTIFYING DISPLAY UNIT**

(75) Inventors: **Ikuya Arai**, Yokohama (JP); **Kouji Kitou**, Yokohama (JP)

(73) Assignee: **Mondis Technology Ltd.**, Hempstead, London

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 25 days.

(21) Appl. No.: **10/160,022**

(22) Filed: **Jun. 4, 2002**

(65) **Prior Publication Data**

US 2002/0147879 A1    Oct. 10, 2002

**Related U.S. Application Data**

(63) Continuation of application No. 09/732,292, filed on Dec. 8, 2000, now Pat. No. 6,513,088, which is a continuation of application No. 09/265,363, filed on Mar. 10, 1999, now Pat. No. 6,247,090, which is a continuation of application No. 08/833,346, filed on Apr. 4, 1997, now Pat. No. 5,887,147, which is a continuation of application No. 08/598,903, filed on Feb. 9, 1996, now Pat. No. 5,652,845, which is a continuation of application No. 08/190,848, filed on Feb. 3, 1994, now abandoned.

(30) **Foreign Application Priority Data**

Feb. 10, 1993    (JP)    .................................... 5-022212

(51) **Int. Cl.**
**G06F 13/00**    (2006.01)

(52) **U.S. Cl.** ........................... **710/305**; 710/62; 710/64; 710/104; 345/99

(58) **Field of Classification Search** ......... 710/301–304, 710/8–10, 15–16, 305, 313, 62–64, 72–73, 710/6, 306–308, 104–110; 345/58, 99–100, 345/132, 204

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,691,295 A    9/1972    Fisk

(Continued)

FOREIGN PATENT DOCUMENTS

DE    2413839    9/1975

(Continued)

OTHER PUBLICATIONS

Nasa Tech Brief, "Interface for Color-Video Monitor", Apr. 1988, pp. 246-247.

(Continued)

*Primary Examiner*—Raymond N Phan
(74) *Attorney, Agent, or Firm*—Antonelli, Terry, Stout & Kraus, LLP.

(57) **ABSTRACT**

A display unit for displaying an image based on video signals and synchronization signals inputted from an externally connected video source, includes a video circuit adapted to display an image based on the video signals sent by the externally connected video source, a memory which stores an identification number for identifying the display unit, and a communication controller which sends the identification number stored in the memory to the video source. The communication controller is capable of bi-directionally communicating with the video source.

**29 Claims, 12 Drawing Sheets**



## US 7,475,180 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,007,443 | A | 2/1977 | Bromberg et al. |
| 4,047,158 | A | 9/1977 | Jennings |
| 4,145,179 | A | 3/1979 | Tachi |
| 4,145,719 | A | 3/1979 | Hand et al. |
| 4,148,070 | A | 4/1979 | Taylor |
| 4,159,480 | A | 6/1979 | Tachi |
| 4,169,262 | A | 9/1979 | Schwartz et al. |
| 4,172,264 | A | 10/1979 | Taylor et al. |
| 4,177,462 | A | 12/1979 | Chung et al. |
| 4,197,590 | A | 4/1980 | Hofmanis et al. |
| 4,251,755 | A | 2/1981 | Bryden |
| 4,342,029 | A | 7/1982 | Hofmanis et al. |
| 4,394,689 | A | 7/1983 | Wallace et al. |
| 4,415,985 | A | 11/1983 | McDaniel et al. |
| 4,429,384 | A | 1/1984 | Kaplinsky |
| 4,450,535 | A | 5/1984 | De Pommery et al. |
| 4,451,824 | A | 5/1984 | Thayer et al. |
| 4,468,768 | A | 8/1984 | Sunkle et al. |
| 4,497,036 | A | 1/1985 | Dunn |
| 4,534,012 | A | 8/1985 | Yokozawa |
| 4,563,677 | A | 1/1986 | Seiler |
| 4,574,279 | A | 3/1986 | Roberts |
| 4,589,063 | A | 5/1986 | Shah et al. |
| 4,591,974 | A | 5/1986 | Dornbush et al. |
| 4,626,837 | A | 12/1986 | Priestly |
| 4,626,892 | A | 12/1986 | Nortrup et al. |
| 4,641,262 | A | 2/1987 | Bryan et al. |
| 4,665,433 | A | 5/1987 | Hinson et al. |
| 4,672,501 | A | 6/1987 | Bilac et al. |
| 4,680,647 | A | 7/1987 | Moriyama |
| 4,689,669 | A | * 8/1987 | Hoshino et al. ............... 358/80 |
| 4,689,740 | A | 8/1987 | Moelands et al. |
| 4,727,362 | A | 2/1988 | Rackley et al. |
| 4,727,947 | A | 3/1988 | Naito |
| 4,736,324 | A | 4/1988 | Sainen et al. |
| 4,737,772 | A | 4/1988 | Nishi et al. |
| 4,743,968 | A | 5/1988 | Mogi et al. |
| 4,745,404 | A | 5/1988 | Kallenberg |
| 4,747,041 | A | 5/1988 | Engel et al. |
| 4,754,204 | A | 6/1988 | Ando et al. |
| 4,757,239 | A | 7/1988 | Starkey, IV |
| 4,757,443 | A | 7/1988 | Hecker et al. |
| 4,775,857 | A | 10/1988 | Staggs |
| 4,779,132 | A | 10/1988 | McBeath et al. |
| 4,788,658 | A | 11/1988 | Hanebuth |
| 4,789,856 | A | 12/1988 | Yokota et al. |
| 4,794,381 | A | 12/1988 | Iwai |
| 4,800,376 | A | 1/1989 | Suga et al. |
| 4,839,638 | A | 6/1989 | Kosler et al. |
| 4,870,531 | A | 9/1989 | Danek |
| 4,875,158 | A | 10/1989 | Ashkin et al. |
| 4,882,687 | A | 11/1989 | Gordon |
| 4,893,248 | A | 1/1990 | Pitts et al. |
| 4,910,655 | A | 3/1990 | Ashkin et al. |
| 4,912,627 | A | 3/1990 | Ashkin et al. |
| 4,918,598 | A | 4/1990 | Ashkin et al. |
| 4,922,448 | A | 5/1990 | Kunieda et al. |
| 4,930,160 | A | 5/1990 | Vogel |
| 4,939,652 | A | 7/1990 | Steiner |
| 4,970,655 | A | 11/1990 | Winn et al. |
| 4,980,678 | A | 12/1990 | Zenda |
| 4,990,904 | A | 2/1991 | Zenda |
| 4,991,023 | A | 2/1991 | Nicols |
| 4,995,080 | A | 2/1991 | Bestler et al. |
| 5,010,238 | A | 4/1991 | Kadono et al. |
| 5,012,339 | A | 4/1991 | Kurata et al. |
| 5,031,118 | A | 7/1991 | Morizot |
| 5,038,301 | A | 8/1991 | Thoma, III |
| 5,047,754 | A | 9/1991 | Akatsuka et al. |
| 5,051,827 | A | 9/1991 | Fairhurst |
| 5,054,022 | A | 10/1991 | Van Steenbrugge |
| 5,060,079 | A | 10/1991 | Rufus-Isaacs |
| 5,068,732 | A | 11/1991 | Satoh |
| 5,072,411 | A | * 12/1991 | Yamaki ..................... 345/520 |
| 5,073,773 | A | 12/1991 | Van Steenbrugge |
| 5,092,686 | A | 3/1992 | Tsukamoto |
| 5,109,434 | A | 4/1992 | Shimizu et al. |
| 5,117,070 | A | 5/1992 | Ueno et al. |
| 5,126,725 | A | 6/1992 | Yanagisawa |
| 5,128,677 | A | 7/1992 | Donovan et al. |
| 5,136,695 | A | 8/1992 | Goldshlag et al. |
| 5,138,305 | A | 8/1992 | Tomiyasu |
| 5,138,565 | A | 8/1992 | Satou |
| 5,142,576 | A | 8/1992 | Nadan |
| 5,144,290 | A | 9/1992 | Honda et al. |
| 5,150,109 | A | 9/1992 | Berry |
| 5,151,997 | A | 9/1992 | Bailey et al. |
| 5,159,683 | A | 10/1992 | Lvovsky et al. |
| 5,166,893 | A | 11/1992 | Hosoi |
| 5,175,750 | A | 12/1992 | Donovan et al. |
| 5,202,961 | A | 4/1993 | Mills et al. |
| 5,216,504 | A | 6/1993 | Webb et al. |
| 5,222,212 | A | 6/1993 | Johary et al. |
| 5,227,863 | A | * 7/1993 | Bilbrey et al. ................. 358/22 |
| 5,227,881 | A | 7/1993 | Wess et al. |
| 5,233,547 | A | 8/1993 | Kapp et al. |
| 5,237,488 | A | 8/1993 | Moser et al. |
| 5,241,281 | A | 8/1993 | Wilkes et al. |
| 5,251,031 | A | 10/1993 | Tagami |
| 5,253,060 | A | 10/1993 | Welmer |
| 5,257,350 | A | 10/1993 | Howard et al. |
| 5,262,759 | A | 11/1993 | Moriconi et al. |
| 5,264,992 | A | 11/1993 | Hogdahl et al. |
| 5,270,821 | A | 12/1993 | Samuels |
| 5,276,458 | A | 1/1994 | Sawdon |
| 5,276,875 | A | 1/1994 | Satoh |
| 5,282,247 | A | 1/1994 | McLean et al. |
| 5,285,197 | A | 2/1994 | Schmidt et al. |
| 5,309,174 | A | 5/1994 | Minkus |
| 5,309,504 | A | 5/1994 | Morganstein |
| 5,315,695 | A | 5/1994 | Saito et al. |
| 5,317,691 | A | 5/1994 | Traeger |
| 5,319,582 | A | 6/1994 | Ma |
| 5,321,750 | A | 6/1994 | Nadan |
| 5,347,630 | A | 9/1994 | Ishizawa et al. |
| 5,353,423 | A | 10/1994 | Hamid et al. |
| 5,371,518 | A | 12/1994 | Hannah |
| 5,375,210 | A | 12/1994 | Monnes et al. |
| 5,389,952 | A | 2/1995 | Kikinis |
| 5,396,593 | A | 3/1995 | Mori et al. |
| 5,444,849 | A | 8/1995 | Farrand et al. |
| 5,446,740 | A | 8/1995 | Yien et al. |
| 5,448,697 | A | 9/1995 | Parks et al. |
| 5,457,473 | A | 10/1995 | Arai et al. |
| 5,483,255 | A | 1/1996 | Numao |
| 5,483,260 | A | 1/1996 | Parks et al. |
| 5,491,805 | A | 2/1996 | Welmer |
| 5,499,018 | A | 3/1996 | Welmer |
| 5,499,040 | A | 3/1996 | McLaughlin et al. |
| 5,506,602 | A | 4/1996 | Yokoyama |
| 5,526,043 | A | 6/1996 | Wen |
| 5,546,098 | A | 8/1996 | Moriconi |
| 5,546,759 | A | 8/1996 | Lee |
| 5,550,556 | A | 8/1996 | Wu |
| 5,550,966 | A | 8/1996 | Drake et al. |
| 5,576,735 | A | 11/1996 | Kikuchi et al. |
| 5,599,231 | A | 2/1997 | Hibino et al. |
| 5,602,567 | A | 2/1997 | Kanno |
| 5,608,730 | A | 3/1997 | Osakabe et al. |
| 5,670,969 | A | 9/1997 | Yamagami |
| 5,671,371 | A | 9/1997 | Kondo et al. |
| 5,686,934 | A | 11/1997 | Nonoshita et al. |
| 5,691,741 | A | 11/1997 | Kerigan et al. |
| 5,727,191 | A | 3/1998 | Konishi et al. |

# US 7,475,180 B2

Page 3

| | | | |
|---|---|---|---|
| 5,740,436 | A | 4/1998 | Davis et al. |
| 5,742,273 | A | 4/1998 | Flinders et al. |
| 5,764,547 | A | 6/1998 | Bilich et al. |
| 5,771,028 | A | 6/1998 | Dalton et al. |
| 5,828,834 | A | 10/1998 | Choi |
| 5,850,209 | A | 12/1998 | Lemke et al. |
| 5,887,147 | A | 3/1999 | Arai et al. |
| 5,896,546 | A | 4/1999 | Monahan et al. |
| 5,909,592 | A | 6/1999 | Shipman |
| 5,910,806 | A | 6/1999 | Narui et al. |
| 5,917,462 | A | 6/1999 | Suzuki et al. |
| 5,926,155 | A | 7/1999 | Arai et al. |
| 5,943,029 | A | 8/1999 | Ross |
| 5,948,091 | A | 9/1999 | Kerigan et al. |
| 6,011,592 | A | 1/2000 | Vaughan et al. |
| 6,012,103 | A | 1/2000 | Sartore et al. |
| 6,052,740 | A | 4/2000 | Frederick |
| 6,057,812 | A | 5/2000 | Arai et al. |
| 6,057,860 | A | 5/2000 | Hoffert et al. |
| 6,078,301 | A | 6/2000 | Arai et al. |
| 6,169,535 | B1 | 1/2001 | Lee |
| 6,175,356 | B1 | 1/2001 | Jung |
| 6,219,451 | B1 | 4/2001 | Hunt et al. |
| 6,223,283 | B1 | 4/2001 | Chaiken et al. |
| 6,247,090 | B1 * | 6/2001 | Arai et al. .................. 710/305 |
| 6,263,440 | B1 | 7/2001 | Pruett et al. |
| 6,285,397 | B1 | 9/2001 | Webb et al. |
| 6,300,921 | B1 | 10/2001 | Moriconi et al. |
| 6,300,980 | B1 | 10/2001 | McGraw et al. |
| 6,304,236 | B1 | 10/2001 | Arai et al. |
| 6,304,895 | B1 | 10/2001 | Schneider et al. |
| 6,346,930 | B2 | 2/2002 | Arai et al. |
| 6,348,904 | B1 | 2/2002 | Arai et al. |
| 6,437,829 | B1 | 8/2002 | Webb et al. |
| 6,473,060 | B1 | 10/2002 | Kim |
| 6,549,970 | B2 | 4/2003 | Arai et al. |
| 6,590,547 | B2 | 7/2003 | Moriconi et al. |
| 6,590,572 | B1 | 7/2003 | Hoffert et al. |
| 6,618,773 | B1 | 9/2003 | Chang et al. |
| 6,639,588 | B2 | 10/2003 | Arai et al. |
| 6,686,895 | B2 | 2/2004 | Arai et al. |
| 6,693,622 | B1 | 2/2004 | Shahoian et al. |
| 2002/0152347 | A1 | 10/2002 | Arai et al. |
| 2004/0061692 | A1 | 4/2004 | Arai et al. |
| 2004/0196276 | A1 | 10/2004 | Arai et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 2703579 | 8/1977 |
| DE | 2804294 | 8/1978 |
| DE | 28 39 888 | 3/1980 |
| DE | 3512278 | 11/1985 |
| DE | 37 22 169 A1 | 1/1989 |
| DE | 40 25 295 | 2/1991 |
| DE | 40 252 95 | 2/1991 |
| DE | 43 36 116 A1 | 5/1994 |
| EP | 0 042 034 A1 | 12/1981 |
| EP | 0 182 097 A2 | 5/1986 |
| EP | 0 257 684 | 3/1988 |
| EP | 0 303 138 A2 | 2/1989 |
| EP | 0 224 802 B1 | 2/1990 |
| EP | 0 448 267 A2 | 9/1991 |
| EP | 0 456 012 A2 | 11/1991 |
| EP | 0 456 923 A1 | 11/1991 |
| EP | 0 545 828 A3 | 9/1993 |
| EP | 0 612 053 A1 | 8/1994 |
| EP | 0612053 A1 | 8/1994 |
| EP | 0 456 923 B1 | 10/1994 |
| EP | 0 618 561 A2 | 10/1994 |
| EP | 0 665 525 A3 | 8/1995 |
| EP | 0 708 399 A2 | 4/1996 |
| EP | 0 760 499 A1 | 3/1997 |
| EP | 0 856 993 A2 | 8/1998 |
| EP | 0 653 090 B1 | 11/1998 |
| FI | 914435 | 3/1993 |
| FI | 923949 | 3/1994 |
| GB | 2223114 | 3/1990 |
| GB | 2 235 358 A | 2/1991 |
| GB | 2 270 451 A | 3/1994 |
| GB | 1495173 | 12/1997 |
| JP | 54-159130 | 12/1979 |
| JP | 58-103034 | 6/1983 |
| JP | 59-101695 | 6/1984 |
| JP | 60-117327 | 6/1985 |
| JP | 60-154396 | 8/1985 |
| JP | 61-16643 | 1/1986 |
| JP | 61-84688 | 4/1986 |
| JP | 61-290529 | 12/1986 |
| JP | 63-113625 | 5/1988 |
| JP | 63-148327 | 6/1988 |
| JP | 1-274232 | 11/1989 |
| JP | 1-321475 | 12/1989 |
| JP | H01-173787 | 12/1989 |
| JP | 2-007696 | 1/1990 |
| JP | 2-770088 | 3/1990 |
| JP | 2-103592 | 4/1990 |
| JP | 2-127688 | 5/1990 |
| JP | 2-250576 | 10/1990 |
| JP | 2-257196 | 10/1990 |
| JP | 2-293791 | 12/1990 |
| JP | 2-305293 | 12/1990 |
| JP | 3-56931 | 3/1991 |
| JP | 3-056931 | 3/1991 |
| JP | 3-056993 | 3/1991 |
| JP | 3-56993 | 3/1991 |
| JP | 3-116093 | 5/1991 |
| JP | 3-118595 | 5/1991 |
| JP | 3-160494 | 5/1991 |
| JP | 3-148697 | 6/1991 |
| JP | 3-160494 | 7/1991 |
| JP | 3-177919 | 8/1991 |
| JP | 03-204059 | 9/1991 |
| JP | 3-226792 | 10/1991 |
| JP | 3-242688 | 10/1991 |
| JP | 3-261995 | 11/1991 |
| JP | 03-267841 | 11/1991 |
| JP | 3-121442 | 12/1991 |
| JP | 4-21024 | 1/1992 |
| JP | 4-021024 | 1/1992 |
| JP | 4-037787 | 2/1992 |
| JP | 5-46106 | 2/1993 |
| JP | 5-046106 | 2/1993 |
| JP | 5-083719 | 4/1993 |
| JP | 5-158586 | 6/1993 |
| JP | 5-232918 | 9/1993 |
| JP | 5-244404 | 9/1993 |
| JP | 6-116643 | 4/1994 |
| JP | 6-184688 | 7/1994 |
| JP | 6-236339 | 8/1994 |
| JP | 5-232918 | 10/1995 |
| JP | 62-136696 | 3/2006 |
| KR | 1993-0009801 | 10/1993 |
| WO | WO 93/06587 | 4/1993 |

## OTHER PUBLICATIONS

"Display Function Identification", IBM Technical Disclosure Bulletin, vol. 28, No. 12, pp. 5568-5579, May 1980.

"Monitor Identification Technique", IBM Technical Disclosure Bulletin, vol. 30, No. 2, pp. 839-840, Jul. 1987.

"Display Controller Set up as a Function of Display Monitor Type, Display Jumper Settings and Amounts of Vram", IBM Technical Disclosure Bulletin, vol. 33, No. 2, pp. 352-353, Jul. 1990.

"Improved Method of Monitor Identification and Mode Control", IBM Technical Disclosure Bulletin, vol. 33, No. 5, pp. 289-291, Oct. 1990.

"Improvements to Display Identification", IBM Technical Disclosure Bulletin, vol. 33, No. 6B, pp. 83-85.

"Self-Identification Protocol Initialization", IBM Technical Disclosure Bulletin, vol. 33, No. 10A, pp. 406-407, Mar. 1991.

CEBus Comes One Step Closer To Reality, Domestic Automation, K. Davidson, Apr./May 1990 pp. 85-86.

Audio, Video and Audiovisual System Domestic Digital Bus (D2b), International Standard CEI IEC 61030, May 1991 (first edition), International Electrotechnical Commission.

ACCESS.bus, Hardware and Protocol Specifications, Version 2.0, Jun. 1992, Digital Equipment Corporation.

IEEE Standard Codes, Formats, Protocols, and Common Commands For Use With ANSE/IEEE Std 488.1-1987, IEEE Standard Digital Interface For Programmable Instrumentation, Apr. 22, 1988.

"Video Subsystem," IBM Corp., May 1992, TPV 059548-9971.

"Video Subsystem," IBM Corp., 1990, TPV 059422-9547.

"The 12C-Bus Specification, Version 2.1," Phillips Semiconductor, Jan. 2000, TPV 059376-9421.

"ACCESS.bus, Specification Version 3.0," ACCESS.bus Industry Group, Sep. 1995, TPV 059173-9375.

"Display Function Identification," IBM Technical Disclosure Bulletin, May 1986, TPV 040214.

"IBM Personal System/2," IBM Corp., Entry Systems Division, May 1987, TPV 040215-0230.

"Monitor Identification Technique," IBM Technical Disclosure Bulletin, Jul. 1987, TPV 040231.

"Discrimination of Type of Display Devise," IBM Technical Disclosure Bulletin, Oct. 1987, TPV 040232-0233.

"Advances in CRT Displays" by Carlo Infante, CBI, 1988, TPV 040234-0237.

"Automatic Alignment Techniques for Color Television Manufacturing" by Leonard Suckle, Motorola, Inc., Semiconductor Products Sector, Nov. 1988, TPV 040238-0245.

"The Calibrator Explained" by J.B. Van Elstlande et al., Barco, Apr. 1990, TPV 040246-0291.

"Display Controller Set Up as a Function of Display Monitor Type, Display Jumper Settings and Amount of VRAM," IBM Technical Disclosure Bulletin, Jul. 1990, TPV 040292-0293.

"Multimode High Definition and Personal Computer Monitor Chip Set" by Geoffrey W. Perkins et al., Motorola, Inc., Bipolar analog IC Design, Aug. 1990, TPV 040294-0302.

"Improved Method of Monitor Identification and Mode Control," IBM Technical Disclosure Bulletin, Oct. 1990, TPV 040303-0305.

"Monitor Identification Range Extension," IBM Technical Disclosure Bulletin, Nov. 1990, TPV 040306.

"Improvements to Display Identification," IBM Technical Disclosure Bulletin, Nov. 1990, TPV 040307-0309.

"Self-Identification Protocol Initialization," IBM Technical Disclosure Bulletin, Mar. 1991, TPV 040310-0311.

"ACCESS.bus, an Open Desktop Bus" by Peter A. Siebel, Digital Technology Journal, 1991, TPV 040312-0318.

"I²C-Bus and How to Use it," Philips Semiconductors, Jan. 1992, TPV 040319-0346.

"Power Programming . . . the IBM XGA" by Jake Richter, MIS: Press, 1992, TPV 040347-0381.

"Build an Intelligent Display" by Tom Ryan, Eactiva, Aug. 1992, TPV 040382-0383.

"Monitor Standard Impacts Software" by Lisa L. Spiegelman, Dow Jones Interactive, Oct. 1992, TPV 040384-0385.

"Standards Open the Door to the New Digital Video—New Solutions Provide Easy Market Entry" by Ron McCabe, Factiva, Nov. 1992, TPV 040386-0389.

"Method for Expanding Monitor Identification Capability," IBM Technical Disclosure Bulletin, Oct. 1993, TPV 040390-0391.

"ACCESS.bus, Monitor Device Protocol Specification," ACCESS/bus Industry Group, Sep. 1995, TPV 040392-0419.

"VESA Display Configuration Protocol, Proposal to VESA Monitor Timing Committee" by Richard Atanus et al., NEC Tech., Inc., Apr. 1992, TPV 001591-1614.

"Display Communication Channel Level 1" by Jarmo Kurikko, ICL Personal Systems, Apr. 1992, TPV-VESA 001516-1525.

"Monitor Data Transfer" by Adge Hawes, IBM Boca Raton, Sep. 1992, TPV-VESA 001351-1369.

"ICL Proposal, Display Communication Channel Level 1," ICL Personal Systems, Oct. 1992, TPV-VESA 001370-1378.

"CHI: The Combined Human Interface" by Bob Myers, Hewlett Packard Co., Dec. 1992, TPV-VESA 001065-1074.

"A Low-Cost Data Communication Channel Using Existing Synchronization Signal Lines" by Bob Myers, Hewlett Packard Co., User-Interface Hardware Lab, Advanced Systems Division, Sep. 1993, TPV-VESA 005062-5067.

"Proposed VESA Standard, Serial Data Communications via Display Synchronization Lines" by Bob Myers, Hewlett Packard Co., Oct. 1993, TPV-VESA 005003-5014.

Misc. document entitled "The Hardware Approach," no author or date, TPV-VESA 002918.

Misc. document entitled "Display Communication Channel Function Needs," no author or date, TPV-VESA 000481-0483.

Misc. document entitled "VDIF, Three Character Manufacture ID," no author or date, TPV-VESA 004031.

Fax from Jan Shepard, dated Sep. 4, 1990, TPV-VESA 002919-2921.

Letter from Anders Frisk entitled "VESA Monitor Committee, VDDP Status Report," dated Jul. 24, 1992, TPV-VESA 003979.

Letter from Tom Ryan, dated Jul. 28, 1992, TPV-VESA 003974.

Fax from Anthony Cox, dated Jan. 13, 1992, TPV-VESA 008537-8542.

Letter from Tom Ryan, dated Feb. 2, 1993, TPV-VESA 003716.

Email from Bob Myers entitled "DCC Desired Functionality," dated Mar. 26, 1993, TPV-VESA 000485-0487.

Letter from Anders Frisk entitled "New VESA Standards, VESA Display Information Format, VDIF 1.0, Video Image Area Definition, VIAD 1.0," dated Aug. 25, 1993, TPV-VESA 004030.

Misc. document entitled "Display Data Channel (DDC) Questions and Answers," no author or date, TPV-VESA 010482-0485.

"VESA Announces Display Date Channel (DDC) Standard for Monitors" by Valdis Hellevik et al., InterActive Public Relations, Inc., Sep. 12, 1994, TPV-VESA 005680-5682.

Misc. document entitled "Master Meeting Schedule," no author or date, TPV-VESA 004286-4287.

VESA General Meeting Minutes, dated Oct. 20, 1999, TPV-VESA 004081-4083.

Monitor Timing Committee Meeting Minutes, dated Feb. 13, 1992, TPV-VESA 003443-0445.

VESA Board General Membership Meeting Minutes, dated Feb. 21, 1992, TPV-VESA 004088-4093.

VESA General Membership Meeting Minutes—PC Expo, dated Jun. 22, 1992, TPV-VESA 017682-7684.

VESA Monitor Committee Meeting Minutes, dated Jul. 9, 1992, TPV-VESA 001206-1216.

Monitor Committee Meeting Minutes, dated Jul. 11, 1992, TPV-VESA 030448-0449.

VESA Monitor Meeting Minutes, dated Aug. 13, 1992, TPV-VESA 030452-0455.

VESA Monitor Meeting Minutes, dated Sep. 10, 1992, TPV-VESA 030466-0467.

VESA Monitor Meeting Minutes, dated Oct. 7-8, 1992, TPV-VESA 030474-0475.

VESA Monitor Committee Minutes, dated Nov. 5, 1992, TPV-VESA 030478-0479.

VESA Monitor Committee Minutes, dated Dec. 10, 1992, TPV-VESA 030482-0483.

VESA Monitor Committee Meeting Minutes, dated Jan. 14, 1993, TPV-VESA 003787-3788.

VESA Monitor Committee Meeting Minutes, dated Feb. 11, 1993, TPV-VESA 030491-0492.

VESA Monitor Committee Meeting Minutes, dated Apr. 15, 1993, TPV-VESA 030493-0494.

VESA Monitor Meeting Minutes, dated May 13, 1993, TPV-VESA 030495-0498.

VESA Monitor Meeting Minutes, dated Jun. 10, 1993, TPV-VESA 030499-0501.

VESA Monitor Meeting Minutes, dated Jul. 15, 1993, TPV-VESA 030502-0506.

VESA Monitor Meeting Minutes, dated Aug. 12, 1993, TPV-VESA 030507-0511.

# US 7,475,180 B2

Page 5

VESA Monitor Meeting Minutes, dated Sep. 16, 1993, TPV-VESA 030512-0514.
VESA Monitor Meeting Minutes, dated Dec. 9, 1993, TPV-VESA 030517-0518.
VDDP Proposal, Draft 1, dated Jan. 9, 1992, TPV-VESA 001744-1749.
VDDP Proposal, Draft 2, dated Feb. 13, 1992, TPV-VESA 001681-1699.
VDDP Proposal, Draft 3, dated Mar. 12, 1992, TPV-VESA 007331-7338.
VDDP Proposal, Draft 4, dated May 6, 1992, TPV-VESA 001491-1510.
VDDP Proposal, Draft 4.4, dated Jun. 9, 1992, TPV-VESA 007416-7432.
VDDP Proposal, Draft 4.91, dated Jul. 8, 1992, TPV-VESA 014078-4112.
VDDP Proposal, Draft 5.05, dated Jul. 24, 1992, TPV-VESA 007339-7379.
VDDP Proposal, Draft 5.10, dated Sep. 7, 1992, TPV-VESA 007433-7471.
VDDP Proposal, Draft 5.11, dated Sep. 10, 1992, TPV-VESA 001386-1432.
VDDP Proposal, Draft 6.0, dated Oct. 6, 1992, TPV-VESA 007472-7513.
VDDP Proposal, Revision p0.9, dated Nov. 4, 1992, TPV-VESA 001018-1055.
VDIF Proposal, Revision p0.91, dated Nov. 6, 1992, TPV-VESA 000958-0995.
VDID Proposal, Revision p0.93, dated Dec. 8, 1992, TPV-VESA 008498-8535.
VDIF Proposal, Revision p0.94, dated Dec. 10, 1992, TPV-VESA 001135-1171.
Fax from Anthony Cox entitled "VDIF Proposal Revision No. p0.94," dated Jan. 13, 1993, TPV-VESA 008537-8542.
VDIF Proposal, Revision p0.95c4, dated Jan. 13, 1993, TPV-VESA 008582-8622.
VDIF Proposal, Revision p0.96, dated Jan. 15, 1993, TPV-VESA 003743-3782.
VDIF Proposal, Revision p1.00, dated Apr. 14, 1993, TPV-VESA 007640-7684.
VDIF Proposal, Revision p1.01, dated Apr. 14, 1993, TPV-VESA 007597-7638.
VDIF Proposal, Revision p1.03, dated Apr. 16, 1993, TPV-VESA 007555-7595 TPV-VESA 004679-4718.
VDIF Proposal, Draft 1.0, dated Aug. 23, 1993, TPV-VESA 003986-4022.
DDC Initial Proposal, Version 1.0p, Revision 0.1p, dated Oct. 10, 1993, TPV-VESA 005038-5035.
DDC Initial Proposal, Version 1.0p, Revision 0.21p, dated Nov. 1, 1993, TPV-VESA 007294-7313.
DDC Initial Proposal, Version 1.0p, Revision 0.22p, dated Nov. 3, 1993, TPV-VESA 005336-5355.
Monitor Device Protocol Specification, Draft Version, dated Dec. 3, 1993, TPV-VESA 005407-5438.
DDC Proposal, Version 1.0p, Revision 0.40p, dated Dec. 8, 1993, TPV-VESA 005378-5403.

VBE/DI Proposal, Version 1.0p. Revision 0.1p, dated Dec. 9, 1993, TPV-VESA 005368-5377.
DDC Proposal, Version 1.0p. Revision 0.50p, dated Dec. 12, 1993, TPV-VESA 031547-1572.
DDC Proposal, Version 1.0p, Revision 0.48, dated Dec. 27, 1993, TPV-VESA 006424-6450.
DDC Proposal, Version 1.0p, Revision 0.491, dated Feb. 2, 1994, TPV-VESA 006842-6867.
DDC Application No. dated Sep. 12, 1994, TPV-VESA 005683-5690 TPV-VESA 033439-3442.
DDC Proposal, Version 1.0p, Revision 0.50, dated Mar. 2, 1994, TPV-VESA 027211-7245.
DDC Proposal, Version 1.0p, Revision 0.64p, dated Jun. 10, 1994, TPV-VESA 027428-7456.
DDC Discussion Paper, Revision 0.1p, dated Jul. 8, 1993, TPV-VESA 008431-8444.
DDC Standard, Version 1.0, Revision 0, dated Aug. 12, 1994, TPV-VESA 033606-3630.
Letter from Tom Ryan, dated Dec. 2, 1992, TPV-VESA 033519.
Misc. document entitled "Master Meeting Schedule," no author or date, TPV-VESA 033520-3521.
VESA presentation, dated Nov. 15, 1992, TPV-VESA 033522-3597.
VESA presentation, dated Nov. 15, 1992, TPV-VESA 003812-3884.
Letter from Tom Ryan with VESA presentation, dated Mar. 16, 1993, TPV-VESA 003162-3231.
"Display Controller Set up as a Function Display Monitor Type, Display Jumper Settings and Amount of Vram," IBM Technical Disclosure Bulletin, vol. 33, No. 2, pp. 352-353, Jul. 1990, see file history.
"Interface for Color-Video Monitor," NASA Tech. Brief, pp. 246-247, Apr. 1988, see file history.
"Access.bus, an Open Desktop Bus", Peter A. Sichel, Digital Technical Journal, vol. 3, No. 4, Fall 1991.
Barco n.v Video & Communications, The Calibrator Explained, Part 1, Apr. 1990, pp. 1-40.
Fernseh-und Kinotechnische Gesellschaft e. V., Tagungsband, 10. Jahrestagung vom 13. bis 17. Sep. 1982, pp.153-167.
Floyd, Digital Fundamentals, 3rd Ed., 1990, pp. 600-602.
The I-C Bus and How to Use It, Philips Semiconductors, Jan. 1992.
Wischermann, G., "Verfahren zur Bildkompression und Bildexpansion", FKTG, 10 th Annual Mtg., Munich, Sep. 13-17, 1982, pp. 153-167 (including translation).
Hon Hai Precision Industry Co. Ltd.'s Answer and Counterclaims, Apr. 14, 2008.
Innolux Display Corporation's Answer and Counterclaims, Apr. 14, 2008.
LG Electronics, USA, Inc.'s Answer and Counterclaims, Apr. 14, 2008.
U.S. Appl. No. 10/661,527, Office Action, Nov. 16, 2007.
U.S. Appl. No. 10/661,527, Amendment, May 16, 2008.
U.S. Appl. No. 10/832,442, Office Action, Sep. 26, 2007.
U.S. Appl. No. 10/832,442, Amendment, Mar. 25, 2008.
U.S. Appl. No. 11/176,880, Office Action, Nov. 2, 2007.
U.S. Appl. No. 11/176,880, Amendment, Mar. 25, 2008.

* cited by examiner

FIG. 1



*FIG. 2*

| | |
|---|---|
| NUMBER OF DATA SET | REGISTERED ID NUMBERS |
| DATA AREA 1 FOR DELIVERY ADJUSTMENT | |
| DATA AREA 2 FOR DELIVERY ADJUSTMENT | |
| | |
| ADJUSTMENT DATA AREA 1 FOR USER | |
| ADJUSTMENT DATA AREA 2 FOR USER | |
| | |

ADDRESS 1
ADDRESS 2
ADDRESS 3
⋮
ADDRESS i
ADDRESS i+1
⋮



FIG. 3

STEP 1 — ( POWER ON )

STEP 2 — INITIALIZING

STEP 3 — WAITING TO RECEIVE ID NUMBER SENT FROM COMPUTER

STEP 4 — COMPARING RECEIVED ID NUMBER WITH REGISTERED ID NUMBER

NOT MATCHED

MATCHED

STEP 5 — ALLOWING DISPLAY DEVICE TO BE CONTROLLED BY EXTERNAL CONTROL INSTRUCTIONS

STEP 6 — NOT ALLOWING DISPLAY DEVICE TO BE CONTROLLED BY EXTERNAL CONTROL INSTRUCTIONS

*FIG. 4*





FIG. 5

# FIG. 6



V
H

RGB

FROM COM-PUTER

DIVIDER

26

DEFLECTION CIRCUIT — 10

11

VIDEO CIRCUIT

7 — MICROCOMPUTER

25 — COMMUNICATION CONTROLLER    MEMORY — 9

12  13

14

6B

V
H
RGB

TO ANOTHER DISPLAY DEVICE

TO ANOTHER DISPLAY DEVICE

Appx349

FIG. 7



*FIG. 8*



FIG. 9

6F
10
DEFLECTION CIRCUIT
11
VIDEO CIRCUIT
12
13
14
27
ADC1
7
MICROCOMPUTER
29
DAC1
ADC2
28
DAC2
30
8
COMMUNICATION CONTROLLER
9
MEMORY
33
LCD CONTROLLER
34
LCD
1B
3
DISPLAY CONTROLLER
5
COMMUNICATION CONTROLLER
31
AUDIO CONTROLLER
32
CPU
2
MEMORY
4

Case: 20-1812     Document: 55     Page: 75     Filed: 02/24/2021

FIG. 10



*FIG. 11*



## FIG. 12



US 7,475,180 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# DISPLAY UNIT WITH COMMUNICATION CONTROLLER AND MEMORY FOR STORING IDENTIFICATION NUMBER FOR IDENTIFYING DISPLAY UNIT

## CROSS REFERENCE TO RELATED APPLICATION

This is a continuation of U.S. application Ser. No. 09/732,292, filed Dec. 8, 2000, now U.S. Pat. No. 6,513,088, issued Jan. 28, 2003, which is a continuation of U.S. application Ser. No. 09/265,363, filed Mar. 10, 1999, now U.S. Pat. No. 6,247,090, issued Jun. 12, 2001, which is a continuation of U.S. application Ser. No. 08/833,346, filed Apr. 4, 1997, now U.S. Pat. No. 5,887,147, issued Mar. 23, 1999, which is a continuation of U.S. application Ser. No. 08/598,903, filed Feb. 9, 1996, now U.S. Pat. No. 5,652,845, issued Jul. 29, 1997, which is a continuation of U.S. application Ser. No. 08/190,848, filed Feb. 3, 1994, now abandoned, the subject matter of which is incorporated by reference herein, and is related to U.S. application Ser. No. 09/732,291, filed Dec. 8, 2000, now U.S. Pat. No. 6,549,970, issued Apr. 15, 2003.

## BACKGROUND OF THE INVENTION

The present invention relates to an information output system or display apparatus including a computer and an information output device such as a display device or a printer as a computer terminal and more particularly to an information output system or display apparatus for performing various types of control such as the information output method and allowing or not allowing of information output from the computer connected to the above information output device via a communication interface.

In current display devices as computer terminals, a wide variety of display positions and sizes on the screen and video signal frequencies to be displayed are used depending on video signals to be inputted. Therefore, a display or a so-called multi-scan display has been used so that a display device can handle various video signals.

A microcomputer or a memory LSI is used to provide a most suitable display image for each video signal as this type of display device. Such a prior art is indicated in Japanese Patent Application Laid-Open No. 1-321475.

According to this prior art, the microcomputer controls the memory which stores information of the display position and size on the screen for each video signal beforehand and reads the information of the most suitable display position and size on the screen depending on the input video signal from the memory. The microcomputer outputs a control signal on the basis of the read information. This control signal is applied to the deflection circuit as a control voltage or control current through a D-A converter so as to control the voltage or current at a predetermined part of the deflection circuit. By doing this, the display size and position of the display device can be adjusted. When a video signal inputted to the display device is not a known signal, no corresponding information is kept in the above memory. Therefore, the switch mounted on the front of the display device is operated so as to input the adjustment information of the display position and size on the screen. The control circuit of the above microcomputer creates deflection control information on the basis of the above input information and adjusts the display position and size.

According to the aforementioned prior art, the display device obtains a most suitable screen display according to the input video signal. However, according to another prior art, the computer controls and changes the display status. Such a prior art is indicated in Japanese Patent Application Laid-Open No. 61-84688. According to this prior art, a discrimination pulse is superimposed at the blanking interval of a video signal outputted from the computer and the deflection frequency of the display device is changed on the basis of this discrimination pulse.

According to the former prior art among the aforementioned prior arts, the control of the display position and size on the screen is managed by the display device. Therefore, when adjustment is required or requested from the user of display device, it is necessary to perform manual adjustment using the adjustment switch of the display device each time and it is rather troublesome to operate the system.

According to the latter prior art among the aforementioned prior arts, the control can be operated by the computer. However, since the operation is such that the deflection frequency is simply changed on the basis of the discrimination pulse superimposed on the video signal, an image cannot be adjusted to the display image (display position and size) which is required by a user of the computer. Namely, there is a problem imposed that the status which is simply desired by the user cannot be obtained. Furthermore, no consideration is given to prevention of display (indication) of careless images (information) and restraining of unnecessary power consumption. Even if the discrimination pulse is superimposed at the blanking interval of the video signal, the video blanking level is generally shallow in the case of the display device, so that the discrimination pulse is displayed. Furthermore, the control is applied only in one direction from the computer to the display device and no information is sent in the reverse direction, so that there is another problem imposed that a malfunction cannot be avoided.

## SUMMARY OF THE INVENTION

An object of the present invention is to provide an information output system wherein a computer can exercise various types of control of an information output device such as a display device. Another object of the present invention is to provide an information output system for maintaining secrecy of information and for restraining power consumption. A further object of the present invention is to provide an information output system for informing the computer of the operation status of the information output device so as to allow easy maintenance.

To accomplish the above objects, according to the present invention, in an information output system consisting of at least a computer and an information output device, the computer is equipped with a first communication means and the information output device is equipped with a second communication means. Furthermore, a control processing means and a memory means for storing the identification number of the computer beforehand are added to the information output device, or a memory means for storing the identification number of the information output device beforehand is mounted in the computer in addition to the first communication means. The above second communication means has a plurality of communication interfaces. Furthermore, a detection means for detecting the internal operation status and a control processing means for judging the detection result are added to the information output device and an audio output means for outputting the operation status in voice is added to the computer. A second display means for displaying the operation status is mounted in the information output device. Or, a display means for displaying the operation status of the information output device is mounted in the computer.

US 7,475,180 B2

3                                                                    4

The first communication means in the computer controls communication with the information output device and the second communication means in the information output device controls communication with the computer. The control processing means operates and generates control signals for exercising various types of control for the information output device on the basis of control instructions from the second communication means and compares the identification number of the computer stored in the memory means with the identification number sent from the computer via the first and second communication means. When a comparison result match occurs, the control processing means controls a predetermined part in the information output device.

In the memory means mounted in the computer, the identification number for identifying the information output device is stored beforehand. When the identification number which is sent from the information output device via the second and first communication means matches with the identification number which is stored in the memory means beforehand, the computer communicates with the information output device.

When no comparison result match occurs, the above control processing means controls so that information which is sent from the computer to the information output device is not normally outputted from the information output device. By doing this, information of a computer user will not be indicated carelessly.

When the second communication means has a plurality of communication interfaces, it can communicate with another plurality of information output devices and the computer and in the state that a plurality of similar information output devices are connected to the computer, it can exercise various types of control for the information output devices and can inform the computer of the status of each information output device.

The detection means detects the internal operation status of the information output device and the control processing means judges the detection result. The audio output means indicates the operation status of the information output device in voice on the basis of the judgment result which is sent from the information output device to the computer via the second and first communication means. Furthermore, the display means mounted in the information output device displays the above operation status. The display means mounted in the computer performs the same operation as that of the display means mounted in the information output device. In this case, information which is sent to the computer via the second and first communication means is used as display information.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram showing the first embodiment of the present invention.

FIG. 2 is a memory map showing the contents of the memory in the display device shown in FIG. 1.

FIG. 3 is a flow chart showing the operation of the essential section shown in FIG. 1.

FIG. 4 is a block diagram showing the second embodiment of the present invention.

FIG. 5 is a block diagram showing the third embodiment of the present invention.

FIG. 6 is a block diagram showing the internal structure of the display device 6B shown in FIG. 5.

FIG. 7 is a block diagram showing the fourth embodiment of the present invention.

FIG. 8 is a flow chart showing the operation outline shown in FIG. 7.

FIG. 9 is a block diagram showing the fifth embodiment of the present invention.

FIG. 10 is a block diagram showing the sixth embodiment of the present invention.

FIG. 11 is a block diagram showing the seventh embodiment of the present invention.

FIG. 12 is a block diagram showing the eighth embodiment of the present invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The embodiments of the present invention will be explained with reference to the accompanying drawings hereunder.

FIG. 1 is a block diagram showing the first embodiment of the present invention. In the drawing, a section 1 enclosed by a chained line indicates a computer. In the section 1, a reference numeral 2 indicates a CPU (central processing unit), 3 a display controller for generating various signals for video display, 4 a memory, and 5 a communication controller for communicating with peripheral devices. In addition, a magnetic recording unit is mounted as a data storage device which is not shown in the drawing.

A section 6 enclosed by another chained line indicates a so-called multi-scan display device which can be applied to various video signal specifications. In the section 6, a reference numeral 7 indicates a microcomputer for controlling display of the display device 6, 8 a second communication controller for communicating with the above communication controller 5, 9 a second memory, 10 a general deflection circuit of the display device, 11 a video circuit of the display device, 12 a horizontal deflection yoke, 13 a vertical deflection yoke, and 14 a color cathode-ray tube (hereinafter called a CDT (color display tube)) for displaying color images.

The operation shown in FIG. 1 is as shown below. The computer 1 has a structure which is the same as the general structure of a conventional personal computer or work station and the communication controller 5 controls a communication interface such as RS-232C which is installed in the standard type. When a control instruction of the display device 6 is inputted firstly by a user of the computer from a general keyboard which is not shown in the drawing of the computer 1, it is coded digitally by a keyboard controller which is neither shown in the drawing and CPU 2 identifies the instruction and controls the communication controller 5. The communication controller 5 sends the control instruction of the display device to the display device 6. When a control instruction of the display device 6 which is included in the software for allowing the computer 1 to operate is read from the external storage device such as a floppy disk drive or hard disk drive which is not shown in the drawing, CPU 2 identifies the instruction and controls the communication controller 5. The communication controller 5 also sends the control instruction of the display device to the display device 6.

Next, the display device 6 sends the control instruction from the computer 1 which is received by the communication controller 8 to the microcomputer 7. The microcomputer 7 identifies this control instruction and generates control signals to the relevant portions to be adjusted in the deflection circuit 10 or video circuit 11. The aforementioned deflection circuit 10 and video circuit 11 can be adjusted in the same way as with a conventional multiscan display and the adjustment means has a structure which is the same as that of a conventional multiscan display. By doing this, the display size and

US 7,475,180 B2

5
6

position, brightness, contrast, and hue of images displayed on the CDT **14** are made most suitable to a user of the computer system.

Furthermore, WYSIWYG (what you see is what you get) control which makes an image displayed on the display device **6** similar to print output of an output device other than the display, for example, a printer can be realized only by sending a control instruction for changing the display position and size to the display device **6** instead of operating and generating display data by the computer **1**. The interface part of the above display device **6** such as the communication control terminal is mounted on the back or side of the display device from a viewpoint of easy connection to the computer **1** and appearance.

Furthermore, the aforementioned communication function is used for adjustment at a factory. In this case, necessary information is all written into the memory **9** in the display device **6**. FIG. **2** is a memory map showing the contents of the memory **9** in the display device **6**. For adjustment at factory, data to be written can be all set. In a case other than factory adjustment, namely, for adjustment in a system as shown in FIG. **1**, to prevent data requiring no rewriting, namely, preset values at factory such as, for example, the number of all data or the data within the corresponding frequency range from being erased by mistake or rewritten, the computer **1** sends the ID number and the microcomputer **7** in the display device **6** checks the ID number with the registered ID number stored in the memory **9**.

A flow chart of this check is shown in FIG. **3**. As shown in the drawing, when the computer **1** and display device **6** are turned on at Step **1**, each device is initialized at Step **2**. Concretely, CPU **2** and the microcomputer **7** read the starting system software and put the peripheral circuit to be connected to the CPU into the active state so that the next operation can be performed. Then, at Step **3**, the microcomputer **7** in the display device **6** waits for sending of the identification number assigned to the computer **1**, that is, the so-called ID number from the computer **1**. Next, at Step **4**, the microcomputer **7** receives the ID number which is sent from the computer **1** and checks whether the received ID number is registered in the registered ID number list which is stored in the memory **9** in the display device **6**.

When it is registered, at Step **5**, the computer **1** is allowed to control the display device **6** by external control instructions so that the user control of the display size, position, brightness, and contrast can be performed by control instructions sent from the computer **1** thereafter. On the other hand, when the received ID number is not registered in the memory **9**, at Step **6**, the display device **6** is not allowed to be controlled by external control instructions thereafter. Therefore, even if any control instruction is sent from the computer **1**, the display device **6** will not accept it.

Or, at Step **5**, the computer **1** may be allowed to perform all the adjustments which can be performed by the display device **6**, that is, the same control as that for adjustment at factory and at Step **6**, a part of the control of the display device **6** such as display control may be allowed.

By doing this, the display device **6** can be prevented from careless control.

The above is an example that an ID number is sent to the display device **6** from the computer **1**. However, needless to say, the reverse case of the above is possible. Namely, an ID number is sent to the computer **1** from the display device **6** so that the computer **1** identifies that the display device **6** having a communication function is connected and the computer **1** compares the ID number with the ID number registered in the computer **1**. When the corresponding ID number is registered,

the computer **1** controls the display device **6** by a predetermined control instruction. When it is not registered, the computer **1** judges that it cannot control the display device **6** and will not control the display device **6**.

By doing this, the computer **1** communicates with a specific display device **6** and can exercise control such as changing the color temperature of an image displayed on the display device **6** or changing the display size depending on the application software.

According to this embodiment, RS-232C is used as a communication interface. However, a general-purpose interface such as RS-422, RS-423, SCSI or GP-IB, or network interface may be used. Furthermore, the embodiment may be applied to an interface using optical signals instead of electric signals. The above interface may be installed in the neighborhood of the rear cabinet or lower pedestal of the display device **6** for convenience of a user.

FIG. **4** is a block diagram showing the second embodiment of the present invention. According to this embodiment, when the ID number sent from the computer to the display device is not registered in the memory **9**, another operation which is different from the operation shown in the first embodiment is performed. Namely, according to this embodiment, when the ID numbers do not match with each other, nothing is displayed on the display device so as to enhance the secrecy of information.

Next, the structure of FIG. **4** will be explained. In the drawing, a reference numeral **6A** indicates another display device which is different from the display device **6** shown in FIG. **1**, **15** a horizontal deflection circuit, **16** a vertical deflection circuit, **17** a synchronizing signal processing circuit, **18** a horizontal phase control circuit, **19** a horizontal oscillating circuit, **20** a horizontal driving circuit, **21** a horizontal deflection output circuit, **22** a video pre-amplifier circuit, **23** a video blanking circuit, and **24** a video output circuit. The other reference numerals which are the same as those shown in FIG. **1** indicate the same functions. The video circuit **11** is a general video circuit consisting of the video pre-amplifier circuit **22**, video blanking circuit **23**, and video output circuit **24**. The horizontal deflection circuit **15** is a general deflection circuit consisting of the synchronizing signal processing circuit **17**, horizontal phase control circuit **18**, horizontal oscillating circuit **19**, horizontal driving circuit **20**, and horizontal deflection output circuit **21**. The vertical deflection circuit **16** is also a general circuit which has a structure similar to that of the horizontal deflection circuit **15**.

Next, the operation shown in FIG. **4** will be explained. In the drawing, an ID number sent from the computer **1** is inputted into the microcomputer **7** via the communication controller **8**. The microcomputer **7** checks the above ID number with the ID number stored in the memory **9**. When the ID number stored in the memory **9** matches with the ID number sent from the computer **1**, the microcomputer **7** receives the control from the computer **1**.

On the other hand, when the check results do not match with each other, the microcomputer **7** controls the horizontal oscillating circuit **19**, fixes the oscillation frequency to a predetermined value, and allows the display device **6A** to perform a horizontal deflection operation at a value different from the horizontal frequencies of the video signal and synchronizing signal which are sent from the computer. Therefore, the image displayed on the CDT **14** is not synchronized horizontally in this case and the screen content cannot be judged. When the vertical deflection circuit **16** is also controlled in the same way, the image displayed on the CDT **14** is not synchronized vertically on the screen. By controlling the

7

video blanking circuit 23 of the video circuit 11, the video display period may be blanked so that no image is displayed on the CDT 14.

By using the aforementioned methods independently or combined, only when a user of the computer system enters a predetermined ID number from the keyboard, it is displayed correctly on the display device 6A and information displayed on the CDT 14 can be prevented from careless indication.

FIG. 5 is a block diagram of the third embodiment of the present invention. According to this embodiment, the display device is provided with a plurality of communication functions and a plurality of display devices can be connected with the communication interface. In the drawing, reference numerals 6B, 6C, and 6D indicate display devices having the same structure, V1, V2, and V3 lines for video signals and synchronizing signals, C1, C2, and C3 communication lines for, for example, RS-232C, and 1 the aforementioned computer. Each of the display devices 6B, 6C, and 6D has a plurality of video signal I/O terminals and communication interface I/O terminals and a registered ID number. According to this embodiment, as shown in FIG. 5, 1 is assigned to the display device 6B as an ID number, 2 to the display device 6C as an ID number, and 3 to the display device 6D as an ID number.

Next, the operation shown in FIG. 5 will be explained. In the drawing, for example, when controlling the display device 6B from the computer 1, the ID number 1 is sent to the line C1 and the display device 6B is controlled appropriately from the computer 1. Next, when controlling the display device 6C, the ID number 2 is sent from the computer 1 in the same way. Then, the ID number is received by the display device 6C via the lines C1 and C2 and the display device 6c can be controlled appropriately from the computer 1.

Since a plurality of display devices can be controlled by a computer in this way, a plurality of display devices can be adjusted at a time, for example, at the time of delivery adjustment at a factory. Furthermore, by using a multi-display system for displaying an image by assembling a plurality of display devices and for displaying various images on each screen, the display devices can be hued and adjusted in brightness simply.

FIG. 6 is a block diagram showing the internal structure of the display device 6B shown in FIG. 5. In the drawing, a reference numeral 25 indicates a communication controller having two communication ports and 26 a divider of video signals and synchronizing signals. The communication controller 25 sends or receives data to or from the computer 1 in the same way as the communication controller 8 of the display device 6 shown in FIG. 1 and also divides the communication lines and relays other display devices. On the other hand, the divider 26 divides video signals or synchronizing signals sent from the computer 1 or signal source to other display devices. By using such a structure, a plurality of display devices can be connected to a computer as shown in FIG. 5.

Next, the fourth embodiment of the present invention will be described. FIG. 7 is a block diagram showing the fourth embodiment of the present invention. In the drawing, a reference numeral 1B indicates a computer, 31 an audio control circuit for producing a sound, 32 a speaker, 6E a display device, 27 and 28 analog-digital converters (hereinafter abbreviated to ADC), and 29 and 30 digital-analog converters (hereinafter abbreviated to DAC). The other reference numerals which are the same as those shown in FIG. 1 indicate the same functions. The operation of FIG. 7 will be explained hereunder with reference to the operation flow chart shown in FIG. 8.

8

When the computer 1B and display device 6E are started at Step 10 as shown in FIG. 8, they start communication with each other via the communication controllers 5 and 8 at Step 11 next. Then, at Step 12, the computer 1B calls the display device 6E. When no response is received, the computer 1B judges that the display device 6E is faulty, starts the audio control circuit 31 at Step 13, and informs the user of the computer 1B that the display device 6E is faulty from the speaker.

When the communication succeeds, at Step 14, the microcomputer 7 fetches information of the operation status of the deflection circuit 10 or video circuit 11 in the display device 6E from the voltage at a predetermined part in the circuit as digital information via the ADCs 27 and 28. Next, at Step 15, the microcomputer 7 judges whether the value which is fetched at Step 14 is a value in the normal operation status. When the microcomputer 7 judges it as an error, it informs the computer 1B of the faulty value via the communication controller 8 and CPU 2 of the computer 1B allows the audio control circuit 31 to operate and generates a message informing an error of the display device 6E from the speaker 32. Furthermore, CPU 2 allows the display controller 3 to operate and displays also a message informing an error on the CDT 14 via the video circuit 11.

In this case, when an indication code informing the faulty part is sent to the computer 1B from the display device 6E simultaneously, the computer 1B judges the indication code and can inform the user or customer engineer of the display device 6E of the faulty part by sound or display.

When the display device 6E is normal at Step 15, the computer 1B can exercise the communication control such as the display size, hue, and brightness of the display device 6E at Step 17. At this step, when a control instruction is sent to the display device 6E from the computer 1B, the microcomputer 7 decodes the instruction and outputs the control code to the corresponding DAC 29 or 30. The DAC 29 or 30 controls a predetermined control part at the DC control voltage corresponding to the above control code and controls the display size, position, and hue of the image displayed on the CDT 14. When the above series of operations ends, the computer 1B returns to Step 14 and repeats the operations from the monitor mode of a faulty operation of the display device 6E to the normal operation at Step 17.

As mentioned above, the computer 1B can be informed of a faulty operation by using the communication function of the display device 6E. Therefore, the user can judge the faulty part and can maintain the system easily.

FIG. 9 is a block diagram showing the fifth embodiment of the present invention. This embodiment obtains the same effect as that of the embodiment shown in FIG. 7. In FIG. 9, a reference numeral 6F indicates a display device, 33 a liquid crystal display controller in the display device 6F, and 34 a liquid crystal display panel mounted in the display device 6F. The other reference numerals which are the same as those shown in FIGS. 1 and 7 indicate the same functions.

The operation shown in FIG. 9 is basically the same as that shown in FIG. 7. The operation of the deflection circuit or video circuit 11 is monitored by the microcomputer 7 via the ADC 27 or 28. When an error occurs, the microcomputer 7 transmits an indication code informing the occurrence of an error to the computer 1B via the communication line and informs the user of it by voice from the speaker 32.

Furthermore, the microcomputer 7 allows the liquid crystal display controller 33 in the display device 6F to operate and displays information of the occurrence of the fault and faulty

US 7,475,180 B2

**9**

part on the liquid crystal display panel **34**. By doing this, information when an error occurs in the display device **6**F can be obtained more surely.

FIG. **10** is a block diagram showing the sixth embodiment of the present invention. This embodiment obtains the same effect as that of the embodiment shown in FIG. **9**. In FIG. **10**, a reference numeral **1**C indicates a computer and **35** a liquid crystal display controller in the computer **1**C. The other reference numerals which are the same as those shown in FIGS. **1** and **9** indicate the same functions. In FIG. **10**, the display function for a fault and faulty operation of the display device shown in FIG. **9** is mounted in the computer **1**C.

Namely, when an error occurs in the internal circuit of the display device **6**E, the voltage detected by the ADC **27** or **28** is digitized and processed by the microcomputer **7** as faulty voltage occurrence information and information informing an error is transmitted to the computer **1**C via the communication controller **8**. In the computer **1**C, CPU **2** decodes the transmitted faulty information. When CPU **2** identifies the faulty part of the display device **6**E, it allows the audio control circuit **31** to operate as an audio signal and informs the user of the fault by an audio message from the speaker **32** on one hand. On the other hand, CPU **2** controls the liquid crystal display controller **35** so as to display characters or graphics on the liquid crystal display panel **34**. By doing this, the user of the display device **6**E can be informed of an error or fault of the display device **6**E and can maintain the system easily.

FIG. **11** is a block diagram showing the seventh embodiment of the present invention. In the drawing, a reference numeral **36** indicates a power supply of the deflection circuit **10** and video circuit **11**. The other reference numerals which are the same as those shown in FIG. **1** indicate the same functions.

Next, the operation shown in FIG. **11** will be explained.

In FIG. **11**, when a control instruction to the display device **6** is issued from CPU **2** of the computer **1**, the communication controller **5** changes the control instruction to a one in the signal format suited to communication and sends it to the display device **6**. The display device **6** returns the signal received by the communication controller **8** to the control instruction which can be identified by the microcomputer **7** and sends it to the microcomputer **7**. The microcomputer **7** judges the control instruction and decides the part of a predetermined section in the display device **6** to be controlled.

When the control instruction relates to control of the power supply **36** and is an instruction for stopping power supply from the power supply **36** to the deflection circuit **10**, or video circuit **11**, or both circuits, the microcomputer **7** controls the power supply **36** so as to stop the above power supply. Therefore, the image display on the CDT **14** is also stopped.

By doing this, for example, when the computer **1** is not in operation for a predetermined period, the operation power supply for the display device **6** can be automatically put into the off state. Therefore, unnecessary power consumption can be restrained and the life span of the display device can be lengthened. The aforementioned is power supply off control. However, needless to say, power supply on control is also possible. Namely, in this case, when the computer **1** is turned on or the computer **1** is changed from the function stop state to the active state, the microcomputer **7**, power supply **36**, deflection circuit **10**, and video circuit **11** perform the reverse operation of the aforementioned so that the display device automatically starts to display.

FIG. **12** is a block diagram showing the eighth embodiment of the present invention. In the drawing, a reference numeral **37** indicates a display controller and the other numerals which

**10**

are the same as those shown in FIG. **1** indicate units performing the same functions as those shown in FIG. **1**.

Next, the operation of FIG. **12** will be explained. In FIG. **12**, video information is sent to the display device **6** from the communication controller **5** in addition to a control instruction of the display device **6** which is explained in the embodiment shown in FIG. **1**. This video information is a digital signal in the same way as a signal which is inputted to the display controller **3** in the embodiment shown in FIG. **1**. The communication controller **8** of the display device **6** sends video information among the received signals to the display controller **37**. The display controller **37** performs an operation which is the same as that of the display controller shown in FIG. **1** and generates a video signal to be inputted to a general display. By doing this, also in the embodiment shown in FIG. **12**, an effect which is the same as that shown in FIG. **1** can be obtained. Furthermore, in FIG. **12**, since video information is transmitted via a communication interface which is connected between the computer **1** and display device **6**, a video signal line which is conventionally necessary is not necessary.

According to the present invention, a user of a computer can exercise various types of control for an information output device such as a display device from the keyboard of the computer or by the software incorporated in the computer. Therefore, the operability of the computer system is improved so that the system can be used easily and the user can obtain a desired information output status easily.

When an identification number is set to each device, a value which is set by the above control will not be lost by a careless operation of a user. By setting an identification number for a specific user, the secret of information can be protected inversely. Since the power supply for the information output device can be controlled by the computer when necessary, unnecessary power consumption can be restrained.

Since the status of the information output device can be monitored simply, the system can be protected against a malfunction and maintained easily. Furthermore, the aforementioned control hardware can be realized in a minimum structure.

What is claimed is:

**1**. A display unit for displaying an image based on video signals and synchronization signals inputted from an externally connected video source, comprising:

a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

a memory which stores an identification number for identifying at least a type of said display unit; and

a communication controller which sends said identification number stored in said memory to said video source;

wherein said communication controller is capable of bidirectionally communicating with said video source.

**2**. The display unit according to claim **1**, wherein said identification number stored in said memory is utilized for comparison with an identification number stored in said video source.

**3**. The display unit according to claim **1**, wherein said identification number stored in said memory is utilized for executing a predetermined process in said video source in accordance with a result of comparison between said identification number and an identification number stored in said video source.

**4**. The display unit according to claim **1**, wherein said identification number stored in said memory is utilized for executing a predetermined process in said video source based

US 7,475,180 B2

11            12

on a result of comparison of whether said identification number stored in said memory is an identification number stored in said video source.

**5.** The display unit according to claim **1**, wherein said identification number stored in said memory is sent to said video source in response to power on of at least one of said display unit and said video source.

**6.** The display unit according to claim **2**, wherein said identification number stored in said memory is sent to said video source in response to power on of at least one of said display unit and said video source.

**7.** The display unit according to claim **3**, wherein said identification number stored in said memory is sent to said video source in response to power on of at least one of said display unit and said video source.

**8.** The display unit according to claim **4**, wherein said identification number stored in said memory is sent to said video source in response to power on of at least one of said display unit and said video source.

**9.** The display unit according to claim **1**, wherein said display unit receives a signal from said video source that is generated by using said identification number.

**10.** The display unit according to claim **1**, wherein said display unit receives a signal from said video source that is generated in accordance with a result of comparison between said identification number stored in said memory and an identification number stored in said video source.

**11.** The display unit according to claim **1**, said display unit receives a signal from said video source that is generated based on a result of comparison of whether said identification number stored in said memory is an identification number stored in said video source.

**12.** The display unit according to claim **1**, further comprising a processor adapted to control display of said display unit.

**13.** The display unit according to claim **12**, wherein said display unit information is sent to said video source in response to power on of at least one of said display unit and said video source.

**14.** A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

    a video circuit adapted to display an image based on the video signals sent by the externally connected video source;

    a memory in which at least display unit information is stored, said display unit information including an identification number for identifying at least a type of said display unit and characteristic information of said display unit; and

    a communication controller capable of bi-directionally communicating with said video source;

    wherein said communication controller is capable of communicating said display unit information other than said characteristic information to said video source.

**15.** The display unit according to claim **14**, wherein said display unit information is sent to said video source in response to power on of at least one of said display unit and said video source.

**16.** The display unit according to claim **14**, wherein said display unit receives a signal from said video source that is generated by using said identification number stored in said memory.

**17.** A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

    a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

    a memory in which at least display unit information is stored, said display unit information including an identification number for identifying at least a type of said display unit; and

    a communication controller capable of bi-directionally communicating with said video source;

    wherein said communication controller is capable of communicating said identification number stored in said memory and no other display unit information to said video source.

**18.** The display unit according to claim **17**, wherein said display unit information includes characteristic information of said display unit.

**19.** The display unit according to claim **18**, wherein said display unit information is sent to said video source in response to power on of at least one of said display unit and said video source.

**20.** The display unit according to claim **18**, wherein said display unit receives a signal from said video source that is generated by using said identification number stored in said memory.

**21.** A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

    a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

    a memory in which at least display unit information is stored, said display unit information including an identification number for identifying at least a type of said display unit; and

    a communication controller capable of bi-directionally communicating with said video source;

    wherein said communication controller is capable of sending said display unit information stored in said memory to said video source and of receiving a control signal from said video source, and said displayed image is controlled based on said control signal received by said communication controller.

**22.** The display unit according to claim **21**, wherein at least one of color and size of said image displayed on said display unit is changed by using said control signal.

**23.** A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

    a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

    a memory in which at least display unit information is stored, said display unit information including an identification number for identifying at least a type of said display unit;

    a communication controller capable of bi-directionally communicating with said video source, said communication controller being capable of sending said display unit information stored in said memory to said video source and of receiving a control signal from said video source; and

    a processor adapted to control said displayed image on said display unit by using said control signal received by said communication controller.

**24.** The display unit according to claim **23**, wherein at least one of color and size of said image displayed on said display unit is changed by using said control signal.

US 7,475,180 B2

**13**

25. A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

a processor adapted to control display of said display unit;

a memory which stores an identification number for identifying at least a type of said display unit; and

a communication controller capable of bi-directionally communicating with said video source;

wherein said communication controller is capable of sending said identification number stored in said memory to said video source and of receiving a control signal received from said video source, and at least one of color and size of said displayed image on said display unit is controlled by using said control signal received by said communication controller.

26. A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

**14**

a memory in which at least display unit information is stored, said display unit information including an identification number for identifying at least a type of said display unit; and

a communication controller capable of bi-directionally communicating with said video source;

wherein said communication controller is capable of communicating said display unit information from said display unit to said video source, said display unit being capable of receiving a signal from said video source that is generated based on said display unit information, said display unit being capable of controlling said displayed image on said display unit by using a control signal received from said video source via said communication controller.

27. The display unit according to claim **26**, wherein at least one of color and size of said image displayed on said display unit is changed by using said control signal.

28. The display unit according to any one of claims **1-27**, wherein said video source is a computer.

29. A display unit according to any one of claim **1**, **14**, **17**, **21**, **23**, **25** and **26**, wherein the identification number provides at least a unique identification of the type of said display unit.

\* \* \* \* \*

US007475180C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10784th)

# United States Patent

## Arai et al.

(10) **Number:**　　US 7,475,180 C1

(45) **Certificate Issued:**　　Dec. 28, 2015

(54) **DISPLAY UNIT WITH COMMUNICATION CONTROLLER AND MEMORY FOR STORING IDENTIFICATION NUMBER FOR IDENTIFYING DISPLAY UNIT**

(75) Inventors: **Ikuya Arai**, Yokohama (JP); **Kouji Kitou**, Yokohama (JP)

(73) Assignee: **MONDIS TECHNOLOGY LTD.**, Hampstead, London (GB)

**Reexamination Request:**
No. 90/013,237, May 13, 2014
No. 90/013,390, Nov. 3, 2014

**Reexamination Certificate for:**
Patent No.: **7,475,180**
Issued: **Jun. 6, 2009**
Appl. No.: 10/160,022
Filed: Jun. 4, 2002

### Related U.S. Application Data

(63) Continuation of application No. 09/732,292, filed on Dec. 8, 2000, now Pat. No. 6,513,088, which is a continuation of application No. 09/265,363, filed on Mar. 10, 1999, now Pat. No. 6,247,090, which is a continuation of application No. 08/833,346, filed on Apr. 4, 1997, now Pat. No. 5,887,147, which is a continuation of application No. 08/598,903, filed on Feb. 9, 1996, now Pat. No. 5,652,845, which is a continuation of application No. 08/190,848, filed on Feb. 3, 1994, now abandoned.

(30) **Foreign Application Priority Data**

Feb. 10, 1993　(JP) ...................................... 5-022212

(51) **Int. Cl.**
*G06F 13/00* (2006.01)
*G06F 3/153* (2006.01)
*G09G 1/16* (2006.01)
*G06F 3/14* (2006.01)

(52) **U.S. Cl.**
CPC　*G06F 3/153* (2013.01); *G09G 1/16* (2016.01);
*G09G 1/167* (2013.01); *G06F 3/1423*
(2013.01); *G06F 3/1446* (2013.01); *G09G*
*2360/04* (2013.01); *G09G 2370/04* (2013.01);
*G09G 2370/042* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceedings for Reexamination Control Numbers 90/013,237 and 90/013,390, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Christopher E Lee

(57) **ABSTRACT**

A display unit for displaying an image based on video signals and synchronization signals inputted from an externally connected video source, includes a video circuit adapted to display an image based on the video signals sent by the externally connected video source, a memory which stores an identification number for identifying the display unit, and a communication controller which sends the identification number stored in the memory to the video source. The communication controller is capable of bi-directionally communicating with the video source.

**Attention is directed to the decision of *Mondis Technology, Ltd. v. Hon Hai Precision Industry Co., Ltd., et al.* No. 2012-1004 (Fed. Cir.), dated Mar. 13, 2013. This reexamination may not have resolved all questions raised by this decision. See 37 CFR 1.552(c) for *ex parte* reexamination and 37 CFR 1.906(c) for *inter partes* reexamination.**

**At the time of issuance and publication of this certificate, the patent remains subject to pending reexamination control numbers 95/000,480 and 90/013,481 filed Jun. 4, 2009 and Mar. 27, 2015 respectively. The claim content of the patent may be subsequently revised if a reexamination certificate issues from the reexamination proceedings.**



US 7,475,180 C1

**1**

**2**

# EX PARTE
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **14-16**, **28** and **29** is confirmed.

Claims **17-20**, **23** and **24** are cancelled.

Claims **1-13**, **21**, **22** and **25-27** were not reexamined.

\* \* \* \* \*

(12) **INTER PARTES REEXAMINATION CERTIFICATE** (1278th)
# United States Patent
Arai et al.

(10) **Number:** **US 7,475,180 C2**

(45) **Certificate Issued:** **Jun. 6, 2016**

(54) **DISPLAY UNIT WITH COMMUNICATION CONTROLLER AND MEMORY FOR STORING IDENTIFICATION NUMBER FOR IDENTIFYING DISPLAY UNIT**

(75) Inventors: **Ikuya Arai**, Yokohama (JP); **Kouji Kitou**, Yokohama (JP)

(73) Assignee: **MONDIS TECHNOLOGY LTD.**, Hampstead, London (GB)

**Reexamination Request:**
No. 95/000,480, Jun. 4, 2009

**Reexamination Certificate for:**
Patent No.: **7,475,180**
Issued: **Jan. 6, 2009**
Appl. No.: **10/160,022**
Filed: **Jun. 4, 2002**

Reexamination Certificate C1 7,475,180 issued Dec. 28, 2015

### Related U.S. Application Data

(63) Continuation of application No. 09/732,292, filed on Dec. 8, 2000, now Pat. No. 6,513,088, which is a continuation of application No. 09/265,363, filed on Mar. 10, 1999, now Pat. No. 6,247,090, which is a continuation of application No. 08/833,346, filed on Apr. 4, 1997, now Pat. No. 5,887,147, which is a continuation of application No. 08/598,903, filed on Feb. 9, 1996, now Pat. No. 5,652,845, which is a continuation of application No. 08/190,848, filed on Feb. 3, 1994, now abandoned.

(30) **Foreign Application Priority Data**

Feb. 10, 1993     (JP) ...................................... 5-022212

(51) **Int. Cl.**
**G06F 13/00** (2006.01)
**G06F 3/153** (2006.01)
**G09G 1/16** (2006.01)
*G06F 3/14* (2006.01)

(52) **U.S. Cl.**
CPC ............... *G06F 3/153* (2013.01); *G09G 1/167* (2013.01); *G06F 3/1423* (2013.01); *G06F*

*3/1446* (2013.01); *G09G 2360/04* (2013.01); *G09G 2370/04* (2013.01); *G09G 2370/042* (2013.01)

(58) **Field of Classification Search**
USPC ........................................................ 710/305
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 95/000,480, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Christopher E. Lee

(57) **ABSTRACT**

A display unit for displaying an image based on video signals and synchronization signals inputted from an externally connected video source, includes a video circuit adapted to display an image based on the video signals sent by the externally connected video source, a memory which stores an identification number for identifying the display unit, and a communication controller which sends the identification number stored in the memory to the video source. The communication controller is capable of bi-directionally communicating with the video source.

**Attention is directed to the decision of Federal Circuit's March 13, 2013 the parties' to dismiss the appeal.** *Mondis Technology, Ltd. v. Hon Hai Precision Industry Co.,Ltd., et al., No. 2012-1004 (Fed. Cir.), dated March 13, 2013 relating to this patent.* **This reexamination may not have resolved all questions raised by this decision. See 37 CFR 1.552(c) for** *ex parte* **reexamination and 37 CFR 1.906(c) for** *inter partes* **reexamination.**

**At the time of issuance and publication of this certificate, the patent remains subject to pending reexamination control number 90/013,481 filed Mar. 27, 2015. The claim content of the patent may be subsequently revised if a reexamination certificate issues from the reexamination proceeding.**



US 7,475,180 C2

1

2

# INTER PARTES
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims **17-20**, **23**, **24**, **28/18**, **28/19**, **28/20**, **28/23**, **28/24**, **29/17** and **29/23** were previously cancelled.

Claims **1-13**, **21**, **22**, **25-27**, **28/1-13**, **28/21**, **28/22**, **28/25**, **28/26**, **28/27**, **29/1**, **29/21**, **29/25** and **29/26** are cancelled.

Claims **14-16**, **28/14**, **28/15**, **28/16** and **29/14** were not reexamined.

* * * * *

US007475180C3

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10903rd)

# United States Patent
Arai et al.

(10) **Number:** US 7,475,180 C3

(45) **Certificate Issued:** Jun. 28, 2016

(54) **DISPLAY UNIT WITH COMMUNICATION CONTROLLER AND MEMORY FOR STORING IDENTIFICATION NUMBER FOR IDENTIFYING DISPLAY UNIT**

(75) Inventors: **Ikuya Arai**, Yokohama (JP); **Kouji Kitou**, Yokohama (JP)

(73) Assignee: **MONDIS TECHNOLOGY LTD.**, Hampstead, London (GB)

**Reexamination Request:**
    No. 90/013,481, Mar. 27, 2015

**Reexamination Certificate for:**
    Patent No.:    **7,475,180**
    Issued:    **Jan. 6, 2009**
    Appl. No.:    **10/160,022**
    Filed:    **Jun. 4, 2002**

Reexamination Certificate C1 7,475,180 issued Dec. 28, 2015

Reexamination Certificate C2 7,475,180 issued Jun. 6, 2016

**Related U.S. Application Data**

(63)    Continuation of application No. 09/732,292, filed on Dec. 8, 2000, now Pat. No. 6,513,088, which is a continuation of application No. 09/265,363, filed on Mar. 10, 1999, now Pat. No. 6,247,090, which is a continuation of application No. 08/833,346, filed on Apr. 4, 1997, now Pat. No. 5,887,147, which is a continuation of application No. 08/598,903, filed on Feb. 9, 1996, now Pat. No. 5,652,845, which is a continuation of application No. 08/190,848, filed on Feb. 3, 1994, now abandoned.

(30)    **Foreign Application Priority Data**

    Feb. 10, 1993    (JP) ...................................... 5-022212

(51)    **Int. Cl.**
    *G06F 13/00*    (2006.01)
    *G06F 3/153*    (2006.01)

*G09G 1/16*    (2006.01)
*G06F 3/14*    (2006.01)

(52)    **U.S. Cl.**
    CPC ................ *G06F 3/153* (2013.01); *G09G 1/167* (2013.01); *G06F 3/1423* (2013.01); *G06F 3/1446* (2013.01); *G09G 2360/04* (2013.01); *G09G 2370/04* (2013.01); *G09G 2370/042* (2013.01)

(58)    **Field of Classification Search**
    None
    See application file for complete search history.

(56)    **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,481, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Christopher E. Lee

(57)    **ABSTRACT**

A display unit for displaying an image based on video signals and synchronization signals inputted from an externally connected video source, includes a video circuit adapted to display an image based on the video signals sent by the externally connected video source, a memory which stores an identification number for identifying the display unit, and a communication controller which sends the identification number stored in the memory to the video source. The communication controller is capable of bi-directionally communicating with the video source.

**Attention is directed to the decision of Federal Circuit's March 13, 2013 the parties' to dismiss the appeal.** *Order, Mondis Technology, Ltd.* **v.** *Hon Hai Precision Industry Co., Ltd., et al.,* **No. 2012-1004 (Fed. Cir.), dated March 13, 2013 relating to this patent. This reexamination may not have resolved all questions raised by this decision. See 37 CFR 1.552(c) for** *ex parte* **reexamination and 37 CFR 1.906(c) for** *inter partes* **reexamination.**



US 7,475,180 C3

**1**

**2**

**EX PARTE
REEXAMINATION CERTIFICATE**

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **14-16**, **28/14**, **28/15**, **28/16** and **29/14** is confirmed.

Claims **1-13**, **17-27**, **28/1-13**, **28/17-27**, **29/1**, **29/17**, **29/21**, **29/23**, **29/25** and **29/26** were previously cancelled.

\*    \*    \*    \*    \*

**This case was appealed to**
Federal Circuit: 20-1812

# US District Court Civil Docket

## U.S. District - New Jersey
## (Newark)

## 2:15cv4431

## Mondis Technology Ltd v. LG Electronics Inc et al

### This case was retrieved from the court on Friday, August 28, 2020

| | |
|---|---|
| **Date Filed:** 06/26/2015 | |
| **Assigned To:** Judge Stanley R. Chesler | |
| **Referred To:** Magistrate Judge Cathy L. Waldor | **Class Code:** OPEN |
| | **Closed:** |
| **Nature of suit:** Patent (830) | **Statute:** 35:271 |
| **Cause:** Patent Infringement | **Jury Demand:** Both |
| **Lead Docket:** None | **Demand Amount:** $0 |
| **Other Docket:** FEDERAL CIRCUIT, 20-01812 Texas Eastern, 2:14-cv-00702 | **NOS Description:** Patent |
| **Jurisdiction:** Federal Question | |

| Litigants | Attorneys |
|---|---|
| Jeffrey Plies<br>In Re matter of Subpoena Served on Jeffrey Plies<br>In re | |
| Mondis Technology Ltd<br>Plaintiff | MARTIN JAY BLACK<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DECHERT LLP<br>2929 Arch Street<br>Philadelphia , PA  19104<br>USA<br>215-994-2664<br>Email:Martin.Black@dechert.Com<br><br>BRIAN M. GOLDBERG<br>ATTORNEY TO BE NOTICED<br>DECHERT LLP<br>Cira Centre 2929 Arch Street<br>Philadelphia , PA  19104-2808<br>USA<br>215-994-2143 |

Fax: 215-655-2143
Email:Brian.Goldberg@dechert.Com

ROBERT LOUIS MASTERSON
ATTORNEY TO BE NOTICED
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia , PA  19104
USA
215-994-2311
Email:Robert.Masterson@dechert.Com

ROBERT D. RHOAD
ATTORNEY TO BE NOTICED
DECHERT LLP
502 Carnegie Center, Suite 104
Princeton , NJ  08540
USA
(609) 955-3269
Email:Robert.Rhoad@dechert.Com

TERI-LYNN ALLONARDO EVANS
ATTORNEY TO BE NOTICED
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia , PA  19104
USA
215-994-4000

VINCENT AUGUST GALLO
ATTORNEY TO BE NOTICED
[Term: 10/12/2016]
DECHERT
2929 Arch Street
Philadelphia , PA  19104
USA
215-994-4000

Hitachi Maxell, Ltd., N/K/A Maxell Holdings, Ltd.
Plaintiff

BRIAN M. GOLDBERG
ATTORNEY TO BE NOTICED
DECHERT LLP
Cira Centre 2929 Arch Street
Philadelphia , PA  19104-2808
USA
215-994-2143
Fax: 215-655-2143
Email:Brian.Goldberg@dechert.Com

Maxell, Ltd.
Plaintiff

BRIAN M. GOLDBERG
ATTORNEY TO BE NOTICED
DECHERT LLP
Cira Centre 2929 Arch Street
Philadelphia , PA  19104-2808
USA
215-994-2143
Fax: 215-655-2143

Email:Brian.Goldberg@dechert.Com

Lg Electronics Inc
Defendant

LISA MARIE FERRI
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
[Term: 12/15/2017]
MAYER BROWN LLP
1675 Broadway
New York , NY  10019
USA
212 506-2340
Email:Lferri@mayerbrown.Com

LIZA M. WALSH
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973.757.1100
Email:Lwalsh@walsh.Law

JENNIFER C. CRITCHLEY
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
CONNELL FOLEY, LLP
One Newark Center
1085 Raymond Blvd.
19th Floor
Newark , NJ  07102
USA
(973) 436-5800
Email:Jcritchley@connellfoley.Com

READE WILLIAM SELIGMANN
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
Alston & Bird LLP
90 Park Avenue
New York , NY  10016
USA
212-210-9400
Email:Reade.Seligmann@alston.Com

SELINA MIRIAM ELLIS
ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973-757-1100
Email:Sellis@walsh.Law

Lg Electronics U.S.A., Inc.
Defendant

LISA MARIE FERRI
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
[Term: 12/15/2017]

MAYER BROWN LLP
1675 Broadway
New York , NY  10019
USA
212 506-2340
Email:Lferri@mayerbrown.Com

LIZA M. WALSH
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973.757.1100
Email:Lwalsh@walsh.Law

JENNIFER C. CRITCHLEY
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
CONNELL FOLEY, LLP
One Newark Center
1085 Raymond Blvd.
19th Floor
Newark , NJ  07102
USA
(973) 436-5800
Email:Jcritchley@connellfoley.Com

READE WILLIAM SELIGMANN
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
Alston & Bird LLP
90 Park Avenue
New York , NY  10016
USA
212-210-9400
Email:Reade.Seligmann@alston.Com

SELINA MIRIAM ELLIS
ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973-757-1100
Email:Sellis@walsh.Law

Lg Electronics U.S.A., Inc.
Counter Claimant

LIZA M. WALSH
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973.757.1100

Appx372

Email:Lwalsh@walsh.Law

SELINA MIRIAM ELLIS
ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973-757-1100
Email:Sellis@walsh.Law

Lg Electronics Inc
Counter Claimant

LIZA M. WALSH
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973.757.1100
Email:Lwalsh@walsh.Law

SELINA MIRIAM ELLIS
ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973-757-1100
Email:Sellis@walsh.Law

Mondis Technology Ltd
Counter Defendant

MARTIN JAY BLACK
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DECHERT LLP
2929 Arch Street
Philadelphia , PA  19104
USA
215-994-2664
Email:Martin.Black@dechert.Com

BRIAN M. GOLDBERG
ATTORNEY TO BE NOTICED
DECHERT LLP
Cira Centre 2929 Arch Street
Philadelphia , PA  19104-2808
USA
215-994-2143
Fax: 215-655-2143
Email:Brian.Goldberg@dechert.Com

ROBERT D. RHOAD
ATTORNEY TO BE NOTICED
DECHERT LLP
502 Carnegie Center, Suite 104
Princeton , NJ  08540

Appx373

USA
(609) 955-3269
Email:Robert.Rhoad@dechert.Com

TERI-LYNN ALLONARDO EVANS
ATTORNEY TO BE NOTICED
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia , PA  19104
USA
215-994-4000

VINCENT AUGUST GALLO
ATTORNEY TO BE NOTICED
[Term: 10/12/2016]
DECHERT
2929 Arch Street
Philadelphia , PA  19104
USA
215-994-4000

Lg Electronics U.S.A., Inc.
Counter Claimant

LISA MARIE FERRI
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
[Term: 12/15/2017]
MAYER BROWN LLP
1675 Broadway
New York , NY  10019
USA
212 506-2340
Email:Lferri@mayerbrown.Com

LIZA M. WALSH
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973.757.1100
Email:Lwalsh@walsh.Law

JENNIFER C. CRITCHLEY
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
CONNELL FOLEY, LLP
One Newark Center
1085 Raymond Blvd.
19th Floor
Newark , NJ  07102
USA
(973) 436-5800
Email:Jcritchley@connellfoley.Com

READE WILLIAM SELIGMANN
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
Alston & Bird LLP
90 Park Avenue

New York , NY  10016
USA
212-210-9400
Email:Reade.Seligmann@alston.Com

SELINA MIRIAM ELLIS
ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973-757-1100
Email:Sellis@walsh.Law

Lg Electronics Inc
Counter Claimant

LISA MARIE FERRI
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
[Term: 12/15/2017]
MAYER BROWN LLP
1675 Broadway
New York , NY  10019
USA
212 506-2340
Email:Lferri@mayerbrown.Com

LIZA M. WALSH
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973.757.1100
Email:Lwalsh@walsh.Law

JENNIFER C. CRITCHLEY
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
CONNELL FOLEY, LLP
One Newark Center
1085 Raymond Blvd.
19th Floor
Newark , NJ  07102
USA
(973) 436-5800
Email:Jcritchley@connellfoley.Com

READE WILLIAM SELIGMANN
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
Alston & Bird LLP
90 Park Avenue
New York , NY  10016
USA
212-210-9400
Email:Reade.Seligmann@alston.Com

SELINA MIRIAM ELLIS

ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973-757-1100
Email:Sellis@walsh.Law

Mondis Technology Ltd
Counter Defendant

MARTIN JAY BLACK
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DECHERT LLP
2929 Arch Street
Philadelphia , PA  19104
USA
215-994-2664
Email:Martin.Black@dechert.Com

BRIAN M. GOLDBERG
ATTORNEY TO BE NOTICED
DECHERT LLP
Cira Centre 2929 Arch Street
Philadelphia , PA  19104-2808
USA
215-994-2143
Fax: 215-655-2143
Email:Brian.Goldberg@dechert.Com

ROBERT LOUIS MASTERSON
ATTORNEY TO BE NOTICED
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia , PA  19104
USA
215-994-2311
Email:Robert.Masterson@dechert.Com

ROBERT D. RHOAD
ATTORNEY TO BE NOTICED
DECHERT LLP
502 Carnegie Center, Suite 104
Princeton , NJ  08540
USA
(609) 955-3269
Email:Robert.Rhoad@dechert.Com

TERI-LYNN ALLONARDO EVANS
ATTORNEY TO BE NOTICED
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia , PA  19104
USA
215-994-4000

VINCENT AUGUST GALLO
ATTORNEY TO BE NOTICED

[Term: 10/12/2016]
DECHERT
2929 Arch Street
Philadelphia , PA  19104
USA
215-994-4000

**Lg Electronics Inc**
**Counter Claimant**

LISA MARIE FERRI
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
[Term: 12/15/2017]
MAYER BROWN LLP
1675 Broadway
New York , NY  10019
USA
212 506-2340
Email:Lferri@mayerbrown.Com

LIZA M. WALSH
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973.757.1100
Email:Lwalsh@walsh.Law

JENNIFER C. CRITCHLEY
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
CONNELL FOLEY, LLP
One Newark Center
1085 Raymond Blvd.
19th Floor
Newark , NJ  07102
USA
(973) 436-5800
Email:Jcritchley@connellfoley.Com

READE WILLIAM SELIGMANN
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
Alston & Bird LLP
90 Park Avenue
New York , NY  10016
USA
212-210-9400
Email:Reade.Seligmann@alston.Com

SELINA MIRIAM ELLIS
ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973-757-1100

Appx377

Email:Sellis@walsh.Law

Lg Electronics U.S.A., Inc.
Counter Claimant

LISA MARIE FERRI
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
[Term: 12/15/2017]
MAYER BROWN LLP
1675 Broadway
New York , NY  10019
USA
212 506-2340
Email:Lferri@mayerbrown.Com

LIZA M. WALSH
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973.757.1100
Email:Lwalsh@walsh.Law

JENNIFER C. CRITCHLEY
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
CONNELL FOLEY, LLP
One Newark Center
1085 Raymond Blvd.
19th Floor
Newark , NJ  07102
USA
(973) 436-5800
Email:Jcritchley@connellfoley.Com

READE WILLIAM SELIGMANN
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
Alston & Bird LLP
90 Park Avenue
New York , NY  10016
USA
212-210-9400
Email:Reade.Seligmann@alston.Com

SELINA MIRIAM ELLIS
ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973-757-1100
Email:Sellis@walsh.Law

Hitachi Maxell, Ltd., N/K/A Maxell Holdings, Ltd.
Counter Defendant

BRIAN M. GOLDBERG
ATTORNEY TO BE NOTICED
DECHERT LLP

Cira Centre 2929 Arch Street
Philadelphia , PA  19104-2808
USA
215-994-2143
Fax: 215-655-2143
Email:Brian.Goldberg@dechert.Com

Maxell, Ltd.                          BRIAN M. GOLDBERG
Counter Defendant                     ATTORNEY TO BE NOTICED
                                      DECHERT LLP
                                      Cira Centre 2929 Arch Street
                                      Philadelphia , PA  19104-2808
                                      USA
                                      215-994-2143
                                      Fax: 215-655-2143
                                      Email:Brian.Goldberg@dechert.Com

Mondis Technology Ltd                 MARTIN JAY BLACK
Counter Defendant                     LEAD ATTORNEY;ATTORNEY TO BE NOTICED
                                      DECHERT LLP
                                      2929 Arch Street
                                      Philadelphia , PA  19104
                                      USA
                                      215-994-2664
                                      Email:Martin.Black@dechert.Com

                                      BRIAN M. GOLDBERG
                                      ATTORNEY TO BE NOTICED
                                      DECHERT LLP
                                      Cira Centre 2929 Arch Street
                                      Philadelphia , PA  19104-2808
                                      USA
                                      215-994-2143
                                      Fax: 215-655-2143
                                      Email:Brian.Goldberg@dechert.Com

                                      ROBERT LOUIS MASTERSON
                                      ATTORNEY TO BE NOTICED
                                      DECHERT LLP
                                      Cira Centre
                                      2929 Arch Street
                                      Philadelphia , PA  19104
                                      USA
                                      215-994-2311
                                      Email:Robert.Masterson@dechert.Com

                                      ROBERT D. RHOAD
                                      ATTORNEY TO BE NOTICED
                                      DECHERT LLP
                                      502 Carnegie Center, Suite 104
                                      Princeton , NJ  08540
                                      USA
                                      (609) 955-3269
                                      Email:Robert.Rhoad@dechert.Com

                                      TERI-LYNN ALLONARDO EVANS
                                      ATTORNEY TO BE NOTICED
                                      DECHERT LLP

Cira Centre
2929 Arch Street
Philadelphia , PA  19104
USA
215-994-4000

VINCENT AUGUST GALLO
ATTORNEY TO BE NOTICED
[Term: 10/12/2016]
DECHERT
2929 Arch Street
Philadelphia , PA  19104
USA
215-994-4000

Lg Electronics Inc                    LISA MARIE FERRI
Counter Claimant                      LEAD ATTORNEY;ATTORNEY TO BE NOTICED
                                      [Term: 12/15/2017]
                                      MAYER BROWN LLP
                                      1675 Broadway
                                      New York , NY  10019
                                      USA
                                      212 506-2340
                                      Email:Lferri@mayerbrown.Com

                                      LIZA M. WALSH
                                      LEAD ATTORNEY;ATTORNEY TO BE NOTICED
                                      WALSH PIZZI O'REILLY FALANGA LLP
                                      Three Gateway Center
                                      100 Mulberry Street
                                      15th Floor
                                      Newark , NJ  07102
                                      USA
                                      973.757.1100
                                      Email:Lwalsh@walsh.Law

                                      JENNIFER C. CRITCHLEY
                                      ATTORNEY TO BE NOTICED
                                      [Term: 05/19/2016]
                                      CONNELL FOLEY, LLP
                                      One Newark Center
                                      1085 Raymond Blvd.
                                      19th Floor
                                      Newark , NJ  07102
                                      USA
                                      (973) 436-5800
                                      Email:Jcritchley@connellfoley.Com

                                      READE WILLIAM SELIGMANN
                                      ATTORNEY TO BE NOTICED
                                      [Term: 05/19/2016]
                                      Alston & Bird LLP
                                      90 Park Avenue
                                      New York , NY  10016
                                      USA
                                      212-210-9400
                                      Email:Reade.Seligmann@alston.Com

                                      SELINA MIRIAM ELLIS
                                      ATTORNEY TO BE NOTICED

Appx380

WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973-757-1100
Email:Sellis@walsh.Law

Lg Electronics U.S.A., Inc.
Counter Claimant

LISA MARIE FERRI
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
[Term: 12/15/2017]
MAYER BROWN LLP
1675 Broadway
New York , NY  10019
USA
212 506-2340
Email:Lferri@mayerbrown.Com

LIZA M. WALSH
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA
973.757.1100
Email:Lwalsh@walsh.Law

JENNIFER C. CRITCHLEY
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
CONNELL FOLEY, LLP
One Newark Center
1085 Raymond Blvd.
19th Floor
Newark , NJ  07102
USA
(973) 436-5800
Email:Jcritchley@connellfoley.Com

READE WILLIAM SELIGMANN
ATTORNEY TO BE NOTICED
[Term: 05/19/2016]
Alston & Bird LLP
90 Park Avenue
New York , NY  10016
USA
212-210-9400
Email:Reade.Seligmann@alston.Com

SELINA MIRIAM ELLIS
ATTORNEY TO BE NOTICED
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark , NJ  07102
USA

973-757-1100
Email:Sellis@walsh.Law

| | |
|---|---|
| Hitachi Maxell, Ltd., N/K/A Maxell Holdings, Ltd.<br>Counter Defendant | BRIAN M. GOLDBERG<br>ATTORNEY TO BE NOTICED<br>DECHERT LLP<br>Cira Centre 2929 Arch Street<br>Philadelphia , PA  19104-2808<br>USA<br>215-994-2143<br>Fax: 215-655-2143<br>Email:Brian.Goldberg@dechert.Com |

| | |
|---|---|
| Maxell, Ltd.<br>Counter Defendant | BRIAN M. GOLDBERG<br>ATTORNEY TO BE NOTICED<br>DECHERT LLP<br>Cira Centre 2929 Arch Street<br>Philadelphia , PA  19104-2808<br>USA<br>215-994-2143<br>Fax: 215-655-2143<br>Email:Brian.Goldberg@dechert.Com |

| | |
|---|---|
| Mondis Technology Ltd<br>Counter Defendant | MARTIN JAY BLACK<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DECHERT LLP<br>2929 Arch Street<br>Philadelphia , PA  19104<br>USA<br>215-994-2664<br>Email:Martin.Black@dechert.Com<br><br>BRIAN M. GOLDBERG<br>ATTORNEY TO BE NOTICED<br>DECHERT LLP<br>Cira Centre 2929 Arch Street<br>Philadelphia , PA  19104-2808<br>USA<br>215-994-2143<br>Fax: 215-655-2143<br>Email:Brian.Goldberg@dechert.Com<br><br>ROBERT LOUIS MASTERSON<br>ATTORNEY TO BE NOTICED<br>DECHERT LLP<br>Cira Centre<br>2929 Arch Street<br>Philadelphia , PA  19104<br>USA<br>215-994-2311<br>Email:Robert.Masterson@dechert.Com<br><br>ROBERT D. RHOAD<br>ATTORNEY TO BE NOTICED<br>DECHERT LLP<br>502 Carnegie Center, Suite 104<br>Princeton , NJ  08540 |

USA
(609) 955-3269
Email:Robert.Rhoad@dechert.Com

TERI-LYNN ALLONARDO EVANS
ATTORNEY TO BE NOTICED
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia , PA 19104
USA
215-994-4000

VINCENT AUGUST GALLO
ATTORNEY TO BE NOTICED
[Term: 10/12/2016]
DECHERT
2929 Arch Street
Philadelphia , PA 19104
USA
215-994-4000

| Date | # | Proceeding Text | Source |
|------|---|-----------------|--------|
| 06/21/2014 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0540-4713787.), filed by Mondis Technology Ltd. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A U.S. Patent No. 6,513,088, # 3 Exhibit B U.S. Patent No. 6,549,970, # 4 Exhibit C U.S. Patent No. 7,089,342, # 5 Exhibit D U.S. Patent No. 7,435,180, # 6 Exhibit E U.S. Patent No. 6,639,588)(Plies, Jeffrey) (Entered: 06/21/2014) | |
| 06/21/2014 | 2 | Notice of Filing of Patent/Trademark Form (AO 120). AO 120 mailed to the Director of the U.S. Patent and Trademark Office. (Plies, Jeffrey) (Entered: 06/21/2014) | |
| 06/23/2014 | 3 | NOTICE of Attorney Appearance by Otis W Carroll, Jr on behalf of Mondis Technology Ltd (Carroll, Otis) (Entered: 06/23/2014) | |
| 06/23/2014 | 4 | NOTICE of Attorney Appearance by James Patrick Kelley on behalf of Mondis Technology Ltd (Kelley, James) (Entered: 06/23/2014) | |
| 06/23/2014 | | Case assigned to Judge Rodney Gilstrap. (ch, ) (Entered: 06/23/2014) | |
| 06/23/2014 | | In accordance with the provisions of 28 USC Section 636(c), you are hereby notified that a U.S. Magistrate Judge of this district court is available to conduct any or all proceedings in this case including a jury or non-jury trial and to order the entry of a final judgment. The form Consent to Proceed Before Magistrate Judge is available on our website. All signed consent forms, excluding pro se parties, should be filed electronically using the event Notice Regarding Consent to Proceed Before Magistrate Judge. (ch, ) (Entered: 06/23/2014) | |
| 06/24/2014 | 5 | CORPORATE DISCLOSURE STATEMENT filed by Mondis Technology Ltd identifying Other Affiliate RIT Capital Partners PLC for Mondis Technology Ltd. (Plies, Jeffrey) (Entered: 06/24/2014) | |
| 10/09/2014 | 6 | SUMMONS Issued as to LG Electronics U.S.A Inc. (nkl, ) (Entered: 10/09/2014) | |
| 10/16/2014 | 7 | SUMMONS Returned Executed by Mondis Technology Ltd. LG Electronics U.S.A Inc. served on 10/16/2014, answer due 11/6/2014. (nkl, ) (Entered: 10/16/2014) | |
| 10/29/2014 | 8 | | |

|            |    | NOTICE of Attorney Appearance by Allen Franklin Gardner on behalf of LG Electronics Inc, LG Electronics U.S.A Inc. (Gardner, Allen) (Entered: 10/29/2014) |
|------------|----|---|
| 10/29/2014 | 9  | NOTICE of Attorney Appearance by Michael E Jones on behalf of LG Electronics Inc, LG Electronics U.S.A Inc. (Jones, Michael) (Entered: 10/29/2014) |
| 10/29/2014 | 10 | Joint MOTION for Extension of Time to File Answer by LG Electronics Inc, LG Electronics U.S.A Inc., Mondis Technology Ltd. (Attachments: # 1 Exhibit Waiver of Service, # 2 Text of Proposed Order)(Gardner, Allen) (Entered: 10/29/2014) |
| 11/03/2014 | 11 | WAIVER OF SERVICE Returned Executed by Mondis Technology Ltd. LG Electronics Inc waiver sent on 10/23/2014, answer due 12/22/2014. (nkl, ) (Entered: 11/03/2014) |
| 12/01/2014 | 12 | ORDER granting 10 Motion for Extension of Time to Answer re 1 Complaint,. Signed by Judge Rodney Gilstrap on 12/01/2014. (nkl, ) (Entered: 12/01/2014) |
| 12/01/2014 |    | Answer Due Deadline Updated for LG Electronics U.S.A Inc. to 1/21/2015. (nkl, ) (Entered: 12/01/2014) |
| 12/08/2014 |    | CORRECTED WAIVER OF SERVICE Returned Executed by Mondis Technology Ltd. LG Electronics Inc waiver sent on 10/23/2014, answer due 1/21/2015. See document 11 . (nkl, ) (Entered: 12/08/2014) |
| 12/18/2014 | 13 | ORDER - Scheduling Conference set for 1/20/2015 01:30 PM before the Honorable Rodney Gilstrap and the Honorable Roy Payne. Signed by Judge Rodney Gilstrap on 12/18/2014. (nkl, ) (Entered: 12/18/2014) |
| 12/29/2014 | 14 | Unopposed MOTION for Extension of Time to Complete Discovery to Provide P.R. 3-1 to P.R. 3-4 Disclosures by Mondis Technology Ltd. (Attachments: # 1 Text of Proposed Order)(Plies, Jeffrey) (Entered: 12/29/2014) |
| 01/06/2015 | 15 | ORDER granting in part and denying in part 14 Motion for Extension of Time to Complete Discovery. Signed by Judge Rodney Gilstrap on 01/06/2015. (nkl, ) (Entered: 01/06/2015) |
| 01/15/2015 | 16 | NOTICE of Attorney Appearance by Michael W Maas on behalf of LG Electronics Inc, LG Electronics U.S.A Inc. (Maas, Michael) (Entered: 01/15/2015) |
| 01/15/2015 | 17 | NOTICE of Attorney Appearance by Jamie B Beaber on behalf of LG Electronics Inc, LG Electronics U.S.A Inc. (Beaber, Jamie) (Entered: 01/15/2015) |
| 01/20/2015 | 18 | NOTICE of Attorney Appearance by Hyunho Park on behalf of LG Electronics Inc, LG Electronics U.S.A Inc. (Park, Hyunho) (Entered: 01/20/2015) |
| 01/20/2015 |    | Minute Entry for proceedings held before Judge Rodney Gilstrap: Scheduling Conference held on 1/20/15. Counsel for the parties appeared and were asked if they consented to a trial before Judge Payne. The Court then gave Markman and Jury Selection dates; deadlines for submitting Mediator names (3 days); and deadlines for submitting Agreed Scheduling and Discovery Orders (14 days). (Court Reporter Shelly Holmes, CSR-TCRR.)(jml) (Entered: 01/23/2015) |
| 01/21/2015 | 19 | FILED IN ERROR PER ATTORNEY ANSWER to 1 Complaint, Affirmative Defenses, COUNTERCLAIM S against Mondis Technology Ltd by LG Electronics U.S.A Inc., LG Electronics Inc.(Beaber, Jamie) Modified on 1/22/2015 (nkl, ). (Entered: 01/21/2015) |
| 01/21/2015 | 20 | Corrected ANSWER to 1 Complaint, Affirmative Defenses, COUNTERCLAIM S against Mondis Technology Ltd by LG Electronics U.S.A Inc., LG Electronics Inc.(Beaber, Jamie) (Entered: 01/21/2015) |

| | | |
|---|---|---|
| 01/22/2015 | | In accordance with the provisions of 28 USC Section 636(c), you are hereby notified that a U.S. Magistrate Judge of this district court is available to conduct any or all proceedings in this case including a jury or non-jury trial and to order the entry of a final judgment. The form Consent to Proceed Before Magistrate Judge is available on our website. All signed consent forms, excluding pro se parties, should be filed electronically using the event Notice Regarding Consent to Proceed Before Magistrate Judge. (nkl, ) (Entered: 01/22/2015) |
| 01/22/2015 | | ***FILED IN ERROR PER ATTORNEY. Document # 19, Answer. PLEASE IGNORE.*** (nkl, ) (Entered: 01/22/2015) |
| 01/23/2015 | 21 | NOTICE of Designation of Mediator, David Folsom, filed by LG Electronics Inc, LG Electronics U.S.A Inc, Mondis Technology Ltd. (Gardner, Allen) (Entered: 01/23/2015) |
| 01/23/2015 | 22 | ORDER REFERRING CASE to Mediator. Hon. David Folsom is hereby appointed as mediator in the above referenced case. Signed by Judge Rodney Gilstrap on 01/23/2015. (nkl, ) (Entered: 01/23/2015) |
| 01/28/2015 | 23 | CORPORATE DISCLOSURE STATEMENT filed by LG Electronics Inc, LG Electronics U.S.A Inc. identifying Corporate Parent LG Corporation for LG Electronics Inc; Corporate Parent LG Electronics Inc for LG Electronics U.S.A Inc.. (Beaber, Jamie) (Entered: 01/28/2015) |
| 01/28/2015 | 24 | MOTION to Change Venue by LG Electronics Inc, LG Electronics U.S.A Inc.. (Attachments: # 1 Declaration of Timothy Alessi, # 2 Declaration of Michael W. Maas, # 3 Exhibit 1 - Hitachi America Business Address, # 4 Exhibit 2 - 6,513,088 Patent Documents Signed by Kraus, # 5 Exhibit 3 - 6,549,970 Documents Signed by Kraus, # 6 Exhibit 4 - 7,089,342 Documents Signed by Kraus, # 7 Exhibit 5 - 7,475,180 Documents Signed by Kraus, # 8 Exhibit 6 - 6,639,588 Documents Signed by Malur, # 9 Exhibit 7 - Webpage for Attorney Kraus, # 10 Exhibit 8 - Webpage for Attorney Malur, # 11 Exhibit 9 - 088 Patent, Reexamination Certificate, # 12 Exhibit 10 - 970 Patent, Notice of Intent to Issue Reexamination Certificate, # 13 Exhibit 11 - 180 Patent, Examiner's Answer Brief, # 14 Exhibit 12 - 342 Patent, 10.1.12 Action Closing Prosecution, # 15 Exhibit 13 - 588 Patent, 4.11.14 Decision Granting Petition, # 16 Exhibit 14 - 180 Reexamination 95000480, 4.11.14 Decision Dismissing Petition, # 17 Exhibit 15 - 342 Reexamination 95000458, 4.11.14 Decision Denying Petition, # 18 Exhibit 16 - 342 Patent, Reexamination Ordered, # 19 Exhibit 17 - 180 Patent, 11.3.14 Reexamination Ordered, # 20 Exhibit 18 - 342 Patent, 12.2.14 Office Action, # 21 Exhibit 19 - 088 Patent, 1.5.15 Reexamination Ordered, # 22 Exhibit 20 - 970 Patent, 12.24.14 Reexamination Ordered, # 23 Exhibit 21 - 180 Patent, 9.10.14 Reexamination Ordered, # 24 Exhibit 22 - 588 Patent, 12.30.14 Reexamination Ordered, # 25 Exhibit 23 - LHR to IAH - Distance from London to Houston, # 26 Exhibit 24 - IAH to SHV - Distance from Houston to Shreveport, # 27 Exhibit 25 - Distance from Shreveport to Marshall, # 28 Exhibit 26 - LHR to EWR - Distance from London to Newark, # 29 Exhibit 27 - Distance from Newark to District Court, # 30 Exhibit 28 - IBM Contact Information, # 31 Exhibit 29 - Distrance from Hitachi to District Court, # 32 Exhibit 30 - Distrance from IBM to District Court, # 33 Exhibit 31 - National Judicial Caseload Profile, # 34 Exhibit 32 - District of New Jersey Local Rules, # 35 Text of Proposed Order)(Beaber, Jamie) (Entered: 01/28/2015) |
| 01/28/2015 | 25 | WITHDRAWN PER ORDER 41 MOTION to Stay Proceedings Pending Reexamination of the Patents-In-Suit by LG Electronics Inc, LG Electronics U.S.A Inc.. (Attachments: # 1 Declaration of Michael W. Maas, # 2 Exhibit 1 - Status of Claims of the Asserted Patents, # 3 Exhibit 2 - 088 Patent, Reexamination Certificate, # 4 Exhibit 3 - 088 Patent, 11.3.14 Reexamination Request, # 5 Exhibit 4 - 088 Patent, 1.5.15 Reexamination Ordered, # 6 Exhibit 5 - 970 Patent, 1.23.15 Notice of Intent to Issue Reexamination Certificate, # 7 Exhibit 6 - 970 Patent, 11.3.14 |

Reexamination Request, # 8 Exhibit 7 - 970 Patent, 12.24.14
Reexamination Ordered, # 9 Exhibit 8 - 342 Patent, 10.1.12 Action Closing
Prosecution, # 10 Exhibit 9 - 342 Patent, 4.11.14 Decision Denying
Petition, # 11 Exhibit 10 - 342 Patent, 12.2.14 Office Action, # 12 Exhibit
11 - 180 Patent, 11.10.14 Examiner's Answer, # 13 Exhibit 12 - 180
Patent, 9.10.14 Reexamination Ordered, # 14 Exhibit 13 - 180 Patent,
12.10.14 Reexamination Ordered, # 15 Exhibit 14 - 588 Patent, 7.2.12
Decision on Appeal, # 16 Exhibit 15 - 588 Patent, 12.30.14 Reexamination
Ordered, # 17 Text of Proposed Order)(Beaber, Jamie) Modified on
3/2/2015 (nkl, ). (Entered: 01/28/2015)

02/02/2015   26   NOTICE of Discovery Disclosure by Mondis Technology Ltd Pursuant to P.R.
3-1 and 3-2 (Plies, Jeffrey) (Entered: 02/02/2015)

02/03/2015   27   FILED IN ERROR - ATTORNEY WILL RE-FILE Submission of Proposed
Agreed Docket Control/Scheduling order by LG Electronics Inc, LG
Electronics U.S.A Inc., Mondis Technology Ltd . (Attachments: # 1 Text of
Proposed Order Proposed Docket Control Order)(Plies, Jeffrey) Modified on
2/3/2015 (nkl, ). (Entered: 02/03/2015)

02/03/2015   28   FILED IN ERROR - ATTORNEY WILL RE-FILE Submission of Proposed
Agreed Discovery order by LG Electronics Inc, LG Electronics U.S.A Inc.,
Mondis Technology Ltd . (Attachments: # 1 Text of Proposed Order)(Plies,
Jeffrey) Modified on 2/3/2015 (nkl, ). (Entered: 02/03/2015)

02/03/2015        ***FILED IN ERROR - incorrect event used. Document # 27-28,
Submission of Proposed Agreed Docket Control/Scheduling order and
Submission of Proposed Agreed Discovery order. PLEASE IGNORE.***
(nkl, ) (Entered: 02/03/2015)

02/03/2015   29   Joint MOTION Proposed Agreed Docket Control Order by LG Electronics
Inc, LG Electronics U.S.A Inc., Mondis Technology Ltd. (Attachments: # 1
Text of Proposed Order)(Plies, Jeffrey) (Entered: 02/03/2015)

02/03/2015   30   Joint MOTION Agreed Proposed Discovery Order by LG Electronics Inc, LG
Electronics U.S.A Inc., Mondis Technology Ltd. (Attachments: # 1 Text of
Proposed Order)(Plies, Jeffrey) (Entered: 02/03/2015)

02/06/2015   31   DOCKET CONTROL ORDER re 29 Joint MOTION Proposed Agreed Docket
Control Order filed by Mondis Technology Ltd, LG Electronics U.S.A Inc.,
LG Electronics Inc., SCHEDULING ORDER:( Pretrial Conference set for
12/28/2015 09:00 AM in Ctrm 106 (Marshall) before Judge Rodney
Gilstrap., Amended Pleadings due by 4/22/2015., Joinder of Parties due by
1/27/2015., Jury Selection set for 2/8/2016 09:00 AM in Ctrm 106
(Marshall) before Judge Rodney Gilstrap., Mediation Completion due by
8/12/2015., Markman Hearing set for 7/8/2015 01:30 PM in Ctrm 106
(Marshall) before Judge Rodney Gilstrap., Motions in Limine due by
12/7/2015., Proposed Pretrial Order due by 12/21/2015.). Signed by
Judge Rodney Gilstrap on 02/05/2015. (nkl, ) (Entered: 02/06/2015)

02/06/2015   32   DISCOVERY ORDER re 30 Joint MOTION Agreed Proposed Discovery Order
filed by Mondis Technology Ltd, LG Electronics U.S.A Inc., LG Electronics
Inc. Signed by Judge Rodney Gilstrap on 02/05/2015. (nkl, ) (Entered:
02/06/2015)

02/06/2015   33   Unopposed MOTION to Withdraw 25 MOTION to Stay Proceedings Pending
Reexamination of the Patents-In-Suit by LG Electronics Inc, LG Electronics
U.S.A Inc.. (Attachments: # 1 Text of Proposed Order)(Gardner, Allen)
(Entered: 02/06/2015)

02/10/2015   34   Joint MOTION for Protective Order by LG Electronics Inc, LG Electronics
U.S.A Inc.. (Attachments: # 1 Text of Proposed Order)(Gardner, Allen)
(Entered: 02/10/2015)

02/10/2015   35   NOTICE of Discovery Disclosure by Mondis Technology Ltd Pursuant to
Paragraphs 1 and 3 of the Discovery Order (Plies, Jeffrey) (Entered:
02/10/2015)

| | | |
|---|---|---|
| 02/11/2015 | 36 | NOTICE of Discovery Disclosure by LG Electronics Inc, LG Electronics U.S.A Inc. Pursuant to Paragraphs 1 and 3 of the Discovery Order (Beaber, Jamie) (Entered: 02/11/2015) |
| 02/12/2015 | 37 | AGREED PROTECTIVE ORDER. Signed by Judge Rodney Gilstrap on 02/12/2015. (nkl, ) (Entered: 02/12/2015) |
| 02/17/2015 | 38 | ANSWER to 20 Answer to Complaint, Counterclaim by Mondis Technology Ltd.(Plies, Jeffrey) (Entered: 02/17/2015) |
| 02/17/2015 | 39 | SEALED RESPONSE to Motion re 24 MOTION to Change Venue filed by Mondis Technology Ltd. (Attachments: # 1 Affidavit Declaration of Jeffrey B. Plies In Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Affidavit Declaration of Michael B. Spiro In Support, # 34 Exhibit A, # 35 Exhibit B, # 36 Exhibit C, # 37 Exhibit D, # 38 Exhibit E, # 39 Exhibit F, # 40 Text of Proposed Order)(Plies, Jeffrey) (Entered: 02/17/2015) |
| 02/26/2015 | 40 | Unopposed MOTION for Extension of Time to File Response/Reply as to 24 MOTION to Change Venue by LG Electronics Inc, LG Electronics U.S.A Inc.. (Attachments: # 1 Text of Proposed Order)(Gardner, Allen) (Entered: 02/26/2015) |
| 03/02/2015 | 41 | ORDER withdrawing 25 Motion to Stay; granting 33 Motion to Withdraw. Signed by Judge Rodney Gilstrap on 03/02/2015. (nkl, ) (Entered: 03/02/2015) |
| 03/02/2015 | 42 | ORDER granting 40 Motion for Extension of Time to File Response/Reply re 24 MOTION to Change Venue . Replies due by 3/6/2015.. Signed by Judge Rodney Gilstrap on 03/02/2015. (nkl, ) (Entered: 03/02/2015) |
| 03/04/2015 | 43 | NOTICE of Discovery Disclosure by Mondis Technology Ltd Pursuant to P.R. 4-1 (Plies, Jeffrey) (Entered: 03/04/2015) |
| 03/05/2015 | 44 | NOTICE of Discovery Disclosure by LG Electronics Inc, LG Electronics U.S.A Inc. Pursuant to P.R. 4-1 (Beaber, Jamie) (Entered: 03/05/2015) |
| 03/06/2015 | 45 | REPLY to Response to Motion re 24 MOTION to Change Venue Pursuant to 28 U.S.C. Section 1404(a) filed by LG Electronics Inc, LG Electronics U.S.A Inc.. (Attachments: # 1 Declaration of Timothy Alessi, # 2 Declaration of Michael W. Maas, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20, # 23 Exhibit 21, # 24 Exhibit 22, # 25 Exhibit 23, # 26 Exhibit 24, # 27 Exhibit 25, # 28 Exhibit 26, # 29 Exhibit 27, # 30 Exhibit 28)(Beaber, Jamie) (Entered: 03/06/2015) |
| 03/17/2015 | 46 | SUR-REPLY to Reply to Response to Motion re 24 MOTION to Change Venue filed by Mondis Technology Ltd. (Attachments: # 1 Affidavit Declaration of Jeffrey B. Plies In Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S, # 21 Exhibit T)(Plies, Jeffrey) (Entered: 03/17/2015) |
| 03/18/2015 | 47 | NOTICE of Attorney Appearance - Pro Hac Vice by Heidi Guetschow on behalf of Mondis Technology Ltd. Filing fee $ 100, receipt number 0540-5107288. (Guetschow, Heidi) (Entered: 03/18/2015) |
| 03/25/2015 | 48 | |

|            |    | NOTICE of Discovery Disclosure by Mondis Technology Ltd of P.R. 4-2 Disclosures (Plies, Jeffrey) (Entered: 03/25/2015) |
|------------|----|---|
| 03/25/2015 | 49 | NOTICE of Discovery Disclosure by LG Electronics Inc, LG Electronics U.S.A Inc. Notice of Compliance With P.R. Rule 4-2, Preliminary Claim Constructions and Extrinsic Evidence on March 25, 2015. (Beaber, Jamie) (Entered: 03/25/2015) |
| 03/31/2015 | 50 | NOTICE of Discovery Disclosure by LG Electronics Inc, LG Electronics U.S.A Inc. Notice of Compliance with P.R. 3-3 and 3-4 (Beaber, Jamie) (Entered: 03/31/2015) |
| 04/15/2015 | 51 | Joint Claim Construction and Prehearing Statement by Mondis Technology Ltd. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Plies, Jeffrey) (Entered: 04/15/2015) |
| 04/22/2015 | 52 | REPORT of Mediation by David Folsom. Mediation result: suspended (Folsom, David) (Entered: 04/22/2015) |
| 05/27/2015 | 53 | NOTICE by LG Electronics Inc, LG Electronics U.S.A Inc. Regarding Technology Tutorial (Gardner, Allen) (Entered: 05/27/2015) |
| 05/27/2015 | 54 | CLAIM CONSTRUCTION BRIEF filed by Mondis Technology Ltd. (Attachments: # 1 Affidavit Declaration of Jeffrey B. Plies In Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35, # 37 Exhibit 36) (Plies, Jeffrey) (Entered: 05/27/2015) |
| 06/02/2015 | 55 | NOTICE by LG Electronics Inc, LG Electronics U.S.A Inc. re 24 MOTION to Change Venue of Request for Oral Hearing (Jones, Michael) (Entered: 06/02/2015) |
| 06/03/2015 | 56 | ORDER granting 24 Motion to Change Venue. Signed by Judge Rodney Gilstrap on 06/03/2015. (nkl, ) (Entered: 06/03/2015) |
| 06/08/2015 | 57 | MOTION for Clarification that the Court's Deadlines are Suspended in view of the Order Transferring the Case to the District of New Jersey by LG Electronics Inc, LG Electronics U.S.A Inc.. (Attachments: # 1 Declaration of Michael W. Maas, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Text of Proposed Order)(Beaber, Jamie) (Additional attachment(s) added on 6/8/2015: # 13 Revised Proposed Order) (nkl, ). (Entered: 06/08/2015) |
| 06/08/2015 | 58 | SEALED MOTION to Reconsider Order (Dkt. #56) Granting Motion to Transfer Venue by Mondis Technology Ltd. (Attachments: # 1 Affidavit Declaration of Jeffrey B. Plies In Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Text of Proposed Order)(Plies, Jeffrey) (Entered: 06/08/2015) |
| 06/09/2015 | 59 | ORDER denying 57 Motion for Clarification that the Court's Deadlines are Suspended in view of the Order Transferring the Case to the District of New Jersey. Signed by Judge Rodney Gilstrap on 06/09/2015. (nkl, ) (Entered: 06/09/2015) |
| 06/11/2015 | 60 | RESPONSE in Opposition re 58 SEALED MOTION to Reconsider Order (Dkt. #56) Granting Motion to Transfer filed by LG Electronics Inc, LG Electronics U.S.A Inc.. (Attachments: # 1 Affidavit M. Maas, # 2 Exhibit A - 2015.02.10 Document Production Letter from M. Maas to J. Pli..., # 3 Exhibit B - 2015.03.27 Document Production Letter from M. Maas to J. Pli..., # 4 Exhibit C - 2015.03.30 Document Production Letter from M. Maas to J. Pli..., # 5 Exhibit D - 2015.04.24 Document Production Letter |

Appx388

| | | |
|---|---|---|
| | | from J. Beaber to J. P..., # 6 Exhibit E - 2015.05.06 Document Production Letter from M. Maas to J. Pli..., # 7 Exhibit F - 2015.05.14 Document Production Letter from M. Maas to J. Pli..., # 8 Exhibit G - 2015.06.09 Document Production Letter from M. Maas to J. Pli..., # 9 Text of Proposed Order)(Gardner, Allen) (Entered: 06/11/2015) |
| 06/11/2015 | 61 | Responsive 54 Claim Construction Brief,,, filed by LG Electronics Inc, LG Electronics U.S.A Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M)(Beaber, Jamie) (Entered: 06/11/2015) |
| 06/15/2015 | 62 | SEALED REPLY to Response to Motion re 58 SEALED MOTION to Reconsider Order (Dkt. #56) Granting Motion to Transfer Venue filed by Mondis Technology Ltd. (Attachments: # 1 Affidavit Declaration of Jeffrey B. Plies In Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Plies, Jeffrey) (Entered: 06/15/2015) |
| 06/17/2015 | 63 | REPLY in Support of 54 Claim Construction Brief,,, filed by Mondis Technology Ltd. (Plies, Jeffrey) (Entered: 06/17/2015) |
| 06/17/2015 | 64 | SEALED PATENT SUR-REPLY to Reply to Response to PATENT Motion re 58 SEALED MOTION to Reconsider Order (Dkt. #56) Granting Motion to Transfer Venue filed by LG Electronics Inc, LG Electronics U.S.A Inc.. (Attachments: # 1 Declaration of M. Maas, # 2 Exhibit A - May 21, 2015 E-mail, # 3 Exhibit B - June 11, 2015 E-mail, # 4 Exhibit C - April 14, 2015 Letter to Mondis, # 5 Exhibit D - Mondis's Responses to LG's First RFAs)(Jones, Michael) (Entered: 06/17/2015) |
| 06/24/2015 | 65 | Joint Claim Construction Chart by Mondis Technology Ltd. (Plies, Jeffrey) (Entered: 06/24/2015) |
| 06/26/2015 | 66 | ORDER denying 58 Sealed Motion. Signed by Judge Rodney Gilstrap on 06/25/2015. (nkl, ) (Entered: 06/26/2015) |
| 06/26/2015 | 67 | Certified Copy of Transfer Order and docket received, Case transferred in from District of Texas Eastern; Case Number 2:14-cv-00702. Original file certified copy of transfer order and docket sheet received. (Entered: 06/26/2015) |
| 06/26/2015 | 68 | NOTICE of Appearance by VINCENT AUGUST GALLO on behalf of Mondis Technology Ltd (Attachments: # 1 Certificate of Service)(GALLO, VINCENT) (Entered: 06/26/2015) |
| 06/26/2015 | 69 | NOTICE of Appearance by TERI-LYNN ALLONARDO EVANS on behalf of Mondis Technology Ltd (Attachments: # 1 Certificate of Service)(EVANS, TERI-LYNN) (Entered: 06/26/2015) |
| 06/29/2015 | | Judge Madeline C. Arleo and Magistrate Judge Leda D. Wettre added. (eu, ) (Entered: 06/29/2015) |
| 06/29/2015 | 70 | NOTICE of Appearance by LISA M. FERRI on behalf of LG ELECTRONICS U.S.A., INC., LG Electronics Inc (Attachments: # 1 Certificate of Service) (FERRI, LISA) (Entered: 06/29/2015) |
| 07/01/2015 | 71 | NOTICE of Appearance by ROBERT LOUIS MASTERSON on behalf of Mondis Technology Ltd (MASTERSON, ROBERT) (Entered: 07/01/2015) |
| 07/01/2015 | 72 | NOTICE of Appearance by BRIAN M. GOLDBERG on behalf of Mondis Technology Ltd (Attachments: # 1 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 07/01/2015) |
| 07/06/2015 | 73 | NOTICE of Appearance by LIZA M. WALSH on behalf of LG ELECTRONICS U.S.A., INC., LG Electronics Inc (WALSH, LIZA) (Entered: 07/06/2015) |
| 07/06/2015 | 74 | NOTICE of Appearance by JENNIFER C. CRITCHLEY on behalf of LG ELECTRONICS U.S.A., INC., LG Electronics Inc (CRITCHLEY, JENNIFER) (Entered: 07/06/2015) |
| 07/06/2015 | 75 | |

|  |  |  |
|---|---|---|
|  |  | NOTICE of Appearance by READE WILLIAM SELIGMANN on behalf of LG ELECTRONICS U.S.A., INC., LG Electronics Inc (SELIGMANN, READE) (Entered: 07/06/2015) |
| 07/09/2015 | 76 | Letter from Liza M. Walsh to the Honorable Leda D. Wettre, U.S.M.J. enclosing Pro Hac Vice Application on Consent. (Attachments: # 1 Certification of Jamie B. Beaber, # 2 Certification of Michael W. Maas, # 3 Supporting Certification of Liza M. Walsh, # 4 Text of Proposed Order) (WALSH, LIZA) (Entered: 07/09/2015) |
| 07/10/2015 | 77 | ORDER permitting Jamie B. Beaber and Michael W. Maas to appear pro hac vice. Signed by Magistrate Judge Leda D. Wettre on 7/10/15. (sr, ) (Entered: 07/10/2015) |
| 07/10/2015 | 78 | Notice of Request by Pro Hac Vice Jamie B. Beaber to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-6514034.) (WALSH, LIZA) (Entered: 07/10/2015) |
| 07/10/2015 | 79 | Notice of Request by Pro Hac Vice Michael W. Maas to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-6514043.) (WALSH, LIZA) (Entered: 07/10/2015) |
| 07/13/2015 |  | Pro Hac Vice counsel, JAMIE B. BEABER and MICHAEL W. MASS, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (sr, ) (Entered: 07/13/2015) |
| 07/14/2015 | 80 | NOTICE of Appearance by MARTIN JAY BLACK on behalf of Mondis Technology Ltd (Attachments: # 1 Certificate of Service)(BLACK, MARTIN) (Entered: 07/14/2015) |
| 07/15/2015 | 81 | TEXT ORDER - The parties shall submit letters updating the Court on the status of this matter no later than 7/24/15.So Ordered by Magistrate Judge Leda D. Wettre on 7/15/2015. (kd) (Entered: 07/15/2015) |
| 07/22/2015 | 82 | TEXT ORDER - A Telephone Conference Call is set for 7/27/2015 at 03:45 PM before Magistrate Judge Leda D. Wettre to discuss disclosures. So Ordered by Magistrate Judge Leda D. Wettre on 7/22/2015. (kd) (Entered: 07/22/2015) |
| 07/22/2015 | 83 | Letter from Brian M. Goldberg to the Honorable Leda D. Wettre, U.S.M.J. enclosing Pro Hac Vice Application on Consent. (Attachments: # 1 Certification of Jeffrey B. Plies, # 2 Certification of Jeffrey S. Edwards, # 3 Certification of Brian M. Goldberg, # 4 Text of Proposed Order, # 5 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 07/22/2015) |
| 07/23/2015 | 84 | TEXT ORDER - Rescheduling a Telephone Conference from 7/27/2015 at 3:45 om to 7/27/2015 at 4:00 pm.So Ordered by Magistrate Judge Leda D. Wettre on 7/23/15. (kd) (Entered: 07/23/2015) |
| 07/24/2015 | 85 | Letter from Martin J. Black regarding case status. (Attachments: # 1 Exhibit - EDTX Docket Control Order, # 2 Certificate of Service)(BLACK, MARTIN) (Entered: 07/24/2015) |
| 07/24/2015 | 86 | Letter from Liza M. Walsh to Judge Leda D. Wettre, U.S.M.J., Regarding Status of the Case with Exhibits A-D Annexed Thereto. (WALSH, LIZA) (Entered: 07/24/2015) |
| 07/27/2015 |  | Minute Entry for proceedings held before Magistrate Judge Leda D. Wettre: Telephone Conference held on 7/27/2015. (kd) (Entered: 07/28/2015) |
| 07/28/2015 | 87 | Letter from Martin J. Black to Judge Leda D. Wettre, U.S.M.J.. (Attachments: # 1 Certificate of Service)(BLACK, MARTIN) (Entered: 07/28/2015) |
| 07/29/2015 | 88 | Letter from Liza M. Walsh to the Hon. Leda D. Wettre, U.S.M.J.. (WALSH, LIZA) (Entered: 07/29/2015) |
| 08/04/2015 | 89 |  |

|  |  | Letter from Liza M. Walsh to the Hon. Leda D. Wettre, U.S.M.J., Regarding Update in Status of the Case with Exhibit A Annexed Thereto. (Attachments: # 1 Exhibit A)(WALSH, LIZA) (Entered: 08/04/2015) |
|---|---|---|
| 08/10/2015 | 90 | Letter from Martin J. Black to Judge Leda D. Wettre, U.S.M.J., regarding case schedule. (Attachments: # 1 Exhibit A, # 2 Certificate of Service) (BLACK, MARTIN) (Entered: 08/10/2015) |
| 08/11/2015 |  | Minute Entry for proceedings held before Magistrate Judge M. C. Arleo: Pursuant to Local Patent Rule 1.5 Patent Pilot Project, case shall be reassigned to a designated patent judge. (gh, ) (Entered: 08/11/2015) |
| 08/11/2015 | 91 | Letter from Liza M. Walsh to the Hon. Leda D. Wettre in response to Plaintiff's August 10, 2015 Letter. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(WALSH, LIZA) (Entered: 08/11/2015) |
| 08/12/2015 | 92 | TEXT ORDER REASSIGNING CASE. Case reassigned to Judge Stanley R. Chesler and Magistrate Judge Cathy L. Waldor for all further proceedings. Judge Madeline C. Arleo, Magistrate Judge Leda D. Wettre no longer assigned to case. So Ordered by Chief Judge Jerome B. Simandle on 8/12/15. (ak, ) (Entered: 08/12/2015) |
| 08/20/2015 | 93 | TEXT ORDER: The Court will hold a telephone conference, to be initiated by plaintiff, on 9/3/15 at 10:45 AM. Parties may contact chambers at (973) 776 7862. So Ordered by Magistrate Judge Cathy L. Waldor on 8/20/15. (tjg, ) (Entered: 08/20/2015) |
| 08/20/2015 | 94 | ORDER permitting Jeffrey S. Plies, Jeffrey B. Edwards to appear pro hac vice. Signed by Magistrate Judge Cathy L. Waldor on 8/20/15. (sr, ) (Entered: 08/21/2015) |
| 08/25/2015 |  | Pro Hac Vice fee: $ 300, receipt number NEW027074 RE: Jeffrey S. Plies, Jeffrey B. Edwards. (sr, ) (Entered: 08/25/2015) |
| 08/27/2015 | 95 | Notice of Request by Pro Hac Vice Jeffrey S. Plies to receive Notices of Electronic Filings. (Attachments: # 1 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 08/27/2015) |
| 08/27/2015 | 96 | Notice of Request by Pro Hac Vice Jeffrey B. Edwards to receive Notices of Electronic Filings. (Attachments: # 1 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 08/27/2015) |
| 08/27/2015 |  | Pro Hac Vice counsel, JEFFREY S. PLIES and JEFFREY B. EDWARDS, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (sr, ) (Entered: 08/27/2015) |
| 08/31/2015 | 97 | Letter from Liza M. Walsh to Judge Cathy L. Waldor, U.S.M.J., Regarding Additional Information on Status of Ex Parte Reexaminations. (WALSH, LIZA) (Entered: 08/31/2015) |
| 09/02/2015 | 98 | Letter from Jeffrey B. Plies to Hon. Cathy Waldor, U.S.M.J. re 97 Letter. (EVANS, TERI-LYNN) (Entered: 09/02/2015) |
| 09/03/2015 |  | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Status Conference held on 9/3/2015. (tjg, ) (Entered: 09/03/2015) |
| 09/03/2015 | 99 | ORDER that Defendants are permitted leave to file a motion to stay the matter pending the USPTO's reexamination of the patents in suit which shall be filed on or before September 18, 2015. Plaintiff may file its opposition to the motion on or before October 2, 2015. Defendants shall be permitted a reply, which shall be filed on or before October 9, 2015. The Court will hold a teleconference, to be initiated by Plaintiffs counsel, on November 12, 2015 at 12:30 pm; etc. Signed by Magistrate Judge Cathy L. Waldor on 9/3/15. (sr, ) (Entered: 09/03/2015) |
| 09/18/2015 | 100 | MOTION to Seal by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Letter Brief in Support of Motion to Seal, # 2 |

|  |  |  |
|---|---|---|
| | | Certification of Liza M. Walsh, # 3 Text of Proposed Order, # 4 Certificate of Service)(WALSH, LIZA) (Entered: 09/18/2015) |
| 09/18/2015 | 101 | MOTION to Stay by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Declaration of Jennifer Critchley, # 2 Exhibit 1 - 7, # 3 Exhibit 8, # 4 Exhibit 9, # 5 Exhibit 10 - 16, # 6 Exhibit 17 - 18, # 7 Exhibit 19, # 8 Exhibit 20 -33, # 9 Exhibit 34, # 10 Text of Proposed Order, # 11 Certificate of Service)(WALSH, LIZA) (Entered: 09/18/2015) |
| 09/18/2015 | 102 | BRIEF in Support of Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc.'s Motion to Stay Case Pending Outcome of USPTO Proceedings (CONFIDENTIAL) (WALSH, LIZA) (Entered: 09/18/2015) |
| 09/21/2015 | | Set/Reset Deadlines as to 101 MOTION to Stay , 100 MOTION to Seal . Motion set for 10/19/2015 before Judge Stanley R. Chesler. The motion will be decided on the papers. No appearances required unless notified by the court. (sr, ) (Entered: 09/21/2015) |
| 09/21/2015 | 103 | REDACTION to 102 Brief in Support of Motion to Stay by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 09/21/2015) |
| 10/02/2015 | 104 | RESPONSE to Motion filed by Mondis Technology Ltd re 100 MOTION to Seal (Attachments: # 1 Certificate of Service)(BLACK, MARTIN) (Entered: 10/02/2015) |
| 10/02/2015 | 105 | MOTION to Seal Plaintiff's Opposition to Defendants' Motion to Stay Case by Mondis Technology Ltd. (Attachments: # 1 Rule 7.1(d)(4) Statement in Lieu of Brief, # 2 Declaration of Jeffrey S. Edwards in Support of Motion to Seal, # 3 Text of Proposed Order, # 4 Certificate of Service)(BLACK, MARTIN) (Entered: 10/02/2015) |
| 10/02/2015 | 106 | BRIEF in Opposition filed by Mondis Technology Ltd re 101 MOTION to Stay Case Pending Outcome of USPTO Proceedings (Attachments: # 1 Exhibit 1 to the Declaration of Jeffrey B. Plies, # 2 Exhibit 2 to the Declaration of Jeffrey B. Plies, # 3 Exhibit 15 to the Declaration of Jeffrey B. Plies)(BLACK, MARTIN) (Entered: 10/02/2015) |
| 10/02/2015 | 107 | DECLARATION of Jeffrey B. Plies re 106 Brief in Opposition to Motion, to Stay Case Pending Outcome of USPTO Proceedings by Mondis Technology Ltd. (Attachments: # 1 Exhibit 3 to the Declaration of Jeffrey B. Plies, # 2 Exhibit 4 to the Declaration of Jeffrey B. Plies, # 3 Exhibit 5 to the Declaration of Jeffrey B. Plies, # 4 Exhibit 6 to the Declaration of Jeffrey B. Plies, # 5 Exhibit 7 to the Declaration of Jeffrey B. Plies, # 6 Exhibit 8 to the Declaration of Jeffrey B. Plies, # 7 Exhibit 9 to the Declaration of Jeffrey B. Plies, # 8 Exhibit 10 to the Declaration of Jeffrey B. Plies, # 9 Exhibit 11 to the Declaration of Jeffrey B. Plies, # 10 Exhibit 12 to the Declaration of Jeffrey B. Plies, # 11 Exhibit 13 to the Declaration of Jeffrey B. Plies, # 12 Exhibit 14 to the Declaration of Jeffrey B. Plies, # 13 Exhibit 16 to the Declaration of Jeffrey B. Plies, # 14 Exhibit 17 to the Declaration of Jeffrey B. Plies, # 15 Exhibit 18 to the Declaration of Jeffrey B. Plies, # 16 Exhibit 19 to the Declaration of Jeffrey B. Plies, # 17 Exhibit 20 to the Declaration of Jeffrey B. Plies, # 18 Exhibit 21 to the Declaration of Jeffrey B. Plies, # 19 Exhibit 22 to the Declaration of Jeffrey B. Plies, # 20 Exhibit 23 to the Declaration of Jeffrey B. Plies, # 21 Exhibit 24 to the Declaration of Jeffrey B. Plies, # 22 Exhibit 25 to the Declaration of Jeffrey B. Plies, # 23 Certificate of Service)(BLACK, MARTIN) (Entered: 10/02/2015) |
| 10/05/2015 | | Set/Reset Deadlines as to 105 MOTION to Seal Plaintiff's Opposition to Defendants' Motion to Stay Case. Motion set for 11/2/2015 before Judge Stanley R. Chesler. The motion will be decided on the papers. No appearances required unless notified by the court. (sr, ) (Entered: 10/05/2015) |
| 10/09/2015 | 108 | REPLY BRIEF to Opposition to Motion filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 101 MOTION to Stay (WALSH, LIZA) (Entered: 10/09/2015) |
| 10/09/2015 | 109 | |

Appx392

|  |  |  |
|---|---|---|
|  |  | DECLARATION of Liza M. Walsh re 108 Reply Brief to Opposition to Motion by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Exhibit 1-11, # 2 Exhibit 12-24, # 3 Certificate of Service)(WALSH, LIZA) (Entered: 10/09/2015) |
| 10/09/2015 | 110 | MOTION to Seal Reply Brief in Support of LG Electronics, Inc. and LG Electronics U.S.A., Inc. Motion to Stay Case Pending Outcome of USPTO Proceedings by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Letter Brief, # 2 Certification Liza M. Walsh with Exhibit 1, # 3 Text of Proposed Order, # 4 Certificate of Service)(WALSH, LIZA) (Entered: 10/09/2015) |
| 10/13/2015 |  | Set/Reset Deadlines as to 110 MOTION to Seal Reply Brief in Support of LG Electronics, Inc. and LG Electronics U.S.A., Inc. Motion to Stay Case Pending Outcome of USPTO Proceedings. Motion set for 11/2/2015 before Judge Stanley R. Chesler. The motion will be decided on the papers. No appearances required unless notified by the court. (sr, ) (Entered: 10/13/2015) |
| 10/13/2015 | 111 | REDACTION to 108 Reply Brief to Opposition to Motion by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 10/13/2015) |
| 10/15/2015 | 112 | ORDER granting 110 Motion to Seal. Signed by Judge Stanley R. Chesler on 10/15/15. (sr, ) (Entered: 10/15/2015) |
| 10/15/2015 | 113 | ORDER granting 100 Motion to Seal. Signed by Judge Stanley R. Chesler on 10/15/15. (sr, ) (Entered: 10/15/2015) |
| 10/15/2015 | 114 | ORDER granting 105 Motion to Seal. Signed by Judge Stanley R. Chesler on 10/15/15. (sr, ) (Entered: 10/15/2015) |
| 10/22/2015 | 115 | Letter from Liza M. Walsh to the Honorable Stanley R. Chelser, U.S.D.J. and the Honorable Cathy L. Waldor, U.S.M.J. re 101 MOTION to Stay . (WALSH, LIZA) (Entered: 10/22/2015) |
| 10/22/2015 | 116 | BRIEF in Opposition filed by Mondis Technology Ltd re 101 MOTION to Stay (REDACTED) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 15)(GOLDBERG, BRIAN) (Entered: 10/22/2015) |
| 10/27/2015 | 117 | Letter from Brian M. Goldberg to the Clerk of Court Regarding Inadvertent Filing Under Seal. (Attachments: # 1 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 10/27/2015) |
| 11/04/2015 | 118 | Letter from Liza M. Walsh to the Honorable Cathy L. Waldor, U.S.M.J. re 99 Order,,. (WALSH, LIZA) (Entered: 11/04/2015) |
| 11/05/2015 | 119 | TEXT ORDER: The Court will reschedule the start time of the 11/12/15 conference from 12:30 pm to 2:15 pm. So Ordered by Magistrate Judge Cathy L. Waldor on 11/5/15. (tjg, ) (Entered: 11/05/2015) |
| 11/12/2015 | 120 | OPINION fld. Signed by Judge Stanley R. Chesler on 11/12/15. (sr, ) (Entered: 11/12/2015) |
| 11/12/2015 | 121 | ORDER granting 101 Motion to Stay pending PTO reexamination and this case is STAYED pending completion of the PTO patent reexamination process on all asserted patents in this suit. Defense counsel shall provide the Court with status updates regarding the PTO's ex parte reexamination of the 088 patent, the 970 patent, the 342 patent, the 180 patent, and the 588 patent every 60 days starting November 20, 2015, defense counsel shall notify the Court within 10 days of any disposition of the PTO's ex parte reexamination of the 088 patent, the 970 patent, the 342 patent, the 180 patent, or the 588 patent. The Clerk shall administratively terminate this case pending completion of the PTO reexamination process; etc. Signed by Judge Stanley R. Chesler on 11/12/15. (sr, ) (Entered: 11/12/2015) |
| 11/12/2015 |  | ***Civil Case Terminated. (sr, ) (Entered: 11/12/2015) |
| 11/20/2015 | 122 |  |

|            |     | Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. and Honorable Cathy L. Waldor, U.S.M.J re 121 Order on Motion to Stay,,,. (WALSH, LIZA) (Entered: 11/20/2015) |
| 12/15/2015 | 123 | NOTICE by MICHAEL W. MASS of Withdrawal as Counsel Admitted Pro Hac Vice and Request for Removal From Electronic Notification (WALSH, LIZA) (Entered: 12/15/2015) |
| 12/17/2015 | 124 | Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. and Honorable Cathy L. Waldor, U.S.M.J. re 121 Order on Motion to Stay,,, 122 Letter. (WALSH, LIZA) (Entered: 12/17/2015) |
| 01/19/2016 | 125 | Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. and the Honorable Cathy L. Waldor, U.S.M.J. re 121 Order on Motion to Stay,,,. (WALSH, LIZA) (Entered: 01/19/2016) |
| 03/21/2016 | 126 | Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. and Honorable Cathy L. Waldor, U.S.M.J. re 121 Order on Motion to Stay,,,. (WALSH, LIZA) (Entered: 03/21/2016) |
| 05/19/2016 | 127 | Substitution of Attorney - Attorney JENNIFER C. CRITCHLEY and READE WILLIAM SELIGMANN terminated. Attorney LIZA M. WALSH for LG ELECTRONICS U.S.A., INC.,LIZA M. WALSH for LG Electronics Inc added.. (WALSH, LIZA) (Entered: 05/19/2016) |
| 05/23/2016 | 128 | Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. and Honorable Cathy L. Waldor, U.S.M.J. re 121 Order on Motion to Stay,,,. (WALSH, LIZA) (Entered: 05/23/2016) |
| 06/15/2016 | 129 | NOTICE of Change of Address by LIZA M. WALSH (WALSH, LIZA) (Entered: 06/15/2016) |
| 06/17/2016 | 130 | Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. and Honorable Cathy L. Waldor, U.S.M.J. with Exhibits A - D re 121 Order on Motion to Stay,,,. (WALSH, LIZA) (Entered: 06/17/2016) |
| 07/08/2016 | 131 | Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. and the Honorable Cathy L. Waldor, U.S.M.J. re 121 Order on Motion to Stay,,,. (WALSH, LIZA) (Entered: 07/08/2016) |
| 07/13/2016 | 132 | Letter from Martin J. Black to Judge Chesler regarding reactivation of case. (BLACK, MARTIN) (Entered: 07/13/2016) |
| 07/18/2016 | 133 | Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. and the Honorable Cathy L. Waldor, U.S.M.J. re 121 Order on Motion to Stay,,, 132 Letter. (WALSH, LIZA) (Entered: 07/18/2016) |
| 07/18/2016 | 134 | NOTICE of Appearance by SELINA MIRIAM ELLIS on behalf of LG ELECTRONICS U.S.A., INC., LG Electronics Inc (ELLIS, SELINA) (Entered: 07/18/2016) |
| 07/21/2016 | 135 | Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. re 121 Order on Motion to Stay,,,. (Attachments: # 1 Text of Proposed Order Lifting Stay)(WALSH, LIZA) (Entered: 07/21/2016) |
| 07/21/2016 | 136 | ORDER VACATING the stay in this matter, and REOPENING CASE. Signed by Judge Stanley R. Chesler on 7/21/16. (sr, ) (Entered: 07/22/2016) |
| 07/22/2016 | 137 | TEXT ORDER: The Court will hold a teleconference, to be initiated by Plaintiff counsel, on August 4, 2016 at 3:00 PM. So Ordered by Magistrate Judge Cathy L. Waldor on 7/22/16. (tjg, ) (Entered: 07/22/2016) |
| 08/02/2016 | 138 | Letter from Martin J. Black to Judge Waldor regarding case schedule. (Attachments: # 1 Exhibit A - '180 Patent)(BLACK, MARTIN) (Entered: 08/02/2016) |
| 08/03/2016 | 139 | Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. and Cathy L. Waldor, U.S.M.J. attaching proposed case schedule. (WALSH, LIZA) (Entered: 08/03/2016) |
| 08/04/2016 | 140 | |

Appx394

|            |     | Letter from Martin J. Black to Judge Waldor re 139 Letter. (BLACK, MARTIN) (Entered: 08/04/2016) |
|------------|-----|---|
| 08/04/2016 |     | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Telephone Conference held on 8/4/2016. (tjg, ) (Entered: 08/09/2016) |
| 08/11/2016 | 141 | Letter from Martin J. Black to Judge Waldor attaching agreed proposed case schedule. (Attachments: # 1 Exhibit A - Agreed Proposed Schedule) (BLACK, MARTIN) (Entered: 08/11/2016) |
| 08/16/2016 | 142 | Letter from Liza M. Walsh to Honorable Cathy L. Waldor, U.S.M.J. Requesting Permission to File Motion for Leave to Amend Defenses and Counterclaims. (Attachments: # 1 Exhibit A to C (with redactions)) (WALSH, LIZA) (Entered: 08/16/2016) |
| 08/16/2016 | 143 | Exhibit to 142 Letter by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 08/16/2016) |
| 08/16/2016 | 144 | MOTION to Seal by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Brief in Support of Motion to Seal, # 2 Certification of Liza M. Walsh with Exhibit 1 annexed, # 3 Text of Proposed Order, # 4 Certificate of Service)(WALSH, LIZA) (Entered: 08/16/2016) |
| 08/17/2016 |     | Set/Reset Deadlines as to 144 MOTION to Seal . Motion set for 9/19/2016 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sr, ) (Entered: 08/17/2016) |
| 08/17/2016 | 145 | TEXT ORDER: Defendants' request to file a motion for leave to amend its answer (ECF No. 142) is granted. So Ordered by Magistrate Judge Cathy L. Waldor on 8/17/16. (tjg, ) (Entered: 08/17/2016) |
| 08/22/2016 | 146 | MOTION for Leave to File an Amended Answer and Counterclaims by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Brief (Redacted Version), # 2 Declaration of Liza M. Walsh, # 3 Exhibits A - Q (Redacted Version), # 4 Text of Proposed Order, # 5 Certificate of Service)(WALSH, LIZA) (Entered: 08/22/2016) |
| 08/22/2016 | 147 | BRIEF in Support filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 146 MOTION for Leave to File an Amended Answer and Counterclaims (Confidential Version) (Attachments: # 1 Exhibit F (Confidential Version), # 2 Exhibit G (Confidential Version), # 3 Exhibit H (Confidential Version), # 4 Exhibit I (Confidential Version), # 5 Exhibit P (Confidential Version))(WALSH, LIZA) (Entered: 08/22/2016) |
| 08/22/2016 | 148 | MOTION to Seal Portions of the Brief in Support of LG Electronics, Inc. and LG Electronics U.S.A., Inc.s Motion for Leave to File an Amended Answer and Counterclaims and Exhibits F, G, H, I, and P attached to the Declaration of Liza M. Walsh at DE No. 147 by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Letter Brief, # 2 Certification of Liza M. Walsh, # 3 Text of Proposed Order, # 4 Certificate of Service) (WALSH, LIZA) (Entered: 08/22/2016) |
| 08/23/2016 |     | Set/Reset Deadlines as to 148 MOTION to Seal Portions of the Brief in Support of LG Electronics, Inc. and LG Electronics U.S.A., Inc.s Motion for Leave to File an Amended Answer and Counterclaims and Exhibits F, G, H, I, and P attached to the Declaration of Liza M. Walsh at DE, 146 MOTION for Leave to File an Amended Answer and Counterclaims. Motion set for 9/19/2016 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sr, ) (Entered: 08/23/2016) |
| 08/25/2016 | 149 | |

|  |  | MOTION for Leave to Appear Pro Hac Vice on Consent by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Statement, # 2 Certification of William J. Barrow, # 3 Certification of Anita Y. Lam, # 4 Supporting Certification of Liza M. Walsh, # 5 Text of Proposed Order, # 6 Certificate of Service)(WALSH, LIZA) (Entered: 08/25/2016) |
| 08/26/2016 |  | Set/Reset Deadlines as to 149 MOTION for Leave to Appear Pro Hac Vice on Consent. Motion set for 9/19/2016 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sr, ) (Entered: 08/26/2016) |
| 08/26/2016 | 150 | ORDER granting 149 Motion for Leave to Appear Pro Hac Vice RE: William J. Barrow. Signed by Magistrate Judge Cathy L. Waldor on 8/26/16. (sr, ) (Entered: 08/29/2016) |
| 08/30/2016 | 151 | RESPONSE in Support filed by Mondis Technology Ltd re 144 MOTION to Seal (GOLDBERG, BRIAN) (Entered: 08/30/2016) |
| 08/30/2016 |  | Set/Reset Hearings: TELEPHONE CONFERENCE CALL SET FOR 9/14/2016 12:30 PM before Judge Stanley R. Chesler. COUNSEL SHALL INITIATE THE CALL TO CHAMBERS WITH ALL PARTIES ON THE LINE REGARDING doc. 131 (tt, ) Modified on 8/30/2016 (tt). (Entered: 08/30/2016) |
| 09/01/2016 | 152 | Letter from Liza M. Walsh to Honorable Stanley R. Chesler, U.S.D.J. (WALSH, LIZA) (Entered: 09/01/2016) |
| 09/01/2016 | 153 | ORDER granting 144 Motion to Seal. Signed by Magistrate Judge Cathy L. Waldor on 9/1/16. (sr, ) (Entered: 09/02/2016) |
| 09/06/2016 | 154 | Letter from Brian M. Goldberg to Judge Waldor regarding adjournment of motion day re 146 MOTION for Leave to File an Amended Answer and Counterclaims. (Attachments: # 1 Text of Proposed Order)(GOLDBERG, BRIAN) (Entered: 09/06/2016) |
| 09/06/2016 | 155 | RESPONSE to Motion filed by Mondis Technology Ltd re 148 MOTION to Seal Portions of the Brief in Support of LG Electronics, Inc. and LG Electronics U.S.A., Inc.s Motion for Leave to File an Amended Answer and Counterclaims and Exhibits F, G, H, I, and P attached to the Declaration of Liza M. Walsh at DE (GOLDBERG, BRIAN) (Entered: 09/06/2016) |
| 09/07/2016 | 156 | ORDER granting 148 Motion to Seal. Signed by Magistrate Judge Cathy L. Waldor on 9/7/16. (sr, ) (Entered: 09/07/2016) |
| 09/07/2016 | 157 | CONSENT ORDER adjourning the 146 MOTION for Leave to File an Amended Answer and Counterclaims filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. to 10/3/16, deadline for Mondis to submit its papers in opposition to LG's motion shall be September 14, 2016; and the deadline for LG to submit its reply papers in support of its motion shall be September 26, 2016. Signed by Magistrate Judge Cathy L. Waldor on 9/7/16. (sr, ) (Entered: 09/07/2016) |
| 09/07/2016 |  | Reset Deadlines as to 146 MOTION for Leave to File an Amended Answer and Counterclaims. Motion set for 10/3/2016 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sr, ) (Entered: 09/07/2016) |
| 09/12/2016 |  | Set/Reset Hearings: TELEPHONE CONFERENCE CALL SHALL BE RESCHEDULED for 9/21/2016 01:30 PM before Judge Stanley R. Chesler. COUNSEL SHALL INITIATE THE CALL TO CHAMBERS OR PROVIDE TO CHAMBERS THE CONFERENCE CALL IN INFORMATION FOR ALL PARTIES TO PARTICIPATE. (tt, ) (Entered: 09/12/2016) |

Appx396

| | | |
|---|---|---|
| 09/14/2016 | 158 | Notice of Request by Pro Hac Vice William J. Barrow to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-7348619.) (WALSH, LIZA) (Entered: 09/14/2016) |
| 09/14/2016 | 159 | Notice of Request by Pro Hac Vice Anita Y. Lam to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-7348641.) (WALSH, LIZA) (Entered: 09/14/2016) |
| 09/14/2016 | 160 | BRIEF in Opposition filed by Mondis Technology Ltd re 146 MOTION for Leave to File an Amended Answer and Counterclaims (Attachments: # 1 Declaration of Brian M. Goldberg In Support of Mondis' Brief In Opposition to Defendants' Motion to Amend Answer, # 2 Exhibit 1 to the Goldberg Declaration, # 3 Exhibit 2 to the Goldberg Declaration, # 4 Exhibit 3 to the Goldberg Declaration, # 5 Exhibit 4 to the Goldberg Declaration, # 6 Exhibit 5 to the Goldberg Declaration, # 7 Exhibit 6 to the Goldberg Declaration, # 8 Exhibit 7 to the Goldberg Declaration, # 9 Exhibit 8 to the Goldberg Declaration, # 10 Exhibit 9 to the Goldberg Declaration, # 11 Exhibit 10 to the Goldberg Declaration, # 12 Exhibit 11 to the Goldberg Declaration, # 13 Exhibit 12 to the Goldberg Declaration, # 14 Exhibit 13 to the Goldberg Declaration, # 15 Exhibit 14 to the Goldberg Declaration, # 16 Exhibit 15 to the Goldberg Declaration, # 17 Exhibit 16 to the Goldberg Declaration, # 18 Exhibit 17 to the Goldberg Declaration, # 19 Exhibit 18 to the Goldberg Declaration, # 20 Exhibit 19 to the Goldberg Declaration, # 21 Exhibit 20 to the Goldberg Declaration, # 22 Exhibit 21 to the Goldberg Declaration, # 23 Exhibit 22 to the Goldberg Declaration, # 24 Exhibit 23 to the Goldberg Declaration, # 25 Exhibit 24 to the Goldberg Declaration, # 26 Exhibit 25 to the Goldberg Declaration, # 27 Exhibit 26 to the Goldberg Declaration)(BLACK, MARTIN) (Entered: 09/14/2016) |
| 09/15/2016 | | Pro Hac Vice counsel, WILLIAM J. BARROW and ANITA Y. LAM, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (sr, ) (Entered: 09/15/2016) |
| 09/21/2016 | | Minute Entry for proceedings held before Judge Stanley R. Chesler: Telephone Conference held on 9/21/2016. (tt, ) (Entered: 09/21/2016) |
| 09/21/2016 | 161 | Letter from Liza M. Walsh to Honorable Cathy L. Waldor, U.S.M.J. attaching revised proposed case schedule. (WALSH, LIZA) (Entered: 09/21/2016) |
| 09/21/2016 | | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Telephone Conference held on 9/21/2016. (tjg, ) (Entered: 09/24/2016) |
| 09/23/2016 | 162 | TEXT ORDER: The Court will hold a telephone conference, to be initiated by plaintiff, on 10/20/16 at 2:00 PM. Parties may contact chambers at (973) 776 7862 . So Ordered by Magistrate Judge Cathy L. Waldor on 9/23/16. (tjg, ) (Entered: 09/24/2016) |
| 09/26/2016 | 163 | REPLY to Response to Motion filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 146 MOTION for Leave to File an Amended Answer and Counterclaims (Attachments: # 1 Declaration of Liza M. Walsh with Exhibit A, # 2 Certificate of Service)(WALSH, LIZA) (Entered: 09/26/2016) |
| 10/12/2016 | | CLERK'S QUALITY CONTROL MESSAGE - VINCENT A. GALLO, does not have a correct e-mail address listed with the court and is not receiving his/her notices of electronic filing in this case. Pursuant to local rule 10.1 and court procedures, counsel and unrepresented parties are required to notify the court of any mailing or e-mail address changes. The court has deleted the invalid e-mail address. Attorneys should review the ECF link on our web site for information on maintaining your account, and unrepresented parties, or those attorneys without access to maintaining their account, should notice the Clerk. (th, ) (Entered: 10/12/2016) |

| 10/12/2016 | 164 | NOTICE by Mondis Technology Ltd of Withdrawal of Vincent A. Gallo as Counsel and Request for Removal from Electronic Notification (GALLO, VINCENT) (Entered: 10/12/2016) |
|---|---|---|
| 10/20/2016 | | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Telephone Conference held on 10/20/2016. (tjg, ) (Entered: 10/20/2016) |
| 10/20/2016 | 165 | SCHEDULING ORDER: scheduling a Telephone Conference on 12/21/2016 10:00 AM before Magistrate Judge Cathy L. Waldor, Fact Discovery due by 4/26/2017, dispositive motions due 7/26/17; etc. Signed by Magistrate Judge Cathy L. Waldor on 10/20/16. (sr, ) (Entered: 10/20/2016) |
| 10/20/2016 | 166 | Letter from Liza M. Walsh on Behalf of the Parties re: Mediation. (WALSH, LIZA) (Entered: 10/20/2016) |
| 10/21/2016 | | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Oral Opinion read on 10/21/2016. (Court Reporter/Recorder ECR.) (tjg, ) (Entered: 10/21/2016) |
| 10/21/2016 | 167 | ORDER permitting defendants leave to file an amended answer and counterlcaims. Signed by Magistrate Judge Cathy L. Waldor on 10/21/16. (sr, ) (Entered: 10/24/2016) |
| 10/26/2016 | 168 | Transcript of Proceedings of RECORDED OPINION held on October 21, 2016, before Judge CATHY L. WALDOR. Court Reporter/Transcriber KING TRANSCRIPTION SERVICES/Sara L. Kern (973-237-6080🔵⑤). NOTICE REGARDING REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript. Redaction Request due 11/16/2016. Redacted Transcript Deadline set for 11/28/2016. Release of Transcript Restriction set for 1/24/2017. (ek) (Entered: 10/26/2016) |
| 10/31/2016 | 169 | First Amended ANSWER to Complaint with JURY DEMAND , COUNTERCLAIM against Mondis Technology Ltd by LG ELECTRONICS U.S.A., INC., LG Electronics Inc.(WALSH, LIZA) (Entered: 10/31/2016) |
| 11/14/2016 | 170 | ANSWER to Counterclaim I-VI in Defendants' First Amended Answer by Mondis Technology Ltd.(GOLDBERG, BRIAN) (Entered: 11/14/2016) |
| 12/21/2016 | | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Telephone Conference held on 12/21/2016. (tjg, ) (Entered: 12/21/2016) |
| 12/21/2016 | 171 | TEXT ORDER: The Court will hold a telephone conference, to be initiated by plaintiff, on 2/22/17 at 10:30 AM. Parties may contact chambers at (973) 776 7862🔵⑤. So Ordered by Magistrate Judge Cathy L. Waldor on 12/21/16. (tjg, ) (Entered: 12/21/2016) |
| 01/10/2017 | 172 | STATEMENT Joint Claim Construction Statement by Mondis Technology Ltd. (Attachments: # 1 Exhibit A)(GOLDBERG, BRIAN) (Entered: 01/10/2017) |
| 01/25/2017 | 173 | NOTICE by Mondis Technology Ltd of Withdrawal of Teri-Lynn A. Evans as Counsel and Request for Removal from Electronic Notification (EVANS, TERI-LYNN) (Entered: 01/25/2017) |
| 01/30/2017 | 174 | MARKMAN OPENING BRIEF OF MONDIS TECHNOLOGY LTD (Attachments: # 1 Declaration of Brian M. Goldberg In Support Of Mondis's Opening Markman Brief, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27)(BLACK, MARTIN) (Entered: 01/30/2017) |
| 01/30/2017 | 175 | MARKMAN OPENING BRIEF (Attachments: # 1 Declaration of Liza M. Walsh, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 |

Case: 20-1812    Document: 55    Page: 121    Filed: 02/24/2021

|  |  |  |
|---|---|---|
|  |  | Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Certificate of Service)(WALSH, LIZA) (Entered: 01/30/2017) |
| 02/16/2017 | 176 | Letter from Mondis and LG to Judge Waldor regarding discovery dispute. (GOLDBERG, BRIAN) (Entered: 02/16/2017) |
| 02/22/2017 |  | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Telephone Conference held on 2/22/2017. (tjg, ) (Entered: 02/22/2017) |
| 02/22/2017 |  | Set/Reset Hearings: Markman Hearing set for 3/15/2017 10:00 AM. ORDERED ALL PARTIES TO APPEAR READY TO PROCEED. (tt, ) (Entered: 02/22/2017) |
| 02/24/2017 | 177 | MARKMAN RESPONSE BRIEF re 175 Markman Opening Brief, (Attachments: # 1 Declaration of Brian M. Goldberg In Support of Mondis' Responsive Markman Brief, # 2 Exhibit 28, # 3 Exhibit 29, # 4 Exhibit 30, # 5 Exhibit 31)(BLACK, MARTIN) (Entered: 02/24/2017) |
| 02/24/2017 | 178 | MARKMAN RESPONSE BRIEF re 174 Markman Opening Brief,, (Attachments: # 1 Declaration of Liza M. Walsh with Exhibits 1 - 2, # 2 Certificate of Service)(WALSH, LIZA) (Entered: 02/24/2017) |
| 02/27/2017 | 179 | Letter from Brian M. Goldberg to Judge Chesler regarding Markman Hearing. (GOLDBERG, BRIAN) (Entered: 02/27/2017) |
| 02/28/2017 |  | CHAMBER'S NOTATION: MARKMAN HEARING SCHEDULED FOR 3/15/17 HAS BEEN ADJOURNED WITHOUT DATE. (tt, ) (Entered: 02/28/2017) |
| 03/13/2017 | 180 | Letter from Liza M. Walsh to Honorable Cathy L. Waldor, U.S.M.J. with Exhibit A re 176 Letter. (WALSH, LIZA) (Entered: 03/13/2017) |
| 03/15/2017 | 181 | Letter from Brian M. Goldberg to Judge Waldor regarding motion to quash. (GOLDBERG, BRIAN) (Entered: 03/15/2017) |
| 03/16/2017 | 182 | TEXT ORDER: The Court will hold an in-person status conference on 5/17/17 at 2 PM. So Ordered by Magistrate Judge Cathy L. Waldor on 3/16/17. (tjg, ) (Entered: 03/16/2017) |
| 03/16/2017 | 183 | ORDER re: briefing schedule of Protective Order/Motion to Quash; Opening Brief-April 7, 2017; Opposition April 17, 2017; and Reply - April 24, 2017; etc. Signed by Magistrate Judge Cathy L. Waldor on 3/16/16. (sr, ) (Entered: 03/16/2017) |
| 03/17/2017 | 184 | Letter from Brian M. Goldberg to Judge Waldor regarding motion to quash. (GOLDBERG, BRIAN) (Entered: 03/17/2017) |
| 03/21/2017 | 185 | Letter from Liza M. Walsh to Honorable Cathy L. Waldor, U.S.M.J. re 184 Letter. (WALSH, LIZA) (Entered: 03/21/2017) |
| 03/24/2017 | 186 | ORDER TO SHOW CAUSE Show Cause Hearing set for 3/28/2017 01:00 PM before Magistrate Judge Cathy L. Waldor.. Signed by Magistrate Judge Cathy L. Waldor on 3/24/17. (tjg, ) (Entered: 03/24/2017) |
| 03/27/2017 | 187 | AMENDED ORDER TO SHOW CAUSE re: why it cannot comply with the Court's Order [ECF NO. 183], posted on 3/16/17 Show Cause Hearing set for 3/28/2017 01:00 PM before Magistrate Judge Cathy L. Waldor.. Signed by Magistrate Judge Cathy L. Waldor on 3/27/17. (DD, ) (Entered: 03/27/2017) |
| 03/27/2017 | 188 | Letter from Martin J. Black to Judge Waldor regarding Order to Show Cause. (BLACK, MARTIN) (Entered: 03/27/2017) |
| 03/28/2017 |  | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Show Cause Hearing held on 3/28/2017. (Court Reporter/Recorder ECR.) (tjg, ) (Entered: 03/29/2017) |
| 03/29/2017 | 189 |  |

Appx399

TEXT ORDER: Order to Show Cause is hereby discharged based upon the hearing of March 28, 2017.. So Ordered by Magistrate Judge Cathy L. Waldor on 3/29/17. (tjg, ) (Entered: 03/29/2017)

03/31/2017    190    Transcript of Proceedings of a Show Cause Hearing held on 3/28/2017, before Judge Cathy L. Waldor. Court Reporter/Transcriber King Transcription Services/Sara L. Kern (973-237-6080 🔊). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter/Transcription Agency due, but not filed, by 4/21/2017. Redacted Transcript Deadline set for 5/1/2017. Release of Transcript Restriction set for 6/29/2017. (sm, ) (Entered: 03/31/2017)

04/17/2017    191    Letter from Liza M. Walsh to the Honorable Cathy L. Waldor, U.S.M.J. re 181 Letter, 180 Letter, 176 Letter, 183 Order, 185 Letter, 187 Order to Show Cause, 184 Letter. (WALSH, LIZA) (Entered: 04/17/2017)

04/18/2017    192    ORDER RE: discovery; etc. Signed by Magistrate Judge Cathy L. Waldor on 4/18/17. (sr, ) (Entered: 04/18/2017)

04/24/2017    193    Letter from Brian M. Goldberg to Judge Waldor regarding scheduling order. (GOLDBERG, BRIAN) (Entered: 04/24/2017)

04/25/2017    194    ORDER extending deadlines in Court's scheduling order. Signed by Magistrate Judge Cathy L. Waldor on 4/25/17. (sr, ) (Entered: 04/25/2017)

05/03/2017    195    ORDER that Mondis shall submit a statement with its contentions as to the plain and ordinary meaning of all claim terms which it proposes should be construed as having their plain and ordinary meaning, accompanied by a brief in support, within two weeks of the date of entry of this Order. LG shall then submit a responsive brief within two weeks after Mondis' submission. Both briefs, not including the Local Patent Rule 4.2(a) statement, shall be no longer than five pages. Signed by Judge Stanley R. Chesler on 5/3/17. (sr, ) (Entered: 05/03/2017)

05/17/2017           Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Telephone Conference held on 5/17/2017. (tjg, ) (Entered: 05/17/2017)

05/17/2017    196    TEXT ORDER: The Court will hold a telephone conference, to be initiated by plaintiff, on 9/20/17 at 1:00 PM. Parties may contact chambers at (973) 776 7862 🔊. So Ordered by Magistrate Judge Cathy L. Waldor on 5/17/17. (tjg, ) (Entered: 05/17/2017)

05/17/2017    197    STATEMENT Supplementing Mondis' Local Patent Rule 4.2 Disclosure and Claim Construction Briefing by Mondis Technology Ltd. (Attachments: # 1 Brief in Support of Mondis' Proposed Plain and Ordinary Meanings, # 2 Declaration of Brian M. Goldberg in Support of Mondis' Supplemental Claim Construction Brief, # 3 Exhibit 32)(GOLDBERG, BRIAN) (Entered: 05/17/2017)

05/18/2017    198    Letter from Liza M. Walsh to the Honorable Cathy L. Waldor, U.S.M.J. with Exhibit A - F (Confidential - Filed Under Seal) re 192 Order, 191 Letter, Telephone Conference. (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 05/18/2017)

Appx400

| | | |
|---|---|---|
| 05/18/2017 | 199 | REDACTION to 198 Letter,, with Exhibits A - F by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 05/18/2017) |
| 05/31/2017 | 200 | BRIEF in Response to Mondis Technologies Ltd.'s Supplemental Patent Rule 4.2 Disclosures (Attachments: # 1 Certificate of Service)(WALSH, LIZA) (Entered: 05/31/2017) |
| 06/02/2017 | | Set/Reset Hearings: Markman Hearing set for 6/20/2017 10:00 AM.ORDERED ALL PARTIES TO APPEAR READY TO PROCEED (tt, ) (Entered: 06/02/2017) |
| 06/05/2017 | 201 | Letter from Brian M. Goldberg to Judge Waldor re 198 Letter,,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15)(GOLDBERG, BRIAN) (Entered: 06/05/2017) |
| 06/08/2017 | | Set/Reset Hearings: Markman Hearing set for 9/28/2017 10:00 AM.ORDERED ALL PARTIES TO APPEAR READY TO PROCEED. ALL EXHIBITS MUST BE PREMARKED WITH AN ATTACHED EXHIBIT LIST. (tt, ) (Entered: 06/08/2017) |
| 06/19/2017 | 202 | Letter from Brian M. Goldberg to Judge Waldor regarding discovery dispute. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/19/2017) |
| 06/19/2017 | 203 | MOTION to Seal the Letter from Liza M. Walsh to the Honorable Cathy Waldor, USMJ at DE No. 198 by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Proposed Findings of Fact and Conclusions of Law, # 2 Certification of Liza M. Walsh with Exhibit 1, # 3 Certification of Brian M. Goldberg, # 4 Statement, # 5 Text of Proposed Order, # 6 Certificate of Service)(WALSH, LIZA) (Entered: 06/19/2017) |
| 06/19/2017 | 204 | Letter from Liza M. Walsh on Behalf of the Parties to the Honorable Cathy L. Waldor, U.S.M.J. re 198 Letter,, 191 Letter, 201 Letter,. (WALSH, LIZA) (Entered: 06/19/2017) |
| 06/20/2017 | | Set/Reset Deadlines as to 203 MOTION to Seal the Letter from Liza M. Walsh to the Honorable Cathy Waldor, USMJ at DE No. 198. Motion set for 7/17/2017 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sr, ) (Entered: 06/20/2017) |
| 06/20/2017 | 205 | Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. (WALSH, LIZA) (Entered: 06/20/2017) |
| 06/20/2017 | 206 | REDACTION to 202 Letter,,, from Brian M. Goldberg to Judge Waldor regarding discovery dispute by Mondis Technology Ltd. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15)(GOLDBERG, BRIAN) (Entered: 06/20/2017) |
| 06/21/2017 | | Set/Reset Hearings: TELEPHONE CONFERENCE CALL set for 7/12/2017 12:30 PM before Judge Stanley R. Chesler. ORDERED ALL PARTIES TO PARTICIPATE-COUNSEL SHALL INITIATE THE CALL TO CHAMBERS (tt, ) (Entered: 06/21/2017) |

| 06/21/2017 | 207 | TEXT ORDER: The Court will hold oral argument on all outstanding discovery on 8/4/17 at 10 AM. So Ordered by Magistrate Judge Cathy L. Waldor on 6/21/17. (tjg, ) (Entered: 06/21/2017) |
|---|---|---|
| 06/29/2017 | 208 | Joint MOTION to Seal Letter from Brian M. Goldberg to the Honorable Cathy L. Waldor (ECF No. 202) and Exhibits 2, 3, 5, 7-10 thereto by Mondis Technology Ltd. (Attachments: # 1 Statement in Lieu of Brief, # 2 Certification of Brian M. Goldberg in Support of Motion to Seal, # 3 Exhibit 1 to the Certification of Brian M. Goldberg, # 4 Certification of Liza M. Walsh in Support of Motion to Seal, # 5 Proposed Findings of Fact and Conclusions of Law, # 6 Text of Proposed Order, # 7 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 06/29/2017) |
| 06/30/2017 | | Set/Reset Deadlines as to 208 Joint MOTION to Seal Letter from Brian M. Goldberg to the Honorable Cathy L. Waldor (ECF No. 202) and Exhibits 2, 3, 5, 7-10 thereto. Motion set for 8/7/2017 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (DD, ) (Entered: 06/30/2017) |
| 06/30/2017 | 209 | ORDER granting 208 Motion to Seal. If necessary, the parties shall file updated redacted versions of the June 19, 2017 Letter and Exhibits 2 and 10 thereto on the docket, consistent with this Order, etc. Signed by Magistrate Judge Cathy L. Waldor on 6/30/17. (cm, ) (Entered: 07/05/2017) |
| 07/07/2017 | 210 | Letter from Brian M. Goldberg to Judge Chesler re 205 Letter. (GOLDBERG, BRIAN) (Entered: 07/07/2017) |
| 07/10/2017 | 211 | Letter from Liza M. Walsh to the Hon. Stanley R. Chesler re 210 Letter, 205 Letter. (WALSH, LIZA) (Entered: 07/10/2017) |
| 07/11/2017 | 212 | ORDER granting 203 Motion to Seal. Signed by Magistrate Judge Cathy L. Waldor on 7/11/17. (sr, ) (Entered: 07/11/2017) |
| 07/12/2017 | | Minute Entry for proceedings held before Judge Stanley R. Chesler: Telephone Conference held on 7/12/2017. MOTIONS TO BE FILED, COUNSEL TO SET BRIEFING SCHEDULE. (tt, ) (Entered: 07/12/2017) |
| 07/14/2017 | 213 | Letter from Liza M. Walsh to the Honorable Stamley R. Chesler, U.S.D.J.. (Attachments: # 1 Text of Proposed Order)(WALSH, LIZA) (Entered: 07/14/2017) |
| 07/17/2017 | 214 | ORDER permitting LGE leave to file a Motion for Summary Judgment, which shall be filed by 7/21/17. Signed by Judge Stanley R. Chesler on 7/17/17. (sr, ) (Entered: 07/17/2017) |
| 07/21/2017 | 215 | MOTION for Summary Judgment for Lack of Written Description by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. Responses due by 8/23/2017 (Attachments: # 1 Memorandum of Law, # 2 Local Civil Rule 56.1 Statement of Material Facts Not in Dispute, # 3 Declaration of Liza M. Walsh with Exhibits A - I, # 4 Text of Proposed Order, # 5 Certificate of Service)(WALSH, LIZA) (Entered: 07/21/2017) |
| 08/04/2017 | | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Discovery Hearing held on 8/4/2017. (Court Reporter/Recorder ECR.) (tjg, ) (Entered: 08/04/2017) |
| 08/08/2017 | 216 | Letter from LG Defendants re 202 Letter,,,. (WALSH, LIZA) (Entered: 08/08/2017) |
| 08/09/2017 | 217 | ORDER that 15-cv-4431-SRC-CLW and 17-cv-2531-SRC-CLW are hereby consolidated into 15-cv-4431-SRC-CLW, with all subsequent filing to be filed only in 15-cv-4431-SRC-CLW and 17-cv-2531-SRC-CLW to be CLOSED. Signed by Magistrate Judge Cathy L. Waldor on 8/9/17. (DD, ) (Entered: 08/10/2017) |

Appx402

08/11/2017  218  REDACTION to 216 Letter by LG ELECTRONICS U.S.A., INC., LG
Electronics Inc. (WALSH, LIZA) (Entered: 08/11/2017)

08/18/2017  219  MOTION to Seal the Letter from Liza M. Walsh to the Honorable Cathy L.
Waldor, U.S.M.J., dated August 8, 2017 at DE No. 216 by LG
ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1
Proposed Findings of Fact and Conclusions of Law, # 2 Declaration of Liza
M. Walsh with Exhibit 1, # 3 Text of Proposed Order, # 4 Certificate of
Service)(WALSH, LIZA) (Entered: 08/18/2017)

08/18/2017       Set/Reset Deadlines as to 219 MOTION to Seal the Letter from Liza M.
Walsh to the Honorable Cathy L. Waldor, U.S.M.J., dated August 8, 2017
at DE No. 216. Motion set for 9/18/2017 before Judge Stanley R. Chesler.
Unless otherwise directed by the Court, this motion will be decided on the
papers and no appearances are required. Note that this is an automatically
generated message from the Clerk`s Office and does not supersede any
previous or subsequent orders from the Court. (sr, ) (Entered:
08/18/2017)

08/21/2017  220  ORDER granting 219 Motion to Seal. Signed by Magistrate Judge Cathy L.
Waldor on 8/21/17. (sr, ) (Entered: 08/21/2017)

08/23/2017       Set/Reset Deadlines as to 215 MOTION for Summary Judgment for Lack of
Written Description. Motion set for 9/28/2017 10:00 AM before Judge
Stanley R. Chesler. COURT INDICATED MOTION SHALL BE DECIDED
PURSUANT TO RULE 78-NO APPEARANCE IS REQUIRED-NO HEARING AT
THIS TIME-ADJOURNED. (tt, ) (Entered: 08/23/2017)

08/23/2017  221  BRIEF in Opposition filed by Mondis Technology Ltd re 215 MOTION for
Summary Judgment for Lack of Written Description (GOLDBERG, BRIAN)
NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule
5.3(c)(2), a single, consolidated motion to seal shall be filed within 14
days following the completed briefing of the materials sought to be sealed,
or within 14 days following the date on which the last of such materials
was filed under temporary seal if the motion is resolved, unless otherwise
directed by the Court. (Entered: 08/23/2017)

08/23/2017  222  STATEMENT of Material Facts in Opposition filed by Mondis Technology Ltd
re 215 MOTION for Summary Judgment for Lack of Written Description
(Attachments: # 1 Declaration of Joseph D. Lamm in Support of Plaintiff's
Brief in Opposition to Defendants' Motion for Summary Judgment, # 2
Declaration of Brian M. Goldberg in Support of Mondis' Brief in Opposition
to Defendants' Motion for Summary Judgment, # 3 Exhibit 1 to the
Declaration of Brian M. Goldberg, # 4 Exhibit 2 to the Declaration of Brian
M. Goldberg, # 5 Exhibit 3 to the Declaration of Brian M. Goldberg, # 6
Exhibit 4 to the Declaration of Brian M. Goldberg, # 7 Exhibit 5 to the
Declaration of Brian M. Goldberg, # 8 Exhibit 6 to the Declaration of Brian
M. Goldberg, # 9 Exhibit 7 to the Declaration of Brian M. Goldberg, # 10
Exhibit 8 to the Declaration of Brian M. Goldberg, # 11 Exhibit 9 to the
Declaration of Brian M. Goldberg, # 12 Exhibit 10 to the Declaration of
Brian M. Goldberg, # 13 Exhibit 11 to the Declaration of Brian M.
Goldberg, # 14 Exhibit 12 to the Declaration of Brian M. Goldberg, # 15
Exhibit 13 to the Declaration of Brian M. Goldberg, # 16 Exhibit 14 to the
Declaration of Brian M. Goldberg, # 17 Exhibit 15 to the Declaration of
Brian M. Goldberg, # 18 Exhibit 16 to the Declaration of Brian M.
Goldberg, # 19 Exhibit 17 to the Declaration of Brian M. Goldberg, # 20
Exhibit 18-1 to the Declaration of Brian M. Goldberg, # 21 Exhibit 18-2 to
the Declaration of Brian M. Goldberg, # 22 Exhibit 19 to the Declaration of
Brian M. Goldberg, # 23 Exhibit 20 to the Declaration of Brian M.
Goldberg, # 24 Exhibit 21 to the Declaration of Brian M. Goldberg, # 25
Exhibit 22 to the Declaration of Brian M. Goldberg, # 26 Exhibit 23 to the
Declaration of Brian M. Goldberg, # 27 Exhibit 24 to the Declaration of
Brian M. Goldberg, # 28 Exhibit 25 to the Declaration of Brian M.
Goldberg, # 29 Exhibit 26 to the Declaration of Brian M. Goldberg, # 30
Exhibit 27 to the Declaration of Brian M. Goldberg, # 31 Exhibit 28 to the

|  |  |  |
|---|---|---|
|  |  | Declaration of Brian M. Goldberg, # 32 Exhibit 29 to the Declaration of Brian M. Goldberg)(GOLDBERG, BRIAN) (Entered: 08/23/2017) |
| 08/23/2017 | 223 | REDACTION to 221 Brief in Opposition to Motion,, by Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 08/23/2017) |
| 08/24/2017 |  | Set/Reset Hearings: Markman Hearing set for 9/28/2017 10:00 AM HAS BEEN ADJOURNED AND SHALL BE DECIDED PURSUANT TO RULE 78. NO APPEARANCE REQUIRED. (tt, ) (Entered: 08/24/2017) |
| 09/07/2017 | 224 | REPLY BRIEF to Opposition to Motion filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 215 MOTION for Summary Judgment for Lack of Written Description (Attachments: # 1 Responsive Statement of Material Facts Not in Dispute, # 2 Certificate of Service)(WALSH, LIZA) (Entered: 09/07/2017) |
| 09/11/2017 | 225 | Transcript of Proceedings of a Discovery Hearing held on 8/4/2017, before Judge Cathy L. Waldor. Court Reporter/Transcriber King Transcription Services/Jessica Robinson (973-237-6080 ). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter/Transcription Agency due, but not filed, by 10/2/2017. Redacted Transcript Deadline set for 10/12/2017. Release of Transcript Restriction set for 12/11/2017. (sm, ) (Entered: 09/11/2017) |
| 09/19/2017 | 226 | OPINION AND ORDER that the motion for a protective order and to quash the subpoena served upon Mr. Plies by LG is denied. Signed by Magistrate Judge Cathy L. Waldor on 9/19/17. (sr, ) (Entered: 09/19/2017) |
| 09/20/2017 |  | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Telephone Conference held on 9/20/2017. (tjg, ) (Entered: 09/20/2017) |
| 09/20/2017 | 227 | TEXT ORDER: The Court will hold a telephone conference, to be initiated by plaintiff, on 10/20/17 at 9:45 AM. Parties may contact chambers at (973) 776 7862 . So Ordered by Magistrate Judge Cathy L. Waldor on 9/20/17. (tjg, ) (Entered: 09/20/2017) |
| 09/20/2017 | 228 | Joint MOTION to Seal Document (ECF No. 221) by Mondis Technology Ltd. (Attachments: # 1 Statement in Lieu of Brief, # 2 Declaration of Brian M. Goldberg, # 3 Exhibit 1, # 4 Proposed Findings of Fact and Conclusions of Law, # 5 Text of Proposed Order, # 6 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 09/20/2017) |
| 09/20/2017 | 229 | CERTIFICATION in Support filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 228 Joint MOTION to Seal Document (ECF No. 221) (WALSH, LIZA) (Entered: 09/20/2017) |
| 09/21/2017 |  | Set/Reset Deadlines as to 228 Joint MOTION to Seal Document (ECF No. 221). Motion set for 10/16/2017 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sr, ) (Entered: 09/21/2017) |
| 09/25/2017 | 230 | ORDER granting 228 Motion to Seal Document. Signed by Magistrate Judge Cathy L. Waldor on 9/25/17. (sr, ) (Entered: 09/26/2017) |
| 09/28/2017 | 231 | OPINION AND ORDER RE: Application for Claim Construction. Signed by Judge Stanley R. Chesler on 9/28/17. (sr, ) (Entered: 09/28/2017) |
| 10/03/2017 | 232 |  |

|  |  | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Mondis Technology Ltd re (226 in 2:15-cv-04431-SRC-CLW) Order (Attachments: # 1 Brief in Support of Mondis' Appeal, # 2 Declaration of Brian M. Goldberg in Support of Mondis' Appeal, # 3 Exhibit 1 to the Declaration of Brian M. Goldberg, # 4 Exhibit 2 to the Declaration of Brian M. Goldberg, # 5 Exhibit 3 to the Declaration of Brian M. Goldberg, # 6 Exhibit 4 to the Declaration of Brian M. Goldberg, # 7 Text of Proposed Order) (GOLDBERG, BRIAN) (Entered: 10/03/2017) |
|---|---|---|
| 10/04/2017 |  | Set/Reset Deadlines as to 232 APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Mondis Technology Ltd re (226 in 2:15-cv-04431-SRC-CLW) Order. Motion set for 11/6/2017 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sr, ) (Entered: 10/04/2017) |
| 10/12/2017 | 233 | OPINION AND ORDER denying 215 Motion for Summary Judgment. Signed by Judge Stanley R. Chesler on 10/12/17. (sr, ) (Entered: 10/12/2017) |
| 10/17/2017 | 234 | Letter from Brian M. Goldberg to Judge Waldor. (GOLDBERG, BRIAN) (Entered: 10/17/2017) |
| 10/19/2017 | 235 | Letter from Liza M. Walsh to the Honorable Cathy L. Waldor Regarding re 234 Letter. (WALSH, LIZA) (Entered: 10/19/2017) |
| 10/20/2017 |  | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Telephone Conference held on 10/20/2017. (tjg, ) (Entered: 10/20/2017) |
| 10/20/2017 | 236 | TEXT ORDER: The Court will hold a telephone conference, to be initiated by plaintiff, on 11/15/17 at 10:00 AM. Parties are to meet and confer to discuss scheduling, and any open discovery issues. Parties shall offer the professional courtesies and consideration necessary to accomplish completion of this case. Parties may contact chambers at (973) 776 7862. So Ordered by Magistrate Judge Cathy L. Waldor on 10/20/17. (tjg, ) (Entered: 10/20/2017) |
| 10/23/2017 | 237 | MEMORANDUM in Opposition filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 232 APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Mondis Technology Ltd re (226 in 2:15-cv-04431-SRC-CLW) Order (Confidential Version) (Attachments: # 1 Confidential Declaration of Liza M. Walsh with Exhibits A - S, # 2 Certificate of Service) (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 10/23/2017) |
| 10/24/2017 | 238 | REDACTION to 237 Memorandum in Opposition of Motion,,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Redacted Declaration of Liza M. Walsh with Exhibits A - S, # 2 Certificate of Service)(WALSH, LIZA) (Entered: 10/24/2017) |
| 10/30/2017 | 239 | REPLY BRIEF to Opposition to Motion filed by Mondis Technology Ltd re 232 APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Mondis Technology Ltd re (226 in 2:15-cv-04431-SRC-CLW) Order (Attachments: # 1 Declaration of Brian M. Goldberg in Support of Mondis' Reply Brief, # 2 Exhibit 5 to the Declaration of Brian M. Goldberg, # 3 Exhibit 6 to the Declaration of Brian M. Goldberg)(GOLDBERG, BRIAN) (Entered: 10/30/2017) |
| 11/09/2017 | 240 | Letter from Liza M. Walsh to the Honorable Cathy L. Waldor, U.S.M.J. Regarding Pro Hac Vice Application on Consent. (Attachments: # 1 Certification of Michael J. McKeon, # 2 Certification of Christian A. Chu, # |

|  |  |  |
|---|---|---|
|  |  | 3 Certification of Scott A. Elengold, # 4 Certification of R. Andrew Schwentker, # 5 Supporting Certification of Liza M. Walsh, # 6 Text of Proposed Order)(WALSH, LIZA) (Entered: 11/09/2017) |
| 11/13/2017 | 241 | ORDER permitting Michael J. McKeon, Christian A. Chu, Scott A. Elengold, and R.Andrew Schwentker to appear pro hac vice. Signed by Magistrate Judge Cathy L. Waldor on 11/13/17. (sr, ) (Entered: 11/13/2017) |
| 11/14/2017 | 242 | Notice of Request by Pro Hac Vice Michael J. McKeon to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-8254198.) (WALSH, LIZA) (Entered: 11/14/2017) |
| 11/14/2017 | 243 | Notice of Request by Pro Hac Vice Christian A. Chu to receive Notices of Electronic Filings. (Attachments: # 1 Receipt of Payment)(WALSH, LIZA) (Entered: 11/14/2017) |
| 11/14/2017 | 244 | Notice of Request by Pro Hac Vice Scott A. Elengold to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-8254262.) (WALSH, LIZA) (Entered: 11/14/2017) |
| 11/14/2017 | 245 | Notice of Request by Pro Hac Vice R. Andrew Schwentker to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-8254274.) (WALSH, LIZA) (Entered: 11/14/2017) |
| 11/14/2017 |  | Pro Hac Vice counsel, MICHAEL J. MCKEON, CHRISTIAN A. CHU, SCOTT A. ELENGOLD and R. ANDREW SCHWENTKER, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (sr, ) (Entered: 11/14/2017) |
| 11/15/2017 |  | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Telephone Conference held on 11/15/2017. (tjg, ) (Entered: 11/15/2017) |
| 11/15/2017 | 246 | TEXT ORDER: The Court will hold a telephone conference, to be initiated by plaintiff, on 1/17/18 at 11:30 AM. Parties may contact chambers at (973) 776 7862. So Ordered by Magistrate Judge Cathy L. Waldor on 11/15/17. (tjg, ) (Entered: 11/15/2017) |
| 11/15/2017 | 247 | OPINION AND ORDER denying 232 Appeal Magistrate Judge Decision to District Court, and that the Magistrate Judge's opinion and order, filed September 19, 2017(Docket Entry No. 226) is AFFIRMED. Signed by Judge Stanley R. Chesler on 11/15/17. (sr, ) (Entered: 11/16/2017) |
| 11/29/2017 | 248 | Letter from Brian M. Goldberg to Judge Waldor regarding case schedule. (GOLDBERG, BRIAN) (Entered: 11/29/2017) |
| 11/30/2017 | 249 | ORDER, that Fact Discovery shall be due by 12/21/2017, dispositive motions due by 4/19/2018; etc. Signed by Magistrate Judge Cathy L. Waldor on 11/30/17. (sr, ) (Entered: 11/30/2017) |
| 12/15/2017 | 250 | NOTICE by WILLIAM J. BARROW, JAMIE B. BEABER, ANITA Y. LAM of Withdrawal of Pro Hac Vice Admission and Request for Removal from Electronic Notification (WALSH, LIZA) (Entered: 12/15/2017) |
| 12/15/2017 | 251 | Notice to be terminated and withdraw from Notices of Electronic filing as to case. Attorney LISA MARIE FERRI terminated. (FERRI, LISA) (Entered: 12/15/2017) |
| 01/16/2018 | 252 | Letter from Brian M. Goldberg to Judge Waldor regarding case schedule. (GOLDBERG, BRIAN) (Entered: 01/16/2018) |
| 01/16/2018 | 253 | TEXT ORDER: The telephone conference scheduled for 1/16/18 is adjourned to 4/16/18 at 3 PM. So Ordered by Magistrate Judge Cathy L. Waldor on 1/16/18. (tjg, ) (Entered: 01/16/2018) |
| 01/16/2018 | 254 | AMENDED SCHEDULING ORDER: that the close of expert discovery shall be 4/12/18, dispositive motions shall be filed by 5/3/18; etc. Signed by Magistrate Judge Cathy L. Waldor on 1/16/18. (sr, ) (Entered: 01/17/2018) |

Appx406

03/19/2018  255  Letter from Liza M. Walsh to Honorable Cathy L. Waldor, U.S.M.J. re Case Schedule. (WALSH, LIZA) (Entered: 03/19/2018)

03/20/2018  256  ORDER updating case schedule deadlines, etc. re 255 Letter. Signed by Magistrate Judge Cathy L. Waldor on 3/20/18. (cm, ) (Entered: 03/21/2018)

04/13/2018  257  Letter from Liza M. Walsh to Honorable Cathy L. Waldor, U.S.M.J. re Teleconference. (WALSH, LIZA) (Entered: 04/13/2018)

04/13/2018  259  ORDER adjourning the status conference currently scheduled for 4/16/18. Signed by Magistrate Judge Cathy L. Waldor on 4/13/18. (sr, ) (Entered: 04/16/2018)

04/16/2018  258  TEXT ORDER: The Court will hold a telephone conference, to be initiated by plaintiff, on 6/13/18 at 3:30 PM. The 4/16/18 teleconference is canceled. Parties may contact chambers at (973) 776 7862. So Ordered by Magistrate Judge Cathy L. Waldor on 4/16/18. (tjg, ) (Entered: 04/16/2018)

05/02/2018  260  Letter from Liza M. Walsh to the Honorable Cathy L. Waldor Requesting the Withdrawal of Scott A. Elengold's Pro Hac Vice Admission. (WALSH, LIZA) (Entered: 05/02/2018)

05/04/2018  261  ORDER granting 260 Letter from Liza M. Walsh to the Honorable Cathy L. Waldor Requesting the Withdrawal of Scott A. Elengold's Pro Hac Vice Admission. Signed by Magistrate Judge Cathy L. Waldor on 05/03/2018. (sms) (Entered: 05/04/2018)

06/06/2018  262  NOTICE of Appearance by ROBERT D. RHOAD on behalf of Mondis Technology Ltd (RHOAD, ROBERT) (Entered: 06/06/2018)

06/06/2018  263  MOTION for Summary Judgment by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. Responses due by 6/18/2018 (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(WALSH, LIZA) (Entered: 06/06/2018)

06/06/2018  264  MEMORANDUM in Support filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 263 MOTION for Summary Judgment (Confidential Version) (Attachments: # 1 Confidential Statement of Material Facts Not in Dispute, # 2 Confidential Declaration of Liza M. Walsh with Exhibits 1 - 18) (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/06/2018)

06/06/2018  265  MOTION for Summary Judgment of No Inequitable Conduct by Mondis Technology Ltd. Responses due by 6/18/2018 (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 06/06/2018)

06/06/2018  266  BRIEF in Support filed by Mondis Technology Ltd re 265 MOTION for Summary Judgment of No Inequitable Conduct (Confidential Version) (Attachments: # 1 Confidential Rule 56.1 Statement of Material Facts Not in Dispute, # 2 Confidential Declaration of Brian M. Goldberg, # 3 Exhibit 1 to the Confidential Declaration of Brian M. Goldberg, # 4 Exhibit 2 to the Confidential Declaration of Brian M. Goldberg, # 5 Exhibit 3 to the Confidential Declaration of Brian M. Goldberg, # 6 Exhibit 4 to the Confidential Declaration of Brian M. Goldberg, # 7 Exhibit 5 to the Confidential Declaration of Brian M. Goldberg, # 8 Exhibit 6 to the Confidential Declaration of Brian M. Goldberg, # 9 Exhibit 7 to the Confidential Declaration of Brian M. Goldberg, # 10 Exhibit 8 to the Confidential Declaration of Brian M. Goldberg, # 11 Exhibit 9 to the Confidential Declaration of Brian M. Goldberg, # 12 Exhibit 10 to the Confidential Declaration of Brian M. Goldberg, # 13 Exhibit 11 to the Confidential Declaration of Brian M. Goldberg, # 14 Exhibit 12 to the

Appx407

Confidential Declaration of Brian M. Goldberg, # 15 Exhibit 13 to the
Confidential Declaration of Brian M. Goldberg, # 16 Exhibit 14 to the
Confidential Declaration of Brian M. Goldberg, # 17 Exhibit 15 to the
Confidential Declaration of Brian M. Goldberg, # 18 Exhibit 16 to the
Confidential Declaration of Brian M. Goldberg, # 19 Exhibit 17 to the
Confidential Declaration of Brian M. Goldberg, # 20 Exhibit 18 to the
Confidential Declaration of Brian M. Goldberg, # 21 Exhibit 19 to the
Confidential Declaration of Brian M. Goldberg, # 22 Exhibit 20 to the
Confidential Declaration of Brian M. Goldberg, # 23 Exhibit 21 to the
Confidential Declaration of Brian M. Goldberg, # 24 Exhibit 22 to the
Confidential Declaration of Brian M. Goldberg, # 25 Exhibit 23 to the
Confidential Declaration of Brian M. Goldberg, # 26 Exhibit 24 to the
Confidential Declaration of Brian M. Goldberg, # 27 Exhibit 25 to the
Confidential Declaration of Brian M. Goldberg, # 28 Exhibit 26 to the
Confidential Declaration of Brian M. Goldberg, # 29 Exhibit 27 to the
Confidential Declaration of Brian M. Goldberg, # 30 Exhibit 28 to the
Confidential Declaration of Brian M. Goldberg, # 31 Exhibit 29 to the
Confidential Declaration of Brian M. Goldberg)(GOLDBERG, BRIAN)NOTICE
TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)
(2), a single, consolidated motion to seal shall be filed within 14 days
following the completed briefing of the materials sought to be sealed, or
within 14 days following the date on which the last of such materials was
filed under temporary seal if the motion is resolved, unless otherwise
directed by the Court. (Entered: 06/06/2018)

06/07/2018     Set Deadlines as to 263 MOTION for Summary Judgment . Motion set for
7/2/2018 before Judge Stanley R. Chesler. Unless otherwise directed by
the Court, this motion will be decided on the papers and no appearances
are required. Note that this is an automatically generated message from
the Clerk`s Office and does not supersede any previous or subsequent
orders from the Court. (sms) (Entered: 06/07/2018)

06/07/2018     Set Deadlines as to 265 MOTION for Summary Judgment of No Inequitable
Conduct. Motion set for 7/2/2018 before Judge Stanley R. Chesler. Unless
otherwise directed by the Court, this motion will be decided on the papers
and no appearances are required. Note that this is an automatically
generated message from the Clerk`s Office and does not supersede any
previous or subsequent orders from the Court. (sms) (Entered:
06/07/2018)

06/07/2018 267 REDACTION to 266 Brief in Support of Motion,,,,,,,,,,,, by Mondis
Technology Ltd. (Attachments: # 1 Rule 56.1 Statement of Material Facts
Not in Dispute, # 2 Declaration of Brian M. Goldberg, # 3 Exhibit 1, # 4
Exhibit 2 (Redacted), # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8
Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, #
13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17
Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit
19, # 22 Exhibit 20, # 23 Exhibit 21, # 24 Exhibit 22, # 25 Exhibit 23, #
26 Exhibit 24, # 27 Exhibit 25, # 28 Exhibit 26, # 29 Exhibit 27, # 30
Exhibit 28, # 31 Exhibit 29, # 32 Certificate of Service)(GOLDBERG,
BRIAN) (Entered: 06/07/2018)

06/07/2018 268 REDACTION to 264 Memorandum in Support of Motion,,, by LG
ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1
Redacted Local Rule 56.1 Statement of Material Facts Not in Dispute, # 2
Redacted Declaration of Liza M. Walsh with Exhibits 1 - 18)(WALSH, LIZA)
(Entered: 06/07/2018)

06/11/2018 269 Letter from Liza M. Walsh on Behalf of the Parties Reqesting a Briefing
Schedule re 265 MOTION for Summary Judgment of No Inequitable
Conduct, 263 MOTION for Summary Judgment . (WALSH, LIZA) (Entered:
06/11/2018)

06/12/2018 270 ORDER granting 269 Defendant's Letter request for an adjustment to the
current briefing schedule; Reset Deadlines as to 269 Letter, 265 MOTION

for Summary Judgment of No Inequitable Conduct.( Motion reset for 8/6/2018 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court.). Signed by Magistrate Judge Cathy L. Waldor on 06/11/2018. (sms) (Entered: 06/12/2018)

06/13/2018    Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Telephone Conference held on 6/13/2018. (tjg, ) (Entered: 06/13/2018)

06/13/2018  271  TEXT ORDER: A Final Pretrial Conference shall be conducted pursuant to Civil Rule 16(d) on 10/15/18 at 2pm before the Undersigned at the U.S. District Court, 50 Walnut Street, Newark, New Jersey on the 4th Floor in Courtroom 4C. The parties shall submit to the Court their joint final pretrial order via email to CLW_Orders@njd.uscourts.gov no later than five (5) business days before the conference. The Court expects to engage in meaningful settlement discussions at the Final Pretrial Conference. Therefore, trial counsel, clients, and/or other persons with full settlement authority must attend the conference. This does not relieve the parties of their obligation to submit their joint final pretrial order no later than five (5) business before the conference. So Ordered by Magistrate Judge Cathy L. Waldor on 6/13/18. (tjg, ) (Entered: 06/13/2018)

06/29/2018  272  BRIEF in Opposition filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 265 MOTION for Summary Judgment of No Inequitable Conduct (Confidential Version) (Attachments: # 1 Local Civil Rule 56.1 Response to Plaintiff Mondis Technology Ltd.'s Statement of Material Facts Not in Dispute (Confidential Version), # 2 Declaration of Liza M. Walsh with Exhibits 1 - 21 (Confidential Version))(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/29/2018)

06/29/2018  273  CERTIFICATE OF SERVICE by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 272 Brief in Opposition to Motion,,,, (WALSH, LIZA) (Entered: 06/29/2018)

06/29/2018  274  MEMORANDUM in Opposition filed by Mondis Technology Ltd re 263 MOTION for Summary Judgment (Attachments: # 1 Confidential Responsive Rule 56.1 Statement, # 2 Confidential Declaration of Brian M. Goldberg, # 3 Exhibit 1 to the Confidential Declaration of Brian M. Goldberg, # 4 Exhibit 2 to the Confidential Declaration of Brian M. Goldberg, # 5 Exhibit 3-16 of the Confidential Declaration of Brian M. Goldberg, # 6 Confidential Declaration of Michael B. Spiro, # 7 Exhibit 1-8 of the Confidential Declaration of Michael B. Spiro, # 8 Certificate of Service)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/29/2018)

07/02/2018  275  REDACTION to 274 Memorandum in Opposition of Motion,,,, by Mondis Technology Ltd. (Attachments: # 1 Responsive Local Civil Rule 56.1 Statement (Public Version), # 2 Declaration of Brian M. Goldberg (Public Version), # 3 Exhibit 1 to the Declaration of Brian M. Goldberg (Public Version), # 4 Exhibit 2 to the Declaration of Brian M. Goldberg (Public Version), # 5 Exhibit 3-16 of the Declaration of Brian M. Goldberg (Public Version), # 6 Declaration of Michael B. Spiro (Public Version), # 7 Exhibit

Appx409

|  |  |  |
|---|---|---|
| | | 1-8 of the Declaration of Michael B. Spiro (Public Version), # 8 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 07/02/2018) |
| 07/02/2018 | 276 | REDACTION to 272 Brief in Opposition to Motion,,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Local Civil Rule 56.1 Response to Plaintiff Mondis Technology Ltd.'s Statement of Material Facts Not in Dispute (Redacted Version), # 2 Declaration of Liza M. Walsh with Exhibits 1 - 21 (Redacted Version))(WALSH, LIZA) (Entered: 07/02/2018) |
| 07/13/2018 | 277 | Letter from Liza M. Walsh to the Honorable Cathy L. Waldor, U.S.M.J. Regarding Pro Hac Vice Application. (Attachments: # 1 Certification of Jared M. Hartzman, # 2 Certification of Ryan M. Teel, # 3 Supporting Certification of Liza M. Walsh, # 4 Text of Proposed Order on Consent) (WALSH, LIZA) (Entered: 07/13/2018) |
| 07/13/2018 | 278 | REPLY BRIEF to Opposition to Motion filed by Mondis Technology Ltd re 265 MOTION for Summary Judgment of No Inequitable Conduct (GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 07/13/2018) |
| 07/13/2018 | 279 | DECLARATION re 278 Reply Brief to Opposition to Motion,, by Mondis Technology Ltd. (Attachments: # 1 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 07/13/2018) |
| 07/13/2018 | 280 | REPLY BRIEF to Opposition to Motion filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 263 MOTION for Summary Judgment (Confidential Version) (Attachments: # 1 Response to Mondiss Local Rule 56.1 Statement of Disputed Facts (Confidential Version), # 2 Declaration of Liza M. Walsh with Exhibits 1 - 6 (Confidential Version))(WALSH, LIZA) NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 07/13/2018) |
| 07/13/2018 | 281 | CERTIFICATE OF SERVICE by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 280 Reply Brief to Opposition to Motion,,, (WALSH, LIZA) (Entered: 07/13/2018) |
| 07/16/2018 | | Set/Reset Hearings: Settlement Conference set for 8/1/2018 10:00 AM before Judge Stanley R. Chesler. ORDERED COUNSEL WITH FULL SETTLEMENT AUTHORITY TO APPEAR WITH CLIENTS. (tt, ) (Entered: 07/16/2018) |
| 07/16/2018 | 282 | REDACTION to 278 Reply Brief to Opposition to Motion,, by Mondis Technology Ltd. (Attachments: # 1 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 07/16/2018) |
| 07/16/2018 | 283 | REDACTION to 280 Reply Brief to Opposition to Motion,,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Response to Mondiss Local Rule 56.1 Statement of Disputed Facts (Redacted Version), # 2 Declaration of Liza M. Walsh with Exhibits 1 - 6 (Redacted Version))(WALSH, LIZA) (Entered: 07/16/2018) |
| 07/17/2018 | 284 | ORDER granting 277 Letter request for the Pro Hac Vice Admission of Jared M. Hartzman, Esq. and Ryan M. Teel, Esq.; For the duration of the time that they serve as counsel pro hac vice in this matter, each make annual payments to the New Jersey Lawyer's Fund for Client Protection as provided by New Jersey Court Rule 1:28-2(a) and shall each pay the sum of $150.00 to the Clerk of the United States District Court in accordance |

with Local Civil Rule 101.1(c)(3); etc. Signed by Magistrate Judge Cathy L. Waldor on 07/16/2018. (sms) (Entered: 07/17/2018)

07/17/2018   285   REPLY BRIEF to Opposition to Motion filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 263 MOTION for Summary Judgment CORRECTED (Confidential Version) (Attachments: # 1 Corrected Response to Mondiss Local Rule 56.1 Statement of Disputed Facts (Confidential Version))(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 07/17/2018)

07/17/2018   286   Letter from Liza M. Walsh to Hon. Stanley R. Chesler, U.S.D.J. re 285 Reply Brief to Opposition to Motion,,,. (WALSH, LIZA) (Entered: 07/17/2018)

07/18/2018   287   REDACTION to 285 Reply Brief to Opposition to Motion,,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Corrected Response to Mondiss Local Rule 56.1 Statement of Disputed Facts (Redacted Version))(WALSH, LIZA) (Entered: 07/18/2018)

07/25/2018      Set/Reset Hearings: Settlement Conference set for 8/1/2018 11:00 AM **TIME CHANGE** before Judge Stanley R. Chesler. ORDERED COUNSEL WITH FULL SETTLEMENT AUTHORITY TO APPEAR WITH CLIENTS (tt, ) (Entered: 07/25/2018)

07/31/2018   288   Joint MOTION to Seal Summary Judgment Submissions by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Proposed Findings of Fact and Conclusions of Law, # 2 Declaration of Liza M. Walsh with Exhibit 1, # 3 Declaration of Brian M. Goldberg, # 4 Statement in Lieu of Brief, # 5 Text of Proposed Order, # 6 Certificate of Service)(WALSH, LIZA) (Entered: 07/31/2018)

08/01/2018   289   Notice of Request by Pro Hac Vice Jared M. Hartzman to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-8923673.) (WALSH, LIZA) (Entered: 08/01/2018)

08/01/2018   290   Notice of Request by Pro Hac Vice Ryan M. Teel to receive Notices of Electronic Filings. (Attachments: # 1 Receipt of Payment)(WALSH, LIZA) (Entered: 08/01/2018)

08/01/2018      Set Deadlines as to 288 Joint MOTION to Seal Summary Judgment Submissions. Motion set for 9/4/2018 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sms) (Entered: 08/01/2018)

08/01/2018      Pro Hac Vice counsel, RYAN M. TEEL and JARED M. HARTZMAN, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (sms) (Entered: 08/01/2018)

08/01/2018      Minute Entry for proceedings held before Judge Stanley R. Chesler: Settlement Conference held on 8/1/2018. (tt, ) (Entered: 08/02/2018)

08/09/2018   291   ORDER granting 288 Joint Motion to Seal documents; etc. Signed by Magistrate Judge Cathy L. Waldor on 08/09/2018. (sms) (Entered: 08/09/2018)

09/05/2018   292   Letter from Liza M. Walsh to the Honorable Cathy L. Waldor, U.S.M.J. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit I)(WALSH, LIZA) (Entered: 09/05/2018)

09/05/2018  293  Exhibit to 292 Letter (Exhibit F) by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Exhibit G, # 2 Exhibit H, # 3 Exhibit J) (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 09/05/2018)

09/05/2018  294  Letter from Brian M. Goldberg to Judge Waldor re 292 Letter. (GOLDBERG, BRIAN) (Entered: 09/05/2018)

09/06/2018  295  REDACTION to 293 Exhibit (to Document),, (Exhibit F) by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Exhibit G, # 2 Exhibit H, # 3 Exhibit J)(WALSH, LIZA) (Entered: 09/06/2018)

09/14/2018  296  Letter from Brian M. Goldberg to Judge Waldor re 292 Letter. (Attachments: # 1 Exhibit 2, 4, 5, 11, 12 (Confidential))(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 09/14/2018)

09/14/2018  297  Exhibit to 296 Letter,, Exhibits 1, 3, 6-10 by Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 09/14/2018)

09/17/2018  298  Letter from Liza M. Walsh to the Honorable Cathy L. Waldor, U.S.M.J. re 296 Letter,, 292 Letter. (Attachments: # 1 Exhibit K)(WALSH, LIZA) (Entered: 09/17/2018)

09/17/2018  299  REDACTION to 296 Letter,, Public Version by Mondis Technology Ltd. (Attachments: # 1 Exhibit 1-12)(GOLDBERG, BRIAN) (Entered: 09/17/2018)

09/18/2018  300  Letter from Brian M. Goldberg to Judge Waldor re 298 Letter. (GOLDBERG, BRIAN) (Entered: 09/18/2018)

09/20/2018  301  TEXT ORDER: At counsels' request, client representatives do not have to be available for the Final Pretrial Conference on 10/15/18. So Ordered by Magistrate Judge Cathy L. Waldor on 9/20/18. (tjg, ) (Entered: 09/20/2018)

10/02/2018  302  MOTION to Seal DE Nos. 293 and 296 by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Proposed Findings of Fact and Conclusions of Law, # 2 Declaration on Liza M. Walsh with Exhibit 1, # 3 Statement, # 4 Text of Proposed Order, # 5 Certificate of Service) (WALSH, LIZA) (Entered: 10/02/2018)

10/04/2018       Set Deadlines as to 302 MOTION to Seal DE Nos. 293 and 296. Motion set for 11/5/2018 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sms) (Entered: 10/04/2018)

10/04/2018  303  ORDER granting 302 Motion to Seal DE Nos. 293 and 296; the parties shall file updated redacted versions of the Confidential Submissions on the docket, consistent with this Order; etc. Signed by Magistrate Judge Cathy L. Waldor on 10/3/2018. (sms) (Entered: 10/04/2018)

10/04/2018  304  ORDER denying 263 LG's Motion for Summary Judgment; and granting 265 Mondis' Motion for Summary Judgment of no inequitable conduct, and judgment on LG's affirmative defense and counterclaim of unenforceability of the '180 patent due to inequitable conduct is hereby entered in Mondis' favor; etc. Signed by Judge Stanley R. Chesler on 10/04/2018. (sms) (Entered: 10/04/2018)

| | | |
|---|---|---|
| 10/15/2018 | | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Final Pretrial Conference held on 10/15/2018. (Court Reporter/Recorder ECR.) (tjg, ) (Entered: 10/15/2018) |
| 10/15/2018 | 305 | TEXT ORDER: The Court will hold a telephone conference, to be initiated by plaintiff, on 10/22/18 at 3:30pm. Parties may contact chambers at (973) 776 7862. So Ordered by Magistrate Judge Cathy L. Waldor on 10/15/18. (tjg, ) (Entered: 10/15/2018) |
| 10/16/2018 | 306 | Letter from Brian M. Goldberg to Judge Waldor. (GOLDBERG, BRIAN) (Entered: 10/16/2018) |
| 10/16/2018 | 307 | Transcript of Hearing held on October 15, 2018, before Magistrate Judge Cathy L. Waldor. Transcriber: King Transcription Services (973-237-6080). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Transcription Agency due, but not filed, by 11/6/2018. Redacted Transcript Deadline set for 11/16/2018. Release of Transcript Restriction set for 1/14/2019. (jml, ) (Entered: 10/17/2018) |
| 10/25/2018 | 308 | MOTION to Dismiss for Lack of Jurisdiction (Subject Matter) by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(WALSH, LIZA) (Entered: 10/25/2018) |
| 10/25/2018 | 309 | MEMORANDUM in Support filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 308 MOTION to Dismiss for Lack of Jurisdiction (Subject Matter) (Confidential Version) (Attachments: # 1 Declaration of Liza M. Walsh with Exhibits A - F (Confidential Version))(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 10/25/2018) |
| 10/25/2018 | | Set Deadlines as to 308 MOTION to Dismiss for Lack of Jurisdiction (Subject Matter). Motion set for 11/19/2018 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sms ) (Entered: 10/25/2018) |
| 10/26/2018 | 310 | REDACTION to 309 Memorandum in Support of Motion,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Redacted Declaration of Liza M. Walsh with Exhibits A - F)(WALSH, LIZA) (Entered: 10/26/2018) |
| 10/29/2018 | 311 | FINAL PRETRIAL ORDER; etc. Signed by Magistrate Judge Cathy L. Waldor on 10/24/2018. (sms) (Entered: 10/29/2018) |
| 11/02/2018 | 312 | Rule 7.1(d)(5) Letter for an automatic extension of the return date of a dispositive motion re 308 MOTION to Dismiss for Lack of Jurisdiction (Subject Matter) . (GOLDBERG, BRIAN) (Entered: 11/02/2018) |
| 11/09/2018 | 313 | Letter from Liza M. Walsh to the Honorable Cathy L. Waldor, U.S.M.J. re 308 MOTION to Dismiss for Lack of Jurisdiction (Subject Matter). (WALSH, LIZA) (Entered: 11/09/2018) |
| 11/16/2018 | 314 | |

Appx413

ORDER, granting 313 Defendant's letter request for a four (4) day extension, until November 30, 2018, to file its reply; etc. Signed by Magistrate Judge Cathy L. Waldor on 11/14/2018. (sms) (Entered: 11/16/2018)

| | | |
|---|---|---|
| 11/19/2018 | 315 | Letter from Brian M. Goldberg to Judge Waldor regarding modification of briefing schedule. (GOLDBERG, BRIAN) (Entered: 11/19/2018) |
| 11/19/2018 | 316 | Letter from Brian M. Goldberg to Judge Waldor regarding modification of briefing schedule (Corrected) re 315 Letter. (GOLDBERG, BRIAN) (Entered: 11/19/2018) |
| 11/20/2018 | 317 | ORDER, granting 316 letter regarding modification of briefing schedule as follows: Montis requests for a two (2) day extension, until November 21, 2018, to file its opposition and a corresponding two (2) day extension until December 3, 2018, for Defendants' to file their reply; etc. Signed by Magistrate Judge Cathy L. Waldor on 11/20/2018. (sms) (Entered: 11/20/2018) |
| 11/21/2018 | 318 | BRIEF in Opposition filed by Mondis Technology Ltd re 308 MOTION to Dismiss for Lack of Jurisdiction (Subject Matter) Confidential (Attachments: # 1 Declaration of Jeffrey S. Edwards with Exhibits 2, 3, 4, 6-13, 16, 17 (Confidential), # 2 Declaration of Michael B. Spiro (Confidential), # 3 Certificate of Service)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 11/21/2018) |
| 11/21/2018 | 319 | Exhibit to 318 Brief in Opposition to Motion,,, Public Exhibits 1, 5, 14, 15, 18 by Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 11/21/2018) |
| 11/26/2018 | 320 | REDACTION to 318 Brief in Opposition to Motion,,, by Mondis Technology Ltd. (Attachments: # 1 Declaration of Jeffrey S. Edwards with exhibits) (GOLDBERG, BRIAN) (Entered: 11/26/2018) |
| 11/28/2018 | 321 | MOTION in Limine No. 1 to Exclude the Report and Testimony of Walter Bratic under Daubert by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service) (WALSH, LIZA) (Entered: 11/28/2018) |
| 11/28/2018 | 322 | BRIEF in Support filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 321 MOTION in Limine No. 1 to Exclude the Report and Testimony of Walter Bratic under Daubert (Confidential Version) (Attachments: # 1 Confidential Declaration of Liza M. Walsh with Exhibits A - J)(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 11/28/2018) |
| 11/28/2018 | 323 | MOTION in Limine No. 2 Under Daubert to Preclude Evidence or Arguments by Plaintiffs Experts Relating to Commercial Success, and any Damages-Related Opinions Based on Such Evidence or Arguments by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(WALSH, LIZA) (Entered: 11/28/2018) |
| 11/28/2018 | 324 | BRIEF in Support filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 323 MOTION in Limine No. 2 Under Daubert to Preclude Evidence or Arguments by Plaintiffs Experts Relating to Commercial Success, and any Damages-Related Opinions Based on Such Evidence or Arguments (Confidential Version) (Attachments: # 1 Confidential Declaration of Liza M. Walsh with Exhibits A - L)(WALSH, LIZA)NOTICE TO COUNSEL: Counsel |

is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 11/28/2018)

11/28/2018 325 MOTION in Limine No. 3 to Exclude References To Reexamination and Inter Partes Review, as well as the Identity of the Party Seeking Such Reexamination and Review by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Brief, # 2 Declaration of Liza M. Walsh with Exhibits A - P, # 3 Text of Proposed Order, # 4 Certificate of Service) (WALSH, LIZA) (Entered: 11/28/2018)

11/28/2018 326 MOTION in Limine No. 4 to Enforce the Courts Claim Construction by Excluding the U.S. Patent and Trademark Offices Consideration of U.S. Patent No. 5,285,197 to Schmidt that Applies a Different Claim Construction by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Brief, # 2 Declaration of Liza M. Walsh with Exhibits A - C, # 3 Text of Proposed Order, # 4 Certificate of Service)(WALSH, LIZA) (Entered: 11/28/2018)

11/28/2018 327 MOTION in Limine No. 5 to Exclude Judicial Opinions and the Outcome of the Prior Litigation by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service) (WALSH, LIZA) (Entered: 11/28/2018)

11/28/2018 328 BRIEF in Support filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 327 MOTION in Limine No. 5 to Exclude Judicial Opinions and the Outcome of the Prior Litigation (Confidential Version) (Attachments: # 1 Confidential Declaration of Liza M. Walsh with Exhibits A - G)(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 11/28/2018)

11/28/2018 329 MOTION in Limine No. 6 to Exclude Evidence, Testimony, and Argument Regarding LGs Revenues and Profits of Non-Accused Products by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Brief, # 2 Text of Proposed Order, # 3 Certificate of Service)(WALSH, LIZA) (Entered: 11/28/2018)

11/28/2018 330 DECLARATION of of Liza M. Walsh with Exhibits A - G (Confidential Version) re 329 MOTION in Limine No. 6 to Exclude Evidence, Testimony, and Argument Regarding LGs Revenues and Profits of Non-Accused Products by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 11/28/2018)

11/28/2018 331 MOTION in Limine Nos. 1-4 by Mondis Technology Ltd. (Attachments: # 1 Brief in Support of Mondis' Motions In Limine Nos. 1-4 (Confidential), # 2 Declaration of Brian M. Goldberg in Support of Mondis' Motions In Limine Nos. 1-4 with exhibits 1-17 (Confidential), # 3 Text of Proposed Order (Confidential))(GOLDBERG, BRIAN) (Entered: 11/28/2018)

11/29/2018 332 Letter from Brian M. Goldberg to Judge Chesler re 331 MOTION in Limine Nos. 1-4. (GOLDBERG, BRIAN) (Entered: 11/29/2018)

11/29/2018 Set Deadlines as to 321 MOTION in Limine No. 1 to Exclude the Report and Testimony of Walter Bratic under Daubert, 329 MOTION in Limine No. 6 to Exclude Evidence, Testimony, and Argument Regarding LGs Revenues

and Profits of Non-Accused Products, 325 MOTION in Limine No. 3 to Exclude References To Reexamination and Inter Partes Review, as well as the Identity of the Party Seeking Such Reexamination and Review, 323 MOTION in Limine No. 2 Under Daubert to Preclude Evidence or Arguments by Plaintiffs Experts Relating to Commercial Success, and any Damages-Related Opinions Based on Such Evidence or Arguments, 326 MOTION in Limine No. 4 to Enforce the Courts Claim Construction by Excluding the U.S. Patent and Trademark Offices Consideration of U.S. Patent No. 5,285,197 to Schmidt that Applies a Different Claim Construction, 331 MOTION in Limine Nos. 1-4, 327 MOTION in Limine No. 5 to Exclude Judicial Opinions and the Outcome of the Prior Litigation. Motion set for 1/7/2019 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sms) (Entered: 11/29/2018)

| | | |
|---|---|---|
| 11/29/2018 | 333 | ORDER, granting 332 Letter request to seal Mondis' Motions in Limine Nos. 1-4 ECF No. 331 ; etc. Signed by Judge Stanley R. Chesler on 11/29/2018. (sms) (Entered: 11/29/2018) |
| 11/29/2018 | 334 | REDACTION to 331 MOTION in Limine Nos. 1-4 by Mondis Technology Ltd. (Attachments: # 1 Brief in Support of Mondis' Motions In Limine (Public), # 2 Declaration of Brian M. Goldberg in Support of Mondis' Motions In Limine (Public), # 3 Text of Proposed Order)(GOLDBERG, BRIAN) (Entered: 11/29/2018) |
| 11/29/2018 | 335 | REDACTION to 322 Brief in Support of Motion,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Redacted Declaration of Liza M. Walsh with Exhibits A - J)(WALSH, LIZA) (Entered: 11/29/2018) |
| 11/29/2018 | 336 | REDACTION to 324 Brief in Support of Motion,,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Redacted Declaration of Liza M. Walsh with Exhibits A - L)(WALSH, LIZA) (Entered: 11/29/2018) |
| 11/29/2018 | 337 | BRIEF in Support filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 327 MOTION in Limine No. 5 to Exclude Judicial Opinions and the Outcome of the Prior Litigation (WALSH, LIZA) (Entered: 11/29/2018) |
| 11/29/2018 | 338 | REDACTION to 328 Brief in Support of Motion,,, (Redacted Declaration of Liza M. Walsh No. 5 with Exhibits A - G) by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 11/29/2018) |
| 11/29/2018 | 339 | REDACTION to 330 Declaration,, (Redacted Declaration of Liza M. Walsh No. 6 with Exhibits A - G) by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 11/29/2018) |
| 11/30/2018 | 340 | Letter from Brian M. Goldberg to Judge Chesler regarding motion in limine briefing schedule. (GOLDBERG, BRIAN) (Entered: 11/30/2018) |
| 12/03/2018 | 341 | ORDER, granting 340 Plaintiff Mondis Technology Ltd. letter request to extend both parties responses to the Motion in Limine up until to December 19, 2018; etc. Signed by Judge Stanley R. Chesler on 12/3/2018. (sms ) (Entered: 12/03/2018) |
| 12/03/2018 | 342 | REPLY BRIEF to Opposition to Motion filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 308 MOTION to Dismiss for Lack of Jurisdiction (Subject Matter) (Confidential Version) (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 12/03/2018) |
| 12/03/2018 | 343 | DECLARATION of R. Andrew Schwentker in Further Support of Motion to Dismiss re 342 Reply Brief to Opposition to Motion,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 12/03/2018) |

| | | |
|---|---|---|
| 12/04/2018 | 344 | REDACTION to 342 Reply Brief to Opposition to Motion,, to Dismiss for Lack of Jurisdiction (Subject Matter) by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 12/04/2018) |
| 12/07/2018 | | Set/Reset Deadlines as to 308 MOTION to Dismiss for Lack of Jurisdiction (Subject Matter). Motion set for 12/12/2018 12:00 PM before Judge Stanley R. Chesler. ORDERED ALL PARTIES TO APPEAR READY TO PROCEED (tt, ) (Entered: 12/07/2018) |
| 12/12/2018 | 345 | Minute Entry for proceedings held before Judge Stanley R. Chesler: Motion Hearing held on 12/12/2018 re 308 MOTION to Dismiss for Lack of Jurisdiction (Subject Matter) filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc, Motions Taken Under Advisement: 308 MOTION to Dismiss for Lack of Jurisdiction (Subject Matter). Counsel shall file Amended Complaint adding the appropriate parties as stated on the record.Ordered trial date set for 3/26/19 at 10:00 a.m. (J5D)OTBS (Court Reporter/Recorder KASHMER.) (tt, ) (Entered: 12/12/2018) |
| 12/18/2018 | 346 | Letter from Brian M. Goldberg to Judge Chesler regarding schedule. (GOLDBERG, BRIAN) (Entered: 12/18/2018) |
| 12/18/2018 | 347 | Letter from Liza M. Walsh to the Honorable Cathy L. Waldor, U.S.M.J. Requesting Permission to File Omnibus Motion to Seal. (WALSH, LIZA) (Entered: 12/18/2018) |
| 12/20/2018 | 348 | ORDER, granting 347 Letter Requesting Permission to File Omnibus Motion to Seal; etc. Signed by Magistrate Judge Cathy L. Waldor on 12/19/2018. (sms) (Entered: 12/20/2018) |
| 12/20/2018 | 349 | ORDER, granting 346 Plaintiff Mondis Technology Ltd. letter request for a further modification of the briefing schedule for responses to the Motions in limine filed by the parties; and until December 28, to finalize the filings; etc. Signed by Judge Stanley R. Chesler on 12/19/2018. (sms) (Entered: 12/20/2018) |
| 12/21/2018 | 350 | BRIEF in Opposition filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 331 MOTION in Limine Nos. 1-4 (Attachments: # 1 Declaration of Liza M. Walsh with Ex. A-L (Confidential - Filed Under Seal))(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 12/21/2018) |
| 12/21/2018 | 351 | RESPONSE in Opposition filed by Mondis Technology Ltd re 323 MOTION in Limine No. 2 Under Daubert to Preclude Evidence or Arguments by Plaintiffs Experts Relating to Commercial Success, and any Damages-Related Opinions Based on Such Evidence or Arguments (Attachments: # 1 Declaration of Brian M. Goldberg with Exhibits 1-7)(GOLDBERG, BRIAN) NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 12/21/2018) |
| 12/21/2018 | 352 | RESPONSE in Opposition filed by Mondis Technology Ltd re 325 MOTION in Limine No. 3 to Exclude References To Reexamination and Inter Partes Review, as well as the Identity of the Party Seeking Such Reexamination and Review (Attachments: # 1 Declaration of Brian M. Goldberg with Exhibits 1-10)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary |

seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 12/21/2018)

12/21/2018  353  RESPONSE in Opposition filed by Mondis Technology Ltd re 326 MOTION in Limine No. 4 to Enforce the Courts Claim Construction by Excluding the U.S. Patent and Trademark Offices Consideration of U.S. Patent No. 5,285,197 to Schmidt that Applies a Different Claim Construction (GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 12/21/2018)

12/21/2018  354  DECLARATION of Brian M. Goldberg re 353 Response in Opposition to Motion,, with exhibits 1-5 by Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 12/21/2018)

12/21/2018  355  RESPONSE in Opposition filed by Mondis Technology Ltd re 321 MOTION in Limine No. 1 to Exclude the Report and Testimony of Walter Bratic under Daubert (Attachments: # 1 Declaration of Michael B. Spiro, # 2 Declaration of Brian M. Goldberg, # 3 Exhibit Nos. 1-12 to the Declaration of Brian M. Goldberg, # 4 Exhibit Nos. 13-24 to the Declaration of Brian M. Goldberg)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 12/21/2018)

12/21/2018  356  RESPONSE in Opposition filed by Mondis Technology Ltd re 327 MOTION in Limine No. 5 to Exclude Judicial Opinions and the Outcome of the Prior Litigation (Attachments: # 1 Declaration of Brian M. Goldberg, # 2 Exhibit Nos. 1-2, # 3 Exhibit Nos. 3-11)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 12/21/2018)

12/21/2018  357  RESPONSE in Opposition filed by Mondis Technology Ltd re 329 MOTION in Limine No. 6 to Exclude Evidence, Testimony, and Argument Regarding LGs Revenues and Profits of Non-Accused Products (GOLDBERG, BRIAN) NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 12/21/2018)

12/21/2018  358  DECLARATION of Brian M. Goldberg re 357 Response in Opposition to Motion,, with Exhibits 1-2 by Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 12/21/2018)

12/21/2018  359  Certification of Service of Oppositions to LG Motions In Limine Nos. 1-6 by Brian M. Goldberg on behalf of Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 12/21/2018)

12/24/2018  360  REDACTION to 350 Brief in Opposition to Motion,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Declaration of Liza M. Walsh with Exs. A-L (Redacted Version))(WALSH, LIZA) (Entered: 12/24/2018)

12/24/2018  361

|            |     |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                          |
|------------|-----|----|
|            |     | REDACTION to 355 Response in Opposition to Motion,,, by Mondis Technology Ltd. (Attachments: # 1 Declaration of Michael B. Spiro (Public), # 2 Declaration of Brian M. Goldberg (Public), # 3 Exhibit Nos. 1-24 (Public))(GOLDBERG, BRIAN) (Entered: 12/24/2018) |
| 12/24/2018 | 362 | REDACTION to 351 Response in Opposition to Motion,,, by Mondis Technology Ltd. (Attachments: # 1 Declaration of Brian M. Goldberg (Public), # 2 Exhibit Nos. 1-7 (Public))(GOLDBERG, BRIAN) (Entered: 12/24/2018) |
| 12/24/2018 | 363 | REDACTION to 352 Response in Opposition to Motion,,, by Mondis Technology Ltd. (Attachments: # 1 Declaration of Brian M. Goldberg with Exhibits 1-10 (Public))(GOLDBERG, BRIAN) (Entered: 12/24/2018) |
| 12/24/2018 | 364 | REDACTION to 353 Response in Opposition to Motion,, by Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 12/24/2018) |
| 12/24/2018 | 365 | REDACTION to 356 Response in Opposition to Motion,,, by Mondis Technology Ltd. (Attachments: # 1 Declaration of Brian M. Goldberg (Public), # 2 Exhibit Nos. 1-11 (Public))(GOLDBERG, BRIAN) (Entered: 12/24/2018) |
| 12/24/2018 | 366 | REDACTION to 357 Response in Opposition to Motion,, by Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 12/24/2018) |
| 12/28/2018 | 367 | Letter from Brian M. Goldberg to Judge Chesler Regarding Amended Complaint re 345 Motion Hearing,,, Motions Taken Under Advisement,,. (Attachments: # 1 Text of Proposed Order, # 2 Amended Complaint) (GOLDBERG, BRIAN) (Entered: 12/28/2018) |
| 01/04/2019 | 368 | Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. re 367 Letter. (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 01/04/2019) |
| 01/06/2019 | 372 | Transcript of Motion Hearing held on December 12, 2018, before Judge Stanley R. Chesler. Court Reporter: Jackie Kashmer (908-200-1040 $). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 1/28/2019. Redacted Transcript Deadline set for 2/6/2019. Release of Transcript Restriction set for 4/8/2019. (jml, ) (Entered: 01/08/2019) |
| 01/07/2019 | 369 | ORDER, denying as moot 308 Defendants' Motion to Dismiss for Lack of Jurisdiction; Plaintiff Mondis Technology, Ltd,'s request in the alternative to permit the joinder of the relevant Hitachi party under Fed. R. Civ. P. 15, 17(a)(3), 19, 20 and 21 is GRANTED, and the amended complaint attached to this order shall be filed forthwith. The parties shall have 30 days from entry of this order to supplement the pretrial order, exhibit list, and deposition designations to reflect any matters made relevant by the joinder; etc. Signed by Judge Stanley R. Chesler on 01/07/2018. (sms) (Entered: 01/07/2019) |
| 01/07/2019 | 370 | REDACTION to 368 Letter,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 01/07/2019) |
| 01/08/2019 | 371 | AMENDED COMPLAINT against LG ELECTRONICS U.S.A., INC., LG Electronics Inc, filed by Mondis Technology Ltd, Hitachi Maxell, Ltd., n/k/a |

|  |  |  |
|---|---|---|
|  |  | Maxell Holdings, Ltd., Maxell, Ltd.. (Attachments: # 1 Exhibit A - U.S. Patent No. 7,475,180)(GOLDBERG, BRIAN) (Entered: 01/08/2019) |
| 01/09/2019 | 373 | Corporate Disclosure Statement by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd. identifying Maxell Holdings, Ltd. as Corporate Parent.. (GOLDBERG, BRIAN) (Entered: 01/09/2019) |
| 01/10/2019 | 374 | Letter from Liza M. Walsh to Honorable Stanley R. Chesler, U.S.D.J. re 369 Order on Motion to Dismiss/Lack of Jurisdiction,,. (WALSH, LIZA) (Entered: 01/10/2019) |
| 01/11/2019 | 375 | Joint MOTION to Seal the Motion to Dismiss, Motions in Limine, and the Letter from Liza M. Walsh, dated January 4, 2019 by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Proposed Findings of Fact and Conclusions of Law, # 2 Declaration of Liza M. Walsh with Exhibit 1, # 3 Declaration of Brian M. Goldberg, # 4 Statement in Lieu of Brief, # 5 Text of Proposed Order, # 6 Certificate of Service)(WALSH, LIZA) (Entered: 01/11/2019) |
| 01/11/2019 | 376 | Letter from Brian M. Goldberg to Judge Chesler re 374 Letter. (GOLDBERG, BRIAN) (Entered: 01/11/2019) |
| 01/14/2019 |  | Set/Reset Hearings: TELEPHONE CONFERENCE CALL set for 1/16/2019 02:00 PM before Judge Stanley R. Chesler. COUNSEL SHALL INITIATE THE CALL TO CHAMBERS WITH ALL PARTIES PRESENT. (tt, ) (Entered: 01/14/2019) |
| 01/14/2019 |  | Set Deadlines as to 375 Joint MOTION to Seal the Motion to Dismiss, Motions in Limine, and the Letter from Liza M. Walsh, dated January 4, 2019. Motion set for 2/4/2019 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sms, ) (Entered: 01/14/2019) |
| 01/14/2019 |  | Set/Reset Hearings: TELEPHONE CONFERENCE CALL ON THE RECORD SHALL BE MOVED TO 1/17/2019 AT 01:00 PM before Judge Stanley R. Chesler REGARDING DOC. 368. COUNSEL SHALL INITIATE THE CALL TO CHAMBERS. (tt, ) Modified on 1/14/2019 (tt). Modified on 1/14/2019 (tt). (Entered: 01/14/2019) |
| 01/15/2019 | 377 | ORDER, granting 375 the parties' joint Motion to Seal the referenced portions of the Confidential Materials; etc. Signed by Magistrate Judge Cathy L. Waldor on 01/14/2019. (sms) (Entered: 01/15/2019) |
| 01/17/2019 | 378 | Minute Entry for proceedings held before Judge Stanley R. Chesler: TELEPHONE CONFERENCE CALL ON THE RECORD held on 1/17/2019. ORDERED COUNSEL TO APPEAR FOR A STATUS CONFERENCE SET FOR 2/20/19 AT 10:00 A.M. ORDERED TRIAL CALL FOR JURY SELECTION SET FOR 3/26/19 AT 10:00 A.M. (5dj) (Court Reporter/Recorder KASHMER.) (tt, ) Modified on 1/17/2019 (tt). (Entered: 01/17/2019) |
| 01/18/2019 |  | Set/Reset Deadlines as to 321 MOTION in Limine No. 1 to Exclude the Report and Testimony of Walter Bratic under Daubert, 329 MOTION in Limine No. 6 to Exclude Evidence, Testimony, and Argument Regarding LGs Revenues and Profits of Non-Accused Products, 325 MOTION in Limine No. 3 to Exclude References To Reexamination and Inter Partes Review, as well as the Identity of the Party Seeking Such Reexamination and Review, 323 MOTION in Limine No. 2 Under Daubert to Preclude Evidence or Arguments by Plaintiffs Experts Relating to Commercial Success, and any Damages-Related Opinions Based on Such Evidence or Arguments, 326 MOTION in Limine No. 4 to Enforce the Courts Claim Construction by Excluding the U.S. Patent and Trademark Offices Consideration of U.S. Patent No. 5,285,197 to Schmidt that Applies a Different Claim Construction, 331 MOTION in Limine Nos. 1-4, 327 MOTION in Limine No. 5 to Exclude Judicial Opinions and the Outcome of the Prior Litigation. |

Motion set for 2/20/2019 10:00 AM before Judge Stanley R. Chesler. ORDERED ALL PARTIES TO APPEAR READY TO PROCEED. ORDERED STATUS CONFERENCE TO FOLLOW AFTER HEARING. (tt, ) (Entered: 01/18/2019)

01/22/2019  379  MOTION to Dismiss for Lack of Subject Matter Jurisdiction by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Text of Proposed Order)(WALSH, LIZA) (Entered: 01/22/2019)

01/22/2019  380  MEMORANDUM in Support filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 379 MOTION to Dismiss for Lack of Subject Matter Jurisdiction (Confidential - Filed Under Seal) (Attachments: # 1 Confidential Declaration of Liza M. Walsh with Exhibits A - D)(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 01/22/2019)

01/22/2019  381  ANSWER to Amended Complaint , COUNTERCLAIM against All Plaintiffs by LG Electronics Inc, LG ELECTRONICS U.S.A., INC..(WALSH, LIZA) (Entered: 01/22/2019)

01/23/2019       Set Deadlines as to 379 MOTION to Dismiss for Lack of Subject Matter Jurisdiction. Motion set for 2/19/2019 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sms) (Entered: 01/23/2019)

01/23/2019  382  REDACTION to 380 Memorandum in Support of Motion,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Redacted Declaration of Liza M. Walsh with Exhibits A - D)(WALSH, LIZA) (Entered: 01/23/2019)

01/30/2019  383  Letter from Liza M. Walsh on Behalf of the Parties to the Honorable Cathy L. Waldor, U.S.M.J. Requesting Extension re 369 Order on Motion to Dismiss/Lack of Jurisdiction,,. (WALSH, LIZA) (Entered: 01/30/2019)

01/31/2019  384  ORDER, granting 369 Defendant's letter request for an extension until February 13, 2019 to provide the parties sufficient time to coordinate and finalize the supplemental submission re Order; etc. Signed by Magistrate Judge Cathy L. Waldor on 01/31/2019. (sms) (Entered: 01/31/2019)

02/05/2019  385  ANSWER to Counterclaim by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd.(GOLDBERG, BRIAN) (Entered: 02/05/2019)

02/05/2019  386  BRIEF in Opposition filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd re 379 MOTION to Dismiss for Lack of Subject Matter Jurisdiction (GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 02/05/2019)

02/05/2019  387  DECLARATION re 386 Brief in Opposition to Motion,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 02/05/2019)

02/06/2019  388  REDACTION to 386 Brief in Opposition to Motion,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 02/06/2019)

Appx421

02/13/2019  389  REPLY BRIEF to Opposition to Motion filed by LG ELECTRONICS U.S.A.,
                 INC., LG Electronics Inc re 379 MOTION to Dismiss for Lack of Subject
                 Matter Jurisdiction (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is
                 advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated
                 motion to seal shall be filed within 14 days following the completed
                 briefing of the materials sought to be sealed, or within 14 days following
                 the date on which the last of such materials was filed under temporary
                 seal if the motion is resolved, unless otherwise directed by the Court.
                 (Entered: 02/13/2019)

02/14/2019  390  REDACTION to 389 Reply Brief to Opposition to Motion,, by LG
                 ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered:
                 02/14/2019)

02/20/2019  391  Minute Entry for proceedings held before Judge Stanley R. Chesler: Motion
                 Hearing held on 2/20/2019 Hearing on Motions in Limine 321, 323,325,
                 326, 327, 329 and 331 Ordered motions granted in part denied in part
                 reserved in part for reasons stated on the record. Ordered Daubert
                 hearing regarding experts set for 3/22/19 at 2:00 p.m.Counsel is directed
                 to file individual Orders pertaining to each separate motion based on those
                 decisions made by the Court on the record.Ordered trial with jury set for
                 3/26/19-5D; on call backup to criminal trial. Status Conference (Court
                 Reporter/Recorder KASHMER.) (tt, ) (Entered: 02/20/2019)

02/25/2019  392  Letter from Liza M. Walsh to the Honorable Cathy L. Waldor, U.S.M.J. re:
                 Pro Hac Vice Applicaiton on Consent. (Attachments: # 1 Certification of
                 Ralph A. Phillips, # 2 Supporting Certification of Liza M. Walsh, # 3 Text of
                 Proposed Order)(WALSH, LIZA) (Entered: 02/25/2019)

02/27/2019  393  ORDER, denying 379 LG's Motion to Dismiss the FAC for lack of subject
                 matter jurisdiction; Mondis shall file a further amended complaint to
                 restore the original allegation as to the date of notice; etc. Signed by
                 Judge Stanley R. Chesler on 02/26/2019. (sms) (Entered: 02/27/2019)

02/27/2019  394  ORDER, granting 392 Letter application for the pro hac vice admission of
                 Ralph A. Phillips; Counsel shall have all pleadings, briefs and other papers
                 filed with the Court in this matter signed by Liza M. Walsh or her partners
                 or associates as the attorneys of record in this matter pursuant to Local
                 Civil Rule 101.1(c)(3); etc. Signed by Magistrate Judge Cathy L. Waldor on
                 02/25/2019. (sms) (Entered: 02/27/2019)

02/27/2019  395  Joint MOTION to Seal Motion to Dismiss Papers (ECF Nos. 380, 380-1,
                 386, 389) by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd.,
                 Mondis Technology Ltd. (Attachments: # 1 Statement in Lieu of Brief, # 2
                 Declaration of Brian M. Goldberg In Support of Motion to Seal, # 3 Exhibit
                 1 to the Declaration of Brian M. Goldberg, # 4 Proposed Findings of Fact
                 and Conclusions of Law, # 5 Text of Proposed Order)(GOLDBERG, BRIAN)
                 (Entered: 02/27/2019)

02/28/2019  396  Notice of Request by Pro Hac Vice Ralph A. Phillips to receive Notices of
                 Electronic Filings. (Attachments: # 1 Receipt of Payment)(WALSH, LIZA)
                 (Entered: 02/28/2019)

02/28/2019  397  ORDER, granting 395 the parties' joint Motion to Seal pursuant to Local
                 Civil Rule 5.3(c); etc. Signed by Magistrate Judge Cathy L. Waldor on
                 02/28/2019. (sms) (Entered: 02/28/2019)

02/28/2019       Pro Hac Vice counsel, RALPH PHILLIPS, has been added to receive Notices
                 of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are
                 entitled to sign and file papers, enter appearances and receive payments
                 on judgments, decrees or orders. (sms) (Entered: 02/28/2019)

02/28/2019  398  MEMORANDUM in Opposition filed by LG ELECTRONICS U.S.A., INC., LG
                 Electronics Inc re 331 MOTION in Limine Nos. 1-4 (Opposition to America
                 Can!'s Omnibus Motion in Limine) (Attachments: # 1 Declaration of Briggs
                 M. Wright with Exhibit 1)(WALSH, LIZA) (Entered: 02/28/2019)

02/28/2019  399

Appx422

|  |  | MEMORANDUM in Opposition filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 331 MOTION in Limine Nos. 1-4 (Opposition to America Can!'s Motion to Exclude Plaintiff's Survey Concerning Secondary Meaning and Corresponding Opinion Testimony of Alex Simonson, Ph.D.) (Attachments: # 1 Declaration of Briggs M. Wright with Exhibits 1 - 2) (WALSH, LIZA) (Entered: 02/28/2019) |
|---|---|---|
| 02/28/2019 | 400 | Transcript of Motions in Limine held on February 20, 2019, before Judge Stanley R. Chesler. Court Reporter: Jackie Kashmer (908-200-1040). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 3/21/2019. Redacted Transcript Deadline set for 4/1/2019. Release of Transcript Restriction set for 5/29/2019. (jml, ) (Entered: 03/01/2019) |
| 03/01/2019 |  | CLERK'S QUALITY CONTROL MESSAGE - The MEMORANDUM in Opposition to America Can!'s Omnibus Motion in Limine [D.E. 398] &amp; MEMORANDUM in Opposition to America Can!'s Motion to Exclude [D.E. 399] filed by Liza Walsh on 2/28/2019 appears to be filed in the incorrect case. PLEASE DISREGARD THE SUBMISSIONS. The submissions will remain on the docket unless otherwise ordered by the court. (byl) (Entered: 03/01/2019) |
| 03/01/2019 | 401 | MOTION to Bifurcate the Issues of Willfulness and Damages from Liability by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Brief, # 2 Text of Proposed Order)(WALSH, LIZA) (Entered: 03/01/2019) |
| 03/06/2019 |  | Set Deadlines as to 401 MOTION to Bifurcate the Issues of Willfulness and Damages from Liability. Motion set for 4/1/2019 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sms) (Entered: 03/06/2019) |
| 03/07/2019 |  | Set/Reset Hearings: **TIME CHANGE** DAUBERT Hearing set for 3/22/2019 09:30 AM before Judge Stanley R. Chesler. PLEASE NOTIFY ALL COUNSEL TO APPEAR READY TO PROCEED (tt, ) (Entered: 03/07/2019) |
| 03/08/2019 | 402 | NOTICE of Intent to Request Redaction re 400 Transcript,,, by LIZA M. WALSH (WALSH, LIZA) (Entered: 03/08/2019) |
| 03/08/2019 | 403 | AMENDED COMPLAINT against LG ELECTRONICS U.S.A., INC., LG Electronics Inc, filed by Maxell, Ltd., Mondis Technology Ltd, Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd.. (Attachments: # 1 Exhibit A - U.S. Patent No. 7,475,180, # 2 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 03/08/2019) |
| 03/11/2019 | 404 | Letter from Brian M. Goldberg to Judge Waldor regarding Pro Hac Vice Application on Consent. (Attachments: # 1 Certification of Brian M. Goldberg, # 2 Certification of Nisha N. Patel, # 3 Certification of Joseph J. Gribbin, # 4 Text of Proposed Order, # 5 Certificate of Service) (GOLDBERG, BRIAN) (Entered: 03/11/2019) |
| 03/11/2019 | 405 | Letter from Brian M. Goldberg to Judge Chesler re 391 Motion Hearing,,, Motions Taken Under Advisement,,. (Attachments: # 1 Text of Proposed Order)(GOLDBERG, BRIAN) (Entered: 03/11/2019) |
| 03/12/2019 | 406 | ANSWER to Amended Complaint , COUNTERCLAIM against Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd by LG Electronics Inc, LG ELECTRONICS U.S.A., INC..(WALSH, LIZA) (Entered: 03/12/2019) |

03/13/2019 407 ORDER, granting 404 Letter application for the Pro Hac Vice admission of Nisha N. Patel and Joseph J. Gribbin; Counsel shall make payment of $150.00 to the Clerk of the United States District Court in accordance with L.Civ.R. lOl.1(c)(3), as amended, within twenty (20) days from the date of entry of this Order; etc. Signed by Magistrate Judge Cathy L. Waldor on 03/12/2019. (sms) (Entered: 03/13/2019)

03/14/2019 408 RESPONSE in Opposition filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd re 401 MOTION to Bifurcate the Issues of Willfulness and Damages from Liability (Confidential Version) (Attachments: # 1 Declaration of Brian M. Goldberg with Exhibits 1-6, # 2 Certificate of Service)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 03/14/2019)

03/15/2019 409 TRIAL BRIEF (Confidential Version) by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 03/15/2019)

03/15/2019 410 TRIAL BRIEF (Confidential Version) by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 03/15/2019)

03/15/2019 411 Proposed Jury Instructions by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 03/15/2019)

03/15/2019 412 Proposed Voir Dire by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 03/15/2019)

03/15/2019 413 Exhibit to 408 Response in Opposition to Motion,,, Corrected Exhibit 6 by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 03/15/2019)

03/15/2019 414 REDACTION to 408 Response in Opposition to Motion,,, 413 Corrected Exhibit 6 by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Declaration of Brian M. Goldberg (Public Version))(GOLDBERG, BRIAN) (Entered: 03/15/2019)

03/18/2019 415 REDACTION to 410 Trial Brief by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 03/18/2019)

03/18/2019 416 REDACTION to 409 Trial Brief by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 03/18/2019)

03/19/2019     Pro Hac Vice fee: as to Nisha N. Patel, Esq., and Joseph J. Gribbin, Esq. $ 300, receipt number NEW039010. (sms) (Entered: 03/19/2019)

03/19/2019 417 Notice of Request by Pro Hac Vice Joseph J. Gribbin to receive Notices of Electronic Filings. (GOLDBERG, BRIAN) (Entered: 03/19/2019)

03/19/2019 418 Notice of Request by Pro Hac Vice Nisha N. Patel to receive Notices of Electronic Filings. (GOLDBERG, BRIAN) (Entered: 03/19/2019)

03/19/2019     Pro Hac Vice counsel, JOSEPH J. GRIBBIN and NISHA N. PATEL, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (sms) (Entered: 03/19/2019)

Appx424

| 03/19/2019 | 419 | Letter from Liza M. Walsh on Behalf of the Parties Requesting Court Access for Trial Set-Up. (WALSH, LIZA) (Entered: 03/19/2019) |

03/19/2019   420   Letter from Liza M. Walsh on Behalf of the Parties to the Honorable Cathy L. Waldor, U.S.M.J. Requesting Permission to File Omnibus Motion to Seal. (WALSH, LIZA) (Entered: 03/19/2019)

03/19/2019   421   REPLY BRIEF to Opposition to Motion filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 401 MOTION to Bifurcate the Issues of Willfulness and Damages from Liability (Confidential Version) (Attachments: # 1 Confidential Declaration of Liza M. Walsh with Exhibits A-B)(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 03/19/2019)

03/20/2019   422   REDACTION to 421 Reply Brief to Opposition to Motion,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Redacted Declaration of Liza M. Walsh with Exhibits A-B)(WALSH, LIZA) (Entered: 03/20/2019)

03/21/2019   423   ORDER, granting 419 Letter from Liza M. Walsh on Behalf of the Parties Requesting Court Access for Trial Set-Up. Signed by Judge Stanley R. Chesler on 3/20/2019. (sms) (Entered: 03/21/2019)

03/21/2019   424   Joint MOTION to Seal the Transcript, dated February 20, 2019 at DE No. 400 by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Proposed Findings of Fact and Conclusions of Law, # 2 Declaration of Liza M. Walsh with Ex. 1, # 3 Declaration of Brian M. Goldberg, # 4 Statement in Lieu of Brief, # 5 Text of Proposed Order)(WALSH, LIZA) (Entered: 03/21/2019)

03/21/2019      Set Deadlines as to 424 Joint MOTION to Seal the Transcript, dated February 20, 2019 at DE No. 400. Motion set for 4/15/2019 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sms) (Entered: 03/21/2019)

03/21/2019   425   ORDER, granting 420 Letter from Liza M. Walsh on Behalf of the Parties to the Honorable Cathy L. Waldor, U.S.M.J. Requesting Permission to File Omnibus Motion to Seal. Signed by Magistrate Judge Cathy L. Waldor on 3/20/2019. (sms) (Entered: 03/21/2019)

03/22/2019   426   Proposed Jury Instructions by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 03/22/2019)

03/22/2019   427   Minute Entry for proceedings held before Judge Stanley R. Chesler: Daubert Hearing held on 3/22/2019. Decision Reserved Counsel shall submit 5 page submission by Tuesday, March 26, 2019Hearing on motion for bifurcation (401)Ordered motion granted for reasons stated on the record. Ordered trial date set for 3/26/19 ON CALL #2 to follow Criminal Case. (Court Reporter/Recorder KASHMER.) (tt, ) (Entered: 03/22/2019)

03/24/2019   428   Letter from Brian M. Goldberg to Judge Stanley R. Chesler re Security Access for courier. (GOLDBERG, BRIAN) (Entered: 03/24/2019)

03/25/2019      Set/Reset Hearings: Jury Selection set for 3/27/2019 09:30AM before Judge Stanley R. Chesler. ON CALL BACK UP TO CRIMINAL TRIAL (tt, ) (Entered: 03/25/2019)

03/25/2019   429   Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. re 405 Letter. (Attachments: # 1 Text of Proposed Order on Motions in Limine)(WALSH, LIZA) (Entered: 03/25/2019)

03/25/2019  430  ORDER that Breakaway Courier Inc. will be delivering approximately 30 boxes to the Courthouse on Monday, 3/25/2018 at 2 p.m. He will continue daily to deliver and pickup 5-10 boxes at the court for the remainder of the trial, etc. Signed by Judge Stanley R. Chesler on 3/25/2019. (sm) (Entered: 03/25/2019)

03/26/2019  431  ORDER, granting 424 Motion to Seal pursuant to Local Civil Rule 5.3(c) to seal; etc. Signed by Magistrate Judge Cathy L. Waldor on 3/25/2019. (sms) (Entered: 03/26/2019)

03/26/2019       Set/Reset Hearings: Jury Trial MOVED TO 4/2/2019 09:30 AM before Judge Stanley R. Chesler OR soon thereafter ORDERED ALL PARTIES TO APPEAR READY TO PROCEED (tt, ) (Entered: 03/26/2019)

03/26/2019  432  ORDER, that LG's Motion in Limine No. 1 is CARRIED, pending the Daubert hearing scheduled for March 22, 2019; LG's Motion in Limine No. 2 is hereby GRANTED IN-PART; LG's Motion in Limine No. 3 is hereby GRANTED IN- PART, with the following instructions, and based on LGs stipulation that Mondis provided LG notice of infringement pursuant to 35 U.S.C. § 287; that subject to the rulings above with respect to LGs Motion in Limine No. 3, LG's Motion in Limine No. 4 is otherwise hereby DENIED; LG's Motion in Limine No. 5 is hereby GRANTED IN-PART; LG's Motion in Limine No. 6 is hereby GRANTED; Motion in Limine No. 1 is CARRIED, pending the Danbert hearing scheduled for March 22, 2019; Plaintiffs' Motion in Limine No. 2 is hereby GRANTED-IN-PART; Plaintiffs' Motion in Limine No. 3 is hereby GRANTED, and the parties are precluded from referring to the outcomes of prior Patent Office proceedings and trial verdicts regarding patents no longer in the case; Plaintiffs Motion in Limine No. 4 is hereby GRANTED-IN-PART-AND-DENIED-IN-PART as follows: (i) Plaintiffs motion to preclude LGs expert from offering testimony or opinions regarding the late produced HDMI license agreement is DENIED; and (ii) Plaintiffs are permitted, if they choose, to submit a rebuttal expert report addressing the HDMI license agreement by March 13, 2019; etc. Signed by Judge Stanley R. Chesler on 3/25/2019. (sms) (Entered: 03/26/2019)

03/26/2019  433  AFFIDAVIT in Opposition filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd re 321 MOTION in Limine No. 1 to Exclude the Report and Testimony of Walter Bratic under Daubert (Attachments: # 1 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 03/26/2019)

03/26/2019  434  RESPONSE in Opposition filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd re 321 MOTION in Limine No. 1 to Exclude the Report and Testimony of Walter Bratic under Daubert (Attachments: # 1 Exhibit 1 to the Declaration of Brian M. Goldberg)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 03/26/2019)

03/26/2019  435  BRIEF (LG's Supplemental Brief Pursuant to the Court's Instructions During the Daubert Hearing) (Attachments: # 1 Declaration of Liza M. Walsh with Exhibits 1-3 (Confidential - Filed Under Seal))(WALSH, LIZA) NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 03/26/2019)

03/27/2019  436

Appx426

| | | |
|---|---|---|
| | | Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.D.J. on Trial Schedule re Set/Reset Hearings. (WALSH, LIZA) (Entered: 03/27/2019) |
| 03/27/2019 | 437 | Letter from Martin J. Black re 436 Letter. (Attachments: # 1 Attachment) (BLACK, MARTIN) (Entered: 03/27/2019) |
| 03/27/2019 | | Minute Entry for proceedings held before Judge Stanley R. Chesler: Telephone Conference held on 3/27/2019. COUNSEL SHALL APPEAR FOR TRIAL ON TUESDAY, APRIL 2, 2019 AT 9:30 A.M. (5DJ) (tt, ) (Entered: 03/27/2019) |
| 03/27/2019 | 440 | Redacted Transcript of Motions In Limine held on February 20, 2019, before Judge Stanley R. Chesler. Court Reporter: Jackie Kashmer (908-200-1040 ⑤). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 4/17/2019. Redacted Transcript Deadline set for 4/29/2019. Release of Transcript Restriction set for 6/25/2019. (jml, ) (Entered: 03/28/2019) |
| 03/28/2019 | 438 | ANSWER to Counterclaim by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd.(GOLDBERG, BRIAN) (Entered: 03/28/2019) |
| 03/28/2019 | 439 | REDACTION to 434 Response in Opposition to Motion,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Exhibit 1 (Redacted))(GOLDBERG, BRIAN) (Entered: 03/28/2019) |
| 03/28/2019 | 441 | REDACTION to 435 Brief,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Declaration of Liza M. Walsh with Exhibits 1-3 (Redacted Version))(WALSH, LIZA) (Entered: 03/28/2019) |
| 03/29/2019 | 442 | BRIEF (LG's Bench Memo Regarding the Scope of the Court's Bifurcation Order and the Order of Presentation at Trial) (Attachments: # 1 Declaration of Liza M. Walsh with Exs. 1-4 (Confidential Version))(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 03/29/2019) |
| 03/29/2019 | 443 | Letter from Liza M. Walsh on Behalf of the Parties Requesting Court Access for Upcoming Trial. (WALSH, LIZA) (Entered: 03/29/2019) |
| 03/29/2019 | 444 | Letter from Liza M. Walsh to the Hon. Stanley R. Chesler, U.S.D.J. re: Clarification of Damages Related Trial Testimony. (WALSH, LIZA) (Entered: 03/29/2019) |
| 03/29/2019 | 445 | Exhibit to 444 Letter (Expert Report of Walter Bratic) by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 03/29/2019) |
| 04/01/2019 | 446 | BRIEF in Opposition to LG Bench Memo Regarding the Scope of the Court's Bifurcation Order and the Order of Presentation at Trial (Attachments: # 1 Declaration of Brian Goldberg, # 2 Exhibit 1, # 3 Exhibit 2)(BLACK, |

Appx427

MARTIN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 04/01/2019)

04/01/2019  447  Letter from Liza M. Walsh on Behalf of the Parties to Hon. Stanley R. Chesler, U.S.D.J. re: Revised Jury Instructions re 427 Daubert Hearing, 426 Proposed Jury Instructions. (WALSH, LIZA) (Entered: 04/01/2019)

04/01/2019  448  REDACTION to 442 Brief,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Redacted Declaration of Liza M. Walsh with Exhibits 1 - 4)(WALSH, LIZA) (Entered: 04/01/2019)

04/01/2019  449  STIPULATION Regarding Pre-Admission of Certain Exhibits by both Parties by All Plaintiffs. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(BLACK, MARTIN) (Entered: 04/01/2019)

04/02/2019  450  BRIEF (LG's Reply in Support of its Bench Memo Regarding the Scope of the Court's Bifurcation Order and the Order of Presentation at Trial) (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 04/02/2019)

04/02/2019  451  Minute Entry for proceedings held before Judge Stanley R. Chesler: Jury Trial held on 4/2/2019. JURY SELECTION, OPENINGS &amp; TESTIMONY. Ordered trial with jury adjourned at 5:10 p.m. until Wednesday, April 3, 2019 at 9:45 a.mCOUNSEL SHALL APPEAR AT 9:00 A.M. FOR ADDITIONAL ARGUMENT. BRIEFS TO BE SUBMITTED TONIGHT (Court Reporter/Recorder KASHMER.) (tt, ) (Entered: 04/02/2019)

04/02/2019  452  REDACTION to 446 Brief,, Plaintiffs' Opposition to Bench Brief re Scope of Court's Bifurcation by All Plaintiffs. (BLACK, MARTIN) (Entered: 04/02/2019)

04/03/2019  453  Minute Entry for proceedings held before Judge Stanley R. Chesler: Jury Trial held on 4/3/2019. Ordered trial with jury adjourned at 4:45 p.m. until Friday, April 5, 2019 at 9:45 a.m. (Court Reporter/Recorder KASHMER/SEKELLA.) (tt, ) (Entered: 04/03/2019)

04/03/2019  454  REDACTION to 450 Brief,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 04/03/2019)

04/05/2019  455  BRIEF PLAINTIFFS BENCH MEMO IN SUPPORT OF USING LGS WITHDRAWN ADMISSION AS A NON-BINDING EVIDENTIARY ADMISSION (BLACK, MARTIN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 04/05/2019)

04/05/2019  456  BRIEF (LGs Opposition to Plaintiffs Bench Memo Seeking to Use LGs Withdrawn Admission as a Non-Binding Evidentiary Admission) (Attachments: # 1 Declaration of Liza M. Walsh with Ex. A)(WALSH, LIZA) NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 04/05/2019)

04/05/2019  457  Minute Entry for proceedings held before Judge Stanley R. Chesler: Jury Trial held on 4/5/2019. Ordered trial with jury adjourned at 4:45 p.m.

until Monday, April 8, 2019 at 11:00 a.m. (Court Reporter/Recorder KASHMER/SEKELLA.) (tt, ) (Entered: 04/05/2019)

04/07/2019    458    Letter from Brian Goldberg to the Hon. Stanley R. Chesler, U.S.D.J. regarding Trial Schedule. (GOLDBERG, BRIAN) (Entered: 04/07/2019)

04/07/2019    459    Letter from Liza M. Walsh to Hon. Stanley R. Chesler, U.S.D.J. re 458 Letter. (WALSH, LIZA) (Entered: 04/07/2019)

04/07/2019    460    BRIEF (LGs Bench Memo in Support of an Order Barring Plaintiffs from Arguing in Summation a New Theory of Infringement) (Attachments: # 1 Declaration of Liza M. Walsh with Exs.1-6)(WALSH, LIZA) (Entered: 04/07/2019)

04/07/2019    461    Letter from Liza M. Walsh to Hon. Stanley R. Chesler, U.S.D.J. re Jury Verdict Sheet and Proposed Revised Final Jury Instructions (Liability Phase). (WALSH, LIZA) (Entered: 04/07/2019)

04/08/2019    462    BRIEF (Bench Memo In Opposition To LG's Request to Limit Plaintiffs' Use of Evidence In Summation) (GOLDBERG, BRIAN) (Entered: 04/08/2019)

04/08/2019    463    Minute Entry for proceedings held before Judge Stanley R. Chesler: Jury Trial held on 4/8/2019. CHARGE CONFERENCE Ordered trial with jury adjourned at 3:30 p.m., until Tuesday, April 9, 2019 at 9:45 a.m. (Court Reporter/Recorder KASHMER/SEKELLA.) (tt, ) (Entered: 04/08/2019)

04/09/2019    464    Minute Entry for proceedings held before Judge Stanley R. Chesler: Jury Trial held on 4/9/2019. SUMMATIONS CHARGE BY THE COURT DELIBERATIONS VERDICT Plaintiff proved that it is more likely than not that LG infringed the following patent Claim 14 of the 180 patent and Claim 15 of the180 patent and that LG did not prove by clear and convincing evidence that the following patent claims are invalid on Claim 14 of the180 patent and Claim 15 of the180 patent. CASE SHALL PROCEED TO DAMAGE PORTION. ORDERED ALL EXHIBITS RETURNED TO COUNSEL. ORDERED TRIAL WITH JURY ADJOURNED AT 3:00 P.M. UNTIL WEDNESDAY, APRIL 10, 2019 AT 9:45 A.M. (Court Reporter/Recorder SEKELLA.) (tt, ) Modified on 4/10/2019 (tt). (Entered: 04/09/2019)

04/09/2019    465    Jury Note 1 (Unredacted). (tt, ) (Entered: 04/09/2019)

04/09/2019    466    Jury Note 1 (Redacted). (tt, ) (Entered: 04/09/2019)

04/09/2019    467    JURY VERDICT AS TO LIABILITY- (Unredacted). (tt, ) (Entered: 04/09/2019)

04/09/2019    468    JURY VERDICT AS TO LIABILITY (Redacted). (tt, ) (Entered: 04/09/2019)

04/10/2019    469    STIPULATION Regarding Relevant Damages Period for the Damages Phase of the Trial by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 04/10/2019)

04/10/2019    470    Minute Entry for proceedings held before Judge Stanley R. Chesler: Jury Trial held on 4/10/2019, AS TO DAMAGES. OPENINGS Ordered trial with jury adjourned at 4:25 p.m., until Thursday, May 11, 2019 at 9:45 a.m. (Court Reporter/Recorder KASHMER/SEKELLA.) (tt, ) (Entered: 04/10/2019)

04/10/2019    471    Letter from Brian M. Goldberg to Judge Chesler regarding proposed order. (Attachments: # 1 Text of Proposed Order)(GOLDBERG, BRIAN) (Entered: 04/10/2019)

04/11/2019    472    Letter from Liza M. Walsh to Hon. Stanley R. Chesler, U.S.D.J. re Jury Verdict Sheet and Proposed Final Jury Instructions (Remedy Phase). (WALSH, LIZA) (Entered: 04/11/2019)

04/11/2019    473    ORDER, granting-in-part and denying-in-part 321 Motion in Limine No. 1; LG's damages expert will be permitted to testify in accordance with the following opinions he presented during the March 22, 2019 hearing: (i) apportionment of the LG, TPV, and Hon Hai licenses, and (ii)

apportionment based on excess sales price; etc. Signed by Judge Stanley R. Chesler on 4/11/2019. (sms, ) (Entered: 04/11/2019)

| 04/11/2019 | 474 | Minute Entry for proceedings held before Judge Stanley R. Chesler: Jury Trial held on 4/11/2019. SUMMATIONS CHARGE CHARGE DELIBERATIONS JURY NOTES #1 AND #2 Ordered trial with jury adjourned at 4:00 p.m. until Friday, May 12, 2019 at 9:45 a.m. (Court Reporter/Recorder KASHMER/SEKELLA.) (tt, ) (Entered: 04/11/2019) |
| 04/11/2019 | 475 | Jury Note 1 (Redacted). (tt, ) (Entered: 04/11/2019) |
| 04/11/2019 | 476 | Jury Note 2 (Redacted). (tt, ) (Entered: 04/11/2019) |
| 04/11/2019 | 477 | Jury Note #1 (Unredacted). (tt, ) Modified on 4/12/2019 (tt). (Entered: 04/12/2019) |
| 04/11/2019 | 478 | Jury Note #2 (Unredacted). (tt, ) (Entered: 04/12/2019) |
| 04/12/2019 | 479 | Minute Entry for proceedings held before Judge Stanley R. Chesler: Jury Trial completed on 4/12/2019. RESUMED DELIBERATIONS JURY NOTE #3 VERDICT:In favor of Plaintiffs MONDIS TECHNOLOGY, LTD., et al., &amp; against Defendants LG ELECTRONICS, INC., et al., in the amount of $45 Million, total royalty damages (no interest as the Court will determine interest if it deems necessary) and that plaintiffs have proven that it is more likely than not that LGs infringement of the 180 patent was willful.Ordered jury polled and concurred with the verdict rendered by forepersonOrdered all exhibits returned to counselOrdered jury releasedOrdered counsel to submit a further schedule for briefing as indicated on the record.Ordered trial with jury adjourned at 10:30 a.m. (Court Reporter/Recorder KASHMER.) (tt, ) (Entered: 04/12/2019) |
| 04/12/2019 | 480 | Jury Note #3 (Redacted). (tt, ) (Entered: 04/12/2019) |
| 04/12/2019 | 481 | Jury Note #3 (Unredacted). (tt, ) (Entered: 04/12/2019) |
| 04/12/2019 | 482 | JURY VERDICT (Redacted). VERDICT: In favor of Plaintiffs MONDIS TECHNOLOGY, LTD., et al., &amp; against Defendants LG ELECTRONICS, INC., et al., in the amount of $45 million, total royalty damages (no interest as the Court will determine interest if it deems necessary) and that plaintiffs have proven that it is more likely than not that LGs infringement of the 180 patent was willful.(tt, ) (Entered: 04/12/2019) |
| 04/12/2019 | 483 | JURY VERDICT (Unredacted). (tt, ) (Entered: 04/12/2019) |
| 04/29/2019 | 484 | Letter from Brian M. Goldberg to Judge Chesler regarding post-trial motion schedule. (GOLDBERG, BRIAN) (Entered: 04/29/2019) |
| 04/30/2019 | 485 | ORDER, regarding post-trial briefing scheduling; etc. Signed by Judge Stanley R. Chesler on 4/30/2019. (sms) (Entered: 04/30/2019) |
| 05/31/2019 | 486 | MOTION for Judgment as a Matter of Law Under Rule 50(b) and/or a New Trial under Rule 59 Regarding Invalidity by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Brief, # 2 Declaration of Liza M. Walsh with Exhibits 1 - 5, # 3 Text of Proposed Order)(WALSH, LIZA) (Entered: 05/31/2019) |
| 05/31/2019 | 487 | MOTION for Judgment as a Matter of Law Under Rule 50(b) and/or a New Trial under Rule 59 Regarding Noninfringement by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Brief, # 2 Declaration of Liza M. Walsh with Exhibits 1 - 12, # 3 Text of Proposed Order)(WALSH, LIZA) (Entered: 05/31/2019) |
| 05/31/2019 | 488 | Exhibit to 487 Motion for Judgment as a Matter of Law, (Exhibit 7 attached to the Declaration of Liza M. Walsh) by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the |

motion is resolved, unless otherwise directed by the Court. (Entered: 05/31/2019)

05/31/2019  489  MOTION for Judgment as a Matter of Law Under Rule 50(b), a New Trial under Rule 59, and/or Remittitur Regarding Damages and Willfulness by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Brief, # 2 Text of Proposed Order)(WALSH, LIZA) (Entered: 05/31/2019)

05/31/2019  490  DECLARATION of Liza M. Walsh with Exhibits 1 - 5 (Confidential Version) re 489 MOTION for Judgment as a Matter of Law Under Rule 50(b), a New Trial under Rule 59, and/or Remittitur Regarding Damages and Willfulness by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 05/31/2019)

05/31/2019  491  MOTION for Attorney Fees Pursuant to 35 U.S.C. s. 285 by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service) (GOLDBERG, BRIAN) (Entered: 05/31/2019)

05/31/2019  492  BRIEF in Support filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd re 491 MOTION for Attorney Fees Pursuant to 35 U.S.C. s. 285 (Attachments: # 1 Declaration of Brian M. Goldberg with Exhibits 1-4, # 2 Exhibit 5-6 to the Declaration of Brian M. Goldberg, # 3 Exhibit 7-39 to the Declaration of Brian M. Goldberg, # 4 Exhibit 40-48 to the Declaration of Brian M. Goldberg, # 5 Declaration of Jeffrey B. Plies with Exhibits 1-8, # 6 Exhibit 9 part 1 to the Declaration of Jeffrey B. Plies, # 7 Exhibit 9 part 2 to the Declaration of Jeffrey B. Plies, # 8 Exhibit 9 part 3 to the Declaration of Jeffrey B. Plies, # 9 Exhibit 9 part 4 to the Declaration of Jeffrey B. Plies, # 10 Exhibit 9 part 5 to the Declaration of Jeffrey B. Plies, # 11 Exhibit 9 part 6 to the Declaration of Jeffrey B. Plies, # 12 Exhibit 9 part 7 to the Declaration of Jeffrey B. Plies, # 13 Exhibit 9 part 8 to the Declaration of Jeffrey B. Plies, # 14 Exhibit 9 part 9 to the Declaration of Jeffrey B. Plies)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c) (2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 05/31/2019)

05/31/2019  493  MOTION for Enhanced Damages Pursuant to 35 U.S.C. s. 284 by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service) (GOLDBERG, BRIAN) (Entered: 05/31/2019)

05/31/2019  494  BRIEF in Support filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Mondis Technology Ltd re 493 MOTION for Enhanced Damages Pursuant to 35 U.S.C. s. 284 (Attachments: # 1 Declaration of Brian M. Goldberg with Exhibits 1-4, # 2 Exhibit 5 part 1 to the Declaration of Brian M. Goldberg, # 3 Exhibit 5 part 2 to the Declaration of Brian M. Goldberg, # 4 Exhibit 5 part 3 to the Declaration of Brian M. Goldberg, # 5 Exhibit 6-13 to the Declaration of Brian M. Goldberg, # 6 Exhibit 14 to the Declaration of Brian M. Goldberg, # 7 Exhibit 15-17 to the Declaration of Brian M. Goldberg, # 8 Exhibit 17-34 to the Declaration of Brian M. Goldberg) (GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the

|  |  | motion is resolved, unless otherwise directed by the Court. (Entered: 05/31/2019) |
|---|---|---|
| 05/31/2019 | 495 | MOTION for Prejudgment and Postjudgment Interest by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A)(GOLDBERG, BRIAN) (Entered: 05/31/2019) |
| 05/31/2019 | 496 | BRIEF in Support filed by Maxell, Ltd., Mondis Technology Ltd re 495 MOTION for Prejudgment and Postjudgment Interest (Attachments: # 1 Declaration of Walter Bratic with Exhibits 1-4)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 05/31/2019) |
| 06/03/2019 |  | Set Deadlines as to 495 MOTION for Prejudgment and Postjudgment Interest . Motion set for 7/1/2019 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sms) (Entered: 06/03/2019) |
| 06/03/2019 |  | Set Deadlines as to 495 MOTION for Prejudgment and Postjudgment Interest . Motion set for 7/1/2019 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (sms) (Entered: 06/03/2019) |
| 06/03/2019 | 497 | REDACTION to 488 Exhibit (to Document),, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 06/03/2019) |
| 06/03/2019 | 498 | REDACTION to 490 Declaration,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 06/03/2019) |
| 06/03/2019 | 499 | REDACTION to 494 Brief in Support of Motion,,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Declaration of Brian M. Goldberg with exhibits 1-4, # 2 Exhibit 5 part 1 to the Declaration of Brian M. Goldberg, # 3 Exhibit 5 part 2 to the Declaration of Brian M. Goldberg, # 4 Exhibit 5 part 3 to the Declaration of Brian M. Goldberg, # 5 Exhibit 6 to 13 to the Declaration of Brian M. Goldberg, # 6 Exhibit 14 to the Declaration of Brian M. Goldberg, # 7 Exhibit 15-16 to the Declaration of Brian M. Goldberg, # 8 Exhibit 17-34 to the Declaration of Brian M. Goldberg)(GOLDBERG, BRIAN) (Entered: 06/03/2019) |
| 06/03/2019 | 500 | REDACTION to 492 Brief in Support of Motion,,,,,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Declaration of Jeffrey B. Plies with Exhibits 1-9, # 2 Declaration of Brian M. Goldberg with Exhibits 1-4, # 3 Exhibit 5-16 to the Declaration of Brian M. Goldberg, # 4 Exhibit 17-39 to the Declaration of Brian M. Goldberg, # 5 Exhibit 40-48 to the Declaration of Brian M. Goldberg)(GOLDBERG, BRIAN) (Entered: 06/03/2019) |
| 06/03/2019 | 501 | REDACTION to 496 Brief in Support of Motion,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Declaration of Walter Bratic with Exhibits 1-4) (GOLDBERG, BRIAN) (Entered: 06/03/2019) |
| 06/27/2019 | 502 | NOTICE of Change of Address by LIZA M. WALSH (WALSH, LIZA) (Entered: 06/27/2019) |
| 06/28/2019 | 503 |  |

MEMORANDUM in Opposition filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 491 MOTION for Attorney Fees Pursuant to 35 U.S.C. s. 285 (Attachments: # 1 Confidential Declaration of Liza M. Walsh with Exhibits A - E)(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/28/2019)

06/28/2019  504   MEMORANDUM in Opposition filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 493 MOTION for Enhanced Damages Pursuant to 35 U.S.C. s. 284 (Attachments: # 1 Confidential Declaration of Liza M. Walsh with Exhibits A - C)(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/28/2019)

06/28/2019  505   MEMORANDUM in Opposition filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 495 MOTION for Prejudgment and Postjudgment Interest (Attachments: # 1 Confidential Declaration of John L. Hansen with Exhibits 1 - 6)(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/28/2019)

06/28/2019  506   MEMORANDUM in Opposition filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd re 489 MOTION for Judgment as a Matter of Law Under Rule 50(b), a New Trial under Rule 59, and/or Remittitur Regarding Damages and Willfulness (CONFIDENTIAL) (Attachments: # 1 Certificate of Service)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/28/2019)

06/28/2019  507   MEMORANDUM in Opposition filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd re 487 MOTION for Judgment as a Matter of Law Under Rule 50(b) and/or a New Trial under Rule 59 Regarding Noninfringement (CONFIDENTIAL) (Attachments: # 1 Declaration of Brian M. Goldberg with Exhibits 1-7, # 2 Exhibit 8-14 to the Declaration of Brian M. Goldberg, # 3 Certificate of Service)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/28/2019)

06/28/2019  508   MEMORANDUM in Opposition filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd re 486 MOTION for Judgment as a Matter of Law Under Rule 50(b) and/or a New Trial under Rule 59 Regarding Invalidity (CONFIDENTIAL) (Attachments: # 1 Declaration of Brian M. Goldberg with Exhibits 1-5, # 2 Exhibit 6-11 to the Declaration of Brian M. Goldberg, # 3 Certificate of Service)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local

|  |  | Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/28/2019) |
|---|---|---|
| 07/01/2019 | 509 | REDACTION to 503 Memorandum in Opposition of Motion,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Declaration of Liza M. Walsh with Exhibits A - E)(WALSH, LIZA) (Entered: 07/01/2019) |
| 07/01/2019 | 510 | REDACTION to 504 Memorandum in Opposition of Motion,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Declaration of Liza M. Walsh with Exhibits A - C)(WALSH, LIZA) (Entered: 07/01/2019) |
| 07/01/2019 | 511 | REDACTION to 505 Memorandum in Opposition of Motion,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Redacted Declaration of John L. Hansen with Exhibits 1-6)(WALSH, LIZA) (Entered: 07/01/2019) |
| 07/01/2019 | 512 | REDACTION to 506 Memorandum in Opposition of Motion,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 07/01/2019) |
| 07/01/2019 | 513 | REDACTION to 507 Memorandum in Opposition of Motion,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Declaration of Brian M. Goldberg with exhibits 1-7 (Public), # 2 Exhibit 8-14 to the declaration of Brian M. Goldberg (Public)) (GOLDBERG, BRIAN) (Entered: 07/01/2019) |
| 07/01/2019 | 514 | REDACTION to 508 Memorandum in Opposition of Motion,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Declaration of Brian M. Goldberg with exhibits 1-5, # 2 Exhibit 6-11 to the Declaration of Brian M. Goldberg)(GOLDBERG, BRIAN) (Entered: 07/01/2019) |
| 07/12/2019 | 515 | Letter from Brian M. Goldberg to Judge Chesler regarding trial transcript. (Attachments: # 1 Text of Proposed Order)(GOLDBERG, BRIAN) (Entered: 07/12/2019) |
| 07/12/2019 | 516 | Exhibit to 515 Letter Confidential Version by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 07/12/2019) |
| 07/15/2019 | 517 | REDACTION to 516 Exhibit (to Document),, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 07/15/2019) |
| 07/15/2019 | 518 | Letter from Brian M. Goldberg to Judge Chesler regarding filing error re 517 Redacted Document. (GOLDBERG, BRIAN) (Entered: 07/15/2019) |
| 07/16/2019 | 519 | REDACTION to 516 Exhibit (to Document),, Corrected Version by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 07/16/2019) |
| 07/17/2019 | 520 | ORDER REGARDING CORRECTION OF TRIAL TRANSCRIPT; The clip report of the Ju Seong Ryu deposition designations played at trial on April 10, 2019, attached hereto as Exhibit A, is entered as an addendum to the trial transcript record as if transcribed in the April 10, 2019 trial transcript, and is hereby made part of the trial record but will not be placed in the public record until the parties have an opportunity to submit redactions and file a |

motion to seal; etc. Signed by Judge Stanley R. Chesler on 7/17/2019. (sms) (Entered: 07/17/2019)

07/19/2019  521  REPLY BRIEF to Opposition to Motion filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 486 MOTION for Judgment as a Matter of Law Under Rule 50(b) and/or a New Trial under Rule 59 Regarding Invalidity (Confidential Version) (Attachments: # 1 Confidential Declaration of Liza M. Walsh With Exhibit 6)(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 07/19/2019)

07/19/2019  522  REPLY BRIEF to Opposition to Motion filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 487 MOTION for Judgment as a Matter of Law Under Rule 50(b) and/or a New Trial under Rule 59 Regarding Noninfringement (Confidential Version) (Attachments: # 1 Confidential Declaration of Liza M. Walsh With Exhibits 13-15)(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 07/19/2019)

07/19/2019  523  REPLY BRIEF to Opposition to Motion filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 489 MOTION for Judgment as a Matter of Law Under Rule 50(b), a New Trial under Rule 59, and/or Remittitur Regarding Damages and Willfulness (Confidential Version) (Attachments: # 1 Confidential Declaration of Liza M. Walsh With Exhibits 6-7)(WALSH, LIZA) NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 07/19/2019)

07/19/2019  524  NOTICE by RYAN M. TEEL of Withdrawal of Pro Hac Vice Admission and Request for Removal from Court Notifications (WALSH, LIZA) (Entered: 07/19/2019)

07/19/2019  525  REPLY BRIEF to Opposition to Motion filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd re 495 MOTION for Prejudgment and Postjudgment Interest (Confidential Version) (Attachments: # 1 Declaration of Brian M. Goldberg with exhibits A-D (confidential), # 2 Declaration of Walter Bratic with exhibits (confidential)) (GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 07/19/2019)

07/19/2019  526  REPLY BRIEF to Opposition to Motion filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd re 491 MOTION for Attorney Fees Pursuant to 35 U.S.C. s. 285 (Confidential Version) (Attachments: # 1 Declaration of Jeffrey B. Plies with exhibits 10-14, # 2 Declaration of Brian M. Goldberg with exhibits 49-50)(GOLDBERG, BRIAN) NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials

was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 07/19/2019)

07/19/2019  527  REPLY BRIEF to Opposition to Motion filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd re 493 MOTION for Enhanced Damages Pursuant to 35 U.S.C. s. 284 (Confidential Version) (Attachments: # 1 Declaration of Brian M. Goldberg with exhibits 34-37) (GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 07/19/2019)

07/22/2019  528  Letter from Liza M. Walsh to the Honorable Stanley R. Chesler, U.S.M.J. re 526 Reply Brief to Opposition to Motion,,,. (WALSH, LIZA) (Entered: 07/22/2019)

07/22/2019  529  REPLY BRIEF to Opposition to Motion filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 486 MOTION for Judgment as a Matter of Law Under Rule 50(b) and/or a New Trial under Rule 59 Regarding Invalidity (WALSH, LIZA) (Entered: 07/22/2019)

07/22/2019  530  REDACTION to 521 Reply Brief to Opposition to Motion,,, (Redacted Declaration of Liza M. Walsh with Exhibit 6) by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 07/22/2019)

07/22/2019  531  REDACTION to 522 Reply Brief to Opposition to Motion,,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Redacted Declaration of Liza M. Walsh with Exhibits 13-15)(WALSH, LIZA) (Entered: 07/22/2019)

07/22/2019  532  REDACTION to 523 Reply Brief to Opposition to Motion,,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Redacted Declaration of Liza M. Walsh with Exhibits 6-7)(WALSH, LIZA) (Entered: 07/22/2019)

07/22/2019  533  REDACTION to 525 Reply Brief to Opposition to Motion,,, (Public Version) by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Declaration of Brian M. Goldberg with exhibits A-D (Public), # 2 Declaration of Walter Bratic with exhibits (Public))(GOLDBERG, BRIAN) (Entered: 07/22/2019)

07/22/2019  534  REDACTION to 526 Reply Brief to Opposition to Motion,,, (Public Version) by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Declaration of Jeffrey B. Plies with exhibits 10-14 (Public), # 2 Declaration of Brian M. Goldberg with exhibits 49-50 (Public))(GOLDBERG, BRIAN) (Entered: 07/22/2019)

07/22/2019  535  REDACTION to 527 Reply Brief to Opposition to Motion,,, (Public Version) by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Declaration of Brian M. Goldberg with exhibits 34-37 (Public))(GOLDBERG, BRIAN) (Entered: 07/22/2019)

07/29/2019  536  Transcript of Daubert Hearing held on March 22, 2019, before Judge Stanley R. Chesler. Court Reporter: Jacqueline Kashmer (908-200-1040). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter Agency due, but not filed, by 8/19/2019. Redacted Transcript Deadline set

for 8/29/2019. Release of Transcript Restriction set for 10/28/2019. (mfr) (Entered: 07/29/2019)

07/29/2019  537  Transcript of Jury Trial held on April 2, 2019, before Judge Stanley R. Chesler. Court Reporter: Jacqueline Kashmer (908-200-1040,ⓢ). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 8/19/2019. Redacted Transcript Deadline set for 8/29/2019. Release of Transcript Restriction set for 10/28/2019. (mfr) (Main Document 537 replaced on 7/29/2019) (mfr). (Entered: 07/29/2019)

07/29/2019  538  Transcript of Jury Trial - Volume 2 held on April 3, 2019, before Judge Stanley R. Chesler. Court Reporter: Jacqueline Kashmer (908-200-1040,ⓢ). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 8/19/2019. Redacted Transcript Deadline set for 8/29/2019. Release of Transcript Restriction set for 10/28/2019. (mfr) (Main Document 538 replaced on 7/29/2019) (mfr). (Entered: 07/29/2019)

07/29/2019  539  Transcript of Jury Trial - Volume 3 held on April 5, 2019, before Judge Stanley R. Chesler. Court Reporter: Jacqueline Kashmer (908-200-1040,ⓢ). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 8/19/2019. Redacted Transcript Deadline set for 8/29/2019. Release of Transcript Restriction set for 10/28/2019. (mfr) (Main Document 539 replaced on 7/29/2019) (mfr). (Entered: 07/29/2019)

07/29/2019  540  Transcript of Jury Trial - Volume 4 held on April 8, 2019, before Judge Stanley R. Chesler. Court Reporter: Jacqueline Kashmer (908-200-1040,ⓢ). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 8/19/2019. Redacted Transcript Deadline set for 8/29/2019. Release of Transcript Restriction set for 10/28/2019. (mfr) (Main Document 540 replaced on 7/29/2019) (mfr). (Entered: 07/29/2019)

07/29/2019  541

Appx437

Transcript of Jury Trial - Volume 5 held on April 9, 2019, before Judge Stanley R. Chesler. Court Reporter: Joanne Sekella (908-310-1177🔇⚫). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 8/19/2019. Redacted Transcript Deadline set for 8/29/2019. Release of Transcript Restriction set for 10/28/2019. (mfr) (Entered: 07/29/2019)

07/29/2019  542    Transcript of Jury Trial - Volume 6 held on April 10, 2019, before Judge Stanley R. Chesler. Court Reporter: Joanne Sekella (908-310-1177🔇⚫). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 8/19/2019. Redacted Transcript Deadline set for 8/29/2019. Release of Transcript Restriction set for 10/28/2019. (mfr) (Main Document 542 replaced on 7/29/2019) (mfr). (Entered: 07/29/2019)

07/29/2019  543    Transcript of Trial - Volume 7 held on April 11, 2019, before Judge Stanley R. Chesler. Court Reporter: Jacqueline Kashmer (908-200-1040⚫). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 8/19/2019. Redacted Transcript Deadline set for 8/29/2019. Release of Transcript Restriction set for 10/28/2019. (mfr) Modified on 7/29/2019 (mfr). (Main Document 543 replaced on 7/29/2019) (mfr). (Entered: 07/29/2019)

07/29/2019  544    Transcript of Jury Verdict held on April 12, 2019, before Judge Stanley R. Chesler. Court Reporter: Jacqueline Kashmer (908-200-1040⚫). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 8/19/2019. Redacted Transcript Deadline set for 8/29/2019. Release of Transcript Restriction set for 10/28/2019. (mfr) (Main Document 544 replaced on 7/29/2019) (mfr). (Entered: 07/29/2019)

07/29/2019  545    Transcript of Charge Conference held on April 8, 2019, before Judge Stanley R. Chesler. Court Reporter:Joanne Sekella (908-310-1177🔇⚫). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and

Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 8/19/2019. Redacted Transcript Deadline set for 8/29/2019. Release of Transcript Restriction set for 10/28/2019. (mfr) (Entered: 07/29/2019)

07/29/2019  546  Transcript of Charge Conference held on April 11, 2019, before Judge Stanley R. Chesler. Court Reporter: Jacqueline Kashmer (908-200-1040). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 8/19/2019. Redacted Transcript Deadline set for 8/29/2019. Release of Transcript Restriction set for 10/28/2019. (mfr) (Entered: 07/29/2019)

07/30/2019  547  Letter from Brian M. Goldberg to Judge Chesler re 528 Letter. (GOLDBERG, BRIAN) (Entered: 07/30/2019)

08/02/2019  548  NOTICE of Intent to Request Redaction re 544 Transcript,,, 536 Transcript,,, 539 Transcript,,, 546 Transcript,,, 537 Transcript,,, 541 Transcript,,, 543 Transcript,,, 540 Transcript,,, 545 Transcript,,, 542 Transcript,,, 538 Transcript,,, by BRIAN M. GOLDBERG (GOLDBERG, BRIAN) (Entered: 08/02/2019)

08/02/2019  549  NOTICE of Intent to Request Redaction re 536 Transcript,,, 537 Transcript,,, 541 Transcript,,, 543 Transcript,,, 540 Transcript,,, 542 Transcript,,, 538 Transcript,,, by LIZA M. WALSH (WALSH, LIZA) (Entered: 08/02/2019)

08/06/2019  550  Letter from Brian M. Goldberg to Judge Waldor re 425 Order. (GOLDBERG, BRIAN) (Entered: 08/06/2019)

08/09/2019  551  ORDER; granting 550 the parties letter request for an additional thirty days, until September 18, to file a joint omnibus motion to seal; etc. Signed by Magistrate Judge Cathy L. Waldor on 8/8/2019. (sms) (Entered: 08/09/2019)

08/16/2019  552  Joint MOTION to Seal Transcripts at DE Nos. 536, 537, 538, 540, 541, 542, 543 and Trial Exhibits by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Proposed Findings of Fact and Conclusions of Law, # 2 Declaration of Liza M. Walsh with Exhibit 1, # 3 Declaration of Brian M. Goldberg, # 4 Statement in Lieu of Brief, # 5 Text of Proposed Order)(WALSH, LIZA) (Entered: 08/16/2019)

08/16/2019      Set/Reset Deadlines as to 552 Joint MOTION to Seal Transcripts at DE Nos. 536, 537, 538, 540, 541, 542, 543 and Trial Exhibits. Motion set for 9/16/2019 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (ld, ) (Entered: 08/16/2019)

08/19/2019  553  ORDER TO SEAL; granting 552 the parties' joint Motion to Seal pursuant to Local Civil Rule 5.3(c) to seal the following referenced portions of the Confidential Materials; etc. Signed by Magistrate Judge Cathy L. Waldor on 8/19/2019. (sms) (Entered: 08/19/2019)

09/18/2019  554  REDACTION to 456 Brief,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Declaration of Liza M. Walsh with Exhibit A)(WALSH, LIZA) (Entered: 09/18/2019)

09/18/2019  555  Joint MOTION to Seal (Omnibus) by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Proposed Findings of Fact and Conclusions of Law, # 2 Declaration of Liza M. Walsh with Exhibit 1, # 3

Appx439

Declaration of Brian M. Goldberg, # 4 Statement in Lieu of Brief, # 5 Text of Proposed Order)(WALSH, LIZA) (Entered: 09/18/2019)

09/18/2019  556  REDACTION to 455 Brief,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 09/18/2019)

09/19/2019       Set Deadlines as to 555 Joint MOTION to Seal (Omnibus). Motion set for 10/21/2019 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (lag, ) (Entered: 09/19/2019)

09/19/2019  557  ORDER; granting 555 the parties' joint Motion pursuant to Local Civil Rule 5.3(c) to Seal the referenced portions of the Confidential Materials; etc. Signed by Magistrate Judge Cathy L. Waldor on 9/19/2019. (sms) (Entered: 09/19/2019)

09/24/2019  558  ORDER; denying LG's motion for judgment as a matter of law under Rule 50(b) and/or a new trial under Rule 59 regarding invalidity (Docket Entry No. 486); LGs motion for judgment as a matter of law under Rule 50(b) and/or a new trial under Rule 59 regarding noninfringement (Docket Entry No. 487) is DENIED; LGs motion for judgment as a matter of law under Rule 50(b), a new trial under Rule 59, and/or remittitur regarding damages and willfulness (Docket Entry No. 489) is GRANTED in part, DENIED in part, and decision is RESERVED in part pending further briefing; the jury verdict returned on April 12, 2019, finding that LG's infringement was willful and awarding $45 million in compensatory damages, is VACATED in part, and the jury's verdict awarding $45 million in compensatory damages is hereby VACATED, but the jury verdict of willful infringement is unchanged; Mondis' motion for enhanced damages (Docket Entry No. 493), pursuant to 35 U.S.C. § 284, is DENIED without prejudice as premature; Mondis' motion for attorney fees (Docket Entry No. 491), pursuant to 35 U.S.C. § 285, is DENIED without prejudice as premature. Mondis' motion for pre-judgment and post-judgment interest (Docket Entry No. 495) is DENIED without prejudice as premature; etc. Signed by Judge Stanley R. Chesler on 9/24/2019. (sms) (Entered: 09/24/2019)

10/04/2019  559  NOTICE by JARED M. HARTZMAN of Withdrawal of Pro Hac Vice Admission and Request for Removal from Court Notifications (WALSH, LIZA) (Entered: 10/04/2019)

10/08/2019  560  MOTION for Reconsideration re 558 Order on Motion for Judgment as a Matter of Law,,,,,,,,,,,,,,,,,, Order on Motion for Attorney Fees,,,,,, Order on Motion for Miscellaneous Relief,,,,,,,,,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(GOLDBERG, BRIAN) (Entered: 10/08/2019)

10/08/2019  561  BRIEF in Support filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd re 560 MOTION for Reconsideration re 558 Order on Motion for Judgment as a Matter of Law,,,,,,,,,,,,,,,,,, Order on Motion for Attorney Fees,,,,,, Order on Motion for Miscellaneous Relief,,,,,,,,,,, (GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 10/08/2019)

10/08/2019  562  DECLARATION of of Brian M. Goldberg In Support of Plaintiffs' Motion for Reconsideration on Order Vacating Damages Award re 561 Brief in Support of Motion,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd.,

|            |     | Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Exhibit 1) (GOLDBERG, BRIAN) (Entered: 10/08/2019) |
|------------|-----|---|
| 10/10/2019 |     | Set/Reset Deadlines as to 560 MOTION for Reconsideration re 558 Order on Motion for Judgment as a Matter of Law, Order on Motion for Attorney Fees, Order on Motion for Miscellaneous Relief. Motion set for 11/4/2019 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jc, ) (Entered: 10/10/2019) |
| 10/10/2019 | 563 | REDACTION to 561 Brief in Support of Motion,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (GOLDBERG, BRIAN) (Entered: 10/10/2019) |
| 10/17/2019 | 564 | Letter from Brian M. Goldberg to Hon. Stanley R. Chesler, U.S.D.J. re briefing schedule. (GOLDBERG, BRIAN) (Entered: 10/17/2019) |
| 10/18/2019 | 565 | ORDER; granting 564 Plaintiff's letter regarding the briefing schedule; etc. Signed by Judge Stanley R. Chesler on 10/18/2019. (sms) (Entered: 10/18/2019) |
| 10/21/2019 | 566 | BRIEF in Opposition filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 560 MOTION for Reconsideration re 558 Order on Motion for Judgment as a Matter of Law,,,,,,,,,,,,,,,,,,, Order on Motion for Attorney Fees,,,,,, Order on Motion for Miscellaneous Relief,,,,,,,,,,, (WALSH, LIZA) (Entered: 10/21/2019) |
| 10/31/2019 | 567 | ORDER; denying 560 Mondis' Motion for Reconsideration; etc. Signed by Judge Stanley R. Chesler on 10/30/2019*. (sms) (Entered: 10/31/2019) |
| 11/04/2019 | 568 | Joint MOTION to Seal Plaintiffs Brief in Support of Motion for Reconsideration on Order Vacating Damages Award, dated October 9, 2019 at DE No. 561 by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Proposed Findings of Fact and Conclusions of Law, # 2 Declaration of Liza M. Walsh with Ex. 1, # 3 Statement, # 4 Text of Proposed Order)(WALSH, LIZA) (Entered: 11/04/2019) |
| 11/04/2019 | 569 | BRIEF Plaintiffs' Opening Brief Addressing Application of Promega (Per D.I. 558) (GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 11/04/2019) |
| 11/04/2019 | 570 | DECLARATION of Brian M. Goldberg re 569 Brief,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Certificate of Service Certificate of Service)(GOLDBERG, BRIAN) (Entered: 11/04/2019) |
| 11/04/2019 | 571 | BRIEF (LG's Brief Pursuant to the Court's Order Regarding Waiver in Light of the Insufficiency of Plaintiffs' Damages Theory - Confidential Version) (Attachments: # 1 Confidential Declaration of Liza M. Walsh with Exhibits A - E)(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 11/04/2019) |
| 11/05/2019 |     | Set/Reset Deadlines as to 568 Joint MOTION to Seal Plaintiffs Brief in Support of Motion for Reconsideration on Order Vacating Damages Award, dated October 9, 2019 at DE No. 561. Motion set for 12/2/2019 before |

Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jc, ) (Entered: 11/05/2019)

11/05/2019  572  REDACTION to 571 Brief,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Redacted Declaration of Liza M. Walsh with Exs. A - E)(WALSH, LIZA) (Entered: 11/05/2019)

11/05/2019  573  REDACTION to 569 Brief,, by All Plaintiffs. (GOLDBERG, BRIAN) (Entered: 11/05/2019)

11/11/2019  574  Letter from Brian M. Goldberg to Hon. Stanley R. Chesler, U.S.D.J. re briefing schedule.. (GOLDBERG, BRIAN) (Entered: 11/11/2019)

11/12/2019  575  ORDER; granting 574 Letter request for a 3-day modification of the briefing schedule, from November 18, 2019 to November 21, 2019; etc. Signed by Judge Stanley R. Chesler on 11/11/2019. (sms) (Entered: 11/12/2019)

11/21/2019  576  BRIEF (LG's Response to Plaintiffs' Opening Brief Addressing Application of Promega) (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 11/21/2019)

11/21/2019  577  RESPONSE re 571 Brief,,. (Attachments: # 1 Exhibit CONFIDENTIAL Exhibit 16)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 11/21/2019)

11/21/2019  578  DECLARATION of Liza M. Walsh with Exhibit 1 re 576 Brief,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 11/21/2019)

11/21/2019  579  DECLARATION of Brian M. Goldberg re 577 Response (NOT Motion),, in Support of Plaintiffs' Response to D.I. 571, LG's Initial Submission Pursuant to the Court's Order Regarding Waiver by All Plaintiffs. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Certificate of Service Certificate of Service) (GOLDBERG, BRIAN) (Entered: 11/21/2019)

11/22/2019  580  REDACTION to 577 Response (NOT Motion),, by All Plaintiffs. (Attachments: # 1 Exhibit 16 Redacted)(GOLDBERG, BRIAN) (Entered: 11/22/2019)

11/22/2019  581  Letter from Liza M. Walsh to the Hon. Cathy L. Waldor, U.S.M.J. Requesting to Unseal re 576 Brief,,. (WALSH, LIZA) (Entered: 11/22/2019)

11/22/2019  582  Letter from Liza M. Walsh to the Hon. Cathy L. Waldor, U.S.M.J. Requesting to Unseal (Corrected) re 576 Brief,,. (WALSH, LIZA) (Entered: 11/22/2019)

11/25/2019  583  ORDER; granting 568 the parties' joint Motion pursuant to Local Civil Rule 5.3(c) to Seal the above referenced portions of the Confidential Materials; etc. Signed by Magistrate Judge Cathy L. Waldor on 11/25/2019. (sms) (Entered: 11/25/2019)

11/25/2019  584  ORDER; granting 582 Letter requesting that the Clerk unseal D.E. 576; etc. Signed by Magistrate Judge Cathy L. Waldor on 11/25/2019. (sms) (Entered: 11/25/2019)

12/05/2019  585  Joint MOTION to Seal DE Nos. 569, 571-1, 577, and 577-1 by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Proposed Findings of Fact and Conclusions of Law, # 2 Declaration of Liza M. Walsh with Exhibit 1, # 3 Declaration of Brian M. Goldberg, # 4 Statement in Lieu of Brief, # 5 Text of Proposed Order)(WALSH, LIZA) (Entered: 12/05/2019)

12/09/2019       Set Deadlines as to 585 Joint MOTION to Seal DE Nos. 569, 571-1, 577, and 577-1. Motion set for 1/6/2020 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (mfr) (Entered: 12/09/2019)

12/20/2019  586  Redaction of 540 Transcript of April 8, 2019, Jury Trail Volume 4,,,,. (bt, ) (Entered: 12/23/2019)

12/20/2019  587  REDACTED Transcript of Jury Trail held on April 8, 2019, before Judge Stanley R. Chesler. Court Reporter: Jacqueline Kashmer (908-200-1040). Release of Transcript Restriction set for 3/19/2020. (bt, ) (Entered: 12/23/2019)

12/20/2019  588  REDACTED Transcript of Proceedings held on April 9, 2019, before Judge Stanley R. Chesler. Court Reporter: Joanne Sekella (908-310-1177). Release of Transcript Restriction set for 3/19/2020. (bt, ) (Entered: 12/23/2019)

12/20/2019  589  REDACTED Transcript of Jury Trail held on April 10, 2019, before Judge Stanley R. Chesler. Court Reporter: Joanne Sekella (908-310-1177). Release of Transcript Restriction set for 3/19/2020. (bt, ) (Entered: 12/23/2019)

12/20/2019  590  REDACTED Transcript of Proceedings held on April 11, 2019, before Judge Stanley R. Chesler. Court Reporter: Jacqueline Kashmer (908-200-1040). Release of Transcript Restriction set for 3/19/2020. (bt, ) (Entered: 12/23/2019)

12/20/2019  591  REDACTED Transcript of DAUBERT HEARING held on March 22, 2019, before Judge Stanley R. Chesler. Court Reporter: JACQUELINE KASHMER (908) 200-1040). Release of Transcript Restriction set for 3/19/2020. (bt, ) (Entered: 12/23/2019)

12/20/2019  592  REDACTED Transcript of Jury Trail held on April 2, 2019, before Judge Stanley R. Chesler. Court Reporter: Jacqueline Kashmer (908-200-1040). Release of Transcript Restriction set for 3/19/2020. (bt, ) (Entered: 12/23/2019)

12/20/2019  593  REDACTED Transcript of Jury Trail held on April 3, 2019, before Judge Stanley R. Chesler. Court Reporter: Jacqueline Kashmer (908-200-1040). Release of Transcript Restriction set for 3/19/2020. (bt, ) (Entered: 12/23/2019)

01/06/2020  594  ORDER granting 585 Joint MOTION to Seal DE Nos. 569, 571-1, 577, and 577-1 by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. If necessary, the parties shall file updated redacted versions of the Confidential Submissions on the docket, consistent with the order. Signed by Magistrate Judge Cathy L. Waldor on 1/6/2020. (JB, ) (Entered: 01/07/2020)

03/11/2020       Set/Reset Deadlines as to Hearing set for 3/24/2020 10:30 AM before Judge Stanley R. Chesler regarding the supplementary briefing, docket #

Appx443

|   |   |   |
|---|---|---|
| | | 576 and 577, which stem from #489, LGs JMOL motion. ORDERED ALL PARTIES TO APPEAR READY TO PROCEED. (tt, ) (Entered: 03/11/2020) |
| 03/13/2020 | 595 | Letter from Liza M. Walsh to the Hon. Cathy L. Waldor, U.S.M.J. re: Pro Hac Vice Application on Consent. (Attachments: # 1 Certification of Michael J. Ballanco, # 2 Supporting Certification of Liza M. Walsh, # 3 Text of Proposed Order)(WALSH, LIZA) (Entered: 03/13/2020) |
| 03/16/2020 | 596 | ORDER granting 595 Defendants' Application/Letter for the Pro Hac Vice Admission of MICHAEL J. BALLANCO. etc. Signed by Magistrate Judge Cathy L. Waldor on 3/16/2020. (dam, ) (Entered: 03/16/2020) |
| 03/16/2020 | | Set/Reset Hearings: Hearing set for 4/9/2020 11:00 AM regarding the supplementary briefing, docket # 576 and 577, which stem from #489, LGs JMOL motion. ORDERED ALL PARTIES TO APPEAR READY TO PROCEED before Judge Stanley R. Chesler. (tt, ) (Entered: 03/16/2020) |
| 03/18/2020 | 597 | Notice of Request by Pro Hac Vice Michael J. Ballanco to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number ANJDC-10570794.) (WALSH, LIZA) (Entered: 03/18/2020) |
| 03/19/2020 | | Pro Hac Vice counsel, MICHAEL J BALLANCO, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (qa, ) (Entered: 03/19/2020) |
| 03/23/2020 | | CHAMBER'S NOTIFICATION-HEARING SCHEDULED FOR 4/9/2020, HAS BEEN ADJOURNED WITHOUT DATE NO APPEARANCE REQUIRED. (tt, ) (Entered: 03/23/2020) |
| 03/27/2020 | 598 | Letter from Martin J. Black to Hon. Stanley R. Chesler, U.S.D.J. re Hearing. (BLACK, MARTIN) (Entered: 03/27/2020) |
| 03/30/2020 | 599 | Letter from Liza M. Walsh to the Hon. Stanley R. Chesler, U.S.D.J. re 598 Letter. (WALSH, LIZA) (Entered: 03/30/2020) |
| 04/01/2020 | | Set/Reset Hearings: Hearing set for 5/8/2020 10:30 AM before Judge Stanley R. Chesler regarding the supplementary briefing, docket # 576 and 577, which stem from #489, LGs JMOL motion. ORDERED PLAINTIFF'S COUNSEL TO SET UP THE TELECONFERENCE HEARING WITH ALL PARTIES ON THE RECORD AND TO PROVIDE THE COURT WITH THE CONTACT INFORMATION FOR ALL PARTIES TO PARTICIPATE. COUNSEL IS DIRECTED TO EMAIL THIS INFORMATION TO THE DEPUTY CLERK ALONG WITH THE PARTICIPANT NAMES PARTICIPATING ON THAT CALL (tt, ) (Entered: 04/01/2020) |
| 04/01/2020 | | Set/Reset Hearings: DATE CORRECTION **** Hearing set for 4/8/2020 10:30 AM before Judge Stanley R. Chesler. (tt, ) (Entered: 04/01/2020) |
| 04/08/2020 | 600 | Minute Entry for proceedings held before Judge Stanley R. Chesler: Miscellaneous Hearing held on 4/8/2020, HELD TELEPHONCIALLY-ON THE RECORD, regarding the supplementary briefing, docket # 576 and 577, which stem from #489, LGs JMOL motion. Decision ReservedCounsel was directed to discuss settlement. Court will render a decision within 2 weeks from this date. (Court Reporter/Recorder LEWIS.) (tt, ) (Entered: 04/08/2020) |
| 04/13/2020 | 601 | Letter from Martin J. Black to Hon. Stanley R. Chesler, U.S.D.J. re Promega Argument. (BLACK, MARTIN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 04/13/2020) |
| 04/14/2020 | 602 | REDACTION to 601 Letter,, by All Plaintiffs. (BLACK, MARTIN) (Entered: 04/14/2020) |

Appx444

04/16/2020   603   Letter from Liza M. Walsh to the Hon. Stanley R. Chesler, U.S.D.J. re 601 Letter,,. (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 04/16/2020)

04/17/2020   604   REDACTION to 603 Letter,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 04/17/2020)

04/18/2020   605   Letter from Martin J. Black to Hon. Stanley R. Chesler, U.S.D.J. re remittitur. (BLACK, MARTIN) (Entered: 04/18/2020)

04/20/2020   606   Transcript of Telephone Conference held on April 8, 2020, before Judge Stanley R. Chesler. Court Reporter: Phyllis Lewis (732-735-4522 ). NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter due, but not filed, by 5/11/2020. Redacted Transcript Deadline set for 5/21/2020. Release of Transcript Restriction set for 7/20/2020. (wh) (Entered: 04/20/2020)

04/22/2020   607   OPINION &amp; ORDER that LGs motion for judgment as a matter of law under Rule 50(b), a new trial under Rule 59, and/or remittitur regarding damages and willfulness (Docket Entry No. 489) is GRANTED in part and DENIED in part; that LGs motion for judgment as a matter of law and/or remittitur is DENIED; and that LGs motion for a new trial is GRANTED. Signed by Judge Stanley R. Chesler on 4/22/2020. (sm) (Entered: 04/22/2020)

04/30/2020   608   TEXT ORDER: The Court will hold a teleconference on 5/5/20 at 1pm. Parties are directed to view Judge Waldors COVID-19 emergency preferences at www.njd.uscourts.gov/content/cathy-l-waldor for instructions regarding the upcoming conference in this matter. Additional information can also be found in the link.. So Ordered by Magistrate Judge Cathy L. Waldor on 4/30/20. (tjg, ) (Entered: 04/30/2020)

04/30/2020   609   Joint MOTION to Seal DE Nos. 601 and 603 by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Proposed Findings of Fact of Conclusions of Law, # 2 Declaration of Brian M. Goldberg, # 3 Declaration of Liza M. Walsh, # 4 Statement in Lieu of Brief, # 5 Text of Proposed Order)(WALSH, LIZA) (Entered: 04/30/2020)

05/01/2020    Set Deadlines as to 609 Joint MOTION to Seal DE Nos. 601 and 603. Motion set for 6/1/2020 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (qa, ) (Entered: 05/01/2020)

05/01/2020   610   Letter from Liza M. Walsh to the Hon. Cathy L. Waldor, U.S.M.J. Requesting Adjournment re 608 Order,. (WALSH, LIZA) (Entered: 05/01/2020)

05/04/2020   611   TEXT ORDER: The Court grants the parties request to reschedule the 5/5/20 telephone conference to 5/7/20 at 1:30pm.. So Ordered by Magistrate Judge Cathy L. Waldor on 5/4/20. (tjg, ) (Entered: 05/04/2020)

05/07/2020   612

|            |     | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Telephone Conference held on 5/7/2020. (tjg, ) (Entered: 05/07/2020) |
|------------|-----|-----|
| 05/07/2020 | 613 | TEXT ORDER: Parties are to meet and confer to resolve a scheduling Order and submit same on the docket by May 14, 2020 in accordance with our telephone conference of May 7, 2020. The Court will hold a telephone conference, to be initiated by plaintiff, on 9/17/20 at 2pm. Parties may contact chambers at (973) 776 7862 🔵. So Ordered by Magistrate Judge Cathy L. Waldor on 5/7/20. (tjg, ) (Entered: 05/07/2020) |
| 05/08/2020 | 614 | NOTICE OF APPEAL to Federal Circuit as to 607 Opinion, 558 Order on Motion for Judgment as a Matter of Law,,,,,,,,,,,,,,,,, Order on Motion for Attorney Fees,,,,,, Order on Motion for Miscellaneous Relief,,,,,,,,,,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. Filing fee $ 505, receipt number ANJDC-10789740. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (WALSH, LIZA) (Entered: 05/08/2020) |
| 05/08/2020 | 615 | Letter from Liza M. Walsh to the Hon. Stanley R. Chesler, U.S.D.J. re 614 Notice of Appeal (Federal Circuit),l. h(WALSH, LIZA) (Entered: 05/08/2020) |
| 05/11/2020 | 616 | Letter from Martin J. Black to Hon. Stanley R. Chesler, U.S.D.J. re Appeal. (BLACK, MARTIN) (Entered: 05/11/2020) |
| 05/12/2020 | 617 | MOTION to Stay the New Damages Trial and Related Proceedings Pending Resolution of LG's Appeal by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Brief, # 2 Text of Proposed Order)(WALSH, LIZA) (Entered: 05/12/2020) |
| 05/13/2020 |     | Set Deadlines as to 617 MOTION to Stay the New Damages Trial and Related Proceedings Pending Resolution of LG's Appeal. Motion set for 6/15/2020 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (qa, ) (Entered: 05/13/2020) |
| 05/14/2020 | 618 | Letter from Martin J. Black to the Hon. Cathy L. Waldor, U.S.M.J. re scheduling proposals. (BLACK, MARTIN) (Entered: 05/14/2020) |
| 05/15/2020 | 619 | ORDER granting 609 Joint Motion to Seal D.E. 601 and 603 ; etc. Signed by Magistrate Judge Cathy L. Waldor on 5/15/2020. (sm) (Entered: 05/15/2020) |
| 05/18/2020 | 620 | TEXT ORDER: The Court has considered the parties submission DE 618 and finds that the following pre-trial schedule for the damages portion of the case will govern: Plaintiffs expert report due 6/19/20; Defendants rebuttal expert report due 7/24/20; Close of expert discovery 8/14/20; Daubert motions 8/28/20; Daubert responses 9/11/20; Daubert replies 9/25/20.. So Ordered by Magistrate Judge Cathy L. Waldor on 5/18/20. (tjg, ) (Entered: 05/18/2020) |
| 05/18/2020 | 621 | TRANSCRIPT REQUEST by LG ELECTRONICS U.S.A., INC., LG Electronics Inc for proceedings held on 12/12/18 at DE No. 372, 02/20/19 at DE No. 400, 04/02/19 at DE No. 537, 04/03/19 at DE No. 538, 04/05/19 at DE No. 539, and 04/08/19-04/12/19 at DE Nos. 538-546 before Judge Chesler, (WALSH, LIZA) (Entered: 05/18/2020) |
| 05/20/2020 | 624 | Federal Circuit Appeal Docketed re 614 Notice of Appeal (Federal Circuit). Federal Circuit Case Number 20-1812. (dam, ) (Entered: 06/02/2020) |
| 06/01/2020 | 622 | BRIEF in Opposition filed by All Plaintiffs re 617 MOTION to Stay the New Damages Trial and Related Proceedings Pending Resolution of LG's Appeal (GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the |

Appx446

materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/01/2020)

| | | |
|---|---|---|
| 06/01/2020 | 623 | DECLARATION re 622 Brief in Opposition to Motion,, with exhibits 1 - 6 by All Plaintiffs. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Certificate of Service Certificate of Service)(GOLDBERG, BRIAN) (Entered: 06/01/2020) |
| 06/02/2020 | 625 | REDACTION to 622 Brief in Opposition to Motion,, by All Plaintiffs. (GOLDBERG, BRIAN) (Entered: 06/02/2020) |
| 06/08/2020 | 626 | REPLY BRIEF to Opposition to Motion filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 617 MOTION to Stay the New Damages Trial and Related Proceedings Pending Resolution of LG's Appeal (WALSH, LIZA) NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/08/2020) |
| 06/09/2020 | 627 | Letter from Liza M. Walsh to the Hon. Cathy L. Waldor, U.S.M.J. re: Request to Unseal re 626 Reply Brief to Opposition to Motion,,. (WALSH, LIZA) (Entered: 06/09/2020) |
| 06/11/2020 | 628 | ORDER that the Clerk of the Court will unseal D.E. 626 as it does not contain confidential material and is suitable for the public docket without redaction. Signed by Magistrate Judge Cathy L. Waldor on 6/10/2020. (sm) (Entered: 06/11/2020) |
| 06/11/2020 | 629 | OPINION &amp; ORDER denying 617 LG's Motion to Stay. Signed by Judge Stanley R. Chesler on 6/11/2020. (sm) (Entered: 06/11/2020) |
| 06/22/2020 | 630 | Joint MOTION to Seal Plaintiffs' Brief in Opposition to LG's Motion to Stay the New Damages Trial, dated June 1, 2020 at DE No. 622 by All Plaintiffs. (Attachments: # 1 Proposed Findings of Facts and Conclusions of Law, # 2 Declaration of Brian M. Goldberg with Ex. 1, # 3 Statement, # 4 Text of Proposed Order)(GOLDBERG, BRIAN) (Entered: 06/22/2020) |
| 06/23/2020 | 631 | Letter from Liza M. Walsh to the Hon. Stanley R. Chesler, U.S.D.J. (Confidential - Filed Under Seal). (Attachments: # 1 Attachments (Confidential - Filed Under Seal))(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/23/2020) |
| 06/23/2020 | | Set Deadlines as to 630 Joint MOTION to Seal Plaintiffs' Brief in Opposition to LG's Motion to Stay the New Damages Trial, dated June 1, 2020 at DE No. 622. Motion set for 7/20/2020 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (qa, ) (Entered: 06/23/2020) |
| 06/24/2020 | 632 | Letter from Martin J. Black to Hon. Stanley R. Chesler, U.S.D.J. re Expert Reports. (BLACK, MARTIN) (Entered: 06/24/2020) |
| 06/24/2020 | 633 | ORDER that the Court has received and reviewed the letter from Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc., dated June 23, 2020. The Court concludes that the relief that LG seeks should be the subject of an appropriate formal motion. Signed by Judge Stanley R. Chesler on 6/24/2020. (sm) (Entered: 06/24/2020) |

Appx447

06/26/2020 634 MOTION to Strike Plaintiffs' Unauthorized Supplemental Technical Expert Report and New Damages Theories in Plaintiffs' Supplemental Damages Expert Report by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Declaration of Liza M. Walsh, # 2 Exhibit D, # 3 Text of Proposed Order)(WALSH, LIZA) (Entered: 06/26/2020)

06/26/2020 635 MEMORANDUM in Support filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 634 MOTION to Strike Plaintiffs' Unauthorized Supplemental Technical Expert Report and New Damages Theories in Plaintiffs' Supplemental Damages Expert Report (Confidential - Filed Under Seal) (Attachments: # 1 Exhibit A-C (Confidential - Filed Under Seal)) (WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 06/26/2020)

06/26/2020 636 ORDER granting 630 Joint MOTION to Seal Plaintiffs' Brief in Opposition to LG's Motion to Stay the New Damages Trial, dated June 1, 2020 at DE No. 622 by All Plaintiffs, etc. Signed by Magistrate Judge Cathy L. Waldor on 6/26/2020. (lag, ) (Entered: 06/26/2020)

06/30/2020 Set Deadlines as to 634 MOTION to Strike Plaintiffs' Unauthorized Supplemental Technical Expert Report and New Damages Theories in Plaintiffs' Supplemental Damages Expert Report. Motion set for 7/20/2020 before Judge Stanley R. Chesler. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (qa, ) (Entered: 06/30/2020)

07/06/2020 637 REDACTION to 631 Letter,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Attachments)(WALSH, LIZA) (Entered: 07/06/2020)

07/06/2020 638 REDACTION to 635 Memorandum in Support of Motion,,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Exhibits A-C (Redacted))(WALSH, LIZA) (Entered: 07/06/2020)

07/06/2020 639 BRIEF in Opposition filed by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd re 634 MOTION to Strike Plaintiffs' Unauthorized Supplemental Technical Expert Report and New Damages Theories in Plaintiffs' Supplemental Damages Expert Report (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 5, # 5 Exhibit 6)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 07/06/2020)

07/06/2020 640 DECLARATION of Brian M. Goldberg re 639 Brief in Opposition to Motion,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Exhibit 4)(GOLDBERG, BRIAN) (Entered: 07/06/2020)

07/08/2020 641 REDACTION to 639 Brief in Opposition to Motion,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 5, # 5 Exhibit 6)(GOLDBERG, BRIAN) (Entered: 07/08/2020)

07/13/2020 642 REPLY BRIEF to Opposition to Motion filed by LG ELECTRONICS U.S.A., INC., LG Electronics Inc re 634 MOTION to Strike Plaintiffs' Unauthorized Supplemental Technical Expert Report and New Damages Theories in Plaintiffs' Supplemental Damages Expert Report (WALSH, LIZA)NOTICE TO

Appx448

|  |  | COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 07/13/2020) |
|---|---|---|
| 07/14/2020 | 643 | REDACTION to 642 Reply Brief to Opposition to Motion,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (WALSH, LIZA) (Entered: 07/14/2020) |
| 07/15/2020 | 644 | OPINION &amp; ORDER that LGs motion to strike 634 is GRANTED in partand decision is RESERVED in part; as to Mr. Lamms supplementary report, the motion to strike is GRANTED, and the Court STRIKES that report from the record; as to Mr. Bratics supplementary report, decision on the motion tostrike is RESERVED pending supplementary briefing; within two weeks of the date of entry of this Order, Mondis shall submit the supplementary briefing described above; within two weeks of the filing of Plaintiffs supplementary briefing, LG shall submit a responsive brief. Signed by Judge Stanley R. Chesler on 7/15/2020. (sm) (Entered: 07/16/2020) |
| 07/20/2020 | 645 | Letter from Liza M. Walsh to the Hon. Stanley R. Chesler, U.S.D.J. and the Hon. Cathy L. Waldor, U.S.M.J. re 644 Order on Motion to Strike,, 620 Order,. (WALSH, LIZA) (Entered: 07/20/2020) |
| 07/23/2020 | 646 | TEXT ORDER: The Court will hold a teleconference on 7/27/20 at 12pm. Parties are directed to view Judge Waldors COVID-19 emergency preferences at www.njd.uscourts.gov/content/cathy-l-waldor for instructions regarding the upcoming conference in this matter. Additional information can also be found in the link.. So Ordered by Magistrate Judge Cathy L. Waldor on 7/23/20. (tjg, ) (Entered: 07/23/2020) |
| 07/27/2020 |  | Minute Entry for proceedings held before Magistrate Judge Cathy L. Waldor: Telephone Conference held on 7/27/2020. (tjg, ) (Entered: 07/27/2020) |
| 07/27/2020 | 647 | ORDER re 645 Letter modifying Judge Waldor's 5/18/2020 Scheduling Order 620 ; etc. Signed by Magistrate Judge Cathy L. Waldor on 7/27/2020. (sm) (Entered: 07/27/2020) |
| 07/27/2020 | 648 | TEXT ORDER: The 9/17/20 conference is canceled.. So Ordered by Magistrate Judge Cathy L. Waldor on 7/27/20. (tjg, ) (Entered: 07/27/2020) |
| 07/29/2020 | 649 | BRIEF (Plaintiffs' Brief in Response to Court's Request for Supplemental Briefing on Motion to Strike (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 7, # 6 Exhibit 8, # 7 Exhibit 9, # 8 Exhibit 10, # 9 Exhibit 11, # 10 Exhibit 12, # 11 Exhibit 13, # 12 Exhibit 14, # 13 Exhibit 15, # 14 Exhibit 16, # 15 Exhibit 19, # 16 Exhibit 20, # 17 Exhibit 21, # 18 Exhibit 22, # 19 Exhibit 23, # 20 Exhibit 25) (GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 07/29/2020) |
| 07/29/2020 | 650 | DECLARATION of of Brian M. Goldberg in Support of Plaintiffs' Brief in Response to Court's Request for Supplemental Briefing on Motion to Strike and exhibits 5, 6, 17, 18, and 24 re 649 Brief,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Exhibit 5, # 2 Exhibit 6, # 3 Exhibit 17, # 4 Exhibit 18, # 5 Exhibit 24)(GOLDBERG, BRIAN) (Entered: 07/29/2020) |
| 07/30/2020 | 651 |  |

Appx449

Letter from Brian M. Goldberg to Judge Waldor regarding extension of time to submit redacted copies of D.I. 649. (GOLDBERG, BRIAN) (Entered: 07/30/2020)

07/31/2020 652 ORDER granting the parties' joint request for an extension until 8/3/2020 to file the redacted versions of the sealed brief and exhibits. Signed by Magistrate Judge Cathy L. Waldor on 7/31/2020. (sm) (Entered: 07/31/2020)

08/03/2020 653 REDACTION to 649 Brief,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell, Ltd., Mondis Technology Ltd. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 7, # 6 Exhibit 8, # 7 Exhibit 9, # 8 Exhibit 10, # 9 Exhibit 11, # 10 Exhibit 12, # 11 Exhibit 13, # 12 Exhibit 14, # 13 Exhibit 15, # 14 Exhibit 16, # 15 Exhibit 19, # 16 Exhibit 20, # 17 Exhibit 21, # 18 Exhibit 22, # 19 Exhibit 23, # 20 Exhibit 25)(GOLDBERG, BRIAN) (Entered: 08/03/2020)

08/12/2020 654 BRIEF (LG's Response to Plaintiffs' Supplemental Briefing on Motion to Strike) (Attachments: # 1 Exhibit D (Confidential))(WALSH, LIZA)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 08/12/2020)

08/12/2020 655 DECLARATION of Liza M. Walsh in Support of LG's Response to Plaintiffs' Supplemental Briefing on Motion to Strike re 654 Brief,, by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(WALSH, LIZA) (Entered: 08/12/2020)

08/13/2020 656 REDACTION to 654 Brief,, (LG's Response to Plaintiffs' Supplemental Briefing on Motion to Strike) by LG ELECTRONICS U.S.A., INC., LG Electronics Inc. (Attachments: # 1 Exhibit D (Redacted))(WALSH, LIZA) (Entered: 08/13/2020)

08/17/2020 657 ORDER that Mondis shall submit its supplementary brief within one week of the date of entry of today's order, and LG shall submit its responsive supplementary brief within one week after that, etc. Signed by Judge Stanley R. Chesler on 8/17/2020. (lag) (Entered: 08/17/2020)

08/17/2020 658 Letter from Martin J. Black to Hon. Stanley R. Chesler, U.S.D.J., re Court's Order. (BLACK, MARTIN) (Entered: 08/17/2020)

08/18/2020 659 ORDER that the court has not given Mondis leave to add or change any of the opinions in the Bratic Supplement, etc. Signed by Judge Stanley R. Chesler on 8/18/2020. (lag, ) (Entered: 08/18/2020)

08/20/2020 660 Letter from Martin J. Black to Hon. Stanley R. Chesler, U.S.D.J., re Extension of Time. (BLACK, MARTIN) (Entered: 08/20/2020)

08/21/2020 661 ORDER granting Plaintiffs a 4-day extension to 8/28/2020 to submit a revised submission regarding the supplemental Bratic report. Signed by Judge Stanley R. Chesler on 8/21/2020. (sm) (Entered: 08/21/2020)

08/28/2020 662 BRIEF Plaintiffs' Brief in Response to Court's Request for Supplemental Briefing on Motion to Strike (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 7, # 6 Exhibit 9, # 7 Exhibit 11, # 8 Exhibit 12, # 9 Exhibit 13, # 10 Exhibit 14, # 11 Exhibit 15, # 12 Exhibit 16, # 13 Exhibit 19, # 14 Exhibit 20, # 15 Exhibit 21, # 16 Exhibit 22, # 17 Exhibit 23, # 18 Exhibit 25)(GOLDBERG, BRIAN)NOTICE TO COUNSEL: Counsel is advised that pursuant to Local Civil Rule 5.3(c)(2), a single, consolidated motion to seal shall be filed within 14 days following the completed briefing of the materials sought to be sealed, or within 14 days following the date on which the last of such materials was filed under temporary seal if the motion is resolved, unless otherwise directed by the Court. (Entered: 08/28/2020)

Appx450

08/28/2020  663  DECLARATION of Brian M. Goldberg In Support of Plaintiffs' Brief in
                 Response to Court's Request for Supplemental Briefing on Motion to Strike
                 re 662 Brief,,, by Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., Maxell,
                 Ltd., Mondis Technology Ltd. (Attachments: # 1 Exhibit 5, # 2 Exhibit 6, #
                 3 Exhibit 8, # 4 Exhibit 17, # 5 Exhibit 18, # 6 Exhibit 24)(GOLDBERG,
                 BRIAN) (Entered: 08/28/2020)

Copyright © 2020 LexisNexis CourtLink, Inc. All rights reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| MONDIS TECHNOLOGY LTD., | |
| Plaintiff, | |
| v. | Civil Case No.: _____ |
| LG ELECTRONICS, INC. and LG ELECTRONICS U.S.A., INC., | **JURY** |
| Defendants. | |

## COMPLAINT

Plaintiff Mondis Technology Ltd. ("Mondis" or "Plaintiff"), for its Complaint against Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc. (collectively, "LG" or "Defendants") hereby alleges as follows:

## NATURE OF ACTION

1.     This is a civil action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*

## THE PARTIES

2.     Plaintiff Mondis is a corporation organized under the laws of England, with its principal place of business at Suite 3C, Lyttelton House, 2 Lyttelton Road, London N2 0EF, England.

3.     Defendant LG Electronics, Inc. ("LG Korea") is a corporation organized under the laws of Korea with its principal place of business at LG Twin Tower 128, Yeoui-daero, Yeongdeungpo-gu, Seoul, Korea.  LG Korea is in the business of developing, manufacturing,

and selling consumer electronics for importation into the United States. Such devices include, but are not limited to, televisions.

4.  Defendant LG Electronics U.S.A., Inc. ("LG USA") is a company organized under the laws of the state of Delaware with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey. LG USA has a registered agent, United States Corporation Company, located at 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218 USA. LG USA is in the business of developing, manufacturing, importing, and selling electronic devices. Such devices include, but are not limited to, televisions.

## JURISDICTION AND VENUE

5.  This Court has original jurisdiction over the subject matter of this Complaint under 28 U.S.C. § 1338(a) because this action arises under the patent laws of the United States, including 35 U.S.C. § 271, *et seq.*

6.  This Court has personal jurisdiction over LG in this action. LG knowingly and purposefully availed itself of the protections and benefits of the laws of the United States, the State of Texas, and this District. For example, LG availed itself of this District when it filed counterclaims against Plaintiff in *Mondis Tech. Ltd. v. LG Elecs., Inc.*, 2:07-cv-565, asserting actions for declaratory judgment of non-infringement, invalidity, and unenforceability of certain of Plaintiff's patents, including the Patents-in-Suit in this action.

7.  This Court also has personal jurisdiction over LG in this action because LG knowingly and purposefully ships, distributes, offers for sale, and/or sells its products in the United States and this District through an established distribution network, either directly or through intermediaries (including distributors, retailers, and others), subsidiaries, and/or agents. LG has knowingly placed the accused television into the stream of commerce, with the intent and

2

result that they have been distributed and sold in the state of Texas and this District. For example, accused LG televisions have been sold to and by Walmart and Best Buy stores located within this District.

8.     This Court also has personal jurisdiction over LG in this action because LG has purposefully and voluntarily operated and currently operates an interactive website that is available to persons in this District which advertises and markets infringing televisions and provides information as to stores located in this District which advertise and offer for sale the accused televisions. These accused LG televisions have been purchased by consumers in this District. Upon information and belief, LG has committed the tort of patent infringement in this District and/or has induced others to commit patent infringement in this District.

9.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b), (c), and (d), as well as 28 U.S.C. § 1400(b), in that LG is subject to personal jurisdiction in this District, and therefore is deemed to reside in this District for purposes of venue, and LG has committed acts within this judicial District giving rise to this action and does business in this District, including but not limited to filing judicial actions in this District, distributing and/or offering for sale and/or selling infringing televisions in this District, providing service and support to their respective customers in this District, and/or operating an interactive website that is available to persons in this District which advertises and markets infringing televisions and provides information as to stores located in this District which advertise and offer for sale infringing televisions.

**THE PATENTS-IN-SUIT**

10.     On January 28, 2003, United States Patent Number 6,513,088 ("the '088 Patent"), entitled DISPLAY UNIT AND METHOD ENABLING BIDIRECTIONAL COMMUNICATION WITH VIDEO SOURCE with named inventors Ikuya Arai and Kouji Kitou, was duly and legally issued by the United States Patent and Trademark Office from

United States Application Number 09/732,292, claiming priority from a foreign application filed on February 10, 1993. A true and correct copy of the '088 Patent is attached as Exhibit A to this Complaint. Mondis is the assignee and owner of the right, title, and interest in and to the '088 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it, including past damages.

11. On April 15, 2003, United States Patent Number 6,549,970 ("the '970 Patent"), entitled DISPLAY UNIT WITH CONTROLLER ENABLING BI-DIRECTIONAL COMMUNICATION WITH COMPUTER with named inventors Ikuya Arai and Kouji Kitou, was duly and legally issued by the United States Patent and Trademark Office from United States Application Number 09/732,291, claiming priority from a foreign application filed on February 10, 1993. A true and correct copy of the '970 Patent is attached as Exhibit B to this Complaint. Mondis is the assignee and owner of the right, title, and interest in and to the '970 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it, including past damages.

12. On August 8, 2006, United States Patent Number 7,089,342 ("the '342 Patent"), entitled METHOD ENABLING DISPLAY UNIT TO BIDIRECTIONALLY COMMUNICATE WITH VIDEO SOURCE with named inventors Ikuya Arai and Kouji Kitou, was duly and legally issued by the United States Patent and Trademark Office from U.S. Patent Application Number 10/772,236, claiming priority from a foreign application filed on February 10, 1993. A true and correct copy of the '342 Patent is attached as Exhibit C to this Complaint. Mondis is the assignee and owner of the right, title, and interest in and to the '342 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it, including past damages.

4

13.     On January 6, 2009, United States Patent Number 7,475,180 ("the '180 Patent"), entitled DISPLAY UNIT WITH COMMUNICATION CONTROLLER AND MEMORY FOR STORING IDENTIFICATION NUMBER FOR IDENTIFYING DISPLAY UNIT with named inventors Ikuya Arai and Kouji Kitou, was duly and legally issued by the United States Patent and Trademark Office from U.S. Patent Application Number 10/160,022, claiming priority from a foreign application filed on February 10, 1993.  A true and correct copy of the '180 Patent is attached as Exhibit D to this Complaint.  Mondis is the assignee and owner of the right, title, and interest in and to the '180 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it, including past damages.

14.     On October 28, 2003, United States Patent Number 6,639,588 ("the '588 Patent"), entitled IMAGE DISPLAY APPARATUS, with named inventors Ikuya Arai, Kouji Kitou, and Yuji Sano, was duly and legally issued by the United States Patent and Trademark Office from United States Patent Application 10/166,691, claiming priority from a foreign application filed on February 20, 1992.  A true and correct copy of the '588 Patent is attached as Exhibit E to this Complaint.  Mondis is the assignee and owner of the right, title, and interest in and to the '588 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it, including past damages.

## FACTUAL BACKGROUND

### Prior Litigation

15.     On December 31, 2007, Mondis filed a Complaint in this district against LG *et. al.*, (Case No. 2:07-CV-565) alleging that certain LG computer monitors infringed, *inter alia*, the '088, '970, and '588 patents.

16.     On May 14, 2008, Mondis filed a First Amended Complaint in Case No. 2:07-CV-565, alleging that certain LG computer monitors also infringed the '342 patent.

17.     On March 9, 2009, Mondis filed a Second Amended Complaint in Case No. 2:07-CV-565, alleging that certain LG computer monitors also infringed the '180 patent.

18.     Mondis and LG subsequently reached a settlement with respect to Mondis's claims against LG's computer monitors, and the district court entered an Order of Dismissal on September 17, 2009.  The Order of Dismissal states that: "[a]ll claims and counterclaims in the above-captioned action between the parties are hereby dismissed: (a) with prejudice in relation to all products other than 'Unreleased Products' noted in the parties' Settlement Agreement, and (b) without prejudice in relation to those 'Unreleased Products.'"

19.     To the extent that any of Mondis' claims in Case No. 2:07-CV-565 pertained to infringement of the patents-in-suit by LG televisions, those claims were dismissed without prejudice.

20.     Following the settlement in Case No. 2:07-CV-565, Mondis and LG exchanged periodic communications and engaged in repeated negotiations regarding LG's need to obtain a license from Mondis for its television products.  At no time has Mondis or any other entity granted LG a license to practice any of the patents-in-suit with respect to televisions.

21.     After LG was dismissed from Case No. 2:09-CV-565, the case proceeded against named co-defendants Innolux and Hon Hai. At the conclusion of a jury trial, the jury returned a verdict finding that televisions manufactured, sold, and/or imported by Innolux and Hon Hai infringed at least claim 15 of the '342 patent and claim 14 of the '180 patent.  The jury also found these claims to be valid over numerous prior art references and extensive fact and expert

6

testimony introduced by the defendants.  The jury also determined that a reasonable royalty rate for televisions was 0.75%.

### Plug-and-Play ("PnP") Functionality

22.     The Video Electronics Standards Association ("VESA") is an industry standards setting organization for monitors and displays that was formed in the late 1980's.  VESA has promulgated several standards that relate to LG televisions

23.     More particularly, on June 7, 2004, VESA promulgated a standard for "Plug & Play."  The purpose of this standard was to enable a display and an attached video source to readily communicate with one another, wherein the display is able to transmit stored display unit information to the video source.  The video source is then able to use this display unit information to generate and send a compatible video signal to the display.  This process can take place automatically so that user intervention is not required.  The user may simply connect his computer or other video source to the display, and a viewable picture will be displayed without the user having to make numerous manual adjustments.  Indeed, this process is normally performed, for example, when a computer running Microsoft Windows or the Apple operating system is started and is connected to a display supporting the Plug-and-Play feature.

24.     To facilitate the foregoing Plug-and-Play functionality, displays supporting this technology include a memory that stores information relating to the display unit.  The specific types and formats of this display unit information are set forth in a VESA standard entitled Enhanced Extended Display Identification Data Standard ("E-EDID"). The EDID information may include data such as a product identification number, product name, a serial number, display type information, information relating to potentially supported functions (*e.g.*, power

management or operating modes), as well as characteristic information relating to the video resolutions and signal timings supported by the display unit.

25.    To further facilitate Plug-and-Play functionality, the display unit includes a bi-directional communications channel that enables the video source to request and receive the EDID display unit information from the memory.  This communications channel is described in the VESA Enhanced Display Data Channel Standard ("E-DDC").  The bi-directional communications channel described in the E-DDC standard employs a Philips I2C bus and protocols to enable the video source to read the EDID display unit information from the memory in the display unit.  The display unit further includes an I2C communications controller that manages these bi-directional communications.  The I2C protocol includes the sending of an acknowledgement signal back to the transmitter upon receipt of a message.

26.    Displays, including the accused LG televisions, include an interface for communicating video signals, display unit information, and control signals between the display and a video source.  Such interfaces include, but are not limited to, a VGA (*i.e.*, "RGB," "PC" or "D-SUB") interface.  In the case of a VGA interface, the accused televisions include a memory associated with the VGA interface that stores the EDID data.  Pins 12 and 15 of the VGA interface are used to implement the bi-directional I2C communications channel between the television and the video source that enables the video source to read the EDID data out of the television's memory.

27.    The accused LG televisions further include a video circuit for receiving, processing, displaying, and outputting video signals received over the video interfaces, including the VGA interface.  More particularly, the accused LG televisions include a system-on-a-chip ("SOC") that includes video input circuitry, analog and digital video decoders, scaling circuitry,

and output circuitry.  Non-limiting examples of such SOC's include the LG XD Engine

LGE2112, LG XD Engine LGE2111, and LG L9.

28.     LG manufactures and then imports, sells, or offers to sell in the United States

numerous models of televisions that support the VESA Plug-and-Play functionality and

implement the VESA E-EDID, VESA E-DDC, and Philips I2C standards.  LG TV's that provide

Plug-and-Play or EDID functionality comprise accused televisions. Non-limiting examples of

such accused televisions include: 26LG30, 22LF10, 32LH20, 37LH20, 50PJ350, and

47LM6200.

### Smart TV Functionality

29.     On or about June 2009, LG began importing and selling "smart" televisions in the

United States.  These "smart" televisions are capable of receiving and displaying streaming video

signals provided via an internet connection.  LG has marketed this functionality under various

trade names including, but not limited to, "NetCast" and "Smart TV."  LG's Smart TV's support

several on-line video streaming services, including: Netflix, CinemaNow, HuluPlus, Amazon,

YouTube, and Vudu, among others.

30.     To support these on-line video streaming services, LG Smart TV's include a

network interface such as an Ethernet interface, which uses an RJ45 connector.  The television

also includes a memory storing an Ethernet Hardware Address (EHA), also known as a Media

Access Control (MAC) address that is capable of identifying the television.  The circuitry in the

television associated with the Ethernet interface includes a communications controller for bi-

directionally communicating IP data packets that include display unit information, control

information and/or video signals between the Smart TV and the on-line video service.

31.     To support the on-line video streaming services, LG Smart TV's must be assigned an IP address that identifies the television when it is connected to a network.  The Smart TV obtains this IP address via a Dynamic Host Configuration Protocol (DHCP) process or the user manually assigns it.  After the IP address is received via the DHCP process or manually assigned, it is stored in a memory of the television and included in data packets sent from the television to the on-line video provider.

32.     To support the on-line video streaming services, LG Smart TV's further include an electronic serial number (ESN) that is stored in a memory of the television.  The ESN is capable of uniquely identifying the television.

33.     The on-line video services receive the IP address  and ESN from the Smart TV and generate packetized video signals based upon one or more of these two identification numbers of the television.

34.     By way of non-limiting example, Netflix provides its service to customers in the United States.  Netflix does not permit viewing of videos from most locations outside the United States.  When processing a request for a video that it wishes to provide only to United States customers, Netflix checks to determine whether the device that is requesting a video is in the United States.  In particular, Netflix examines the IP address from which the request came, and if Netflix determines that that IP address is not located in the United States, Netflix will not provide the requested video program and will instead send a video signal informing the customer that Netflix service is not supported at the customer's location.

35.     LG manufactures and then imports, sells, or offers to sell in the United States various models of televisions that support the foregoing Smart TV functionality.  These LG

Smart TV's comprise accused televisions.  Non-limiting examples of such accused televisions

include: 47LH50, 50PS80, 47LM6200 and 55LM6200.

## COUNT I

### (LG's Infringement of the '088 Patent)

36.     Paragraphs 1 through 35 are incorporated by reference as if fully restated herein.

37.     LG has had knowledge of the '088 patent since no later than December 31, 2007.

Pursuant to 35 U.S.C. § 287(a), LG received actual notice of infringement no later than this date.

38.     LG has directly infringed, either literally or under the doctrine of equivalents, one

or more claims of the '088 patent under 35 U.S.C. § 271(a) by importing, selling, and/or offering

to sell televisions that support Plug-and-Play and/or Smart TV functionality in the United States.

LG has also directly infringed by using, testing, operating and/or demonstrating televisions

possessing Plug-and-Play and/or Smart TV functionality at tradeshows or during the execution of

test and repair procedures at service facilities in the United States.

39.     LG has indirectly infringed, either literally or under the doctrine of equivalents,

one or more claims of the '088 patent under 35 U.S.C. § 271(b) by inducing users and customers

of LG televisions to use the Plug-and-Play and/or Smart TV functionality in an infringing

manner.  For example, LG advertises and identifies to users the Plug-and-Play functionality and

provides instructions on how to connect video sources to the television's VGA port, wherein the

TV will then use the claimed technology.  By way of further example, LG provides instructional

and tutorial materials for its Smart TV functionality instructing users on how to configure and

connect the televisions to the internet and to on-line video providers in a manner that results in

the use of the claimed inventions.  These materials include instructional videos posted on LG's

web site.  In view of the foregoing, LG has possessed specific intent to encourage others, and has

in fact encouraged others, to infringe one or more claims of the '088 patent.  The customers and

end users have used and practiced the claimed inventions.

40.     On information and belief, LG has also indirectly infringed, either literally or

under the doctrine of equivalents, one or more claims of the '088 patent under 35 U.S.C. §

271(b) by inducing third-parties to import, sell, or offer to sell LG televisions that possess Plug-

and-Play and/or Smart TV functionality in the United States.  More particularly, LG has

manufactured accused TV's overseas with full knowledge and intent that such TV's will be

imported, sold, or offered for sale in the United States.  This intent is demonstrated at least by

LG designing and manufacturing the TV's to be compliant with Federal Communication

Commission (FCC) requirements, obtaining Underwriters Laboratories (UL) certification for the

TV's, making the TV's compatible with ATSC broadcast standards used in the United States,

providing written instructions and on-screen displays in English, maintaining a U.S. web site for

marketing of the TV's, and by making the TV's compatible with U.S. power requirements.  LG

encourages third-parties to import and/or sell the accused TV's in the United States by entering

into contractual relationships with them and assisting them with the movement of LG's TV's

through distribution channels into and within the United States. Third-parties have, in fact,

imported, sold, and/or offered to sell the accused LG TV's in the United States.  Such third

parties include, by way of example, Walmart and Best Buy.

41.     LG has also indirectly infringed, either literally or under the doctrine of

equivalents, one or more claims of the '088 patent under 35 U.S.C. § 271(c) by importing,

selling, and/or offering to sell in the United States televisions that possess Plug-and-Play and/or

Smart TV functionality wherein there is no substantial non-infringing use for televisions with

these features.  Further, televisions that include the foregoing functionalities are not staple items

of commerce.  In addition, LG knew that the TV's with the foregoing functionalities were

especially made and adapted to use the claimed inventions of the '088 patent. Customers and end

users of the accused LG televisions have used and practiced the claimed inventions.

42.    LG's infringement has been willful.  LG has been aware of the '088 patent since

no later than December 31, 2007, and LG has engaged in prior litigation with Mondis over this

patent.  Furthermore, LG has previously taken a license to the '088 patent for computer monitors,

wherein computer monitors employ substantially similar Plug-and-Play functionality.  Thus,

LG's conduct has been objectively reckless, and LG has possessed subjective specific intent to

infringe the patent.

43.    Mondis has been harmed by LG's infringement and is entitled to recover damages

to compensate for the infringement.  Further, any damages award should be trebled in view of

LG's willful infringement.

## COUNT II

### (LG's Infringement of the '970 Patent)

44.    Paragraphs 1 through 35 are incorporated by reference as if fully restated herein.

45.    LG has had knowledge of the '970 patent since no later than December 31, 2007.

Pursuant to 35 U.S.C. § 287(a), LG received actual notice of infringement no later than this date.

46.    LG has directly infringed, either literally or under the doctrine of equivalents, one

or more claims of the '970 patent under 35 U.S.C. § 271(a) by importing, selling, and/or offering

to sell televisions that support Plug-and-Play and/or Smart TV functionality in the United States.

LG has also directly infringed by using, testing, operating and/or demonstrating televisions

possessing Plug-and-Play and/or Smart TV functionality at tradeshows or during the execution of

test and repair procedures at service facilities in the United States.

47.     LG has indirectly infringed, either literally or under the doctrine of equivalents, one or more claims of the '970 patent under 35 U.S.C. § 271(b) by inducing users and customers of LG televisions to use the Plug-and-Play and/or Smart TV functionality in an infringing manner.  For example, LG advertises and identifies to users the Plug-and-Play functionality and provides instructions on how to connect video sources to the television's VGA port, wherein the TV will then use the claimed technology.  By way of further example, LG provides instructional and tutorial materials for its Smart TV functionality instructing users on how to configure and connect the accused televisions to the internet and to on-line video providers in a manner that results in the use of the claimed inventions.  These materials include instructional videos posted on LG's web site.  In view of the foregoing, LG has possessed specific intent to encourage others, and has in fact encouraged others, to infringe one or more claims of the '970 patent.  The customers and end users have used and practiced the claimed inventions.

48.     On information and belief, LG has also indirectly infringed, either literally or under the doctrine of equivalents, one or more claims of the '970 patent under 35 U.S.C. § 271(b) by inducing third-parties to import, sell, or offer to sell LG televisions that possess Plug-and-Play and/or Smart TV functionality in the United States.  More particularly, LG has manufactured accused TV's overseas with full knowledge and intent that such TV's will be imported, sold, or offered for sale in the United States.  This intent is demonstrated at least by LG designing and manufacturing the TV's to be compliant with Federal Communication Commission (FCC) requirements, obtaining Underwriters Laboratories (UL) certification for the TV's, making the TV's compatible with ATSC broadcast standards used in the United States, providing written instructions and on-screen displays in English, maintaining a U.S. web site for marketing of the TV's, and by making the TV's compatible with U.S. power requirements.  LG

14

encourages third-parties to import and/or sell the accused TV's in the United States by entering

into contractual relationships with them and assisting them with the movement of LG's TV's

through distribution channels into and within the United States. Third-parties have, in fact,

imported, sold, and/or offered to sell the accused LG TV's in the United States. Such third

parties include, by way of example Walmart and Best Buy.

49.    LG has also indirectly infringed, either literally or under the doctrine of

equivalents, one or more claims of the '970 patent under 35 U.S.C. § 271(c) by importing,

selling, and/or offering to sell in the United States televisions that possess Plug-and-Play and/or

Smart TV functionality wherein there is no substantial non-infringing use for televisions with

these features. Further, televisions that include the foregoing functionalities are not staple items

of commerce. In addition, LG knew that the TV's with the foregoing functionalities were

especially made and adapted to use the claimed inventions of the '970 patent. Customers and end

users of the accused LG televisions have used and practiced the claimed inventions.

50.    LG's infringement has been willful. LG has been aware of the '970 patent since

no later than December 31, 2007, and LG has engaged in prior litigation with Mondis over this

patent. Furthermore, LG has previously taken a license to the '970 patent for computer monitors,

wherein computer monitors employ substantially similar Plug-and-Play functionality. Thus,

LG's conduct has been objectively reckless, and LG has possessed subjective specific intent to

infringe the patent.

51.    Mondis has been harmed by LG's infringement and is entitled to recover damages

to compensate for the infringement. Further, any damages award should be trebled in view of

LG's willful infringement.

## COUNT III

### (LG's Infringement of the '342 Patent)

52.     Paragraphs 1 through 35 are incorporated by reference as if fully restated herein.

53.     LG has had knowledge of the '342 patent since no later than May 14, 2008. Pursuant to 35 U.S.C. § 287(a), LG received actual notice of infringement no later than this date.

54.     LG has directly infringed, either literally or under the doctrine of equivalents, one or more claims of the '342 patent under 35 U.S.C. § 271(a) by using, testing, operating and/or demonstrating televisions possessing Plug-and-Play and/or Smart TV functionality at tradeshows or during the execution of test and repair procedures at service facilities in the United States.

55.     LG has indirectly infringed, either literally or under the doctrine of equivalents, one or more claims of the '342 patent under 35 U.S.C. § 271(b) by inducing users and customers of LG televisions to use the Plug-and-Play and/or Smart TV functionality in an infringing manner.  For example, LG advertises and identifies to users the Plug-and-Play functionality and provides instructions on how to connect video sources to the television's VGA port, wherein the TV will then use the claimed technology.  By way of further example, LG provides instructional and tutorial materials for its Smart TV functionality instructing users on how to configure and connect the accused televisions to the internet and to on-line video providers in a manner that results in the use of the claimed inventions.  These materials include instructional videos posted on LG's web site.  In view of the foregoing, LG has possessed specific intent to encourage others, and has in fact encouraged others, to infringe one or more claims of the '342 patent.  The customers and end users have used and practiced the claimed inventions.

56.     LG has also indirectly infringed, either literally or under the doctrine of equivalents, one or more claims of the '342 patent under 35 U.S.C. § 271(c) by importing,

selling, and/or offering to sell in the United States televisions that possess Plug-and-Play and/or

Smart TV functionality wherein there is no substantial non-infringing use for televisions with

these features.  Further, televisions that include the foregoing functionalities are not staple items

of commerce.  In addition, LG knew that the TV's with the foregoing functionalities were

especially made and adapted to use the claimed inventions of the '342 patent. Customers and end

users of the accused LG televisions have used and practiced the claimed inventions.

57.     LG's infringement has been willful.  LG has been aware of the '342 patent since

no later than May 14, 2008, and LG has engaged in prior litigation with Mondis over this patent.

Furthermore, LG has previously taken a license to the '342 patent for computer monitors,

wherein computer monitors employ substantially similar Plug-and-Play functionality.  Thus,

LG's conduct has been objectively reckless, and LG has possessed subjective specific intent to

infringe the patent.

58.     Mondis has been harmed by LG's infringement and is entitled to recover damages

to compensate for the infringement.  Further, any damages award should be trebled in view of

LG's willful infringement.

### COUNT IV

### (LG's Infringement of the '180 Patent)

59.     Paragraphs 1 through 35 are incorporated by reference as if fully restated herein.

60.     LG has had knowledge of the '180 patent since no later than March 9, 2009.

Pursuant to 35 U.S.C. § 287(a), LG received actual notice of infringement no later than this date.

61.     LG has directly infringed, either literally or under the doctrine of equivalents, one

or more claims of the '180 patent under 35 U.S.C. § 271(a) by importing, selling, and/or offering

to sell televisions that support Plug-and-Play functionality in the United States.  LG has also

directly infringed by using, testing, operating and/or demonstrating televisions possessing the
Plug-and-Play functionality at tradeshows or during the execution of test and repair procedures at
service facilities in the United States.

62.     LG has indirectly infringed, either literally or under the doctrine of equivalents,
one or more claims of the '180 patent under 35 U.S.C. § 271(b) by inducing users and customers
of LG televisions to use the Plug-and-Play functionality in an infringing manner.  For example,
LG advertises and identifies to users the Plug-and-Play functionality and provides instructions on
how to connect video sources to the television's VGA port, wherein the TV will then use the
claimed technology.  In view of the foregoing, LG has possessed specific intent to encourage
others, and has in fact encouraged others, to infringe one or more claims of the '180 patent.  The
customers and end users have used and practiced the claimed inventions.

63.     On information and belief, LG has also indirectly infringed, either literally or
under the doctrine of equivalents, one or more claims of the '180 patent under 35 U.S.C. §
271(b) by inducing third-parties to import, sell, or offer to sell LG televisions that possess Plug-
and-Play functionality in the United States.  More particularly, LG has manufactured accused
TV's overseas with full knowledge and intent that such TV's will be imported, sold, or offered
for sale in the United States.  This intent is demonstrated at least by LG designing and
manufacturing the TV's to be compliant with Federal Communication Commission (FCC)
requirements, obtaining Underwriters Laboratories (UL) certification for the TV's, making the
TV's compatible with ATSC broadcast standards used in the United States, providing written
instructions and on-screen displays in English, maintaining a U.S. web site for marketing of the
TV's, and by making the TV's compatible with U.S. power requirements.  LG encourages third-
parties to import and/or sell the accused TV's in the United States by entering into contractual

relationships with them and assisting them with the movement of LG's TV's through distribution channels into and within the United States. Third-parties have, in fact, imported, sold, and/or offered to sell the accused LG TV's in the United States.  Such third parties include, by way of example Walmart and Best Buy.

64.     LG has also indirectly infringed, either literally or under the doctrine of equivalents, one or more claims of the '180 patent under 35 U.S.C. § 271(c) by importing, selling, and/or offering to sell in the United States televisions that possess Plug-and-Play wherein there is no substantial non-infringing use for televisions with this feature.  Further, televisions that include the Plug-and Play feature are not staple items of commerce.  In addition, LG knew that the TV's with Plug-and-Play were especially made and adapted to use the claimed inventions of the '180 patent. Customers and end users of the accused LG televisions have used and practiced the claimed inventions.

65.     LG's infringement has been willful.  LG has been aware of the '180 patent since no later than March 9, 2009, and LG has engaged in prior litigation with Mondis over this patent. Furthermore, LG has previously taken a license to the '180 patent for computer monitors, wherein computer monitors employ substantially similar Plug-and-Play functionality.  Thus, LG's conduct has been objectively reckless, and LG has possessed subjective specific intent to infringe the patent.

66.     Mondis has been harmed by LG's infringement and is entitled to recover damages to compensate for the infringement.  Further, any damages award should be trebled in view of LG's willful infringement.

## COUNT V

### (LG's Infringement of the '588 Patent)

67.     Paragraphs 1 through 35 are incorporated by reference as if fully restated herein.

68.     LG has had knowledge of the '588 patent since no later than December 31, 2007. Pursuant to 35 U.S.C. § 287(a), LG received actual notice of infringement no later than this date.

69.     LG has directly infringed, either literally or under the doctrine of equivalents, one or more claims of the '588 patent under 35 U.S.C. § 271(a) by importing, selling, and/or offering to sell televisions that support Plug-and-Play functionality in the United States.  LG has also directly infringed by using, testing, operating and/or demonstrating televisions possessing the Plug-and-Play functionality at tradeshows or during the execution of test and repair procedures at service facilities in the United States.

70.     LG has indirectly infringed, either literally or under the doctrine of equivalents, one or more claims of the '588 patent under 35 U.S.C. § 271(b) by inducing users and customers of LG televisions to use the Plug-and-Play functionality in an infringing manner.  For example, LG advertises and identifies to users the Plug-and-Play functionality and provides instructions on how to connect video sources to the television's VGA port, wherein the TV will then use the claimed technology.  In view of the foregoing, LG has possessed specific intent to encourage others, and has in fact encouraged others, to infringe one or more claims of the '588 patent.  The customers and end users have used and practiced the claimed inventions.

71.     On information and belief, LG has also indirectly infringed, either literally or under the doctrine of equivalents, one or more claims of the '588 patent under 35 U.S.C. § 271(b) by inducing third-parties to import, sell, or offer to sell LG televisions that possess Plug-and-Play functionality in the United States.  More particularly, LG has manufactured accused

TV's overseas with full knowledge and intent that such TV's will be imported, sold, or offered

for sale, in the United States.  This intent is demonstrated at least by LG designing and

manufacturing the TV's to be compliant with Federal Communication Commission (FCC)

requirements, obtaining Underwriters Laboratories (UL) certification for the TV's, making the

TV's compatible with ATSC broadcast standards used in the United States, providing written

instructions and on-screen displays in English, maintaining a U.S. web site for marketing of the

TV's, and by making the TV's compatible with U.S. power requirements.  LG encourages third-

parties to import and/or sell the accused TV's in the United States by entering into contractual

relationships with them and assisting them with the movement of LG's TV's through distribution

channels into and within the United States. Third-parties have, in fact, imported, sold, and/or

offered to sell the accused LG TV's in the United States.  Such third parties include, by way of

example Walmart and Best Buy.

72.     LG has also indirectly infringed, either literally or under the doctrine of

equivalents, one or more claims of the '588 patent under 35 U.S.C. § 271(c) by importing,

selling, and/or offering to sell in the United States televisions that possess Plug-and-Play

functionality wherein there is no substantial non-infringing use for televisions with this feature.

Further, televisions that include the Plug-and Play feature are not staple items of commerce.  In

addition, LG knew that the TV's with Plug-and-Play were especially made and adapted to use

the claimed inventions of the '588 patent. Customers and end users of the accused LG televisions

have used and practiced the claimed inventions.

73.     LG's infringement has been willful.  LG has been aware of the '588 patent since

no later than December 31, 2007, and LG has engaged in prior litigation with Mondis over this

patent.  Furthermore, LG has previously taken a license to the '588 patent for computer monitors,

wherein computer monitors employ substantially similar Plug-and-Play functionality.  Thus,

LG's conduct has been objectively reckless and LG has possessed subjective specific intent to

infringe the patent.

74.     Mondis has been harmed by LG's infringement and is entitled to recover damages

to compensate for the infringement.  Further, any damages award should be trebled in view of

LG's willful infringement.

## DEMAND FOR JURY TRIAL

75.     Mondis hereby demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Mondis Technology Ltd. respectfully requests judgment for itself and

against Defendants as follows:

a)     That this Court issue a judgment that each of U.S. Patent Nos. 6,513,088;

6,549,970; 7,089,342; 7,475,180; and 6,639,588 are valid and enforceable

b)     That this Court adjudge that Defendants have infringed each of U.S. Patent Nos.

6,513,088; 6,549,970; 7,089,342; 7,475,180; and 6,639,588.

c)     That this Court ascertain and award Mondis all appropriate damages under 35

U.S.C. § 284 sufficient to compensate Mondis for the Defendants' past infringement, including

interest, costs, and disbursements.

d)     That this Court adjudge Defendants' infringement of one or more of the patents-

in-suit to have been willful and to award treble damages pursuant to 35 U.S.C. § 284.

e)     That this Court finds this case to be exceptional within the meaning of 35 U.S.C.

§ 285 and awards Mondis its reasonable attorneys' fees, costs, and expenses that Mondis incurs

in prosecuting this action; and

     f)     That this Court awards Mondis any further relief at law or in equity as the Court

deems just and proper.

DATED:   June 21, 2014

Respectfully submitted,


By: /s/Jeffrey B. Plies

Jeffrey B. Plies
Texas Bar No. 24027621
jeff.plies@dechert.com
DECHERT LLP
300 W. 6th Street, Suite 1850
Austin, TX 78701
Telephone: (512) 394-3000

Otis W. Carroll
Texas Bar No. 03895700
nancy@icklaw.com
Patrick Kelley
Texas Bar No. 11202500
patkelley@icklaw.com
IRELAND, CARROLL & KELLEY, P.C.
6101 S. Broadway, Suite 500
Tyler, Texas 75703
Tel: (903) 561-1600
Fax: (903) 581-1071

*Attorneys for Plaintiff Mondis Technology Ltd.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| MONDIS TECHNOLOGY LTD., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:14-CV-702-JRG |
| | § | |
| LG ELECTRONICS, INC., et al., | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## ORDER

Before the Court is Defendants LG Electronics Inc. and LG Electronics U.S.A., Inc. (collectively, "LG")'s Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) (Dkt. No. 24, filed January 18, 2015.)

### APPLICABLE LAW

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (2006). The first inquiry when analyzing a case's eligibility for § 1404(a) transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*In re Volkswagen I*").

Once that threshold is met, courts analyze both public and private factors relating to the convenience of parties and witnesses as well as the interests of particular venues in hearing the case. *See Humble Oil & Ref. Co. v. Bell Marine Serv., Inc.*, 321 F.2d 53, 56 (5th Cir. 1963); *In re Nintendo Co., Ltd.*, 589 F.3d 1194, 1198 (Fed. Cir. 2009); *In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2009). The private factors are: 1) the relative ease of access to sources of

proof; 2) the availability of compulsory process to secure the attendance of witnesses; 3) the cost of attendance for willing witnesses; and 4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *In re Volkswagen I*, 371 F.3d at 203; *In re Nintendo*, 589 F.3d at 1198; *In re TS Tech*, 551 F.3d at 1319. The public factors are: 1) the administrative difficulties flowing from court congestion; 2) the local interest in having localized interests decided at home; 3) the familiarity of the forum with the law that will govern the case; and 4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *In re Volkswagen I*, 371 F.3d at 203; *In re Nintendo*, 589 F.3d at 1198; *In re TS Tech*, 551 F.3d at 1319.

The plaintiff's choice of venue is not a factor in this analysis. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 314-15 (5th Cir. 2008) ("*In re Volkswagen II*"). Rather, the plaintiff's choice of venue contributes to the defendant's burden of proving that the transferee venue is "clearly more convenient" than the transferor venue. *In re Volkswagen II*, 545 F.3d at 315; *In re Nintendo*, 589 F.3d at 1200; *In re TS Tech*, 551 F.3d at 1319. Furthermore, though the private and public factors apply to most transfer cases, "they are not necessarily exhaustive or exclusive," and no single factor is dispositive. *In re Volkswagen II*, 545 F.3d at 314-15.

Timely motions to transfer venue should be "should [be given] a top priority in the handling of [a case]," and "are to be decided based on 'the situation which existed when suit was instituted.'" *In re Horseshoe Entm't*, 337 F.3d 429, 433 (5th Cir. 2003); *In re EMC Corp.*, Dkt. No. 2013-M142, 2013 WL 324154 (Fed. Cir. Jan. 29, 2013) (quoting *Hoffman v. Blaski*, 363 U.S. 335, 443 (1960)).

Section "1404(a) requires individualized, case-by-case consideration of convenience and fairness." *In re Genentech, Inc.*, 566 F.3d 1338, 1346 (Fed. Cir. 2009).

## ANALYSIS

Here, the Court has considered the motions, supporting declarations with exhibits, and related briefing. The parties do not dispute, and the Court expressly finds, that the action could have been originally brought in the District of New Jersey. Such threshold having been crossed, the Court next turns to the public and private interest factors identified above. In this particular case, Defendant has presented sufficient evidence to meet the high burden of showing that the public and private interest factors—including the convenience of the parties and non-party witnesses—weigh in favor of finding that the District of New Jersey is clearly more convenient than the Eastern District of Texas.  *See In re Nintendo*, 589 F.3d at 1197-98; *In re Genentech*, 566 F.3d at 1342; *In re TS Tech*, 551 F.3d at 1319; *In re Volkswagen II*, 545 F.3d at 315.

## CONCLUSION

For the reasons set forth above, the Court hereby **GRANTS** Defendants' Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) (Dkt. No. 24).

It is therefore ORDERED that the above-styled cause of action is hereby transferred to the United States District Court for the District of New Jersey. The Clerk of the Court shall forthwith take all such steps as are needed to effectuate this transfer.

**So ORDERED and SIGNED this 3rd day of June, 2015.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| MONDIS TECHNOLOGY LTD., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| LG ELECTRONICS, INC. and LG | : |
| ELECTRONICS U.S.A., INC., | : |
| | : |
| Defendant. | : |

Civil Action No. 15-cv-4431 (SRC)(CLW)

**OPINION**

**CHESLER**, District Judge

This matter comes before the Court upon the motion filed by Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc. ("LGE") to stay this case pending the outcome of ongoing United States Patent and Trademark Office ("PTO") reexamination proceedings. Plaintiff Mondis Technology Ltd. ("Mondis") opposes this motion. The Court has considered the parties' submissions and proceeds to rule without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court will grant LGE's motion to stay this case pending the outcome of the PTO reexamination proceedings.

I. **BACKGROUND**

a. **DISTRICT OF NEW JERSEY LITIGATION**

Mondis filed the Complaint in this case against LGE in the United States District Court for the Eastern District of Texas on June 21, 2014, alleging that LGE's "Plug and Play" and "Smart TV" products infringe certain claims in patents asserted by Mondis [Docket Entry 1]. Mondis asserts claims from five patents against LGE's products: claims 3 and 4 from U.S. Patent

1

Number 6,513,088 ("the '088 patent," filed Dec. 8, 2000), claim 22 from U.S. Patent Number 6,549,970 ("the '970 patent," filed Dec. 8, 2000), claim 15 from U.S. Patent Number 7,089,342 ("the '342 patent," filed Feb. 6, 2004), claims 14-16 from U.S. Patent Number 7,475,180 ("the '180 patent," filed June 4, 2002), and claim 1 from U.S. Patent Number 6,639,588 ("the '588 patent," filed June 12, 2002).

On January 28, 2015, LGE filed both a motion to transfer the case to this Court and a motion to stay the case pending resolution of ongoing reexamination proceedings at the PTO on [Docket Entry 24]. LGE subsequently withdrew the motion to stay [Docket Entries 25, 41]. On June 3, 2015, the Eastern District of Texas granted LGE's motion to transfer the case to this Court [Docket Entry 56]; Mondis requested reconsideration of the transfer order on June 8, 2015 [Docket Entry 58], but the Eastern District of Texas denied this motion on June 26, 2015 [Docket Entry 66], the same day this action was transferred to this Court [Docket Entry 67].

Mondis served its initial infringement contentions on January 30, 2015 [Docket Entry 26], and LGE served invalidity contentions on March 27, 2015 [Docket Entry 50]. Mondis served its opening claim construction brief on May 27, 2015 [Docket Entry 54]. LGE served its responsive claim construction brief on June 11, 2015 [Docket Entry 61]. Mondis served its reply claim construction brief on June 17, 2015 [Docket Entry 63]. No further documents regarding claim construction have been exchanged by the parties to this date, and no date for a *Markman* hearing has been set. On August 5, 2015, Mondis gave LGE a new list of 67 allegedly infringing products (Defs.' Br. at 5), and Mondis served supplemental infringement contentions on August 21, 2015 (Defs'. Br. at 4). Discovery on these contentions is still ongoing. The deadline for paper discovery was extended to November 9, 2015 [Docket Entry 99]. No depositions have been

2

taken, and no expert reports have been filed. Finally, this Court has not set a trial date in this case.

**b.  Related Litigation Between Mondis, LGE, and Innolux in the Eastern District of Texas**

On December 31, 2007, Mondis filed a complaint in the Eastern District of Texas against LGE and other entities, including Chimei-Innolux Corporation and Innolux Corporation ("Innolux"), alleging that monitors produced by these companies infringed the '088, '970, and '588 patents. (Case No. 2:07-cv-565 (E.D. Tex.); Compl. ¶ 15.) Mondis's amended complaints, filed on May 14, 2008 and March 9, 2009 (Compl. ¶¶ 16-17), asserted infringement of the '342 and the '180 patents, respectively. LGE settled with Mondis with respect to Mondis's infringement claims against LGE's monitors on September 17, 2009, prior to trial. (Compl. ¶ 18). Mondis continued the case against Innolux and other defendants. (Compl ¶ 21.) The jury returned a verdict that televisions sold, manufactured, and/or imported by Innolux and other defendants infringed at least claim 15 of the '342 patent, claim 14 of the '180 patent, and claim 1 of the '588 patent, amongst others. *Id.* The jury also found these claims to be valid over prior art and fact and expert testimony. *Id.*

**c.  Reexaminations at the PTO**

Concurrent with litigation in the Eastern District of Texas, Innolux requested *inter partes* reexaminations for each of the asserted patents with the PTO. In addition, LGE has filed multiple ex parte and *inter partes* reexamination requests on each asserted patent in the instant case. The status of the PTO proceedings for each asserted patent is detailed below.

3

## 1. '088 Patent

Mondis asserts claims 3 and 4 of the '088 patent in this case. The PTO confirmed claims 3, 4, and 6-8 in the Innolux reexamination proceeding, but cancelled claims 1, 2, 5, 10-24, and 26-33 on November 5, 2014 (Reexam No. 95/000,459).

The PTO granted LGE's November 3, 2014 ex parte reexamination request on January 5, 2015 (Reexam No. 90/013,391). On April 15, 2015 the PTO issued a non-final office action rejecting claims 3, 4, and 6-8 of the '088 patent (Reexam No. 90/013,391).

LGE filed ex parte and *inter partes* reexamination requests on March 27, 2015, based on additional prior art not considered in the Innolux reexamination proceedings (Reexam No. 90/013,479). The PTO granted LGE's request to institute a ex parte reexamination on May 26, 2015, on the grounds that the additional prior art raises a substantial question of patentability (Reexam No. 90/013,479).  The PTO merged the two pending ex parte reexamination proceedings (August 14, 2015 Decision Merging Proceedings at 3, Reexam No. 90/013,479).  On September 25, 2015, the PTO issued a non-final office action rejecting claims 3, 4, and 6-8 of the '088 patent (Reexam Nos. 90/013,479 and 90/013,391).

The PTO denied LGE's request for *inter partes* reexamination on September 17, 2015, finding that the petition was time barred under 35 U.S.C. § 315(b) since it was not filed within one year of service of "a complaint alleging infringement of the patent." *LG Elecs., Inc. v. Mondis Tech. Ltd.*, IPR2015-00937 (P.T.A.B. Sept. 17, 2015).

## 2. '970 Patent

Mondis asserts claim 22 of the '970 patent in this case. The PTO confirmed claim 22 during the Innolux reexamination proceedings, on June 24, 2015 (Reexam No. 95/000,457).

4

The PTO granted LGE's November 3, 2014 ex parte reexamination request on December 24, 2014 (Reexam No. 90/013,388). LGE filed ex parte and *inter partes* reexamination requests on March 27, 2015, based on additional prior art not considered in the Innolux reexamination proceedings (Reexam No. 90/013,479). The PTO granted LGE's request to institute an ex parte reexamination on May 27, 2015, on the grounds that the additional prior art raises a substantial question of patentability (Reexam No. 90/013,478), and merged the two pending ex parte reexamination proceedings (August 14, 2015 Decision Merging Proceedings at 3, Reexam No. 90/013,388).  On September 21, 2015, the PTO issued a non-final office action rejecting claims 1-17, 22, 24, 26, and 29 of the '970 patent (Reexam Nos. 90/013,478 and 90/013,388).

The PTO denied LGE's request for *inter partes* reexamination on September 17, 2015, finding that the petition was time barred under 35 U.S.C. § 315(b) since it was not filed within one year of service of "a complaint alleging infringement of the patent." *LG Elecs., Inc. v. Mondis Tech. Ltd.*, IPR2015-00938 (P.T.A.B. Sept. 17, 2015).

### 3.   '342 Patent

Mondis asserts claim 15 of the '342 patent in this case. In the Innolux reexamination proceedings, the PTO rejected claims 1-18 of the '342 patent in a non-final office action, and closed prosecution of the claims on October 1, 2012 (Reexam No. 95/000,458).  In the Mondis-Innolux litigation, the jury found claim 15 of the '342 patent to be valid on June 27, 2011, and the court upheld the jury verdict over a motion for judgment as a matter of law as to the invalidity of the asserted claim. *Mondis Tech, Ltd. v. LG Elecs, Inc.*, No. 07-565, 2011 WL 3847603 (E.D. Tex. Aug. 29, 2011).  In light of this verdict, the PTO stated that any rejection in the Innolux reexamination pertaining to claim 15 of the '342 patent would not be further maintained by the PTO, and that no further rejection of claim 15 would be made in the

5

reexamination proceeding then ongoing, pursuant to 35 U.S.C. § 317(b). (Apr. 11, 2014 Decision at 10, Reexam No. 95/000,458).[1]

LGE filed an ex parte reexamination request against claim 15 of the '342 patent on May 13, 2014 (Reexam No. 90/013,238); the PTO instituted this request on July 1, 2014. In this proceeding, the PTO rejected claim 15 in a non-final office action on December 2, 2014 (Reexam No. 90/013,238). LGE filed a second ex parte reexamination request on November 13, 2014, and the PTO denied this request on January 9, 2015 on the grounds that the second reexamination request did not raise a substantial new question of patentability over the first request pending at the PTO (Reexam No. 90/013,389).

LGE filed additional ex parte and *inter partes* reexamination requests on March 27, 2015, based on additional prior art not considered in the Innolux reexamination proceedings (Reexam No. 90/013,477). The PTO instituted the ex parte reexamination request on May 4, 2015 (Reexam No. 90/013,477), merged the two ex parte reexamination proceedings on August 10, 2015, and on August 12, 2015, issued a non-final office action rejecting claims 14 and 15 of the '342 patent (Reexam Nos. 90/013,477 and 90/013,238).

The PTO denied LGE's request for *inter partes* reexamination on September 17, 2015, finding that the petition was time barred under 35 U.S.C. § 315(b) since it was not filed within one year of service of "a complaint alleging infringement of the patent." *LG Elecs., Inc. v. Mondis Tech. Ltd.*, IPR2015-00940 (P.T.A.B. Sept. 17, 2015).

---

[1] In their brief, LGE alleges that this action occurred because of a settlement between Mondis and Innolux in which Mondis was permitted to withdraw claim 15 before it was cancelled. Defs.' Br. at 10.

#### 4. '180 Patent

Mondis asserts claims 14-16 of the '180 patent in this case. In the Innolux reexamination proceedings, the PTO rejected claims 1-16 and 21-29 of the '180 patent in a non-final office action, and closed prosecution of the claims on October 14, 2011 (Reexam No. 95/000,480). In the Mondis-Innolux litigation, the jury found claims 14 and 23 of the '180 patent[2] to be valid on June 27, 2011, and the court upheld the jury verdict over a motion for judgment as a matter of law as to the invalidity of the asserted claims. *Mondis Tech, Ltd. v. LG Elecs, Inc.*, No. 07-565, 2011 WL 3847603 (E.D. Tex. Aug. 29, 2011). In light of this verdict, the PTO stated that any rejection in the Innolux reexamination pertaining to claims 14-16 of the '180 patent would not be further maintained by the PTO, and that no further rejection of claims 14-16 would be made in the reexamination proceeding then ongoing, pursuant to 35 U.S.C. § 317(b). (Apr. 11, 2014 Decision at 11, Reexam No. 95/000,480).[3]

LGE filed two ex parte reexamination requests on claims 14-16 of the '180 patent, on May 13, 2014 (Reexam No. 90/013,237) and on November 3, 2014 (Reexam No. 90/013,390). The PTO *sua sponte* merged the instituted requests on February 11, 2015. On June 30, 2015, the PTO confirmed claims 14-16 as patentable (Reexam Nos. 90/013,237 and 90/013,390).[4]

LGE filed a third ex parte reexamination request on March 27, 2015, based on additional prior art references not presented in the Innolux reexamination proceeding (Reexam No.

---

[2] Claims 15 and 16 are dependent claims of Claim 14.
[3] In their brief, LGE alleges that this action occurred because of a settlement between Mondis and Innolux in which Mondis was permitted to withdraw claim 15 before it was cancelled. Defs.' Br. at 10.
[4] LGE asserts in its briefing that Mondis proposed inconsistent claim construction for the term "display unit information other than said characteristic information" in the reexamination and district court proceedings, and that the PTO's reasoning for confirming the disputed claims supports LGE's current claim construction position on this term. Pl.'s Br. at 12.

90/013,481), and the PTO instituted the reexamination on April 27, 2015. On July 29, 2015, the

PTO rejected claims 14-16 in a non-final office action (Reexam No. 90/013,481).

Finally, LGE filed an *inter partes* reexamination request on March 27, 2015, and the PTO

denied LGE's request for *inter partes* reexamination on September 17, 2015, finding that the

petition was time barred under 35 U.S.C. § 315(b) since it was not filed within one year of

service of "a complaint alleging infringement of the patent." *LG Elecs., Inc. v. Mondis Tech.*

*Ltd.*, IPR2015-00942 (P.T.A.B. Sept. 17, 2015).

### 5.  '588 Patent

Mondis asserts claim 1 of the '588 patent in this case. In the Innolux reexamination

proceedings, the PTO affirmed the examiner's rejection of claims 1-5 of the '588 patent on July

2, 2012 (Decision on Appeal at 1, Reexam No. 95/000,455).  In the Mondis-Innolux litigation,

the jury found claim 1 of the '588 patent to be valid on June 27, 2011, and the court upheld the

jury verdict over a motion for judgment as a matter of law as to the invalidity of the asserted

claim. *Mondis Tech, Ltd. v. LG Elecs, Inc.*, No. 07-565, 2011 WL 3847603 (E.D. Tex. Aug. 29,

2011).[5]

The PTO granted LGE's November 3, 2014 ex parte reexamination request on claim 1 of

the '588 patent on December 30, 2014 (Reexam No. 90/013,392). On March 31, 2015, the PTO

issued a non-final office action rejecting claim 1 of the '588 patent (Reexam No. 90/013,392).

On September 10, 2015, the PTO issued a final office action rejecting claims 1-5 in this

reexamination. *Id.*

---

[5] In their brief, LGE alleges that this action occurred because of a settlement between Mondis and Innolux in which
Mondis was permitted to withdraw claim 15 before it was cancelled. Defs.' Br. at 10.

LGE filed ex parte and *inter partes* reexamination requests on March 27, 2015 on claim 1 of the '588 patent, based on additional prior art not considered in the Innolux reexamination proceedings (Reexam No. 90/013,480). The PTO granted LGE's request to institute an ex parte reexamination on May 4, 2015, on the grounds that the additional prior art raises a substantial question of patentability (Reexam No. 90/013,480). On June 23, 2015, the PTO rejected claim 1 of the '588 patent in a non-final office action, and on October 21, 2015, the PTO issued a final rejection against claim 1 of the '588 patent on different grounds than presented in the final rejection on claims 1-5 of the '588 patent in the 90/013,392 reexamination.

The PTO denied LGE's request for *inter partes* reexamination on September 17, 2015, finding that the petition was time barred under 35 U.S.C. § 315(b) since it was not filed within one year of service of "a complaint alleging infringement of the patent." *LG Elecs., Inc. v. Mondis Tech. Ltd.*, IPR2015-00939 (P.T.A.B. Sept. 17, 2015).

## II.   LEGAL STANDARD TO STAY A PROCEEDING

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). "How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Id.* at 254-55. Therefore, district courts have broad powers to stay proceedings. *Bechtel v. Laborers' Int'l Union*, 544 F.2d 1207, 1215 (3d Cir. 1976). "In the exercise of its sound discretion, a court may hold one lawsuit in abeyance to abide the outcome of another which may substantially affect it or be dispositive of the issues." *Id.*; *see also Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 215 (1937). The party seeking a stay of civil litigation bears the burden to show that the stay would be appropriate. *Landis*, 299 U.S. at 255.

9

In the context of patent cases, courts have "consistently recognized the inherent power of the district courts to grant a stay pending reexamination of a patent." *Procter & Gamble v. Kraft Foods Global, Inc.*, 549 F.3d 842, 849 (Fed. Cir. 2008); *see also Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988) ("Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination." (internal citations omitted)); *Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316 (Fed. Cir. 2001). There is no conflict between a challenge to a patent in federal court and a reexamination at the PTO, despite the fact that the two forums may come to different legal conclusions on the same patent given the different legal standards applied. *Ethicon*, 849 F.2d at 1428-29, n.3.

Courts in this District have noted a generally liberal policy toward granting stays pending patent reexamination by the PTO. *See, e.g.*, *Sabert Corp. v. Waddington N. Am., Inc.*, No. 06-5423, 2007 WL 2705157, at *5-6 (D.N.J. Sept. 14, 2007); *Cima Labs., Inc. v. Actavis Grp. HF*, No. 07-893, 2007 WL 1672229, at *9 (D.N.J. June 7, 2007). In fact, most reported District of New Jersey opinions considering this issue have granted a stay when a reexamination request was pending. *See Brass Smith, LLC v. RPI Indus., Inc.*, No. 09-6344, 2011 WL 4444717, at *6 (D.N.J. Nov. 1, 2010) (listing relevant cases). When courts have denied a stay pending reexamination proceedings at the PTO, it has most often been because the case was in a "late stage of litigation, [] discovery was or would be almost completed, or the matter had been marked for trial." *GPAC, Inc. v. D.W.W. Enters., Inc.*, 144 F.R.D. 60, 64 (1992).

District courts apply this liberal policy for staying pending reexaminations due to the potential for waste of a court's time and resources when a PTO decision could "drastically alter" the nature of a case. *WABCO Holdings v. Bendix Commercial Vehicle Sys.*, No. 09-3179, 2010

10

WL 2628335, at *2 n.2 (D.N.J. June 28, 2010). But stays pending PTO reexamination of one or

more asserted patents in a case are not automatic, as a "stay in litigation inevitably causes further

delay in an already lengthy process, and could potentially harm [the opposing party]." *Brass Smith,*

2011 WL 4444717, at *2 (quoting *Eberle v. Harris*, No. 03-5809, 2005 WL 6192865, at *2 (D.N.J.

Dec. 8, 2005)).  A stay pending reexamination by the PTO can simplify the pending litigation in

several ways, and has several potential advantages:

> (1) a review of all prior art presented to a court by the PTO, with its particular
> expertise; (2) the potential alleviation of numerous discovery problems relating to
> prior art by PTO examination; (3) the potential dismissal of a civil action should
> invalidity of a patent by found by the PTO; (4) encouragement to settle based upon
> the outcome of the PTO reexamination; (5) an admissible record at trial from the
> PTO proceedings which would reduce the complexity and length of the litigation;
> (6) a reduction of issues, defenses and evidence during pre-trial conferences; and
> (7) a reduction of costs for the parties and a court.

*Eberle*, 2005 WL 6192865, at *2 (citing *GPAC,* 144 F.R.D. at 63).  Furthermore, the PTO cannot

stay the reexamination once a request has been granted, and thus the district court is the only

forum in which a party can seek a stay in a case with parallel proceedings.  *Ethicon*, 849 F.2d at

1422.

## III.   ANALYSIS

As noted above, the decision to impose or deny a stay is well within this Court's

discretion. Courts consider the following three factors in determining whether to stay a case

pending reexamination of a patent:  "(1) whether a stay would unduly prejudice or present a clear

tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues and the

trial of the case; and (3) whether discovery is complete and a trial date has been set." *Stryker*

*Trauma S.A. v. Synthes (USA),* No. 01–3879, 2008 WL 877848, at *1 (D.N.J. Mar. 28, 2008)

(quoting *Xerox Corp. v. 3Com Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y. Feb. 18, 1999)). In

analyzing these factors, courts "weigh[ ] the benefits of the stay against the costs." *Id.* The Court will examine each factor in turn.

### a. Prejudice to the Non-Moving Party

The first factor for consideration in analyzing LGE's request for a stay is "whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party." *Id.* The court weighs whether disadvantages from delay are outweighed by advantages from allowing the PTO to complete the reexamination process before further consideration of the district court case. *ICI Uniqema v. Kobo Prods., Inc.*, No. 06-2943, 2009 WL 4034829, at *2 (D.N.J. Nov. 20, 2009). Furthermore, "[t]he delay inherent to the reexamination process does not constitute, by itself, undue prejudice." *CCP Sys. AG v. Samsung Elecs. Corp.*, No. 09-4354, 2010 WL 5080570, at *3 (D.N.J. Dec. 7, 2010).

The Court is unconvinced that granting a stay in this action would unduly prejudice Mondis or give LGE a clear tactical advantage in this litigation. As noted above, the delay inherent in a reexamination does not create undue prejudice on its own, and thus any delay from the reexamination proceeding does not alone weigh against imposing a stay. *Id.*

Furthermore, economic concerns raised by Mondis are not sufficient to convince this Court that a stay would be inappropriate in this case. Courts have found that prejudice may result from a stay where parties are direct competitors, but Mondis and LGE are not direct competitors in any market. *See, e.g.*, *Cordis Corp. v. Abbott Labs.*, No. 07-2265, 2009 WL 8591527, at *1 (D.N.J. Feb. 3, 2009); *Nippon Steel & Sumito Metal Corp. v. POSCO*, No. 12-2429, 2013 WL 1867042, at *4-5 (D.N.J. May 2, 2013). In addition, courts have noted that if an allegedly injured party is not selling or actively licensing goods or services related to the patents-at-issue, like Mondis in this case, money damages are an adequate remedy to redress harm. *See, e.g.*, *Gioello Enters. Ltd.*

*v. Mattel, Inc.*, No. 99-375 GMS, 2001 WL 125340, at *2 (D. Del. Jan. 29, 2001). The Court finds that Mondis will not suffer undue prejudice from a stay, given that it is not practicing the patents and the patents are expired.[6] If Mondis is awarded money damages as redress for past harm, Mondis can still be made whole monetarily, despite the stay.

Importantly, the Court notes that all of Mondis's legal and equitable remedies will be available when the stay is lifted; a stay does not foreclose Mondis from any remedy, so long as the PTO does not invalidate or otherwise alter the asserted patents. *Monosol Rx, LLC v. BioDelivery Sciences Int'l, Inc.*, No. 1-5695, 2012 WL 762501, at *10 (D.N.J. Mar. 7, 2012). Given the reasons presented above, the Court finds that this factor weighs in favor of granting a stay.

**b. Simplification of Remaining Issues in the Case**

The second factor for consideration in evaluating LGE's motion for a stay is "whether a stay will simplify the issues in question and trial of the case." *Stryker Trauma,* 2008 WL 877848, at *1. Reexamination proceedings may simplify litigation by the "cancellation, clarification, or limitation of claims" that may eliminate the court's need to litigate whether LGE has infringed one or more of the asserted claims. *Ethicon*, 849 F.2d at 1428. Thus, a stay could "prevent resources from being expended on invalid or amended claims." *ICI Uniqema*, 2009 WL 4034829, at *2 (D.N.J. Nov. 20, 2009). And "even if the reexamination [does] not lead to claim amendment or

---

[6] In their briefing, the parties addressed the applicability to this case of the reasoning in *Intellectual Ventures I LLC v. Toshiba Corp.*, a case from the District of Delaware deciding a motion to partially stay a case where the plaintiff was a patent assertion entity. No. 13-453-SLR/SRF, 2015 WL 3773779 (D. Del. May 15, 2015). That case denied a stay on the grounds that delay would unduly prejudice the plaintiff because patent licensing is a core part of a patent assertion entity's business, and because there had been significant delay in moving the dispute forward. *Id.* at *2. The Court first notes that this case is not binding authority on this Court. And in addition, the result from the *inter partes* reexamination related to *Intellectual Ventures* was scheduled to be announced before claim construction had been completed in the district court case, and thus the case would not be simplified by a stay. *Id.* at *3. This case is markedly different from *Intellectual Ventures* in that a stay here will likely simplify the case because of the advanced stage of the reexamination proceedings versus the stage of the district court case.

13

cancellation, it could still provide valuable analysis to the district court." *Ethicon*, 849 F.2d at 1428. The Court need not find that all issues be eliminated by a reexamination to grant a stay; the fact that the PTO's reexaminations may create simplification in the case is a sufficient reason to support granting a stay. *Indus. Tech. Research Inst. v. LG Elecs. Inc.*, No. 12-949, 2013 WL 5180108, at *8 (D.N.J. Sept. 12, 2013).

In its analysis of this factor, the Court finds two significant advantages to staying this action. First, staying this action will allow this Court to review the full prosecution history of all asserted patents. The Court will also benefit from review of the PTO's analysis of prior art and the scope of the asserted claims.

Second, the PTO may dispose of one or more of the claims raised in this case, creating the possibility that this case may be simplified without further effort from this Court. As LGE notes, the PTO seems very likely to dispose of at least one claim in the case, given the PTO's historical statistics for patent reexamination. The Court notes that the reexamination proceedings are advanced, given that the PTO has issued a final rejection on the '588 patent and non-final rejections on all asserted claims. Furthermore, the PTO does not have to reject all asserted claims to justify a stay in this action, so long as the case may be simplified. Given the strong likelihood that the PTO will reject or amend at least one claim at issue in this litigation, thus simplifying the action before this Court, the Court finds that this factor weighs towards granting a stay.

### c. Effect of Stay on Trial Schedule and Discovery

The third and final factor for consideration in evaluating LGE's motion for a stay is "whether discovery is complete and whether a trial date has been set." *Stryker Trauma,* 2008 WL 877848, at *1. Courts emphasize that a stay should be sought early in the litigation process. *Sabert Corp.*, 2007 WL 2705157, at *7 (D.N.J. Sept. 14, 2007). The third factor often weighs against a

14

stay in situations with a "late stage of litigation, [where] discovery was or would be almost completed, or [when] the matter had been marked for trial." *GPAC*, 144 F.R.D. at 64.

The Court finds that this case is still in its early stages. Fact discovery in this case began in February 2015, and paper discovery has been extended to November 9, 2015 [Docket Entry 99]. *Markman* hearing and trial dates have not been set by this Court. Furthermore, Mondis recently added claims of infringement on 67 different products on August 5, 2015, and little discovery has been conducted on these additional claims. No depositions have been taken, no expert reports have been filed, and no dispositive motions have been filed with the Court. Discovery in this case is certainly not complete. The Court finds that this factor weighs in favor of granting a stay.

Given the application of the factors above, this Court finds that it will be most efficient to stay the present case in this Court and allow litigation of the dispute to proceed within the PTO. Once the PTO has made a final determination about the validity of the asserted patents, the stay may be lifted and the litigation may continue in this Court.

## IV.   CONCLUSION

For the foregoing reasons, the Court will grant LGE's motion to stay these proceedings pending the completion of the reexamination process for all asserted patents at the PTO. An appropriate Order will be filed.


                                                                      ___ s/ Stanley R. Chesler ___
                                                     STANLEY R. CHESLER
                                                United States District Judge

Dated:  November 12, 2015

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MONDIS TECHNOLOGY LTD.,

:
:
:
:                    **Civil Action No. 15-cv-4431 (SRC)(CLW)**
:
Plaintiff,       :
:
v.               :                    **ORDER**
:
LG ELECTRONICS, INC. and LG         :
ELECTRONICS U.S.A., INC.,           :
:
Defendant.       :

**CHESLER**, District Judge

This matter came before the Court upon the motion filed by Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc.'s ("Defendants") to stay this case pending the outcome of ongoing United States Patent and Trademark Office ("PTO") reexamination proceedings. Plaintiff Mondis Technology Ltd. ("Plaintiff") opposed this motion. The Court has proceeded to rule based on the papers submitted by the parties and without oral argument, pursuant to Federal Rule of Civil Procedure 78; and for the reasons expressed in the Opinion filed herewith,

**IT IS** on this 12th day of November, 2015,

**ORDERED** that Defendants' motion to stay this action pending the outcome of ongoing PTO reexamination proceedings [Docket Entry 101] be and hereby is **GRANTED** and this case is hereby **STAYED** pending completion of the PTO patent reexamination process on all asserted patents in this suit; and it is further

1

**ORDERED** that defense counsel shall provide the Court with status updates regarding the PTO's *ex parte* reexamination of the '088 patent, the '970 patent, the '342 patent, the '180 patent, and the '588 patent every sixty (60) days starting **November 20, 2015**; and it is further

**ORDERED** that defense counsel shall notify the Court within ten (10) days of any disposition of the PTO's *ex parte* reexamination of the '088 patent, the '970 patent, the '342 patent, the '180 patent, or the '588 patent; and it is further

**ORDERED** that the Clerk of the Court shall administratively terminate this case pending completion of the PTO reexamination process.

　　s/Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

2



ONE RIVERFRONT PLAZA
1037 Raymond Blvd., 6th Floor
Newark, NJ 07102

T: 973.757.1100
F: 973.757.1090

THEWALSHFIRM.COM

Liza M. Walsh
Direct Dial: (973) 757-1101
lwalsh@thewalshfirm.com

July 18, 2016

**VIA ECF AND REGULAR MAIL**

Hon. Stanley R. Chesler, U.S.D.J.
Hon. Cathy L. Waldor, U.S.M.J.
Martin Luther King Building
& U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

> Re:    *Mondis Technology Ltd. v. LG Electronics Inc., et al.,*
>        **Civil Action No. 15-4431**

Dear Judge Chesler and Judge Waldor:

This firm, together with Mayer Brown LLP, represents Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc. (collectively, "LGE") in the above-captioned litigation. We write further to our letter of July 8, 2016, apprising the Court of recent developments in the pending reexaminations, as per this Court's November 12, 2015 order staying the litigation. (See Dkts. 121, 130). This letter also addresses issues raised in the July 13, 2016 letter filed by Mondis. (See Dkt. 132).

> **I.    Status of Reexaminations**

On July 11, 2016, Mondis filed an Amendment, requesting cancellation of asserted claims 3 and 4 of the '088 patent. (See Ex. A, Jul. 11, 2016 Amend. (90/013,479)). Upon entry of this Amendment and the subsequent issuance of a reexamination certificate, all originally issued claims of the '088 patent (including asserted claims 3 and 4) will be cancelled or otherwise invalidated, and of no effect.

As per our May 23, 2016 letter, all asserted claims of the '588, '342, and '970 patents are cancelled, disclaimed, or otherwise of no effect. (See Dkt. 128). And as per our letter of July 8, 2016, the PTO confirmed asserted claims 14-16 of the '180 patent in reexamination no. 90/013,481. (See Dkt. 131). For the Court's convenience, attached at Exhibit B please find an updated status chart of the relevant PTO reexaminations.

> **II.    Procedural History**

For the sake of clarity, LGE provides below a brief summary of relevant events occurring over the course of this litigation (and related proceedings), as referenced in Mondis's July 13th letter.

Mondis initially filed suit against LGE and other defendants on December 31, 2007. Mondis chose not to accuse LGE's televisions of infringement. LGE settled that case on September 17, 2009, and

Hon. Stanley R. Chesler, U.S.D.J.
Hon. Cathy L. Waldor, U.S.M.J.
July 18, 2016
Page 2

Mondis proceeded to trial against other defendants. Ultimately, claim 14 of the '180 patent was determined not to be invalid over specific prior art. Certain claims of the other patents were invalidated in that case or cancelled in reexamination proceedings initiated by *Innolux* (one of the other defendants) or later by LGE.

Mondis waited until June 21, 2014 to file a Complaint accusing LGE's televisions—months after the patents had expired and Mondis's rights to prospective relief had extinguished. Mondis did not serve the Complaint until October 16, 2014, and thereafter requested a one-month extension to serve its Infringement Contentions (which deadline was partially extended to January 30, 2015). (See Dkts. 13-15). On August 21, 2015, Mondis served Amended Infringement Contentions, accusing 67 new LGE products of infringing its expired patents.

Following transfer of the case to this district, LGE filed a motion to stay in view of the advanced status of the reexaminations. Shortly after this Court granted the stay (beginning the same day, in fact), Mondis requested cancellation of several claims of the asserted patents—many of which were subject to final rejections. (See Dkt. 122 at 1, Exs. A, B; Dkt. 124 at 1, Exs. A-C). As per above, after the PTO affirmed the final rejection of the asserted claims of the '088 patent, Mondis elected to cancel those claims. (See Ex. A).

Of the 5 originally asserted patents, only the '180 patent has emerged from the PTO. The stay has achieved its stated and anticipated goal, in less than 8 months, of promoting judicial economy, namely, by: (1) reducing the number of asserted patents from 5 to 1, and the number of asserted claims from 7 to 3; and (2) allowing the PTO to provide additional guidance regarding the meaning of certain claim terms. Thus, this stay did not result in any undue delay, particularly in view of Mondis's concern that the stay would "add years to the dispute." (See Dkt. 106 at 23).

**III.     Schedule for Completing Claim Construction, Discovery, and Other Matters**

LGE respectfully submits that the 4-6 week timeline suggested by Mondis for completing discovery, claim construction, and other matters, is not workable—due to the effect of the reexamination proceedings and the current status of the case. As expected, and as this Court recognized would be the case in granting LGE's stay request, the reexaminations have had a significant impact on several issues in this litigation. As just one recent example, in the June 7, 2016 notice confirming asserted claims 14-16 of the '180 patent—the lone surviving patent—the PTO clarified the meaning of several case-dispositive terms, in many instances at the insistence of Mondis:

| *Video Signal* |
|---|
| "The Patent Owner essentially alleges that the term 'video signals' recited in the claims conveys data describing the screen image to be displayed, and the claimed subject matter 'video signals' is different and distinct from not only the subject matter 'control signal,' but also the subject matter 'video information' … The Patent Owner's allegation on this point is persuasive." (Dkt. 130, Ex. A at 4). |
| "In response to the Patent Owner's allegation with respect to "the '180 specification and prosecution history also teach that 'video signals' convey the image being displayed, are not |

Hon. Stanley R. Chesler, U.S.D.J.
Hon. Cathy L. Waldor, U.S.M.J.
July 18, 2016
Page 3

| control signals, and are distinct from 'video information'…the Examiner has fully considered and agreed." (*Id.* See also *id.* at 4-6 (discussing meaning of "video signal")). |
|---|
| ***Communication Controller*** |
| "Fundamentally, the electrical connector and wires is a hardware part for interfacing communication between devices. However, the hardware part, e.g., said electrical connector and wires, cannot properly function as the communication interface, as pointed out by the Patent Owner. Thus, there should be something to control the communication interface."(*Id.* at 9. See also *id.* at 7-11). |
| ***Identification Number for Identifying at Least a Type of Display Unit*** |
| "[T]he identification number of the '180 Patent requires a[] uniqueness of the identification number for distinctively identifying and controlling the display units…" (*Id.* at 12. See also *id.* at 11-12). |

The reexaminations affected the case (as relating to the '180 patent) even before the stay. For example, not long after the transfer, the PTO adopted LGE's construction (proffered in its claim construction brief) for the "communicating said display unit information ***other than said characteristic information of said display unit***" limitation of claim 14. (See Ex. C, Jun. 30, 2015 Final OA at 21 (interpreting term as "display unit information [that] does not include characteristic information stored in the memory.")). These and other statements from the PTO will necessarily impact the parties' infringement and invalidity positions, and thus the scope of discovery. This includes written discovery, document production, and depositions—none of which have been completed. Indeed, no depositions have been taken or even scheduled.

The status of the case also dictates that more than 4-6 weeks are needed to complete discovery. On August 21, 2015—after the case was transferred—Mondis served Amended Infringement Contentions, accusing 67 new LGE products. To date, no discovery has taken place on these products. In view of the remaining discovery to be undertaken, the scope of which LGE is still assessing, this case is still in its early stages—just as this Court acknowledged at the time of the stay. (See Dkt. 120, Order Staying Case at 15).

The same goes for claim construction. The reexaminations have drastically altered the claim construction landscape, necessitating a complete redo of briefing and possibly more (*e.g.*, identification of claim terms, joint claim construction statement, *etc.*). Further, briefing (under the E.D. Texas framework) was not complete at the time of the stay.[1] And as this Court is aware, the framework/schedule for addressing claim construction differs substantially between the two districts.[2]

---

[1] The E.D. Texas case was transferred right after LGE filed its responsive claim construction brief, thereby precluding Mondis from filing its reply brief, as required under the Local Patent Rules for E.D. Texas.

[2] Unlike, E.D. Texas, the Local Patent Rules for this district require the concurrent exchange of opening briefs ***and*** responsive briefs. Starting from the joint claim construction statement, briefing typically takes around 6 months to complete before a hearing is even scheduled. (See L.P.R. §§ 4.5(a),(c), and 4.6). Mondis acknowledged these differences in its Motion to Reconsider the Order Transferring Venue. (See Dkt. 58 at 6).

Hon. Stanley R. Chesler, U.S.D.J.
Hon. Cathy L. Waldor, U.S.M.J.
July 18, 2016
Page 4


Thus, Mondis's proposed 4-6 week timeline for completing claim construction, discovery, and other matters is plainly inadequate, particularly in view of the impact of the reexaminations.

LGE is amenable to attending a status or scheduling conference with the Court to address the foregoing and to answer any questions the Court may have.

We thank the Court for its continued attention to this matter.


Respectfully submitted,

*s/ Liza M. Walsh*

Liza M. Walsh

Attachments
LMW/mh

cc:     All Counsel of Record via ECF and Email

# EXHIBIT A

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| In re Patent No.: | **6,513,088** | Reexam Control No.: | **90/013,391 & 90/013,479** |
| Original Issue Date: | January 28, 2003 | Examiner: | Albert J. GAGLIARDI |
| Original Serial No.: | 09/732,292 | Group Art Unit: | 3992 |
| Original Filing Date: | December 8, 2000 | Confirmation No.: | 2497 & 3933 |
| By: | Ikuya ARAI and Kouji KITOU | | |
| For: | DISPLAY UNIT AND METHOD ENABLING BI-DIRECTIONAL COMMUNICATION WITH VIDEO SOURCE | | |

## RESPONSE TO ADVISORY ACTION IN *EX PARTE* REEXAMINATION

Mail Stop *Ex Parte* Reexam
Central Reexamination Unit
Commissioner for Patents
United States Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

In response to the Advisory Action mailed June 29, 2016, Patent Owner files this response.

## AMENDMENTS TO THE CLAIMS

**In the Claims**

The following Listing of Claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims Subject To Reexamination**

Claim 3 (cancelled)

Claim 4 (cancelled)

## REMARKS

U.S. Patent No. 6,513,088 ("the '088 Patent") issued with claims 1–33. Claims 9 and 25 were held invalid during litigation in the Eastern District of Texas (Case No. 2:07-cv-565). Claims 1, 2, 5, 10–24, and 26–33 were cancelled in Reexamination Control No. 95/000,459. Claims 6–8 were cancelled in Patent Owner's December 9, 2016 Response. Claims 3 and 4 are subject to reexamination and currently stand rejected. The '088 Patent is now expired.

With this amendment, the rejected claims, *i.e.*, claims 3 and 4, are cancelled. The rejections maintained in the Advisory Action and Patent Owner's cancellation of claims 3 and 4 are discussed in more detail below.

Claims 3 and 4 currently stand rejected as follows:

**Issue A—Baji (from 90/013,479)**

Claim 3 stands rejected under 35 U.S.C. 102(b) as anticipated by Baji

**Issue B—Lien (from 90/013,479)**

Claims 3 and 4 stand rejected under 35 U.S.C. 102(e) as anticipated by, or in the alternative, as obvious over Lien.

**Issue D—Wasti in view of Welk (from 90/013,479)**

Claims 3 and 4 stand rejected under 35 U.S.C. 103(a) as obvious over Wasti in view of Welk.

**Issue E—Satoru in view of Schmidt (from 90/013,479)**

Claims 3 and 4 stand rejected under 35 U.S.C. 103(a) as obvious over Satoru in view of Schmidt.

**Issue F—Satoru in view of Lien (from 90/013,479)**

Claims 3, 4, stand rejected under 35 U.S.C. 103(a) as obvious over Satoru in view of Lien.

**Issue 1—Schmidt in view of Satoru Takui (from 90/013,391)**

Claims 3 and 4 stand rejected under pre-AIA 35 U.S.C. 103(a) as obvious over Schmidt in view of Satoru Takui.

**Issue 2—Moriconi in view of Satoru Takui (from 90/013,391)**

Claims 3 and 4 stand rejected under pre-AIA 35 U.S.C. 103(a) as obvious over Moriconi in view of Satoru Takui.

The '088 Patent is expired.  Claims 3 and 4, the sole claims subject to reexamination, stand rejected.  Patent Owner has decided to no longer oppose the rejections of claims 3 and 4 of the '088 Patent.  Therefore, Patent Owner hereby cancels claims 3 and 4.  As all claims subject to reexamination are now cancelled, this reexamination should be ended.

To be clear, Patent Owner does not agree with or acquiesce to the rejections of claims 3 and 4, and has cancelled these claims solely for purposes of avoiding unnecessary expenditure of resources by Patent Owner and the Patent Office.  Patent Owner expressly reserves the right to advance any and all arguments in any other proceedings involving related patents, including but not limited to U.S. Patent No. 7,475,180.

<u>CONCLUSION</u>

No fees are believed to be due with this response. However, the Director is authorized to charge any fees that may be required, or credit any overpayment, to Dechert LLP Deposit Account No. 50-2778 (Order No. 379922-391RX (105402)).

Respectfully submitted,

Date:   July 11, 2016                                    /Scott Warren/
                                                         Scott Warren
**DECHERT LLP**                                          Reg. No. 47,167
**Customer No. 37509**
Tel:  212.698.3500
Fax:  212.698.3599


22472614

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 26317595 |
| **Application Number:** | 90013479 |
| **International Application Number:** | |
| **Confirmation Number:** | 3933 |
| **Title of Invention:** | DISPLAY UNIT AND METHOD ENABLING BI-DIRECTIONAL COMMUNICATION WITH VIDEO SOURCE |
| **First Named Inventor/Applicant Name:** | 6513088 |
| **Customer Number:** | 37509 |
| **Filer:** | Scott A. Warren/Andrew Horner |
| **Filer Authorized By:** | Scott A. Warren |
| **Attorney Docket Number:** | |
| **Receipt Date:** | 11-JUL-2016 |
| **Filing Date:** | 27-MAR-2015 |
| **Time Stamp:** | 19:40:07 |
| **Application Type:** | Reexam (Patent Owner) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Miscellaneous Incoming Letter | 391RX_479RX_Resp_to_Advis_Action.pdf | 366523 b3839483504386648323779914c72796e67fa74c | no | 5 |

**Warnings:**

**Information:**

| 2 | Reexam Certificate of Service | 391RX_479RX_CoS.pdf | 361878 | no | 1 |
|---|---|---|---|---|---|
|   |   |   | e4e333cf24b16e2b870684d56256a5a0507da417 |   |   |

**Warnings:**

**Information:**

| | Total Files Size (in bytes): | 728401 |
|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

# EXHIBIT B

**SUMMARY OF REEXAMINATIONS**

| Asserted Patent | Originally Issued Claims | Asserted Claims | Recent / Relevant Events in Reexaminations | Overall Status |
|---|---|---|---|---|
| '588 Patent | 1-5 | 1 | PTO issued reexamination certificate, cancelling lone asserted claim 1.<br><br>(See Dkt. 126, Ex. A, Feb. 8, 2016 Reexam. Cert. (90/013,480 and 90/013,392)). | All issued claims cancelled or disclaimed, and thus of no effect. |
| '342 Patent | 1-18 | 15 | PTO issued reexamination certificate, cancelling claims 1-14 and 16-18 in reexamination no. 95/000,458.<br><br>(See Dkt. 125, Ex. D, Jan. 7, 2016 Reexam. Cert. (95/000,458).<br><br>PTO issued reexamination certificate, cancelling claim 15.<br><br>(See Dkt. 128, Ex. A, Apr. 1, 2016 Reexam. Cert. (90/013,477 and 90/013,238)). | All issued claims cancelled and of no effect. |
| '970 Patent | 1-29 | 22 | PTO issued reexamination certificate, cancelling claims 1-17, 22, 24, 26, and 29.<br><br>(See Dkt. 128, Ex. B, Apr. 11, 2016 Reexam. Cert. (90/013,388 and 90/013,478)). | All issued claims cancelled and of no effect. |
| '088 Patent | 1-33 | 3, 4 | Mondis filed amendment, requesting cancellation of asserted claims 3-4.<br><br>(See Ex. A, Jul. 11, 2016 Amendment (90/013,479)). | Upon entry of recent amendment, all issued claims (including asserted claims 3 and 4) will be cancelled or invalidated, and of no effect. |
| '180 Patent | 1-27, 28 (1-27), 29 (1, 14, 17, 21, 23, 25, and 26) | 14-16 | PTO issued reexamination certificate confirming patentability of asserted claims 14-16.<br><br>(See Dkt. 131, Ex. B, Jun. 28, 2016 Reexam. Cert. (90/013,481)). | Patentability of asserted claims 14-16 confirmed. |

Case 2:15-cv-04951-SRC-CLW   Document 153   Filed: 07/28/16   Page 25 of 31 PageID: 7443

# EXHIBIT C

# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,390 | 11/03/2014 | 7475180 | 008739.00112.REX0 | 1872 |

90/013397

| | | |
|---|---|---|
| 37509 | 7590 | 06/30/2015 |

DECHERT LLP
P.O. BOX 390460
MOUNTAIN VIEW, CA 94039-0460

| EXAMINER |
|---|
| LEE, CHRISTOPHER E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/30/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Song K. Jung
McKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, DC 20006

Date Mailed:

**MAILED**

JUN 30 2015

**CENTRAL REEXAMINATION UNIT**

## *Ex Parte* Reexamination Communication Transmittal Form

REEXAMINATION CONTROL NO. : _90/013,390_ + 90013237

PATENT NO. : _7475180_

TECHNOLOGY CENTER : _3999_

ART UNIT _3992_

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the ex parte reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)                    Date Mailed:

Vito A. Canuso III
9582 Featherhill Dr.
Villa Park, CA 92861

# *Ex Parte* Reexamination Communication Transmittal Form

REEXAMINATION CONTROL NO. : *90/013,237+'390*

PATENT NO. : *7475180*

TECHNOLOGY CENTER : *3999*

ART UNIT *3992*

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the ex parte reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| *Office Action in Ex Parte Reexamination* | Control No.<br>90/013,237+'390 | Patent Under Reexamination<br>7475180 | |
|---|---|---|---|
| | Examiner<br>Christopher E. Lee | Art Unit<br>3992 | AIA (First Inventor to File) Status<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a. ☒ Responsive to the communication(s) filed on <u>5/11/15</u> .

    ☐ A declaration(s)/affidavit(s) under 37 CFR 1.130(b) was/were filed on _____ .

b. ☒ This action is made FINAL.

c. ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.    3. ☐ Interview Summary, PTO-474.

2. ☒ Information Disclosure Statement, PTO/SB/08.    4. ☐ _____

Part II    SUMMARY OF ACTION

1a. ☒ Claims <u>14-20,23,24,28/14-20,28/23,28/24,29/14, 29/17,29/23</u> are subject to reexamination.

1b. ☒ Claims <u>1-13, 21, 22,25-27,28/1-13,28/21,28/22, 28/25-27,29/1,29/21,29/25,29/26</u> are not subject to reexamination.

2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

3. ☒ Claims <u>14-16</u> are patentable and/or confirmed.

4. ☒ Claims <u>17-20,23,24,28/14-20,28/23,28/24,29/14, 29/17,29/23</u> are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a) ☐ approved (7b) ☐ disapproved.

8. ☒ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

     a) ☒ All   b) ☐ Some*   c) ☐ None    of the certified copies have

     1 ☐ been received.

     2 ☐ not been received.

     3 ☒ been filed in Application No. <u>10/160,022</u> .

     4 ☐ been filed in reexamination Control No. _____ .

     5 ☐ been received by the International Bureau in PCT application No. _____ .

     * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)

Application/Control Number: 90/013,237+'390                                    Page 2
Art Unit: 3992                                        *Ex Parte* REX Final Office Action

## DETAILED ACTION
### *Ex Parte Reexamination*

1.      This is an *ex parte* reexamination of United States Patent Number 7,475,180 B2, which

issued to Arai et al. [hereinafter "the '180 Patent"], and it is being reexamined under the pre-AIA

first to invent provisions. The '180 Patent has expired. However, it is enforceable under 37 CFR

§ 1.510(a) at the time of filing the instant *ex parte* reexamination proceeding.


### *Merger of Proceedings*

2.      Patent Owner is reminded that the *ex parte* reexamination proceedings Control Numbers

90/013,237 filed by the 1st Third Party requester and 90/013,390 filed by the 2nd Third Party

requester have been merged and the merged proceedings will be conducted in accordance with

the guidelines and requirements stated in the Decision, *sua sponte,* to merge reexamination

proceedings mailed on February 11, 2015.


### *Receipt Acknowledgement*

3.      Receipt is acknowledged of the Response filed on May 11, 2015. No amendment may

be proposed for entry in the '180 Patent because it has expired. The original claims 14-20, 23,

24, 28/14-20, 28/23, 28/24, 29/14, 29/17, and 29/23 are currently subject to reexamination.


### *Summary of Ex Parte Reexamination Prosecution*

4.      In the 1st Third Party requester's reexamination request, the 1st Third Party requester

alleges that the following references, in certain combinations, have been asserted as providing

teachings relevant to the claims 14-16, 23, 24, 28/15, 28/16, 28/23, 28/24, 29/14, and 29/23 of

the '180 Patent:

- Moriconi et al. [US 5,262,759 A], "Removable Computer Display Interface," issued on
  16th of November 1993 (hereinafter Moriconi)

- Schmidt et al. [US 5,285,197 A], "Method and Apparatus for Automatic Selection of Scan
  Rates for Enhanced VGA-Compatible Monitors," issued on 8th of February 1994
  (hereinafter Schmidt)

- Takahashi et al. [JP 4037787], "Digital Image Adjustment and Display Device,"
  published on 7th of February 1992 (hereinafter Takahashi)

- Sony DDM Monitor Interface Manual, 3rd edition, published December 1989 (hereinafter
  Sony DDM Monitor Interface)

Application/Control Number: 90/013,237+'390                                    Page 3
Art Unit: 3992                                              *Ex Parte* REX Final Office Action

5.      In the 2nd Third Party requester's reexamination request, the 2nd Third Party requester
alleges that the following references, in certain combinations, have been asserted as providing
teachings relevant to the claims 14-20, 23, 24, 28/14-20, 28/23, 28/24, 29/14, 29/17, and 29/23
of the '180 Patent:

- Moriconi [US 5,262,759 A], "Removable Computer Display Interface," issued on 16th of
  November 1993
- Schmidt [US 5,285,197 A], "Method and Apparatus for Automatic Selection of Scan
  Rates for Enhanced VGA-Compatible Monitors," issued on 8th of February 1994
- Takahashi [JP 4037787], "Digital Image Adjustment and Display Device," published on
  7th of February 1992
- Sony DDM Monitor Interface, 3rd edition, published December 1989
- Revesz et al. [US 4,888,709], "Electronic Product Information Display System," issued
  on 19th of December 1989 (hereinafter Revesz)
- Pfeiffer et al. [US 5,198,644], "System for Display of Prices and Related Method," issued
  on 30th of March 1993 (hereinafter Pfeiffer)
- Satoru [EP 0 498 995 B1], "Data Transfer Control System," filed on 12th of September
  1991 and published on 9th of October 1997, thus it is determined not to be a proper prior
  art in the instant proceeding because the publishing date (not the filing date) of Satoru is
  later than the effective filing date of the patent under reexamination '180 Patent.

6.      Here is the '180 Patent's reexamination prosecution history listed in chronological.
-       *inter partes* reexamination prosecution history of copending proceeding 95/000,480

1/6/09      The original '180 Patent was issued.

6/4/09      A Third Party requester filed a request for *inter* partes reexamination of the '180
            Patent.

7/24/09     The request for *inter partes* reexamination was granted, and the original claims
            1-16 and 21-29 were determined to be subject to reexamination.

9/24/09     The Third Party requester filed a petition under 37 CFR §§ 1.182-1.183 to
            resolve contradictory examiner findings in copending reexamination
            proceedings, and it was dismissed as moot on 8/31/11.

| | |
|---|---|
| 10/6/09 | A First Action on the Merits (FAOM) Non-ACP Office action was issued with the original claims 1-16 and 21-29 under rejection, and was mailed. |
| 10/9/09 | The Patent Owner filed a petition under 37 CFR §§ 1.182 and 1.183 to dismiss and expunge an impermissible filing from the record, and it was granted-in-part on 4/21/10. |
| 11/16/09 | The Patent Owner filed a petition under 37 CFR § 1.956 to request extension of time to respond to an Office action, and it was granted on 11/18/09. |
| 1/6/10 | The Patent Owner filed a response to the FAOM Non-ACP Office action, but it was decided as improper response in the petition decision mailed on 6/4/10 and was expunged. |
| 2/5/10 | The Third Party requester filed a petition under 37 CFR § 1.183 for suspension of rules 37 CFR §§ 1.948(a) and 1.943(b), and it was dismissed as moot on 6/4/10. |
| 2/5/10 | The Third Party requester filed a petition under 37 CFR § 1.182 for replacement of papers previously filed, and it was dismissed as moot on 6/4/10. |
| 6/18/10 | The Patent Owner filed corrected response to the FAOM Non-ACP Office action. |
| 6/28/10 | The Third Party requester filed a petition under 37 CFR § 1.182 for expungement of declaration previously submitted and replacement with corrected declaration, and it was dismissed on 9/29/10. |
| 7/19/10 | The Third Party requester filed requester's comments to the FAOM Non-ACP Office action and the Patent Owner's corrected response, but it was decided as improper comments in the petition decision mailed on 9/29/10 and was expunged. |
| 8/13/10 | The Patent Owner filed a petition under 37 CFR §§ 1.182 and 1.183 to expunge the Third Party requester's improper comments submission, and it was dismissed as moot on 8/31/11. |
| 9/3/10 | The Third Party requester filed a petition under 37 CFR § 1.183 for suspension of rule 37 CFR § 1.943(b), and it was dismissed on 9/29/10. |
| 9/10/10 | The Third Party requester filed a petition under 37 CFR § 1.181 to oppose petition filed by Patent Owner for expungement of Third Party requester's comments, and it was dismissed as untimely on 8/31/11. |

Application/Control Number: 90/013,237+'390                                      Page 5

Art Unit: 3992                                                *Ex Parte* REX Final Office Action

| | |
|---|---|
| 10/14/10 | The Third Party requester filed new requester's comments after the Patent Owner's corrected response. |
| 11/23/10 | The Patent Owner filed a petition under 37 CFR §§ 1.182 and 1.183 to expunge the Third Party requester's improper comments submission, and it was dismissed as premature on 8/31/11. |
| 12/30/10 | The Third Party requester filed a petition under 37 CFR § 1.181 to oppose petition filed by Patent Owner for expungement of Third Party requester's comments, and it was dismissed as premature and untimely on 8/31/11. |
| 10/14/11 | An Action Closing Prosecution (ACP) was issued with the original claims 1-16 and 21-29 under rejection, and was mailed. |
| 11/14/11 | The Patent Owner filed response to the ACP Office action. |
| 12/14/11 | The Third Party requester filed requester's comments to the ACP Office action and the Patent Owner's response. |
| 3/23/12 | A Right of Appeal Notice (RAN) was issued with the original claims 1-16 and 21-29 under rejection, and was mailed. |
| 4/23/12 | The Patent Owner filed a notice of appeal identifying that the rejected claims 1-16 and 21-29 were appealed. |
| 5/4/12 | The Third Party requester filed a notice of cross appeal identifying that the Examiner's decision not to enter various ground of claims rejections proposed by the Third Party requester was appealed. |
| 7/5/12 | a) The Patent Owner filed an appellant brief. |
| | b) The Third Party requester filed an appellant brief. |
| 8/6/12 | a) The Patent Owner filed a respondent brief. |
| | b) The Third Party requester filed a respondent brief. |
| 1/17/13 | An Examiner's Answer was issued and mailed. |
| 2/19/13 | a) The Patent Owner filed a rebuttal brief. |
| | b) The Third Party requester filed a rebuttal brief. |
| 3/12/13 | The Third Party requester submitted a notice of withdrawal of Third Party request. |
| 3/18/13 | The Patent Owner filed a request for oral hearing under 37 CFR § 41.73 (b). |
| 4/10/13 | The Rebuttal briefs were noted by the Examiner of record. |

Paper No. 20150527

Application/Control Number: 90/013,237+'390                    Page 6

Art Unit: 3992                                    *Ex Parte* REX Final Office Action

| | | |
|---|---|---|
| 5/3/13 | | The Patent Owner filed a petition under 37 CFR § 41.3 to terminate this *inter partes* reexamination proceeding, and it was dismissed by PTAB (Patent Trial and Appeal Board) on 12/3/13. |
| 7/24/13 | | The Third Party requester submitted a confirmation of Third Party requester withdrawal of appeal. |
| 12/23/13 | | The Patent Owner filed a petition under 37 CFR § 1.182 to transfer jurisdiction over, and consider on the merits, Patent Owner's petition to terminate this *inter partes* reexamination proceeding, and it was dismissed by OPLA (Office of Patent Legal Administration) on 4/11/14. |
| 4/11/14 | a) | The Office determined that the estoppel provisions of 35 U.S.C. § 317(b) apply to any rejection of claims 14-16, 23, 24, 28/14-16, 28/23, 28/24, 29/14, and 29/23 in this *inter partes* reexamination proceeding. |
| | b) | The prosecution of this *inter partes* reexamination proceeding with respect to the claims 1-13, 21, 22, 25-27, 28/1-13, 28/21, 28/22, 28/25-27, 29/1, 29/21, 29/25, and 29/26 of the '180 Patent will continue. |
| 5/7/14 | | A second Right of Appeal Notice (the 2nd RAN) was issued with the original claims 1-13, 21, 22, 25-27, 28/1-13, 28/21, 28/22, 28/25-27, 29/1, 29/21, 29/25, and 29/26 under rejection, and was mailed. |
| 6/6/14 | | The Patent Owner filed a notice of appeal identifying that the rejected claims 1-13, 21, 22, 25-27, 28/1-13, 28/21, 28/22, 28/25-27, 29/1, 29/21, 29/25, and 29/26 were appealed. |
| 8/4/14 | | The Patent Owner Appellant filed an Appellant brief. |
| 8/20/14 | | The Office issued a notification re Appellant brief filed on 8/4/14. |
| 9/4/14 | | The Patent Owner Appellant filed a response to the notification re Appellant brief mailed on 8/20/14. |
| 11/10/14 | | An Examiner's Answer was issued and mailed, and the jurisdiction of the copending *inter partes* reexamination proceeding 95/000,480 has been transferred to PTAB. |
| 6/10/15 | | The PTAB affirmed the Examiner's rejection of claims 1-13, 21, 26, 28/1-13, 28/21, 28/22, 28/25-27, 29/1, 29/21, 29/25, and 29/26. |

- *ex parte* reexamination prosecution history of the proceeding 90/013,237

5/13/14      The 1st Third Party requester filed a 1st request for *ex parte* reexamination of the '180 Patent (hereinafter "the 1st Request").

5/21/14      The Office contacted the Patent Owner by telephone for requesting waiver of the Patent Owner's statement pursuant to the pilot program for waiver of Patent Owner's statement in *ex parte* reexamination proceedings. The Patent Owner did not agree to waive its right to file a Patent Owner's statement under 35 U.S.C. § 304.

6/10/14      The 1st Request for *ex parte* reexamination of the '180 Patent was denied.

7/10/14      The 1st Third Party requester filed a petition under 37 CFR §§ 1.515(c) and 1.181(b) for requesting reconsideration of denial of *ex parte* reexamination pursuant to 37 CFR § 1.510(b)(1), and it was granted by Director of CRU (Central Reexamination Unit) on 9/10/14.

9/10/14      Due to the petition decision granted, the 1st Request for *ex parte* reexamination of the '180 Patent was granted, and the original claims 14-16, 23, 24, 28/14-16, 28/23, 28/24, 29/14, and 29/23 were determined to be subject to reexamination.

- *ex parte* reexamination prosecution history of the proceeding 90/013,390

11/3/14      The 2nd Third Party requester filed a 2nd request for *ex parte* reexamination of the '180 Patent (hereinafter "the 2nd Request").

12/5/14      The 2nd Request for *ex parte* reexamination of the '180 Patent was granted, and the original claims 14-20, 23, 24, 28/14-20, 28/23, 28/24, 29/14, 29/17, and 29/23 were determined to be subject to reexamination. It was mailed on 12/10/14.

2/11/15      The 2nd Request for reexamination was merged with the 1st Request for reexamination.

- *ex parte* reexamination prosecution history of the proceeding 90/013,237+'390 (merged cases)

3/9/15      A First Action on the Merits (FAOM) Non-Final Office action was issued with the original claims 14-20, 23, 24, 28/14-20, 28/23. 28/24, 29/14, 29/17, and 29/23 under rejection, and was mailed.

5/11/15      The Patent Owner filed a response to the FAOM Non-Final Office action.

Application/Control Number: 90/013,237+'390                                    Page 8
Art Unit: 3992                                           *Ex Parte* REX Final Office Action

        The Examiner issues the instant Final Office action.

## *Declaration*

7.      The declaration of Michael B. Spiro under 37 CFR § 1.132 filed on May 11, 2015 is
insufficient to overcome the rejection of claims subject to reexamination in this *ex parte*
reexamination.

        The declarant Michael B. Spiro states the personal knowledge of the licensing of the
Patens (including the '180 Patent) since 2003. Nevertheless, the declaration is insufficient to
overcome the claims rejection because the Mondis' licensing of its patent to other companies is
insufficient to show nexus between the "merits of the '180 Patent's invention and the Mondis'
licenses," and thus does not establish secondary consideration of commercial success.

8.      The declaration of Joseph D. Lamm under 37 CFR §1.132 filed on May 11, 2015 is
considered.

        The declarant states an expert opinion on what the prior arts taught, and explains the
prior arts of the record Moriconi, Sony DDM Monitor Interface, and Schmidt. Furthermore, the
declarant traverses the rejections of the claims under 35 U.S.C. § 103(a) as being unpatentable
(i) over Sony DDM Monitor Interface in view of Moriconi and (ii) over Schmidt in view of either
Takahashi or Satoru.

        First, the declarant testifies that there is no motivation to combine Sony DDM Monitor
Interface with Moriconi due to the different problems being addressed.

        However, the Examiner recognizes that obviousness may be established by combining
or modifying the teachings of the prior art to produce the claimed invention where there is some
teaching, suggestion, or motivation to do so found either in the references themselves or in the
knowledge generally available to one of ordinary skill in the art. See *In re Fine*, 837 F.2d 1071,
5 USPQ2d 1596 (Fed. Cir. 1988), *In re Jones*, 958 F.2d 347, 21 USPQ2d 1941 (Fed. Cir. 1992),
and *KSR International Co. v. Teleflex, Inc.*, 550 U.S. 398, 82 USPQ2d 1385 (2007). In this
case, even though the declarant provides a particular reason of undesirable combination of
Sony DDM Monitor Interface with Moriconi, the Examiner had established a *prima facie* case of
obviousness of the rejected claims of the '180 Patent by combining the teachings of the prior
arts Sony DDM Monitor Interface and Moriconi with desirable rationale of doing so found in the
respective references Sony DDM Monitor Interface and Moriconi themselves in order to produce

the claimed invention. The Examiner notes that the test for obviousness is not whether the

features of a secondary reference Moriconi may be bodily incorporated into the structure of the

primary reference Sony DDM Monitor Interface; nor is it that the claimed invention must be

expressly suggested in any one or all of the references. Rather, the test is what the combined

5    teachings of the references would have suggested to those of ordinary skill in the art. See *In re
Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981).

    And, the declarant further testifies that there is no motivation to combine Sony DDM

Monitor Interface with Moriconi because the Sony DDM-2801C disclosed in the primary

reference Sony DDM Monitor Interface has a dedicated hardware interface, which does not

10   need to send an identity code to the computer so that the computer could locate an appropriate

driver to generate compatible video signals in Moriconi.

    However, it is not true that there is any dedicated hardware interface between the Sony

DDM-2801C and the external host computer for the monitor alignment, which is cited in the

claim rejection. In fact, a general purpose serial interface RS-422A is used for externally

15   aligning the Sony DDM-2801C using the host computer, which can save the monitor's alignment

data on its disk. Thus, it would have been obvious to one of ordinary skill in the art at the time

the invention was made to have stored the identification number of the particular monitor, as

disclosed by Moriconi, in the memory (i.e., EEPROM memory), as disclosed by Sony DDM

Monitor Interface, so as to make the external host computer recognize the coupled monitor (i.e.,

20   display unit) with the external host computer (i.e., querying the identification information within

said EEPROM) for the advantage of uploading the correct alignment data saved in the host

computer (i.e., correct routine to operate that module; See Moriconi, col. 5, lines 25-26).

    Furthermore, the declarant argues that the identity code of Moriconi for identifying the

"type" of display monitor is not necessary for the Sony DDM Monitor Interface because the Sony

25   DDM system is preconfigured for use with color CRT-type. In other words, the Sony DDM

system does not need to ask the type of monitor, i.e., monochrome, passive color, etc., such as

Moriconi does. Thus, there is no motivation to combine Sony DDM Monitor Interface with

Moriconi.

    Although the Sony DDM system of the Sony DDM Monitor Interface is preconfigured for

30   use with color CRT-type, *arguendo*, the combination of the monitor of Sony DDM Monitor

Interface and the identity code of Moriconi would be able to make the monitor of Sony DDM

system upload the correct alignment data saved in the host computer using the identity code
(i.e., correct routine to operate that module; See Moriconi, col. 5, lines 25-26).

Therefore, in view of the foregoing, when all of the evidence regarding the rejection of
the claims under 35 U.S.C. § 103(a) as being unpatentable over Sony DDM Monitor Interface in

5   view of Moriconi is considered, the totality of the rebuttal evidence of nonobviousness fails to
outweigh the evidence of obviousness.

Second, the declarant testifies that the communication of supported features in Schmidt
is different than the identification of a monitor's type because the monitor of Schmidt
communicates its supported features to the video source, not its type.

10   Contrary to the declarant's statement, Schmidt discloses display unit information (i.e., a
plurality of bits) that includes an identification number (i.e., said plurality of bits used to uniquely
identify the video display monitor type) for identifying at least a type of said display unit (i.e.,
Table 2 illustrates an exemplary byte sequence sent by the monitor to identify monitor type. Bit
7 of byte 0 uniquely identifies whether the monitor supports the Parameter Response Mode for

15   enhanced resolution, and Byte 2 provides a list of features provided by the monitor; See
Schmidt, col. 1, lines 8-14, col. 8, lines 39-43 and 59-64, and col. 11, TABLE 2 and lines 23-27
and 31-37).

Actually, the declarant does not explain sufficiently why Schmidt's recitation "a plurality
of bits used to uniquely identify the video display monitor type" at col. 8, lines 59-62 is not

20   disclosing the claimed subject matter "an identification number for identifying at least a type of
said display unit (i.e., monitor's type)," but the mere features of the monitor. Instead, the
declarant brought Moriconi and one of ordinary skill in the art for defining the meaning of the
claiming language "type" in the context of the claimed invention such as the monitor's "type"
refers only to the technology type of a display. However, the declarant does not sufficiently

25   explain why the monitor's "type" in the claim refers only to the technology type of a display in
light of the specification of the '180 Patent.

Moreover, the declarant testifies that Schmidt does not teach the claimed subject matter
"communication controller" because the "CPU 110 of Processor 106 in Fig. 1" cited as
"communication controller" in the claim rejection does not control the transmission of data out of

30   the display.

Contrary to the declarant's statement, Schmidt discloses that the "bits" or "bytes" stored
in memory are output until all bytes needed to identify the video display monitor type are output

to monitor response line MR (See Schmidt, col. 8, lines 65-68). In other words, Schmidt discloses "control" of the output of the bytes or "communication" of the bytes from the memory.

5
Therefore, in view of the foregoing, when all of the evidence regarding the rejection of the claims under 35 U.S.C. §102(e) as being anticipated by Schmidt is considered, the totality of the rebuttal evidence of anticipation fails to outweigh the evidence of anticipation.

Third, the declarant testifies that there is no motivation to combine Schmidt with either Takahashi or Satoru due to the different ways of displaying images. Essentially, the declarant asserts that the problem addressed in Schmidt is fundamentally different that the one addressed in Takahashi and Satoru.

10
However, it has been held that a prior art reference must either be in the field of applicant's endeavor or, if not, then be reasonably pertinent to the particular problem with which the applicant was concerned, in order to be relied upon as a basis for rejection of the claimed invention. See *In re Oetiker*, 977 F.2d 1443, 24 USPQ2d 1443 (Fed. Cir. 1992). In this case, the prior art references Schmidt, Takahashi, and Satoru are in the field of the '180 Patent

15
inventor's endeavor, i.e., display unit with communication controller.

And, Takahashi and Satoru are reasonably pertinent to the particular problem with which the inventor was concerned, i.e., the communication controller capable of bi-directionally communicating with video source for changing color of displayed images, which is relied upon as a basis for rejection of the claimed invention (See Takahashi, pages 766-767, wherein,

20
parameters including screen size, brightness, hue, focus, contrast, and that like can be adjusted by forwarding control signals from a video source such as a computer; and Satoru, col. 1, lines 18-25, wherein, an ID code included in transmission data, which code serves to identify said display unit UI, and adjusting the luminance or color of an image).

Nevertheless, the Examiner determines that the reference Satoru cannot be a proper

25
prior art in the instant proceeding because the publishing date (not the filing date) of Satoru is later than the effective filing date of the patent under reexamination '180 Patent.

Therefore, in view of the foregoing, when all of the evidence regarding the rejection of the claims under 35 U.S.C. § 103(a) as being unpatentable over Schmidt in view of Takahashi only is considered, the totality of the rebuttal evidence of nonobviousness fails to outweigh the

30
evidence of obviousness. And, the rejection of the claims under 35 U.S.C. § 103(a) as being unpatentable over Schmidt in view of Satoru proposed in the previous Office action will be withdrawn *infra*.

Application/Control Number: 90/013,237+'390                                      Page 12
Art Unit: 3992                                                    *Ex Parte* REX Final Office Action

      Last, the declarant asserts that one or more computer display standards promulgated by VESA have incorporated the inventions claimed in the '180 Patent. Although the declarant shows a list that the claim limitations of the '180 Patent were allegedly infringed by VESA Compliance for the VESA EDID and DDC/CI standards, there is no hard evidence of said asserted incorporation.

      Furthermore, even though the declarant shows that Microsoft Corporation mandates the compliance with both the VESA EDID and DDC/CI standards, and the vast majority of computer monitors practices the VESA EDID and DDC/CI standards, the declarant fails to show any nexus between the claimed invention of the '180 Patent and the VESA EDID and DDC/CI standards. In fact, those exemplified compliances with the VESA EDID and DDC/CI standards is not related with the inventor's commercial success at all because of no nexus between the claimed invention of the '180 Patent and the VESA EDID and DDC/CI standards.

      In conclusion, there is not any hard evidence of incorporating the claimed invention of the '180 Patent into the VESA EDID and DDC/CI standards, and the declaration is insufficient to overcome the claims rejection.

### *Statutory Basis for Grounds of Rejections - 35 USC § 102 and § 103*

9.     The following is a quotation of the appropriate paragraphs of pre-AIA 35 U.S.C. § 102 that form the basis for the rejections under this section made in this Office action

     A person shall be entitled to a patent unless –

     (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

10.    The following is a quotation of pre-AIA 35 U.S.C. § 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

     (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

This application currently names joint inventors. In considering patentability of the claims under pre-AIA 35 U.S.C. § 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR § 1.56 to point out

the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of pre-AIA 35 U.S.C. § 103(c) and potential pre-AIA 35 U.S.C. § 102(e), (f) or (g) prior art under pre-AIA 35 U.S.C. § 103(a).

### *Claims Rejections*

### Re. Ground #1: Schmidt

11.    Claims 17-20, 23, 28/14-20, 28/23, 29/14, 29/17, and 29/23 are rejected under pre-AIA 35 U.S.C. § 102(e) as being anticipated by Schmidt [US 5,285,197 A].

*Referring to claim 17,* Schmidt discloses a display unit (i.e., Display monitor 100 in Fig. 1) for displaying an image based on video signals (i.e., Video signal) *inputted from an externally connected video source* (i.e., Computer system in Fig. 2; See Figs. 1 and 2 and col. 1, lines 24-28), comprising:

- a video circuit (i.e., Color processor 102 of Fig. 1) adapted to display an image based on the video signals (i.e., RGB video signals) *sent by the externally connected video source* (i.e., said Computer system; See Fig. 1 and col. 5, lines 32-41);

- a memory (i.e., Memory 112 of Fig. 1) in which at least display unit information (i.e., a plurality of bits) is stored (See col. 4, lines 32-38), said display unit information including an identification number (i.e., said plurality of bits used to uniquely identify the video display monitor type) for identifying at least a type of said display unit (i.e., Table 2 illustrates an exemplary byte sequence sent by the monitor to identify monitor type. Bit 7 of byte 0 uniquely identifies whether the monitor supports the Parameter Response Mode for enhanced resolution, and Byte 2 provides a list of features provided by the monitor; See col. 1, lines 8-14, col. 8, lines 39-43 and 59-64, and col. 11, TABLE 2 and lines 23-27 and 31-37); and

- a communication controller (i.e., CPU 110 of Processor 106 in Fig. 1) capable of bi-directionally communicating with said video source (See col. 8, lines 25-29 and col. 8, line 8 through col. 9, line 13);

  o wherein said communication controller (i.e., said CPU of the Processor) is capable of communicating said identification number (i.e., said plurality of bits used to uniquely identify the video display monitor type) stored in said memory (i.e., Memory 112 of Fig. 1) and no other display unit information to said video source (i.e., said CPU enters PRM mode and sends monitor identifying information to the graphics

controller but said Parameter Response Mode for enhanced resolution; See col. 8,
line 40 through col. 9, line 13).

Furthermore, the preamble language "inputted from an externally connected video source" and
the claiming language "sent by the externally connected video source" do not affirmatively limit
the scope of this claim because they do not require the structure of the claimed apparatus to
include the external video source, and should not be given weight in determining patentability[1].

*Referring to claim 18,* Schmidt teaches that

- said display unit information (i.e., a plurality of bits used to uniquely identify the video
  display monitor type; See col. 4, lines 32-38) includes characteristic information of said
  display unit (i.e., Table 2 illustrates an exemplary byte sequence sent by the monitor to
  identify monitor type. Bit 7 of byte 0 uniquely identifies whether the monitor supports the
  Parameter Response Mode for enhanced resolution, and Byte 2 provides a list of
  features provided by the monitor; See col. 1, lines 8-14, col. 8, lines 39-43 and 59-64,
  and col. 11, TABLE 2 and lines 23-27 and 31-37).

*Referring to claim 19,* Schmidt teaches that

- said display unit information (i.e., a plurality of bits used to uniquely identify the video
  display monitor type; See col. 4, lines 32-38) is sent to said video source (i.e., Computer
  system in Fig. 2) in response to power on (i.e., power-up) of at least one of said display
  unit and said video source (i.e., a microprocessor 202 of Fig. 2 of the monitor sends
  monitor identifying information, e.g., identification number, to the graphics controller of
  the computer system, and monitor detection and identification operations are initiated
  during power up of the computer system. See Fig. 2, col. 6, lines 39-45, col. 8, lines 15-
  19, and col. 8, line 40 through col. 9, line 3).

*Referring to claim 20,* Schmidt teaches that

- said display unit (i.e., Display monitor 100 in Fig. 1) receives a signal (i.e., video and
  sync signals compatible with said Display monitor) from said video source (i.e.,
  Computer system in Fig. 2) that is generated by using said identification number (i.e., a
  plurality of bits used to uniquely identify the video display monitor type) stored in said

---

[1] See Board decisions – Appeal Number 2011-002708 (Decision dated 3/21/11 at pages 3-4), Appeal Number 2011-
006035 (Decision dated 7/11/11 at pages 4-5), and Appeal Number 2011-006440 (Decision dated 7/11/11 at pages
3-4).

memory (i.e., Memory 112 of Fig. 1; in fact, using the ID sent from said Display monitor
to identify the type of the Display monitor, the ID sent from the Display monitor must be
compared with a number stored in said Computer system, and upon identifying the
correct type of the Display monitor, the Computer system BIOS starts a process to select
the proper operating parameters of graphics controller, wherein the graphics controller
configures itself based on the identification information received from said Display
monitor and, thereafter, sends video and sync signals compatible with said Display
monitor that is generated in accordance with a result of comparison between said
identification number stored in said memory and an identification number stored in said
video source; See further Abstract, Figs. 1 and 2, col. 2, line 60 through col. 3, line 3,
col. 8, lines 5-64, col. 11., line 66 through col. 12, line 12, and col. 13, lines 12-18).

*Referring to claim 23,* Schmidt discloses a display unit (i.e., Display monitor 100 in Fig.
1) for displaying an image based on video signals (i.e., Video signal) *inputted from an externally
connected video source* (i.e., Computer system in Fig. 2; See Figs. 1 and 2 and col. 1, lines 24-
28), comprising:

- a video circuit (i.e., Color processor 102 of Fig. 1) adapted to display an image based on
  the video signals (i.e., RGB video signals) *sent by said externally connected video
  source* (i.e., said Computer system; See Fig. 1 and col. 5, lines 32-41);

- a memory (i.e., Memory 112 of Fig. 1) in which at least display unit information (i.e., a
  plurality of bits) is stored (See col. 4, lines 32-38), said display unit information including
  an identification number (i.e., said plurality of bits used to uniquely identify the video
  display monitor type) for identifying at least a type of said display unit (i.e., Table 2
  illustrates an exemplary byte sequence sent by the monitor to identify monitor type. Bit 7
  of byte 0 uniquely identifies whether the monitor supports the Parameter Response
  Mode for enhanced resolution, and Byte 2 provides a list of features provided by the
  monitor; See col. 1, lines 8-14, col. 8, lines 39-43 and 59-64, and col. 11, TABLE 2 and
  lines 23-27 and 31-37); and

- a communication controller (i.e., CPU 110 of Processor 106 in Fig. 1) capable of bi-
  directionally communicating with said video source (See col. 8, lines 25-29 and col. 8,
  line 8 through col. 9, line 13), said communication controller (i.e., said CPU of the
  Processor) being capable of sending said display unit information stored in said memory
  to said video source (i.e., said CPU enters PRM mode and sends monitor identifying

information to the graphics controller but said Parameter Response Mode for enhanced resolution; See col. 8, line 40 through col. 9, line 13) and of receiving a control signal from said video source (i.e., a microprocessor 202 of Fig. 2 of the monitor receives signals from the graphics controller located within a personal computer, and the microprocessor sends monitor identifying information to the graphics controller upon receiving a certain number of signals from the graphics controller. See col. 8, lines 25-29 and col. 8, line 40 through col. 9, line 13. Therefore, the communication controller is capable of bi-directional communication with said display unit and said computer.); and

- a processor (i.e., I/O device 108 of Processor 106 in Fig. 1) adapted to control said displayed image on said display unit by using said control signal received by said communication controller (i.e., The control signals sent from the computer are received by said I/O device, and said I/O device must communicate said received control signals to control CRT sweeping. See col. 5, lines 41-57).

Furthermore, the preamble language "inputted from an externally connected video source" and the claiming language "sent by said externally connected video source" do not affirmatively limit the scope of this claim because they do not require the structure of the claimed apparatus to include the external video source, and should not be given weight in determining patentability[2].

*Referring to claim 28,* Schmidt teaches that
- said video source (i.e., Computer system in Fig. 2) is a computer (See Fig. 2 and col. 1, lines 14-18 and 24-28).

*Referring to claim 29,* Schmidt teaches that
- the identification number (i.e., a plurality of bits used to uniquely identify the video display monitor type; See col. 11, TABLE 2 and lines 23-27 and 31-37) provides at least a unique identification of the type of said display unit (See col. 1, lines 8-14, col. 4, lines 32-38, and col. 8, lines 59-64).

**Re. Ground #2: Schmidt in view of Takahashi**

12.    Claims 24 and 28/24 are rejected under pre-AIA 35 U.S.C. § 103(a) as being

---

[2] See Board decisions – Appeal Number 2011-002708 (Decision dated 3/21/11 at pages 3-4), Appeal Number 2011-006035 (Decision dated 7/11/11 at pages 4-5), and Appeal Number 2011-006440 (Decision dated 7/11/11 at pages 3-4).

unpatentable over Schmidt [US 5,285,197 A] as applied to claims 17-20, 23, 28/14-20, 28/23, 29/14, 29/17, and 29/23 above, and further in view of Takahashi [JP 4037787].

   *Referring to claim 24,* Schmidt discloses all the limitations of the claim 24 except that does not teach that at least one of color and size of said image displayed on said display unit is changed by using said control signal.

   Takahashi discloses a display device equipped with a color CRT (See Abstract), wherein

- at least one of color and size of an image displayed on a display unit is changed by using a control signal (i.e., parameters including "screen size, brightness, hue, focus, contrast, and that like" can be adjusted by forwarding control signals from a video source such as a computer; See pages 766-767).

   It would have been obvious to one of ordinary skill in the art at the time the invention was made to have applied said method of adjusting the size and color of a displayed image, as disclosed by Takahashi, to said displayed image on a display unit (i.e., Display monitor), as disclosed by Schmidt, for the advantage of providing a digital image adjustment and display device that enables automated adjustment of the screen size, brightness, hue, focus, contrast and so on of an image to be performed easily (See Takahashi, page 766, left and top paragraph).


   *Referring to claim 28,* Schmidt teaches that

- said video source is a computer (See Fig. 2, col. 1, lines 14-18 and 24-28).

### Re. Ground #3: Sony DDM Monitor Interface in view of Moriconi

13.   Claims 23, 24, 28/23, 28/24, and 29/23 are rejected under pre-AIA 35 U.S.C. § 103(a) as being unpatentable over Sony DDM Monitor Interface in view of Moriconi [US 5,262,759 A].

   *Referring to claim 23,* Sony DDM Monitor Interface discloses a display unit (i.e., 2K x 2K color monitor) for displaying an image based on video signals inputted from an externally connected video source (i.e., external host computer; See page 1 and Block Diagram), comprising:

- a video circuit (i.e., means for performing all alignment and display adjustment functions) adapted to display an image based on the video signals sent by said externally connected video source (See page 1);
- a memory (i.e., EEPROM memory of Interface Block Diagram at page 1) in which at least display unit information (e.g., display parameters) is stored (See pages 1-5);

- a communication controller (i.e., means for controlling communication on CPU) capable of bi-directionally communicating with said video source (i.e., communicating with said external host computer over standard RS-422A interface; See pages 3-5), said communication controller being capable of receiving a control signal from said video source (See pages 3-12; in fact, said CPU receives control signals from said external host computer); and

- a processor (i.e., means for controlling function of monitor on said CPU; See page 1) adapted to control said displayed image on said display unit by using said control signal received by said communication controller (i.e., said means for controlling function of monitor on said CPU adjusts various features of said monitor display including contrast, brightness, color, focus, size, and alignment; See pages 3-12).

Sony DDM Monitor Interface does not expressly teach said display unit information including an identification number for identifying at least a type of said display unit, wherein said communication controller being capable of sending said display unit information stored in said memory to said video source.

Moriconi discloses a display unit (i.e., removable display unit 13 of Fig. 1), wherein

- a memory (i.e., EEPROM 51 of Fig. 4) which stores an identification number for identifying at least a type of said display unit (i.e., unique identity code for specific type of module; See col. 5, lines 21-29); and

- a communication controller (i.e., means for controlling serial I/O to said EEPROM - See SDE, SD1, and SD2 in Fig. 5) which sends said identification number stored in said memory to a video source (i.e., Notebook computer queries the identification information within said EEPROM; See col. 5, lines 24-27), and receives a control signal (i.e., video operating signal) from said video source (i.e., Notebook computer; in fact, said unique identity code stored in said EEPROM is communicated to the display circuitry 41 via the connector 39 in Fig. 4, and the computer system configures itself with the compatible display driver routine to provide correct operating signals. Thus, the video signals provided by the computer and based on the display module's identification code are "signals generated based on the display unit information"; See col. 4, lines 51-68 and col. 5, lines 20-40).

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have stored said identification number, as disclosed by Moriconi, in said memory

(i.e., EEPROM memory), as disclosed by Sony DDM Monitor Interface, so as to make said computer recognize that a display unit is capable of communicating with said computer (i.e., querying the identification information within said EEPROM) for the advantage of loading the correct routine to operate that computer (i.e., module; See Moriconi, col. 5, lines 25-26).

*Referring to claim 24,* Sony DDM Monitor Interface teaches that

- at least one of color and size of said image displayed on said display unit is changed by using said control signal (See pages 3-12; in fact, said CPU receives control signals from said external host computer to adjust various features of said monitor display including contrast, brightness, color, focus, size, and alignment).

*Referring to claim 28,* Sony DDM Monitor Interface teaches that

- said video source is a computer (i.e., external host computer; See page 1 and Block Diagram).

*Referring to claim 29,* Moriconi teaches that

- the identification number (i.e., unique identity code for specific type of module; See col. 5, lines 21-29) provides at least a unique identification of the type of said display unit (in fact, said unique identity code stored in EEPROM 51 is communicated to the display circuitry 41 via the connector 39 in Fig. 4, and the computer system configures itself with the compatible display driver routine to provide correct operating signals. Thus, said unique identity code provides a unique identification of the type of display module to be used for displaying; See col. 4, lines 51-68 and col. 5, lines 20-40).

### *Response to Arguments/Remarks*

14. The Patent Owner's arguments filed on May 11, 2015 have been fully considered.

**Issue 1:** *Whether the preamble language "...inputted from an externally connected video source" affirmatively limits the scope of the claims 14, 17, and 23 (See the Response at pages 2-3, footnote).*

The Patent Owner disputes the Examiner's decision that the preamble "...inputted from an externally connected video source" does not affirmatively limit the scope of the claim because the preamble language provides antecedent basis for the "sent by said externally

connected video source" and "computer" language recited in the body that is used to describe the required configuration and functional capabilities of the claimed display unit.

⁵

However, the referenced "externally connected video source" is neither a structural element nor a part of the claimed apparatus "display unit," and the claiming language of the independent claims 14, 17, and 23 shows that the claimed apparatus "display unit" is not intended to include any separate video source.

Therefore, it should not be given weight in determining patentability of the claimed apparatus "display unit," and the Patent Owner's dispute on this point is not persuasive.

¹⁰ **Issue 2:**       *Whether claims 14-20, 23, 28/14-20, 28/23, 29/14, 29/17, and 29/23 should be confirmed over Schmidt (See the Response at pages 2-19).*

*In response to the Patent Owner's argument with respect to* "Schmidt does not store 'an identification number for identifying at least a type of display unit'" in the Response page 2, line 6 through page 10, line 5, the Examiner respectfully disagrees.

¹⁵

Essentially, the Patent Owner asserts that the term "type" in the claims should refer to the display technology used by the display unit because the prior arts of record Moriconi and Schmidt explain the meaning of display "type" is the display technology used in the display unit, i.e., CRT, flat panel, monochrome or color, etc.

However, the Patent Owner fails to bring any definition of the term "type" from the specification including the claiming context of the '180 Patent. Furthermore, the word "type" in the claim is not given its ordinary and customary meaning as understood by a person of ordinary skill in the art in question at the time of the invention.

²⁰

The Examiner assures that the ordinary and customary meaning of the term "type" could be <u>a particular kind or group of display unit</u> according to the dictionary definition[3]. It is not necessary for a person of ordinary skill in the art in question at the time of the invention to narrowly limit the meaning of the term "type" such as only the display technology (e.g., CRT, flat panel, monochrome or color, etc.), because the claiming words undefined in a specification should be generally given their ordinary and customary meaning (See MPEP § 2111.01 III. <u>"Plain Meaning" refers to the ordinary and customary meaning given to the term by those of ordinary skill in the art</u>). *In re Phillips v. AWH Corp.*, 415 F.3d 1303, 1316, 75 USPQ2d 1321, 1329 (Fed. Cir. 2005)

²⁵

³⁰

---

[3] Merriam-Webster's Collegiate® Dictionary (10th ed.)

Application/Control Number: 90/013,237+'390                                    Page 21
Art Unit: 3992                                                    *Ex Parte* REX Final Office Action

As shown in the above claim rejection, Schmidt clearly teaches the claimed subject matter "memory" (i.e., Memory 112 of Fig. 1), which stores at least display unit information (i.e., a plurality of bits used to uniquely identify the video display monitor type; See Schmidt, col. 8, lines 59-62) including an identification number (i.e., binary number of said plurality of bits) for identifying at least a type of a display unit and characteristic information of said display unit (i.e., said binary number identifies the display monitor with parameter response mode information, features, video rate, and horizontal/vertical sync information; See Schmidt, col. 11, TABLE 2 and lines 13-52).

Therefore, the Patent Owner's argument on this point is not persuasive.

*In response to the Patent Owner's argument with respect to* "Schmidt does not disclose 'communicating display unit information other than said characteristics information'" in the Response page 10, line 6 through page 11, line 14, the Examiner agrees.

Schmidt discloses a communication controller (i.e., CPU 110 of Processor 106 in Fig. 1) capable of bi-directionally communicating with said video source (See Schmidt, col. 8, lines 25-29 and col. 8, line 8 through col. 9, line 13) wherein said communication controller (i.e., said CPU of the Processor) is capable of communicating display unit information to said video source (i.e., said CPU enters PRM mode and sends monitor identifying information (e.g., parameter response mode information, features, video rate, and horizontal/vertical sync information) to the graphics controller; See Schmidt, col. 8, line 40 through col. 9, line 13).

However, Schmidt is silent upon whether said communicated display unit information does not include characteristic information stored in the memory.

Therefore, the rejections of the claims 14-16 over Schmidt alone have been **withdrawn**.

*In response to the Patent Owner's argument with respect to* "Schmidt does not disclose 'a communication controller'" in the Response page 11, line 15 through page 14, line 21, the Examiner respectfully disagrees.

The Patent Owner particularly asserts that a "communication controller" recited in the claim should perform at least basic controlling functions to control the flow of messages between the display unit and the computer. In other words, the Patent Owner alleges that the claimed subject matter "communication controller" must at least perform the basic function of determining the intended destination device, and argues that Schmidt does not teach it.

However, it is noted that the features upon which the Patent Owner relies (i.e., a communication controller must at least perform the basic function of determining the intended destination device) are not recited in the rejected claims. Although the claims are interpreted in light of the specification, limitations from the specification are not read into the claims. See *In re*

5  *Van Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993).

In fact, the exemplary claim 17 recites "a communication controller capable of bi-directionally communicating with said video source," and Schmidt shows a CPU 110 of Processor 106 in Fig. 1 (i.e., communication controller) that is capable of bi-directionally communicating with a Computer system in Fig. 2 (i.e., video source; See Schmidt, col. 8, lines

10  25-29 and col. 8, line 8 through col. 9, line 13).

Therefore, the Patent Owner's argument on this point is not persuasive.

*In response to the Patent Owner's argument with respect to* "Schmidt does not disclose 'receiving a control signal from said video source'" in the Response page 15, line 1 through

15  page 16, line 8, the Examiner respectfully disagrees.

The Patent Owner essentially asserts that a "communication controller" recited in the claims 23, 28/23, and 29/23 should be capable of receiving a control signal from a video source, wherein the control signal is used to adjust or control the image being displayed on the monitor in view of the disclosure in the specification of the '180 Patent, and argues that Schmidt does

20  not teach it.

However, it is noted that the features upon which Patent Owner relies (i.e., the control signal is used to adjust or control the image being displayed on the monitor) are not recited in the rejected claims 23, 28/23, and 29/23. Although the claims are interpreted in light of the specification, limitations from the specification are not read into the claims. See *In re Van*

25  *Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993).

In fact, the exemplary claim 23 recites "a communication controller capable of bi-directionally communicating with said video source, said communication controller being capable of receiving a control signal from said video source," and Schmidt shows a CPU 110 of Processor 106 in Fig. 1 (i.e., communication controller) that is capable of bi-directionally

30  communicating with a Computer system in Fig. 2 (i.e., video source; See Schmidt, col. 8, lines 25-29 and col. 8, line 8 through col. 9, line 13), said CPU of the Processor (i.e., said communication controller) being capable of receiving a control signal from said Computer

system (i.e., video source; a microprocessor 202 of Fig. 2 of the monitor receives signals from the graphics controller located within a personal computer, and the microprocessor sends monitor identifying information to the graphics controller upon receiving a certain number of signals from the graphics controller. See Schmidt, col. 8, lines 25-29 and col. 8, line 40 through
5    col. 9, line 13).

Therefore, the Patent Owner's argument on this point is not persuasive.

*In response to the Patent Owner's argument with respect to* "Schmidt does not disclose 'a processor adapted to control said display image'" in the Response page 16, line 9 through
10    page 19, line 12, the Examiner respectfully disagrees.

The Patent Owner stresses that the claims of the '180 Patent have expired. Thus, the Patent Owner alleges that the claiming language "control" exercised by the claimed subject matter "processor" of claims 23, 28/23, and 29/23 involves receiving and applying control instructions from a computer to control display image parameters such as brightness, contrast,
15    and positions, as opposed to processing of the video signal itself, and argues that Schmidt does not teach it.

Fundamentally, in a reexamination proceeding involving claims of an expired patent, claim construction pursuant to the principle set forth by the court in (words of a claim "are generally given their ordinary and customary meaning" as understood by a person of ordinary
20    skill in the art in question at the time of the invention) should be applied since the expired claim are not subject to amendment. See *Ex parte Papst-Motoren*, 1 USPQ2d 1655 (Bd. Pat. App. & Inter. 1986) However, this court authority never makes the Examiner allow that limitations from the specification can be read into the claims. See *In re Van Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993).

25    In this case, although the claiming language "control" exercised by the "processor" could be given its ordinary and customary meaning "to direct the action or function of (display unit)" or "to cause (display unit) to act or function in a certain way," the limitations from the specification "receiving and applying control instructions from a computer to control display image such as brightness, contrast, and positions, as opposed to processing of the video signal itself" cannot
30    be read into the claims 23, 28/23, and 29/23.

Actually, the exemplary claim 23 recites "a processor adapted to control said displayed image on said display unit by using said control signal received by said communication

Application/Control Number: 90/013,237+'390                                   Page 24

Art Unit: 3992                                                *Ex Parte* REX Final Office Action

controller," and Schmidt discloses an I/O device 108 of Processor 106 in Fig. 1 (i.e., processor)

adapted to control displayed image on a display unit by using control signal received by a

communication controller (i.e., The control signals sent from the computer are received by said

I/O device, and said I/O device must communicate said received control signals to control CRT

5      sweeping. See Schmidt, col. 5, lines 41-57).

       Therefore, the Patent Owner's argument on this point is not persuasive.


**Issue 3:**      *Whether claims 24 and 28/24 should be confirmed over Schmidt in view of*

*Takahashi (See the Response at pages 19-22).*

10           *In response to the Patent Owner's argument with respect to* "neither Schmidt nor

Takahashi discloses the claimed 'communication controller'" in the Response page 20, lines 4-

19, the Examiner respectfully disagrees.

       Contrary to the Patent Owner's argument, Schmidt discloses the claimed subject matter

"communication controller" such that a communication controller (i.e., CPU 110 of Processor

15     106 in Fig. 1) capable of bi-directionally communicating with said video source (See Schmidt,

col. 8, lines 25-29 and col. 8, line 8 through col. 9, line 13).

       Although the Patent Owner alleges that the claimed subject matter "communication

controller" must at least perform the basic function of determining the intended destination

device, it is noted that the features upon which Patent Owner relies *supra* are not recited in the

20     rejected claims.  Although the claims are interpreted in light of the specification, limitations from

the specification are not read into the claims.  See *In re Van Geuns*, 988 F.2d 1181, 26

USPQ2d 1057 (Fed. Cir. 1993).

       Therefore, the Patent Owner's argument on this point is not persuasive.


25           *In response to the Patent Owner's argument with respect to* "neither Schmidt nor

Takahashi discloses an identification number for identifying at least a type of said display unit" in

the Response page 20, line 20 through page 21, line 3, the Examiner respectfully disagrees.

       Contrary to the Patent Owner's argument, Schmidt discloses the claimed subject matter

"an identification number" such that an identification number (i.e., said plurality of bits used to

30     uniquely identify the video display monitor type) for identifying at least a type of said display unit

(i.e., Table 2 illustrates an exemplary byte sequence sent by the monitor to identify monitor type.

Bit 7 of byte 0 uniquely identifies whether the monitor supports the Parameter Response Mode

for enhanced resolution, and Byte 2 provides a list of features provided by the monitor; See Schmidt, col. 1, lines 8-14, col. 8, lines 39-43 and 59-64, and col. 11, TABLE 2 and lines 23-27 and 31-37).

5       Although the Patent Owner alleges that Takahashi does not disclose any memory at all, the primary reference Schmidt clearly discloses the claimed subject matter "memory" such that a memory (i.e., Memory 112 of Fig. 1) in which at least display unit information (i.e., a plurality of bits) is stored (See Schmidt, col. 4, lines 32-38).

      Therefore, the Patent Owner's argument on this point is not persuasive.

10       *In response to the Patent Owner's argument with respect to* "there was no reason or motivation to combine Schmidt and Takahashi" in the Response page 21, line 4 through page 22, line 2, the Examiner respectfully disagrees.

      The Patent Owner states that the "problem" of Schmidt is "ensuring signal compatibility between a display and a computer," and the "problem" of Takahashi is "adjusting the

15 parameters (e.g., brightness, color) of a displayed picture." Thus, the Patent Owner essentially argues that Schmidt and Takahashi are directed to fundamentally different problems.

      However, the Patent Owner does not explain sufficiently how the "problem" of Schmidt of ensuring signal compatibility between a display and a computer differs materially from the "problem" of Takahashi of adjusting the parameters (e.g., brightness, color) of a displayed

20 picture. On the contrary, the problems of Schmidt and Takahashi to be solved are not materially different each other in light of controlling a displayed image by way of communicating between a display unit and an external video source.

      Furthermore, It would have been obvious to one of ordinary skill in the art at the time the invention was made to have applied said method of adjusting the size and color of a displayed

25 image, as disclosed by Takahashi, to said displayed image on a display unit (i.e., Display monitor), as disclosed by Schmidt, for the advantage of providing a digital image adjustment and display device that enables automated adjustment of the screen size, brightness, hue, focus, contrast and so on of an image to be performed easily (See Takahashi, page 766, left and top paragraph).

30       Therefore, the Patent Owner's argument on this point is not persuasive.

**Issue 4:**      *Whether claims 24 and 28/24 should be confirmed over Schmidt in view of*

*Satoru (See the Response at pages 22-23).*

The Examiner has reconsidered *de novo* the claims 24 and 28/24 rejections under pre-AIA 35 U.S.C. § 103(a) as being unpatentable over Schmidt in view of Satoru, and determined that the reference of record Satoru cannot be a pertinent prior art for the instant case because [5] the publishing date of Satoru (EP 0 498 995 B1) is October 9, 1997, which is later than the effective filing date of the patent under reexamination '180 Patent.

Therefore, the rejections of the claims 24 and 28/24 over Schmidt in view of Satoru have been **withdrawn**.

[10] **Issue 5:**          *Whether claims 23-24, 28/23-24, and 29/23 should be confirmed over Sony DDM Manual in view Moriconi (See the Response at pages 23-30).*

*In response to the Patent Owner's argument with respect to* "the Office action fails to make out a *prima facie* case that Sony DDM Manual is a printed publication" in the Response page 24, line 1 through page 27, line 11, the Examiner respectfully disagrees.

[15]     .          Essentially, the Patent Owner alleges that the reference "Sony DDM Monitor Interface" is not a pertinent prior art in the instant reexamination proceeding because there is no evidence that (i) the reference "Sony DDM Monitor Interface" was disseminated outside Sony Corporation prior to the priority date; (ii) the reference "Sony DDM Monitor Interface" was publicly accessible to individuals outside Sony Corporation prior to the priority date; (iii) individuals of ordinary skill [20] in the art outside Sony Corporation would have known of the availability of the reference "Sony DDM Monitor Interface"; and (iv) individuals of ordinary skill in the art outside Sony Corporation would have been able to attain a copy of the reference "Sony DDM Monitor Interface" prior to the priority date.

A product interface manual is a form of technical writing with the purpose of targeting [25] specific persons interested and ordinarily skilled in the subject matter or art, and typically focusing on the description of how to do something.  In this particular case, the reference "Sony DDM Monitor Interface" in the record is a Sony DDM 2801C monitor interface manual, which is dated on December 1989 and is a technical writing with the purpose of targeting specific persons interested and ordinarily skilled in the subject matter of interfacing the Sony DDM [30] 2801C monitor, and focusing on the description of an interfacing protocol and alignment functions for the Sony DDM 2801C monitor.

      First, the reference "Sony DDM Monitor Interface" has a date description "Printed in Japan © 1989.12" on the cover page, which is usually understood by one of the ordinary skill in the art as a date of releasing the manual.  Thus, the releasing date of the manual "Sony DDM Monitor Interface" is prior to the effective filing date of the '180 Patent.

5      Second, the Examiner needs not to prove someone actually looked at the manual "Sony DDM Monitor Interface" when the publication of the manual "Sony DDM Monitor Interface" was accessible to the public.  In general, a reference is proven to be a "printed publication" upon a satisfactory showing that such document has been made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can

10   locate it. *In re Wyer,* 655 F.2d 221, 210 USPQ 790 (CCPA 1981)

Even though the Patent Owner doubts the date "1989.12" on the cover page of Sony DDM Monitor Interface as if it may merely reflect the date of a printing date, the Examiner needs not to prove someone actually looked at the Sony DDM Monitor Interface when the publication of the reference "Sony DDM Monitor Interface" was accessible to the public

15     Third, the reference "Sony DDM Monitor Interface" is not an internal company document with any mark of "draft version," but a published manual for product interface released prior to the effective filing date of the '180 Patent in accordance with the cited reference "the declaration of David Lesh"[4] in the IDS filed on 9th of March 2010.  In other words, the manual "Sony DDM Monitor Interface" was made available to the extent that persons interested and ordinarily skilled

20   in the subject matter, exercising reasonable diligence, could locate it.

      In fact, "the Sony DDM Monitor Interface" is a **reference manual** to be used by the user, who is interfacing the Sony product "Sony DDM Monitor" with other device (e.g., computer system).  The public users of the Sony product "Sony DDM Monitor" could interface with their own systems using this "Sony DDM Monitor Interface" reference manual published by the Sony

25   Corporation.

      Therefore, one of ordinary skill in the art easily understands that the Sony DDM Manual was underline{publicly distributed by Sony Corporation} for supporting its Sony DDM Monitor user.  Moreover, the Patent Owner still fails to show any evidence that the Sony DDM Manual was only distributed internally within Sony Corporation, which was intended to remain confidential in

30   company with an existing policy of confidentiality or agreement to remain confidential within

---

[4] This declaration was executed by the declarant David Lesh on 10th of December 2009 during the *ex parte* reexamination 90/010,777 prosecution.

Sony Corporation. This is not a shift of the burden to the Patent Owner of establishing a *prima facie* basis for denying patentability, but shows a lack of evidence to support the Patent Owner's position such that the Sony DDM Manual was only distributed internally within Sony Corporation in accordance with an existing policy of confidentiality or agreement to remain confidential within
⁵ Sony Corporation.

Although the Patent Owner asserts that Mr. David Lesh testified in his deposition that the designation on the face of the document was, in effect, a confidentiality notice and showed that Sony intended to maintain the confidentiality of Sony DDM Manual (See Exhibit B filed on 11th of May 2015), this was not only the personal opinion regarding the Sony DDM Manual, but also the
¹⁰ court proceedings given due consideration.

Fourth, the Sony DDM Monitor Interface is not an internal company document, but a product interface manual published to the specific persons, who are interested and ordinarily skilled in the subject matter or art.

Basically, documents and items only distributed internally within an organization, which
¹⁵ are intended to remain confidential, are not "printed publications" no matter how many copies are distributed. However, mere intent to remain confidential without an existing policy of confidentiality or agreement to remain confidential within the organization is insufficient (See MPEP § 2128.01(III)).

In this particular case, the Patent Owner fails to show any evidence that the Sony DDM Monitor
²⁰ Interface reference was only distributed internally within Sony Corporation, which was intended to remain confidential in company with an existing policy of confidentiality or agreement to remain confidential within Sony Corporation.

Furthermore, (i) the Notice on the cover page regarding the information being the property of Sony Corporation is not showing any confidentiality of the Sony DDM Monitor
²⁵ Interface reference, but the limited right of using the information, which is the intellectual property of Sony Corporation; (ii) said Notice regarding the prohibition of duplicating any portion of the manual or using thereof beyond the limited right of using the information without the express written permission of Sony Corporation is not showing any confidentiality of the Sony DDM Monitor Interface reference, but a general protection of the copyright reserved for the
³⁰ Sony DDM Monitor Interface reference; and (iii) the referred deposition of Mr. David Lesh is not only the personal opinion regarding the Sony DDM Monitor Interface reference, but also the court proceedings given due consideration.

Therefore, the Patent Owner's argument on this point is not persuasive.

*In response to the Patent Owner's arguments with respect to* "there was no reason or motivation to combine Sony DDM Manual and Moriconi" in the Response page 27, line 12 through page 30, line 10, the Examiner respectfully disagrees.

First, the Patent Owner argues that there is no motivation to combine Sony DDM Monitor Interface with Moriconi due to the different problems being addressed, such that the signal compatibility feature with the video source of Moriconi is very different from the internal alignment system of Sony DDM Monitor Interface.

However, the Examiner recognizes that obviousness may be established by combining or modifying the teachings of the prior art to produce the claimed invention where there is some teaching, suggestion, or motivation to do so found either in the references themselves or in the knowledge generally available to one of ordinary skill in the art. See *In re Fine*, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988), *In re Jones*, 958 F.2d 347, 21 USPQ2d 1941 (Fed. Cir. 1992), and *KSR International Co. v. Teleflex, Inc.*, 550 U.S. 398, 82 USPQ2d 1385 (2007). In this case, even though the Patent Owner provides a particular reason of undesirable combination of Sony DDM Monitor Interface with Moriconi, the Examiner had established a *prima facie* case of obviousness of the rejected claims of the '180 Patent by combining the teachings of the prior arts Sony DDM Monitor Interface and Moriconi with desirable rationale of doing so found in the respective references Sony DDM Monitor Interface and Moriconi themselves in order to produce the claimed invention. The Examiner notes that the test for obviousness is not whether the features of a secondary reference Moriconi may be bodily incorporated into the structure of the primary reference Sony DDM Monitor Interface; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981).

Second, the Patent Owner further argues that there is no motivation to combine Sony DDM Monitor Interface with Moriconi because the Sony DDM-2801C disclosed in the primary reference Sony DDM Monitor Interface has a dedicated hardware interface, which does not need to send an identity code to the computer so that the computer could locate an appropriate driver to generate compatible video signals in Moriconi.

However, it is not true that there is any dedicated hardware interface between the Sony DDM-2801C and the external host computer for the monitor alignment, which is cited in the

claim rejection. In fact, a general purpose serial interface RS-422A is used for externally aligning the Sony DDM-2801C using the host computer, which can save the monitor's alignment data on its disk. Thus, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have stored the identification number of the particular monitor, as

[5] disclosed by Moriconi, in the memory (i.e., EEPROM memory), as disclosed by Sony DDM Monitor Interface, so as to make the external host computer recognize the coupled monitor (i.e., display unit) with the external host computer (i.e., querying the identification information within said EEPROM) for the advantage of uploading the correct alignment data saved in the host computer (i.e., correct routine to operate that module; See Moriconi, col. 5, lines 25-26).

[10]     Third, the Patent Owner argues that the identity code of Moriconi for identifying the "type" of display monitor is not necessary for the Sony DDM Monitor Interface because the Sony DDM system is preconfigured for use with color CRT-type. In other words, the Sony DDM system does not need to ask the type of monitor, i.e., monochrome, passive color, etc., such as Moriconi does. Thus, there is no motivation to combine Sony DDM Monitor Interface with

[15] Moriconi.

     Although the Sony DDM system of the Sony DDM Monitor Interface is preconfigured for use with color CRT-type, *arguendo*, the combination of the monitor of Sony DDM Monitor Interface and the identity code of Moriconi would be able to make the monitor of Sony DDM system upload the correct alignment data saved in the host computer using the identity code

[20] (i.e., correct routine to operate that module; See Moriconi, col. 5, lines 25-26).

     Therefore, the Patent Owner's arguments on these points are not persuasive.

**Issue 6:**     *Whether objective evidence of commercial success weighs in favor of the claims being non-obvious (See the Response at pages 30-34).*

[25]     The Patent Owner asserts that the declarations of Joseph Lamm and Michael Spiro establish secondary consideration of commercial success. The Examiner respectfully disagrees.

     The Patent Owner states that Joseph Lamm explains that one or more the technical standards promulgated by VESA have incorporated the inventions claimed in the '180 Patent.

[30] However, there is no hard evidence of said asserted incorporation.

     Even though the Patent Owner states that Joseph Lamm describes that the vast majority of computer monitors practices the VESA EDID and DDC/CI standards, the declarant Joseph Lamm fails to show any nexus between the claimed invention of the '180 Patent and the VESA

EDID and DDC/CI standards. In fact, those exemplified compliances with the VESA EDID and DDC/CI standards is not related with the Patentee's commercial success at all because of no nexus between the claimed invention of the '180 Patent and the VESA EDID and DDC/CI standards. In other words, there is not any hard evidence of incorporating the claimed invention of the '180 Patent into the VESA EDID and DDC/CI standards.

In addition, contrary to the Patent Owner's assertion, the declaration of Michael B. Spiro is insufficient to overcome the rejection of claims subject to reexamination in this *ex parte* reexamination proceeding (See paragraph 7 of the instant Office action).

The declarant Michael Spiro states the personal knowledge of the licensing of the Patens (including the '180 Patent) since 2003. However, the declaration is insufficient to overcome the claims rejection because the Mondis' licensing of its patent to other companies is insufficient to show nexus between the "merits of the invention and the licenses," and thus does not establish secondary consideration of commercial success.

Therefore, the Patent Owner's argument on this point is not persuasive.


## STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION

15.     The claims 14-16 are confirmed.

16.     The following is an Examiner's statement of reasons for patentability and/or confirmation of the claims found patentable in this reexamination proceeding:

With respect to claims 14-16, the claim limitation recited in the claim 14 is deemed patentable over the prior art of record having raised the substantial new question of patentability as the prior art fails to teach or suggest that said communication controller is capable of communicating said display unit information other then said characteristic information to said video source. The claims 15 and 16 are dependent claims of the claim 14.

Any comments considered necessary by PATENT OWNER regarding the above statement must be submitted promptly to avoid processing delays. Such submission by the patent owner should be labeled: "Comments on Statement of Reasons for Patentability and/or Confirmation" and will be placed in the reexamination file.


### *Conclusion*

17.    **THIS ACTION IS MADE FINAL.**


Paper No. 20150527

Application/Control Number: 90/013,237+'390                                        Page 32
Art Unit: 3992                                                          *Ex Parte* REX Final Office Action

      A shortened statutory period for response to this action is set to expire **TWO (2)** months
from the mailing date of this action

      Extensions of time under 37 CFR § 1.136(a) do not apply in reexamination proceedings.
The provisions of 37 CFR § 1.136 apply only to "an applicant" and not to parties in a
reexamination proceeding.  Further, in 35 U.S.C. § 305 and in 37 CFR § 1.550(a), it is required
that reexamination proceedings "will be conducted with special dispatch within the Office."

      Extensions of time in reexamination proceedings are provided for in 37 CFR § 1.550(c).
A request for extension of time must specify the requested period of extension and it must be
accompanied by the petition fee set forth in 37 CFR § 1.17(g).  Any request for an extension in a
Third Party requested *ex parte* reexamination must be filed on or before the day on which action
by the Patent Owner is due, and the mere filing of a request will not effect any extension of time.
A request for an extension of time in a Third Party requested *ex parte* reexamination will be
granted only for sufficient cause, and for a reasonable time specified. Any request for extension
in a Patent Owner requested *ex parte* reexamination <u>(including reexamination ordered under 35
U.S.C. § 257)</u> for up to two months from the time period set in the Office action must be filed no
later than two months from the expiration of the time period set in the Office action.  A request
for an extension in a Patent Owner requested *ex parte* reexamination for more than two months
from the time period set in the Office action must be filed on or before the day on which action
by the Patent Owner is due, and the mere filing of a request for an extension for more than two
months will not effect the extension. The time for taking action in a Patent Owner requested *ex
parte* reexamination will not be extended for more than two months from the time period set in
the Office action in the absence of sufficient cause or for more than a reasonable time.

      The filing of a timely first response to this final rejection will be construed as including a
request to extend the shortened statutory period for an additional two months.  In no event,
however, will the statutory period for response expire later than SIX MONTHS from the mailing
date of the final action.  See MPEP § 2265.


      **All** correspondence relating to this ex parte reexamination proceeding should be
directed:

By EFS:      Registered users may submit via the electronic filing system EFS-Web, at
              https://efs.uspto.gov/efile/myportal/efs-registered

By Mail to:    Mail Stop *Ex Parte* Reexam

Application/Control Number: 90/013,237+'390

Page 33

Art Unit: 3992

*Ex Parte* REX Final Office Action

Central Reexamination Unit
Commissioner for Patents
United States Patent & Trademark Office
P.O. Box 1450
5  Alexandria, VA 22313-1450

By FAX to:    (571) 273-9900
Central Reexamination Unit

10  By hand:    Customer Service Window
Randolph Building
401 Dulany Street
Alexandria, VA 22314

For EFS-Web transmissions, 37 CFR § 1.8(a)(1)(i) (C) and (ii) states that correspondence
15  (except for a request for reexamination and a corrected or replacement request for
reexamination) will be considered timely filed if (a) it is transmitted via the Office's electronic
filing system in accordance with 37 CFR § 1.6(a)(4), and (b) includes a certificate of
transmission for each piece of correspondence stating the date of transmission, which is prior to
the expiration of the set period of time in the Office action.

20

Any inquiry concerning this communication or earlier communications from the
Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be
directed to the Central Reexamination Unit at telephone number (571) 272-7705.

25  Signed:

*/Christopher E. Lee/*
Christopher E. Lee / Primary Patent Examiner
Patent Reexamination Specialist / Art Unit 3992
Central Reexamination Unit
30

Conferees:

/My Trang Ton/

Primary Examiner, CRU 3992

35  /MICHAEL FUELLING/

Supervisory Patent Examiner, Art Unit 3992

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONDIS TECHNOLOGY LTD., | **Civil Action No. 15-cv-4431 (SRC)(CLW)** |
| Plaintiff, | |
| v. | **ORDER** |
| LG ELECTRONICS, INC. and LG ELECTRONICS U.S.A., INC., | |
| Defendant. | |

**CHESLER**, District Judge

    **WHEREAS** this matter was stayed by the Court on November 12, 2015, pending completion of the PTO patent reexamination process on all asserted patents in suit [Docket Entry 121]; and

    **WHEREAS** it has been reported to the Court that such proceedings have been completed [Docket Entries 131-33],

    **IT IS** on this 21st day of July, 2016,

    **ORDERED** that the stay in this matter is hereby **VACATED**, and the Clerk of Court is hereby directed to reopen the matter.

                     s/Stanley R. Chesler
                     STANLEY R. CHESLER
                     United States District Judge

1

different from the ID number and is sent from the computer to the display.  *See, e.g.*, '180 Patent at 5:67-6:9, 4:58-5:3.  Notably, <u>even if</u> every described embodiment did use the ID number to control the display, these exemplary descriptions of the invention do not limit the claims.  *Phillips*, 415 F.3d at 1323 ("… although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

### iii.    Prosecution History

The prosecution history confirms that the limitation "identification number for identifying at least a type of said display unit" does not require or include LG's proposed functional limitations.   For instance, during the original prosecution of the '180 Patent, the pending claims originally recited "an identification number for identifying said display unit," and, after an interview with the Examiner, these claims were specifically amended by inserting the phrase "at least a type of" after the word "identifying" in order to avoid a prior art reference.  *See* Exh. 13, '180 FH, May 4, 2007 Amendment and Remarks at 6 (claim 40), 11-12.  Thus, the amendment expressly changed the function of the ID number from one that identifies <u>the display unit</u> to one that identifies the <u>type</u> of the display unit.  LG's proposed construction would effectively undo this claim amendment by once again requiring the ID number to identify the display unit itself rather than its type (LG:

30

Liza M. Walsh
Selina M. Ellis
WALSH PIZZI O'REILLY FALANGA LLP
One Riverfront Plaza
1037 Raymond Blvd., Suite 600
Newark, NJ 07102
Telephone: (973) 757-1100
Facsimile: (973) 757-1090

*Attorneys for Defendants
LG Electronics Inc. and
LG Electronics U.S.A., Inc.*

Michael J. McKeon (*pro hac vice*)
Christian A. Chu (*pro hac vice*)
R. Andrew Schwentker (*pro hac vice*)
Jared Hartzman (*pro hac vice*)
Ryan Teel (*pro hac vice*)
FISH & RICHARDSON P.C.
1000 Maine Ave. SW, Suite 1000
Washington, D.C. 20024
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONDIS TECHNOLOGY LTD., <br><br> Plaintiff, <br><br> v. <br><br> LG ELECTRONICS, INC. and LG ELECTRONICS U.S.A., INC., <br><br> Defendants. | Civil Action No.: 15-cv-4431 (SRC)(CLW) <br><br> **NOTICE OF MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICATION** <br><br> *Electronically Filed* |

**PLEASE TAKE NOTICE** that on November 19, 2018, or at a date that the

Court deems appropriate, counsel for Defendants LG Electronics Inc. and LG

Electronics U.S.A., Inc. (collectively, "LG"), shall move before the Honorable

Stanley R. Chesler, U.S.D.J., at the United States District Court, District of New

Jersey, Martin Luther King, Jr. Building & U.S. Courthouse, 50 Walnut Street,

Newark, New Jersey, for an Order granting LG's Motion to Dismiss for Lack of Subject Matter Jurisdiction.

**PLEASE TAKE FURTHER NOTICE** that in support of the within Motion to Dismiss for Lack of Subject Matter Jurisdiction, LG will rely upon the submitted Memorandum and Declaration of Liza M. Walsh with Exhibits attached thereto, and any additional submissions made hereafter.  A proposed Order is also submitted.

Dated: October 25, 2018

*s/ Liza M. Walsh*
Liza M. Walsh
Selina M. Ellis
WALSH PIZZI O'REILLY FALANGA LLP
One Riverfront Plaza
1037 Raymond Blvd., Suite 600
Newark, NJ 07102
Phone: (973) 757-1100
Fax: (973) 757-1090

*Of Counsel:*

Michael J. McKeon (*pro hac vice*)
Christian A. Chu (*pro hac vice*)
R. Andrew Schwentker (*pro hac vice*)
Jared Hartzman (*pro hac vice*)
Ryan Teel (*pro hac vice*)
FISH & RICHARDSON P.C.
1000 Maine Ave. SW, Suite 1000
Washington, D.C. 20024
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

*Attorneys for Defendants*
*LG Electronics Inc. and*
*LG Electronics U.S.A., Inc.*

CONFIDENTIAL MATERIAL REDACTED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

MONDIS TECHNOLOGY LTD.,

Plaintiff,

v.

LG ELECTRONICS, INC. and
LG ELECTRONICS U.S.A., INC.,

Defendants.

Civil Case No.: 2:15-cv-04431 (**SRC**)(CLW)

*Electronically Filed*

**DECLARATION OF JEFFREY S. EDWARDS IN SUPPORT OF MONDIS'**
**OPPOSITION TO LG MOTION TO DISMISS**

I, Jeffrey S. Edwards, declare as follows:

1.    I am an attorney with Dechert LLP, counsel for plaintiff Mondis Technology

Ltd. ("Mondis).  I have knowledge of the following and, if called as a witness, could and would

testify competently to the contents of this declaration.

2.    Attached as Exhibit 1 to this declaration is a true and correct copy of the

Answer, Affirmative Defenses, and Counterclaims of defendants LG Electronics, Inc. and

LG Electronics, USA, Inc. dated April 14, 2008, D.I. 31 in Case No. 2:07-cv-00565 in the

Eastern District of Texas.

3.    Attached as Exhibit 2 to this declaration is a true and correct copy of the

1

CONFIDENTIAL MATERIAL REDACTED

4. Attached as Exhibit 3 to this declaration is a true and correct copy of an email chain dated February 19, 2012, between Takashi Suzuki of Hitachi Ltd. and Joosup Kim of LG.

5. Attached as Exhibit 4 to this declaration is a true and correct copy of an email dated February 21, 2012, from Takashi Suzuki of Hitachi Ltd. to Joosup Kim of LG.

6. Attached as Exhibit 5 to this declaration is a true and correct copy of U.S. Patent No. 7,475,180 B2.

7. Attached as Exhibit 6 to this declaration is a true and correct copy of the

8. Attached as Exhibit 7 to this declaration is a true and correct copy of a

9. Attached as Exhibit 8 to this declaration is a true and correct copy of excerpts of the deposition of Michael Spiro taken by LG in the present litigation on March 29, 2017.

10. Attached as Exhibit 9 to this declaration is a true and correct copy of an email from Michael Spiro to Hitachi dated February 27, 2008.

11. Attached as Exhibit 10 to this declaration is a true and correct copy of a

12. Attached as Exhibit 11 to this declaration is a true and correct copy of a

2

CONFIDENTIAL MATERIAL REDACTED

13.     Attached as Exhibit 12 to this declaration is a true and correct copy of a

14.     Attached as Exhibit 13 to this declaration is a true and correct copy of excerpts of a slide presentation of Innolux dated January 17, 2008, identifying Innolux as an "[a]ffiliate of the Hon Hai Group."

15.     Attached as Exhibit 14 to this declaration is a true and correct copy of an unopposed motion to change case caption dated April 14, 2008, D.I. 168 in Case No. 2:07-cv-00565 in the Eastern District of Texas, reflecting merger of Hon Hai affiliate Innolux Display Corporation with Chi Mei Corporation.

16.     Attached as Exhibit 15 to this declaration is a true and correct copy of a certified patent assignment from Hitachi Ltd. to Mondis Technology Ltd., dated October 30, 2007 and recorded with the PTO on December 7, 2007, listing, among other things, application 10/160,222 that matured into U.S. Pat. No. 7,475,180.

17.     Attached as Exhibit 16 to this declaration is a true and correct copy of a

18.     Attached as Exhibit 17 to this declaration is a true and correct copy of a

3

19.     Attached as Exhibit 18 to this declaration is a true and correct copy of a maintenance fee statement and status sheet for the '180 patent from the Public Pair website of the USPTO.

20.     In the present lawsuit, Mondis produced copies of LG exhibit A to its motion to dismiss, ████████████████████████████████████████ ████████████████████████████████████████ on February 10, 2015. Mondis produced numerous other copies of the agreement under other bates numbers. The document is specifically identified by number on page 13 of exhibit F to LG's motion to dismiss, Mondis' response to interrogatory 3, dated June 15, 2015.

21.     Mondis produced exhibits B-E to LG's motion in April 2015 (Ex. B on 4/30/2015, Exs. C and D 4/3/2014, and Ex. E on 4/14/2015). The documents were within the bates ranges identified on page 13 of exhibit F to LG's motion to dismiss, Mondis' response to interrogatory 3, dated June 15, 2015.

22.     During discussions over the drafting of the joint pretrial order, Mondis proposed stipulated facts relating to its ownership of the '180 patent. LG revised the order to remove those facts, to object to a Mondis request to take judicial notice of the relevant recorded assignments, and to state that LG would file a motion to dismiss for lack of standing. LG did not explain the basis for its motion.

4

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed November 21, 2018, in Philadelphia, PA.

Jeffrey S. Edwards

5



CONFIDENTIAL MATERIAL REDACTED

**Attorneys' Eyes Only**

**MONLG 00224678**



CONFIDENTIAL

MONLG 00647604

CONFIDENTIAL MATERIAL REDACTED

CONFIDENTIAL MATERIAL REDACTED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK

12/12/18
Judge Chesler
Jackie Kashmer, Court Reporter
**Title of Case**
MONDIS TECHNOLOGY LTD
v.
LG ELECTRONICS INC., et al

Docket No. 15-4431

**Appearances**
Martin Black, Esq., Brian Goldberg, Esq., and Jeff Edwards, Esq.,
Selina Ellis, Esq., Christian Chu, Esq., and Ryan Teel, Esq.,


**Nature of Proceedings**-

Hearing on motion to dismiss for lack of jurisdiction (308)
Decision Reserved.
Counsel shall file Amended Complaint adding the appropriate parties as stated on the record.
Ordered trial date set for 3/26/19 at 10:00 a.m. (J5D)
OTBS

11:50 a.m. to 12:20 p.m. 30

s/Theresa C. Trivino, Senior Courtroom Deputy to the Honorable Stanley R. Chesler

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONDIS TECHNOLOGY LTD., HITACHI MAXELL, LTD., n/k/a MAXELL HOLDINGS, LTD., and MAXELL, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> LG ELECTRONICS, INC. and LG ELECTRONICS U.S.A., INC., <br><br> Defendants. | Civil Case No.: 2:15-cv-04431 (SRC)(CLW) <br><br> *Electronically Filed* |

### FIRST AMENDED COMPLAINT

Plaintiffs Mondis Technology Ltd. ("Mondis"), Hitachi Maxell, Ltd. n/k/a Maxell

Holdings, Ltd., and Maxell, Ltd. (collectively "Plaintiffs") for their First Amended Complaint

against Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc. (collectively, "LG" or

"Defendants") hereby allege as follows:

### NATURE OF ACTION

1.      This is a civil action for patent infringement arising under the Patent Laws of the

United States, 35 U.S.C. § 1, *et seq.*

### THE PARTIES

2.      Plaintiff Mondis is a corporation organized under the laws of England, with its

principal place of business at Suite 3C, Lyttelton House, 2 Lyttelton Road, London N2 0EF,

England.

3.     Plaintiff Maxell Holdings, Ltd., formerly Hitachi Maxell, Ltd., is a corporation organized under the laws of Japan, with its principal place of business at 1 Koizumi, Oyamazaki, Oyamazaki-cho, Otokuni-gun, Kyoto, Japan.

4.     Plaintiff Maxell, Ltd. is a corporation organized under the laws of Japan, with a registered place of business at 1 Koizumi, Oyamazaki, Oyamazaki-cho, Otokuni-gun, Kyoto, Japan.

5.     Defendant LG Electronics, Inc. ("LG Korea") is a corporation organized under the laws of Korea with its principal place of business at LG Twin Tower 128, Yeoui-daero, Yeongdeungpo-gu, Seoul, Korea.  LG Korea is in the business of developing, manufacturing, and selling consumer electronics for importation into the United States.  Such devices include, but are not limited to, televisions.

6.     Defendant LG Electronics U.S.A., Inc. ("LG USA") is a company organized under the laws of the state of Delaware with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey.  LG USA is in the business of developing, manufacturing, importing, and selling electronic devices.  Such devices include, but are not limited to, televisions.

## JURISDICTION AND VENUE

7.     This Court has original jurisdiction over the subject matter of this Complaint under 28 U.S.C. § 1338(a) because this action arises under the patent laws of the United States, including 35 U.S.C. § 271, *et seq.*

8.     This Court has personal jurisdiction over LG in this action.  LG knowingly and purposefully availed itself of the protections and benefits of the laws of the United States, the State of New Jersey, and this District.  For example, LG availed itself of this District when it

filed counterclaims against Mondis asserting actions for declaratory judgment of non-infringement, invalidity, and unenforceability of certain of Plaintiff's patents, including the Patent-in-Suit in this action, U.S. Patent No. 7,475,180.

9.      This Court also has personal jurisdiction over LG in this action because LG knowingly and purposefully ships, distributes, offers for sale, and/or sells its products in the United States and this District through an established distribution network, either directly or through intermediaries (including distributors, retailers, and others), subsidiaries, and/or agents. LG has knowingly placed the accused television into the stream of commerce, with the intent and result that they have been distributed and sold in the state of New Jersey and this District. For example, accused LG televisions have been sold to and by Walmart and Best Buy stores located within this District.

10.     This Court also has personal jurisdiction over LG in this action because LG has purposefully and voluntarily operated and currently operates an interactive website that is available to persons in this District which advertises and markets infringing televisions and provides information as to stores located in this District which advertise and offer for sale the accused televisions.  These accused LG televisions have been purchased by consumers in this District.  Upon information and belief, LG has committed the tort of patent infringement in this District and/or has induced others to commit patent infringement in this District.

11.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b), (c), and (d), as well as 28 U.S.C. § 1400(b), in that LG is subject to personal jurisdiction in this District, and therefore is deemed to reside in this District for purposes of venue, and LG has committed acts within this judicial District giving rise to this action and does business in this District, including but not limited to filing judicial actions in this District, distributing and/or offering for sale and/or

selling infringing televisions in this District, providing service and support to their respective

customers in this District, and/or operating an interactive website that is available to persons in

this District which advertises and markets infringing televisions and provides information as to

stores located in this District which advertise and offer for sale infringing televisions.

## THE PATENT-IN-SUIT

12.     On January 6, 2009, United States Patent Number 7,475,180 ("the '180 Patent"),

entitled DISPLAY UNIT WITH COMMUNICATION CONTROLLER AND MEMORY FOR

STORING IDENTIFICATION NUMBER FOR IDENTIFYING DISPLAY UNIT with named

inventors Ikuya Arai and Kouji Kitou, was duly and legally issued by the United States Patent

and Trademark Office from U.S. Patent Application Number 10/160,022, claiming priority

from a foreign application filed on February 10, 1993. A true and correct copy of the '180

Patent is attached as Exhibit A to this Complaint.

13.     Mondis is the assignee and owner of the right, title, and interest in and to the

'180 Patent, including the right to assert all causes of action arising under said patent and the

right to any remedies for infringement of it, including past damages.

14.     Pursuant to a patent, sale, and assignment agreement ("PSALA") dated October

30, 2007: (a) Hitachi, Ltd. ("Hitachi") assigned to Mondis its interest in U.S. Patent Application

No. 10/160,022, which matured into the '180 patent, and (b) Mondis granted a license back to

Hitachi. By agreement dated July 1, 2013, Hitachi Maxell, Ltd. became the Hitachi party under

the PSALA and assumed any and all of Hitachi Ltd.'s rights and interests in the '180 patent. As

of October 1, 2017, Hitachi Maxell, Ltd. completed a reorganization pursuant to which Hitachi

Maxell, Ltd. changed its name to Maxell Holdings, Ltd. and became a holding company with

active operations conducted through subsidiary Maxell, Ltd. Maxell Holdings, Ltd. and Maxell,

Ltd. agree to be bound by the judgment in this case.

## FACTUAL BACKGROUND

### Prior Litigation

15.    On December 31, 2007, Mondis filed a Complaint in the Eastern District of Texas against LG *et al.*, (Case No. 2:07-CV-565) alleging that certain LG computer monitors infringed several U.S. patents in the same family as the '180 patent.

16.    On May 14, 2008, Mondis filed a First Amended Complaint in Case No. 2:07-CV-565, alleging that certain LG computer monitors also infringed U.S. Patent No. 7,089,342.

17.    On March 9, 2009, Mondis filed a Second Amended Complaint in Case No. 2:07-CV-565, alleging that certain LG computer monitors also infringed the '180 patent.

18.    Mondis and LG subsequently reached a settlement with respect to Mondis's claims against LG's computer monitors, and the district court entered an Order of Dismissal on September 17, 2009.  The Order of Dismissal states that: "[a]ll claims and counterclaims in the above-captioned action between the parties are hereby dismissed: (a) with prejudice in relation to all products other than 'Unreleased Products' noted in the parties' Settlement Agreement, and (b) without prejudice in relation to those 'Unreleased Products.'"

19.    To the extent that any of Mondis' claims in Case No. 2:07-CV-565 pertained to infringement of the patents-in-suit by LG televisions, those claims were dismissed without prejudice.

20.    Following the settlement in Case No. 2:07-CV-565, Mondis and LG exchanged periodic communications and engaged in repeated negotiations regarding LG's need to obtain a license from Mondis for its television products.  At no time has Mondis or any other entity granted LG a license to practice any of the patents-in-suit with respect to televisions.

21.     After LG was dismissed from Case No. 2:09-CV-565, the case proceeded against named co-defendants Innolux and Hon Hai. At the conclusion of a jury trial, the jury returned a verdict finding that televisions manufactured, sold, and/or imported by Innolux and Hon Hai infringed at least claim 15 of the '342 patent and claim 14 of the '180 patent. The jury also found these claims to be valid over numerous prior art references and extensive fact and expert testimony introduced by the defendants. The jury also determined that a reasonable royalty rate for televisions was 0.75%.

### Plug-and-Play ("PnP") Functionality

22.     The Video Electronics Standards Association ("VESA") is an industry standards setting organization for monitors and displays that was formed in the late 1980's. VESA has promulgated several standards that relate to LG televisions

23.     More particularly, on June 7, 2004, VESA promulgated a standard for "Plug & Play." The purpose of this standard was to enable a display and an attached video source to readily communicate with one another, wherein the display is able to transmit stored display unit information to the video source. The video source is then able to use this display unit information to generate and send a compatible video signal to the display. This process can take place automatically so that user intervention is not required. The user may simply connect his computer or other video source to the display, and a viewable picture will be displayed without the user having to make numerous manual adjustments. Indeed, this process is normally performed, for example, when a computer running Microsoft Windows or the Apple operating system is started and is connected to a display supporting the Plug-and-Play feature.

24.     To facilitate the foregoing Plug-and-Play functionality, displays supporting this technology include a memory that stores information relating to the display unit. The specific

types and formats of this display unit information are set forth in a VESA standard entitled Enhanced Extended Display Identification Data Standard ("E-EDID"). The EDID information may include data such as a product identification number, product name, a serial number, display type information, information relating to potentially supported functions (*e.g.*, power management or operating modes), as well as characteristic information relating to the video resolutions and signal timings supported by the display unit.

25.     To further facilitate Plug-and-Play functionality, the display unit includes a bi-directional communications channel that enables the video source to request and receive the EDID display unit information from the memory.  This communications channel is described in the VESA Enhanced Display Data Channel Standard ("E-DDC").  The bi-directional communications channel described in the E-DDC standard employs a Philips I2C bus and protocols to enable the video source to read the EDID display unit information from the memory in the display unit.  The display unit further includes an I2C communications controller that manages these bi-directional communications.  The I2C protocol includes the sending of an acknowledgement signal back to the transmitter upon receipt of a message.

26.     Displays, including the accused LG televisions, include an interface for communicating video signals, display unit information, and control signals between the display and a video source.  Such interfaces include, but are not limited to, a VGA (*i.e.*, "RGB," "PC" or "D-SUB") interface.  In the case of a VGA interface, the accused televisions include a memory associated with the VGA interface that stores the EDID data.  Pins 12 and 15 of the VGA interface are used to implement the bi-directional I2C communications channel between the television and the video source that enables the video source to read the EDID data out of the television's memory.

27.     The accused LG televisions further include a video circuit for receiving, processing, displaying, and outputting video signals received over the video interfaces, including the VGA interface.  More particularly, the accused LG televisions include a system-on-a-chip ("SOC") that includes video input circuitry, analog and digital video decoders, scaling circuitry, and output circuitry.  Non-limiting examples of such SOC's include the LG XD Engine LGE2112, LG XD Engine LGE2111, and LG L9.

28.     LG manufactures and then imports, sells, or offers to sell in the United States numerous models of televisions that support the VESA Plug-and-Play functionality and implement the VESA E-EDID, VESA E-DDC, and Philips I2C standards.  LG TV's that provide Plug-and-Play or EDID functionality comprise accused televisions. Non-limiting examples of such accused televisions include: 26LG30, 22LF10, 32LH20, 37LH20, 50PJ350, and 47LM6200.

## COUNT I

### (LG's Infringement of the '180 Patent)

29.     Paragraphs 1 through 28 are incorporated by reference as if fully restated herein.

30.     LG has had knowledge of the '180 patent since January 15, 2009.  Pursuant to 35 U.S.C. § 287(a), LG received actual notice of infringement no later than this date.

31.     LG has directly infringed, either literally or under the doctrine of equivalents, one or more claims of the '180 patent under 35 U.S.C. § 271(a) by importing, selling, and/or offering to sell televisions that support Plug-and-Play functionality in the United States.  LG has also directly infringed by using, testing, operating and/or demonstrating televisions possessing the Plug-and-Play functionality at tradeshows or during the execution of test and repair procedures at service facilities in the United States.

32.     LG has indirectly infringed, either literally or under the doctrine of equivalents, one or more claims of the '180 patent under 35 U.S.C. § 271(b) by inducing users and customers of LG televisions to use the Plug-and-Play functionality in an infringing manner.  For example, LG advertises and identifies to users the Plug-and-Play functionality and provides instructions on how to connect video sources to the television's VGA port, wherein the TV will then use the claimed technology.  In view of the foregoing, LG has possessed specific intent to encourage others, and has in fact encouraged others, to infringe one or more claims of the '180 patent.  The customers and end users have used and practiced the claimed inventions.

33.     On information and belief, LG has also indirectly infringed, either literally or under the doctrine of equivalents, one or more claims of the '180 patent under 35 U.S.C. § 271(b) by inducing third-parties to import, sell, or offer to sell LG televisions that possess Plug-and-Play functionality in the United States.  More particularly, LG has manufactured accused TV's overseas with full knowledge and intent that such TV's will be imported, sold, or offered for sale in the United States.  This intent is demonstrated at least by LG designing and manufacturing the TV's to be compliant with Federal Communication Commission (FCC) requirements, obtaining Underwriters Laboratories (UL) certification for the TV's, making the TV's compatible with ATSC broadcast standards used in the United States, providing written instructions and on-screen displays in English, maintaining a U.S. web site for marketing of the TV's, and by making the TV's compatible with U.S. power requirements.  LG encourages third-parties to import and/or sell the accused TV's in the United States by entering into contractual relationships with them and assisting them with the movement of LG's TV's through distribution channels into and within the United States. Third-parties have, in fact,

imported, sold, and/or offered to sell the accused LG TV's in the United States.  Such third

parties include, by way of example Walmart and Best Buy.

34.     LG has also indirectly infringed, either literally or under the doctrine of

equivalents, one or more claims of the '180 patent under 35 U.S.C. § 271(c) by importing,

selling, and/or offering to sell in the United States televisions that possess Plug-and-Play

wherein there is no substantial non-infringing use for televisions with this feature.  Further,

televisions that include the Plug-and Play feature are not staple items of commerce.  In addition,

LG knew that the TV's with Plug-and-Play were especially made and adapted to use the

claimed inventions of the '180 patent. Customers and end users of the accused LG televisions

have used and practiced the claimed inventions.

35.     LG's infringement has been willful.  LG has been aware of the '180 patent since

no later than January 15, 2009, and LG has engaged in prior litigation with Mondis over this

patent.  Furthermore, LG has previously taken a license to the '180 patent for computer

monitors, wherein computer monitors employ substantially similar Plug-and-Play functionality.

Thus, LG's conduct has been objectively reckless, and LG has possessed subjective specific

intent to infringe the patent.

36.     Mondis has been harmed by LG's infringement and is entitled to recover

damages to compensate for the infringement.  Further, any damages award should be trebled in

view of LG's willful infringement.

## **DEMAND FOR JURY TRIAL**

37.     Mondis hereby demands a trial by jury on all claims and issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment for themselves and against

Defendants as follows:

a)      That this Court issue a judgment that U.S. Patent No. 7,475,180 is valid and

enforceable.

b)      That this Court adjudge that Defendants have infringed U.S. Patent No.

7,475,180.

c)      That this Court ascertain and award Mondis all appropriate damages under 35

U.S.C. § 284 sufficient to compensate Mondis for the Defendants' past infringement, including

interest, costs, and disbursements.

d)      That this Court adjudge Defendants' infringement of U.S. Patent No. 7,475,180

to have been willful and to award treble damages pursuant to 35 U.S.C. § 284.

e)      That this Court finds this case to be exceptional within the meaning of 35 U.S.C.

§ 285 and awards Plaintiffs their reasonable attorneys' fees, costs, and expenses that Plaintiffs

incur in prosecuting this action; and

f)      That this Court awards Plaintiffs any further relief at law or in equity as the

Court deems just and proper.

*DATED:*  January 8, 2019                          Respectfully submitted,


                                     By:  /s/ Brian M. Goldberg

                                          Martin J. Black
                                          Brian M. Goldberg
                                          Jeffrey S. Edwards (pro hac vice)
                                          DECHERT LLP
                                          2929 Arch Street
                                          Philadelphia, PA 19106
                                          Tel.: (215) 994-4000
                                          Fax: (215) 994-2222
                                          martin.black@dechert.com
                                          brian.goldberg@dechert.com
                                          jeffrey.edwards@dechert.com

                                          Jeffrey B. Plies (pro hac vice)
                                          DECHERT LLP
                                          300 W. 6th Street, Suite 2010
                                          Austin, TX 78701
                                          Tel.: (512) 394-3000
                                          Fax: (512) 394-3001
                                          jeff.plies@dechert.com

                                          Attorneys for Plaintiffs Mondis Technology
                                          Ltd., Maxell Holdings, Ltd., and Maxell, Ltd.

Liza M. Walsh
Selina M. Ellis
WALSH PIZZI O'REILLY FALANGA LLP
One Riverfront Plaza
1037 Raymond Blvd., Suite 600
Newark, NJ 07102
Telephone: (973) 757-1100
Facsimile: (973) 757-1090

*Attorneys for Defendants*
*LG Electronics Inc. and*
*LG Electronics U.S.A., Inc.*

Michael J. McKeon (*pro hac vice*)
Christian A. Chu (*pro hac vice*)
R. Andrew Schwentker (*pro hac vice*)
Jared Hartzman (*pro hac vice*)
Ryan Teel (*pro hac vice*)
FISH & RICHARDSON P.C.
1000 Maine Ave. SW, Suite 1000
Washington, D.C. 20024
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONDIS TECHNOLOGY LTD., HITACHI MAXELL, LTD., n/k/a MAXELL HOLDINGS, LTD., and MAXELL, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> LG ELECTRONICS, INC. and LG ELECTRONICS U.S.A., INC., <br><br> Defendants. | Civil Action No.: 15-cv-4431 (SRC)(CLW) <br><br> **NOTICE OF MOTION TO DISMISS FOR (1) FOR LACK OF SUBJECT MATTER JURISDICTION BASED ON LACK OF STANDING; AND (2) FOR NON-COMPLIANCE WITH THE STATUTORY LIMITATION ON DAMAGES** <br><br> *Electronically Filed* |

**PLEASE TAKE NOTICE** that on February 19, 2019, or at a date that the

Court deems appropriate, counsel for Defendants LG Electronics, Inc. and LG

Electronics U.S.A., Inc. (collectively, "LG"), shall move before the Honorable

Stanley R. Chesler, U.S.D.J., at the United States District Court, District of New

Jersey, Martin Luther King, Jr. Building & U.S. Courthouse, 50 Walnut Street,

Newark, New Jersey, for an Order granting LG's Motion to Dismiss for Lack of Subject Matter Jurisdiction.

    **PLEASE TAKE FURTHER NOTICE** that in support of the within Motion to Dismiss, LG will rely upon the submitted Memorandum and Declaration of Liza M. Walsh with Exhibits attached thereto, and any additional submissions made hereafter.  A proposed Order is also submitted.

Dated: January 22, 2019

    *s/ Liza M. Walsh*
Liza M. Walsh
Selina M. Ellis
WALSH PIZZI O'REILLY FALANGA LLP
One Riverfront Plaza
1037 Raymond Blvd., Suite 600
Newark, NJ 07102
Phone: (973) 757-1100
Fax: (973) 757-1090

*Of Counsel:*

Michael J. McKeon (*pro hac vice*)
Christian A. Chu (*pro hac vice*)
R. Andrew Schwentker (*pro hac vice*)
Jared Hartzman (*pro hac vice*)
Ryan Teel (*pro hac vice*)
FISH & RICHARDSON P.C.
1000 Maine Ave. SW, Suite 1000
Washington, D.C. 20024
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

*Attorneys for Defendants*
*LG Electronics Inc. and*
*LG Electronics U.S.A., Inc.*

CONFIDENTIAL MATERIAL REDACTED

### A.    RELEVANT FACTUAL BACKGROUND

In its November 21, 2018 opposition to LG's first motion to dismiss for lack of standing (D.I. 308), Mondis provided a detailed description of the provenance of the '180 patent-in-suit, including its issuance on January 6, 2009, by the Patent Office directly to Mondis as the patentee under 35 U.S.C. § 100(d), and the transfer of the entire Hitachi "DDC" patent portfolio from Hitachi Ltd. to Mondis pursuant to the 2007 Patent Sale, Assignment and License Agreement ("PSALA"). D.I. 318, pp. 2-11, 20-39.  Mondis respectfully requests that the Court consider that prior description, which accurately lays out the agreements and explains why LG's characterizations are inaccurate and misleading.

LG's inaccurate description of the agreements aside, the principal fact that is relevant to LG's current motion is ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████ LG is simply talking out of both sides of its mouth, arguing that standing doctrine both requires (D.I. 309) and forbids (D.I. 380) Hitachi's participation in this case.

### B.    THE RELEVANT HITACHI PARTIES HAVE BEEN JOINED

The amended complaint joined the Hitachi company formerly known as

| **D.I. 1, Complaint, June 21, 2014** | **D.I. 371, First Amended Complaint, January 8, 2019** |
|---|---|
| COUNT IV<br>(LG's Infringement of the '180 Patent)<br><br>66. Mondis has been harmed by LG's infringement and is entitled to recover damages to compensate for the infringement. | COUNT I<br>(LG's Infringement of the '180 Patent)<br><br>36. Mondis has been harmed by LG's infringement and is entitled to recover damages to compensate for the infringement. |
| Prayer for Relief<br><br>c) That this Court ascertain and award Mondis all appropriate damages under 35 U.S.C. § 284 sufficient to compensation Mondis for the Defendants' past infringement, including interest, cost, and disbursements. | Prayer for Relief<br><br>c) That this Court ascertain and award Mondis all appropriate damages under 35 U.S.C. § 284 sufficient to compensate Mondis for the Defendants' part infringement, including interest, costs, and disbursements. |

These operative damages sections are unchanged, as are Mondis' infringement claims, and underlying factual assertions. *Compare* D.I. 1, Count IV, with D.I. 371, Count I; Ex. 2 (redline). As this shows, Hitachi did not assert its own claim for infringement damages in the amended complaint, ████████████████████ ████████████████████████████████████████ ████████████████████ As such, LG's arguments about the relation-back doctrine and 35 U.S.C. § 286 are irrelevant to Hitachi.

### C.  LG CITES NO LAW RESETTING DAMAGES UNDER 35 U.S.C. § 286 UPON THE JOINDER OF A PARTY CURING PRUDENTIAL STANDING

The cases LG cites in its discussion of 35 U.S.C. § 286 do no more than

that Hitachi might be a plaintiff against it (LG Br., p. 26) rings hollow.  Finally,

LG has asserted absolutely no unfair prejudice arising from the joinder of Hitachi

nor could it.  LG has received full discovery into all infringement, validity and

damages issues, and Hitachi's presence does not expand or change the scope of

those issues to be tried beginning on March 26.

LG's assertion that the Plaintiffs could not satisfy Rule 15(c) relation-back

because the failure to name Hitachi as an original plaintiff was intentional and not

a mistake is meritless.  LG Br., p. 27.  While Mondis contends that it has correctly

interpreted the governing agreements and has constitutional and prudential

standing, to the extent the Court ultimately disagrees, that would simply

demonstrate a mistake of law by Mondis.  A legal mistake constitutes a mistake

supporting relation-back under the joinder rules.  *See Advanced Magnetics*, 106

F.3d at 20; *American Bank Note Holographics, Inc. v. The Upper Deck Co.*, No. 92

Civ. 9146 (JGK), 1997 WL 30877, *2 (S.D.N.Y. Jan 27, 1997);  *Godfrey v.*

*Upland Borough,* 246 F. Supp. 3d 1078, 1092 (E.D. Pa. 2017) (holding amended

complaint related back under Rule 15(c) where plaintiff's earlier failure to assert

claim arose from legal mistake).  LG's naked suggestion that ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MONDIS TECHNOLOGY LTD., HITACHI MAXELL, LTD., n/k/a MAXELL HOLDINGS, LTD., and MAXELL, LTD., | Civil Case No.: 2:15-cv-04431 (SRC)(CLW) |
| Plaintiffs, | *Electronically Filed* |
| v. |  |
| LG ELECTRONICS, INC. and LG ELECTRONICS U.S.A., INC., |  |
| Defendants. |  |

### SECOND AMENDED COMPLAINT

Plaintiffs Mondis Technology Ltd. ("Mondis"), Hitachi Maxell, Ltd. n/k/a Maxell

Holdings, Ltd., and Maxell, Ltd. (collectively "Plaintiffs") for their Second Amended

Complaint against Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc.

(collectively, "LG" or "Defendants") hereby allege as follows:

### NATURE OF ACTION

1.      This is a civil action for patent infringement arising under the Patent Laws of the

United States, 35 U.S.C. § 1, *et seq.*

### THE PARTIES

2.      Plaintiff Mondis is a corporation organized under the laws of England, with its

principal place of business at Suite 3C, Lyttelton House, 2 Lyttelton Road, London N2 0EF,

England.

3.     Plaintiff Maxell Holdings, Ltd., formerly Hitachi Maxell, Ltd., is a corporation organized under the laws of Japan, with its principal place of business at 1 Koizumi, Oyamazaki, Oyamazaki-cho, Otokuni-gun, Kyoto, Japan.

4.     Plaintiff Maxell, Ltd. is a corporation organized under the laws of Japan, with a registered place of business at 1 Koizumi, Oyamazaki, Oyamazaki-cho, Otokuni-gun, Kyoto, Japan.

5.     Defendant LG Electronics, Inc. ("LG Korea") is a corporation organized under the laws of Korea with its principal place of business at LG Twin Tower 128, Yeoui-daero, Yeongdeungpo-gu, Seoul, Korea.  LG Korea is in the business of developing, manufacturing, and selling consumer electronics for importation into the United States.  Such devices include, but are not limited to, televisions.

6.     Defendant LG Electronics U.S.A., Inc. ("LG USA") is a company organized under the laws of the state of Delaware with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey.  LG USA is in the business of developing, manufacturing, importing, and selling electronic devices.  Such devices include, but are not limited to, televisions.

## JURISDICTION AND VENUE

7.     This Court has original jurisdiction over the subject matter of this Complaint under 28 U.S.C. § 1338(a) because this action arises under the patent laws of the United States, including 35 U.S.C. § 271, *et seq.*

8.     This Court has personal jurisdiction over LG in this action.  LG knowingly and purposefully availed itself of the protections and benefits of the laws of the United States, the State of New Jersey, and this District.  For example, LG availed itself of this District when it

filed counterclaims against Mondis asserting actions for declaratory judgment of non-infringement, invalidity, and unenforceability of certain of Plaintiff's patents, including the Patent-in-Suit in this action, U.S. Patent No. 7,475,180.

9.      This Court also has personal jurisdiction over LG in this action because LG knowingly and purposefully ships, distributes, offers for sale, and/or sells its products in the United States and this District through an established distribution network, either directly or through intermediaries (including distributors, retailers, and others), subsidiaries, and/or agents. LG has knowingly placed the accused television into the stream of commerce, with the intent and result that they have been distributed and sold in the state of New Jersey and this District. For example, accused LG televisions have been sold to and by Walmart and Best Buy stores located within this District.

10.     This Court also has personal jurisdiction over LG in this action because LG has purposefully and voluntarily operated and currently operates an interactive website that is available to persons in this District which advertises and markets infringing televisions and provides information as to stores located in this District which advertise and offer for sale the accused televisions.  These accused LG televisions have been purchased by consumers in this District.  Upon information and belief, LG has committed the tort of patent infringement in this District and/or has induced others to commit patent infringement in this District.

11.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b), (c), and (d), as well as 28 U.S.C. § 1400(b), in that LG is subject to personal jurisdiction in this District, and therefore is deemed to reside in this District for purposes of venue, and LG has committed acts within this judicial District giving rise to this action and does business in this District, including but not limited to filing judicial actions in this District, distributing and/or offering for sale and/or

selling infringing televisions in this District, providing service and support to their respective customers in this District, and/or operating an interactive website that is available to persons in this District which advertises and markets infringing televisions and provides information as to stores located in this District which advertise and offer for sale infringing televisions.

## THE PATENT-IN-SUIT

12.     On January 6, 2009, United States Patent Number 7,475,180 ("the '180 Patent"), entitled DISPLAY UNIT WITH COMMUNICATION CONTROLLER AND MEMORY FOR STORING IDENTIFICATION NUMBER FOR IDENTIFYING DISPLAY UNIT with named inventors Ikuya Arai and Kouji Kitou, was duly and legally issued by the United States Patent and Trademark Office from U.S. Patent Application Number 10/160,022, claiming priority from a foreign application filed on February 10, 1993.  A true and correct copy of the '180 Patent is attached as Exhibit A to this Complaint.

13.     Mondis is the assignee and owner of the right, title, and interest in and to the '180 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it, including past damages.

14.     Pursuant to a patent, sale, and assignment agreement ("PSALA") dated October 30, 2007: (a) Hitachi, Ltd. ("Hitachi") assigned to Mondis its interest in U.S. Patent Application No. 10/160,022, which matured into the '180 patent, and (b) Mondis granted a license back to Hitachi.  By agreement dated July 1, 2013, Hitachi Maxell, Ltd. became the Hitachi party under the PSALA and assumed any and all of Hitachi Ltd.'s rights and interests in the '180 patent.  As of October 1, 2017, Hitachi Maxell, Ltd. completed a reorganization pursuant to which Hitachi Maxell, Ltd. changed its name to Maxell Holdings, Ltd. and became a holding company with active operations conducted through subsidiary Maxell, Ltd.  Maxell Holdings, Ltd. and Maxell, Ltd. agree to be bound by the judgment in this case.

## FACTUAL BACKGROUND

### Prior Litigation

15.    On December 31, 2007, Mondis filed a Complaint in the Eastern District of Texas against LG *et al.*, (Case No. 2:07-CV-565) alleging that certain LG computer monitors infringed several U.S. patents in the same family as the '180 patent.

16.    On May 14, 2008, Mondis filed a First Amended Complaint in Case No. 2:07-CV-565, alleging that certain LG computer monitors also infringed U.S. Patent No. 7,089,342.

17.    On March 9, 2009, Mondis filed a Second Amended Complaint in Case No. 2:07-CV-565, alleging that certain LG computer monitors also infringed the '180 patent.

18.    Mondis and LG subsequently reached a settlement with respect to Mondis's claims against LG's computer monitors, and the district court entered an Order of Dismissal on September 17, 2009.  The Order of Dismissal states that: "[a]ll claims and counterclaims in the above-captioned action between the parties are hereby dismissed: (a) with prejudice in relation to all products other than 'Unreleased Products' noted in the parties' Settlement Agreement, and (b) without prejudice in relation to those 'Unreleased Products.'"

19.    To the extent that any of Mondis' claims in Case No. 2:07-CV-565 pertained to infringement of the patents-in-suit by LG televisions, those claims were dismissed without prejudice.

20.    Following the settlement in Case No. 2:07-CV-565, Mondis and LG exchanged periodic communications and engaged in repeated negotiations regarding LG's need to obtain a license from Mondis for its television products.  At no time has Mondis or any other entity granted LG a license to practice any of the patents-in-suit with respect to televisions.

21.     After LG was dismissed from Case No. 2:09-CV-565, the case proceeded against named co-defendants Innolux and Hon Hai. At the conclusion of a jury trial, the jury returned a verdict finding that televisions manufactured, sold, and/or imported by Innolux and Hon Hai infringed at least claim 15 of the '342 patent and claim 14 of the '180 patent. The jury also found these claims to be valid over numerous prior art references and extensive fact and expert testimony introduced by the defendants. The jury also determined that a reasonable royalty rate for televisions was 0.75%.

## Plug-and-Play ("PnP") Functionality

22.     The Video Electronics Standards Association ("VESA") is an industry standards setting organization for monitors and displays that was formed in the late 1980's. VESA has promulgated several standards that relate to LG televisions

23.     More particularly, on June 7, 2004, VESA promulgated a standard for "Plug & Play." The purpose of this standard was to enable a display and an attached video source to readily communicate with one another, wherein the display is able to transmit stored display unit information to the video source. The video source is then able to use this display unit information to generate and send a compatible video signal to the display. This process can take place automatically so that user intervention is not required. The user may simply connect his computer or other video source to the display, and a viewable picture will be displayed without the user having to make numerous manual adjustments. Indeed, this process is normally performed, for example, when a computer running Microsoft Windows or the Apple operating system is started and is connected to a display supporting the Plug-and-Play feature.

24.     To facilitate the foregoing Plug-and-Play functionality, displays supporting this technology include a memory that stores information relating to the display unit. The specific

types and formats of this display unit information are set forth in a VESA standard entitled

Enhanced Extended Display Identification Data Standard ("E-EDID"). The EDID information

may include data such as a product identification number, product name, a serial number,

display type information, information relating to potentially supported functions (*e.g.*, power

management or operating modes), as well as characteristic information relating to the video

resolutions and signal timings supported by the display unit.

25.     To further facilitate Plug-and-Play functionality, the display unit includes a bi-

directional communications channel that enables the video source to request and receive the

EDID display unit information from the memory.  This communications channel is described in

the VESA Enhanced Display Data Channel Standard ("E-DDC").  The bi-directional

communications channel described in the E-DDC standard employs a Philips I2C bus and

protocols to enable the video source to read the EDID display unit information from the

memory in the display unit.  The display unit further includes an I2C communications controller

that manages these bi-directional communications.  The I2C protocol includes the sending of an

acknowledgement signal back to the transmitter upon receipt of a message.

26.     Displays, including the accused LG televisions, include an interface for

communicating video signals, display unit information, and control signals between the display

and a video source.  Such interfaces include, but are not limited to, a VGA (*i.e.*, "RGB," "PC"

or "D-SUB") interface.  In the case of a VGA interface, the accused televisions include a

memory associated with the VGA interface that stores the EDID data.  Pins 12 and 15 of the

VGA interface are used to implement the bi-directional I2C communications channel between

the television and the video source that enables the video source to read the EDID data out of

the television's memory.

27.     The accused LG televisions further include a video circuit for receiving, processing, displaying, and outputting video signals received over the video interfaces, including the VGA interface.  More particularly, the accused LG televisions include a system-on-a-chip ("SOC") that includes video input circuitry, analog and digital video decoders, scaling circuitry, and output circuitry.  Non-limiting examples of such SOC's include the LG XD Engine LGE2112, LG XD Engine LGE2111, and LG L9.

28.     LG manufactures and then imports, sells, or offers to sell in the United States numerous models of televisions that support the VESA Plug-and-Play functionality and implement the VESA E-EDID, VESA E-DDC, and Philips I2C standards.  LG TV's that provide Plug-and-Play or EDID functionality comprise accused televisions. Non-limiting examples of such accused televisions include: 26LG30, 22LF10, 32LH20, 37LH20, 50PJ350, and 47LM6200.

### COUNT I

### (LG's Infringement of the '180 Patent)

29.     Paragraphs 1 through 28 are incorporated by reference as if fully restated herein.

30.     LG has had knowledge of the '180 patent since no later than March 9, 2009. Pursuant to 35 U.S.C. § 287(a), LG received actual notice of infringement no later than this date.

31.     LG has directly infringed, either literally or under the doctrine of equivalents, one or more claims of the '180 patent under 35 U.S.C. § 271(a) by importing, selling, and/or offering to sell televisions that support Plug-and-Play functionality in the United States.  LG has also directly infringed by using, testing, operating and/or demonstrating televisions possessing

the Plug-and-Play functionality at tradeshows or during the execution of test and repair procedures at service facilities in the United States.

32.     LG has indirectly infringed, either literally or under the doctrine of equivalents, one or more claims of the '180 patent under 35 U.S.C. § 271(b) by inducing users and customers of LG televisions to use the Plug-and-Play functionality in an infringing manner.  For example, LG advertises and identifies to users the Plug-and-Play functionality and provides instructions on how to connect video sources to the television's VGA port, wherein the TV will then use the claimed technology.  In view of the foregoing, LG has possessed specific intent to encourage others, and has in fact encouraged others, to infringe one or more claims of the '180 patent.  The customers and end users have used and practiced the claimed inventions.

33.     On information and belief, LG has also indirectly infringed, either literally or under the doctrine of equivalents, one or more claims of the '180 patent under 35 U.S.C. § 271(b) by inducing third-parties to import, sell, or offer to sell LG televisions that possess Plug-and-Play functionality in the United States.  More particularly, LG has manufactured accused TV's overseas with full knowledge and intent that such TV's will be imported, sold, or offered for sale in the United States.  This intent is demonstrated at least by LG designing and manufacturing the TV's to be compliant with Federal Communication Commission (FCC) requirements, obtaining Underwriters Laboratories (UL) certification for the TV's, making the TV's compatible with ATSC broadcast standards used in the United States, providing written instructions and on-screen displays in English, maintaining a U.S. web site for marketing of the TV's, and by making the TV's compatible with U.S. power requirements.  LG encourages third-parties to import and/or sell the accused TV's in the United States by entering into contractual relationships with them and assisting them with the movement of LG's TV's

through distribution channels into and within the United States. Third-parties have, in fact, imported, sold, and/or offered to sell the accused LG TV's in the United States. Such third parties include, by way of example Walmart and Best Buy.

34.     LG has also indirectly infringed, either literally or under the doctrine of equivalents, one or more claims of the '180 patent under 35 U.S.C. § 271(c) by importing, selling, and/or offering to sell in the United States televisions that possess Plug-and-Play wherein there is no substantial non-infringing use for televisions with this feature. Further, televisions that include the Plug-and Play feature are not staple items of commerce. In addition, LG knew that the TV's with Plug-and-Play were especially made and adapted to use the claimed inventions of the '180 patent. Customers and end users of the accused LG televisions have used and practiced the claimed inventions.

35.     LG's infringement has been willful. LG has been aware of the '180 patent since no later than March 9, 2009, and LG has engaged in prior litigation with Mondis over this patent. Furthermore, LG has previously taken a license to the '180 patent for computer monitors, wherein computer monitors employ substantially similar Plug-and-Play functionality. Thus, LG's conduct has been objectively reckless, and LG has possessed subjective specific intent to infringe the patent.

36.     Mondis has been harmed by LG's infringement and is entitled to recover damages to compensate for the infringement. Further, any damages award should be trebled in view of LG's willful infringement.

## DEMAND FOR JURY TRIAL

37.     Mondis hereby demands a trial by jury on all claims and issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment for themselves and against Defendants as follows:

a)      That this Court issue a judgment that U.S. Patent No. 7,475,180 is valid and enforceable.

b)      That this Court adjudge that Defendants have infringed U.S. Patent No. 7,475,180.

c)      That this Court ascertain and award Mondis all appropriate damages under 35 U.S.C. § 284 sufficient to compensate Mondis for the Defendants' past infringement, including interest, costs, and disbursements.

d)      That this Court adjudge Defendants' infringement of U.S. Patent No. 7,475,180 to have been willful and to award treble damages pursuant to 35 U.S.C. § 284.

e)      That this Court finds this case to be exceptional within the meaning of 35 U.S.C. § 285 and awards Plaintiffs their reasonable attorneys' fees, costs, and expenses that Plaintiffs incur in prosecuting this action; and

f)      That this Court awards Plaintiffs any further relief at law or in equity as the Court deems just and proper.

*DATED:*  March 8, 2019

Respectfully submitted,


By:  /s/ Brian M. Goldberg

Martin J. Black
Brian M. Goldberg
Jeffrey S. Edwards (pro hac vice)
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19106
Tel.: (215) 994-4000
Fax: (215) 994-2222
martin.black@dechert.com
brian.goldberg@dechert.com
jeffrey.edwards@dechert.com

Jeffrey B. Plies (pro hac vice)
DECHERT LLP
300 W. 6th Street, Suite 2010
Austin, TX 78701
Tel.: (512) 394-3000
Fax: (512) 394-3001
jeff.plies@dechert.com

*Attorneys for Plaintiffs Mondis Technology*
*Ltd., Maxell Holdings, Ltd., and Maxell, Ltd.*



Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
+1 215 994 4000 Main
+1 215 994 2222 Fax
www.dechert.com

**BRIAN GOLDBERG**

brian.goldberg@dechert.com
+1 215 994 2143 Direct
+1 215 655 2143 Fax

April 29, 2019

**VIA ECF**

Hon. Stanley R. Chesler, U.S.D.J.
United States District Court
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

Re: *Mondis Technology, Ltd. et al., v. LG Electronics, Inc. et al.*, Civil Action No. 2:15-cv-04431-SRC-CLW

Dear Judge Chesler:

This firm represents Plaintiffs Mondis Technology Ltd., Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd. and Maxell, Ltd (collectively "Plaintiffs"). We write to inform the Court that, pursuant to the Court's direction on April 12, the parties have conferred and agreed to the below post-trial briefing schedule:

| LG motions for JMOL under Rule 50 and for new trial under Rules 50/59: | Friday, May 31 |
|---|---|
| Plaintiff motion for enhanced § 284 damages: | Friday, May 31 |
| Plaintiff motion for § 285 attorneys' fees: | Friday, May 31 |
| Plaintiff motion for pre- and post-judgment interest | Friday, May 31 |
| Responses to all motions: | Friday, June 28 |
| Replies to all motion responses: | Friday, July 19 |

Subject to the court's approval and for purposes of any appeals, the parties agree that the above post-trial motions should be decided prior to the entry of judgement and commencement of the time for any appeals. Further, Plaintiffs expect to file a bill of costs pursuant to Local Rule 54.1 upon entry of judgment.

If Your Honor approves of the requested post-trial briefing schedule, we respectfully request that you "So Order" this letter and enter it on the docket. We are available to discuss the requested schedule at Your Honor's convenience should you have any questions or concerns about it.



Hon. Stanley R. Chesler, U.S.D.J.
April 29, 2019
Page 2

Respectfully submitted,

*/s/ Brian M. Goldberg*

Brian M. Goldberg

BMG

cc:    All Counsel of Record (via ECF)

SO ORDERED:

Hon. Stanley R. Chesler

Dated:  4/30/19

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONDIS TECHNOLOGY LTD., HITACHI MAXELL, LTD., n/k/a MAXELL HOLDINGS, LTD., and MAXELL, LTD., | Civil Action No. 15-04431(SRC/CLW) |
| Plaintiffs, | **NOTICE OF APPEAL** |
| v. | |
| LG ELECTRONICS INC. and LG ELECTRONICS U.S.A., INC., | *Electronically Filed* |
| Defendants. | |

## DEFENDANTS LG ELECTRONICS INC. AND
## LG ELECTRONICS U.S.A., INC.'S NOTICE OF APPEAL

1

Notice is hereby given that Defendants LG Electronics Inc. and LG Electronics U.S.A. Inc. (collectively "LG") hereby appeal to the United States Court of Appeals for the Federal Circuit from the above-captioned matter.

Following a jury trial held on April 2-12, 2019, the jury returned verdicts in favor of Plaintiffs on April 9 and 12, 2019. [Dkt. Nos. 467, 468, 482, 483.] The parties then filed various post-trial motions. [Dkt. Nos. 486-496.] On September 24, 2019, the Court entered an order disposing of some of the parties' post-trial motions, while reserving a decision on LG's combined Motion for Judgment as a Matter of Law Under Rule 50(b), a New Trial Under Rule 59, and/or Remittitur Regarding Damages and Willfulness. [Dkt. No. 558.] On April 22, 2020, the Court disposed of this last post-trial motion by denying LG's motion for judgment as a matter of law and/or remittitur, but granting LG's motion for a new trial regarding damages. [Dkt. No. 607.] As such, this matter is now "final except for an accounting" and thus appealable under 28 U.S.C. § 1292(c)(2). *See Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305 (Fed. Cir. 2013) (en banc).

In view of the foregoing, LG appeals from any and all decisions, orders, rulings, findings, and/or conclusions adverse to LG (except to the extent they are not presently appealable because they relate to an "accounting"), including all such orders, rulings, findings, and/or conclusions that are intertwined with, related to, or

resulted in this appeal.  These orders, rulings, findings, and/or conclusions include but are not limited to:

- September 28, 2017 Opinion & Order [Dkt. No. 231] regarding claim construction;

- October 12, 2017 Opinion & Order [Dkt. No. 233] denying LG's Motion for Summary Judgment for Lack of Written Description [Dkt. Nos. 215 and 215-1];

- October 4, 2018 Opinion & Order [Dkt. No. 304] denying LG's Motion for Summary Judgment [Dkt. Nos. 263 and 264] and granting Mondis' Motion for Summary Judgment [Dkt. Nos. 265 and 266];

- October 29, 2018 Final Pretrial Order [Dkt. No. 311] and any supplements thereto;

- January 7, 2019 Order [Dkt. No. 369] denying LG's Motion to Dismiss for Lack of Subject Matter Jurisdiction [Dkt. Nos. 308 and 309];

- February 27, 2019 Opinion & Order [Dkt. No. 393] denying LG's Motion to Dismiss (1) for Lack of Subject Matter Jurisdiction Based on Lack of Standing; and (2) for Non-Compliance with the Statutory Limitation on Damages [Dkt. Nos. 379 and 380];

- March 25, 2019 Order Regarding the Parties' Motions *in Limine* [Dkt. Nos. 391, 432], including the decisions indicated on the hearing record [Dkt. Nos. 391-392], addressing LG's Motions *in Limine* Nos. 1 through 6 [Dkt. Nos. 321, 323, 325, 326, 327, and 329] and Plaintiffs' Motions *in Limine* Nos. 1 through 4 [Dkt. No. 331];

- The Court's pre-trial evidentiary rulings;

- The Court's evidentiary rulings during trial, [*see, e.g.,* Dkt. Nos. 451, 453, 457, 463, 464, 470, 474, 537-546];

- The Final Jury Instructions [Dkt. Nos. 461, 472, and as read during trial];

- April 9, 2019 Jury Verdict Regarding Liability [Dkt. Nos. 467, 468];

- April 12, 2019 Jury Verdict Regarding Remedy [Dkt. Nos. 482, 483];

3

- September 24, 2019 Opinion & Order [Dkt. No. 558] and April 22, 2020 Opinion & Order [Dkt. No. 607] regarding the parties' post-trial motions, including:

  o LG's Motion for Judgment as a Matter of Law Under Rule 50(b) and/or a New Trial Under Rule 59 Regarding Noninfringement [Dkt. Nos. 487 and 487-1];

  o LG's Motion for Judgment as a Matter of Law Under Rule 50(b) and/or a New Trial Under Rule 59 Regarding Invalidity [Dkt. Nos. 486 and 486-1];

  o LG's Motion for Judgment as a Matter of Law Under Rule 50(b), New Trial Under Rule 59, and/or Remittitur Regarding Damages and Willfulness [Dkt. Nos. 489 and 489-1].

Dated: May 8, 2020

Respectfully submitted,

*s/ Liza M. Walsh*

Of Counsel:
(*pro hac vice*)

Michael J. McKeon
Christian A. Chu
R. Andrew Schwentker
Michael F. Ballanco
FISH & RICHARDSON P.C.
1000 Maine Ave. SW,
Suite 1000
Washington, D.C. 20024
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

Liza M. Walsh
Selina M. Ellis
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
Telephone: (973) 757-1100
Facsimile: (973) 757-1090

*Attorneys for Defendants*
*LG Electronics Inc. and*
*LG Electronics U.S.A., Inc.*

4





A 2034838

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

**September 20, 2018**

**THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE
RECORDS OF THIS OFFICE OF A DOCUMENT RECORDED ON
DECEMBER 07, 2007.**

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

**SYLVIA HOLLEY**
Certifying Officer

12/07/2007 10:48 FAX 7033128666    ☑ 001/005

| Form PTO-1595 (Rev. 10/02) OMB No. 0651-0027 (exp. 6/30/2005) | **RECORDATION FORM COVER SHEET** **PATENTS ONLY** | U.S. DEPARTMENT OF COMMERCE U.S. Patent and Trademark Office |
|---|---|---|

Attorney Docket No. 1484.10279G00

To the Honorable Commissioner of Patents and Trademarks: Please record the attached original documents or copy thereof.

| 1. Name of conveying party(ies): Hitachi, Ltd. Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No | 2. Name and address of receiving party(ies) Name: Mondis Technology Ltd. Street Address: 19 Perrins Lane, Hampstead, London NW3 1QY, England |
|---|---|

| 3. Nature of conveyance/ Execution Date: October 30, 2007 . ☒ Assignment ☐ Merger ☐ Security Agreement ☐ Change of Name ☐ Joint Research Agreement ☐ Government Interest Assignment ☐ Executive Order 9424, Confirmatory License ☐ Other . | Additional name(s) & address(es) attached? ☐ Yes ☒ No |
|---|---|

| 4. Application number(s) or patent number(s): | ☐ This document is being filed together with a new application. |
|---|---|
| A. Patent Application No.(s) 10/661,527; 10/832,442; 10/160,022; 10/160,056 | B. Patent Registration No.(s) 5,457,473; 5,926,155; 6,057,812; 6,078,301; 6,304,236; 6,346,930; 6,348,904; 6,639,588; 5,686,695; 5,652,845; 5,887,147; 6,247,090; 6,513,068; 6,549,970; 7,089,342 |

Additional number(s) attached ☐ Yes ☒ No

| 5. Name and address of party to whom correspondence concerning document should be mailed: Name: **ANTONELLI, TERRY, STOUT & KRAUS, LLP** Internal Address: **1300 NORTH 17TH STREET – SUITE 1800** City: **ARLINGTON** State: **VA** Zip **22209** Phone Number: (703) 312-6600 Facsimile Number: (703) 312-6666 Email Address: email@antonelli.com | 6. Total number of applications and patents involved |
|---|---|
| | 7. Total fee (37 CFR 3.41).................. $ 760.00 ☐ Authorized to be charged by credit card ☐ Authorized to be charged to deposit account ☒ Enclosed Credit Card Payment Form ☐ None required (government interest not affecting title) |
| | 8. Payment Information: a. Credit Card   Last 4 numbers: Expiration date: b. Deposit account number: 01-2135 Authorized User Name: |

**DO NOT USE THIS SPACE**

9. Statement and signature.
To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.

| Melvin Kraus – Reg. No. 22,466 | | December 7, 2007 |
|---|---|---|
| Name of Person Signing | Signature | Date |

Total number of pages including cover sheet, attachments, and document:
Documents to be recorded (including cover sheet) should be faxed to (571) 273-0140, or mailed to:
Mail Stop Assignment Recordation Services, Director of the USPTO, P.O. Box 1450, Alexandria, VA 22313-1450

OP $760.00 10661527

Appx1404

700352762

**PATENT**
**REEL: 020218 FRAME: 0791**

12/07/2007 10:49 FAX 7033126666                                           ☑002/005

*ANNEX 2*

*FORM OF ASSIGNMENT*

### ASSIGNMENT

THIS ASSIGNMENT, effective the **30** day of **Oct**, 2007, is entered into between HITACHI LTD ("**Assignor**"), a corporation organized under the laws of the Japan and having an office at 6-6, Marunouchi, 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan, and MONDIS TECHNOLOGY LTD ("**Assignee**"), a corporation organized under the laws of England and having an office at 19 Perrins Lane, Hampstead, London NW3 1QY, England.

WHEREAS, the Assignor is the owner of the patents and patent applications set forth in Schedule A hereto (the "Patents"); and

WHEREAS, the Assignee is desirous of obtaining the Assignor's entire right, title and interest in, to and under the Patents;

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the Assignor has sold, assigned, transferred and set over, and by these presents does hereby sell, assign, transfer and sets over to the Assignee, its successors, assigns and legal representatives, all inventions covered by the Patents together with and including:

    (a)    the entire right, title and interest in, to and under all of the Patents;

    (b)    all continuations, divisions, reissues, extensions and reexamination certificates of all of the Patents;

    (c)    all other applications for Letters Patent relating to any and all inventions of the Patents which have been filed in the United States, its territorial possessions and/or any countries foreign to the United States;

    (d)    all rights to file further such applications, and to claim the same priority rights as the Patents, under the Patent Laws of the United States, the applicable laws of the country in which any such application is filed, the International Convention for the Protection of Industrial Property and any other international union, convention, agreement and treaty; and

    (e)    all rights to sue for past infringement of any and all of the Patents, and to hold for the Assignee's sole use and benefit all recoveries, rights and benefits arising from all such suits.

AND THE ASSIGNOR HEREBY:

    (a)    authorizes and requests the Commissioner of Patents and Trademarks of the United States, and any Official of any country or countries foreign to the United States, whose duty is to issue patents or other evidence or forms of industrial property protection on applications as aforesaid, to issue the same to the Assignee, its successors, legal representatives and assigns, in accordance with the terms of this instrument; and

    (b)    covenants and agrees that (i) it has full right to convey its entire interest herein assigned, (ii) it has not executed, and will not execute, any agreement in conflict herewith, (iii) it will communicate to the Assignee, its

12

**PATENT**
**REEL: 020218 FRAME: 0792**

12/07/2007 10:49 FAX 7033126666 ☑003/005

successors, legal representatives and assigns, any fact known or becoming to the Assignor respecting the Patents and the inventions disclosed therein, and testify in any legal proceeding, sign all lawful papers, make all rightful oaths, and generally do everything possible to aid the Assignee, its successors, legal representatives and assigns, to record and perfect the interest of the Assignee in and to the Patents, and to maintain and enforce the Patents.

**WITNESS MY HAND AND SEAL** this 30 day of _October_, 2007.

**HITACHI LTD (Assignor)**

By: 由木 鬱夫

Name: Ikuo Yuki

Title: General Manager, Digital AV Product Division

## _SCHEDULE A_

### The "Patents"

| Title | Country | Number | Issue Date (US, DE) / Registration Date (JP) |
|---|---|---|---|
| Image Display Apparatus | USA | 5,457,473 | 10 October 1995 |
| Digital video display system | USA | 5,926,155 | 20 July 1999 |
| Image display apparatus which both receives video information and outputs information about itself | USA | 6,057,812 | 2 May 2000 |
| Computer apparatus for sending video information to an image display apparatus and receiving information from the image display apparatus | USA | 6,078,301 | 20 June 2000 |
| Display apparatus for adjusting the display image using a control signal from an external computer | USA | 6,304,236 | 16 October 2001 |
| Computer apparatus for sending video information to an image display apparatus and receiving information from the image display apparatus | USA | 6,346,930 | 12 February 2002 |
| Computer apparatus for sending video information to an image display apparatus and receiving information | USA | 6,348,904 | 19 February 2002 |

13

**PATENT**
**REEL: 020218 FRAME: 0793**

12/07/2007 10:49 FAX 7033126666                                      ☑004/005

| | | | |
|---|---|---|---|
| from the image display apparatus | | | |
| Image display apparatus | USA | 6,639,588 | 28 October 2003 |
| Display unit for displaying an image based on a video signal received from a personal computer which is connected to an input device | USA | 6,686,895 | 3 February 2004 |
| Workstation display unit with input device - has display modified by circuit generating control signals that are added in to modify video and deflection control signals | Germany | 4,305,026 | 26 August 1993 |
| Workstation display unit with input device | Germany | 4,345,426 | 4 December 2003 |
| Display apparatus | USA | 5,652,845 | 29 July 1997 |
| Display apparatus | USA | 5,887,147 | 23 March 1999 |
| Display apparatus enabled to control communicatability with an external computer using identification information | USA | 6,247,090 | 12 June 2001 |
| Display unit and method enabling bi-directional communication with video source | USA | 6,513,088 | 28 January 2003 |
| Display unit with controller enabling bi-directional communication with computer | USA | 6,549,970 | 15 April 2003 |
| Method enabling display unit to bi-directionally communicate with video source | USA | 7,089,342 | 8 August 2006 |
| Information output system | Germany | 4,404,104 | 15 May 2003 |
| Information output system for CRT display | Germany | 4,447,944 | 11 November 2004 |
| Display | Japan | 3,334,211 | 2 August 2002 |
| Display | Japan | 3,749,879 | 9 December 2005 |

14

RECORDED: 12/07/2007

PATENT
REEL: 020218 FRAME: 0794

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |
|---|---|
| MONDIS TECHNOLOGY LTD., <br><br> Plaintiff, <br><br> v. <br><br> LG ELECTRONICS, INC. and <br> LG ELECTRONICS U.S.A., INC., <br><br> Defendants. | Civil Action No. 2:14-cv-00702 <br><br> **JURY TRIAL DEMANDED** |

## DEFENDANTS LG ELECTRONICS, INC. AND LG ELECTRONICS U.S.A., INC.'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc. (collectively, "LG" or "Defendants"), by their attorneys, hereby answer the Complaint for patent infringement of Plaintiff Mondis Technology Ltd. ("Mondis" or "Plaintiff") as follows:

## NATURE OF ACTION

1.      LG admits that the Complaint purports to make allegations under the patent laws of the United States, 35 U.S.C. § 101 *et seq*., but LG denies those allegations.

## THE PARTIES

2.      LG lacks sufficient knowledge or information to confirm or deny the allegations and content of Paragraph 2 of Mondis's Complaint and therefore denies the same.

3.      LG admits that LG Electronics, Inc. ("LG Korea") is a corporation organized under the laws of Korea with its principal place of business at LG Twin Tower 128, Yeoui-daero, Yeongdeungpo-gu, Seoul, Korea. LG admits that LG Korea is in the business of developing,

1

manufacturing, and selling consumer electronics and that such devices include, but are not limited to, televisions. LG otherwise denies the allegations of Paragraph 3.

4.      LG admits that LG Electronics U.S.A., Inc. ("LG U.S.A.") is a company organized under the laws of the state of Delaware with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey and that it has a service agent, United States Corporation Company, located at 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218 U.S.A. LG admits that LG U.S.A. is in the business of importing and selling electronic devices and that such devices include, but are not limited to, televisions. LG otherwise denies the allegations of Paragraph 4.

## JURISDICTION AND VENUE

5.      LG admits that the Complaint purports to make allegations under the patent laws of the United States, including 35 U.S.C. § 271, *et seq.* LG admits that this Court has original jurisdiction over the subject matter of this Complaint under 28 U.S.C. § 1338(a).

6.      LG does not dispute that it is subject to personal jurisdiction in this District for the purposes of this action only; however, LG is without sufficient knowledge or information to determine whether Mondis has standing or legal capacity to sue on the Asserted Patents identified in the Complaint, and, on that basis, LG denies the remaining allegations of Paragraph 6. LG specifically denies any express or implied allegations that it has infringed, or is now infringing, directly or indirectly, any patent, or any claim of the '088, '970, '342, '180, and '588 Patents, or has ever harmed Mondis. Except as expressly admitted herein, LG denies the allegations of Paragraph 6 of the Complaint.

7.      LG does not dispute that it is subject to personal jurisdiction in this District for the purposes of this action only; however, LG is without sufficient knowledge or information to determine whether Mondis has standing or legal capacity to sue on the asserted patents identified

2

in the Complaint, and, on that basis, LG denies the remaining allegations of Paragraph 7. LG specifically denies any express or implied allegations that it has infringed, or is now infringing, directly or indirectly, any patent, or any claim of the '088, '970, '342, '180, and '588 Patents, or has ever harmed Mondis. LG lacks sufficient knowledge or information to confirm or deny the allegations that the accused televisions have been sold in the Eastern District of Texas, including in Wal-Mart and Best Buy stores located therein, and, on that basis, denies those allegations. LG denies that it has knowingly placed the accused televisions into the stream of commerce   with the intent that they be distributed and sold in the state of Texas and this District.

8.      LG does not dispute that it is subject to personal jurisdiction in this District for the purposes of this action only; however, LG is without sufficient knowledge or information to determine whether Mondis has standing or legal capacity to sue on the asserted patents identified in the Complaint, and on that basis, LG denies the remaining allegations of Paragraph 8. LG specifically denies any express or implied allegations that it has infringed, or is now infringing, directly or indirectly, any patent, or any claim of the '088, '970, '342, '180, and '588 Patents, or has ever induced others to commit patent infringement. LG lacks sufficient knowledge or information to confirm or deny the allegation that the accused televisions have been purchased by consumers in the Eastern District of Texas and, on that basis, denies that allegation. Except as expressly admitted herein, LG denies the allegations of Paragraph 8 of the Complaint.

9.      LG admits that venue is proper in this Court pursuant to 28 U.S.C. §§1391(b), (c), and (d), as well as 28 U.S.C. § 1400(b), in that LG is subject to personal jurisdiction in this District for the purposes of this action only; however, LG denies that it has committed acts or continues to commit acts within this judicial district giving rise to this action. LG does not admit that venue is convenient under 28 U.S.C. § 1404 and reserves its right to move for a change of

venue under 28 U.S.C. § 1404. LG incorporates by reference its responses to paragraphs 6, 7, and 8 of the Complaint.

## **THE PATENTS-IN-SUIT**

10.     LG admits that U.S. Patent No. 6,513,088 ("the '088 Patent"), attached to the Complaint as Exhibit A, is entitled DISPLAY UNIT AND METHOD ENABLING BIDIRECTIONAL COMMUNICATION WITH VIDEO SOURCE. LG admits that Ikuya Arai and Kouji Kitou are identified as inventors on the face of the '088 Patent. LG admits that the '088 Patent states on its face that it issued on January 28, 2003. LG lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 10, and, on that basis denies those allegations.

11.     LG admits that U.S. Patent No. 6,549,970 ("the '970 Patent"), attached to the Complaint as Exhibit B, is entitled DISPLAY UNIT WITH CONTROLLER ENABLING BI-DIRECTIONAL COMMUNICATION WITH COMPUTER. LG admits that Ikuya Arai and Kouji Kitou are identified as inventors on the face of the '970 Patent. LG admits that the '970 Patent states on its face that it issued on April 15, 2003. LG lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 11, and, on that basis denies those allegations.

12.     LG admits that U.S. Patent No. 7,089,342 ("the '342 Patent"), attached to the Complaint as Exhibit C, is entitled METHOD ENABLING DISPLAY UNIT TO BIDIRECTIONALLY COMMUNICATE WITH VIDEO SOURCE. LG admits that Ikuya Arai and Kouji Kitou are identified as inventors on the face of the '342 Patent. LG admits that the '342 Patent states on its face that it issued on August 8, 2006. LG lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 12, and, on that basis denies those allegations.

4

13.     LG admits that U.S. Patent No. 7,475,180 ("the '180 Patent"), attached to the

Complaint as Exhibit D, is entitled DISPLAY UNIT WITH COMMUNICATION

CONTROLLER AND MEMORY FOR STORING IDENTIFICATION NUMBER FOR

IDENTIFYING DISPLAY UNIT. LG admits that Ikuya Arai and Kouji Kitou are identified as

inventors on the face of the '180 Patent. LG admits that the '180 Patent states on its face that it

issued on January 6, 2009. LG lacks knowledge or information sufficient to form a belief about

the truth of the remaining allegations in Paragraph 13, and, on that basis denies those allegations.

14.     LG admits that U.S. Patent No. 6,639,588 ("the '588 Patent"), attached to the

Complaint as Exhibit E, is entitled IMAGE DISPLAY APPARATUS. LG admits that Ikuya Arai,

Kouji Kitou, and Yuji Sano are identified as inventors on the face of the '588 Patent. LG admits

that the '588 Patent states on its face that it issued on October 28, 2003. LG lacks knowledge or

information sufficient to form a belief about the truth of the remaining allegations in Paragraph

14, and, on that basis denies those allegations.

## **FACTUAL BACKGROUND**

### **Prior Litigation**

15.     LG admits that, on December 31, 2007, Mondis filed a Complaint in this district

against LG *et. al.*, (Case No. 2:07-CV-565), alleging that certain LG computer monitors

infringed, *inter alia*, the '088, '970, and '588 Patents.

16.     LG admits that, on May 14, 2008, Mondis filed a First Amended Complaint in

this Case No. 2:07-CV-565, alleging that certain LG computer monitors infringed the '342

Patent.

17.     LG admits that, on March 9, 2009, Mondis filed a Second Amended Complaint in

this Case No. 2:07-CV-565, alleging that certain LG computer monitors infringed the '180

Patent.

5

18.     LG admits that Mondis and LG subsequently reached a settlement with respect to Mondis's claims against LG's computer monitors. LG further admits that, on September 17, 2009, the district court entered an Order of Dismissal, stating that: "[a]ll claims and counterclaims in the above-captioned action between the parties are hereby dismissed: (a) with prejudice in relation to all products other than 'Unreleased Products' noted in the parties' Settlement Agreement, and (b) without prejudice in relation to those 'Unreleased Products.'"

19.     LG admits that all claims and counterclaims between LG and Mondis were dismissed without prejudice as to "Unreleased Products," as defined in the parties' settlement agreement. LG denies the remaining allegations.

20.     LG denies that it ever exchanged periodic communications with Mondis or engaged in repeated negotiations regarding its "need" for a license following the settlement in Case No. 2:07-CV-565. LG is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 of the Complaint and therefore denies those allegations.

21.     Based on publicly available information, LG admits that, after it was dismissed from Case No. 2:07-CV-565, the case proceeded against named co-defendants Innolux and Hon Hai and that the jury returned a verdict finding that the accused Innolux and Hon Hai televisions infringed claim 15 of the '342 Patent and claim 14 of the '180 Patent. LG also admits that the jury determined that a reasonable royalty rate for televisions was 0.75%. LG is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 21 of the Complaint and therefore denies those allegations.

**Plug-and-Play ("PnP") Functionality**

22.     LG admits that the Video Electronics Standards Association ("VESA") is an industry standards-setting organization for monitors and displays. LG is without knowledge or

6

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 22 of the Complaint and therefore denies those allegations.

23.     LG is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 of the Complaint and therefore denies those allegations.

24.     LG is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 of the Complaint and therefore denies those allegations.

25.     LG is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 of the Complaint and therefore denies those allegations.

26.     LG is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 of the Complaint and therefore denies those allegations.

27.     LG specifically denies any express or implied allegations that it has infringed, or is now infringing, directly or indirectly, any patent, or any claim of the '088, '970, '342, '180, and '588 Patents, or has ever harmed Mondis. LG is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 27 of the Complaint and therefore denies those allegations.

28.     LG admits that Mondis alleges that "LG TV's that provide Plug-and-Play or EDID functionality comprise the accused televisions."  LG admits that Mondis alleges that "[n]on-limiting examples of such televisions include:  26LG30, 22LF10, 32LH20, 37LH20, 50PJ350, and 47LM6200."  LG is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 28 of the Complaint and therefore denies those allegations. LG specifically denies any express or implied allegations that it has infringed, or is now infringing, directly or indirectly, any patent, or any claim of the '088, '970, '342, '180, and '588 Patents, or has ever harmed Mondis.

7

**Smart TV Functionality**

29.     LG admits that on or about June 2009, LG U.S.A. began importing and selling, in the United States, televisions that are capable of receiving and displaying streaming video signals that are provided via an internet connection, by such services as Netflix, CinemaNow, HuluPlu, Amazon, YouTube, and VuDu. The video streaming functionality has been or is marketed under "NetCast" and "Smart TV." LG is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 29 of the Complaint and therefore denies those allegations.

30.     LG is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 30 of the Complaint and therefore denies those allegations.

31.     LG is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 31 of the Complaint and therefore denies those allegations.

32.     LG is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 32 of the Complaint and therefore denies those allegations.

33.     LG is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 33 of the Complaint and therefore denies those allegations.

34.     LG is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 34 of the Complaint and therefore denies those allegations.

8

35.     LG admits that Mondis alleges that so-called "LG Smart TV's comprise accused televisions." LG admits that Mondis alleges that "[n]on-limiting examples of such accused televisions include:  47LH50, 50PS80, 47LM6200 and 55LM6200." LG is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 34 of the Complaint and therefore denies those allegations. LG specifically denies any express or implied allegations that it has infringed, or is now infringing, directly or indirectly, any patent, or any claim of the '088, '970, '342, '180, and '588 Patents, or has ever harmed Mondis. Except as expressly admitted herein, LG denies the allegations of Paragraph 35 of the Complaint.

## COUNT I

### (LG's Infringement of the '088 Patent)

36.     Paragraphs 1-35 are incorporated by reference as if fully restated herein.

37.     LG denies that it had actual knowledge no later than December 31, 2007 of the '088 Patent pursuant to 35 U.S.C. §287(a). LG admits that it was aware of Mondis's allegations that certain LG monitors infringed the '088 patent on or after January 11, 2008.

38.     LG denies the allegations of Paragraph 38.

39.     LG denies the allegations of Paragraph 39.

40.     LG denies the allegations of Paragraph 40.

41.     LG denies the allegations of Paragraph 41.

42.     LG denies that it has infringed or is now infringing – directly, indirectly, willfully, or otherwise – any of the Asserted Patents. LG denies that it had actual knowledge no later than December 31, 2007 of the '088 Patent pursuant to 35 U.S.C. §287(a). LG admits that it engaged in prior litigation with Mondis over the '088 Patent and that it was aware of Mondis's allegations that certain LG monitors infringed the '088 Patent on or after January 11, 2008. LG denies that

9

the prior litigation provided it knowledge or notice of any allegations against LG's televisions. LG denies that it was objectively reckless or had specific intent to infringe the '088 Patent, or that it has infringed any of the Asserted Patents. LG is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 42 of the Complaint and therefore denies those allegations.

43.     LG denies the allegations of Paragraph 43. LG specifically denies any express or implied allegations that it has infringed, or is now infringing, directly or indirectly, any patent, or any claim of the '088 Patent, or has ever harmed Mondis.

## COUNT II

### (LG's Infringement of the '970 Patent)

44.     Paragraphs 1-35 are incorporated by reference as if fully restated herein.

45.     LG denies that it had actual knowledge no later than December 31, 2007 of the '970 Patent pursuant to 35 U.S.C. §287(a). LG admits that it was aware of Mondis's allegations that certain LG monitors infringed the '970 Patent on or after January 11, 2008.

46.     LG denies the allegations of Paragraph 46.

47.     LG denies the allegations of Paragraph 47.

48.     LG denies the allegations of Paragraph 48.

49.     LG denies the allegations of Paragraph 49.

50.     LG denies that it has infringed or is now infringing – directly, indirectly, willfully, or otherwise – any of the Asserted Patents. LG denies that it had actual knowledge no later than December 31, 2007 of the '970 Patent pursuant to 35 U.S.C. §287(a). LG admits that it engaged in prior litigation with Mondis over the '970 Patent and that it was aware of Mondis's allegations that certain LG monitors infringed the '970 Patent on or after January 11, 2008. LG denies that the prior litigation provided it knowledge or notice of any allegations against LG's televisions.

10

LG denies that it was objectively reckless or had specific intent to infringe the '970 patent, or

that it has infringed any of the Asserted Patents. LG is without knowledge or information

sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 50 of

the Complaint and therefore denies those allegations.

51.     LG denies the allegations of Paragraph 51. LG specifically denies any express or

implied allegations that it has infringed, or is now infringing, directly or indirectly, any patent, or

any claim of the  '970 Patent, or has ever harmed Mondis.

## COUNT III

### (LG's Infringement of the '342 Patent)

52.     Paragraphs 1-35 are incorporated by reference as if fully restated herein.

53.     LG denies that it had actual knowledge no later than May 14, 2008 of the '342

Patent pursuant to 35 U.S.C. §287(a). LG admits that it was aware of Mondis's allegations that

certain LG monitors infringed the '342 patent on or after May 14, 2008.

54.     LG denies the allegations of Paragraph 54.

55.     LG denies the allegations of Paragraph 55.

56.     LG denies the allegations of Paragraph 56.

57.     LG denies that it has infringed or is now infringing – directly, indirectly, willfully,

or otherwise – any of the Asserted Patents. LG denies that it had actual knowledge no later than

May 14, 2008 of the '342 Patent pursuant to 35 U.S.C. §287(a). LG admits that it engaged in

prior litigation with Mondis over the '342 Patent and that it was aware of Mondis's allegations

that certain LG monitors infringe the '342 Patent. LG denies that the prior litigation provided it

knowledge or notice of any allegations against LG's televisions. LG denies that it was

objectively reckless or had  specific intent to infringe the '342 Patent. LG is without knowledge

11

or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 57 of the Complaint and therefore denies those allegations.

58.      LG denies the allegations of Paragraph 58. LG specifically denies any express or implied allegations that it has infringed, or is now infringing, directly or indirectly, any patent, or any claim of the '342 Patent, or has ever harmed Mondis.

### **COUNT IV**

### **(LG's Infringement of the '180 Patent)**

59.      Paragraphs 1-35 are incorporated by reference as if fully restated herein.

60.      LG denies that it had actual knowledge no later than March 9, 2009 of the '180 patent pursuant to 35 U.S.C. §287(a). LG admits that it was aware of Mondis's allegations that certain LG monitors infringe the '180 Patent on or after March 9, 2009.

61.      LG denies the allegations of Paragraph 61.

62.      LG denies the allegations of Paragraph 62.

63.      LG denies the allegations of Paragraph 63.

64.      LG denies the allegations of Paragraph 64.

65.      LG denies that it has infringed or is now infringing – directly, indirectly, willfully, or otherwise – any of the Asserted Patents. LG denies that it had actual knowledge no later than March 9, 2009 of the '180 Patent pursuant to 35 U.S.C. §287(a). LG admits that it engaged in prior litigation with Mondis over the '180 Patent and that it was aware of Mondis's allegations that certain LG monitors infringe the '180 Patent on or after March 9, 2009. LG denies that the prior litigation provided it knowledge or notice of any allegations against LG's televisions. LG denies that it was objectively reckless or had specific intent to infringe the '180 Patent. LG is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 65 of the Complaint and therefore denies those allegations.

66.     LG denies the allegations of Paragraph 66. LG specifically denies any express or implied allegations that it has infringed, or is now infringing, directly or indirectly, any patent, or any claim of the '180 Patent, or has ever harmed Mondis.

## COUNT V

### (LG's Infringement of the '588 Patent)

67.     Paragraphs 1-35 are incorporated by reference as if fully restated herein.

68.     LG denies that it had actual knowledge no later than December  31, 2007 of the '588 Patent pursuant to 35 U.S.C. §287(a). LG admits that it was aware of Mondis's allegations that certain LG monitors infringed the '588 Patent on or after January 11, 2008.

69.     LG denies the allegations of Paragraph 69.

70.     LG denies the allegations of Paragraph 70.

71.     LG denies the allegations of Paragraph 71.

72.     LG denies the allegations of Paragraph 72.

73.     LG denies that it had actual knowledge no later than December 31, 2007 of the '588 patent pursuant to 35 U.S.C. §287(a). LG admits that it engaged in prior litigation with Mondis over the '588 Patent and was aware of Mondis's allegations that certain LG monitors infringed the '588 Patent on or after January 11, 2008. LG denies that the prior litigation provided it knowledge or notice of any allegations against LG's televisions. LG denies that it was objectively reckless or had specific intent to infringe the '588 Patent. LG is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 73 of the Complaint and therefore denies those allegations.

74.     LG denies the allegations of Paragraph 74. LG specifically denies any express or implied allegations that it has infringed, or is now infringing, directly or indirectly, any patent, or any claim of the '588 Patent, or has ever harmed Mondis

## DEMAND FOR JURY TRIAL

75.     LG admits that Mondis "demands a trial by jury on all claims and issues so triable."

## PRAYER FOR RELIEF

LG denies that Mondis is entitled to any relief, and specifically denies each allegation and request for relief in Paragraphs a) through f) of Mondis's Prayer for Relief.

## AFFIRMATIVE DEFENSES

76.     Subject to the responses above, LG alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein. In addition to the affirmative defenses described below, subject to the responses above, LG reserves the right to supplement its defenses as the result of any information that it confirms or learns during the course of discovery in this matter.

## FIRST DEFENSE

### Failure to State a Claim

77.     The Complaint fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

### Non-Infringement

78.     LG has not infringed, contributed to the infringement, or induced the infringement of any valid and enforceable claim of the '088 Patent either literally or under the doctrine of equivalents, and is not liable as an infringer with respect to any valid and enforceable claim of the '088 Patent.

79.     LG has not infringed, contributed to the infringement, or induced the infringement of any valid and enforceable claim of the '970 Patent either literally or under the doctrine of

14

equivalents, and is not liable as an infringer with respect to any valid and enforceable claim of the '970 Patent.

80.     LG has not infringed, contributed to the infringement, or induced the infringement of any valid and enforceable claim of the '342 Patent either literally or under the doctrine of equivalents, and is not liable as an infringer with respect to any valid and enforceable claim of the '342 Patent.

81.     LG has not infringed, contributed to the infringement, or induced the infringement of any valid and enforceable claim of the '180 Patent either literally or under the doctrine of equivalents, and is not liable as an infringer with respect to any valid and enforceable claim of the '180 Patent.

82.     LG has not infringed, contributed to the infringement, or induced the infringement of any valid and enforceable claim of the '588 Patent either literally or under the doctrine of equivalents, and is not liable as an infringer with respect to any valid and enforceable claim of the '588 patent.

### THIRD DEFENSE

### Patent Invalidity

83.     The claims of the '088 Patent are invalid for failure to comply with one or more of the conditions for patentability set forth in the Patent Laws of the United States Code, Title 35, at least in Sections 101, 102, 103, and/or 112.

84.     The claims of the '970 Patent are invalid for failure to comply with one or more of the conditions for patentability set forth in the Patent Laws of the United States Code, Title 35, at least in Sections 101, 102, 103, and/or 112.

15

85.     The claims of the '342 Patent are invalid for failure to comply with one or more of the conditions for patentability set forth in the Patent Laws of the United States Code, Title 35, at least in Sections 101, 102, 103, and/or 112.

86.     The claims of the '180 Patent are invalid for failure to comply with one or more of the conditions for patentability set forth in the Patent Laws of the United States Code, Title 35, at least in Sections 101, 102, 103, and/or 112.

87.     The claims of the '588 Patent are invalid for failure to comply with one or more of the conditions for patentability set forth in the Patent Laws of the United States Code, Title 35, at least in Sections 101, 102, 103, and/or 112.

## FOURTH DEFENSE

### Inequitable Conduct

88.     Pursuant to 37 C.F.R. § 1.56, inventors, patent counsel and others associated with the filing and prosecution of a patent application are under a duty to disclose all information to the U.S. Patent & Trademark Office ("PTO") that is known to them and that a reasonable patent examiner would find material to patentability.

89.     For the reasons set forth in greater detail below, on information and belief, U.S. Patent Nos. 5,625,845 ("'845 Patent"), 5,887,147 ("'147 Patent"), and 6,247,090 ("'090 Patent"), to which certain asserted patents claim priority, and the Asserted Patents are unenforceable as a result of inequitable conduct before the PTO.

### Prosecuting Attorney Kraus Improperly Failed to Disclose Moriconi 1 and 2 During the Prosecution of the '845, '147, '090, '088, and the '970 Patents

90.     Prosecuting attorney Melvin Kraus's failure to comply with his absolute duty of candor and good faith before the PTO by his knowing and deliberate failure to disclose prior art to the PTO during the prosecution of the '845, '147, '090, '088, and the '970 Patents was so

material that but for such non-disclosure the '845, '147, '088, and '970 Patents would not have issued. Furthermore, Kraus's failure to disclose prior art to the PTO was done with the intent to deceive the PTO into allowing the '845, '147, '088, and '970 Patents, such that each of these acts of inequitable conduct independently renders each of the '845, '147, '088, and '970 Patents unenforceable. Moreover, the '147, '088, '090, '970, '180, and '342 Patents were rendered unenforceable through inequitable conduct occurring during the prosecution of patents to which they claimed priority.

91.     As set forth below in more detail, U.S. Patent No. 5,262,759 to Moriconi ("Moriconi 1") and U.S. Patent No. 5,546,098 to Moriconi ("Moriconi 2") are prior art to the '845, '147, '088, '090 and '970 Patents, and are highly material to the patentability of the '845, '147, '088, '090, and '970 Patents, such that, but for their non-disclosure, the PTO would not have issued the '845, '147, '088, and '970 Patents, which, on information and belief, were withheld by prosecuting attorney Kraus with an intent to deceive the PTO.

92.     Moriconi 1 was filed on July 27, 1992 and issued on November 16, 1993 and accordingly is at least prior art under 35 U.S.C. § 102(e) against the '845, '147, '088, '090, and '970 Patents. Moriconi 2 was filed on July 26, 1993 as a divisional to the application which led to Moriconi 1. Accordingly, Moriconi 2 claims priority to Moriconi 1's July 27, 1992 filing date. Moriconi 2 issued on August 13, 1996 and is at least prior art under 35 U.S.C. § 102(e) against the '845, '147, '088, '090, and '970 Patents.

93.     Moriconi 2, as a divisional, shares common disclosure with Moriconi 1, and particularly discloses all of the subject matter that is disclosed in Moriconi 1. The shared disclosure of Moriconi 1 and Moriconi 2 anticipates numerous claims of the '845, '147, '090, '088, and '970 Patents and thus is highly material to the patentability of each of those patents.

17

94.     In Reexamination Control No. 95/000,457, the Examiner held that Moriconi 1 anticipated claims 23, 25, 27, and 28 of the '970 Patent. The Examiner's determination was subsequently upheld by the Patent Trial and Appeals Board. These claims are anticipated by Moriconi 1 for at least the reasons set forward in the July 9, 2014 Decision on Appeal. In Reexamination Control No. 95/000,459 the PTO held that Moriconi 1 anticipated claims 1, 2, 5, 10-24, and 26-33 of the '088 Patent and issued a reexamination certificate cancelling claims 1, 2, 5, 10-24, and 26-33. These claims are anticipated by Moriconi 1 for at least the reasons set forward in the July 10, 2014 Decision on Appeal. The shared disclosure of  Moriconi 1 and Moriconi 2 also anticipates and/or renders obvious at least claim 1 of the '845 Patent, claim 1 of the '147 Patent, and claim 3 of the '090 Patent, and claim 1 of the '088 Patent.

95.     Accordingly, the PTO would not have issued the '845, '147, '090, '088, and '970 Patents had Moriconi 1 and Moriconi 2 been disclosed to the PTO.

96.     Kraus was the prosecuting attorney of record during the prosecution of the '845, '147, '090, '088, and '970 Patents.

97.     Kraus was also the prosecuting attorney of record during the prosecution of U.S. Patent No. 5,670,969 (the "'969 Patent"). On information and belief the '969 Patent is assigned to Hitachi, the original assignee of the '845, '147, '088, '090, and  '970 Patents.

98.     The '969 Patent claims, *inter alia,* a "a display device including a panel type display and display control means storing attribute information of said panel type display which is readable/writable by said CPU through said read/write bus, said display control means controlling the display of said panel type display in accordance with display data received from said CPU through said read/write bus."

99.     Accordingly, Kraus was on notice that prior art cited during the prosecution of the '969 Patent might be relevant to the claims of the '845, '147, '088, '090, and '970 Patents.

100.     During the prosecution of the '969 Patent the Examiner based claim rejections over Moriconi 1 in an August 8, 1995 Office Action, a May 13, 1996 Office Action, and an August 15, 1996 Office Action.

101.     In a February 9, 1996 response, during the prosecution of the '969 Patent, Kraus discussed what he alleged to be the substantive features of Moriconi 1, noting that Moriconi 1 disclosed a display that includes a memory storing "display type" information and transmits this information to a connected display controller:

> Irrespective of the Examiner's contentions concerning this patent, applicants note that Moriconi et al discloses in column 4, line 51, column 5, line 30, that the EEPROM 51 is located in the display device and plural panel type display information are stored, the information according to the connected panel type information is read out via the connector 39 from the EEPROM 51 to the display device 13 and the data is processed according to the information by the display controller so that plural types of panel type displays can be connected. As may be considered from such description, the display controller is located in the main body and the particular interface between the display device and the main body is used such that the types of connectors are restricted and the types of panel type displays connectable are also restricted. Applicants note that the structural arrangement of Moriconi et al differs from the present invention as clearly shown by the attached sketch 3 representative of Moriconi et al.

102.     In his February 9, 1996 response, Kraus attached a handwritten sketch of Moriconi 1 setting forth his understanding of Moriconi 1's disclosure. Kraus's sketch illustrated that Moriconi 1 disclosed bidirectional communication between a display controller and a display:

19



103.    Kraus was also the prosecuting attorney of record during the prosecution of U.S.

Patent No. 5,977,934 (the "'934 Patent").

104.    The '934 Patent was originally assigned to Hitachi, the original assignee of the

'845, '147, '088, '090, and '970 Patents.

105.    The '934 Patent claims, *inter alia*,

> means for generating identification signals for specifying the
> display specifications of said display devices;
>
> instruction execution means for reading one of the display
> specification setting instructions from said memory means in
> response to an identification signal to execute the display
> specification setting instruction, said instruction execution means
> receiving the identification  signal from said identification signal
> generation means to specify the display specification setting
> instruction;
>
> and  a display controller for outputting the display signal in
>
> accordance with the display specification of the display
> specification setting instruction . . . .

106.    Accordingly, Kraus was on notice that prior art cited during the prosecution of the

'934 Patent might be relevant to the claims of the '845, '147, '088, '090, and '970 Patents.

107.     During the prosecution of the '934 Patent, the Examiner based claim rejections on

Moriconi 2 in a May 15, 1997  Office Action, an April 13, 1998 Office Action, a May 26, 1998

Office Action, and a February 16, 1999 Office Action.

108.     During the prosecution of the '934 Patent, Kraus described  what he alleged to be

the disclosure of Moriconi 2 in August 15, 1997 and November 11, 1998 responses to the PTO.

109.     Particularly, in his November 11, 1998 response, during the prosecution of the

'934 Patent, Kraus filed a detailed two-page summary of Moriconi 2 in which he discussed what

he considered  to be his understanding of Moriconi 2's disclosure. Kraus argued  in his response

that the display of Moriconi communicates identification information to a main body, such as a

computer.

> Consequently, each of the applied references discusses an
> information processing apparatus in which the identification signal
> generating means (whether it be oscillator circuit 131 in the Dalton
> device or EEPROM 51 in Moriconi) is contained in the display
> device and the generated signal is transmitted to the main body
> through a connection between the display device and the main
> body.

110.     In this November 11, 1998 response, Kraus also quoted a section of Moriconi 2

that described the disclosed system of Moriconi 2 as having an EEPROM that stored

identification codes identifying the display and that the identification codes were provided to a

display controller:

> In the present embodiment EEPROM 51 is programmed with a
> unique identity code for the specific type of module. Each type of
> module offered for the computer has a specific identity code. On
> initializing, the system BIOS queries the display to ascertain the
> module type, and loads the correct routines to operate that module.
> For the situation where a new type or improved display module is
> introduced, a simple BIOS upgrade allows previously
> manufactured computers to use the new display module.

21

111.    Though Moriconi 1 and Moriconi 2 were discussed in at least nine communications during the prosecutions of the '969 and '934 Patents, spanning a three year period, Kraus never disclosed Moriconi 1 or Moriconi 2 to the PTO during the prosecutions of the '845, '147, '088, '090, and '970 Patents.

112.    Accordingly, based on information and belief, Kraus was aware of Moriconi 1 and Moriconi 2 during prosecution of the '845, '147, '088, '090, and '970 Patents and understood that  Moriconi 1 and Moriconi 2 were highly material to the claims of the '845, '147, '088, '090, and '970 Patents.

113.    Based on information and belief and the facts above, the PTO would not have issued the '845, '147, '090, '088, and '970 Patents, but for Kraus's failure to disclose Moriconi 1 and Moriconi 2 to the PTO.

114.    Additionally, notwithstanding the fact that Kraus's written remarks during the prosecutions of '969 and '934 Patents demonstrated that he understood that Moriconi 1 and Moriconi 2 disclosed (A) a memory in a display storing display information; (B) that the display information is provided to a connected display controller; and (C) bi-directional communication between the display controller and display, Kraus continued to make arguments distinguishing certain claims on these bases.

115.    By way of a non-limiting example, in a May 6, 1996 amendment in the prosecution of the '845 Patent Kraus notified the Examiner that certain pending claims had previously been allowed in the abandoned parent application, Application No. 08/190,848. On information and belief, this statement was made to cause the Examiner to rely on the previous allowance of those claims and allow them in the '845 Patent. However, the Examiner's October 11, 1995 statement allowing the claims in Application No. 08/190,848 relied upon the purported

22

patentability of features that as of May 6, 1996, Kraus had previously identified  in Moriconi 1 and 2:

> Independent claims 13, 22, 26, and 27 each describe a combination of a computer and display unit that bidirectionally communicate with each other, and that store identification information about each other so that this communication will be proper for the combination. No prior art could be found, either individually or in combination, that described this.

116.    By way of another non-limiting example, Kraus attempted to distinguish the cited prior art in a June 16, 2000 response during the prosecution of the '090 Patent by arguing that the prior art did not include bi-directional communication:

> As discussed at the·interview, claims 54-62 generally corresponding to claims 41-49 of the proposed amendment submitted to the Examiner prior to the interview, recite the features of bi-directional communication and a process and it is not apparent that such features as claimed are disclosed in the cited art.

117.    On information and belief, and based on Kraus's extensive contact with Moriconi 1 and 2 and his attempts to distinguish pending claims based upon features that he knew were disclosed in Moriconi 1 and 2, Kraus failed to disclose Moriconi 1 and Moriconi 2 with the specific intent to deceive the PTO.

118.    Each of Kraus's acts of inequitable conduct renders all subsequent continuation or divisional applications within the patent family unenforceable under the doctrine of infectious unenforceability. *See, e.g., Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804 (Fed. Cir. 1990).

119.    Kraus's inequitable conduct during prosecution of the '845 Patent renders the '845, '147, '090, '088, '970, '180, and '342 Patents unenforceable.

120.    Kraus's inequitable conduct during prosecution of the '147 Patent renders the '147, '090, '088, '970, '180, and '342 Patents unenforceable.

23

121.    Kraus's inequitable conduct during prosecution of the '090 Patent renders the '090, '088, '970, '180, and '342 Patents unenforceable.

122.    Kraus's inequitable conduct during prosecution of the '088 Patent renders the '088,'970, '180, and '342 Patents unenforceable.

123.    Kraus's inequitable conduct during prosecution of the '970 Patent renders the '180 and '342 Patents unenforceable.

**Prosecuting Attorney Kraus Misrepresented The Disclosure Of Moriconi 1 During The Prosecution Of The '180 Patent**

124.    In Reexamination Control No. 95/000,480, the reexamination of the '180 patent, the Examiner held in both an Office Action and in a subsequent Action Closing Prosecution that claims 1-13 of the '180 Patent were anticipated by Moriconi 1. These claims are anticipated by Moriconi 1 for at least the reasons set forth in the November 10, 2014 Examiner's Answer.

125.    On information and belief, Kraus intentionally misrepresented the disclosure of Moriconi 1 during the prosecution of the '180 Patent. In an August 12, 2004 interview summary, Kraus alleged that the system disclosed in Moriconi 1 was not capable of bidirectional communication and did not send the identification information stored in memory to the video source or controller:

> Thus, it is apparent that Moriconi et al does not disclose a display unit as claimed, and although the display module 13 in the form of the flat panel display 43 as illustrated in Fig. 4 has EEPROM memory device 51 for storing a code, it is not seen that the panel includes a communication controller which sends the identification number stored in the memory to the video source and that the communication controller is capable of bi-directionally communicating with a video source as recited in the claims of this application.

126.    This characterization was false and the allegedly missing features are disclosed by Moriconi 1.

24

127.    Additionally,  Kraus's August 12, 2004 characterization directly contradicts his

February 9, 1996  description of Moriconi 1 during the prosecution of the '969 Patent in which

he characterized Moriconi as sending identification information from a display to a video source.

> Irrespective of the Examiner's contentions concerning this patent,
> applicants note that Moriconi et al discloses in column 4, line 51,
> column 5, line 30, that the EEPROM 51 is located in the display
> device and plural panel type display information are stored, the
> information according to the connected panel type information is
> read out via the connector 39 from the EEPROM 51 to the display
> device 13 and the data is processed according to the information by
> the display controller so that plural types of panel type displays can
> be connected. As may be considered from such description, the
> display controller is located in the main body and the particular
> interface between the display device and the main body is used
> such that the types of connectors are restricted and the types of
> panel type displays connectable are also  restricted. Applicants
> note that the structural arrangement of Moriconi et al differs from
> the present invention as clearly shown by the attached sketch 3
> representative of Moriconi et al.

128.    Kraus's August 12, 2004 characterization also directly contradicts his February 9,

1996 description of Moriconi 1 during the prosecution of the '969 Patent, in which he submitted

a handwritten drawing that illustrates Moriconi 1 as being capable of bi-directional

communication between the display and video source.



25

129.    Kraus's August 12, 2004 characterization of Moriconi 1 also directly contradicts his November 11, 1998 characterization of Moriconi 2, which has a shared disclosure with Moriconi 1, during the prosecution of the '934 Patent. Kraus, in describing Moriconi 2, argued that Moriconi 2 disclosed transmitting identification information from a display to an external computer, referred to as a main body.

> Consequently, each of the applied references discusses an information processing apparatus in which the identification signal generating means (whether it be oscillator circuit 131 in the Dalton device or EEPROM 51 in Moriconi) is contained in the display device and the generated signal is transmitted to the main body through a connection between the display device and the main body.

130.    Accordingly, based on information and belief and the facts above, Kraus knew that his August 12, 2004 characterization of Moriconi 1 was false based on his previous statements regarding the disclosures of Moriconi 1 and Moriconi 2.

131.    During reexamination of the '180 Patent, in Reexamination Control No. 95/000,480 the Examiner held in both an Office Action and in a subsequent Action Closing Prosecution that claims 1-13 of the '180 Patent were anticipated by Moriconi 1. These claims are anticipated by Moriconi 1 for at least the reasons set forward in the November 10, 2014 Examiner's Answer. Upon information and belief, if not for Kraus's knowingly false statements, the '180 Patent would not have issued. Upon information and belief and the facts above, Kraus's knowingly false statements were made with an intent to deceive.

132.    Kraus's acts of inequitable conduct renders all subsequent continuation or divisional applications within the patent family unenforceable under the doctrine of infectious unenforceability. *See, e.g., Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804 (Fed. Cir. 1990).

133.   Kraus's inequitable conduct during prosecution of the '180 Patent renders the '180 and '342 Patents unenforceable.

**Named Inventors Arai and Kitou Failed to Disclose VESA Prior Art References With An Intent To Deceive The PTO**

134.   In the period of time leading up to February 10, 1993 (the earliest priority date claimed in the Asserted Patents), VESA was the only standards-setting organization that focused directly on the subject matter described and claimed in these patents. Specifically, it was the only standards-setting organization that was focused on different techniques for allowing communication between a display device and an external video source, such as a computer. Prior to the priority dates for the Asserted Patents, VESA provided an industry forum to develop, promote and support open standards for the display industry. This forum included a Monitor Committee that discussed, debated, agreed on, and adopted standards for computer monitors.

135.   Prior to the filing of the asserted patents, and during these patents' prosecutions, Hitachi and/or its U.S. subsidiaries or affiliates including, but not limited to, Hitachi America Ltd. and Hitachi Yokohama USA, were members of VESA's Monitor Committee. On information and belief, Hitachi representatives received materials disseminated by VESA and its Monitor Committee members relating to standards for display designs prior to the filing of the Asserted Patents.

136.   Such materials are material to the patentability of one or more of the Asserted Patents to the extent that they define a communications protocol that allows for the exchange of configuration information between a display and a video controller in a computer body. By way of a non-limiting example,  VDDP Proposal Draft 5.05, was disseminated to VESA members on July 24, 1992. VDDP Proposal Draft 5.05, either alone or in combination of the prior art of record, anticipates or renders obvious at least claim 1 of the '845 Patent, claim 1 of the '147

27

Patent, claim 3 of the '090 Patent, claim 23 of the '970 Patent, claim 1 of the '088 Patent, and

claim 1 of the '588 Patent under the broadest reasonable interpretation of those claims.

137.    Upon information and belief, the named inventors of the asserted patents, Ikuya

Arai and Kouji Kitou, as engineers working in the same field at Hitachi, were aware of VESA

Materials including the VDDP Proposal Draft 5.05  and its materiality to the Asserted Patents.

138.    Upon information and belief, the '845, '147, '090, '970, '088, and '588 Patents

would not have issued, but for the non-disclosure of VESA Materials including the VDDP

Proposal Draft 5.05.

139.    Notwithstanding their knowledge of the materiality of the information disclosed

in the VESA materials, Arai and Kitou did not disclose VESA Materials including the VDDP

Proposal Draft 5.05 to the PTO during prosecution of the '845, '147, '090, '970, '088, and '588

Patents, and this failure to disclose was done with an intent to deceive.

140.    Arai and Kitou's acts of inequitable conduct render all subsequent continuation or

divisional applications within the patent family unenforceable under the doctrine of infectious

unenforceability. *See, e.g., Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804

(Fed. Cir. 1990).

141.    Arai and Kitou's inequitable conduct, during prosecution of the '845 Patent,

renders the '845, '147, '088, '090, '970, '180, and '342 Patents unenforceable.

142.    Arai and Kitou's inequitable conduct, during prosecution of the '147 Patent,

renders the '174, '088, '090, '970, '180, and '342 Patents unenforceable.

143.    Arai and Kitou's inequitable conduct, during prosecution of the '090 Patent,

renders the '090, '088, '970, '180, and '342 Patents unenforceable.

144.    Arai and Kitou's inequitable conduct, during prosecution of the '088 Patent, renders the '088,'970, '180, and '342 Patents unenforceable.

145.    Arai and Kitou's inequitable conduct, during prosecution of the '970 Patent, renders the '970 Patent unenforceable.

146.    Arai and Kitou's inequitable conduct, during prosecution of the '588 Patent, renders the '588 Patent unenforceable.

### FIFTH DEFENSE

147.    On information and belief, Plaintiff is barred in whole or in part from asserting at least the '088, '970, '342, '180, and '588 Patents against LG under the doctrine of laches, equitable estoppel, or both.

### SIXTH DEFENSE

148.    Plaintiff's claims for damages, if any, against LG are statutorily limited by 35 U.S.C. § 286 and § 287.

### SEVENTH DEFENSE

149.    Plaintiff's claims against LG are barred under LG's express or implied license to any valid claim of the '088, '970, '342, '180, and '588 Patents, and/or under the doctrines of patent exhaustion and first sale, to the extent that Plaintiff seeks royalties or damages for any activity that is, or will be, licensed to persons or companies that supply accused services, devices or their infrastructure to LG.

### EIGHTH DEFENSE

150.    Plaintiff is estopped by virtue of prior art and/or due to conduct and representations during the prosecution of the '088, '970, '342, '180, and '588 Patents from asserting infringement against LG.

29

## NINTH DEFENSE

151.     To the extent that Mondis, its alleged predecessors in interest to the Asserted

Patents, and/or their respective licensees, failed to properly mark any of the relevant products as

required by 35 U.S.C. § 287 or otherwise give proper notice that LG's actions allegedly infringed

the Asserted Patents, LG is not liable to Mondis for the acts alleged to have been performed

before it received actual notice that it was allegedly infringing the Asserted Patents.

## TENTH DEFENSE

152.     Plaintiff is estopped from asserting a construction of any claim of the '088, '970,

'342, '180, and '588 patents in any manner inconsistent with prior positions taken before the

United States Patent and Trademark Office or any court.

## ELEVENTH DEFENSE

153.     Plaintiff is estopped by reasons of prosecution history estoppel from asserting

infringement of the '088, '970, '342, '180, and '588 Patents by application of the doctrine of

equivalents.

## TWELFTH DEFENSE

154.     The '088, '970, '342, '180, and '588 Patents are unenforceable because Plaintiff

has unclean hands and/or has misused the Asserted Patents by attempting to enforce them despite

knowing that they are invalid, unenforceable, and/or not infringed by methods or systems

manufactured, used, imported, sold or offered for sale by LG.

## THIRTEENTH DEFENSE

155.     Upon information and belief, Mondis lacks standing to bring this action.

## COUNTERCLAIMS

156.     Without admitting any of the allegations of the Complaint other than those

admitted herein and without prejudice to LG's right to plead additional counterclaims as the facts

30

of the matter warrant, Counterclaimants LG Electronics, Inc. and LG Electronics U.S.A., Inc.

("LG") assert the following counterclaims for Declaratory Relief against Mondis Technology

Ltd. ("Mondis") and allege as follows:

## NATURE OF THE ACTION

157.    This is a civil action for declaratory judgment of non-infringement, patent

invalidity, and unenforceability of one or more claims of the '088, '970, '342, '180, and '588

Patents under 35 U.S.C. §§ 1, *et. seq.* and 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

158.    Plaintiff LG Electronics, Inc. is a corporation organized under the laws of Korea

with its principal place of business at LG Twin Tower 128, Yeoui-daero, Yeongdeungpo-gu,

Seoul, Korea.

159.    Plaintiff LG Electronics U.S.A., Inc. is a company organized under the laws of the

state of Delaware with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs,

New Jersey.

160.    On information and belief, Mondis is a corporation organized under the laws of

England with its principal place of business at Suite 3C, Lyttelton House, 2 Lyttelton Road,

London N2 0EF, England.

## JURISDICTION AND VENUE

161.    LG's counterclaims arise under Title 35 of the United States Code. The Court has

original jurisdiction over the subject matter of these counterclaims pursuant to 28 U.S.C. §§

1331, 1338(a), 2201, and 2202.

162.    Personal jurisdiction in this judicial District is proper at least because Mondis

availed itself of this Court to litigate its patent infringement claims against LG.

163.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c) and 1400(a). Although venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c) and 1400(a), venue is not convenient under 28 U.S.C. § 1404. Accordingly, LG reserves its right to move for a change of venue under 28 U.S.C. § 1404.

164.     As demonstrated by the Complaint filed by Mondis in this action, an actual justiciable controversy exists between LG and Mondis concerning the non-infringement, invalidity, and unenforceability of U.S. Patent Nos. 6,513,088 ("the '088 Patent"), 6,549,970 ("the '970 Patent"), 7,089,342 ("the '342 patent"), 7,475,180 ("the '180 Patent"), and 6,639,588 ("the '588 Patent") (collectively the "Asserted Patents"). Mondis, by its Complaint, has asserted that LG has infringed and is infringing the Asserted Patents. LG asserts that it has not infringed and is not infringing the Asserted Patents and that the Asserted Patents are invalid and/or unenforceable. Absent a declaration of non-infringement, invalidity, and/or unenforceability, Counterclaim Defendant Mondis will continue to wrongfully assert the Asserted Patents against Counterclaim Plaintiff LG, and thereby cause it irreparable injury and damage.

## COUNTERCLAIM I

### (Declaration of Noninfringement of U.S. Patent No. 6,513,088)

165.     LG realleges and incorporates by reference each and every allegation contained in Paragraphs 156-164 of its Counterclaims as though fully set forth herein.

166.     LG has not infringed and is not infringing any valid claim of the '088 Patent directly, contributorily, by way of inducement, literally or under the doctrine of equivalents.

167.     LG is entitled to judgment that the claims of the '088 Patent are not infringed by LG.

## COUNTERCLAIM II

### (Declaration of Invalidity of U.S. Patent No. 6,513,088)

168.    LG realleges and incorporates by reference each and every allegation contained in Paragraphs 156-164 of its Counterclaims as though fully set forth herein.

169.    On information and belief, the claims of the '088 Patent that are allegedly infringed by LG are invalid for failure to comply with one or more of the conditions for patentability specified under Title 35 of the United States Code, including without limitation, Sections 101, 102, 103, and/or 112.

170.    LG is entitled to judgment that the claims of the '088 Patent are invalid.

## COUNTERCLAIM III

### (Declaration of Noninfringement of U.S. Patent No. 6,549,970)

171.    LG realleges and incorporates by reference each and every allegation contained in Paragraphs 156-164 of its Counterclaims as though fully set forth herein.

172.    LG has not infringed and is not infringing any valid claim of the '970 Patent directly, contributorily, by way of inducement, literally or under the doctrine of equivalents.

173.    LG is entitled to judgment that the claims of the '970 Patent are not infringed by LG.

## COUNTERCLAIM IV

### (Declaration of Invalidity of U.S. Patent No. 6,549,970)

174.    LG realleges and incorporates by reference each and every allegation contained in Paragraphs 156-164 of its Counterclaims as though fully set forth herein.

175.    On information and belief, the claims of the '970 Patent that are allegedly infringed by LG are invalid for failure to comply with one or more of the conditions for

33

patentability specified under Title 35 of the United States Code, including without limitation, Sections 101, 102, 103, and/or 112.

176.    LG is entitled to judgment that the claims of the '970 Patent are invalid.

## COUNTERCLAIM V

### (Declaration of Noninfringement of U.S. Patent No. 7,089,342)

177.    LG realleges and incorporates by reference each and every allegation contained in Paragraphs 156-164 of its Counterclaims as though fully set forth herein.

178.    LG has not infringed and is not infringing any valid claim of the '342 Patent directly, contributorily, by way of inducement, literally or under the doctrine of equivalents.

179.    LG is entitled to judgment that the claims of the '342 Patent are not infringed by LG.

## COUNTERCLAIM VI

### (Declaration of Invalidity of U.S. Patent No. 7,089,342)

180.    LG realleges and incorporates by reference each and every allegation contained in Paragraphs 156-164 of its Counterclaims as though fully set forth herein.

181.    On information and belief, the claims of the '342 Patent that are allegedly infringed by LG are invalid for failure to comply with one or more of the conditions for patentability specified under Title 35 of the United States Code, including without limitation, Sections 101, 102, 103, and/or 112.

182.    LG is entitled to judgment that the claims of the '342 Patent are invalid.

## COUNTERCLAIM VII

### (Declaration of Noninfringement of U.S. Patent No. 7,475,180)

183.    LG realleges and incorporates by reference each and every allegation contained in Paragraphs 156-164 of its Counterclaims as though fully set forth herein.

34

184.    LG has not infringed and is not infringing any valid claim of the '180 Patent directly, contributorily, by way of inducement, literally or under the doctrine of equivalents.

185.    LG is entitled to judgment that the claims of the '180 Patent are not infringed by LG.

### COUNTERCLAIM VIII

### (Declaration of Invalidity of U.S. Patent No. 7,475,180)

186.    LG realleges and incorporates by reference each and every allegation contained in Paragraphs 156-164 of its Counterclaims as though fully set forth herein.

187.    On information and belief, the claims of the '180 Patent that are allegedly infringed by LG are invalid for failure to comply with one or more of the conditions for patentability specified under Title 35 of the United States Code, including without limitation, Sections 101, 102, 103, and/or 112.

188.    LG is entitled to judgment that the claims of the '180 Patent are invalid.

### COUNTERCLAIM IX

### (Declaration of Noninfringement of U.S. Patent No. 6,639,588)

189.    LG realleges and incorporates by reference each and every allegation contained in Paragraphs 156-164 of its Counterclaims as though fully set forth herein.

190.    LG has not infringed and is not infringing any valid claim of the '588 Patent directly, contributorily, by way of inducement, literally or under the doctrine of equivalents.

191.    LG is entitled to judgment that the claims of the '588 Patent are not infringed by LG.

## COUNTERCLAIM X

### (Declaration of Invalidity of U.S. Patent No. 6,639,588)

192.    LG realleges and incorporates by reference each and every allegation contained in Paragraphs 156-164 of its Counterclaims as though fully set forth herein.

193.    On information and belief, the claims of the '588 Patent that are allegedly infringed by LG are invalid for failure to comply with one or more of the conditions for patentability specified under Title 35 of the United States Code, including without limitation, Sections 101, 102, 103, and/or 112.

194.    LG is entitled to judgment that the claims of the '588 Patent are invalid.

## COUNTERCLAIM XI

### (Declaration of Unenforceability of the Patents-In-Suit Due to Equitable Estoppel)

195.    LG realleges and incorporates by reference each and every allegation contained in Paragraphs 156-164 of its Counterclaims as though fully set forth herein.

196.    Upon information and belief, the '088, '970, '342, '180, and '588 Patents may be alleged to have been assigned to Mondis, by Hitachi, Ltd. ("Hitachi"), a corporation organized and existing under the laws of Japan.

197.    Upon information and belief, Hitachi, through its subsidiaries and agents, has been a member of the Video Electronic Standards Association ("VESA"), a non-profit standards-setting association composed of virtually all major computer hardware and software manufacturers, since 1991.

198.    VESA requires its members to disclose the existence of patents and pending patent applications relating to proposed standards. Prior to approval of a proposed standard by VESA, VESA members are required to either certify that they do not hold and do not anticipate to hold any patents required to practice the proposed standard or to disclose the patents and/or

36

applications required to practice the proposed standard and certify that the patents and/or applications will be licensed without compensation or under reasonable and non-discretionary terms and conditions for the purpose of implementing the standard.

199.   From the early 1990s, VESA developed a number of design standards for a "display data channel" ("DDC") to standardize "plug and play" monitors.

200.   Compatibility with standards such as DDC is effectively mandatory to participate in the market for plug-and-play monitors.

201.   Upon information and belief, Hitachi, through its subsidiaries and agents, participated in the development of the VESA DDC standards. Hitachi withheld from VESA, during the development of the VESA DDC standards, pending applications that Hitachi knew were potentially relevant to proposed or actual VESA DDC standards. These pending applications later resulted in the '088, '970, '342, '180, and '588 Patents.

202.   Had VESA known about the then pending applications that resulted in the '088, '970, '342, '180, and '588 Patents, VESA would have revised the proposed standards and/or negotiated a royalty-free license for the implementation of the proposed standards.

203.   As a consequence, Hitachi, by its non-disclosure of the then pending applications that resulted in the '088, '970, '180, '342, and '588 Patents to VESA during the development of the VESA DDC standards, is equitably estopped from asserting infringement of the '088, '970, '342, '180, and '588 Patents by implementation of the VESA DDC standards.

204.   Mondis, if proven as an assignee of the '088, '970, '180, '342, and '588 Patents by Hitachi, receives only those rights to which Hitachi is entitled to assign. Mondis is, therefore, also estopped from asserting infringement of the '088, '970, '342, '180, and '588 Patents by implementation of the VESA DDC standards.

37

205.     Mondis, if proven as an assignee of the '088, '970, '342, '180, and '588 Patents by Hitachi, has actual and/or imputed knowledge that Hitachi withheld information of the then pending applications that resulted in the '088, '970, '342, '180, and '588 Patents to VESA during the development of the VESA DDC standards. Mondis is, therefore, additionally estopped from asserting infringement of the '088, '970, '342, '180, and '588 Patents by implementation of the VESA DDC standards.

## COUNTERCLAIM XII

**(Declaration of Unenforceability of the Patents-In-Suit Due to Implied License)**

206.     The allegations of Paragraphs 156-164 are incorporated herein.

207.     Mondis is estopped from asserting infringement of the '088, '970, '342, '180, and '588 patents by implementation of the VESA DDC standards, because an implied license was created to '088, '970, '342, '180, and '588 Patents by the non-disclosure of the then pending applications that resulted in the '088, '970, '342, '180, and '588 Patents to VESA during the development of the VESA DDC standards.

## COUNTERCLAIM XIII

**(Declaration of Unenforceability of the Patents-In-Suit Due to Patent Misuse)**

208.     The allegations of Paragraphs 156-164 are incorporated herein.

209.     Mondis is estopped from asserting infringement of the '088, '970, '342, '180, and '588 patents by implementation of the VESA DDC standards, because Mondis impermissibly broadened the scope of the '088, '970, '342, '180, and '588 patents by withholding disclosure of the then pending applications that resulted in the '088, '970, '342, '180, and '588 patents to VESA during the development of the VESA DDC standards.

210.     The '088, '970, '342, '180, and '588 Patents are unenforceable, because Plaintiff has unclean hands and/or has misused the Patents-in-Suit by attempting to enforce them despite

knowing that they are invalid, unenforceable, and/or not infringed by methods or systems manufactured, used, imported, sold or offered for sale by LG. Pursuant to 37 C.F.R. § 1.56, inventors, patent counsel and others associated with the filing and prosecution of a patent application are under a duty to disclose all information to the PTO that is known to them and that a reasonable patent examiner would find material to patentability.

## COUNTERCLAIM XIV

### (Declaration of Unenforceability of the Patents-In-Suit Due to Inequitable Conduct)

211.    The allegations of Paragraphs 156-64 are incorporated herein.

212.    As set forth in LG's Fourth Affirmative Defense at Paragraphs 88-123, which are incorporated by reference herein, U.S. Patent Nos. 5,652,845 ( "'845 Patent"), 5,887,147 ("'147 Patent"),  6,247,090 ("'090 Patent"), to which certain asserted patents claim priority, and the '088, '970, '180, and '342 Patents are unenforceable as a result of inequitable conduct before the Patent and Trademark Office ("PTO"). Prosecuting attorney of record, Melvin Kraus, breached his absolute duty of candor and good faith before the PTO by his knowing and deliberate failure to disclose, to the PTO during the prosecution of the '088, '970, '180, and '342 Patents, prior art that was so material that, but for such non-disclosure, the '088, '970, '180, and '342 Patents would not have issued. This failure to disclose was done with the intent to deceive the PTO into allowing the '088, '970, '180, and '342 Patents such that each of these patents are unenforceable. Additionally, these acts of inequitable conduct render the '180 and '342 Patents unenforceable through the doctrine of infectious inequitable conduct.

213.    For the reasons set forth in greater detail in LG's Fourth Affirmative Defense at Paragraphs 124-133, which are incorporated by reference herein, upon information and belief, the '180 Patent is unenforceable as a result of inequitable conduct before the PTO. Kraus breached his absolute duty of candor and good faith before the PTO by knowingly making false

39

statements to the PTO regarding the disclosure of the prior art that was so material that, but for such false statements, the '180 Patent would not have issued. These false statements were made with the intent to deceive the PTO into allowing the '180 Patent to issue and such inequitable conduct renders the '180 Patent unenforceable. Additionally, these acts of inequitable conduct render the '342 Patent unenforceable through the doctrine of infectious inequitable conduct.

214.    For the reasons set forth in greater detail in LG's Fourth Affirmative Defense at Paragraphs 134-146, which are incorporated by reference herein, the asserted patents are unenforceable as a result of inequitable conduct before the PTO. Named inventors Ikuya Arai and Kouji Kitou breached their absolute duty of candor and good faith before the PTO by their knowing and deliberate failure to disclose, to the PTO during the prosecution of the '845, '147, '090, '088, '588, and '970 Patents, prior art that was so material that, but for such non-disclosure, the '845, '147, '090, '088, '588, and '970 Patents would not have issued. This failure to disclose was done with the intent to deceive the PTO into allowing the patents. Accordingly, each of these acts of inequitable  conduct renders the '845, '147, '090, '088, '588, and '970 Patents unenforceable. Additionally, these same acts of inequitable conduct render the '180 and '342 Patents unenforceable through the doctrine of infectious inequitable conduct.

**PRAYER FOR RELIEF**

WHEREFORE, LG denies that Mondis is entitled to any of the relief prayed for in its Complaint, and LG prays that judgment be entered against Mondis as follows:

a)    That the Court enter judgment in favor of LG and against Mondis on all of the claims in Mondis's Complaint;

b)    That Mondis's claims be dismissed in their entirety, with prejudice;

c)    That Mondis takes nothing by way of its claims;

40

d)       That the Court enter judgment in favor of LG on each of its Counterclaims against Mondis;

e)       That LG be found not to have infringed the '088 Patent;

f)       That the '088 patent be declared to be invalid and unenforceable against LG;

g)       That LG be found not to have infringed the '970 Patent;

h)       That the '970 patent be declared to be invalid and unenforceable against LG;

i)       That LG be found not to have infringed the '342 Patent;

j)       That the '342 patent be declared to be invalid and unenforceable against LG;

k)       That LG be found not to have infringed the '180 Patent;

l)       That the '180 patent be declared to be invalid and unenforceable against LG;

m)       That LG be found not to have infringed the '588 Patent;

n)       That the '588 patent be declared to be invalid and unenforceable against LG;

o)       That this case be declared an exceptional case;

p)       That LG be awarded its costs and attorneys' fees pursuant to 35 U.S.C. § 285; and

q)       That LG be awarded such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, LG hereby requests a trial by jury on all claims and issues so triable.

41

Respectfully submitted,

MAYER BROWN LLP

Dated: January 21, 2015

By: */s/ Jamie B. Beaber*

Jamie B. Beaber (D.C. Bar No. 484186)
Michael Maas  (D.C. Bar No. 493685)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC  20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
jbeaber@mayerbrown.com
mmaas@mayerbrown.com

Michael E. Jones
State Bar No. 10929400
Allen F. Gardner
State Bar No. 24043679
POTTER MINTON P.C.
110 N. College Avenue, Suite 500
Tyler, Texas  75702
Telephone: (903) 597-8311
Facsimile: (903) 593-0846
mikejones@potterminton.com
allengardner@potterminton.com


Counsel for Defendants LG ELECTRONICS,
INC. and LG ELECTRONICS U.S.A., INC.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on this 21st day of January, 2015. Any other counsel of record will be served via First Class U.S. Mail on this same date.

*/s/ Jamie B. Beaber*
Jamie B. Beaber

CONFIDENTIAL MATERIAL REDACTED

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONDIS TECHNOLOGY LTD.,<br><br>               Plaintiff,<br><br>     v.<br><br>LG ELECTRONICS, INC. and<br>LG ELECTRONICS U.S.A.,<br>INC.,<br><br>               Defendants. | Civil Action No.: 2:15-cv-04431<br>(SRC)(CLW)<br><br>*Electronically Filed*<br><br>████████████<br><br>**ORAL ARGUMENT REQUESTED** |

## PLAINTIFF MONDIS TECHNOLOGY LTD.'S
## BRIEF IN OPPOSITION TO LG'S MOTION TO DISMISS
## FOR LACK OF SUBJECT MATTER JURISDICTION

*Of Counsel*

Jeffrey B. Plies (*pro hac vice*)
jeff.plies@dechert.com
DECHERT LLP
300 W. 6th Street, Suite 2010
Austin, TX 78701
Telephone: (512) 394-3000
jeffrey.plies@dechert.com

Robert D. Rhoad
DECHERT LLP
100 Overlook Center, 2nd Floor
Princeton, NJ  08540
(609) 306-4775
robert.rhoad@dechert.com

Martin J. Black
Brian M. Goldberg
Jeffrey S. Edwards (*pro hac vice*)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000
martin.black@dechert.com
brian.goldberg@dechert.com
jeffrey.edwards@dechert.com

*Attorneys for Plaintiff Mondis
Technology Ltd.*

CONFIDENTIAL MATERIAL REDACTED

preclude prudential standing).

    **a.**    **LG BR. PP. 26-28: "THE 'LICENSEE'S PURPORTED RIGHT TO BRING SUIT, TOGETHER WITH … ANY RIGHT TO SUE PURPORTEDLY RETAINED BY THE LICENSOR'"**



*Alvarado Ortho. Res., L.P. v. Linvatec Corp.*, No. 11-CV-246-IEG

(RBB), 2013 WL 2351814, *6 (S.D. Cal. May 24, 2013).

*Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1193 (Fed. Cir. 2007); *Applied Interact,*

*LLC v. Vermont Teddy Bear Co.*, No. 04 Civ. 8713 HB, 2005 WL 1785115, *5

(S.D.N.Y. July 28, 2005) (rejecting argument that third-party licensee's right to sue

infringers defeated prudential standing where license's nonexclusive nature made

exercise of that right doubtful); *Princeton Digital Image*, 2013 WL 1454945 at *6

(denying Rule 12(b)(1) motion to dismiss for lack of standing where patent assignor who received nonexclusive rights to practice patents, and rights to enforce, sue and license patents against numerous infringers lacked standing to sue after patent expiration and was not a necessary party).



CONFIDENTIAL MATERIAL REDACTED



**b.** **LG Br. pp. 27-28: "The 'transfer of the exclusive right to make, use, and sell products or services under the patent'"**

(1) **Hitachi's post-PSALA rights**

*Luminara*, 814 F.3d at 1351; *Patent Harbor,* 2012 WL 12842300 at *5, *citing*

*Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005).



████████████████████████████████████████████████████

██████████████

    **d.**　　**LG BRIEF PP. 30-31: "THE 'RIGHT OF THE LICENSOR TO
RECEIVE A PORTION OF THE RECOVERY IN
INFRINGEMENT SUITS BROUGHT BY THE LICENSEE'"**

Contrary to LG, ████████████████████████████████████████

████████████████████████████████████████████████████

████████.[9]  *Vaupel*, 944 F.2d at 875 ("[T]he right to receive infringement damages

was merely a means of compensation under the agreement; this was not

inconsistent with an assignment[,]" *citing Rude v. Westcott*, 130 U.S. 152, 162-63

(1889)); *Luminara*, 814 F.3d at 1351 (licensor's financial interest in patent's

exploitation not a substantial right).

LG cites the *Propat* decision, but there the compensation the plaintiff paid

was just one factor among many that the Court found important to its holding, and

was not the sole or even most important factor.  More important were that the

agreement specified that the absent party was the patent's owner, that the plaintiff

lacked the right (let alone the exclusive right) to practice the patent, that the owner

would control related patent prosecution and pay maintenance fees, had a right to

---

[9] 

Appx7006-7007

Confidential Material Subject to Protective Order Redacted

The present invention is related to a display system in which control data is communicated between a computer system and a display device.

The control data includes parameters for specifying the geometry and resolution of an image presented on the display device. In a display system comprising a raster-scanned display device such as a Cathode Ray Tube (CRT) display device, these parameters are determined by the rates and amplitudes of horizontal and vertical scan signals generated for producing the raster scan by electrical circuits in the display device. In order to generate the image, the scan signals are synchronised to video signals from a video source such as a computer system by synchronisation (sync) pulses also generated by the video source.

Some display devices can only operate in a single display mode in accordance with a single set of parameters. Other display devices can be configured to operate in any one of a number of display modes characterised by different sets of parameters. The latter will hereinafter be referred to as multiple mode display devices. In a display device controlled by a computer system it is desirable for the computer system to identify the type of the display device so that appropriate video and sync signals can be generated. Many examples of such computer systems, including the IBM PS 2 range, comprise a video graphics adapter (VGA adapter) having an output port for connecting video and sync signals to a display device. The VGA adapter also has logic responsive to the manner in which identification pins in the output port are terminated when connected to the display device. The logic identifies the type of display device connected to the VGA adapter from these terminations.

UK Patent No.2,162,026 describes an example of a display system employing a multiple-mode display device receiving video and sync signals from a computer system display adapter. The display device can operate in any one of four display modes. The computer system can be instructed to provide sync pulses of either positive or negative polarities. Each polarity combination indicates a different display mode. The display device includes decoding logic for configuring the display device to operate in a particular display mode in response to predetermined sync pulse polarities.

The display systems of the prior art have the disadvantage that the display interfaces of the prior art can identify, and therefore generate appropriate control signals for, only a limited number different display devices. This limitation arises because the number of pins available for display device identification and control is limited by the physical form of the output port.

All object of the present invention is therefore to provide a display system having a display adapter which is potentially compatible with an unlimited variety of display devices.

In accordance with the present invention, there is now proposed a display system comprising a display device for generating a visual output in response to a plurality of data signals defining the data to be displayed, a display adapter circuit for generating the data signals in a form specified by control data, the control data being unique to the display device, an output port for connecting the data signals from the display adapter circuit to the display device and for connecting the control data from the display device to the display adapter circuit, characterised in that the display system further comprises a non-volatile memory located in the display device for storing the extended control data in the form of a plurality of control codes, and communication logic for communicating the control codes between the memory and the output port in response to command signals generated by the display adapter circuit. This has the advantage that, since the control data such as the signal timing requirements of any new display device can now be stored in the form of digital control codes held within the memory of the display device, the display system programming does not require updating every time a different display device is connected to the output port. Instead, the display adapter can now read the new timing requirements from the memory of the new display device for the purpose of generating video and sync signals for correctly driving the new display device.

Preferably, the communication logic comprises a serial data link for communicating the control code between the display device and the output port, device control logic for communicating the control code between the memory and the serial data link, and adapter control logic for communicating the control code between the serial data link and the display adapter circuit. This has the advantage that, where the display system comprises a multiple mode display device, the display adaptor circuit can use the serial link to configure the display device to operate in a desired display mode.

An example of the present invention will now be described with reference to the accompanying drawings in which:

Figure 1 is a block diagram of a computer system incorporating a display system including a display device;

Figure 2 is a block diagram of communication logic for for communicating display information between the display adapter and the display device;

Figure 1 illustrates an example of a computer system incorporating a display system having a CRT display device 88.

3

LGEMOND00066080

**22** MAKING CONNECTIONS

# Connecting to a HD receiver, DVD, or VCR player

Connect a HD receiver, DVD, or VCR player to the TV and select an appropriate input mode.

## HDMI Connection

**HDMI is the best way to connect a device.**

Transmits the digital video and audio signals from an external device to the TV. Connect the external device and the TV with the HDMI cable as shown in the following illustration.

 **NOTE**
- Use the latest High Speed HDMI™ Cable with CEC (Customer Electronics Control) function.
- High Speed HDMI™ Cables are tested to carry an HD signal up to 1080p and higher.

**Choose any HDMI input port to connect.**
**It does not matter which port you use.**





(*Not Provided)

DVD/ Blu-Ray / HD Cable Box / HD STB

 NOTE
- DTV Audio Supported Codec: MPEG, Dolby Digital
- HDMI Audio Supporeted Format: Dolby Digital, PCM (Up to 192 KHz, 32k/44.1k/48k/88k/96k/176k/192k) -> Not supported DTS.

**ARC (Audio Return Channel)**
- When connected with a high-speed HDMI cable, digital audio can be sent to a compactible device without an additional optical audio cable.
- ARC is only supported on the HDMI input 1 (ARC) port. An external audio device that supports ARC should be connected to HDMI 1 if you wish to use ARC.

ENGLISH

LGEMOND00003248

## Method B: DVI to HDMI Connection



## Method C: RGB Connection

Monitor Asset Manager Report, generated 10/18/2016
Copyright (c) 1995-2016, EnTech Taiwan.
--------------------------

Monitor #1 [Real-time 0x0061]
    Model name............... LG TV
    Manufacturer............. LGE
    Plug and Play ID......... GSM0001
    Serial number............ 97240
    Manufacture date......... 2009, ISO week 3
    Filter driver............ None
    --------------------------
    EDID revision............ 1.3
    Input signal type........ Digital
    Color bit depth.......... Undefined
    Display type............. RGB color
    Screen size.............. 1150 x 650 mm (52.0 in)
    Power management......... Not supported
    Extension blocs.......... 1 (CEA-EXT)
    ------------------------
    DDC/CI................... Not supported

Color characteristics
    Default color space...... Non-sRGB
    Display gamma............ 2.50
    Red chromaticity......... Rx 0.640 - Ry 0.340
    Green chromaticity....... Gx 0.300 - Gy 0.690
    Blue chromaticity........ Bx 0.138 - By 0.038
    White point (default).... Wx 0.282 - Wy 0.297
    Additional descriptors... None

Timing characteristics
    Horizontal scan range.... 31-60kHz
    Vertical scan range...... 56-63Hz
    Video bandwidth.......... 90MHz
    CVT standard............. Not supported
    GTF standard............. Not supported
    Additional descriptors... None
    Preferred timing......... Yes
    Native/preferred timing.. 1360x768p at 60Hz (16:9)
        Modeline.............. "1360x768" 84.750 1360 1424 1560 1776 768 771 777 798
+hsync +vsync
    Detailed timing #1....... 1280x768p at 60Hz (16:9)
        Modeline.............. "1280x768" 79.500 1280 1344 1472 1664 768 771 778 798
+hsync +vsync

Standard timings supported
        640 x  480p at  60Hz - IBM VGA

Defendants' Trial
Exhibit

LG-297

LGEMOND00153187

Appx10862-10892

Confidential Material Subject to Protective Order Redacted

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| MONDIS TECHNOLOGY LTD, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Civil Case No. 2:07-CV-565 |
| | : | |
| LG ELECTRONICS, INC., | : | |
| LG ELECTRONICS, USA, INC. | : | |
| HON HAI PRECISION INDUSTRY CO., LTD., | : | |
| a/k/a FOXCONN, | : | |
| INNOLUX DISPLAY CORP., and | : | JURY TRIAL DEMANDED |
| INNOLUX CORP. | : | |
| | : | |
| Defendants. | : | |

## THIRD AMENDED COMPLAINT

Plaintiff Mondis Technology Ltd. ("Mondis" or "Plaintiff), by way of Complaint against

defendants Hon Hai Precision Industry Co., Ltd., a/k/a/ Foxconn ("Hon Hai"), and Innolux

Display Corp. and Innolux Corp. (collectively, "Innolux"), hereby alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for patent infringement arising under the Patent Laws of the

United States, 35 U.S.C. § 101, *et seq*.

## THE PARTIES

2.      Plaintiff Mondis is a corporation organized under the laws of England with its

principal place of business at 19 Perrins Lane, Hampstead, London NW3 1QY, England.

3.      Defendant Hon Hai is a company organized under the laws of Taiwan with its

principal place of business at 2 Tzu Yu St., Tu-Cheng City, Taiwan, Republic of China.

Defendants' Trial
Exhibit
LG-422

LGEMOND00182971

4.     Hon Hai maintains an office in the United States at 468 E. Lambert Road, Fullerton, California, and has a registered agent located at 10515 Okanella St., Suite 800, Houston, Texas.

5.     Defendant Innolux Display Corporation is a company organized under the laws of Taiwan with its principal place of business at No. 160 Kesyue Rd., Chu-Nan Site, Taiwan, Republic of China.

6.     Defendant Innolux Corporation is a company organized under the laws of the state of Texas with its principal place of business at 2525 Brockton Dr., Austin, Texas and a registered agent at 8801 Fallbrook Dr., Houston, Texas.

7.     Hon Hai and Innolux (the "Foxconn Defendants") are an inter-related group of companies, with overlapping facilities and registered agents throughout Texas, that all manufacture and sell products under the trade name Foxconn.  Together, the Foxconn Defendants comprise one of the largest contract electronics manufacturers in the world for computer, consumer electronics, and communications products.

## JURISDICTION AND VENUE

8.     This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).  Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1400(b).

9.     The Foxconn Defendants manufacture and assemble computer monitors and televisions ("TVs") that infringe the patents-in-suit, as is alleged below, and those products are sold and offered for sale in the State of Texas, including in this judicial district.

- 2 -

LGEMOND00182972

10.     The Foxconn Defendants act as an original equipment manufacturer ("OEM"), an original design manufacturer ("ODM"), and/or a contract manufacturer, pursuant to which the Foxconn Defendants manufacturer products under the brand names of others.  Those products, including computer monitors and TVs, are sold throughout the United States, creating a well-established U.S. distribution chain.  The Foxconn Defendants know, expect, and intend that, by selling computer monitors and TVs designed for use in the U.S. market, some of those computer monitors and TVs will be sold in the State of Texas, including in this judicial district.

**COUNT I – INFRINGEMENT OF U.S. PATENT NO. 6,057,812**

11.     Mondis repeats and realleges the allegations of paragraphs 1 through 10 as if set forth herein.

12.     On May, 2, 2000, United States Letters Patent No. 6,057,812 ("the '812 Patent"), entitled IMAGE DISPLAY APPARATUS WHICH BOTH RECEIVES VIDEO INFORMATION AND OUTPUTS INFORMATION ABOUT ITSELF, was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '812 Patent is attached as Exhibit A to this Complaint.

13.     Mondis is the assignee and owner of the right, title, and interest in and to the '812 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

14.     Without license or authorization, the Foxconn Defendants have been infringing the '812 Patent, and contributing to and actively inducing the infringement of said patent by others in the United States, by making, using, selling, offering for sale, and/or importing into the United States, including within this judicial district, certain computer monitors that embody the

- 3 -

LGEMOND00182973

inventions claimed in the '812 Patent.  Such acts constitute infringement under at least 35 U.S.C. §§ 271(a), (b), and/or (c).

15.     On information and belief, Defendants have known of the existence of the '812 Patent, but have continued to infringe that patent despite such knowledge.

16.     On information and belief, Defendants' acts of infringement as set out in the previous paragraphs have been deliberate and willful, and in reckless disregard of Mondis's patent rights.

17.     Mondis has been damaged by Defendants' infringing activities.  On information and belief, Defendants will continue their infringing activities, and continue to damage Mondis, unless enjoined by this Court. Mondis has no adequate remedy at law.

<u>**COUNT II – INFRINGEMENT OF U.S. PATENT NO. 6,247,090**</u>

18.     Mondis repeats and realleges the allegations of paragraphs 1 through 10 as if set forth herein.

19.     On June 12, 2001, United States Letters Patent No. 6,247,090 ("the '090 Patent"), entitled DISPLAY APPARATUS ENABLED TO CONTROL COMMUNICABILITY WITH AN EXTERNAL COMPUTER USING IDENTIFICATION INFORMATION, was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '090 Patent is attached as Exhibit B to this Complaint.

20.     Mondis is the assignee and owner of the right, title, and interest in and to the '090 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

- 4 -

LGEMOND00182974

21.     Without license or authorization, the Foxconn Defendants have been infringing the '090 Patent, and contributing to and actively inducing the infringement of said patent by others in the United States, by making, using, selling, offering for sale, and/or importing into the United States, including within this judicial district, certain computer monitors and TVs that embody the inventions claimed in the '090 Patent.  Such acts constitute infringement under at least 35 U.S.C. §§ 271(a), (b), and/or (c).

22.     On information and belief, Defendants have known of the existence of the '090 Patent, but have continued to infringe that patent despite such knowledge.  In particular, and among other things, the Foxconn Defendants were given notice of the '090 Patent in accordance with 35 U.S.C. § 287 by letter dated April 1, 2005.

23.     On information and belief, Defendants' acts of infringement as set out in the previous paragraphs have been deliberate and willful, and in reckless disregard of Mondis's patent rights.

24.     Mondis has been damaged by Defendants' infringing activities.  On information and belief, Defendants will continue their infringing activities, and continue to damage Mondis, unless enjoined by this Court.  Mondis has no adequate remedy at law.

**COUNT III – INFRINGEMENT OF U.S. PATENT NO. 6,304,236**

25.     Mondis repeats and realleges the allegations of paragraphs 1 through 10 as if set forth herein.

26.     On October 16, 2001, United States Letters Patent No. 6,304,236 ("the '236 Patent"), entitled DISPLAY APPARATUS FOR ADJUSTING THE DISPLAY IMAGE USING A CONTROL SIGNAL FROM AN EXTERNAL COMPUTER, was duly and legally issued by

- 5 -

LGEMOND00182975

the United States Patent and Trademark Office.  A true and correct copy of the '236 Patent is

attached as Exhibit C to this Complaint.

27.     Mondis is the assignee and owner of the right, title, and interest in and to the '236

Patent, including the right to assert all causes of action arising under said patent and the right to

any remedies for infringement of it.

28.     Without license or authorization, the Foxconn Defendants have been infringing

the '236 Patent, and contributing to and actively inducing the infringement of said patent by

others in the United States, by making, using, selling, offering for sale, and/or importing into the

United States, including within this judicial district, certain computer monitors that embody the

inventions claimed in the '236 Patent.  Such acts constitute infringement under at least 35 U.S.C.

§§ 271(a), (b), and/or (c).

29.     On information and belief, Defendants have known of the existence of the '236

Patent, but have continued to infringe that patent despite such knowledge.

30.     On information and belief, Defendants' acts of infringement as set out in the

previous paragraphs have been deliberate and willful, and in reckless disregard of Mondis's

patent rights.

31.     Mondis has been damaged by Defendants' infringing activities.  On information

and belief, Defendants will continue their infringing activities, and continue to damage Mondis,

unless enjoined by this Court.  Mondis has no adequate remedy at law.

## COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 6,513,088

32.     Mondis repeats and realleges the allegations of paragraphs 1 through 10 as if set

forth herein.

- 6 -

LGEMOND00182976

33.     On January 28, 2003, United States Letters Patent No. 6,513,088 ("the '088 Patent"), entitled DISPLAY UNIT AND METHOD ENABLING BI-DIRECTIONAL COMMUNICATION WITH VIDEO SOURCE, was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '088 Patent is attached as Exhibit D to this Complaint.

34.     Mondis is the assignee and owner of the right, title, and interest in and to the '088 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

35.     Without license or authorization, the Foxconn Defendants have been infringing the '088 Patent, and contributing to and actively inducing the infringement of said patent by others in the United States, by making, using, selling, offering for sale, and/or importing into the United States, including within this judicial district, certain computer monitors and TVs that embody the inventions claimed in the '088 Patent. Such acts constitute infringement under at least 35 U.S.C. §§ 271(a), (b), and/or (c).

36.     On information and belief, Defendants have known of the existence of the '088 Patent, but have continued to infringe that patent despite such knowledge.  In particular, and among other things, the Foxconn Defendants were given notice of the '088 Patent in accordance with 35 U.S.C. § 287 by letter dated April 1, 2005.

37.     On information and belief, Defendants' acts of infringement as set out in the previous paragraphs have been deliberate and willful, and in reckless disregard of Mondis's patent rights.

- 7 -

LGEMOND00182977

38.    Mondis has been damaged by Defendants' infringing activities.  On information and belief, Defendants will continue their infringing activities, and continue to damage Mondis, unless enjoined by this Court Months has no adequate remedy at law.

### COUNT V – INFRINGEMENT OF U.S. PATENT NO, 6,549,970

39.    Mondis repeats and realleges the allegations of paragraphs 1 through 10 as if set forth herein.

40.    On April 15, 2003, United States Letters Patent No. 6,549,970 ("the '970 Patent"), entitled DISPLAY UNIT WITH CONTROLLER ENABLING BI-DIRECTIONAL COMMUNICATION WITH COMPUTER, was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '970 Patent is attached as Exhibit E to this Complaint.

41.    Mondis is the assignee and owner of the right, title, and interest in and to the '970 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

42.    Without license or authorization, the Foxconn Defendants have been infringing the '970 Patent, and contributing to and actively inducing the infringement of said patent by others in the United States, by making, using, selling, offering for sale, and/or importing into the United States, including within this judicial district, certain computer monitors and TVs that embody the inventions claimed in the '970 Patent.  Such acts constitute infringement under at least 35 U.S.C. §§ 271(a), (b), and/or (c).

43.    On information and belief, Defendants have known of the existence of the '970 Patent, but have continued to infringe that patent despite such knowledge.  In particular, and

LGEMOND00182978

among other things, the Foxconn Defendants were given notice of the '970 Patent in accordance
with 35 U.S.C. § 287 by letter dated April 1, 2005.

44.     On information and belief, Defendants' acts of infringement as set out in the
previous paragraphs have been deliberate and willful, and in reckless disregard of Mondis's
patent rights.

45.     Mondis has been damaged by Defendants' infringing activities.  On information
and belief, Defendants will continue their infringing activities, and continue to damage Mondis,
unless enjoined by this Court.  Mondis has no adequate remedy at law.

### COUNT VI – INFRINGEMENT OF U.S. PATENT NO. 6,639,588

46.     Mondis repeats and realleges the allegations of paragraphs 1 through 10 as if set
forth herein.

47.     On October 28, 2003, United States Letters Patent No. 6,639,588 ("the '588
Patent"), entitled IMAGE DISPLAY APPARATUS, was duly and legally issued by the United
States Patent and Trademark Office.  A true and correct copy of the '588 Patent is attached as
Exhibit F to this Complaint.

48.     Mondis is the assignee and owner of the right, title, and interest in and to the '588
Patent, including the right to assert all causes of action arising under said patent and the right to
any remedies for infringement of it.

49.     Without license or authorization, the Foxconn Defendants have been infringing
the '588 Patent, and contributing to and actively inducing the infringement of said patent by
others in the United States, by making, using, selling, offering for sale, and/or importing into the
United States, including within this judicial district, certain computer monitors that embody the

- 9 -

LGEMOND00182979

inventions claimed in the '588 Patent.  Such acts constitute infringement under at least 35 U.S.C. §§ 271(a), (b), and/or (c).

50.     On information and belief, Defendants have known of the existence of the '588 Patent, but have continued to infringe that patent despite such knowledge.

51.     On information and belief, Defendants' acts of infringement as set out in the previous paragraphs have been deliberate and willful, and in reckless disregard of Mondis's patent rights.

52.     Mondis has been damaged by Defendants' infringing activities.  On information and belief, Defendants will continue their infringing activities, and continue to damage Mondis, unless enjoined by this Court.  Mondis has no adequate remedy at law.

**COUNT VII – INFRINGEMENT OF U.S. PATENT NO. 6,686,895**

53.     Mondis repeats and realleges the allegations of paragraphs 1 through 10 as if set forth herein.

54.     On February 3, 2004, United States Letters Patent No. 6,686,895 ("the '895 Patent"), entitled DISPLAY UNIT FOR DISPLAYING AN IMAGE BASED ON A VIDEO SIGNAL RECEIVED FROM A PERSONAL COMPUTER WHICH IS CONNECTED TO AN INPUT DEVICE, was duly and legally issued by the United States Patent and Trademark Office. A true and correct copy of the '895 Patent is attached as Exhibit G to this Complaint.

55.     Mondis is the assignee and owner of the right, title, and interest in and to the '895 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

LGEMOND00182980

56.    Without license or authorization, the Foxconn Defendants have been infringing the '895 Patent, and contributing to and actively inducing the infringement of said patent by others in the United States, by making, using, selling, offering for sale, and/or importing into the United States, including within this judicial district, certain computer monitors that embody the inventions claimed in the '895 Patent.  Such acts constitute infringement under at least 35 U.S.C. §§ 271(a), (b), and/or (c).

57.    On information and belief, Defendants have known of the existence of the '895 Patent, but have continued to infringe that patent despite such knowledge.

58.    On information and belief, Defendants' acts of infringement as set out in the previous paragraphs have been deliberate and willful, and in reckless disregard of Mondis's patent rights.

59.    Mondis has been damaged by Defendants' infringing activities.  On information and belief, Defendants will continue their infringing activities, and continue to damage Mondis, unless enjoined by this Court. Mondis has no adequate remedy at law.

### COUNT VIII – INFRINGEMENT OF U.S. PATENT NO. 7,089,342

60.    Mondis repeats and realleges the allegations of paragraphs 1 through 10 as if set forth herein.

61.    On August 8, 2006, United States Letters Patent No. 7,089,342 ("the '342 Patent"), entitled METHOD ENABLING DISPLAY UNIT TO BI-DIRECTIONALLY COMMUNICATE WITH VIDEO SOURCE, was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '342 Patent is attached as Exhibit H to this Complaint.

- 11 -

LGEMOND00182981

62.     Mondis is the assignee and owner of the right, title, and interest in and to the '342

Patent, including the right to assert all causes of action arising under said patent and the right to

any remedies for infringement of it.

63.     Without license or authorization, the Foxconn Defendants have been infringing

the '342 Patent, and contributing to and actively inducing the infringement of said patent by

others in the United States, by making, using, selling, offering for sale, and/or importing into the

United States, including within this judicial district, certain computer monitors and TVs that

embody the inventions claimed in the '342 Patent.  Such acts constitute infringement under at

least 35 U.S.C. §§ 271(a), (b), and/or (c).

64.     On information and belief, Defendants have known of the existence of the '342

Patent, but have continued to infringe that patent despite such knowledge.

65.     On information and belief, Defendants' acts of infringement as set out in the

previous paragraphs have been deliberate and willful, and in reckless disregard of Mondis's

patent rights.

66.     Mondis has been damaged by Defendants' infringing activities.  On information

and belief, Defendants will continue their infringing activities, and continue to damage Mondis,

unless enjoined by this Court. Mondis has no adequate remedy at law.

### COUNT IX – INFRINGEMENT OF U.S. PATENT NO. 7,475,180

67.     Mondis repeats and realleges the allegations of paragraphs 1 through 10 as if set

forth herein.

68.     On January 6, 2009, United States Letters Patent No. 7,475,180 ("the '180

Patent"), entitled DISPLAY UNIT WITH COMMUNICATION CONTROLLER AND

LGEMOND00182982

MEMORY FOR STORING IDENTIFICATION NUMBER FOR IDENTIFYING DISPLAY

UNIT, was duly and legally issued by the United States Patent and Trademark Office. A true

and correct copy of the '180 Patent is attached as Exhibit I to this Complaint.

69. Mondis is the assignee and owner of the right, title, and interest in and to the '180

Patent, including the right to assert all causes of action arising under said patent and the right to

any remedies for infringement of it.

70. Without license or authorization, the Foxconn Defendants have been infringing

the '180 Patent, and contributing to and actively inducing the infringement of said patent by

others in the United States, by making, using, selling, offering for sale, and/or importing into the

United States, including within this judicial district, certain computer monitors and TVs that

embody the inventions claimed in the '180 Patent. Such acts constitute infringement under at

least 35 U.S.C. §§ 271(a), (b), and/or (c).

71. On information and belief, Defendants have known of the existence of the '180

Patent, but have continued to infringe that patent despite such knowledge.

72. On information and belief, Defendants' acts of infringement as set out in the

previous paragraphs have been deliberate and willful, and in reckless disregard of Mondis's

patent rights.

73. Mondis has been damaged by Defendants' infringing activities. On information

and belief, Defendants will continue their infringing activities, and continue to damage Mondis,

unless enjoined by this Court. Mondis has no adequate remedy at law.

Appx10924

LGEMOND00182983

## COUNT X – INFRINGEMENT OF U.S. PATENT NO. 7,475,181

74.     Mondis repeats and realleges the allegations of paragraphs 1 through 10 as if set forth herein.

75.     On January 6, 2009, United States Letters Patent No. 7,475,181 ("the '181 Patent"), entitled DISPLAY UNIT WITH PROCESSOR AND COMMUNICATION CONTROLLER WHICH COMMUNICATES INFORMATION TO THE PROCESSOR, was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '181 Patent is attached as Exhibit J to this Complaint.

76.     Mondis is the assignee and owner of the right, title, and interest in and to the '181 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

77.     Without license or authorization, the Foxconn Defendants have been infringing the '181 Patent, and contributing to and actively inducing the infringement of said patent by others in the United States, by making, using, selling, offering for sale, and/or importing into the United States, including within this judicial district, certain computer monitors that embody the inventions claimed in the '181 Patent.  Such acts constitute infringement under at least 35 U.S.C. §§ 271(a), (b), and/or (c).

78.     On information and belief, Defendants have known of the existence of the '180 Patent, but have continued to infringe that patent despite such knowledge.

79.     On information and belief, Defendants' acts of infringement as set out in the previous paragraphs have been deliberate and willful, and in reckless disregard of Mondis's patent rights.

LGEMOND00182984

80.     Mondis has been damaged by Defendants' infringing activities.  On information and belief, Defendants will continue their infringing activities, and continue to damage Mondis, unless enjoined by this Court.  Mondis has no adequate remedy at law.

### JURY DEMAND

81.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mondis demands a trial by jury on all issues triable as such.

### PRAYER FOR RELIEF

WHEREFORE, Mondis respectfully demands judgment for itself and against Defendants as follows:

a.      That this Court adjudge that Defendants have infringed each of the '812, '090, '236, '088, '970, '588, '895, '342, '180, and '181 Patents;

b.      That this Court issue an injunction, enjoining Defendants and their officers, agents, servants and employees, privies, and all persons in active concert or participation with it, from further infringement of said patents;

c.      That this Court ascertain and award Mondis damages sufficient to compensate it for the above infringement and that the damages so ascertained be trebled and awarded to Mondis with interest;

d.      That this Court find this case to be exceptional and award Mondis its attorneys fees, costs and expenses in this action; and

- 15 -

LGEMOND00182985

e.     That this Court award Mondis such other relief as the Court may deem just and proper.


Respectfully submitted,


Dated:  January 15, 2010                    *Michael A. Fisher by Patrick Kelley*
                                            *with permission*
                                            Martin J. Black
                                            martin.black@dechert.com
                                            **LEAD ATTORNEY**
                                            Michael A. Fisher
                                            michael.fisher@dechert.com
                                            Jeffrey S. Edwards
                                            jeffrey.edwards@dechert.com
                                            DECHERT LLP
                                            Cira Centre
                                            2929 Arch Street
                                            Philadelphia, PA 19104
                                            (215) 994-4000

                                            Jeffrey B. Plies
                                            jeffrey.plies@dechert.com
                                            George W. Webb III
                                            george.webb@dechert.com
                                            Gretchen S. Sween
                                            gretchen.sween@dechert.com
                                            DECHERT LLP
                                            300 W. 6th Street
                                            Suite 1850
                                            Austin, TX 78701
                                            (512) 394-3000

- 16 -

LGEMOND00182986

Otis W. Carroll
Tex. Bar No. 03895700
Patrick Kelley
Tex. Bar No. 11202500
IRELAND, CARROLL & KELLEY, P.C.
6101 South Broadway, Suite 500
Tyler, TX  75703
(903) 561-1600
(903) 581-1071 (fax)
fedserv@icklaw.com
*Attorneys for Plaintiff Mondis Technology Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing THIRD AMENDED

COMPLAINT was served to all counsel of record via the Court's electronic delivery system this

15th day of January, 2010.

/s/ Patrick Kelley
Patrick Kelley

- 17 -

LGEMOND00182987

35. (new) The display unit according to claim 27, wherein said display unit receives a signal from said video source that is generated by using said identification number.

36. (new) The display unit according to claim 27, wherein said display unit receives a signal from said video source that is generated in accordance with a result of comparison between said identification number stored in said memory and an identification number stored in said video source.

37. (new) The display unit according to claim 27, said display unit receives a signal from said video source that is generated based on a result of comparison of whether said identification number stored in said memory is an identification number stored in said video source.

38. (new) The display unit according to claim 27, further comprising a processor adapted to control display of said display unit.

39. (new) The display unit according to claim 38, wherein said display unit information is sent to said video source in response to power on of at least one of said display unit and said video source.

40. (new) A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

a video circuit adapted to display an image based on the video signals sent by the externally connected video source;

LG-504.0007

a memory in which at least display unit information is stored, said display unit information including an identification number for identifying said display unit and characteristic information of said display unit; and

a communication controller capable of bi-directionally communicating with said video source;

wherein said communication controller is capable of communicating said display unit information other than said characteristic information to said video source.

41. (new) The display unit according to claim 40, wherein said display unit information is sent to said video source in response to power on of at least one of said display unit and said video source.

42. (new) The display unit according to claim 40, wherein said display unit receives a signal from said video source that is generated by using said identification number stored in said memory.

43. (new) A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

a memory in which at least display unit information is stored, said display unit information including an identification number for identifying said display unit; and

a communication controller capable of bi-directionally communicating with said video source;

7

Appx11045

LG-504.0008

# Exhibit 16

Defendants' Trial
Exhibit

**LG-505**

LG-505.0001

520.32696CX7

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants:    ARAI et al

Serial No.:    10/160,022

Filed:    June 4, 2002

For:    Display Unit With Communication Controller

Art Unit:    2111

Examiner:    R. Phan

### AMENDMENT

Mail Stop:  Amendment (Fee)
Commissioner For Patents                          May 4, 2007
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

The following amendments and remarks are respectfully submitted in connection with the above-identified application, in response to the Office Action dated March 22, 2007 and in light of the interview conducted April 30, 2007.  The amendments are listed below and set forth on the following pages.


Amendment to the Title;

Amendments to the Claims; and

Remarks are included following the amendments.

1

LG-505.0002

<u>Amendments to the Title</u>:

Please amend the title to read as follows:


Display Unit With Communication Controller <u>and Memory For Storing Identification</u>

<u>Number for Identifying Display Unit</u>

2

**LG-505.0003**

Amendments to the Claims:

This listing of claims will replace all prior versions, and listings, of claims in the application:

Listing of Claims:

Claims 1 - 26 (canceled)

27.    (currently amended) A display unit for displaying an image based on video signals and synchronization signals inputted from an externally connected video source, comprising:

a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

a memory which stores an identification number for identifying at least a type of said display unit; and

a communication controller which sends said identification number stored in said memory to said video source;

wherein said communication controller is capable of bi-directionally communicating with said video source.

28.    (previously presented) The display unit according to claim 27, wherein said identification number stored in said memory is utilized for comparison with an identification number stored in said video source.

29.    (previously presented) The display unit according to claim 27, wherein said identification number stored in said memory is utilized for executing a

3

predetermined process in said video source in accordance with a result of comparison between said identification number and an identification number stored in said video source.

30.    (previously presented) The display unit according to claim 27, wherein said identification number stored in said memory is utilized for executing a predetermined process in said video source based on a result of comparison of whether said identification number stored in said memory is an identification number stored in said video source.

31.    (previously presented) The display unit according to claim 27, wherein said identification number stored in said memory is sent to said video source in response to power on of at least one of said display unit and said video source.

32.    (previously presented) The display unit according to claim 28, wherein said identification number stored in said memory is sent to said video source in response to power on of at least one of said display unit and said video source.

33.    (previously presented) The display unit according to claim 29, wherein said identification number stored in said memory is sent to said video source in response to power on of at least one of said display unit and said video source.

34.    (previously presented) The display unit according to claim 30, wherein said identification number stored in said memory is sent to said video source in response to power on of at least one of said display unit and said video source.

4

LG-505.0005

35.    (previously presented) The display unit according to claim 27, wherein said display unit receives a signal from said video source that is generated by using said identification number.

36.    (previously presented) The display unit according to claim 27, wherein said display unit receives a signal from said video source that is generated in accordance with a result of comparison between said identification number stored in said memory and an identification number stored in said video source.

37.    (previously presented) The display unit according to claim 27, said display unit receives a signal from said video source that is generated based on a result of comparison of whether said identification number stored in said memory is an identification number stored in said video source.

38.    (previously presented) The display unit according to claim 27, further comprising a processor adapted to control display of said display unit.

39.    (previously presented) The display unit according to claim 38, wherein said display unit information is sent to said video source in response to power on of at least one of said display unit and said video source.

40.    (currently amended) A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

5

a video circuit adapted to display an image based on the video signals sent by the externally connected video source;

a memory in which at least display unit information is stored, said display unit information including an identification number for identifying <u>at least a type of </u>said display unit and characteristic information of said display unit; and

a communication controller capable of bi-directionally communicating with said video source;

wherein said communication controller is capable of communicating said display unit information other than said characteristic information to said video source.

41.     (previously presented) The display unit according to claim 40, wherein said display unit information is sent to said video source in response to power on of at least one of said display unit and said video source.

42.     (previously presented) The display unit according to claim 40, wherein said display unit receives a signal from said video source that is generated by using said identification number stored in said memory.

43.     (currently amended) A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

LG-505.0007

a memory in which at least display unit information is stored, said display unit information including an identification number for identifying at least a type of said display unit; and

a communication controller capable of bi-directionally communicating with said video source;

wherein said communication controller is capable of communicating said identification number stored in said memory and no other display unit information to said video source.

44.    (previously presented) The display unit according to claim 43, wherein said display unit information includes characteristic information of said display unit.

45.    (previously presented) The display unit according to claim 44, wherein said display unit information is sent to said video source in response to power on of at least one of said display unit and said video source.

46.    (previously presented) The display unit according to claim 44, wherein said display unit receives a signal from said video source that is generated by using said identification number stored in said memory.

47.    (currently amended) A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

7

LG-505.0008

a memory in which at least display unit information is stored, said display unit information including an identification number for identifying <u>at least a type of</u> said display unit; and

a communication controller capable of bi-directionally communicating with said video source;

wherein said communication controller is capable of sending said display unit information stored in said memory to said video source and of receiving a control signal from said video source, and said displayed image is controlled based on said control signal received by said communication controller.

48.    (previously presented) The display unit according to claim 47, wherein at least one of color and size of said image displayed on said display unit is changed by using said control signal.

49.    (currently amended) A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

a memory in which at least display unit information is stored, said display unit information including an identification number for identifying <u>at least a type of</u> said display unit;

a communication controller capable of bi-directionally communicating with said video source, said communication controller being capable of sending said display unit information stored in said memory to said video source and of receiving a control signal from said video source; and

8

LG-505.0009

a processor adapted to control said displayed image on said display unit by using said control signal received by said communication controller.

50.    (previously presented) The display unit according to claim 49, wherein at least one of color and size of said image displayed on said display unit is changed by using said control signal.

51.    (currently amended) A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

a processor adapted to control display of said display unit;

a memory which stores an identification number for identifying at least a type of said display unit; and

a communication controller capable of bi-directionally communicating with said video source;

wherein said communication controller is capable of sending said identification number stored in said memory to said video source and of receiving a control signal received from said video source, and at least one of color and size of said displayed image on said display unit is controlled by using said control signal received by said communication controller.

52.    (currently amended) A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

9

**LG-505.0010**

a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

a memory in which at least display unit information is stored, said display unit information including an identification number for identifying at least a type of said display unit; and

a communication controller capable of bi-directionally communicating with said video source;

wherein said communication controller is capable of communicating said display unit information from said display unit to said video source, said display unit being capable of receiving a signal from said video source that is generated based on said display unit information, said display unit being capable of controlling said displayed image on said display unit by using a control signal received from said video source via said communication controller.

53.    (previously presented) The display unit according to claim 52, wherein at least one of color and size of said image displayed on said display unit is changed by using said control signal.

54.    (previously presented) The display unit according to any one of claims 27-53, wherein said video source is a computer.

55.    (new) A display unit according to any one of claim 27, 40, 43, 47, 49, 51 and 52, wherein the identification number provides at least a unique identification of the type of said display unit.

10

LG-505.0011

## REMARKS

The Examiners, Messrs. Rinehart and Phan are thanked for the courtesy extended applicants representatives during the interview of April 30, 2007 and based upon the discussion at the interview, the claims have been amended.

As noted in the Interview Summary:

Examiner concurs that previous office action reassembling previous rejection is incorrect. Therefore, the previous office action will be vacated. Applicants proposes to more clearly specify identification number as "type" of display unit which Examiner agrees will read over the previous art applied regarding to the claims.

By the present amendment, each of the independent claims has been amended in a manner similar to that discussed at the interview by reciting the feature of "an identification number for identifying <u>at least a type of</u> said display unit." Further, a new multiple dependent claim 55 has been presented which recites the feature that "the identification number provides at least a unique identification of the type of said display unit".

Additionally, by the present amendment, the title has been amended to "Display Unit With Communication Controller and Memory For Storing Identification Number for Identifying Display Unit", which is considered to be more clearly indicative of the claimed invention and is responsive to the requirement in the Office Action which is indicated to be vacated.

With respect to the rejection of claims 27, 35, 38, 40, 42 - 44, 46 - 54 under 35 USC 102(e) as being anticipated by Sawdon (US 5,276,458) and the rejection of claims 28 - 34, 36 - 37, 39, 41, 45 under 35 USC 103 as being unpatentable over Sawdon in view of Monnes (US 5,375,210) as set forth in the Office Action indicated to be vacated, such rejections are traversed insofar as they are applicable to the present claims.

11

LG-505.0012

As noted in the Interview Summary, the Office Action is to be vacated and the Examiner agrees that the amendment, as presented herein, will read over the previous art applied regarding the claims. That is, applicants submit that neither Sawdon nor Monnes provide any disclosure or teaching in the sense of 35 USC 102 or 35 USC 103 of the recited features of the independent and dependent claims that a memory stores an identification number for identifying at least a type of the display unit, irrespective of the Examiner's contentions concerning other features of the claims of this application. Further, it is apparent that Sawdon and Monnes also fail to disclose that the identification number provides at least a unique identification of the type of the display unit, as now recited in new dependent claim 55.

In view of the above amendment and remarks, and the discussion at the interview, as reflected in the Interview Summary, applicants submit that all claims present in this application patentably distinguish over the cited art and should now be in condition for allowance. Accordingly, issuance of an action of a favorable nature is courteously solicited.

In view of the above amendments and remarks, applicants submit that all claims present in this application should now be in condition for allowance and issuance of an action of favorable nature is courteously solicited.

To the extent necessary, applicants petition for an extension of time under 37 CFR 1.136. Please charge any shortage in the fees due in connection with the filing of this paper, including extension of time fees, to the deposit account of Antonelli,

LG-505.0013

Terry, Stout & Kraus, LLP, Deposit Account No. 01-2135 (Case: 520.32696CX7),

and please credit any excess fees to such deposit account.

Respectfully submitted,

ANTONELLI, TERRY, STOUT & KRAUS, LLP


_____/Melvin Kraus/_____
Melvin Kraus
Registration No. 22,466

MK/jla
(703) 312-6600

13

**LG-505.0014**

## FIG. 2

| | |
|---|---|
| ADDRESS 1 | NUMBER OF DATA SET \| REGISTERED ID NUMBERS |
| ADDRESS 2 | DATA AREA 1 FOR DELIVERY ADJUSTMENT |
| ADDRESS 3 | DATA AREA 2 FOR DELIVERY ADJUSTMENT |
| ⋮ | |
| ADDRESS i | ADJUSTMENT DATA AREA 1 FOR USER |
| ADDRESS i+1 | ADJUSTMENT DATA AREA 2 FOR USER |
| ⋮ | |

Copy provided by USPTO from the PIRS Image Database on 10-17-2018 .

Appx11107

*FIG. 9*



Copy provided by USPTO from the PIRS Image Database on 10-17-2018

US 7,475,180 B2

1

## DISPLAY UNIT WITH COMMUNICATION CONTROLLER AND MEMORY FOR STORING IDENTIFICATION NUMBER FOR IDENTIFYING DISPLAY UNIT

### CROSS REFERENCE TO RELATED APPLICATION

This is a continuation of U.S. application Ser. No. 09/732, 292, filed Dec. 8, 2000, now U.S. Pat. No. 6,513,088, issued Jan. 28, 2003, which is a continuation of U.S. application Ser. No. 09/265,363, filed Mar. 10, 1999, now U.S. Pat. No. 6,247, 090, issued Jun. 12, 2001, which is a continuation of U.S. application Ser. No. 08/833,346, filed Apr. 4, 1997, now U.S. Pat. No. 5,887,147, issued Mar. 23, 1999, which is a continuation of U.S. application Ser. No. 08/598,903, filed Feb. 9, 1996, now U.S. Pat. No. 5,652,845, issued Jul. 29, 1997, which is a continuation of U.S. application Ser. No. 08/190, 848, filed Feb. 3, 1994, now abandoned, the subject matter of which is incorporated by reference herein, and is related to U.S. application Ser. No. 09/732,291, filed Dec. 8, 2000, now U.S. Pat. No. 6,549,970, issued Apr. 15, 2003.

### BACKGROUND OF THE INVENTION

The present invention relates to an information output system or display apparatus including a computer and an information output device such as a display device or a printer as a computer terminal and more particularly to an information output system or display apparatus for performing various types of control such as the information output method and allowing or not allowing of information output from the computer connected to the above information output device via a communication interface.

In current display devices as computer terminals, a wide variety of display positions and sizes on the screen and video signal frequencies to be displayed are used depending on video signals to be inputted. Therefore, a display or a so-called multi-scan display has been used so that a display device can handle various video signals.

A microcomputer or a memory LSI is used to provide a most suitable display image for each video signal as this type of display device. Such a prior art is indicated in Japanese Patent Application Laid-Open No. 1-321475.

According to this prior art, the microcomputer controls the memory which stores information of the display position and size on the screen for each video signal beforehand and reads the information of the most suitable display position and size on the screen depending on the input video signal from the memory. The microcomputer outputs a control signal on the basis of the read information. This control signal is applied to the deflection circuit as a control voltage or control current through a D-A converter so as to control the voltage or current at a predetermined part of the deflection circuit. By doing this, the display size and position of the display device can be adjusted. When a video signal inputted to the display device is not a known signal, no corresponding information is kept in the above memory. Therefore, the switch mounted on the front of the display device is operated so as to input the adjustment information of the display position and size on the screen. The control circuit of the above microcomputer creates deflection control information on the basis of the above input information and adjusts the display position and size.

According to the aforementioned prior art, the display device obtains a most suitable screen display according to the input video signal. However, according to another prior art, the computer controls and changes the display status. Such a

2

prior art is indicated in Japanese Patent Application Laid-Open No. 61-84688. According to this prior art, a discrimination pulse is superimposed at the blanking interval of a video signal outputted from the computer and the deflection frequency of the display device is changed on the basis of this discrimination pulse.

According to the former prior art among the aforementioned prior arts, the control of the display position and size on the screen is managed by the display device. Therefore, when adjustment is required or requested from the user of display device, it is necessary to perform manual adjustment using the adjustment switch of the display device each time and it is rather troublesome to operate the system.

According to the latter prior art among the aforementioned prior arts, the control can be operated by the computer. However, since the operation is such that the deflection frequency is simply changed on the basis of the discrimination pulse superimposed on the video signal, an image cannot be adjusted to the display image (display position and size) which is required by a user of the computer. Namely, there is a problem imposed that the status which is simply desired by the user cannot be obtained. Furthermore, no consideration is given to prevention of display (indication) of careless images (information) and restraining of unnecessary power consumption. Even if the discrimination pulse is superimposed at the blanking interval of the video signal, the video blanking level is generally shallow in the case of the display device, so that the discrimination pulse is displayed. Furthermore, the control is applied only in one direction from the computer to the display device and no information is sent in the reverse direction, so that there is another problem imposed that a malfunction cannot be avoided.

### SUMMARY OF THE INVENTION

An object of the present invention is to provide an information output system wherein a computer can exercise various types of control of an information output device such as a display device. Another object of the present invention is to provide an information output system for maintaining secrecy of information and for restraining power consumption. A further object of the present invention is to provide an information output system for informing the computer of the operation status of the information output device so as to allow easy maintenance.

To accomplish the above objects, according to the present invention, in an information output system consisting of at least a computer and an information output device, the computer is equipped with a first communication means and the information output device is equipped with a second communication means. Furthermore, a control processing means and a memory means for storing the identification number of the computer beforehand are added to the information output device, or a memory means for storing the identification number of the information output device beforehand is mounted in the computer in addition to the first communication means. The above second communication means has a plurality of communication interfaces. Furthermore, a detection means for detecting the internal operation status and a control processing means for judging the detection result are added to the information output device and an audio output means for outputting the operation status in voice is added to the computer. A second display means for displaying the operation status is mounted in the information output device. Or, a display means for displaying the operation status of the information output device is mounted in the computer.

Copy provided by USPTO from the PIRS Image Database on 10-17-2018

US 7,475,180 B2

3

The first communication means in the computer controls communication with the information output device and the second communication means in the information output device controls communication with the computer. The control processing means operates and generates control signals for exercising various types of control for the information output device on the basis of control instructions from the second communication means and compares the identification number of the computer stored in the memory means with the identification number sent from the computer via the first and second communication means. When a comparison result match occurs, the control processing means controls a predetermined part in the information output device.

In the memory means mounted in the computer, the identification number for identifying the information output device is stored beforehand. When the identification number which is sent from the information output device via the second and first communication means matches with the identification number which is stored in the memory means beforehand, the computer communicates with the information output device.

When no comparison result match occurs, the above control processing means controls so that information which is sent from the computer to the information output device is not normally outputted from the information output device. By doing this, information of a computer user will not be indicated carelessly.

When the second communication means has a plurality of communication interfaces, it can communicate with another plurality of information output devices and the computer and in the state that a plurality of similar information output devices are connected to the computer, it can exercise various types of control for the information output devices and can inform the computer of the status of each information output device.

The detection means detects the internal operation status of the information output device and the control processing means judges the detection result. The audio output means indicates the operation status of the information output device in voice on the basis of the judgment result which is sent from the information output device to the computer via the second and first communication means. Furthermore, the display means mounted in the information output device displays the above operation status. The display means mounted in the computer performs the same operation as that of the display means mounted in the information output device. In this case, information which is sent to the computer via the second and first communication means is used as display information.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram showing the first embodiment of the present invention.

FIG. 2 is a memory map showing the contents of the memory in the display device shown in FIG. 1.

FIG. 3 is a flow chart showing the operation of the essential section shown in FIG. 1.

FIG. 4 is a block diagram showing the second embodiment of the present invention.

FIG. 5 is a block diagram showing the third embodiment of the present invention.

FIG. 6 is a block diagram showing the internal structure of the display device 6B shown in FIG. 5.

FIG. 7 is a block diagram showing the fourth embodiment of the present invention.

FIG. 8 is a flow chart showing the operation outline shown in FIG. 7.

4

FIG. 9 is a block diagram showing the fifth embodiment of the present invention.

FIG. 10 is a block diagram showing the sixth embodiment of the present invention.

FIG. 11 is a block diagram showing the seventh embodiment of the present invention.

FIG. 12 is a block diagram showing the eighth embodiment of the present invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The embodiments of the present invention will be explained with reference to the accompanying drawings hereunder.

FIG. 1 is a block diagram showing the first embodiment of the present invention. In the drawing, a section 1 enclosed by a chained line indicates a computer. In the section 1, a reference numeral 2 indicates a CPU (central processing unit), 3 a display controller for generating various signals for video display, 4 a memory, and 5 a communication controller for communicating with peripheral devices. In addition, a magnetic recording unit is mounted as a data storage device which is not shown in the drawing.

A section 6 enclosed by another chained line indicates a so-called multi-scan display device which can be applied to various video signal specifications. In the section 6, a reference numeral 7 indicates a microcomputer for controlling display of the display device 6, 8 a second communication controller for communicating with the above communication controller 5, 9 a second memory, 10 a general deflection circuit of the display device, 11 a video circuit of the display device, 12 a horizontal deflection yoke, 13 a vertical deflection yoke, and 14 a color cathode-ray tube (hereinafter called a CDT (color display tube)) for displaying color images.

The operation shown in FIG. 1 is as shown below. The computer 1 has a structure which is the same as the general structure of a conventional personal computer or work station and the communication controller 5 controls a communication interface such as RS-232C which is installed in the standard type. When a control instruction of the display device 6 is inputted firstly by a user of the computer from a general keyboard which is not shown in the drawing of the computer 1, it is coded digitally by a keyboard controller which is neither shown in the drawing and CPU 2 identifies the instruction and controls the communication controller 5. The communication controller 5 sends the control instruction of the display device to the display device 6. When a control instruction of the display device 6 which is included in the software for allowing the computer 1 to operate is read from the external storage device such as a floppy disk drive or hard disk drive which is not shown in the drawing, CPU 2 identifies the instruction and controls the communication controller 5. The communication controller 5 also sends the control instruction of the display device to the display device 6.

Next, the display device 6 sends the control instruction from the computer 1 which is received by the communication controller 8 to the microcomputer 7. The microcomputer 7 identifies this control instruction and generates control signals to the relevant portions to be adjusted in the deflection circuit 10 or video circuit 11. The aforementioned deflection circuit 10 and video circuit 11 can be adjusted in the same way as with a conventional multiscan display and the adjustment means has a structure which is the same as that of a conventional multiscan display. By doing this, the display size and

Copy provided by USPTO from the PIRS Image Database on 10-17-2018

US 7,475,180 B2

5        6

position, brightness, contrast, and hue of images displayed on the CDT **14** are made most suitable to a user of the computer system.

Furthermore, WYSIWYG (what you see is what you get) control which makes an image displayed on the display device **6** similar to print output of an output device other than the display, for example, a printer can be realized only by sending a control instruction for changing the display position and size to the display device **6** instead of operating and generating display data by the computer **1**. The interface part of the above display device **6** such as the communication control terminal is mounted on the back or side of the display device from a viewpoint of easy connection to the computer **1** and appearance.

Furthermore, the aforementioned communication function is used for adjustment at a factory. In this case, necessary information is all written into the memory **9** in the display device **6**. FIG. **2** is a memory map showing the contents of the memory **9** in the display device **6**. For adjustment at factory, data to be written can be all set. In a case other than factory adjustment, namely, for adjustment in a system as shown in FIG. **1**, to prevent data requiring no rewriting, namely, preset values at factory such as, for example, the number of all data or the data within the corresponding frequency range from being erased by mistake or rewritten, the computer **1** sends the ID number and the microcomputer **7** in the display device **6** checks the ID number with the registered ID number stored in the memory **9**.

A flow chart of this check is shown in FIG. **3**. As shown in the drawing, when the computer **1** and display device **6** are turned on at Step **1**, each device is initialized at Step **2**. Concretely, CPU **2** and the microcomputer **7** read the starting system software and put the peripheral circuit to be connected to the CPU into the active state so that the next operation can be performed. Then, at Step **3**, the microcomputer **7** in the display device **6** waits for sending of the identification number assigned to the computer **1**, that is, the so-called ID number from the computer **1**. Next, at Step **4**, the microcomputer **7** receives the ID number which is sent from the computer **1** and checks whether the received ID number is registered in the registered ID number list which is stored in the memory **9** in the display device **6**.

When it is registered, at Step **5**, the computer **1** is allowed to control the display device **6** by external control instructions so that the user control of the display size, position, brightness, and contrast can be performed by control instructions sent from the computer **1** thereafter. On the other hand, when the received ID number is not registered in the memory **9**, at Step **6**, the display device **6** is not allowed to be controlled by external control instructions thereafter. Therefore, even if any control instruction is sent from the computer **1**, the display device **6** will not accept it.

Or, at Step **5**, the computer **1** may be allowed to perform all the adjustments which can be performed by the display device **6**, that is, the same control as that for adjustment at factory and at Step **6**, a part of the control of the display device **6** such as display control may be allowed.

By doing this, the display device **6** can be prevented from careless control.

The above is an example that an ID number is sent to the display device **6** from the computer **1**. However, needless to say, the reverse case of the above is possible. Namely, an ID number is sent to the computer **1** from the display device **6** so that the computer **1** identifies that the display device **6** having a communication function is connected and the computer **1** compares the ID number with the ID number registered in the computer **1**. When the corresponding ID number is registered,

the computer **1** controls the display device **6** by a predetermined control instruction. When it is not registered, the computer **1** judges that it cannot control the display device **6** and will not control the display device **6**.

By doing this, the computer **1** communicates with a specific display device **6** and can exercise control such as changing the color temperature of an image displayed on the display device **6** or changing the display size depending on the application software.

According to this embodiment, RS-232C is used as a communication interface. However, a general-purpose interface such as RS-422, RS-423, SCSI or GP-IB, or network interface may be used. Furthermore, the embodiment may be applied to an interface using optical signals instead of electric signals. The above interface may be installed in the neighborhood of the rear cabinet or lower pedestal of the display device **6** for convenience of a user.

FIG. **4** is a block diagram showing the second embodiment of the present invention. According to this embodiment, when the ID number sent from the computer to the display device is not registered in the memory **9**, another operation which is different from the operation shown in the first embodiment is performed. Namely, according to this embodiment, when the ID numbers do not match with each other, nothing is displayed on the display device so as to enhance the secrecy of information.

Next, the structure of FIG. **4** will be explained. In the drawing, a reference numeral **6A** indicates another display device which is different from the display device **6** shown in FIG. **1**, **15** a horizontal deflection circuit, **16** a vertical deflection circuit, **17** a synchronizing signal processing circuit, **18** a horizontal phase control circuit, **19** a horizontal oscillating circuit, **20** a horizontal driving circuit, **21** a horizontal deflection output circuit, **22** a video pre-amplifier circuit, **23** a video blanking circuit, and **24** a video output circuit. The other reference numerals which are the same as those shown in FIG. **1** indicate the same functions. The video circuit **11** is a general video circuit consisting of the video pre-amplifier circuit **22**, video blanking circuit **23**, and video output circuit **24**. The horizontal deflection circuit **15** is a general deflection circuit consisting of the synchronizing signal processing circuit **17**, horizontal phase control circuit **18**, horizontal oscillating circuit **19**, horizontal driving circuit **20**, and horizontal deflection output circuit **21**. The vertical deflection circuit **16** is also a general circuit which has a structure similar to that of the horizontal deflection circuit **15**.

Next, the operation shown in FIG. **4** will be explained. In the drawing, an ID number sent from the computer **1** is inputted into the microcomputer **7** via the communication controller **8**. The microcomputer **7** checks the above ID number with the ID number stored in the memory **9**. When the ID number stored in the memory **9** matches with the ID number sent from the computer **1**, the microcomputer **7** receives the control from the computer **1**.

On the other hand, when the check results do not match with each other, the microcomputer **7** controls the horizontal oscillating circuit **19**, fixes the oscillation frequency to a predetermined value, and allows the display device **6A** to perform a horizontal deflection operation at a value different from the horizontal frequencies of the video signal and synchronizing signal which are sent from the computer. Therefore, the image displayed on the CDT **14** is not synchronized horizontally in this case and the screen content cannot be judged. When the vertical deflection circuit **16** is controlled in the same way, the image displayed on the CDT **14** is not synchronized vertically on the screen. By controlling the

Copy provided by USPTO from the PIRS Image Database on 10-17-2018

US 7,475,180 B2

7

video blanking circuit 23 of the video circuit 11, the video display period may be blanked so that no image is displayed on the CDT 14.

By using the aforementioned methods independently or combined, only when a user of the computer system enters a predetermined ID number from the keyboard, it is displayed correctly on the display device 6A and information displayed on the CDT 14 can be prevented from careless indication.

FIG. 5 is a block diagram of the third embodiment of the present invention. According to this embodiment, the display device is provided with a plurality of communication functions and a plurality of display devices can be connected with the communication interface. In the drawing, reference numerals 6B, 6C, and 6D indicate display devices having the same structure, V1, V2, and V3 lines for video signals and synchronizing signals, C1, C2, and C3 communication lines for, for example, RS-232C, and 1 the aforementioned computer. Each of the display devices 6B, 6C, and 6D has a plurality of video signal I/O terminals and communication interface I/O terminals and a registered ID number. According to this embodiment, as shown in FIG. 5, 1 is assigned to the display device 6B as an ID number, 2 to the display device 6C as an ID number, and 3 to the display device 6D as an ID number.

Next, the operation shown in FIG. 5 will be explained. In the drawing, for example, when controlling the display device 6B from the computer 1, the ID number 1 is sent to the line C1 and the display device 6B is controlled appropriately from the computer 1. Next, when controlling the display device 6C, the ID number 2 is sent from the computer 1 in the same way. Then, the ID number is received by the display device 6C via the lines C1 and C2 and the display device 6c can be controlled appropriately from the computer 1.

Since a plurality of display devices can be controlled by a computer in this way, a plurality of display devices can be adjusted at a time, for example, at the time of delivery adjustment at a factory. Furthermore, by using a multi-display system for displaying an image by assembling a plurality of display devices and for displaying various images on each screen, the display devices can be hued and adjusted in brightness simply.

FIG. 6 is a block diagram showing the internal structure of the display device 6B shown in FIG. 5. In the drawing, a reference numeral 25 indicates a communication controller having two communication ports and 26 a divider of video signals and synchronizing signals. The communication controller 25 sends or receives data to or from the computer 1 in the same way as the communication controller 8 of the display device 6 shown in FIG. 1 and also divides the communication lines and relays other display devices. On the other hand, the divider 26 divides video signals or synchronizing signals sent from the computer 1 or signal source to other display devices. By using such a structure, a plurality of display devices can be connected to a computer as shown in FIG. 5.

Next, the fourth embodiment of the present invention will be described. FIG. 7 is a block diagram showing the fourth embodiment of the present invention. In the drawing, a reference numeral 1B indicates a computer, 31 an audio control circuit for producing a sound, 32 a speaker, 6E a display device, 27 and 28 analog-digital converters (hereinafter abbreviated to ADC), and 29 and 30 digital-analog converters (hereinafter abbreviated to DAC). The other reference numerals which are the same as those shown in FIG. 1 indicate the same functions. The operation of FIG. 7 will be explained hereunder with reference to the operation flow chart shown in FIG. 8.

8

When the computer 1B and display device 6E are started at Step 10 as shown in FIG. 8, they start communication with each other via the communication controllers 5 and 8 at Step 11 next. Then, at Step 12, the computer 1B calls the display device 6E. When no response is received, the computer 1B judges that the display device 6E is faulty, starts the audio control circuit 31 at Step 13, and informs the user of the computer 1B that the display device 6E is faulty from the speaker.

When the communication succeeds, at Step 14, the microcomputer 7 fetches information of the operation status of the deflection circuit 10 or video circuit 11 in the display device 6E from the voltage at a predetermined part in the circuit as digital information via the ADCs 27 and 28. Next, at Step 15, the microcomputer 7 judges whether the value which is fetched at Step 14 is a value in the normal operation status. When the microcomputer 7 judges it as an error, it informs the computer 1B of the faulty value via the communication controller 8 and CPU 2 of the computer 1B allows the audio control circuit 31 to operate and generates a message informing an error of the display device 6E from the speaker 32. Furthermore, CPU 2 allows the display controller 3 to operate and displays also a message informing an error on the CDT 14 via the video circuit 11.

In this case, when an indication code informing the faulty part is sent to the computer 1B from the display device 6E simultaneously, the computer 1B judges the indication code and can inform the user or a customer engineer of the display device 6E of the faulty part by sound or display.

When the display device 6E is normal at Step 15, the computer 1B can exercise the communication control such as the display size, hue, and brightness of the display device 6E at Step 17. At this step, when a control instruction is sent to the display device 6E from the computer 1B, the microcomputer 7 decodes the instruction and outputs the control code to the corresponding DAC 29 or 30. The DAC 29 or 30 controls a predetermined control part at the DC control voltage corresponding to the above control code and controls the display size, position, and hue of the image displayed on the CDT 14. When the above series of operations ends, the computer 1B returns to Step 14 and repeats the operations from the monitor mode of a faulty operation of the display device 6E to the normal operation at Step 17.

As mentioned above, the computer 1B can be informed of a faulty operation by using the communication function of the display device 6E. Therefore, the user can judge the faulty part and can maintain the system easily.

FIG. 9 is a block diagram showing the fifth embodiment of the present invention. This embodiment obtains the same effect as that of the embodiment shown in FIG. 7. In FIG. 9, a reference numeral 6F indicates a display device, 33 a liquid crystal display controller in the display device 6F, and 34 a liquid crystal display panel mounted in the display device 6F. The other reference numerals which are the same as those shown in FIGS. 1 and 7 indicate the same functions.

The operation shown in FIG. 9 is basically the same as that shown in FIG. 7. The operation of the deflection circuit or video circuit 11 is monitored by the microcomputer 7 via the ADC 27 or 28. When an error occurs, the microcomputer 7 transmits an indication code informing the occurrence of an error to the computer 1B via the communication line and informs the user of it by voice from the speaker 32.

Furthermore, the microcomputer 7 allows the liquid crystal display controller 33 in the display device 6F to operate and displays information of the occurrence of the fault and faulty

Copy provided by USPTO from the PIRS Image Database on 10-17-2018

US 7,475,180 B2

11

on a result of comparison of whether said identification number stored in said video memory is an identification number stored in said video source.

**5.** The display unit according to claim **1**, wherein said identification number stored in said memory is sent to said video source in response to power on of at least one of said display unit and said video source.

**6.** The display unit according to claim **2**, wherein said identification number stored in said memory is sent to said video source in response to power on of at least one of said display unit and said video source.

**7.** The display unit according to claim **3**, wherein said identification number stored in said memory is sent to said video source in response to power on of at least one of said display unit and said video source.

**8.** The display unit according to claim **4**, wherein said identification number stored in said memory is sent to said video source in response to power on of at least one of said display unit and said video source.

**9.** The display unit according to claim **1**, wherein said display unit receives a signal from said video source that is generated by using said identification number.

**10.** The display unit according to claim **1**, wherein said display unit receives a signal from said video source that is generated in accordance with a result of comparison between said identification number stored in said memory and an identification number stored in said video source.

**11.** The display unit according to claim **1**, said display unit receives a signal from said video source that is generated based on a result of comparison of whether said identification number stored in said memory is an identification number stored in said video source.

**12.** The display unit according to claim **1**, further comprising a processor adapted to control display of said display unit.

**13.** The display unit according to claim **12**, wherein said display unit information is sent to said video source in response to power on of at least one of said display unit and said video source.

**14.** A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

a video circuit adapted to display an image based on the video signals sent by the externally connected video source;

a memory in which at least display unit information is stored, said display unit information including an identification number for identifying at least a type of said display unit and characteristic information of said display unit; and

a communication controller capable of bi-directionally communicating with said video source;

wherein said communication controller is capable of communicating said display unit information other than said characteristic information to said video source.

**15.** The display unit according to claim **14**, wherein said display unit information is sent to said video source in response to power on of at least one of said display unit and said video source.

**16.** The display unit according to claim **14**, wherein said display unit receives a signal from said video source that is generated by using said identification number stored in said memory.

**17.** A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

12

a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

a memory in which at least display unit information is stored, said display unit information including an identification number for identifying at least a type of said display unit; and

a communication controller capable of bi-directionally communicating with said video source;

wherein said communication controller is capable of communicating said identification number stored in said memory and no other display unit information to said video source.

**18.** The display unit according to claim **17**, wherein said display unit information includes characteristic information of said display unit.

**19.** The display unit according to claim **18**, wherein said display unit information is sent to said video source in response to power on of at least one of said display unit and said video source.

**20.** The display unit according to claim **18**, wherein said display unit receives a signal from said video source that is generated by using said identification number stored in said memory.

**21.** A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

a memory in which at least display unit information is stored, said display unit information including an identification number for identifying at least a type of said display unit; and

a communication controller capable of bi-directionally communicating with said video source;

wherein said communication controller is capable of sending said display unit information stored in said memory to said video source and of receiving a control signal from said video source, and said displayed image is controlled based on said control signal received by said communication controller.

**22.** The display unit according to claim **21**, wherein at least one of color and size of said image displayed on said display unit is changed by using said control signal.

**23.** A display unit for displaying an image based on video signals inputted from an externally connected video source, comprising:

a video circuit adapted to display an image based on the video signals sent by said externally connected video source;

a memory in which at least display unit information is stored, said display unit information including an identification number for identifying at least a type of said display unit;

a communication controller capable of bi-directionally communicating with said video source, said communication controller being capable of sending said display unit information stored in said memory to said video source and of receiving a control signal from said video source; and

a processor adapted to control said displayed image on said display unit by using said control signal received by said communication controller.

**24.** The display unit according to claim **23**, wherein at least one of color and size of said image displayed on said display unit is changed by using said control signal.

Appx11170-11201

Confidential Material Subject to Protective Order Redacted

| | Application No. | Applicant(s) | |
|---|---|---|---|
| **Interview Summary** | 10/160,022 | ARAI ET AL. | |
| | **Examiner** | **Art Unit** | |
| | Raymond Phan | 2111 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) _Raymond Phan - USPTO_.                    (3)_Melvin Kraus (Reg # 22,466)_.

(2) _Mark Rinehart - USPTO_.                    (4)_Masaichi Aoyagi - Hitachi Patent Engineer_.

Date of Interview: _30 April 2007_.

Type:   a)☐  Telephonic   b)☐  Video Conference
        c)☒  Personal [copy given to: 1)☐ applicant    2)☒ applicant's representative]

Exhibit shown or demonstration conducted:   d)☐ Yes    e)☒ No.
        If Yes, brief description: _____.

Claim(s) discussed: _27_.

Identification of prior art discussed: _____.

Agreement with respect to the claims f)☒ was reached.   g)☐ was not reached.   h)☐ N/A.

Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments: _Examiner concurs that previous office action reassembling previous rejection is incorrrect.  Therefore, the previous office action will be vacated.  Applicant proposes to more clearly specify identification number as a "type" of display unit which examiner agrees will read over the previous art applied regarding to the claims._

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims allowable, if available, must be attached.  Also, where no copy of the amendments that would render the claims allowable is available, a summary thereof must be attached.)

THE FORMAL WRITTEN REPLY TO THE LAST OFFICE ACTION MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW. (See MPEP Section 713.04).  If a reply to the last Office action has already been filed, APPLICANT IS GIVEN A NON-EXTENDABLE PERIOD OF THE LONGER OF ONE MONTH OR THIRTY DAYS FROM THIS INTERVIEW DATE, OR THE MAILING DATE OF THIS INTERVIEW SUMMARY FORM, WHICHEVER IS LATER, TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.  See Summary of Record of Interview requirements on reverse side or on attached sheet.

PLAINTIFF'S EXHIBIT
MOXI-0094
2:15-cv-04431-SRC-CLW

Examiner Note:  You must sign this form unless it is an Attachment to a signed Office action.

Examiner's signature, if required

MONLG 00199409

## Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

### Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews
Paragraph (b)
In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

### 37 CFR §1.2 Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

———

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
– An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
   (The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.

Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

2

MONLG 00199410

## Acknowledgments

This document would not have been possible without the efforts of the VESA Display Systems Committee's EDID Task Group. In particular, the following individuals and their companies have contributed significant time and knowledge.

**Release A, Rev. 2**

| | | |
|---|---|---|
| Syed Athar Hussain | ATI Technologies | |
| Chi Tai Hong | Chrontel | |
| Joe Goodart | Dell | |
| James R. Webb | DisplayLabs | |
| Bob Myers | Hewlett-Packard | |
| Gang Han | NVIDIA | |
| Isaac Yang | NVIDIA | |
| Glenn Adler | Philips | |
| Ian Miller | Samsung | |
| Paul Doyle | Sony | |
| Robert Blanchard | Sony | |
| Joe Lamm | Tech Source | |
| Alain d'Hautecourt | ViewSonic | Task Group Chair & Editor |

**Release A, Rev. 1 and/or previous**

| | |
|---|---|
| Bill Milford | 3Dfx |
| Warren Whaley | Canon |
| Joe Goodart | Dell |
| Drew Loucks | Elo Touchsystems |
| Bob Myers | Hewlett-Packard |
| Ton Wang | Hitachi |
| Ian Miller | IBM |
| Shaun Kerigan | IBM |
| En Anwyl | IBM |
| Geoff Gould | Intel |
| Rick Stoneking | Microchip Technology |
| Chuck Scott | Microsoft |
| Anthony Cianfarano | Mitsubishi |
| Jack Hosek | NEC |
| Richard Atanus | NEC |
| Anders Frisk | Nokia |
| Hans van der Ven | Panasonic |
| Glenn Adler | Philips |
| John Matsumoto | Toshiba |
| Alain d'Hautecourt | ViewSonic |
| Don Panell | |

MTL012768
Confidential

MONLG 00021605



PLAINTIFF'S EXHIBIT
PDX-0507
2:15-cv-04431-SRC-CLW

 **VESA**

Video Electronics Standards Association

**E-DDC™ Standard**

**Video Electronics Standards Association**
860 Hillview Court, Suite 150
Milpitas, CA 95035

Phone: (408) 957-9270
Fax:    (408) 957-9277

---

# ENHANCED DISPLAY DATA CHANNEL STANDARD

### Version 1.1
### March 24, 2004

## Purpose

The purpose of this standard is to define a communications channel between an electronic display (e.g. CRT, LCD, etc. displays) and a host system. The channel may be used to carry configuration information to enable 'plug & play' and allow optimum use of the display. The channel may also carry display control information.

## Summary

Today's computing and consumer electronic environments demands that systems offer user-friendly set-up. With the growing popularity of intuitive and simpler software user interfaces, hardware manufacturers are responding with plug-and-play systems and peripherals. However, for the user to receive full benefit from these advances, standardization is necessary. VESA, as the prominent standards organization for graphics subsystems, has developed a communications channel between the host and the display. This communication channel offers basic configuration information plus a standard way of communicating advanced functionality.

*Caution:*
The current requirement for +5 volt DDC is likely to be replaced in a future revision with a +3.3 volt requirement. In the current transition phase, it is recommended that new monitor designs work with a 3.3 volt supply and are tolerant of a +5 volt supply for backward compatibility.

---

MTL012889
Confidential

MONLG 00021726

## Preface

### Scope

This revision of the DDC Standard is intended to eliminate sections that support standards that have not been adopted by the industry. This will simplify the document while maintaining compatibility with previous revisions of this standard for displays and systems.

### 1.1 Intellectual Property

Copyright © 1994-2004 Video Electronics Standards Association. All rights reserved.

While every precaution has been taken in the preparation of this standard, the Video Electronics Standards Association and its contributors assume no responsibility for errors or omissions, and make no warranties, expressed or implied, of functionality or suitability for any purpose.

VESA has received notification from the following entities, stating that this document may describe techniques which may be considered similar to claims in patents held by these entities. VESA makes no effort to verify these statements.

     Companies: Dell, IBM Corporation, Hitachi, Philips Semiconductors,

To check for claims which may have been made since this standard was published, visit the VESA website at www.vesa.org and click on the link for Intellectual Property.

### Trademarks

All trademarks used within this document are property of their respective owners. VESA, DDC, E-DDC, DPMS, DPM, VDIF, EDID and E-EDID are trademarks of the Video Electronics Standards Association. I²C is a trademark owned by Philips.

### Patents

VESA proposals and standards are adopted by the Video Electronics Standards Association without regard to whether their adoption may involve any patents or articles, materials, or processes. Such adoption does not assume any liability to any patent owner, nor does it assume any obligation whatsoever to parties adopting the proposals or standards documents

### 1.2 Support for this standard

Clarifications and application notes to support this standard may be written. To obtain the latest standard and any support documentation, contact VESA.

If you have a product that incorporates DDC, you should ask the company that manufactured your product for assistance. If you are a manufacturer, VESA can assist you with any clarification you may require. All comments or reported errors should be submitted in writing to VESA using one of the following methods.

- Fax       408-957-9277, *direct this note to Technical Support at VESA*

- e-mail      support@vesa.org

- mail to     Technical Support
               Video Electronics Standards Association
               860 Hillview Court, Suite 150
               Milpitas, CA 95035

MTL012890
Confidential

MONLG 00021727

## Acknowledgments

This document would not have been possible without the efforts of the VESA Display Committee. In particular, the following individuals and their companies contributed significant time and knowledge.

| | | |
|---|---|---|
| Syed Athar Hussain | ATI Technologies Inc. | |
| Chi Tai Hong | Chrontel, Inc. | |
| Joe Goodart | Dell | |
| Graham Loveridge | Genesis Microchip | |
| Jim Webb | Genesis Microchip | |
| Bob Myers | Hewlett-Packard | |
| Ian Miller | Samsung | Workgroup leader |
| Joe Lamm | Tech Source | |
| Alain d'Hautecourt | ViewSonic | |

## Revision History

### Version 1        September 2, 1999

Initial release of the standard. The body of the standard is derived from the VESA DDC version 3 standard. The major changes were the addition of the E-DDC protocols, removal of DDC1 protocol and clarification to the DDC power requirements.

### Version 1 Revision 1          March 24, 2004

This revision is primarily to update the E-DDC standard and not to introduce major changes. The scope has been expanded to encompass usage in consumer electronic products and video interfaces other than VGA with text clarified in several places.

Support for the P&D and FPDI-2 standards has been eliminated along with recommendation that new designs do not support DDC1.

Warning about the possible future change of the "DDC +5V" to a 3.3 volt supply has been added.

Pins 4 and 11 of the VGA connector have been changed from "optional" to "reserved - no connection" designation.

MTL012891
Confidential

MONLG 00021728

# TABLE OF CONTENTS

PREFACE .................................................................................................................................... 2
1.1    INTELLECTUAL PROPERTY ............................................................................................... 2
TRADEMARKS ............................................................................................................................ 2
PATENTS ..................................................................................................................................... 2
1.2    SUPPORT FOR THIS STANDARD ......................................................................................... 2

1.    OVERVIEW .......................................................................................................................... 6
1.1    SUMMARY ...................................................................................................................... 6
1.2    BACKGROUND ................................................................................................................ 6
1.3    STANDARD OBJECTIVES .................................................................................................. 6
1.4    SIGNIFICANT CHANGES IN CURRENT E-DDC REVISION ................................................... 7
1.5    REFERENCE DOCUMENTS ................................................................................................ 7
1.6    COMPATIBILITY WITH NON-DDC SYSTEM UNITS / GRAPHIC CARDS ............................... 8

2.    DEFINITIONS ...................................................................................................................... 9
2.1    DATA FORMATS .............................................................................................................. 9
    2.1.1    Enhanced Extended Display Identification Data : E-EDID ..................................... 9
    2.1.2    Enhanced Extended Display Identification Data Extension Blocks ......................... 9
2.2    COMMUNICATION PROTOCOLS ....................................................................................... 9
    2.2.1    DDC1 (for reference only ... not recommended for new designs) .......................... 9
    2.2.2    I²C Bus .................................................................................................................. 9
    2.2.3    Display Data Channel – Bi-directional (DDC2B) ................................................. 9
    2.2.4    Enhanced DDC (E-DDC) ....................................................................................... 9
    2.2.5    DDC Command Interface (DDC/CI) .................................................................... 10
2.3    DDC ADDRESSING ....................................................................................................... 10
    2.3.1    DDC address (A0h / A1h) ................................................................................... 10
    2.3.2    Segment pointer (60h) ........................................................................................ 10
2.4    DISPLAY TYPES ........................................................................................................... 12
    2.4.1    Non-DDC Display ............................................................................................... 12
    2.4.2    DDC Display ....................................................................................................... 12
    2.4.3    Enhanced DDC Display ...................................................................................... 12
2.5    HOST SYSTEM TYPES ................................................................................................... 12
    2.5.1    Non-DDC Host .................................................................................................... 12
    2.5.2    DDC1 Host ......................................................................................................... 12
    2.5.3    DDC2B Host ....................................................................................................... 12
    2.5.4    Enhanced DDC Host ........................................................................................... 12
2.6    DDC SYSTEM/DISPLAY MATRIX .................................................................................. 13

3.    ENHANCED DDC SYSTEM / DISPLAY COMBINATIONS ....................................... 14
3.1    INTEROPERABILITY ....................................................................................................... 14
    3.1.1    DDC2B Host System Connected to an Enhanced EDID Display ........................... 14
    3.1.2    Enhanced DDC Host System Connected to a Legacy DDC Display ...................... 14

4.    PHYSICAL CONNECTIONS ........................................................................................... 17
4.1    DISPLAY ⇔ HOST GRAPHICS CONTROLLER .................................................................. 17
    4.1.1    Purpose .............................................................................................................. 17
    4.1.2    Mechanical - VGA Connector ............................................................................. 17
    4.1.3    Mechanical – Other connectors .......................................................................... 18
    4.1.4    Electrical ............................................................................................................ 18
    4.1.5    Timing ................................................................................................................ 18
4.2    HOST DDC +5 VOLT SOURCE ...................................................................................... 18
4.3    DISPLAY DDC +5 VOLT LOAD ..................................................................................... 18
4.4    DISPLAY DDC SIGNAL AVAILABILITY .......................................................................... 19
4.5    FUTURE OF +5 VOLTS SUPPLIED BY THE HOST ............................................................. 19

MTL012892
Confidential

5.    DATA TRANSFER PROTOCOLS ................................................................................................ 20

5.1    DDC1 (FOR REFERENCE ONLY — NOT RECOMMENDED FOR NEW DESIGNS) ...................................... 20
5.2    DDC2B AND ENHANCED DDC ............................................................................................................ 20
   5.2.1    *Basic operation for Enhanced DDC access:* ........................................................................... 20

6.    COMPLIANCE WITH THIS STANDARD ............................................................................... 21

6.1    OLDER DESIGNS .................................................................................................................................. 21
6.2    NEW DISPLAY DESIGNS ...................................................................................................................... 21
6.3    NEW HOST SUBSYSTEM DESIGNS ....................................................................................................... 21

7.    APPENDIX A - ANSWERS TO COMMONLY ASKED QUESTIONS ................................. 22

## LIST OF TABLES

Table 2.1 – DDC System/Display Matrix ................................................................................................. 13
Table 4.1 – 15-pin D-type Connector Pinouts ........................................................................................ 18
Table 5.1 – DDC2B device addresses ....................................................................................................... 20
Table 7.1 – Answers to Commonly Asked Questions ............................................................................ 22

## LIST OF FIGURES

Figure 2.1 - E-DDC Segment Pointer and Block Layout ....................................................................... 11
Figure 3.1 - DDC2B Random Address Read (Segment 0 only)  *(For reference only)* ...................... 14
Figure 3.2 - DDC2B Sequential Read (Segment 0 only) *(For reference only)* ................................. 15
Figure 3.3 - DDC2B Current Address Read (Segment 0 only) *(For reference only)* ...................... 15
Figure 3.4 - Enhanced DDC Read ........................................................................................................... 15
Figure 3.5 - Enhanced DDC Sequential Read ........................................................................................ 16

MTL012893
Confidential

MONLG 00021730

# 1. OVERVIEW

## 1.1 Summary

The Enhanced Display Data Channel (E-DDC) described in this document, allows the display to inform the host about its identity and capabilities using an I²C bus. It is enhanced from DDC by enabling the communication channel to address a larger set of data. The communication channel, as used for this purpose, is uni-directional from display to host using the E-DDC operational modes except for the command to initiate an EDID data transfer which the host device sends to the display. The contents and formats of data are described in the VESA Enhanced Extended Display Identification Data Standard (E-EDID) and a number of E-EDID extension block standards.

The scope of this document is detailed description of the operational modes of DDC and their implementation.

However, in addition to serving to request and transmit EDID data, DDC also allows communication that is truly bi-directional between the display and host. This enables control of display functions affecting the displayed images and possibly use of other devices attached to the I²C bus. The bi-directional communication modes are described outside of this standard in the VESA Display Data Channel Command Interface Standard (DDC/CI) and the associated VESA Monitor Command and Control Set (MCCS) standard.

DDC communications has been widely implemented in a number of video interfaces including VGA (15 pin high-density D-sub), DVI (Digital Visual Interface), HDMI (High Definition Multimedia Interface).

This document does not specify how the E-DDC interfaces to the host CPU address and I/O spaces.

Earlier versions of DDC and E-DDC standards introduced and supported the DDC1 operational mode. With this revision, VESA ceases to support DDC1 for new designs (host and display), it is expected that all new designs will support a minimum of DDC2B.

## 1.2 Background

Early personal computer monitor identification schemes were only capable of handling a limited number of display types and parameters. Since these schemes carried very little information about the capabilities of the display, they were of limited value.

Earlier versions of DDC and EDID defined a communication method and configuration data appropriate for traditional CRT displays, but were limited in support of other display types and the amount of data that could be supported in the display. As new display technologies have been introduced to the market, support for communication methods and configuration information suitable for these displays has become a necessity  In recent years displays intended for digital and high definition television have also started to use the DDC protocols.

## 1.3 Standard Objectives

The E-DDC standard was developed by VESA to meet, exceed and/or complement certain criteria. These criteria are set forth as Standard Objectives as follows:
- Support Microsoft® Plug and Play definition
- Provide information to allow the graphics subsystem to be configured based on the capabilities of the attached display
- Ensure scaleable, low cost, fast market acceptance

MTL012894
Confidential

MONLG 00021731

- Allow for base level to be achieved with minimal hardware cost penalties in host controller and display
- Retain compatibility with most existing graphic controller chips at minimum configuration level
- Define a full communication channel capable of sending E-EDID as well as allowing control of display parameters from the host.
- Remain compatible with and continue to support DDC2B protocols for existing monitors.

### 1.4 Significant Changes in Current E-DDC Revision

This version (1.1) updates the E-DDC standard but does not introduce any major changes. Changes may be summarized as:

- Deletion of references to P&D and FPDI-2 standards
- DDC1 support is strongly discouraged for new designs
- Support for E-EDID extensions explicitly added
- Pins 4 and 11 of the VGA connector are redefined as "reserved – do not use". Previously undefined.
- Recognition that E-DDC is supported on multiple interfaces

### 1.5 Reference Documents

Versions identified here are current but users of this standard are advised to ensure they have the latest versions of reference standards and documents.

| Source | Name | Version / Date |
|---|---|---|
| VESA | Video BIOS extensions for Display Data Channel (VBE/DDC) | 1.1 / Nov. 1999 |
| | Enhanced Extended Display identification Data (E-EDID) | A.1 / Feb. 2000 |
| | Monitor Command and Control Set (MCCS) | 2 / Oct. 2003 |
| | Display Data Channel – Command Interface (DDC/CI) | 1 / Aug. 1998 |
| | Plug and Play | Proposed standard |
| Philips | The I²C Bus Specification | 2.1 / Jan. 2001 |
| Microsoft | Windows and the Plug and Play Framework Architecture | March 1994 |
| | Plug and Play for Windows 2000 and Windows XP | December 2001 |
| | Windows XP – Plug and Play Overview | |
| | Plug and Play Technology | December 2001 |
| IBM | IBM Personal System/2 Hardware Interface Technical Reference-Common Interfaces Video Subsystem | 1987 |

**Table 1.4: Reference Documents**

MTL012895
Confidential

MONLG 00021732

### 1.6  Compatibility with Non-DDC System Units / Graphic Cards

Old computer graphics subsystems and boards which use the ID bits to identify the attached monitor type may have a problem with a DDC monitor since ID bits 1 has been redefined and may be read as either a '1' or '0' dependent on when it is read.

Use of one of the following options should be considered to avoid this problem:
- Avoid compatibility claims for these systems and boards
- Clearly label monitor as suitable for DDC capable graphics subsystems and boards only
- Provide or recommend a pass-through connector which isolates the monitor DDC lines from the graphics subsystem or board
- Implement a switch (hardware or software) to allow user to disable the monitor DDC function

Note: This is likely to be a problem only with graphic sub-systems designed before the mid-90s.

MTL012896
Confidential

MONLG 00021733

## 2. DEFINITIONS

In the following sections there are references such as "EDID 1.x", this refers to EDID data structure version 1, revision x. Increments of the revision number indicate backward compatibility with earlier revisions, and increments of the version number indicate some degree of incompatibility with earlier versions - see the latest VESA E-EDID standard for details.

### *2.1 Data formats*

#### 2.1.1  **Enhanced Extended Display Identification Data: E-EDID**

Data structure containing the display identity and the basic display specifications. E-EDID defines a 128-byte structure and extensions to the structure in 128-byte increments. E-EDID is fully compatible with EDID version 1 data structure. Details can be found in the VESA E-EDID standard.

#### 2.1.2  **Enhanced Extended Display Identification Data Extension Blocks**

A number of VESA standards have been approved which define EDID Extension Blocks – reference document list. Note, new Extension Block standards will likely be developed periodically, check the VESA website for the latest standards.

The CEA has also developed a Timing Extension Block for use with digital television products compliant with the EIA - 861b specification.

### *2.2 Communication Protocols*

The original DDC standard supported two modes, a very simple mode called DDC1 and a $I^2C$ bus (see Philips $I^2C$ specification) based mode called DDC2. There are a number of DDC2 protocols with different features and capabilities ... DDC2B provides the base level of bi-directional communications, E-DDC provides the same set of functions as DDC2B but with a larger accessible memory space and DDC/CI extends the range and type of communications available.

#### 2.2.1  **DDC1 (for reference only ...** *not recommended for new designs*)

A protocol which utilizes a uni-directional data channel from the display to the host to carry continuous transmission of the EDID information.
Note: DDC1 cannot be used to support E-DDC displays

#### 2.2.2  $I^2C$ **Bus**

A standard protocol two-wire (clock and data) serial data bus. Note that all devices on an $I^2C$ bus are allocated fixed addresses by Philips. In the case of displays, addresses are A0h and A1h. See $I^2C$ specification for details.

#### 2.2.3  **Display Data Channel – Bi-directional (DDC2B)**

A protocol based on $I^2C$ and used on a bi-directional data channel between the display and host. In DDC2B mode the only transmission from the host to the monitor is a request for EDID data. This request is implemented by accessing the device at the $I^2C$ address of A0h / A1h

#### 2.2.4  **Enhanced DDC (E-DDC)**

A protocol based on $I^2C$ and used on a bi-directional data channel between the display and host. This protocol accesses devices at $I^2C$ address of A0h / A1h as well as the address 60h. The 60h address is used as a segment register to allow larger amounts of data to be retrieved than is possible using DDC2B protocols. The protocol is compatible with DDC2B protocols.

MTL012897
Confidential

MONLG 00021734

### 2.2.5 DDC Command Interface (DDC/CI)

A set of protocols based on $I^2C$ and used on a bi-directional data channel between display and host. The protocols provide a mechanism to send commands to the display; data may also be sent/received to/from the display. Details can be found in the VESA DDC/CI Standard. Compatible with DDC2B and E-DDC.

### 2.3 *DDC addressing*

DDC accesses data from the display by using $I^2C$ protocols to access particular device addresses.

### 2.3.1 DDC address (A0h / A1h)

The base DDC address pair of A0h / A1h is used to access EDID data structure 1.x. The address pair allows access of up to 256 bytes of data, which enables reading of two EDID 1.x data blocks. Larger data sizes cannot be accessed using the base DDC address alone.

### 2.3.2 Segment pointer (60h)

Enhanced DDC allows access of up to 32 Kbytes of data. This is accomplished using a combination of the A0h / A1h address pair and a segment pointer. For each value of the segment pointer 256 bytes of data are available at the A0h / A1h address pair. An unspecified segment pointer references the same data as when the segment pointer is 0. Each successive value of the segment pointer allows access to the next two blocks of EDID (128 bytes in each block). This is illustrated in Figure 2.1. The value of the segment pointer register cannot be read since it is reset at the completion of each command.

MTL012898
Confidential

MONLG 00021735

Appx12436



**Figure 2.1 - E-DDC Segment Pointer and Block Layout**

MTL012899
Confidential

MONLG 00021736

## 2.4 Display Types

### 2.4.1 Non-DDC Display
- Display with no DDC capabilities

### 2.4.2 DDC Display
- DDC2B capable
- Display containing EDID 1.x data (128 bytes) plus an optional EDID Extension block (128 bytes) at DDC address A0h / A1h
- Older displays may support DDC1 ... *not recommended for new designs.*

### 2.4.3 Enhanced DDC Display
- Enhanced DDC read compliant
- Display with EDID 1.3 (or higher) data and up to 255 extension blocks, each 128 bytes (up to 32K bytes total EDID memory).
  Note that a single extension may occupy multiple 128 byte blocks.

## 2.5 Host System Types

### 2.5.1 Non-DDC Host
- Host without DDC capabilities

### 2.5.2 DDC1 Host
- Host using DDC1 protocols to read EDID 1.x. It is recognized that some DDC1 host and graphics cards may still be in use but DDC1 is not recommended for new designs.

### 2.5.3 DDC2B Host
- Host using DDC2B protocols
- Reads EDID 1.x plus an optional EDID Extension block (128 bytes) at DDC address A0h / A1h

### 2.5.4 Enhanced DDC Host
- Host using E-DDC protocols
- Reads EDID 1.x at DDC address 60h / A0h / A1h
- Reads Enhanced EDID extensions at DDC address 60h / A0h / A1h

MTL012900
Confidential

MONLG 00021737

### 2.6 DDC System/Display Matrix

The matrix in Table 2.1 shows interoperability of DDC operations between monitors and systems of different types. For each case where interoperability is possible, the matrix shows the EDID block size, the DDC mode used and the DDC address where the data is found.

| | Non DDC Display | DDC Display | Enhanced DDC Display |
|---|---|---|---|
| **Non-DDC Host** | No DDC function | No DDC function | No DDC function |
| **DDC2B Host** | No DDC function | EDID 1.x and an optional EDID extension at DDC Addresses A0h / A1h | EDID 1.3 (or higher) and an optional EDID extension in Segment 0 at DDC Addresses A0h / A1h |
| **Enhanced DDC Host** | No DDC function | EDID 1.x and an optional EDID extension at DDC Addresses A0h / A1h | EDID 1.3 (or higher) and any EDID extensions at E-DDC Addresses 60h / A0h / A1h. |
| | | | |
| **Legacy Mode** | | | |
| **DDC1 Host** | No DDC function | EDID 1.x using DDC1 protocol | No DDC function |

Table 2.1 – DDC System/Display Matrix

MTL012901
Confidential

MONLG 00021738

# 3. Enhanced DDC System / Display Combinations

This section addresses issues most likely to arise in computer/display systems. Figure 3.1 through Figure 3.5 illustrate typical communication sequences.

## 3.1  Interoperability

There are two scenarios that can occur where the display and host system support different versions of EDID standards. This potentially raises issues of compatibility and interoperability between standards (existing and proposed). These are discussed in the following sections.

### 3.1.1  DDC2B Host System Connected to an E-EDID Display

The first scenario of potential concern is that of an existing, DDC2B / EDID 1.x compliant, system connected to a monitor that supports the E-EDID standard. This situation is addressed by the full backward compatibility of the E-EDID standard. A unique situation can potentially occur where an EDID 1.x graphics controller can utilize a software driver to utilize the extended features of the proposed new standard. In this situation it is possible that a system reset can be initiated while the software driver is performing an extended EDID operation, in which the segment pointer has been set to point to a segment other than segment 0. If the extended EDID operation has not been completed when the system resets, then the segment pointer will not be reset and the graphics controller BIOS would then be unable to recognize the monitor. In order to address this issue, this standard requires that the segment pointer be reset to 00h when a NO ACK or a STOP condition is received.

### 3.1.2  Enhanced DDC Host System Connected to a Legacy DDC Display

The second scenario is one in which the graphics controller supports the Enhanced EDID standard, and the monitor is EDID 1.x compliant only. In this case, the system issues the START condition and the DDC Address byte for the E-EDID command (60h) but the display memory device will not respond to this address - in effect issue a NO ACK. Since a NO ACK is a valid response, the host will continue by writing the segment pointer. (Since the attached display is a legacy DDC display the host can't assume that there are any other segments than segment 0, hence the segment pointer must be segment 0 in order to read EDID 1.x.) The display will once again not respond, in effect issue a NO ACK. Also here, the NO ACK is a valid response and the host will continue with the read process. The rest of the process is identical to the legacy DDC2B EDID 1.x read operation and the display will respond with its EDID data.



**Figure 3.1 - DDC2B Random Address Read (Segment 0 only)**
*(For reference only)*

MTL012902
Confidential

MONLG 00021739



**Figure 3.2 – DDC2B Sequential Read (Segment 0 only)**
*(For reference only)*



**Figure 3.3 - DDC2B Current Address Read (Segment 0 only)**
*(For reference only)*



**Figure 3.4 - Enhanced DDC Read**

VESA Enhanced Display Data Channel Standard
Copyright © 1994 – 2004 Video Electronics Standards Association

Page 15 of 24
Version 1.1

MTL012903
Confidential



**Figure 3.5 - Enhanced DDC Sequential Read**

Copyright © 1994 - 2004 Video Electronics Standards Association

## 4. Physical Connections

DDC2B, E-DDC and DDC/CI can be implemented on any video interface supporting the E-DDC standard. Examples include the 15 pin VGA (Video Graphics Array), DVI (Digital Visual Interface) and HDMI (High Definition Multimedia Interface). Details of the VGA interface are included here but the appropriate specification should be consulted for details of other video interfaces.

### 4.1 Display ⇔ Host Graphics Controller

#### 4.1.1 Purpose

To provide a standard mechanical and electrical interface between the display and host graphics controller through which DDC communications can pass. This standard specifies the interface through the standard 15-pin VGA connector. Other interface standards implement DDC on alternate connector types and pin allocations, check the appropriate specification for details.

#### 4.1.2 Mechanical - VGA Connector

The mechanical specification for DDC is backward compatible with the standard 15-position VGA-type connector with the following exceptions.

- Socket # 9 shall be recessed by 0.050 inches for DDC compliance. Socket to retain contact capability.
- The host side connector color, plastic part, shall be "royal blue" to clearly indicate that socket is DDC compatible

Suitable connectors are available from a number of sources; the following are listed for reference. This does not imply that VESA recommends or approves these particular connectors:

- AMP       p/n    787066-1      787066-2      787506-1
- Molex     p/n    89263-*7**    89141-70**    89046-70**

MTL012905
Confidential

MONLG 00021742

### 4.1.2.1 Connector Pinouts

| Pin # | Legacy VGA | DDC2B Host | E-DDC Display |
|-------|------------|------------|---------------|
| 1 | Red video | Red video | Red video |
| 2 | Green video | Green video | Green video |
| 3 | Blue video | Blue video | Blue video |
| 4 | Monitor ID bit 2 | Monitor ID bit | Reserved - No connection |
| 5 | Test (ground) | Return (ground) | Return |
| 6 | Red video return | Red video return | Red video return |
| 7 | Green video return | Green video return | Green video return |
| 8 | Blue video return | Blue video return | Blue video return |
| 9 | No connection (mechanical key) | DDC +5 volt supply (mandatory supply) | DDC +5 volt load (See section 4.5) |
| 10 | Sync. return | Sync. return | Sync. return |
| 11 | Monitor ID bit 0 | Monitor ID bit 0 | Reserved - No connection |
| 12 | Monitor ID bit 1 | Bi-directional data (SDA) | Bi-directional data (SDA) |
| 13 | Horizontal sync. | Horizontal sync. | Horizontal sync. |
| 14 | Vertical sync. | Vertical sync. | Vertical sync. |
| 15 | Monitor ID bit 3 | Data clock (SCL) | Data clock (SCL) |

Table 4.1 – 15-pin D-type Connector Pinouts

### 4.1.3 Mechanical – Other connectors

DDC signals assignments on other connectors are defined in the respective documents.

### 4.1.4 Electrical

#### 4.1.4.1 General

Graphics controller boards should provide pull-up resistors of $\geq 1.5$ K$\Omega$ and $\leq 2.2$ K$\Omega$ to a +5 volt reference or a 3 mA current source for the SCL and SDA open drain signals.

All SDA and SCL pull up resistors should be located within the host system except for the 47 K$\Omega$ pull up resistor on the SCL line.

### 4.1.5 Timing

#### 4.1.5.1 DDC2 Timing

Data is synchronized with the clock signal and timing shall comply with the I$^2$C specification. Refer to I$^2$C specification for details.

### 4.2 Host DDC +5 Volt Source

The system unit or graphics card shall supply +5 volts (+/- 5%) whenever the video port is active. The required current capability is 50mA with over current protection limited the maximum current to no more than 1A.

### 4.3 Display DDC +5 Volt Load

When the display is not AC powered and / or the power switch is in the off position it may draw up to

MTL012906
Confidential

MONLG 00021743

50mA from the +5 volt supplied by the host.

When the display is AC powered and the power switch is the on position it shall not draw more than 1mA from the +5 volts supplied by the host.

### 4.4  Display DDC Signal Availability

The display should be capable of providing EDID information over the DDC channel whenever the DDC 5v signal is provided. EDID information should be available within 20ms after the 5v signal is provided.

### 4.5  Future of +5 Volts Supplied by the Host

As noted in section 4.2 there is currently a requirement for the host device to supply 5 volts $\pm$ 5% to the display to ensure that the EDID data can be read even if the display is switched off.  It is anticipated that this requirement will change to 3.3 volts in a future revision of this standard.

In order to ensure an orderly migration with maximum interoperability it is recommended that new display designs operate using a 3.3 volts AND are tolerant of a 5 volt supply from the host.

MTL012907
Confidential

MONLG 00021744

# 5. Data Transfer Protocols

## 5.1  DDC1 (for reference only – *not recommended for new designs*)

A uni-directional channel from display to host. The 128-byte EDID is continuously transferred from the display to the host on the serial data line (SDA), clocked by Vsync.

## 5.2  DDC2B and Enhanced DDC

DDC2B is an uni-directional channel from display to host. The host computer uses base level $I^2C$ commands to read information from a display with a slave address of A0h / A1h

Enhanced DDC uses the same command structure with one modification.  A segment pointer is used to allow addressing outside of the normal 256-byte limit of the A0h address.  The Enhanced DDC protocol sets the segment pointer before the remainder of the DDC command.

| Display type | EDID base address | Data size | EDID extension address | Data size |
|---|---|---|---|---|
| DDC | A0h Device<br>00h word offset | 128 bytes | A0h device<br>80h word offset | 128 bytes |
| E-DDC | 00h segment pointer<br>A0h Device<br>00h word offset | 128 bytes | Segment pointer 00h -7Fh<br>A0h device<br>00h or 80h word offset | 128 bytes |

Table 5.1 - DDC2B device addresses

### 5.2.1  Basic operation for Enhanced DDC access:

Read EDID

SET Segment 0, device A0h, start address 00h, READ 128 bytes
IF no valid response
       THEN display is not DDC capable
IF Extension flag is not equal to zero
       THEN Optional Extended EDID extension blocks of 128 bytes each can be read at
       subsequent segments and start addresses

e.g. A single optional EDID block can be read with the command:
Segment 0, device A0h, start address 80h, read 128 bytes

MTL012908
Confidential

MONLG 00021745

# 6. Compliance with this Standard

Compliance with the VESA E-DDC Standard requires that all requirements of Sections 1 to 5 inclusive, for whichever level of the DDC Standard is being implemented, are met.

## 6.1  Older Designs

Older DDC displays and graphics subsystem designs will generally comply with the DDC Standard Versions 1, 2 or 3 only and not support the new features added in the E-DDC Standard.
Designs based on the DDC1 protocol are not compliant with the E-DDC standard, DDC1 is not recommended for any new design.

## 6.2  New Display Designs

It is recommended that new DDC monitor designs comply with E-DDC Standard Version 1.1. Displays are not required to implement the segment pointer if all data can be accessed in segment 0.

## 6.3  New Host Subsystem Designs

It is recommended that new DDC host designs comply with E-DDC Standard Version 1.1.  Designs compliant with DDC Standard Version 3 or earlier may be unable to access complete data in an E-DDC display.

MTL012909
Confidential

MONLG 00021746

## 7. Appendix A - Answers to Commonly Asked Questions

| | Question | Answer |
|---|---|---|
| 1 | Why is +5 volts on pin 9 of the VGA connector mandatory for hosts and/or graphic cards? | Ref.: Section 4.2<br>It has become common for system management software to interrogate peripheral devices for product type and serial number as a form of asset management. This is usually scheduled for nighttime but if the monitor is powered off then no data can be collected. Providing +5 volts allows the DDC circuit in the monitor to remain active even when the monitor itself is powered off.<br>It also allows for EDID to be available to the host even if the user has not switched on the monitor yet i.e. it enables display plug and play |
| 2 | Is +5 volts mandatory for portable computers? | Ref.: Section 4.2<br>Portable computers that want to be able to claim compliance with VESA DDC standard version 2 (and later) must provide the +5 volt output. |
| 3 | Is +5V from the host required to be continuously active? | Ref.: Section 4.2.<br>+5V should be provided whenever the host video port is active, or when the host is attempting to read the monitor's EDID data. In particular, hosts running on battery power may disable the +5V output when the host video port is not active, to conserve battery power. |
| 4 | What are the intended uses for the +5V output? | Ref.: Sections 4.2 & 4.4.<br>+5V is needed as a power source for the DDC and EDID circuits of a display monitor when the host is attempting to read the monitor's EDID data and the display's own local power supply is not yet turned on. This capability is especially important when a host is initially booting up or when a mobile host user enables the external video port, so that the host can properly detect the type of display attached. This is the main use of +5V defined in the Enhanced DDC Standard. (The EDID and DDC circuits in a display should always be powered from the display's own local power supply whenever it is available.)<br>The E-DDC Standard does not directly define or constrain other possible uses for the +5V output, provided that the specified load limits are not exceeded. For example, when the display is powered on, +5V may be used as a logic signal to control display power states, i.e., signaling to the display whether or not the host video port is active, so that the display can decide when to go into a reduced power mode. This is the reason why the +5V must be provided continuously whenever the host video port is active. Since the host might be a portable device running on battery power, the total load on the +5V from the host must be limited to 1 mA maximum when the display has local power. |

MTL012910
Confidential

MONLG 00021747

| | Question | Answer |
|---|---|---|
| 5 | Is clock stretching required? | Ref. Section 2.2<br>Yes, compliance with VESA E-DDC standard requires that the requirements of the I$^2$C specification are fully met. |
| 6 | Will +5 volt supply continue to be required? | As noted in section 4.2 there is currently a requirement for the host device to supply 5 volts ± 5% to the display to ensure that the EDID data can be read even if the display is switched off. It is anticipated that this requirement will change to 3.3 volts in a future revision of this standard.<br>In order to ensure an orderly migration with maximum interoperability it is recommended that new display designs operate using 3.3 volts AND are tolerant of a 5 volt supply from the host. |

MTL012911
Confidential

MONLG 00021748

Appx12449

**THIS PAGE INTENTIONALLY LEFT BLANK**

MTL012912
Confidential

MONLG 00021749



MTL012913
Confidential

MONLG 00021750



MTL012914
Confidential

MONLG 00021751



**VESA**



Video Electronics Standards Association

# VESA®

**VBE/DDC™ Standard**

**Video Electronics Standards Association**
860 Hillview Ct., Suite 150
Milpitas, CA 95035

Phone: (408) 957-9270
Fax:    (408) 957-9277

---

## VESA BIOS Extensions/Display Data Channel Standard

### Version: 1.1
### November 18, 1999

### Purpose

To establish a standard set of hardware-independent system services for reading the Display Identity via the Display Data Channel (DDC).

### Summary

The VBE/DDC standard defines a set of functions to retrieve the EDID data structures from the display over the Display Data Channel. These functions supplement the VESA Video BIOS Extensions (VBE) normally provided in ROM with the display controller and accessed through interrupt 10h.

The hardware mechanism and the identity information content that can be retrieved from the display devices are defined by the VESA Display Data Channel (DDC) standard.

Version 1.1 of this document enables the reading of EDID Extension blocks as defined in the Enhanced DDC and Enhanced EDID Standards, while keeping the software interface backward compatible.

---

MTL012915
Confidential

MONLG 00021752

Appx12453

## Intellectual Property

Copyright © 1993,1994, 1999 Video Electronics Standards Association. All rights reserved.

While every precaution has been taken in the preparation of this standard, the Video Electronics Standards Association and its contributors assume no responsibility for errors or omissions, and make no warranties, expressed or implied, of functionality or suitability for any purpose.

## Trademarks

All trademarks used within this document are the property of their respective owners. VESA, DDC and VBE/DDC are trademarks of the Video Electronics Standards Association.

## Patents

VESA proposals and standards are adopted by the Video Electronics Standards Association without regard to whether their adoption may involve any patents or articles, materials, or processes. Such adoption does not assume any liability to any patent owner, nor does it assume any obligation whatsoever to parties adopting the proposals or standards documents.

## Support for this Standard

Clarifications and application notes to support this standard may be written. To obtain the latest standard and any support documentation, contact VESA.

If you have a product, which incorporates VBE/DDC, you should ask the company that manufactured your product for assistance. If you are a manufacturer, VESA can assist you with any clarification you may require. All comments or reported errors should be submitted in writing to VESA using one of the following methods.

- Fax:      (408) 957-9277, *direct this note to Technical Support at VESA*

- e-mail:     support@vesa.org

- mail to:    Technical Support
  Video Electronics Standards Association
  860 Hillview Ct. Suite 150
  Milpitas, CA 95035

## Acknowledgments

This document was made possible by the joint efforts of the members of the VESA Monitor Committee, the VESA Software Standards Committee 1993, 1994, and the VESA Display Committee, DDC workgroup, 1999.

In particular, the following individuals and their companies contributed significantly with time and knowledge.

Version 1.0
Anders Frisk, ICL Personal Systems         Tim Crawford, Cirrus Logic

Version 1.1
Jack Hosek, NEC                    Anders Frisk, Nokia Display Products

MTL012916
Confidential

MONLG 00021753

## Document revision history

**Standard version 1.0 revision 0, August 12, 1994**
Initial issue of document.
The information in this document is identical with VESA VBE/DDC Proposal ver. 1.0p rev. 0.22p dated June 10, 1994

**Standard version 1.0 revision 1.0, August 12, 1994**
Initial issue of adopted document.

**Standard version 1.1, November 18, 1999**
Removed 3.2.201 Read EDID/Input Wording: "Zero is the only valid value in version 1.0".
Removed VDIF Read-Sub Function
Section 3.2, Clarification of the term "Controller unit number"

MTL012917
Confidential

MONLG 00021754

# Table of Contents

1.  INTRODUCTION ..................................................................................................... 5

2.  GOALS AND OBJECTIVES ..................................................................................... 5

3.  DISPLAY IDENTIFICATION BIOS EXTENSIONS, VBE/DDC ............................ 5

3.1     STATUS INFORMATION .......................................................................................... 5
3.2     VBE SUB-FUNCTION 15H – DISPLAY IDENTIFICATION EXTENSIONS ....................... 6
  3.2.1     00 – Report VBE/DDC Capabilities ............................................................. 6
  3.2.2     01 – Read EDID ............................................................................................ 7

VESA VBE/DDC Standard                                    Version 1.1
©Copyright 1993-1999 Video Electronics Standards Association      Page 4 of 8

MTL012918
Confidential

MONLG 00021755

# 1. Introduction

This document contains a specification for an application interface - VBE/DDC. The VBE/DDC interface will allow operating system software, as well as application software, to retrieve the display identity information from the display device without specific hardware knowledge or direct hardware access. The hardware protocol for retrieving the identity from the display is described in the VESA Standard Enhanced DDC.

Readers of this document should already be familiar with the VESA Video BIOS extensions and programming video hardware at BIOS level. The VESA Video BIOS extensions are defined by the VESA VBE Specification available from the VESA office.

# 2. Goals and Objectives

The VESA Display BIOS Extensions/Display Data Channel (VBE/DDC) provides a hardware-independent means for operating system software and configuration utility software to retrieve identity and capabilities information from the attached display.

VBE/DDC services need to be provided as part of the Video BIOS ROM, since the functions need to be used during system boot up.

VBE/DDC services can be implemented with a standard VGA BIOS, and do not require the support of other VESA VBE Video BIOS services.

# 3. Display Identification BIOS Extensions, VBE/DDC

The new BIOS calls have been defined to map to both standard VGA BIOS, as well as all implementations of a VESA VBE BIOS. For compatibility with these environments, the VBE/DDC function calls are grouped under the VBE function number *4Fh*, sub-function *15h*. The number *4F15h* is passed in the AX register to the *int 10h* interrupt handler.

### 3.1 Status information

Every function returns status information in the AX register. The format of the status word is as follows:

**AL =4Fh:Function is supported**
**AL !=4Fh:Function is not supported**
**AH =00h:Function call successful**
**AH =01h:Function call failed**

Software should treat a non-zero value in the AH register as a general failure condition. In later versions of VBE or VBE/DDC, new error codes might be defined. Refer to the VBE Standard documentation.

MTL012919
Confidential

MONLG 00021756

## 3.2 VBE Sub-function 15h - Display Identification Extensions

The VESA VBE sub-function 15h is used to implement the VBE/DDC services. The VBE/DDC services are defined below and are not included in the VBE Standard documentation.

### 3.2.1 00 - Report VBE/DDC Capabilities

**Input:**

| | | |
|---|---|---|
| | AH= 4fh | VESA Extension |
| | AL= 15h | **VBE/DDC Services** |
| | BL = 00h | **Report DDC Capabilities** |
| | CX = 00h | Controller unit number (00 = primary controller) (*) |
| | ES:DI | Null pointer, must be 0:0 in version 1.0 Reserved for future use. |

**Output:**

| | | |
|---|---|---|
| | AX= | Status |
| | BH= | Approx. time in seconds, rounded up, to transfer one EDID block (128 bytes). |
| | BL = | DDC level supported (**) |
| | bit 0 | = 0 DDC1 not supported |
| | | = 1 DDC1 supported |
| | bit 1 | = 0 DDC2 not supported |
| | | = 1 DDC2 supported |
| | bit 2 | = 0 Screen not blanked during data transfer (***) |
| | | = 1 Screen blanked during data transfer |
| | CX = | Unchanged |
| | ES:DI | Unchanged |

All other registers may be destroyed

(*) This refers to the monitor port number. When version 1.0 of the document was developed it was assumed that one graphics controller had only one monitor port. Later controller designs have multiple monitor ports per graphics controller. This parameter selects the monitor port number from which the function reads an EDID block.

(**) DDC level supported by both the display and the controller.

(***) This refers to the behavior of the controller and the VBE/DDC software.

VESA VBE/DDC Standard                                                    Version 1.1
©Copyright 1993-1999 Video Electronics Standards Association              Page 6 of 8

MTL012920
Confidential

MONLG 00021757

### 3.2.2  01 - Read EDID

| | | |
|---|---|---|
| **Input:** | AH= 4fh | VESA Extension |
| | AL= 15h | **VBE/DDC Services** |
| | BL = 01h | **Read EDID** |
| | CX = 00h | Controller unit number (00 = primary controller) |
| | DX = 00h | EDID block number. |
| | ES:DI= | Pointer to area in which the EDID block (128 bytes) shall be returned |

| | | |
|---|---|---|
| **Output:** | AX= | Status (*) |
| | BH= | Unchanged |
| | CX = | Unchanged |
| | ES:DI= | Pointer to area in which the EDID block is returned |

All other registers may be destroyed

MTL012921
Confidential

MONLG 00021758

Appx12459

THIS PAGE INTENTIONALLY LEFT BLANK

MTL012922
Confidential

MONLG 00021759



# 24C02C

## 2K 5.0V I²C™ Serial EEPROM

### Features

- Single supply with operation from 4.5 to 5.5V
- Low-power CMOS technology
  - 1 mA active current typical
  - 10 µA standby current typical at 5.5V
- Organized as a single block of 256 bytes (256 x 8)
- Hardware write protection for upper half of array
- 2-wire serial interface bus, I²C compatible
- 100 kHz and 400 kHz compatibility
- Page write buffer for up to 16 bytes
- Self-timed write cycle (including auto-erase)
- Fast 1 mS write cycle time for Byte or Page mode
- Address lines allow up to eight devices on bus
- 1,000,000 erase/write cycles
- ESD protection > 4,000V
- Data retention > 200 years
- 8-pin PDIP, SOIC or TSSOP packages
- Available for extended temperature ranges
  - Commercial (C):    0°C    to    +70°C
  - Industrial (I):    -40°C    to    +85°C
  - Automotive (E):    -40°C    to    +125°C

### Description

The Microchip Technology Inc. 24C02C is a 2K bit Serial Electrically Erasable PROM with a voltage range of 4.5V to 5.5V. The device is organized as a single block of 256 x 8-bit memory with a 2-wire serial interface. Low current design permits operation with typical standby and active currents of only 10 µA and 1 mA respectively. The device has a page write capability for up to 16 bytes of data and has fast write cycle times of only 1 mS for both byte and page writes. Functional address lines allow the connection of up to eight 24C02C devices on the same bus for up to 16K bits of contiguous EEPROM memory. The device is available in the standard 8-pin PDIP, 8-pin SOIC (150 mil) and TSSOP packages.

### Package Types



### Block Diagram





PLAINTIFFS'
EXHIBIT
MON-0511
2:15-cv-04431-SRC-CLW

I²C is a trademark of Philips Corporation.

© 2003 Microchip Technology Inc.

DS21202D-page 1

MTL024449

MONLG 00033292

# 24C02C

## 1.0    ELECTRICAL CHARACTERISTICS

### Absolute Maximum Ratings[†]

Vcc....................................................................................................................................................................7.0V

All inputs and outputs w.r.t. Vss .................................................................................................. -0.6V to Vcc +1.0V

Storage temperature ...................................................................................................................-65°C to +150°C

Ambient temperature with power applied.....................................................................................-65°C to +125°C

ESD protection on all pins ............................................................................................................................ ≥ 4 kV

† NOTICE: Stresses above those listed under "Absolute Maximum Ratings" may cause permanent damage to the device. This is a stress rating only and functional operation of the device at those or any other conditions above those indicated in the operational listings of this specification is not implied. Exposure to maximum rating conditions for extended periods may affect device reliability.

### TABLE 1-1:    DC CHARACTERISTICS

| All parameters apply across the specified operating ranges unless otherwise noted. | | Vcc = +4.5V to +5.5V<br>Commercial (C):    TA = 0°C to +70°C<br>Industrial (I):        TA = -40°C to +85°C<br>Automotive (E):    TA = -40°C to +125°C | | | |
|---|---|---|---|---|---|
| Parameter | Symbol | Min. | Max. | Units | Conditions |
| SCL and SDA pins:<br>High-level input voltage | $V_{IH}$ | 0.7 Vcc | — | V | |
| Low-level input voltage | $V_{IL}$ | — | 0.3 Vcc | V | |
| Hysteresis of Schmitt Trigger inputs | $V_{HYS}$ | 0.05 Vcc | — | V | (Note) |
| Low-level output voltage | $V_{OL}$ | — | 0.40 | V | $I_{OL}$ = 3.0 mA, Vcc = 4.5V |
| Input leakage current | $I_{LI}$ | — | ±1 | µA | $V_{IN}$ = 0.1V to 5.5V, WP = Vss |
| Output leakage current | $I_{LO}$ | — | ±1 | µA | $V_{OUT}$ = 0.1V to 5.5V |
| Pin capacitance (all inputs/outputs) | $C_{IN}$, $C_{OUT}$ | — | 10 | pF | Vcc = 5.0V (Note)<br>TA = 25°C, f = 1 MHz |
| Operating current | Icc Read | — | 1 | mA | Vcc = 5.0V, SCL = 400 kHz |
| | Icc Write | — | 3 | mA | Vcc = 5.5V |
| Standby current | Iccs | — | 50 | µA | Vcc = 5.5V, SDA = SCL = Vcc<br>WP = Vss |

**Note:**    This parameter is periodically sampled and not 100% tested.

© 2003 Microchip Technology Inc.

MTL024450

**MONLG 00033293**

# 24C02C

### TABLE 1-2:    AC CHARACTERISTICS

| Parameter | Symbol | TA > +85°C Min. | TA > +85°C Max. | −40°C ≤ TA ≤ +85°C Min. | −40°C ≤ TA ≤ +85°C Max. | Units | Remarks |
|---|---|---|---|---|---|---|---|
| All parameters apply across the specified operating ranges unless otherwise noted. | | VCC = +4.5V to +5.5V Commercial (C):    TA = 0°C to +70°C Industrial (I):        TA = −40°C to +85°C Automotive (E):   TA = −40°C to +125°C | | | | | |
| Clock frequency | FCLK | — | 100 | — | 400 | kHz | |
| Clock high time | THIGH | 4000 | — | 600 | — | ns | |
| Clock low time | TLOW | 4700 | — | 1300 | — | ns | |
| SDA and SCL rise time | TR | — | 1000 | — | 300 | ns | (Note 1) |
| SDA and SCL fall time | TF | — | 300 | — | 300 | ns | (Note 1) |
| Start condition hold time | THD:STA | 4000 | — | 600 | — | ns | After this period the first clock pulse is generated |
| Start condition setup time | TSU:STA | 4700 | — | 600 | — | ns | Only relevant for repeated Start condition |
| Data input hold time | THD:DAT | 0 | — | 0 | — | ns | (Note 2) |
| Data input setup time | TSU:DAT | 250 | — | 100 | — | ns | |
| Stop condition setup time | TSU:STO | 4000 | — | 600 | — | ns | |
| Output valid from clock | TAA | — | 3500 | — | 900 | ns | (Note 2) |
| Bus free time | TBUF | 4700 | — | 1300 | — | ns | Time the bus must be free before a new transmission can start |
| Output fall time from VIH minimum to VIL maximum | TOF | — | 250 | 20 + 0.1 CB | 250 | ns | (Note 1), CB ≤ 100 pF |
| Input filter spike suppression (SDA and SCL pins) | TSP | — | 50 | — | 50 | ns | (Note 3) |
| Write cycle time | TWR | — | 1.5 | — | 1 | ms | Byte or Page mode |
| Endurance | | 1M | — | 1M | — | cycles | 25°C, VCC = 5.0V, Block mode (Note 4) |

**Note 1:** Not 100% tested. CB = total capacitance of one bus line in pF.

   **2:** As a transmitter, the device must provide an internal minimum delay time to bridge the undefined region (minimum 300 ns) of the falling edge of SCL to avoid unintended generation of Start or Stop conditions.

   **3:** The combined TSP and VHYS specifications are due to Schmitt Trigger inputs which provide improved noise spike suppression. This eliminates the need for a TI specification for standard operation.

   **4:** This parameter is not tested but ensured by characterization. For endurance estimates in a specific application, please consult the Total Endurance™ Model which can be obtained from our web site.

### FIGURE 1-1:    BUS TIMING DATA



MTL024451

Appx12495

MONLG 00033294

# 24C02C

## 2.0   PIN DESCRIPTIONS

The descriptions of the pins are listed in Table 2-1.

**TABLE 2-1:   PIN FUNCTION TABLE**

| Name | Function |
|------|----------|
| Vss | Ground |
| SDA | Serial Data |
| SCL | Serial Clock |
| Vcc | +4.5V to 5.5V Power Supply |
| A0, A1, A2 | Chip Selects |
| WP | Hardware Write-Protect |

### 2.1   SDA Serial Data

This is a bidirectional pin used to transfer addresses and data into and data out of the device. It is an open drain terminal, therefore the SDA bus requires a pull-up resistor to Vcc (typical 10 kΩ for 100 kHz, 2 kΩ for 400 kHz).

For normal data transfer SDA is allowed to change only during SCL low. Changes during SCL high are reserved for indicating the Start and Stop conditions.

### 2.2   SCL Serial Clock

This input is used to synchronize the data transfer from and to the device.

### 2.3   A0, A1, A2

The levels on these inputs are compared with the corresponding bits in the slave address. The chip is selected if the compare is true.

Up to eight 24C02C devices may be connected to the same bus by using different Chip Select bit combinations. These inputs must be connected to either Vcc or Vss.

### 2.4   WP

This is the hardware write-protect pin. It must be tied to Vcc or Vss. If tied to Vcc, the hardware write protection is enabled. If the WP pin is tied to Vss the hardware write protection is disabled.

### 2.5   Noise Protection

The 24C02C employs a Vcc threshold detector circuit which disables the internal erase/write logic if the Vcc is below 3.8 volts at nominal conditions.

The SCL and SDA inputs have Schmitt Trigger and filter circuits which suppress noise spikes to assure proper device operation even on a noisy bus.

## 3.0   FUNCTIONAL DESCRIPTION

The 24C02C supports a bidirectional 2-wire bus and data transmission protocol. A device that sends data onto the bus is defined as transmitter, and a device receiving data as receiver. The bus has to be controlled by a master device which generates the serial clock (SCL), controls the bus access, and generates the Start and Stop conditions, while the 24C02C works as slave. Both master and slave can operate as transmitter or receiver but the master device determines which mode is activated.

© 2003 Microchip Technology Inc.

MTL024452

MONLG 00033295

Appx12496

# 24C02C

## 4.0 BUS CHARACTERISTICS

The following **bus protocol** has been defined:

- Data transfer may be initiated only when the bus is not busy.
- During data transfer, the data line must remain stable whenever the clock line is high. Changes in the data line while the clock line is high will be interpreted as a Start or Stop condition.

Accordingly, the following bus conditions have been defined (Figure 4-1).

### 4.1 Bus not Busy (A)

Both data and clock lines remain high.

### 4.2 Start Data Transfer (B)

A high-to-low transition of the SDA line while the clock (SCL) is high determines a Start condition. All commands must be preceded by a Start condition.

### 4.3 Stop Data Transfer (C)

A low-to-high transition of the SDA line while the clock (SCL) is high determines a Stop condition. All operations must be ended with a Stop condition.

### 4.4 Data Valid (D)

The state of the data line represents valid data when, after a Start condition, the data line is stable for the duration of the high period of the clock signal.

The data on the line must be changed during the low period of the clock signal. There is one bit of data per clock pulse.

Each data transfer is initiated with a Start condition and terminated with a Stop condition. The number of the data bytes transferred between the Start and Stop conditions is determined by the master device and is theoretically unlimited, although only the last sixteen will be stored when doing a write operation. When an overwrite does occur it will replace data in a first in first out fashion.

### 4.5 Acknowledge

Each receiving device, when addressed, is required to generate an acknowledge after the reception of each byte. The master device must generate an extra clock pulse which is associated with this Acknowledge bit.

> **Note:** The 24C02C does not generate any Acknowledge bits if an internal programming cycle is in progress.

The device that acknowledges has to pull down the SDA line during the Acknowledge clock pulse in such a way that the SDA line is stable low during the high period of the acknowledge related clock pulse. Of course, setup and hold times must be taken into account. A master must signal an end of data to the slave by not generating an Acknowledge bit on the last byte that has been clocked out of the slave. In this case, the slave must leave the data line high to enable the master to generate the Stop condition (Figure 4-2).

**FIGURE 4-1:    DATA TRANSFER SEQUENCE ON THE SERIAL BUS CHARACTERISTICS**



**FIGURE 4-2:    ACKNOWLEDGE TIMING**



MTL024453

MONLG 00033296

# 24C02C

## 5.0    DEVICE ADDRESSING

A control byte is the first byte received following the Start condition from the master device (Figure 5-1). The control byte consists of a four bit control code; for the 24C02C this is set as 1010 binary for read and write operations. The next three bits of the control byte are the Chip Select bits (A2, A1, A0). The Chip Select bits allow the use of up to eight 24C02C devices on the same bus and are used to select which device is accessed. The Chip Select bits in the control byte must correspond to the logic levels on the corresponding A2, A1, and A0 pins for the device to respond. These bits are in effect the three Most Significant bits of the word address.

The last bit of the control byte defines the operation to be performed. When set to a one a read operation is selected, and when set to a zero a write operation is selected. Following the Start condition, the 24C02C monitors the SDA bus checking the control byte being transmitted. Upon receiving a 1010 code and appropriate Chip Select bits, the slave device outputs an Acknowledge signal on the SDA line. Depending on the state of the R/W bit, the 24C02C will select a read or write operation.

**FIGURE 5-1:    CONTROL BYTE FORMAT**



## 5.1    Contiguous Addressing Across Multiple Devices

The Chip Select bits A2, A1, A0 can be used to expand the contiguous address space for up to 16K bits by adding up to eight 24C02C devices on the same bus. In this case, software can use A0 of the **control byte** as address bit A8, A1 as address bit A9, and A2 as address bit A10. It is not possible to write or read across device boundaries.

© 2003 Microchip Technology Inc.

MTL024454

MONLG 00033297

# 24C02C

## 6.0    WRITE OPERATIONS

### 6.1    Byte Write

Following the Start signal from the master, the device code(4 bits), the Chip Select bits (3 bits) and the R/W̅ bit which is a logic low is placed onto the bus by the master transmitter. The device will acknowledge this control byte during the ninth clock pulse. The next byte transmitted by the master is the word address and will be written into the address pointer of the 24C02C. After receiving another Acknowledge signal from the 24C02C the master device will transmit the data word to be written into the addressed memory location. The 24C02C acknowledges again and the master generates a Stop condition. This initiates the internal write cycle, and during this time the 24C02C will not generate Acknowledge signals (Figure 6-1). If an attempt is made to write to the protected portion of the array when the hardware write protection has been enabled, the device will acknowledge the command but no data will be written. The write cycle time must be observed even if the write protection is enabled.

### 6.2    Page Write

The write control byte, word address and the first data byte are transmitted to the 24C02C in the same way as in a byte write. But instead of generating a Stop condition, the master transmits up to 15 additional data bytes to the 24C02C which are temporarily stored in the on-chip page buffer and will be written into the memory after the master has transmitted a Stop condition. After the receipt of each word, the four lower order address pointer bits are internally incremented by one. The higher order four bits of the word address remains constant. If the master should transmit more than 16 bytes prior to generating the Stop condition, the address counter will roll over and the previously received data will be overwritten. As with the byte write

operation, once the Stop condition is received an internal write cycle will begin (Figure 6-2). If an attempt is made to write to the protected portion of the array when the hardware write protection has been enabled, the device will acknowledge the command but no data will be written. The write cycle time must be observed even if the write protection is enabled.

> **Note:**    Page write operations are limited to writing bytes within a single physical page, **regardless** of the number of bytes actually being written. Physical page boundaries start at addresses that are integer multiples of the page buffer size (or 'page size') and end at addresses that are integer multiples of [page size - 1]. If a Page Write command attempts to write across a physical page boundary, the result is that the data wraps around to the beginning of the current page (overwriting data previously stored there), instead of being written to the next page as might be expected. It is therefore necessary for the application software to prevent page write operations that would attempt to cross a page boundary.

### 6.3    WRITE PROTECTION

The WP pin must be tied to Vcc or Vss. If tied to Vcc, the upper half of the array (080-0FF) will be write-protected. If the WP pin is tied to Vss, then write operations to all address locations are allowed.

**FIGURE 6-1:    BYTE WRITE**



**FIGURE 6-2:    PAGE WRITE**



---

© 2003 Microchip Technology Inc.

DS21202D-page 7

MTL024455

MONLG 00033298

# 24C02C

## 7.0    ACKNOWLEDGE POLLING

Since the device will not acknowledge during a write cycle, this can be used to determine when the cycle is complete (this feature can be used to maximize bus throughput). Once the Stop condition for a Write command has been issued from the master, the device initiates the internally timed write cycle. ACK polling can be initiated immediately. This involves the master sending a Start condition followed by the control byte for a Write command ($R/\overline{W} = 0$). If the device is still busy with the write cycle, then no ACK will be returned. If no ACK is returned, then the Start bit and control byte must be re-sent. If the cycle is complete, then the device will return the ACK and the master can then proceed with the next Read or Write command. See Figure 7-1 for flow diagram.

**FIGURE 7-1:      ACKNOWLEDGE POLLING FLOW**



## 8.0    READ OPERATIONS

Read operations are initiated in the same way as write operations with the exception that the $R/\overline{W}$ bit of the slave address is set to one. There are three basic types of read operations: current address read, random read, and sequential read.

### 8.1    Current Address Read

The 24C02C contains an address counter that maintains the address of the last word accessed, internally incremented by one. Therefore, if the previous read access was to address n, the next current address read operation would access data from address n + 1. Upon receipt of the slave address with the $R/\overline{W}$ bit set to one, the 24C02C issues an acknowledge and transmits the eight bit data word. The master will not acknowledge the transfer but does generate a Stop condition and the 24C02C discontinues transmission (Figure 8-1).

### 8.2    Random Read

Random read operations allow the master to access any memory location in a random manner. To perform this type of read operation, first the word address must be set. This is done by sending the word address to the 24C02C as part of a write operation. After the word address is sent, the master generates a Start condition following the acknowledge. This terminates the write operation, but not before the internal address pointer is set. Then the master issues the control byte again but with the $R/\overline{W}$ bit set to a one. The 24C02C will then issue an acknowledge and transmits the eight bit data word. The master will not acknowledge the transfer but does generate a Stop condition and the 24C02C discontinues transmission (Figure 8-2). After this command, the internal address counter will point to the address location following the one that was just read.

### 8.3    Sequential Read

Sequential reads are initiated in the same way as a random read except that after the 24C02C transmits the first data byte, the master issues an acknowledge as opposed to a Stop condition in a random read. This directs the 24C02C to transmit the next sequentially addressed 8-bit word (Figure 8-3).

To provide sequential reads the 24C02C contains an internal address pointer which is incremented by one at the completion of each operation. This address pointer allows the entire memory contents to be serially read during one operation. The internal address pointer will automatically roll over from address FF to address 00.

© 2003 Microchip Technology Inc.

MTL024456

MONLG 00033299

Appx12500

# 24C02C

**FIGURE 8-1:        CURRENT ADDRESS READ**



**FIGURE 8-2:        RANDOM READ**



**FIGURE 8-3:        SEQUENTIAL READ**



© 2003 Microchip Technology Inc.

MTL024457

**MONLG 00033300**

# 24C02C

**APPENDIX A:   REVISION HISTORY**

**Revision D**

Corrections to Section 1.0, Electrical Characteristics.

     © 2003 Microchip Technology Inc.

MTL024458

Appx12502

**MONLG 00033301**

# 24C02C

## ON-LINE SUPPORT

Microchip provides on-line support on the Microchip World Wide Web site.

The web site is used by Microchip as a means to make files and information easily available to customers. To view the site, the user must have access to the Internet and a web browser, such as Netscape® or Microsoft® Internet Explorer. Files are also available for FTP download from our FTP site.

## Connecting to the Microchip Internet Web Site

The Microchip web site is available at the following URL:

**www.microchip.com**

The file transfer site is available by using an FTP service to connect to:

**ftp://ftp.microchip.com**

The web site and file transfer site provide a variety of services. Users may download files for the latest Development Tools, Data Sheets, Application Notes, User's Guides, Articles and Sample Programs. A variety of Microchip specific business information is also available, including listings of Microchip sales offices, distributors and factory representatives. Other data available for consideration is:

- Latest Microchip Press Releases
- Technical Support Section with Frequently Asked Questions
- Design Tips
- Device Errata
- Job Postings
- Microchip Consultant Program Member Listing
- Links to other useful web sites related to Microchip Products
- Conferences for products, Development Systems, technical information and more
- Listing of seminars and events

## SYSTEMS INFORMATION AND UPGRADE HOT LINE

The Systems Information and Upgrade Line provides system users a listing of the latest versions of all of Microchip's development systems software products. Plus, this line provides information on how customers can receive the most current upgrade kits. The Hot Line Numbers are:

1-800-755-2345 for U.S. and most of Canada, and

1-480-792-7302 for the rest of the world.

042003

MTL024459

MONLG 00033302

# 24C02C

## READER RESPONSE

It is our intention to provide you with the best documentation possible to ensure successful use of your Microchip product. If you wish to provide your comments on organization, clarity, subject matter, and ways in which our documentation can better serve you, please FAX your comments to the Technical Publications Manager at (480) 792-4150.

Please list the following information, and use this outline to provide us with your comments about this document.

To:   Technical Publications Manager                Total Pages Sent _____

RE:   Reader Response

From: Name _____

       Company _____

       Address _____

       City / State / ZIP / Country _____

       Telephone: (_____) _____ - _____      FAX: (_____) _____ - _____

Application (optional):

Would you like a reply?____Y ____N

Device:  24C02C              Literature Number:  DS21202D

Questions:

1.  What are the best features of this document?

    _____

    _____

2.  How does this document meet your hardware and software development needs?

    _____

    _____

3.  Do you find the organization of this document easy to follow? If not, why?

    _____

    _____

4.  What additions to the document do you think would enhance the structure and subject?

    _____

    _____

5.  What deletions from the document could be made without affecting the overall usefulness?

    _____

    _____

6.  Is there any incorrect or misleading information (what and where)?

    _____

    _____

7.  How would you improve this document?

    _____

    _____

© 2003 Microchip Technology Inc.

MTL024460

MONLG 00033303

# 24C02C

## PRODUCT IDENTIFICATION SYSTEM

To order or obtain information, e.g., on pricing or delivery, refer to the factory or the listed sales office.



**PART NO.**    **X**    **/XX**    **XXX**

Device    Temperature    Package    Pattern
Range

| Device | 24C02C 2K I²C™ Serial EEPROM |
| | 24C02CT 2K I²C™ Serial EEPROM (Tape and Reel) |

| Temperature Range | Blank | = | 0°C to +70°C |
| | I | = | -40°C to +85°C |
| | E | = | -40°C to +125°C |

| Package | P | = | Plastic DIP (300 mil Body), 8-lead |
| | SN | = | Plastic SOIC, (150 mil Body), 8-lead |
| | ST | = | TSSOP (4.4 mm Body), 8-lead |

## Sales and Support

**Data Sheets**

Products supported by a preliminary Data Sheet may have an errata sheet describing minor operational differences and recommended workarounds. To determine if an errata sheet exists for a particular device, please contact one of the following:

1. Your local Microchip sales office
2. The Microchip Corporate Literature Center U.S. FAX: (480) 792-7277
3. The Microchip Worldwide Site (www.microchip.com)

Please specify which device, revision of silicon and Data Sheet (include Literature #) you are using.

**New Customer Notification System**

Register on our web site (www.microchip.com/cn) to receive the most current information on our products.

MTL024461

MONLG 00033304

Appx12505

# 24C02C

**NOTES:**

© 2003 Microchip Technology Inc.

MTL024462

MONLG 00033305

**Note the following details of the code protection feature on Microchip devices:**

- Microchip products meet the specification contained in their particular Microchip Data Sheet.

- Microchip believes that its family of products is one of the most secure families of its kind on the market today, when used in the intended manner and under normal conditions.

- There are dishonest and possibly illegal methods used to breach the code protection feature. All of these methods, to our knowledge, require using the Microchip products in a manner outside the operating specifications contained in Microchip's Data Sheets. Most likely, the person doing so is engaged in theft of intellectual property.

- Microchip is willing to work with the customer who is concerned about the integrity of their code.

- Neither Microchip nor any other semiconductor manufacturer can guarantee the security of their code. Code protection does not mean that we are guaranteeing the product as "unbreakable."

Code protection is constantly evolving. We at Microchip are committed to continuously improving the code protection features of our products. Attempts to break microchip's code protection feature may be a violation of the Digital Millennium Copyright Act. If such acts allow unauthorized access to your software or other copyrighted work, you may have a right to sue for relief under that Act.

Information contained in this publication regarding device applications and the like is intended through suggestion only and may be superseded by updates. It is your responsibility to ensure that your application meets with your specifications. No representation or warranty is given and no liability is assumed by Microchip Technology Incorporated with respect to the accuracy or use of such information, or infringement of patents or other intellectual property rights arising from such use or otherwise. Use of Microchip's products as critical components in life support systems is not authorized except with express written approval by Microchip. No licenses are conveyed, implicitly or otherwise, under any intellectual property rights.

**Trademarks**

The Microchip name and logo, the Microchip logo, Accuron, dsPIC, KEELOQ, MPLAB, PIC, PICmicro, PICSTART, PRO MATE and PowerSmart are registered trademarks of Microchip Technology Incorporated in the U.S.A. and other countries.

AmpLab, FilterLab, microID, MXDEV, MXLAB, PICMASTER, SEEVAL and The Embedded Control Solutions Company are registered trademarks of Microchip Technology Incorporated in the U.S.A.

Application Maestro, dsPICDEM, dsPICDEM.net, ECAN, ECONOMONITOR, FanSense, FlexROM, fuzzyLAB, In-Circuit Serial Programming, ICSP, ICEPIC, microPort, Migratable Memory, MPASM, MPLIB, MPLINK, MPSIM, PICkit, PICDEM, PICDEM.net, PowerCal, PowerInfo, PowerMate, PowerTool, rfLAB, rfPIC, Select Mode, SmartSensor, SmartShunt, SmartTel and Total Endurance are trademarks of Microchip Technology Incorporated in the U.S.A. and other countries.

Serialized Quick Turn Programming (SQTP) is a service mark of Microchip Technology Incorporated in the U.S.A.

All other trademarks mentioned herein are property of their respective companies.

© 2003, Microchip Technology Incorporated, Printed in the U.S.A., All Rights Reserved.

Printed on recycled paper.



*Microchip received QS-9000 quality system certification for its worldwide headquarters, design and wafer fabrication facilities in Chandler and Tempe, Arizona in July 1999 and Mountain View, California in March 2002. The Company's quality system processes and procedures are QS-9000 compliant for its PICmicro® 8-bit MCUs, KEELOQ® code hopping devices, Serial EEPROMs, microperipherals, non-volatile memory and analog products. In addition, Microchip's quality system for the design and manufacture of development systems is ISO 9001 certified.*

MTL024463

MONLG 00033306



# WORLDWIDE SALES AND SERVICE

### AMERICAS

**Corporate Office**
2355 West Chandler Blvd.
Chandler, AZ 85224-6199
Tel: 480-792-7200
Fax: 480-792-7277
Technical Support: 480-792-7627
Web Address: http://www.microchip.com

**Atlanta**
3780 Mansell Road, Suite 130
Alpharetta, GA 30022
Tel: 770-640-0034
Fax: 770-640-0307

**Boston**
2 Lan Drive, Suite 120
Westford, MA 01886
Tel: 978-692-3848
Fax: 978-692-3821

**Chicago**
333 Pierce Road, Suite 180
Itasca, IL 60143
Tel: 630-285-0071
Fax: 630-285-0075

**Dallas**
4570 Westgrove Drive, Suite 160
Addison, TX 75001
Tel: 972-818-7423
Fax: 972-818-2924

**Detroit**
Tri-Atria Office Building
32255 Northwestern Highway, Suite 190
Farmington Hills, MI 48334
Tel: 248-538-2250
Fax: 248-538-2260

**Kokomo**
2767 S. Albright Road
Kokomo, IN 46902
Tel: 765-864-8360
Fax: 765-864-8387

**Los Angeles**
18201 Von Karman, Suite 1090
Irvine, CA 92612
Tel: 949-263-1888
Fax: 949-263-1338

**Phoenix**
2355 West Chandler Blvd.
Chandler, AZ 85224-6199
Tel: 480-792-7966
Fax: 480-792-4338

**San Jose**
2107 North First Street, Suite 590
San Jose, CA 95131
Tel: 408-436-7950
Fax: 408-436-7955

**Toronto**
6285 Northam Drive, Suite 108
Mississauga, Ontario L4V 1X5, Canada
Tel: 905-673-0699
Fax: 905-673-6509

### ASIA/PACIFIC

**Australia**
Suite 22, 41 Rawson Street
Epping 2121, NSW
Australia
Tel: 61-2-9868-6733
Fax: 61-2-9868-6755

**China - Beijing**
Unit 915
Bei Hai Wan Tai Bldg.
No. 6 Chaoyangmen Beidajie
Beijing, 100027, No. China
Tel: 86-10-85282100
Fax: 86-10-85282104

**China - Chengdu**
Rm. 2401-2402, 24th Floor,
Ming Xing Financial Tower
No. 88 TIDU Street
Chengdu 610016, China
Tel: 86-28-86766200
Fax: 86-28-86766599

**China - Fuzhou**
Unit 28F, World Trade Plaza
No. 71 Wusi Road
Fuzhou 350001, China
Tel: 86-591-7503506
Fax: 86-591-7503521

**China - Hong Kong SAR**
Unit 901-6, Tower 2, Metroplaza
223 Hing Fong Road
Kwai Fong, N.T., Hong Kong
Tel: 852-2401-1200
Fax: 852-2401-3431

**China - Shanghai**
Room 701, Bldg. B
Far East International Plaza
No. 317 Xian Xia Road
Shanghai, 200051
Tel: 86-21-6275-5700
Fax: 86-21-6275-5060

**China - Shenzhen**
Rm. 1812, 18/F, Building A, United Plaza
No. 5022 Binhe Road, Futian District
Shenzhen 518033, China
Tel: 86-755-82901380
Fax: 86-755-8295-1393

**China - Shunde**
Room 401, Hongjian Building
No. 2 Fengxiangnan Road, Ronggui Town
Shunde City, Guangdong 528303, China
Tel: 86-765-8395507  Fax: 86-765-8395571

**China - Qingdao**
Rm. B505A, Fullhope Plaza,
No. 12 Hong Kong Central Rd.
Qingdao 266071, China
Tel: 86-532-5027355  Fax: 86-532-5027205

**India**
Divyasree Chambers
1 Floor, Wing A (A3/A4)
No. 11, O'Shaugnessey Road
Bangalore, 560 025, India
Tel: 91-80-2290061 Fax: 91-80-2290062

**Japan**
Benex S-1 6F
3-18-20, Shinyokohama
Kohoku-Ku, Yokohama-shi
Kanagawa, 222-0033, Japan
Tel: 81-45-471- 6166  Fax: 81-45-471-6122

### Korea
168-1, Youngbo Bldg. 3 Floor
Samsung-Dong, Kangnam-Ku
Seoul, Korea 135-882
Tel: 82-2-554-7200 Fax: 82-2-558-5932 or
82-2-558-5934

**Singapore**
200 Middle Road
#07-02 Prime Centre
Singapore, 188980
Tel: 65-6334-8870  Fax: 65-6334-8850

**Taiwan**
Kaohsiung Branch
30F - 1 No. 8
Min Chuan 2nd Road
Kaohsiung 806, Taiwan
Tel: 886-7-536-4818
Fax: 886-7-536-4803

**Taiwan**
Taiwan Branch
11F-3, No. 207
Tung Hua North Road
Taipei, 105, Taiwan
Tel: 886-2-2717-7175  Fax: 886-2-2545-0139

### EUROPE

**Austria**
Durisolstrasse 2
A-4600 Wels
Austria
Tel: 43-7242-2244-399
Fax: 43-7242-2244-393

**Denmark**
Regus Business Centre
Lautrup hoj 1-3
Ballerup DK-2750 Denmark
Tel: 45-4420-9895 Fax: 45-4420-9910

**France**
Parc d'Activite du Moulin de Massy
43 Rue du Saule Trapu
Batiment A - Ier Etage
91300 Massy, France
Tel: 33-1-69-53-63-20
Fax: 33-1-69-30-90-79

**Germany**
Steinheilstrasse 10
D-85737 Ismaning, Germany
Tel: 49-89-627-144-0
Fax: 49-89-627-144-44

**Italy**
Via Quasimodo, 12
20025 Legnano (MI)
Milan, Italy
Tel: 39-0331-742611
Fax: 39-0331-466781

**Netherlands**
P. A. De Biesbosch 14
NL-5152 SC Drunen, Netherlands
Tel: 31-416-690399
Fax: 31-416-690340

**United Kingdom**
505 Eskdale Road
Winnersh Triangle
Wokingham
Berkshire, England RG41 5TU
Tel: 44-118-921-5869
Fax: 44-118-921-5820

07/28/03

© 2003 Microchip Technology Inc.

MTL024464

Appx12508

MONLG 00033307

Appx13243-13246

Confidential Material Subject to Protective Order Redacted

Transcript Page Numbers

[97-128; 176-179; 188-191; 216-219; 256-263; 268-585; 598-625; 630-645; 658-669; 674-689; 720-723; 744-747; 814-817; 878-885; 894-909; 944-947; 988-999; 1004-1007; 1012-1019; 1040-1043; 1052-1055; 1198-1201; 1226-1229; 1250-1253; 1286-1293]

**97**

1    Q.    Over the years, how many patent licenses have you
2    negotiated, roughly?
3    **A.    About 75 now.**
4    Q.    Who owns the '180 patent at issue in this lawsuit?
5    **A.    That's Mondis.**
6    Q.    And would you just take a look in your binder and
7    identify Mondis Exhibit 1.
8    **A.    I haven't got a binder.**
9    Q.    Let me give you a binder.
10    MR. BLACK:  May I approach, Your Honor?
11    THE COURT:  You may.
12    **A.    Which was that?  Sorry.**
13    Q.    Take a look at Exhibit 1.
14    **A.    Okay.**
15    Q.    Can you identify that for the record?
16    **A.    Yes.  That's the patent, the '180 patent.**
17    MR. BLACK:  Your Honor, we have a stipulation on
18    admission of this and other exhibits.  Would you like me to
19    formally move them in at the time that we introduce them or
20    can I do it at the end of the testimony?
21    THE COURT:  As long as it's governed by the
22    stipulation which you've got, frankly, it's in evidence.
23    MR. BLACK:  Thank you.
24    THE COURT:  There is no objection to the admission of
25    any of the exhibits listed on the stipulation being

**98**

1    admitted into evidence.  Correct?
2    MR. McKEON:  That's right, Your Honor.
3    THE COURT:  Fine.  All right.  We will deem all of
4    them admitted into evidence, and you will simply make sure
5    that Miss Trivino has that list by the end of the day and
6    they will be marked into evidence and you can refer to them
7    as being admitted into evidence already.  Okay.
8    MR. BLACK:  Thank you, Your Honor.
9    Q.    Okay. Mondis owns the '180 patent.  Was that
10    in-house technology?
11    **A.    No.  This was technology that was invented at**
12    **Hitachi.**
13    Q.    And who is Hitachi?
14    **A.    Hitachi is a major Japanese company headquartered in**
15    **Japan, operates all over the world.  They employ about**
16    **300,000 people and spend about 3 to 4 billion dollars a**
17    **year in R & D, one of the top patent companies in the world**
18    **and a real powerhouse in technology.**
19    Q.    How long have you had a business relationship with
20    Hitachi?
21    **A.    It's about 20 years now.**
22    Q.    And when did that first happen?
23    **A.    That was in 1996.  That's more than 20 years.**
24    Q.    In what context?
25    **A.    Well, we approached them in the context of power**

**99**

1    **management, the licensing of the DPMS patents, and they**
2    **were our first Japanese licensee.  Our second licensee all**
3    **over was in 1998.**
4    Q.    Did you reach any special arrangement with them?
5    **A.    Yes.  We reached an agency agreement as well.**
6    Q.    And explain how that worked.
7    **A.    Hitachi became an agent of Elonex to help license the**
8    **power management patents in Japan to Japanese companies.**
9    Q.    We're going to put up I think our first demonstrative
10    slide, a time line all of this as agreed.
11    So, we have on the left the Elonex-Hitachi agency
12    agreement in 1998.
13    **A.    Yes.**
14    Q.    And that is the agreement where Hitachi was actually
15    representing you for your patents in Japan.  Is that right?
16    **A.    Yes, the agency part.**
17    Q.    And then what happened in March of 2003?
18    **A.    Well, in March the agency flipped and Elonex became**
19    **the agency of Hitachi for some of the patents for the**
20    **Plug-N-Play patents, the DDC patents.**
21    Q.    By the way, with respect to the agency agreement that
22    Hitachi helped you with, did Hitachi license your
23    technology to anyone familiar?
24    **A.    Yes.  A number of them, Sony and Sharp, Mitsubishi,**
25    **Toshiba, Sanyo, and others, basically Japanese electronics**

**100**

1    **industry.**
2    Q.    Now, in 2003, you reversed the deal and became
3    Hitachi's agent.  Is that right?
4    **A.    That's correct.**
5    Q.    For what patents?
6    **A.    Those were for the Plug-N-Play patents, the DDC**
7    **patents, what we are here for today.**
8    Q.    Why did Hitachi need you to help them license others?
9    **A.    Well, throughout the period that they were our agent**
10    **from April '98 to this period, we were meeting with them**
11    **regularly in Japan or wherever it was and they were**
12    **tracking that they were impressed by what we were doing and**
13    **the companies we were dealing with, the success that we**
14    **had, and they were also trying with the same companies to**
15    **license the Plug-N-Play patents, and they thought that we**
16    **could help them maybe copy our success to their patents.**
17    Q.    As the person running Elonex, did you have any
18    personal experience with Plug-N-Play problem?
19    **A.    Yes, I did.  The early '90s was a period where**
20    **personal computers, computers in general, were becoming a**
21    **-- just then becoming a household item.  It wasn't yet like**
22    **it is today, everybody's got one and they're small and**
23    **everything.**
24    **In those days they used to deliver computers to the**
25    **consumer in big chunky boxes.  They used to undo the boxes**

**101**

1  and plug the computer into the monitor, the monitor into
2  the computer, switch around and it didn't necessarily work.
3       So, as the consumer, what they would be doing is some
4  would call the help line. We had program that enabled
5  them, that helped them to install the computers. Today it
6  doesn't sound like anything you really need, but it was
7  very much needed in those days until eventually Plug-N-Play
8  came along and all the need for setup and for floppy disks
9  and for all sorts of other mechanisms went away with it.
10  It was a very nice development of the industry,
11  Plug-N-Play.
12  Q.   Did that technology get standardized?
13  A.   Yes. That was the DDC standard.
14  Q.   And was that a VESA standard also?
15  A.   Yes.
16  Q.   You sometimes refer to DDC and Plug-N-Play. Do you
17  use them interchangeably?
18  A.   Yes, yes. It's the same thing, interchangeably.
19  Q.   So, how did you get involved with the Plug-N-Play
20  program?
21  A.   When we did this in 2003, we did negotiate an agency
22  agreement and I started to help and approach the companies
23  on behalf of Hitachi to license those patents.
24  Q.   Okay. There's an arrow in the slide from 2003 to
25  2007. Generally describe what your activities were for the

**102**

1  program at that point?
2  A.   Yes. At that time I was approaching the companies
3  and negotiating licenses with them. It was a lot, we were
4  working very hard then and had quite good success we think.
5  Q.   And then what happened in 2007?
6  A.   In 2007, a couple things happened. The '180, the
7  notice of allowance was about October, and also Mondis
8  bought the patents, the DDC patents, from Hitachi and
9  became the owner of the DDC patents.
10  Q.   Just want to pose on Hitachi and get some
11  nomenclature. So you originally were working with Hitachi.
12  Who is Hitachi Maxell?
13  A.   Hitachi Maxell used to be a wholly-owned subsidiary
14  of Hitachi. It is now partly owned by Hitachi. It was
15  made by the consumer electronics division of Hitachi which
16  became Hitachi Consumer Electronics, which was then merged
17  into Maxell, and became Hitachi Maxell.
18  Q.   And has Hitachi Maxell changed its name to Maxell
19  Holdings?
20  A.   Yes, it's the same company.
21  Q.   And is that also a plaintiff in this case?
22  A.   Yes, it is.
23  Q.   What kind of products does Maxell sell?
24  A.   Maxell, as was mentioned earlier, is the batteries,
25  most known for its batteries which you buy in shops now,

**103**

1  and storage devices, floppy drives, little disks, storage
2  devices.
3  Q.   Okay. Take a look at Exhibit 1 again.
4  A.   Is the patent?
5  Q.   And that's the patent. When did the '180 patent
6  issue?
7  A.   That was January 6, 2009.
8  Q.   And as was pointed out earlier, it relates back to an
9  earlier Japanese patent application. Correct?
10  A.   Yes.
11  Q.   Can you state the filing date of that?
12  A.   That was in field 22 on the left-hand side, says
13  June 4, 2002.
14  Q.   Now, when you license patents, do you license the
15  patents one by one alone or do you tend to license them in
16  groups?
17  A.   In groups. You don't license them one by one.
18  Families.
19  Q.   And what do you mean by a family?
20  A.   A family of patents are patents that originate from a
21  common disclosure, something from the beginning. All of
22  the ones underneath it belong to the same family.
23  Q.   Did you have a name for the family or families that
24  you used during the course of your negotiations?
25  A.   Yes. That was the DDC family, DDC patents.

**104**

1  Q.   Now, the actual application for the '180 was filed in
2  June of 2002, it says up there?
3  A.   Yes.
4  Q.   When did you first receive a notice from the Patent
5  Office, a notice of allowance that the '180 patent would be
6  allowed and finally issued?
7  A.   That was in January 2004.
8  Q.   And when did the patent actually issue and become
9  available to enforce?
10  A.   That was January 2009.
11  Q.   So that's five years in the Patent Office. We heard
12  on the patent video that it often takes three years or more
13  for a patent to get issued but why so long between the
14  notice from the Patent Office that the patent was going to
15  issue and the actual issuance date?
16  A.   Well, as on the video as well, they said that when
17  you knew art prior art is discovered, you're obliged to
18  provide it to the Patent Office.
19       Every time we got a notice of allowance, and there
20  were numerous ones, every time we got one, some more prior
21  art was discovered. Some of it came from our own search,
22  some of it came from licensees we were dealing with, and we
23  had to stop the process of allowance, submit the prior art
24  to the Office and start the process again. Eventually
25  we're to do that until all the time.

**105**

1  Q.  And what day was the '180 patent actually issued?

2  A.  That was January 6, 2009, yes.

3  Q.  Is the information about the '180 patent, the notice

4  of allowance and its progress through the Patent Office,

5  available to the public?

6  A.  Yes.  It's on the USPTO website, United States Patent

7  Office.  There's a section over there where it's all the

8  patent application information retrieval system.  Yes, it's

9  all there.  It was shown on the video, extract of it.

10  Q.  And was this information generally known by your

11  licensing counter parties during the DDC patent

12  negotiation?

13  A.  Absolutely.

14  Q.  Okay.  Please take a look at Exhibit 11 and tell us

15  what that is?

16  A.  This is an assignment from the inventors.  The

17  original inventors up in the top left-hand corner, number

18  one, to Hitachi, number two, there on the right-hand side.

19  Q.  And if you would look at Mondis Exhibit 13, can you

20  tell us what that document is?

21  A.  This is also sn assignment.  This one is from Hitachi

22  to Mondis.

23  Q.  And Exhibit 14, what is that?

24  A.  This is the patent sale, assignment and license

25  agreement between Hitachi and Mondis where Mondis bought

**106**

1  the patents from Hitachi.

2  Q.  And when was that executed?

3  A.  That was in October 2007.

4  Q.  And if we go back to the time line slide, is that

5  reflected on your time line?

6  A.  Yes.  That's at the bottom right-hand corner, the

7  last entry, Mondis purchases DDC patents from Hitachi.

8  Q.  And were those the same patents that you had already

9  been licensing for Hitachi as the agent?

10  A.  Yes, they were.

11  Q.  Was there a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮ described in that agreement?

13  A.  In this agreement?

14  Q.  Yes.  Just generally, does Mondis 14 describe

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮

17  A.  Yes, it does.

18  Q.  How much did Mondis pay for the assignment of the

19  patents and applications?

20  A.  That was ▮▮▮▮▮▮

21  Q.  After Mondis bought the patents in October of '07,

22  did you continue the licensing program?

23  A.  Yes, we were.  Yes, we did.

24  Q.  And how many licenses have been negotiated in the

25  program?

**107**

1  A.  There's about 29 licenses now.

2  Q.  Have you continued to work with Hitachi under the

3  agreement?

4  A.  Yes, we did.  After assigning it, we assisted them in

5  renewing certain agreements that had expired during the

6  period, and also we were working very hard on licensing

7  televisions together with some other patents that they had

8  in relation to televisions.

9  Q.  Did Hitachi reorganize the company from time to time?

10  A.  Yes, yes.

11  Q.  Could you describe for the jury, you mentioned it

12  before but just to be clear, what is Hitachi Consumer

13  Electronics?

14  A.  Hitachi Consumer Electronics was the division of

15  Hitachi that dealt with electronics.  It was just a

16  division to begin with.  They then spun it off as a

17  separate company, and then merged with Maxell, which

18  was also a Hitachi company, to become Hitachi Maxell, now

19  Maxell Holdings Ltd.

20  Q.  If you would take a look at Mondis Exhibit 3150, a

21  memorandum of agreement, and 3151, which is another copy of

22  the same agreement --

23  A.  Yes.

24  Q.  -- would you tell us what those two documents are?

25  A.  Yes.  This is from one of the reorganizations that

**108**

1  they did in July, effective July 2013, they this is the

2  transfer of the relationship, the Inpro relationship to and

3  Mondis relationship from Hitachi Ltd. to Maxell, Hitachi

4  Maxell.

5  Q.  And Recital D.  If we could blow that up, says "HCE

6  transferred its business which related to the above

7  agreement to Maxell and Maxell wishes that those agreements

8  continue with Maxell as the Hitachi party in place of HCE."

9  Do you see that?

10  A.  Yes.

11  Q.  And is that how you conducted your business following

12  this agreement?

13  A.  Yes, it is.

14  Q.  Okay.  Let's talk a little bit more about the

15  licensing program, if we could put the licensee slide back

16  up.

17       Okay.  What is this slide?

18  A.  This is a slide of the companies that took out

19  licenses for the DDC patents.  The companies in green on

20  the left-hand side are the computer monitor companies and

21  the companies on the right are the television companies.

22  Q.  And LG is there.  Can you tell us where LG is?

23  A.  Yes.  LG is on the bottom left-hand side and on the

24  top right-hand corner, two places.

25  Q.  And why two places?

**109**

1    A.    Because, as I said earlier, the green is computer
2    monitors and LG took a license for the computer monitors
3    for the DDC patents but didn't take a license for the TVs,
4    which are blue on the right-hand side.
5    Q.    Now, did this program involve more than one patent
6    family?
7    A.    Yes.
8    Q.    How many patent families?
9    A.    There were two patent families involved in the
10    program.
11    Q.    And what did you call them?
12    A.    Well, the one was the DDC/2B patents and the other is
13    the DDC/CI patents, 2B and CI.
14    Q.    And is the '180 in either of those families?
15    A.    Yes, it's in the 2B family.
16    Q.    Which came first?
17    A.    The 2B.
18    Q.    And is the 2B family or the CI family the basic
19    Plug-N-Play technology?
20    A.    The 2B is the basic Plug-N-Play technology.
21    Q.    Are you an engineer?
22    A.    No, I'm not.
23    Q.    To your understanding, what did the DDC/CI family of
24    patents add?
25    A.    Roughly, yes, I do.  It adds the ability to control

**110**

1    the display from a keyboard, so, it's all the features are
2    controlled in the keyboard.
3    Q.    Okay.  A number of the green companies are names that
4    would be familiar.  Many of them are companies that I doubt
5    the jurors have heard of before.  Could you tell us about
6    those companies and what their business model is?
7    A.    We mentioned OEM companies before, that original
8    equipment manufacturers who made products for other
9    companies.  So, for instance, the ▓▓ in the green in about
10    the middle of the screen, they make monitors for HP, for
11    Lenovo, for Dell, so, all of those products are out there,
12    and they make televisions for Vizio, Toshiba, Sony, ▓▓
13    is another example on the top.  ▓▓▓ makes monitors for
14    Sony and televisions for Vizio.
15    Q.    So, when was the first license entered into as part
16    of this program?
17    A.    The first license was in September 2003.
18    Q.    And who was that with?
19    A.    That was with ▓▓▓▓, the fourth one down on the
20    left.
21    Q.    And what was the next one?
22    A.    The next was ▓▓, but just one of the ▓▓, the
23    green ▓▓, that was in November of 2004.
24    Q.    And were all the other agreements after that?
25    A.    Yes.

**111**

1    Q.    Except for ▓▓ were all these licenses entered into
2    after the November 2004 notice of allowance for the '180?
3    A.    Yes, they were, except for ▓▓▓.
4    Q.    And did these licenses include coverage for the '180
5    patent?
6    A.    Yes, they did, all of them.
7    Q.    Let's discuss the negotiations with LG.  If you take
8    a look at Mondis Exhibit 10, could you tell us what that
9    document is?
10    A.    Yes.  That's the settlement agreement between Mondis
11    and LG from September 2009.
12    Q.    Did that agreement cover the televisions in this
13    case?
14    A.    No.
15    Q.    How much did LG pay for the technology that you
16    licensed to them?
17    A.    About ▓▓▓▓▓▓▓▓▓ under the agreement.
18    Q.    And how was that split?
19    A.    It was all for monitors.
20    Q.    No.  I mean -- I'm sorry.  How was it split between
21    payment at the time of the agreement or ongoing royalties?
22    A.    About ▓▓▓▓▓ was paid when the license was
23    signed and then over time another ▓▓▓ was paid further.
24    Q.    Is LG's television business, to your understanding,
25    larger or smaller than its monitor business?

**112**

1    A.    It's much larger, much larger.
2    Q.    Was this agreement done overnight or were there
3    extensive negotiations involved?
4    A.    There were very extensive negotiations for this.
5    Q.    Do you recall how many times you met with them to
6    negotiate this agreement?
7    A.    I do.  We met eight times for this agreement.  Seven
8    of those were in Korea and one of them in Washington.
9    Q.    Do you recall who you met with from LG?
10    A.    Yes.  There were two people.  There was a Mr. Choi and
11    the other lady, Miss Lee.  Mr. Choi was the senior manager
12    in Intellectual Property Department of LG and Miss Lee was
13    an assistant manager in the same department.
14    Q.    Are either of them in the courtroom today?
15    A.    I have not seen them.  I don't see them.
16    Q.    Did you ever meet with Mr. Alessi, who's going to
17    testify for LG?
18    A.    No, I didn't.
19    Q.    Let's put up the time line slide.  Thank you.
20         So when was the first meeting in Korea?
21    A.    That was October 2008.
22    Q.    And was litigation already pending with LG at that
23    point?
24    A.    Yes, it was.
25    Q.    What was the purpose of the meeting?

**113**

1    A.  We introduced ourselves, we introduced Hitachi,

2  introduced Inpro, the patents, the licensing program, some

3  of the licenses.  We mentioned         , and we offered

4  them, invited them to take a license.

5    Q.  When did you next meet?

6    A.  About a month and a half later in the end of

7  November.

8    Q.  And where was that meeting?

9    A.  That was also in Korea.

10    Q.  And what was the purpose of that meeting?

11    A.  Well, it was to progress the discussions and

12  hopefully try to get to an agreement.

13    Q.  Now, at this point were you discussing monitors,

14  televisions or both?

15    A.  We were discussing monitors.

16    Q.  Now, there's been some suggestion that monitors are

17  only CRT monitors like those things sitting on the table.

18  At this point in 2009, what kind of monitors was LG

19  selling?

20    A.  Well, by now the majority of the monitors were flat

21  screens, like these CRTs weren't being sold anymore.  It

22  was all thin screen TVs.

23    Q.  And did you license those as part of the agreement

24  that you entered into in September 2009?

25    A.  The monitors, yes absolutely, yes.

**114**

1    Q.  Yes.  Take a look at Mondis 176 please.  And if you

2  could identify that document for the record?

3    A.  Yes.  This is the complaint that was filed on

4  January 15, 2009, for the '180 patent against LG.

5    Q.  And if we could just go back to the time line.  Now

6  there was a suggestion that there was something wrong with

7  you filing a lawsuit in January 2009 on the '180 patent.

8  Could you have filed it earlier?

9    A.  We couldn't file it before the date it was issued,

10  which was a few days before that, but that was it.

11    Q.  After you filed the lawsuit on the '180, did you go

12  and meet with LG again?

13    A.  Yes.

14    Q.  When did that happen?

15    A.  Well, we met again in February.  That's the third

16  meeting on the middle of the top screen, the top of the

17  screen in the middle.  And then we met again in April.

18    Q.  Where was the April meeting?

19    A.  Both those meetings were in Korea.

20    Q.  What day in April was that?

21    A.  Pardon?

22    Q.  What day in April?

23    A.  April 2nd.

24    Q.  Ten years ago today?

25    A.  Ten years ago today.

**115**

1    Q.  Okay.  Did you notify LG during the meeting that

2  their televisions infringed your DDC patents?

3    A.  Yes, I did.

4    Q.  Take a look at Mondis 1527.  Could you tell us what

5  that is?

6    A.  Yeah.  That's my meeting notes from the second of

7  April 2009.  The top right-hand corner is the date but it's

8  a UK date, two April, not February 4th.

9    Q.  So, these are your handwritten notes?

10    A.  Yes.

11    Q.  And you saved these?

12    A.  Yes, I do.

13    Q.  The second page of your notes there's a statement

14  shows LG TV data sheet.  Do you see that?

15    A.  Yes, I do.

16    Q.  Is that your handwriting?

17    A.  Yes.

18    Q.  What does that mean?

19    A.  Well, when we are at the meeting, I brought with me

20  some of the data sheet from the LG's website and I

21  presented them with that, showing them what was written on

22  it specifically.

23    Q.  And why did you do that?

24    A.  Because it was a TV data sheet that said that the TVs

25  are using the DDC technology.  So, we found out between

**116**

1  these two meetings really and decided that I needed to show

2  it to them because that was part of what we were

3  negotiating.

4    Q.  Did you save the manual and put it in your file with

5  those notes?

6    A.  Yes, I did.

7    Q.  Could we go to the page that ends in 97 please.

8    A.  Yes.

9    Q.  And what is this document?

10    A.  This is the cover sheet of the LCD TV and plasma TVs

11  owner's manual of array of different LG models.

12    Q.  And if you'd look at the next page, if you could blow

13  up the top section there, what does that say?

14    A.  Yes.  Under PC setup it says "This TV provides

15  Plug-N-Play capability," meaning that this PC adjusts

16  automatically to the TV settings.

17    Q.  Do you see the cable on the right; do you recognize

18  that?

19    A.  Yes.  That's the VGA cable, the one you held up

20  earlier in the opening and the one you can see the sockets

21  at the top and the bottom.

22    Q.  And if you'd go down the page to the bottom half?

23    A.  That section is the HDMI section.  On right-hand side

24  top, on the top right-hand side the DVI, bottom.

25    Q.  And we'll have technical testimony on this but, to

CONFIDENTIAL MATERIAL REDACTED

**117**

1  your understanding, is the DDC channel that handles

2  Plug-N-Play communication in both the RGB and HDMI cables?

3  **A.** Yes, it is.

4  **Q.** If you go two pages further to the page ending 900

5  and blow up the top right, what does this say?

6  **A.** This says "This TV uses a VESA Plug-N-Play solution.

7  **The TV provides EDID data to the PC system with a DDC**

8  **protocol. The PC adjusts automatically when using this**

9  **TV."**

10  **Q.** Did you show this specific language to Mr. Choi?

11  **A.** Yes. When I gave him the brochure and showed it to

12  him, I went over this exact section.

13  **Q.** And what was his reaction?

14  **A.** Well, he looked up and said, "Oh."

15  **Q.** At the April meeting, did you discuss the terms of a

16  settlement for monitors, televisions or both?

17  **A.** We discussed monitors only.

18  **Q.** And what did you decide to do with respect to

19  televisions?

20  **A.** Well, the reason we discussed monitors is we agreed

21  that we would defer the television discussions in the

22  interest of time. We had worked all these meetings before

23  and we were progressing very well with the monitors and it

24  was -- the problem we were having was getting information

25  from LG. At the time they kept promising us pricing

**118**

1  information, product information, and we never got anything

2  from them.

3  So we had to do our own research and we were at a

4  very, very advanced stage in the discussions on the

5  monitors and we hadn't done any of that on TVs, so, in the

6  interest of time, we agreed to defer the TVs. We'll finish

7  the monitor discussions now and come back to the TVs at a

8  later stage.

9  **Q.** What kind of information did you need in order to

10  price the television license?

11  **A.** Well, I needed volumes. I needed how much they use.

12  I needed pricing information. I didn't get any of it from

13  them and we weren't in a position then.

14  **Q.** Okay. Let's go back to the time line. Next meeting

15  is May 14, 2009. What happened at that meeting?

16  **A.** At that meeting we basically agreed the deal that we

17  are discussing, we brought to a -- we reached the broad

18  principles of the agreement.

19  **Q.** Please take a look at Mondis 1531, and could you

20  identify that document for the record.

21  **A.** Yes. This is an e-mail from Miss Lee. That's

22  Korean, I just recognize it from her, to myself of May 25,

23  2009.

24  **Q.** And what is Section 1 of the e-mail?

25  **A.** Section 1 deals with the agreed principle by both

**119**

1  parties, that's what we had agreed, in the meeting, at the

2  first of meeting that we just had earlier in May 14th.

3  **Q.** And is there an attachment to that e-mail?

4  **A.** Yes.

5  **Q.** Could we put that up on the board. It's difficult to

6  read but could you tell us what that is?

7  **A.** Yes. In the meeting room in May, on the 14th of May,

8  there was a white board. This is a picture of the white

9  board at the end of the meeting. This is the principles of

10  the agreement. The majority of the agreement or majority

11  of the writing of here is Mr. Choi's from LG.

12  **Q.** Was the deal finalized on monitors?

13  **A.** Yes, it was.

14  **Q.** And when did that happen?

15  **A.** Well, we signed the agreement in September 2009, a

16  few months after this.

17  **Q.** Okay. If you can put the time line back up.

18  **A.** It's in the bottom right-hand corner.

19  **Q.** September of 2009. Okay. Did you have a specific

20  agreement to carve out televisions and discuss them later?

21  **A.** Yes. That was included in this agreement.

22  **Q.** Okay. Let's take a look at some of the terms of that

23  agreement, which is Mondis 10. So, first of all, let's

24  take a look at

**120**

[Text redacted]

Appx15030



**Page 123:**

2  Q.  Now, it was represented in opening that there were no

3  televisions involved in the prior litigation, that it was

4  something of a surprise to LG when you came back to them

5  and said that they needed a television license.  Is that

6  accurate?

7  A.  Not at all.

8  Q.  Following the September 2009 agreement, did LG pay

9  any ongoing royalties?

10  A.  Yes, yes.

11  Q.  How much did they pay?

12  A.  They paid further about

**Page 124:**

20  Q.  And did LG pay you on those monitor TVs after the

21  '180 lawsuit had been filed?

22  A.  Yes, they did.

23  Q.  Let's put the other time line up.

24      Did there come a time when you resumed negotiations

25  with LG over their televisions?

125

1    A.   Yes.  That was a letter I wrote to them in

2    March 2011.

3    Q.   And how many times did you meet with them?

4    A.   We met overall 11 times.  It was a very frustrating

5    period.

6    Q.   Could you just read into the record, because this

7    slide won't be in the record, the dates and locations of

8    those meetings?

9    A.   Yeah.  The first meeting was in July 2011 in Korea.

10   We then had another meeting in London in October 2011 a few

11   months later, was a waste of time.  In December 2011, we

12   went to Korea again and had another meeting in Korea.

13   Again in February we had a further meeting in Korea, the

14   fourth meeting now and still we weren't getting anywhere.

15   We were getting frustrating, to say the least.

16        In May, another meeting in London.  In June another

17   meeting in Korea.  In July, a month later, another meeting

18   in D.C.  This was just going absolutely nowhere.  It was

19   just --

20   Q.   Why were you meeting with them so frequently if it

21   wasn't going anywhere?

22   A.   We thought we were making progress.  We thought that

23   we were discussing some facts of arrangements and every

24   time they came up with a different excuse to say why it's

25   not right or it can't be, and we just couldn't get it to a

127

1    Q.   And was that meeting successful?

2    A.   It was clear from that meeting that this was

3    absolutely going nowhere, so, and the only way to get them

4    attention and to actually sit them down and to try and

5    reach a proper agreement was we had to file the lawsuit,

6    which we did.

7    Q.   And when did you file the lawsuit?

8    A.   We filed it in June but we didn't serve it until much

9    later.

10   Q.   Why didn't you serve it right away?

11   A.   Well, we were discussing with them, we gave them the

12   opportunity to really --- that we were serious and did they

13   really want to conclude this agreement or not.  And we

14   thought that in that time frame, in that time period before

15   having to serve it, that they would actually -- or we would

16   actually reach some type of agreement, which we didn't, so

17   we had to serve it.

18   Q.   Now, I used a legal term service.  I just want to

19   clarify, did they have a copy of the complaint at the time

20   you met with them in June 2014?

21   A.   Yes.  They had.  I told -- I came to tell them that

22   we filed the lawsuit and to discuss it with them but they

23   knew about it within days of our filing it.

24   Q.   So, even after giving them a chance to take a license

25   after eight meetings, did they agree at the June 2014

126

1    point where we finished -- where we could finish an

2    agreement.  Other things were going on and they kept

3    relating it to, you know, related matters and stalling and

4    stalling.

5    Q.   At the seven meetings --

6    A.   Yes.

7    Q.   -- at any time did they tell you that they did not

8    infringe the patent?

9    A.   Not once.

10   Q.   At any time did they tell you that they didn't need a

11   license for their products because they didn't have

12   communication controllers?

13   A.   No, it didn't, not a matter that even came up.

14   Q.   At any time did they tell you that they didn't need a

15   license because they didn't have a type ID or

16   identification number?

17   A.   No, no.

18   Q.   At any time did they tell you that the patent had

19   been stretched in some unlawful --

20   A.   They never mentioned any such, didn't feature in our

21   discussions at all.

22   Q.   Now, looks like you took a break in 2013.  When did

23   you resume your discussions with LG?

24   A.   On December 13th we had we made contact again, and we

25   met after that in April in Korea again.

128

1    meeting to pay for the televisions?

2    A.   No, they didn't.

3    Q.   How about at the August or October meetings in Korea?

4    A.   No.  They kept, again, inventing all sorts of

5    different reasons why it's not right now, they hadn't

6    looked at it.  It was just stringing us along.

7    Q.   Did you finally serve the lawsuit and start the

8    machinery that brought us here today?

9    A.   Absolutely.

10   Q.   At any of those meetings, did they tell you that they

11   didn't infringe?

12   A.   No.

13   Q.   Did they tell you that they didn't have a

14   communication controller?

15   A.   No communication controller was mentioned, nothing.

16   Q.   Did they tell you they didn't have a type ID?

17   A.   No.

18   Q.   Is it fair to your licensees, Mr. Spiro, who have all

19   taken licenses to the patent, that LG is selling products

20   without paying a royalty?

21   A.   No, it's not fair at all.  We have an obligation to

22   the other licensees to complete -- license everybody in the

23   industry.  That's what the program is about.  It's not

24   fair.

25   Q.   And is it fair to Mondis?

Appx15032

1    (In open court:)
2        MICHAEL BARNETT SPIRO, called as a witness
3    in behalf of the Plaintiffs, having been
4    previously sworn, testifies as follows:
5    CONTINUING CROSS EXAMINATION
6    BY MR. McKEON:
7    Q.    Good morning, Mr. Spiro.
8    A.    **Good morning.**
9    Q.    I hope you had a nice evening. I want to start with
10   some clarification on the relation hip between Hitachi and
11   Maxell. Now, Hitachi Ltd. Is the Japanese company. Isn't
12   that right?
13   A.    **That's correct.**
14   Q.    And that's the company that has all the patents we've
15   been talking about. Isn't that right?
16   A.    **That had the patents?**
17   Q.    Including the '180 patent. Right?
18   A.    **No. The '180 patent was issued first time to Mondis.**
19   Q.    Okay. But that came out of what you've been calling
20   the DDC portfolio. Right?
21   A.    **Yes.**
22   Q.    And that was Hitachi Ltd. Correct?
23   A.    **Originally, yes.**
24   Q.    And the two inventors that are listed on the front
25   cover of the patent, those were Hitachi Ltd. employees.

1    Correct?
2    A.    **Yes.**
3    Q.    And then at some point in time, there was an
4    arrangement with Hitachi Ltd. and Maxell. Isn't that
5    right?
6    A.    **Well, Maxell was a subsidiary to begin with.**
7    Q.    Okay. So, but Hitachi Ltd., is it correct, rolled
8    out the portfolio in question and gave it to Maxell. Is
9    that right?
10   A.    **Gave I it to -- was given to Hitachi Consumer**
11   **Electronics, who then merged with Hitachi, with Maxell, and**
12   **became Hitachi Maxell.**
13   Q.    And then Maxell is currently a plaintiff in the case.
14   Isn't that right?
15   A.    **Yes.**
16   Q.    And Maxell doesn't make any TVs, do they?
17   A.    **I'm not aware.**
18   Q.    Okay. Now, in your direct testimony we heard
19   something about licenses in this case. Do you recall that
20   testimony?
21   A.    **Yes.**
22   Q.    Okay. And when you made the deal with Hitachi Ltd.,
23   you made this deal, Hitachi already had 14 existing
24   licenses. Isn't that right?
25   A.    **No.**

1    Q.    All right. Well, let's look up the pre-admitted
2    exhibit Mondis 14, which is the Mondis-Hitachi agreement.
3    If we can go to -- this is the agreement Hitachi Ltd.
4    between Mondis and Hitachi. Correct?
5    A.    **Yes.**
6        MR. McKEON:    And if we can go to Bates Page 290
7    please. If you can blow that up.
8    Q.    You see here this is a list of licenses. Isn't that
9    right?
10   A.    **Yes.**
11   Q.    And I count them, I might be miscounting, but I count
12   14.
13   A.    **Yes. There are 14 listed there.**
14   Q.    So, at the time you got the patents from Hitachi,
15   Hitachi already had 14 licenses. Correct?
16   A.    **At the time that the agreement was made, Hitachi had**
17   **14 licenses.**
18   Q.    Okay. And they're listed here.
19   A.    **Yes.**
20   Q.    Okay. And we could see some of them, like number 11
21   on this list is ▮▮▮▮▮▮ Right?
22   A.    **Yes.**
23   Q.    And ▮▮▮▮▮-Hitachi, they did this deal, it was a ▮▮▮
24   ▮▮▮▮▮▮▮▮▮ Isn't that right?
25   A.    **I'm not aware of what the terms of their deal were.**

1    **That was a deal that was done by Hitachi directly with**
2    ▮▮▮▮▮▮
3    Q.    You're not aware whether that was ▮▮▮▮▮▮▮
4    ▮▮▮▮
5    A.    **I'm aware it was ▮▮▮▮▮▮▮▮**
6    ▮▮▮▮, **but I'm not aware of any of the details of it.**
7    Q.    Okay. And you're also aware that ▮▮▮▮ which is
8    number four on that list, that was a ▮▮▮▮▮▮▮▮
9    Isn't that right?
10   A.    **Yes.**
11   A.    A ▮▮▮▮▮▮▮▮▮▮▮▮▮
12   A.    **I don't know. I haven't seen that agreements. I**
13   **just know what's written over here and that they entered**
14   **into agreement.**
15   Q.    Certainly you understand that when these two big
16   companies do ▮▮▮▮▮▮▮▮▮▮▮▮
17   ▮▮▮▮▮▮▮▮ Isn't that standard in the industry?
18   A.    **I imagine so, yes.**
19   Q.    And that same with ▮▮▮, that's number ten, that was
20   another ▮▮▮▮▮▮▮ Isn't that right?
21   A.    **Yes.**
22   Q.    And these, of course, ▮▮▮▮▮▮▮▮▮▮
23   ▮▮▮▮▮▮▮▮▮▮▮▮▮
24   ▮▮▮▮▮▮ Isn't that right?
25   A.    ▮▮▮▮▮▮▮▮▮▮▮▮

**188**

1  A.  Yes.

2  Q.  In fact, there were ███████████████

3  ███████  Isn't that right?

4  A.  Yes.

5  Q.  So, when you have just the one patent at the top,

6  it's ████████████████████████

7  ███████  Isn't that right?

8  A.  Possibly.

9  Q.  All right.  Now, let's talk about the LG-Mondis

10  relationship.  Now, even before you sued LG in this case,

11  Mondis and LG were not strangers.  Isn't that right?

12  A.  Correct.

13  Q.  In fact, the first LG first found out about Mondis on

14  December 31st, 2007, when Mondis sued LG in Texas.  Isn't

15  that right?

16  A.  Yes.

17  Q.  And that's December 31st, that's right after

18  Christmas.  That's New Year's Eve.  Isn't that right?

19  A.  The 31st is generally New Year's Eve, yes.

20  Q.  Times Square is going rock and rolling and you're out

21  in Texas, you're suing LG on that day.  Isn't that right?

22  A.  Yes.

23  Q.  And this case that you've brought in Texas, before

24  you filed it, you didn't notify LG.  Isn't that right?

25  A.  No.

**189**

1  Q.  Before this case was filed in Texas, you provided no

2  notice to LG?

3  A.  That's correct, yes.

4  Q.  So, you filed the lawsuit and you never sent a

5  letter, you never made a phone call, you never made a

6  visit.  Isn't that right?

7  A.  Yes.

8  Q.  Because we saw a lot of meetings in your slides

9  yesterday.  But one meeting you didn't have was with LG

10  before you sued them in Texas on the patents.  Isn't that

11  right?

12  A.  Correct.

13  Q.  And in the Texas case that was originally brought,

14  the '180 patent hadn't even issued yet by the Patent

15  Office.  Correct?

16  A.  Yes.

17  Q.  Because that was, as we established, was on New

18  Year's Eve in 2007 and the '180 patent was 2009.  Am I

19  right?

20  A.  Yes.

21  Q.  So, a little bit later what happened was the Patent

22  Office issued this in 2009 and a few days after that you

23  filed another case in Texas against LG on the monitors,

24  asserting infringement of the '180.  Isn't that right?

25  A.  That's correct, yes.

**190**

1  Q.  And in both these cases, in that first case on New

2  Year's Day, New Year's Eve, and on that second case, TVs

3  were never asserted infringing the patents against LG?

4  A.  Well, the patents were asserted against LG.

5  Q.  Against LG?

6  A.  Which covered the displays.

7  Q.  Well, let's explore that.  With respect to the two

8  lawsuits where you sued LG in Texas, the only accusation

9  was computer monitors.  Correct?

10  A.  Those were the models are identified, were computer

11  monitors.

12  Q.  Those were specifically identified in the complaint

13  were computer monitors?

14  A.  Yes.  Just an example, yes.

15  Q.  An example, let's if we can pull up LG-421, which is

16  the March 9, 2009, complaint.  And if we could go to

17  Paragraph 72.

18  For example, this is the complaint, you recognize

19  that, sir, the second amended complaint that was filed in

20  Marshall, Texas.  Do you see that?

21  A.  Yes.  From March 2009, yes.

22  Q.  Right.  And if we look at Paragraph 72, if we blow

23  that up please, do you see there it says here "With respect

24  to LG infringing the '180 patent," some language, computer

25  monitors in Paragraph 72.  Do you see that?

**191**

1  A.  Yes.

2  Q.  So that case was specifically saying computer

3  monitors infringed.  Isn't that right?

4  A.  That's what the complaint says, yes.

5  Q.  And then after this complaint was filed, LG and

6  Mondis got together a couple of times and you reached a

7  deal with LG.  Isn't that right?

8  A.  Eight times, is that the eight times before?

9  Q.  This is after the Texas case.

10  A.  Yes.

11  Q.  You settled the Texas case with LG with the license

12  agreement.  Correct?

13  A.  Yes.

14  Q.  You met a couple of times?

15  A.  Yes.

16  Q.  Right.  And then you settled.  Isn't that right?

17  A.  Yes.

18  Q.  And under the agreement, if we can get that pulled

19  up, LG-410, this is -- if you go to the first page of the

20  agreement which I think is the next page, this is the

21  agreement, sir, between LG and Mondis.  Isn't that right?

22  A.  Yes, it is.

23  Q.  Okay.  And that agreement, sir, LG agreed to settle

24  the dispute with respect to the computer monitors and LG

25  paid Mondis money.  Correct?

**216**

1  didn't.

2  Q.  You're the only one at Mondis.  Isn't that right?

3  A.  **I'm the only one?**

4  Q.  You're it.  You're Mondis.

5  A.  **I'm not the only one who works with Mondis.  I'm the**

6  **only person of Mondis.  The Inpro group, all the employees**

7  **of the Inpro group, and they support Mondis, that's part of**

8  **the group.**

9  Q.  All right, sir.

10  MR. McKEON:  Let's get the ELMO, if we can.

11  Q.  And I want to put up a slide 3 that you talked

12  about yesterday.  This is a slide you presented to the jury

13  yesterday.  Am I right?

14  A.  **Yes.**

15  Q.  Now, there was some discussion, I think you went

16  through the meetings that you had with LG in 2011, 2012, up

17  to the filing of the lawsuit in June of 2014.  Isn't that

18  right?

19  A.  **Yes.**

20  Q.  And as I kind of understood your testimony, you were

21  giving the impression at least that LG was jerking you

22  around.  Is that the kind of impression that you were

23  trying to give?

24  A.  **I don't know what impression you got but they**

25  **certainly were jerking us around.**

**217**

1  Q.  And that was LG just wasn't taking you seriously.  Is

2  that what you were saying?

3  A.  **That's right.**

4  Q.  Now, you also said, I think, that LG did not raise

5  non-infringement arguments, such as those that we discussed

6  in the opening statement, LG never raised those to you in

7  those meetings.  Isn't that right?

8  A.  **Yes.**

9  Q.  But you previously said that you're not a technical

10  guy.  Right?

11  A.  **Correct.**

12  Q.  Now, the one thing we understand, sir, when you go

13  out and negotiate licenses, you're not personally engaging

14  in some sort of negotiation over infringement analysis,

15  over -- or an invalidity analysis.  Correct?

16  A.  **No, I do not.**

17  Q.  Let's make sure we have a clear answer, sir.

18  When you go talk to people, you don't talk about

19  infringement or invalidity.  Isn't that right?

20  A.  **I don't.  That's correct.  I, myself, don't.**

21  Q.  And that's because you don't even have a technical

22  background.  Isn't that right?

23  A.  **No, that's not the reason.  I mean, I do not have a**

24  **technical background, but that's not the reason that I do**

25  **not engage in technical discussion.**

**218**

1  Q.  Well, one thing we do know, when you go meet with

2  people like you did in these meetings, the only thing

3  you're talking to somebody about is how much you think they

4  should pay you.  Isn't that right?

5  A.  **And general terms of an agreement.**

6  Q.  Okay.  Can I go back to Exhibit 424, LG-424 in your

7  binder.  And I'm going to want to read from Page 22, line 6

8  to 9.  You with me?

9  A.  **In a moment.  Line which?**

10  Q.  Line 22 -- I'm sorry -- Page 22, 6 to 9.

11  A.  **Yes.**

12  Q.  Now, this is again testimony you gave in Texas.  You

13  were under oath to tell the truth.  Isn't that right?

14  A.  **Yes.**

15  Q.  You were asked the question:  "The only thing you're

16  talking to somebody about, frankly, let's just be honest

17  about this, is how much you think they should pay you.

18  Correct?"

19  A.  **Yes.**

20  Q.  And you answered, "Yes."

21  A.  **Yes.**

22  Q.  That was truthful testimony.  Isn't that right?

23  A.  **It was.**

24  Q.  So, when you yesterday were saying that LG in these

25  discussions wasn't telling you about non-infringement,

**219**

1  because that's not what you do.  Isn't that right?

2  A.  **But that doesn't stop them from telling me.  Had they**

3  **told me anything to do with -- had they told me anything to**

4  **do with non-infringement, I would have the people to deal**

5  **with that.**

6  Q.  Sir, could you try to focus on my question.  Your

7  lawyer is going to have an opportunity to ask you on

8  redirect.

9  A.  **Sorry.  Apologies.**

10  Q.  LG -- you're the money guy.  Correct?

11  A.  **I wouldn't call me the money guy but yes, I deal with**

12  **the money.**

13  Q.  So, when LG didn't tell you that they weren't

14  infringing because these elements were missing is because

15  that's not what you do.  Isn't that right?

16  A.  **I don't know why they didn't, but they didn't.**

17  Q.  And when yesterday, your testimony, I think there was

18  something about you're talking to Mr. Choi and, as I

19  understood your testimony, you told him about the TVs and

20  infringement and he went, "Oh."

21  Do you remember that testimony?

22  A.  **Yes, I do.**

23  Q.  How do you know it wasn't the fact that you were

24  asking LG again for all this money that he wasn't saying

25  "Oh"?

**256**

1  director of product development entail?

2  "ANSWER: They mainly entailed working with the U.S.

3  -- for the U.S. operation with the product planning groups

4  in Korea to develop the product lineups that we would

5  ultimately offer for sale in the U.S.

6  Now, the actual development is done by engineers and

7  product planning people in Korea on a global basis, but my

8  role was more to help fine tune it for the appropriate

9  lineup for the United States, so which, you know, helped

10  give local market feedback on what trends were happening,

11  what market -- whether it was a competitive landscape, the

12  retail landscape -- just be the voice for the U.S.

13  operation back to headquarters.

14  "QUESTION: Mr. Alessi, does LG Electronics U.S. --

15  between 2009 and 2013, was LGE U.S. the importer of the

16  televisions that it sold in the United States?

17  "ANSWER: Yes.

[REDACTED]

**257**

[REDACTED]

6  "QUESTION: Does any other LG-related entity import

7  televisions into the United States other than LGE U.S.?

8  "ANSWER: No.

9  "QUESTION: And that's unequivocal?

10  "ANSWER: Yes.

11  "QUESTION: Who does -- who did LGE U.S. buy the TVs

12  from that it sold between 2009 and '13 in the U.S.?

13  "ANSWER: We buy them from LG Electronics, Inc.

14  "QUESTION: The defendant?

15  "ANSWER: Yes.

16  "QUESTION: Mr. Alessi, so you started with LGE U.S.

17  in 2004. Is that correct?

18  "ANSWER: Yes, December of 2004.

19  "QUESTION: Okay. And before that you were at Sony?

20  "ANSWER: Yes.

21  "QUESTION: And were you working with televisions?

22  "ANSWER: For my last two years at Sony.

23  "QUESTION: So, you're familiar with the general

24  features of televisions in the U.S. market going back to at

25  least 2002?

**258**

1  "ANSWER: Yes.

2  "QUESTION: Okay. In the year 2000, what's your

3  recollection of whether televisions had ports in the --

4  ports anywhere on them to connect a computer?

5  "ANSWER: In the year 2000, computer connection was

6  available but not ubiquitous.

7  "QUESTION: What was the state of its incorporation

8  in the televisions in 2009?

9  "ANSWER: I think by 2009, virtually any TV would

10  have some means of connecting a computer.

11  "QUESTION: By what means? What are all the

12  different ways it might have been connected?

13  "ANSWER: It could have been a VGA connection or HDMI

14  connection would be the primary two.

15  "QUESTION: If I -- are you familiar with the term

16  DSUB?

17  "ANSWER: Yes.

18  "QUESTION: And do you understand that to be the same

19  as a VGA?

20  "ANSWER: Yes.

21  "QUESTION: And have you ever heard the term "PC

22  input"?

23  "ANSWER: Yes.

24  "QUESTION: And do you understand that that's also

25  the same as VGA or DSUB?

**259**

1  "ANSWER: Yeah. They were general used

2  interchangeably.

3  "QUESTION: And is "RGB" another way of specifying

4  the same connection?

5  "ANSWER: Yeah, generally speaking.

6  "QUESTION: So, was LG putting PC inputs into its

7  televisions in 2004, when you joined?

8  "ANSWER: I would have to think about it a little

9  bit. I believe, yes, that there were at least VGA inputs

10  or, at the time, there may have even been another version

11  called DVI that would have been available.

12  "QUESTION: Why were PC inputs put in televisions?

13  "ANSWER: The main reason was to make them more

14  multifunctional so that somebody, if they wanted to, could

15  hook up their computer to use it as a large -- large format

16  display, especially as when flat panels came out, as a

17  large format computer monitor. And at the time it was --

18  that was kind of the early days of digital media. TiVo had

19  come out. I believe the -- what do they call it -- the

20  Windows Media Center- type products, which was kind of a

21  hybrid computer entertainment device, so a way to connect

22  that to a large format display instead of just a smaller

23  computer monitor was needed.

24  "QUESTION: When you started with LG, was it putting

25  HDMI ports in its televisions?

260

1    "ANSWER:  I don't remember if it was right at that
2    point or shortly after, but it was sometime in the mid
3    2000s that HDMI started coming up, probably right around
4    that time, 2004, 2005.
5    "QUESTION:  Do you have any recollection of whether
6    LG was adopting it along with the rest of the industry or
7    ahead of the industry or behind it?
8    "ANSWER:  My general recollection is that the
9    industry kind of adopted it all at the same time.  There
10   was no standout leader to say, you know, this company has
11   HDMI and nobody else does.
12   "QUESTION:  Did there reach a point where every TV
13   that LG sold in the U.S. had at least one HDMI port?
14   "ANSWER:  Yes.
15   "QUESTION:  When was that, roughly?
16   "ANSWER:  It would have to be sometime in the late
17   2000s, I guess.  I don't remember an exact year.  But it
18   quickly became kind of the standard method for attaching
19   peripheral devices, source devices to TVs.  In the past it
20   would require multiple connections, like a separate audio
21   and video connection.  But then more digital source devices
22   came out, like Blu-Ray players -- well, first DVD players
23   and Blue-Ray players, more cable and satellite set-top
24   boxes started adding them so -- and video games started
25   moving towards them, so everything started moving towards

261

1    the HDMI connection.  So the TV needed to be able to
2    accommodate that as a connectivity source.
3    "QUESTION:  Is it fair to say that LG adopted HDMI
4    because it was essential to sell a television at some
5    point?
6    "ANSWER:  Yeah.  I mean, at some point we -- in order
7    to stay competitive, we have to have as convenient a way to
8    connect your TV as everybody else.  It's not easy to use,
9    then it's going to be points against you in the buying
10   process, I guess I would say.
11   "QUESTION:  Did there come a point in time when
12   having just one HDMI port in the back of the television was
13   not sufficient commercially?
14   "ANSWER:  No, I wouldn't say that.  We still have TVs
15   that have only one, depending on the screen size, price,
16   position in the lineup.  We have at least one on all sets,
17   but they're still out there."
18   MR. EDWARDS:  Your Honor, that completes Mr.
19   Alessi's testimony by deposition.
20   If I may, Plaintiffs now call by deposition Mr.
21   Bieong Geol Lee, who's a deputy principal research engineer
22   at LG Electronics, Incorporated, and for the record,
23   included in this deposition excerpt is a reference to Lee
24   exhibit, Plaintiffs' MON 0476, which has been pre-admitted.
25   THE COURT:  Very good.  Let's proceed.

262

1    (Video deposition of BIEONG GEOL LEE is
2    played as follows:)
3    "QUESTION:  Good morning.  Can you please state your
4    name for the record?
5    "ANSWER:  My name is Lee Bieong Geol.  Last name Lee.
6    First name Bieong. Geol.
7    "QUESTION:  Mr. Lee, do you work at LG?
8    "ANSWER:  I work at LG Electronics.
9    "QUESTION:  And how long have you worked at LG
10   Electronics?
11   "ANSWER:  This is my 15th year.
12   "QUESTION:  And Mr. Lee, what is your job title at LG
13   Electronics?
14   "ANSWER:  Are you asking about my position or my
15   responsibilities?
16   "QUESTION:  First, just -- first the name of his
17   position.
18   "ANSWER:  I'm a deputy principal research engineer.
19   "QUESTION:  Mr. Lee, what are your job
20   responsibilities?
21   "ANSWER:  I'm a part leader.
22   "QUESTION:  Part leader?  What type of parts?
23   "ANSWER:  Well, I work on device driver development
24   and of that, I am a part leader on what's related to
25   tuners, videos and audios.

263

1    "QUESTION:  Would the parts include televisions?
2    "ANSWER:  The part -- a tell -- the part I'm talking
3    about would not include television.
4    "QUESTION:  When you say device drivers, do you mean
5    you develop software?
6    "ANSWER:  Yes.
7    "QUESTION:  And does that include software that runs
8    on televisions?
9    "ANSWER:  Not all the software that runs on
10   television, but of the software that runs on television, I
11   mostly work on device drivers and, in particular, for
12   tuners, videos and audios.
13   "QUESTION:  Within a television.  Is that correct?
14   "ANSWER:  Yes, yes.
15   "QUESTION:  Mr. Lee, do you have a university degree?
16   "ANSWER:  Yes.
17   "QUESTION:  And in what subject is your degree?
18   "ANSWER:  Electrical engineering.
19   "QUESTION:  When did you receive your degree?
20   "ANSWER:  2003.
21   "QUESTION:  Do you have any advanced degrees?
22   "ANSWER:  Yes.
23   "QUESTION:  In what subject do you have an advanced
24   degree?
25   "ANSWER:  In software, I have a degree in software

Appx15068

**268**

1    "ANSWER: Well, EDID has been adopted as an HDMI
2    specification standard and so it is necessary to know what
3    it is.
4    "QUESTION: So, is it your understanding that the
5    HDMI specification requires the synch, the TV, to include
6    the EDID data?
7    "ANSWER: Yes, that is my understanding.
8    "QUESTION: Do you know if the SOCs in the accused
9    televisions perform any video processing?
10    "ANSWER: Well, it would depend on how you define
11    video processing but if -- it would include processing
12    quality and whatnot, you could say that.
13    "QUESTION: Do the SOCs in the accused televisions
14    perform video scaling?
15    "ANSWER: Yes, they do.
16    "QUESTION: Do they perform video color processing?
17    "ANSWER: Yes, they do.
18    "QUESTION: And after the video processing, is the
19    signal sent to the LCD module?
20    "ANSWER: Yes, that's correct."
21    MR. EDWARDS: Your Honor, that concludes Mr. Lee's
22    deposition testimony. If I may, Plaintiffs have a short
23    list of stipulated facts from LG that I'd like to read into
24    the record.
25    LG has said they don't mind me explaining that

**269**

1    there's a phrase in these statements called "accused
2    instrumentalities" and what that means is the accused
3    televisions. That's all that means. It's a lawyer's word.
4    All of the accused instrumentalities include at least
5    one HDMI input port.
6    All of the accused instrumentalities include a
7    memory-storing EDID data that is connected to at least one
8    HDMI port.
9    For those accused instrumentalities that possess a PC
10    input port, the accused instrumentality further includes a
11    memory-storing EDID data that is connected to said PC input
12    port.
13    Each accused instrumentality includes a video
14    circuit.
15    At least one person in the U.S., prior to
16    February 2014, has used an accused instrumentality to
17    display images sent by a computer connected to the accused
18    instrumentality's PC input port.
19    Each accused instrumentality includes a memory that
20    stores EDID data wherein the stored EDID data includes
21    video signal timing information.
22    Each accused instrumentality includes at least one
23    memory-storing EDID data.
24    The EDID data in each of the accused instrumentality
25    includes characteristic information of the display unit.

**270**

1    At least one person in the U.S., subsequent to
2    June 21, 2008, has used an accused instrumentality to
3    display images sent by a computer connected to the accused
4    instrumentality's PC input port.
5    At least one person in the U.S., between June 21,
6    2008, and February 2, 2014, has used an accused
7    instrumentality to display images sent by a computer
8    connected to the accused instrumentality's HDMI port.
9    Thank you, Your Honor.
10    THE COURT: Thank you.
11    MR. PLIES: Your Honor, Plaintiffs calls Mr. Joseph
12    D. Lamm.
13    THE COURT: Mr. Lamm.
14    JOSEPH D. LAMM, called as a witness
15    in behalf of the Plaintiffs, having been
16    duly sworn, testifies as follows:
17    DIRECT EXAMINATION
18    BY MR. PLIES:
19    Q.   Good afternoon at this point, Mr. Lamm.
20    A.   Good afternoon.
21    Q.   And Mr. Lamm, what are you here to discuss with the
22    jury today?
23    A.   I'm here to discuss my opinions regarding
24    infringement of LG TVs against the '180 patent.
25    Q.   Just as an initial matter, where do you live?

**271**

1    A.   I live in Montana, just north of Yellow Stone Park.
2    Q.   Now, have you ever testified to a jury in a court
3    like this before?
4    A.   Only one time. I was involved in what I think we've
5    been calling the Texas case.
6    Q.   Did you bring anything with you today to help explain
7    your opinions to the jury?
8    A.   Yes. I brought a slide show that I think will help
9    the jury understand some of the technical details of what's
10    going on.
11    Q.   Is that what we're seeing on the overhead in the
12    screens around the courtroom?
13    A.   Yes, it is.
14    Q.   Mr. Lamm, why don't we begin with your qualifications
15    and experience. First, where did you go to school?
16    A.   I obtained a Bachelor of Science in electrical
17    engineering at Texas A & M University in 1977.
18    Q.   Now, when you were in college, did you do any work
19    relating to displays or television technology?
20    A.   Well, this is where I first got introduced into
21    displays. I worked at the television station that was on
22    campus for about two and a half years and held various
23    positions in the engineering department.
24    I did -- ran the cameras, inserted commercials
25    between television shows and so forth.

272

1    Q.    Now, what did you do after you graduated?

2    A.    I started a career that basically has involved

3    displays ever since the college years.

4    Q.    And has that been the exclusive focus of your career

5    for the last 42 years?

6    A.    Basically, yes.

7    Q.    Well, I see you have a number of experience bullets

8    here on your slide.  Do you have additional explanation of

9    what you were doing at various companies throughout your

10   career?

11   A.    Yes, I do.  I think each one of these has a quick

12   slide.

13   Q.    So, right after you graduated from college, what were

14   you doing in the 1977-to-1980 time frame?

15   A.    I was working for a company in San Antonio called

16   Datapoint and Datapoint developed computer work stations

17   and computer terminals.  In fact, they led the industry in

18   a number of things.

19   Q.    And I see you have some pictures on the slide.

20   What's the picture on the left?

21   A.    Picture on the left is one of the computer work

22   stations that I developed while I was there.  This is kind

23   of a one-box solution that included a keyboard, a display

24   screen, and the computer was actually a board in the bottom

25   of this chassis.

273

1    Q.    Now, did you play any role in the design of the

2    display or display controller?

3    A.    I played a key role in the design of the display

4    controller portion of this.

5    Q.    And did you sell many of these units?

6    A.    Yes, we did.  It was a very popular product.

7    Q.    And looking at the photo on the right, what are we

8    seeing in that photo on the right in that slide?

9    A.    You might recognize at least one of the individuals

10   in this.  That's Bill Gates on the right of this photo and

11   Paul Allen on the left, and these two names may be

12   familiar.  They're two of the founders of Microsoft

13   Corporation.

14   Q.    And what are they posing with in the photo?

15   A.    Well, if you notice, the box on the right-hand side,

16   I'm not sure you can tell from that, but it's one of the

17   video display terminals I developed while I was at

18   Datapoint.

19   Q.    Now, after Datapoint, turning to the early '80s, what

20   were you doing?

21   A.    I joined a company that was actually started by some

22   folks that I knew at Datapoint called Florida Computer

23   Graphics, and this is where we continued to develop

24   computer work stations.

25        And just to give you a kind of a sense of what time

274

1    this was in the industry, the IBM PC had not been

2    introduced yet.

3    Q.    And, so what kind of products were you developing at

4    Florida Computer Graphics?

5    A.    Well, these were computer work stations that had a

6    display that was separate from the computer, and one of the

7    things that we were very proud of was the ergonomic stand

8    that the display had, but we also had -- this was the first

9    time we really had graphics capability included in the work

10   station.

11   Q.    And what aspects of that work station did you design?

12   A.    I designed a portion of the actual CRT display and

13   also designed both the computer board, which included

14   alphanumeric display controller and also a complete board

15   that was a graphics controller.

16        If you look at the back bench there, there's two

17   large circuit boards, and I designed both of those boards.

18   Q.    You mentioned display controller.  What's a display

19   controller?

20   A.    A display controller is the part within a computer

21   that generates video signals.  You know, if you've had any

22   developing -- I'm sorry.  If you've ever built a computer,

23   you'll know that some of the pieces in there, if it's a

24   desktop computer, for instance, it might have a separate

25   graphics board and, so, that's primarily what -- I'm sorry

275

1    -- a display controller is.

2    Q.    Turning to the mid '80s, where did your career path

3    take you?

4    A.    Well, I was continuing to develop graphics

5    controllers.  That was one of the things that we learned as

6    our real expertise was in the video display controller side

7    of the computers, so, we really focused on that aspect.

8    Q.    Now, on the slide you have another photograph.  What

9    do we see in that photograph?

10   A.    This was a product that was a two-board set.  The

11   upper board is what we call the drawing engine.  In other

12   words, this is the part that was told by the computer to

13   draw an image.  And then the bottom board was the memory

14   that stored that image for eventual display.

15   Q.    And what did those boards that you have in the

16   photograph connect to?

17   A.    Well, there's two connections.  The white connectors

18   on the back connected over to the computer and then the

19   little connector on the kind of the right side of the

20   bottom board was the video interface output, and this was

21   an analog video port.

22   Q.    After FCG Engineering, where did you work next?

23   A.    This was kind of a successor company to the previous

24   one, and basically we more of a name change than anything.

25   We called our Tech-Source, Inc. because nobody knew what

1  FCG Engineering really meant, so...

2     Q.   Did you hold any executive positions at Tech-Source?

3     A.   **Well, I was founder. I held the title of president**

4  **several times during my stay there. I also was called the**

5  **chief technology officer and, basically, you know, it was a**

6  **very small company but I was always involved in developing**

7  **products for the company, even though I might have been**

8  **president. Those duties were only a small portion of my**

9  **time. Most of my time was spent developing products.**

10    Q.   And again, we have another picture on the slide.

11 What are we looking at in this picture?

12    A.   **Well, this is another or kind of the next generation**

13 **of video display controllers that I designed, and in this**

14 **case, the processor that's doing the drawing is that little**

15 **chip in the bottom that says raptor and the memory is off**

16 **to the right and then the video output stage is across the**

17 **top.**

18    Q.   Was Tech-Source successful in selling many of these

19 display controllers?

20    A.   **We developed a number of different products and were**

21 **quite successful in the marketplace.**

22    Q.   And on the next slide, Mr. Lamm, you have lots of

23 figures of yet more and more circuits. So, what are we

24 seeing on the next slide?

25    A.   **These are just more and more products that I**

1  **developed during my time there.**

2     **Remember, this spanned quite a long time frame. But**

3  **these are all display controllers. Some of them were**

4  **designed for different markets. Some of them were**

5  **redesigned just because new technology was coming online.**

6  **But the common theme was they were all display controllers.**

7     Q.   And did you focus on any particular applications or

8  markets for the display controllers that you were making?

9     A.   **Yes. There were a couple of markets that we focused**

10 **on. One of the markets that was very successful for us was**

11 **the air traffic control industry and we developed graphics**

12 **controllers for that market.**

13    Q.   And who were your primary customers for that market?

14    A.   **In the United States, the big customer is the Federal**

15 **Aviation Administration. We were actually a subcontractor**

16 **to Raytheon but the FAA was our -- was the end customer.**

17    Q.   And how many of these display controllers did you

18 sell for air traffic control purposes?

19    A.   **Well, worldwide we had sold over 5,000 of these by**

20 **the time I left the company.**

21    Q.   Are the display controllers that you sold to the FAA

22 for air traffic control still being used today?

23    A.   **Yes, they are. In fact, what you see on the screen**

24 **here is an air traffic controller looking at a display**

25 **screen, and this is actually still in use today and, so, if**

1  you're flying around in an aircraft in the United States or

2  in actually a number of foreign countries, that air traffic

3  controller is looking at a display that's using a display

4  controller that I designed.

5     Q.   Mr. Lamm, after Tech-Source, what did you do with

6  your career?

7     A.   **I continued doing work in the display field and I've**

8  **also continued to do a lot of work for Tech-Source just as**

9  **a consultant instead of an employee.**

10    **One of the things that I spent a lot of time**

11 **developing is digital video recorders, and these are**

12 **primarily used in the air traffic control industry so that**

13 **all of the video information that comes out of the display**

14 **controller goes into one of our boxes and gets recorded and**

15 **then goes onto the display so that we can, you know, if**

16 **there's an incident or somebody wants to replay what --**

17 **exactly what the controller saw, they can go back in time**

18 **and see exactly the video signals that were present.**

19    Q.   Have you been involved in any projects relating to

20 television?

21    A.   **Yes. I spent sometime a few years ago writing a**

22 **bunch of software to be able to decode or capture and**

23 **decode and analyze the digital television signals, and**

24 **these are television signals that you could pick up with an**

25 **antenna off of your television. They're broadcast**

1  throughout the United States and foreign countries, for

2  that matter.

3     Q.   And I see a picture at the bottom. What are we

4  seeing there?

5     A.   **This was a project, it's a heads-up display for**

6  **aircraft simulators, and this was for an F16 simulator.**

7     **It let's the pilot be able to see some of his**

8  **instruments displayed on a screen that is actually**

9  **projected on the cockpit window so he doesn't have to look**

10 **down to be able to see some of his instruments.**

11    Q.   And have you developed and designed a number of other

12 products while being an independent consultant?

13    A.   **Yes, I have.**

14    Q.   And on the next slide I see again more circuit boards

15 and boxes. What are we seeing there?

16    A.   **Well, again, these are some of the product -- I**

17 **believe every one of these were products I actually**

18 **designed for my previous company, Tech-Source.**

19    **The one on the upper left is a display controller.**

20 **The one on the upper right is that heads-up display**

21 **controller. And the rest of the boxes are all some of the**

22 **digital video recorders that I designed.**

23    **MR. PLIES: Your Honor, I'd like to move to publish**

24 **pre-admitted Exhibit MON 0615.**

25    THE COURT: You may.

**280**

1  Q.   Mr. Lamm, do you have any granted patents?

2  A.   I have one granted patent.  This was issued in 1997,

3  and it basically describes some work I was doing in

4  developing the back end of the display controller, so, this

5  was the part that was actually forming the analog signals

6  that go out to a very high-resolution monitor like was used

7  in air traffic controller or medical imaging.

8  Q.   Now, Mr. Lamm, in your career, have you been involved

9  in any industry organizations pertaining to displays and

10  display technology?

11  A.   Yes, I have.  One of the industries was the Video

12  Electronics Standards Association, or VESA.  I use the term

13  VESA.

14  Q.   What years were you a member of VESA?

15  A.   I was a member representing Tech-Source from 2002 to

16  2006.

17  Q.   And during your tenure at VESA, did you hold any

18  executive positions?

19  A.   I was on their board of directors from 2004 to 2006.

20  Q.   And while you were participating in VESA, were you

21  involved in development of any industry standards?

22  A.   Yes.  You know, I think you've probably already heard

23  of a couple of these standards.  One of them was the

24  display data channel or DDC standard.

25       Another one was the EDID standard, the Enhanced

**281**

1  Display Identification Data standard.  And then several

2  others that related to different standards that VESA was

3  publishing.

4  Q.   Now, just recently, what is a standard, an industry

5  standard?

6  A.   Well, an industry standard is basically where

7  companies that are doing work in a particular field get

8  together and decide on how to make compatible products.

9       A great example might be a wall plug that you would

10  have in your kitchen, for instance.  If you go to Walmart

11  and buy a toaster, the plug that's on the end of that

12  toaster is defined by an industry standard.

13       So, the size of the prongs, the spacing of the

14  prongs, the voltage that comes out of the wall plug, those

15  are all part of an industry standard.

16       And so we have the same thing with video electronics.

17  We have standards that tell how display devices can hook up

18  to video sources.

19  Q.   Now, you mentioned having some involvement in

20  versions to the VESA DDC and the EDID standards.  Were

21  there any other VESA standards that you participated in the

22  development of?

23  A.   Yes, there was several that I was very active on.

24  One of them was the DDC/CI standard, which is actually

25  what's called -- the CI stands for Command Interface, and

**282**

1  this is a standard that is primarily used in computer

2  monitors now, but it let's the computer user sitting at a

3  keyboard adjust the brightness and contrast of the monitor,

4  things that would normally be -- you would be required to

5  go over and fiddle with buttons around the periphery of the

6  unit.

7  Q.   What about the MDDI standard?

8  A.   The MDDI standard is for -- is basically for cell

9  phones.  In the early 2000s, you know, the standard phone

10  was a flip phone and, so, the industry was looking for a

11  standard way of hooking what's in the palm portion of the

12  flip phone up to the part that opens up.

13       We had to be able to send video signals to the upper

14  display across an interface.  We wanted to minimize the

15  number of wires it took to do that, so, that's what that

16  standard was all about.

17  Q.   Now, in addition to VESA, have you participated in

18  any other standards organizations or conferences that

19  pertain to displays and display technology?

20  A.   Yes.  The big one in this group is the SID

21  organization or Society for Information Display, and this

22  is a group that has, I believe, been around since the '60s.

23  And it's basically where industry employees get together

24  once a year and have an annual conference where they talk

25  about all the innovations that they've been making in the

**283**

1  previous year, and they also present papers, both written

2  and oral papers, on the kind of work they've done.

3  Q.   And have you presented papers at that conference?

4  A.   Yes, I have.

5  Q.   And in the middle it says the Americas Display

6  Engineering and Application Conference.  What is that?

7  A.   This is another organization that also has annual

8  conferences for the industry and technical people get

9  together and talk about some of the exciting work they've

10  been doing.

11  Q.   And have you presented papers or published at that

12  conference?

13  A.   Yes, I have.

14  Q.   And then in the third column it says U.S. Display

15  Consortium.  What's that about?

16  A.   This is an organization within the United States

17  whose mission was to promote the manufacture of displays

18  within the United States.

19  Q.   All right.  Mr. Lamm, while you're here to talk about

20  the '180 patent, so, why don't we start getting into that.

21       What are some pertinent facts, basic facts of the

22  '180 patent?

23  A.   Well, a few things that you typically look for first

24  on a patent, first is the title, and the title of this

25  patent is Display Unit With Communication Controller and

**284**

1 Memory for Storing Identification Number for Identifying

2 Display Unit.

3 Q. And who is the '180 patent assigned to?

4 A. The assignee on this patent is Mondis Technology Ltd.

5 Q. And what was the effective filing date of the '180

6 patent?

7 A. February 10, 1993.

8 Q. Now, the title mentions a display unit. What is a

9 display unit?

10 A. Basically, a display unit is a display that has the

11 ability to display an image, typically connected to some

12 kind of a video source, and is configured to be able to

13 receive video signals.

14 Q. Now, what kinds of things are video sources?

15 A. Video sources will be things like a computer or a

16 cable box or a DVD player or some kind of a game

17 controller, anything that you might have sitting next to

18 your television or at home.

19 Q. And you mentioned video signals. What are video

20 signals?

21 A. Video signals are the electrical representation of

22 what each of the dots that make up the screen should be set

23 to.

24 Basically, it's information that describes the color

25 and intensity or brightness of each dot.

**285**

1 In fact, if you look at the upper left-hand corner of

2 the screen, I've got what you would see if you held a

3 magnifying glass up to that, and you notice the screen is

4 made up of a bunch of little tiny dots, millions of little

5 dots and, so, the video signal is what tells each of those

6 dots what color and what brightness to become.

7 When you stand back from the TV, all those dots kind

8 of blend together and you see a nice picture.

9 Q. Now, prior to the '180 invention, were there any

10 problems in the display industry that were trying to be

11 solved that related to providing video signals to a display

12 unit?

13 A. Yes, there were. At the time display makers were

14 coming out with larger and larger displays that had higher

15 and higher resolution capability. And at the same time

16 video source makers were coming out with products that also

17 had higher and higher resolutions and capabilities and, so,

18 the trick was trying to figure out how to make the display

19 unit understand the signals coming from the video source,

20 and you can kind of relate this to a language.

21 Let's say you've got a television that only

22 understands the English language and you might have another

23 television sitting next to it that only understands the

24 Spanish language. Well, you need to be able to tell the

25 video source if you're an English display that I only want

**286**

1 to receive video signals in the English format, so, that's

2 really a description of the problem of the day.

3 Q. What are some of the things that can happen if a

4 display receives video signals that are in the wrong

5 format?

6 A. Well, there's a couple of possibilities. On the

7 bottom right of this picture you'll see a case where the

8 display unit just can't understand at all what is being

9 sent to it and so you wind up with, in this case snow or a

10 signal on the screen that might say "no signal input" or

11 something like that.

12 And on the upper display unit screen, we see a signal

13 that's not formatted correctly for the screen. In other

14 words, it is kind of stretched in one dimension, doesn't

15 fill the screen properly, and this is also an example of an

16 incompatible video signal.

17 Q. Now, does the '180 patent contemplate signal

18 compatibility issues as being a problem in the display

19 field?

20 A. Yes. There is mention in many places within the

21 patent that this was a problem that the inventors

22 recognized.

23 Q. All right. So, on the slide it appears that you have

24 an excerpt from the '180 patent which is Mondis Exhibit 1.

25 What's this excerpt saying?

**287**

1 A. Well, this excerpt is from column 4, lines 23 -- I'm

2 sorry -- 26 through 28, and it's basically an

3 acknowledgment by the inventors that one of the problems

4 that they were trying to solve was this problem of various

5 video signal specifications or what the video signal format

6 was.

7 Q. And are there other portions of the '180 spec that

8 also allude to this issue of signal compatibility?

9 A. Yes. This is from column 1, lines 35 through 40 and,

10 again, they're talking about various video signals, but in

11 this case they're talking about the position and size might

12 not be correct if the video signals inputted are not

13 correct for that particular unit. So, it's basically

14 getting compatibility in this case.

15 Q. And then finally I see a third excerpt. What's being

16 conveyed in that third excerpt?

17 A. Well, this is from column 1, lines 56 through 58,

18 where the inventors are talking about if the display

19 receives not a known signal, and this is basically an

20 incompatible video signal, so, it means that it can't put

21 up any kind of a display, so, what they were trying to

22 accomplish was receiving compatible video signals or known

23 video signals so they were able to put up a proper picture.

24 Q. Does the '180 patent provide a solution to this

25 signal compatibility problem?

1     A.  Yes, it does.

2     Q.  And can you briefly explain the '180 patent solution?

3     A.  Yes.  This is Figure 1 from the patent, and if you

4 look on the left side, you'll see a box in green and,

5 basically, this is just an acknowledgment of what a typical

6 video source might look like.

7     In this case they've labeled it a computer, but the

8 computer has a processor, a central processing unit and a

9 display controller.

10     Then on the right is what the patent calls a display

11 device or a display unit, and the boxes that are identified

12 in blue, which are 10, 11, 12, 13, 14, deflexion circuit,

13 video circuit, then item number 14 is just a symbol

14 representative of a display screen, those were all well

15 known in the industry at that time as being parts of a

16 typical monitor or television.

17     Q.  I was just going to say, I notice that you just went

18 through the blue portion.  But I see that you have two

19 boxes highlighted in yellow and what do those represent?

20     A.  These actually represent the portion of the invention

21 that goes into the display unit.

22     Q.  And on the right there's a yellow box marked "Memory

23 9."  What's the purpose of that?

24     A.  Memory 9 is basically where the, what's called

25 display unit information is stored.  These are -- this is

1 information that helps with the computer understanding what

2 compatible video signals might be.

3     Q.  And then you have the box to the left that's

4 highlighted in yellow called "communication controller."

5 What's the purpose of the communication controller?

6     A.  The communication controller is what is responsible

7 for sending the contents of the memory over to the display

8 source, which is the computer on this diagram.

9     Q.  Now, does the '180 patent provide some more

10 information about what kind of information can be stored in

11 memory 9?

12     A.  Yes, it does.

13     Q.  And is that what you have on the slide?

14     A.  Yes.  This is from column 5, lines 15 through 28 of

15 the patent, and there is text in here that's in the upper

16 box that says necessary information is all written into the

17 memory 9 in the display device.

18     Q.  And does the '180 patent go on and give particular

19 example of what that information could include?

20     A.  Yes, a couple of examples are coming forward.  One is

21 this thing called corresponding frequency range data and,

22 basically, what corresponding frequency range data is is

23 information that is stored in the memory that tells the

24 video source how to generate compatible signals.

25     Q.  And have you heard the term "timing information" in

1 the context of displays?

2     A.  Yes, extensively.  If you've ever heard the word

3 "timing information," that's basically what is being stored

4 in the corresponding frequency range fields.

5     Q.  Does the '180 patent describe other things that can

6 be stored in the memory?

7     A.  Yes.  I believe I have another slide that goes into

8 some of these.

9     Q.  And so, what else is described as being stored in the

10 memory?

11     A.  Well, there are also identification numbers, and the

12 upper passages from column 3, lines 14 through 21 of the

13 patent, and it's basically saying that the identification

14 number enables the computer to communicate with the

15 information output device, and the patent uses some

16 language from time to times.  Information output device is

17 basically the display screen and, so, what is happening

18 here is that the identification number is used to help the

19 computer figure out how to communicate with the display.

20     Q.  And then you also have a lower excerpt as well.  What

21 does that represent?

22     A.  Well, this is where the -- I'll try to read this in a

23 format that makes a little more sense.  This is column 5,

24 line 62 through 67, and it basically says the ID number

25 identifies that the display device having a communication

1 function is connected.  And in this case the communication

2 function that they're talking about is an actual video

3 format.  So, the ID number is defining what video format

4 the display is capable of receiving.

5     Q.  Now, Mr. Lamm, did you prepare an animation to help

6 explain more completely how the invention is working to

7 facilitate the signal compatibility?

8     A.  Yes, I did.  And I think this will kind of start

9 making all this very clear.

10     Okay.  What we have on the screen is a video source

11 on the left.  In this case I think it's probably a DVD

12 player.  And we have a television on the right, and they're

13 hooked up with a short cable, typically HDMI cable.

14     And this is Figure 1 from the patent so we're

15 actually drawing on the screen right now, so you can kind

16 of walk throughout where these pieces are and so I'll fill

17 this in like you've seen before.

18     On the left we have the display controller, and it

19 kind of starts this whole process.  It sends a command down

20 to the communication controller.  Communication controller

21 then sends a signal over to the communication controller in

22 the display device to go grab the memory and, so, that's

23 what's happening now.

24     The memory is being transferred back over to the

25 communication controller and then that will go back over to

**292**

1  the computer or display source, make its way up to the
2  display controller.
3      The display controller now knows what compatible
4  signals are and so it can actually properly form the video
5  so you have a nice picture on the screen.
6  Q.    Now, Mr. Lamm, do you know if there was a term in the
7  industry for the solution of the signal compatibility
8  problem that was provided by the '180 patent?
9  A.    Yes, sir. It's called Plug-N-Play.
10  Q.    And do you know if there are any industry standards
11  that implement the solution described by the '180 patent to
12  solve the problem of signal compatibility?
13  A.    Yes, there are several industry standards that deal
14  with Plug-N-Play.
15  Q.    All right. Mr. Lamm, I've pulled up your next slide.
16      THE COURT: I think what we're going to do is take a
17  break at this point, take lunch, and resume at 1:45, and
18  then you can pick up.
19      (The jury is excused.)
20      (Luncheon recess.)
21
22
23
24
25

**293**

1                  AFTERNOON SESSION
2              (In open court 1:48 p.m.)
3              (Parties present.)
4              (Jury is brought in at 1:51 p.m.)
5      THE COURT: Be seated, everybody.
6      Let's proceed.
7      MR. PLIES: Thank you, Your Honor.
8  BY MR. PLIES:
9  Q.    So, Mr. Lamm, before lunch we were talking about the
10  '180 patents and various industry standards. Do you have a
11  slide that helps explain some of the interrelationships
12  between the ''180 patent and those standards?
13  A.    Yes, I do. It's the one that you see on the screen
14  here.
15  Q.    All right. Well, starting on the right-most column,
16  we see what's labeled a "TV" and a "Video Source."
17      So can you just explain what we are seeing?
18  A.    Yes, this is what most people probably have in their
19  homes. It's a television hooked up to some kind of a video
20  source, and -- and most homes, this is probably done with
21  what's called an HDMI cable that heard numerous times
22  today.
23  Q.    Now, the HDMI that you referred to, are there any
24  requirements to implement HDMI in a display unit that are
25  governed by any industry standards?

**294**

1  A.    Yes, not surprisingly the standard is called the HDMI
2  specification, or HDMI standard.
3  Q.    And is that what you show in the third column on the
4  slide?
5  A.    Yes, it is.
6  Q.    And then to the left of that, in the second column
7  from the left, I see that you have three other documents.
8      What are those?
9  A.    These are all documents that are produced by the VESA
10  organization. We have the EDID standard, which describes
11  what goes in the memory of the display; and we have the
12  DDC, which describes the communications channel; and then
13  there's also another document called the Plug-N-Play
14  standard. And this, basically, tells somebody how to use
15  the EDID and DDC standards to accomplish the Plug-N-Play
16  capability.
17  Q.    And then in a follow after we have the Windows
18  patent. So how does that relate to things?
19  A.    Well, the technology that is described in the ''180
20  patent is incorporated in the EDID and DDC standards.
21  Q.    Do you have some additional slides to further
22  elaborate on the interrelationships between these
23  documents?
24  A.    Yes, I do.
25  Q.    And also, on the first column you have February '93.

**295**

1  I assume that's the effective filing date you referred to
2  earlier?
3  A.    Yes, it is.
4  Q.    And with respect to the VESA standards, what was the
5  relevant timeframe that those standards were being
6  published?
7  A.    The first standard that came out relating to this was
8  a standard in August of 1994. At that time the DDC and the
9  EDID standard were actually in just one document they
10  called the DDC standard. Later versions split those into
11  two different documents.
12  Q.    All right. So which standard would you like to
13  tackle first?
14  A.    Let's go to the HDMI standard.
15  Q.    All right.
16      MR. PLIES: Your Honor, I'd like to admit and publish
17  a Mondis Exhibit 0516, which has been pre-admitted.
18      THE COURT: So admitted.
19      (Exhibit Number MON-0516 is received in evidence.)
20      MR. PLIES: Thank you.
21  BY MR. PLIES:
22  Q.    All right. So, Mr. Lamm, what are we seeing here on
23  slide 24?
24  A.    This is the cover sheet for the -- what's called the
25  High-Definition Multimedia Interface specification. And if

Appx15076

296

1 you make that into an acronym, it's HDMI.

2      And this standard defines a couple of things.  It

3 defines the cable that is necessary for this HDMI

4 interface, and it also -- one of the other things it does

5 is describe the -- what needs to be placed in the

6 televisions to be able to be compatible with this interface

7 standard.

8      Q.   Do you know if Hitachi was involved in generation of

9 the HDMI standard?

10     A.   Yes, it was.  They are listed on the cover page of

11 this document as being one of the companies responsible for

12 contributing to this.

13     Q.   Does the HDMI specification require the

14 implementation of any VESA standards?

15     A.   Yes.  The HDMI specification actually calls out two

16 particular VESA standards by name.  And if you look on the

17 lower left, you will see it's actually calling out a

18 specific version of the VESA EDID standard, and it's also

19 calling out a specific version of the VESA E-DDC standard.

20     Q.   And what do we see in the excerpt from the HDMI

21 specification on the right-hand side?

22     A.   Well, there are a couple phrases here that are

23 important.  The top highlighted phrase says:  All sinks --

24 and in this case the word "sink" means display device.  The

25 HDMI specification uses sources and sinks as being the

297

1 video source and the display.

2      So basically this reads:  All displays shall contain

3 a compliant E-EDID data structure accessible through the

4 DDC.

5      Q.   And are those references to the VESA standards?

6      A.   Yes, they are.

7      Q.   And what is the purpose of HDMI citing and requiring

8 implementation of the VESA, EDID and DDC standards?

9      A.   Well, the purpose that is stated is:  The source is

10 responsible for any format conversions that may be

11 necessary to supply audio and video in an understandable

12 form to the sync, or to the display.

13     Q.   And so in sum, is this putting together the EDID and

14 DDC standards to achieve signal compatibility?

15     A.   Yes, it is.

16     Q.   And does the HDMI specification require any

17 particular EDID data structure or format to be stored?

18     A.   Yes.  The EDID version of the structure that is

19 required is version 1.3.

20     Q.   All right.  So, Mr. Lamm, circling back to our sort

21 of overview slide, which standard would you like to address

22 next?

23     A.   Let's go to the DDC standard.

24          MR. PLIES:  Your Honor, with your permission, I would

25 like to publish Exhibit MON-0507, which has been

298

1 pre-admitted.

2          THE COURT:  It's admitted.

3          (Exhibit Number MON-0507 is received in evidence.)

4 BY MR. PLIES:

5      Q.   All right.  So, Mr. Lamm, can you explain what we are

6 seeing here on slide 507 with respect to the DDC standard?

7      A.   Yes.  First thing to note is the full name of the

8 standard is the Enhanced Display Data Channel standard.

9 But, again, we just call it DDC for short.

10          And the purpose of the standard is:  To define a

11 communications channel between an electronic display; i.e.,

12 CRT, LCD, et cetera, displays, and a host system.  The

13 channel may be used to carry configuration information to

14 enable PnP and allow optimum use of the delays.

15 BY MR. PLIES:

16     Q.   How does that relate to the '180 invention?

17     A.   This describes the -- what the communications

18 controller does in communicating the EDID data back over to

19 the video source.

20     Q.   And, Mr. Lamm, did you have any personal involvement

21 in the preparation of any versions or revisions of the VESA

22 EDID standard?

23     A.   Yes.  I participated in one of the versions of the

24 standard as a contributor.  The way VESA does documents,

25 toward the beginning of the document they put an

299

1 acknowledgment section, and this acknowledges the people

2 that helped write a particular version.

3      Q.   And this particular version was published when?

4      A.   This one is -- I believe it's 2004.

5      Q.   Mr. Lamm, do you know if Hitachi had played any role

6 in creating versions or revisions of the VESA E-DDC

7 standard?

8      A.   Yes, they were members during the time that several

9 of the E-DDC standards were being done.  I know that

10 Hitachi was a contributing member while I was there.

11     Q.   And on slide 29, this is an excerpt from the E-DDC

12 standard up in the front.

13          And what is this passage explaining?

14     A.   Well, one of the other things that we did when

15 creating standards was to send out a notice to all of the

16 member companies and to the community, in general, saying,

17 if you've got intellectual property, in other words,

18 patents, that might be patenting something that's inside

19 one of these standards, we'd like to know about it.

20          And so there's a passage in each of the standards

21 that VESA produces that says what the results of this call

22 for intellectual property return.  And in this case, Dell,

23 IBM, Hitachi, and Philips Semiconductor respond in saying,

24 we've -- we have an intellectual property that might be

25 incorporated in this standard.

**300**

1  Q.   In what products was the VESA DDC first implemented?

2  A.   Well, it was first implemented in the -- what we call

3  the VGA connector, and that's used primarily by computer

4  monitors.

5  Q.   And approximately what timeframe are we talking

6  about?

7  A.   This is mid-1990s.

8  Q.   And what are you depicting here on slide 30 in the

9  left-hand column?

10  A.   Well, this is an actual photograph of the -- I

11  believe it's the end of a cable.  It's a VGA cable.  One of

12  the parts in the standard is actually the fact that the

13  connector was blue in color to help identify it, make it

14  easier for the user to use.

15  Q.   Now, you have a table up above the connector with a

16  couple of highlighted rows.

17       What do those represent?

18  A.   These are the actual display data channel pins in the

19  connector.  Pin number 12 and pin number 15 form the what's

20  called the display data channel.

21  Q.   Now, would a computer monitor have a port to receive

22  that cable?

23  A.   Yes, it does.

24  Q.   And do you know if that port would have pins that

25  would connect to those DDC channel lines in the cable?

**301**

1  A.   Yes.

2  Q.   And in the middle column, on slide 30, we see a

3  picture labeled "Back of the TVs."

4       What are you depicting there?

5  A.   Well, this is showing that televisions also began

6  incorporating the VGA connector on the back of the

7  televisions as an internal -- I'm sorry, as an input port.

8  Q.   At approximately what timeframe was that occurring

9  in?

10  A.   It basically occurred about the same time as we

11  started getting high-definition televisions, which is, I am

12  going to say, approximately the year 2000.

13  Q.   Has the industry since moved on to any new

14  connectors?

15  A.   Yes, sir.  In the early 2000s, there was a move to be

16  able to provide the same kind of capability that we saw in

17  the VGA connector but in a digital form.  The VGA connector

18  had analogue video, and the -- we wanted to move toward a

19  digital interface.

20       And so the -- what you're actually seeing on the

21  right is an HDMI connection, and this is the digital

22  connection.

23  Q.   Does the HDMI also include that same VESA DDC data

24  channel?

25  A.   Yes, it does.  It's defined in two pins, pin 15 and

**302**

1  pin 16 of this cable.

2       If you notice, they are labeled "SCL" and "SDA" just

3  like they were on the VGA connector.  And the interface

4  that is used on this is the exact same display data

5  channel, or DDC.

6  Q.   So what types of products did the HDMI connector end

7  up being integrated into?

8  A.   Well, it began -- it really was focused on

9  televisions.  One of the things that occurs that HDMI added

10  was audio capability that was not present on the VGA

11  connector.

12       So televisions really made use of the audio channel

13  and the digital video.

14  Q.   Do monitors also use HDMI?

15  A.   Yes.  I would say most monitors probably also have

16  HDMI connection these days, but every television has them.

17  Q.   Turning back to overview slide, which of the VESA

18  standards would you like to address next?

19  A.   Let's go to the EDID standard.

20       MR. PLIES:  And, Your Honor, may I please publish

21  Exhibit MON-0509, which has been pre-admitted?

22       THE COURT:  Yes, admitted into evidence.  You may

23  publish it.

24       (Exhibit Number MON0-0509 is received in evidence.)

25  BY MR. PLIES:

**303**

1  Q.   So, Mr. Lamm, what are some of the pertinent facts

2  about the VESA EDID standard?

3  A.   Well, first off, the name of the standard, you know,

4  when you've created several different versions, you get a

5  little creative on the names.  So this is called the

6  Enhanced Extended Display Identification Data standard.

7  And the purpose is stated as being:  Standard defines data

8  formats to carry configuration information, allowing

9  optimum use of displays.

10  Q.   Do people sometimes use the terms E-EDID and EDID

11  interchangeably?

12  A.   Yes, absolutely.

13  Q.   And does the EDID standard describe the types of

14  configuration information that a display can include?

15  A.   Yes, it does.

16  Q.   And where is that located?

17  A.   You are going to hear a lot of references this

18  afternoon to Table 3.1, and this is the actual table within

19  the EDID standard that starts defining what each of the

20  bytes in the EDID represent.

21  Q.   And what are some examples of the kinds of

22  information that can be included in the EDID data?

23  A.   Well, there are fields for identifying the vendor and

24  product information, there are fields for basic display

25  parameters and features, and there are also color

Appx15078

304

1 characteristics. And then there are also established
2 timings.
3    Q.    How does the VESA EDID standard relate to the '180
4 invention?
5    A.    The EDID data table, if you add up all the bytes that
6 are defined in this table, it's 128-byte-long table, and
7 this data is what's actually stored in the memory of the
8 display device. And if you remember from Figure 1 of the
9 patent, we showed that memory number nine, in yellow, and
10 that's what's actually going into this memory.
11    MR. PLIES: Your Honor, I move to publish
12 Exhibit MON-0506 which has been pre-admitted.
13    THE COURT: It's admitted, and you may publish it.
14    (Exhibit Number MON-0506 is received in evidence.)
15 BY MR. PLIES:
16    Q.    Mr. Lamm, did you play any role in the development of
17 any versions or revisions of the EDID standard?
18    A.    Yes. While I participated in VESA, I participated on
19 one of the versions of the EDID standard.
20    Q.    While you were there, do you know if Hitachi was also
21 participating?
22    A.    Hitachi was participating but were not a named
23 contributor to this version. But they were a named
24 contributor to the previous version, and so their name also
25 appears on this page.

305

1    Q.    Turning back to our overview slide, we next have a
2 document highlighted "PnP." Remind us what PnP is?
3    A.    PnP stands for Plug-N-Play and this is a standard
4 that VESA produced that basically was a -- kind of road map
5 for how to use the EDID and DDC channels to accomplish the
6 Plug-N-Play technology, which is what they really wanted to
7 be able to do.
8    MR. PLIES: Your Honor, may I publish
9 Exhibit MON-0505, which has been pre-admitted?
10    THE COURT: Yes, it's admitted into evidence and you
11 may publish it.
12    (Exhibit Number MON-0505 is received in evidence.)
13 BY MR. PLIES:
14    Q.    All right. And so what are some of the pertinent
15 facts of the VESA Plug-N-Play standard?
16    A.    Well, the -- this document was published June 7,
17 2004, and the title kind of says it all. PnP means plug it
18 in, turn it on and it works.
19    Q.    Does the VESA Plug-N-Play standard require
20 implementation of the VESA EDID standard?
21    A.    Yes, it does.
22    Q.    And how do you know that?
23    A.    Two places.
24    Down at the very bottom of this slide, this is from
25 the -- what's called the norm of reference section, or the

306

1 included documents section. And so this document is
2 actually calling out a specific version and revision of the
3 DDC standard and also a particular version of the EDID
4 standard.
5    Q.    And does the VESA Plug-N-Play standard require
6 implementation of the VESA E-DDC standard?
7    A.    Yes, it does.
8    Q.    And you also have some excerpts up here on the
9 left-hand side of slide 37.
10    What are those explaining?
11    A.    These are just toward the beginning of the document
12 where it's calling out the requirements or the elements
13 required to support Plug-N-Play.
14    And the two pieces that are highlighted, the upper
15 piece in kind of a blue color is talking about the EDID
16 data stored in a Plug-N-Play-compatible monitor. And then
17 the yellow box is talking about the display -- I'm sorry --
18 the data communications channel or display data channel.
19 And we have highlighted them with the same colors that
20 match what Figure 1 of the "180 patent describes.
21    Q.    All right. Mr. Lamm, you discussed each of the
22 standards. Can you summarize how the '180 patent relates,
23 then, to a TV that implements HDMI capability?
24    A.    Well, the '180 patent describes some technology for
25 Plug-N-Play, and it basically describes a memory and a

307

1 communications channel. And those have been standardized
2 by the VESA organization into the DDC and the EDID
3 standards.
4    Those two standards were incorporated into the HDMI
5 standard, and modern televisions implement the HDMI
6 standard.
7    And so that's how we get the '180 patent into
8 televisions of today.
9    Q.    Mr. Lamm, when you were at VESA, was LG a member of
10 VESA?
11    A.    I believe they were a member, yes.
12    Q.    To your knowledge, when you were there, did they
13 participate in the development of any of these standards?
14    A.    I do not believe they participated in any of the work
15 groups for developing standards.
16    Q.    Was it common for companies to be members of VESA but
17 not participate in the standards development?
18    A.    Yes, it was actually fairly common. A lot of
19 companies will become members for various reasons.
20 Probably one of the best reasons is just to get access and
21 potentially early access to the standards as they are
22 produced.
23    Q.    All right. Why don't we switch gears a little bit,
24 Mr. Lamm, and start talking a little bit more about the
25 accused products in this case.

308

1   **A.  Okay.**

2   Q.  And what are the accused products?

3   **A.  The accused products in this case are 630 models of**

4  **LG televisions.**

5   Q.  Now, have you listed somewhere all the different

6  accused television LG models?

7   **A.  Yes, I have.  I have a spreadsheet that starts**

8  **identifying those.**

9      MR. PLIES:  Your Honor, if I may publish and admit

10  Exhibit MON-0258, which has been pre-admitted?

11      THE COURT:  It's admitted into evidence, and you may

12  publish it.

13      (Exhibit Number MON-0258 is received in evidence.)

14  BY MR. PLIES:

15   Q.  Is this what you're referring to, Mr. Lamm?

16   **A.  Yes, it is.**

17   Q.  All right.  And what do we have here on MON-0258?

18   **A.  This is a list of all of the models of LG televisions**

19  **that are being accused of infringement in this case.**

20   Q.  And over approximately what time period were these

21  models sold in the U.S.?

22   **A.  Approximately the 19- -- I'm sorry, 2009 through 2014**

23  **time period.**

24   Q.  And where did the list of the LG TV models come from?

25   **A.  The list came from LG as a response to a discovery**

309

1  request.

2   Q.  All right, Mr. Lamm, and what are we showing here on

3  slide 42?

4   **A.  This is the actual accused feature of the television,**

5  **and it's basically the Plug-N-Play capability.**

6   Q.  All right.  And is the Plug-N-Play capability

7  associated with any particular features of the television?

8   **A.  Yes, it is.  The HDMI input ports implement**

9  **Plug-N-Play.  And also, the VGA input ports implement**

10  **Plug-N-Play capability.**

11      MR. PLIES:  Your Honor, if I have permission to admit

12  and publish Exhibit MON-0756 which has been pre-admitted?

13      THE COURT:  Yes, you do, and it's admitted into

14  evidence.

15      (Exhibit Number MON-0756 is received in evidence.)

16  BY MR. PLIES:

17   Q.  Mr. Lamm, does any of LG's technical documents refer

18  to the Plug-N-Play capability of their televisions?

19   **A.  Yes.  The -- most of the service manuals have a**

20  **particular paragraph in them that is highlighted in the**

21  **bottom there, and I will read portions of it.**

22      **It says:  It is a VESA regulation, a PC or a MNT will**

23  **display an optimal resolution through information sharing**

24  **without any necessity of user input.  It is the realization**

25  **of Plug-N-Play.**

310

1   Q.  Now, in preparation for generating your opinions in

2  this case, did you review industry standard documents?

3   **A.  Yes.**

4   Q.  And I think you've probably talked about these quite

5  a bit already, but if you could, just for the record, note

6  what kind of standards you reviewed?

7   **A.  Yes.  There were four primary industry standard**

8  **documents that I reviewed, and they won't be new names to**

9  **you.  They are the Plug-N-Play standard, the E-EDID**

10  **standard, the E-DDC standard, and the HDMI specification.**

11   Q.  And, Mr. Lamm, I think you referred to this a little

12  bit earlier, but in some cases there are several versions

13  and revisions of some of these standards.  Is that correct?

14   **A.  That is correct.**

15   Q.  And have you reviewed other versions and revisions of

16  these standards?

17   **A.  Yes, I have.**

18   Q.  And do any of the differences between those versions

19  and revisions affect your infringement opinions in this

20  case?

21   **A.  No, they do not.**

22      MR. PLIES:  Your Honor, with your permission, I would

23  like to admit and publish Exhibits MON-0793, 0663, and 0427

24  as having been pre-admitted.

25      THE COURT:  All right.  They've already been --

311

1      MR. PLIES:  Yes.

2      THE COURT:  They are admitted into evidence.

3      (Exhibit Number MON-0793 is received in evidence.)

4      (Exhibit Number MON-0663 is received in evidence.)

5      (Exhibit Number MON-0427 is received in evidence.)

6  BY MR. PLIES:

7   Q.  Mr. Lamm, did you review some technical documents

8  provided by LG in this case?

9   **A.  Yes, I did.**

10   Q.  What sort of documents did you review?

11   **A.  Well, three main sorts of documents that LG produced**

12  **in this case.**

13      **One of my primary sources for information came from**

14  **the television service manuals.  And the service manuals**

15  **are basically manuals that LG factory personnel and/or**

16  **field service personnel might have at their disposal that**

17  **would tell them a lot of the technical details about what**

18  **is happening inside the television.**

19      **The next major group of manuals I looked at were**

20  **owners' manuals.  And these are the manuals that get**

21  **shipped with every television and probably get left in the**

22  **box and never opened, but, nevertheless, there is valuable**

23  **information in the owners' manuals.**

24      **And thirdly were the actual chip specifications.  So**

25  **there are some components on the circuit boards that**

1  perform a lot of processing functions, and I needed to be
2  able to know what functions were being done in which chips.
3      Q.   Were you able to review LG documentation for each of
4  the 630 accused products?
5      A.   Yes, I was.
6          MR. PLIES:  Your Honor, may I admit and publish
7  Exhibit MON-0259, which has been pre-admitted?
8          THE COURT:  You may, and it's admitted into evidence.
9          (Exhibit Number MON-0259 is received in evidence.)
10 BY MR. PLIES:
11     Q.   All right.  So, Mr. Lamm, on slide 45 there appears
12 to be a very dense and basically illegible spreadsheet.
13         Can you explain what we are seeing on this?
14     A.   Yes.  This is basically where I went through all the
15 manuals and picked out certain things that I was looking
16 for to help me form an opinion whether the products
17 infringe the patent or not.
18         We call it the "Spreadsheet of Documentary Evidence."
19     Q.   Can you give some examples of what sort of
20 information was recorded in the spreadsheet?
21     A.   Yes.  Along the left-hand column is the model number
22 of the television.  So basically there are 630 rows since
23 there are 630 accused products.
24         And then as we look in some of the other columns, we
25 have things that I was looking for, such as, does the

1  television have an HDMI port?  And so the answer to that
2  question was either yes or no.
3          And the next column is what's called "HDMI Port
4  Bates."  And Bates is basically just a legal term for page
5  number.  So every page of every document that is in this --
6  involved in this case has a unique page number.  And so
7  this is -- these are page numbers probably from a service
8  manual that LG provided.
9      Q.   What are some other examples of information you look
10 for?
11     A.   I was looking for, for instance, whether I could
12 identify the memory in which the EDID data was stored in.
13         And this next column, "HDMI EDID Table," the service
14 manuals typically provided a table of exactly what the
15 128 bytes in the EDID data structure was populated with.
16 And so this is a documentation of where I found that in
17 the -- in the service manuals.
18     Q.   So, Mr. Lamm, with 630 products in those columns, do
19 you know how many individual cells of information you
20 looked for?
21     A.   There were 27 columns identifying features that I was
22 looking for.
23     Q.   And were you -- is every cell on the spreadsheet
24 populated?
25     A.   There are a few cells that don't have an entry.

1      Q.   What's the reasons for that?
2      A.   Two primary reasons for that.  One is if we did not
3  -- or if I did not get a service manual on a particular
4  product, I couldn't fill in some of the cells.  And then on
5  other cases, the documentation that I did receive was
6  illegible.
7          And so that -- that was a reason for some of the
8  cells not being filled in.
9      Q.   And who was providing the documentation?
10     A.   LG was providing the documentation.
11     Q.   Okay.  Does -- in the cases where some of the cells
12 aren't filled in, does that affect any of your opinions at
13 all in this case?
14     A.   No, because the primary, or one of the -- the primary
15 things is whether they -- the televisions follow the
16 requirements of the HDMI input, which requires EDID and
17 DDC -- I'm sorry, it requires the HDMI standard which
18 requires EDID and DDC, and we've seen how that chain works.
19         Also, the new VGA input ports also have Plug-N-Play
20 built into them.
21     Q.   And in this case, how many of the 630 accused models
22 had HDMI ports?
23     A.   All of them.
24         And if you remember, before I came on the stand one
25 of the lawyers got up and said that one of the things that

1  LG admitted was that every model of accused television has
2  an HDMI port.
3      Q.   In addition to reviewing standards and LG technical
4  documentation, did you do anything else in preparing your
5  opinions?
6      A.   Yes.  I also obtained a few samples of LG products
7  and performed laboratory testing on them.
8      Q.   And what do we see on this slide in 47?
9      A.   This is an LG television that is being hooked up to a
10 personal computer running some software that extracts the
11 EDID out of the unit.  In this case, I was also looking at
12 the actual signals on one of the DDC pins.
13     Q.   Were your results put into any test reports?
14     A.   Yes, I did produce test reports on all the units that
15 I -- where I tested physical samples.
16     Q.   And were your test results consistent with how LG's
17 technical documentation says the accused products should
18 operate?
19     A.   Yes, it was.
20     Q.   And were your test results consistent with how the
21 VESA and HDMI standards indicate how the accused product
22 should operate?
23     A.   Yes, they were.
24         MR. PLIES:  Your Honor, if I may admit and publish
25 Exhibit MON-0262?

**316**

1    THE COURT: You may. It's admitted into evidence.

2    MR. PLIES: It's been pre-admitted.

3    (Exhibit Number MON-0262 is received in evidence.)

4    BY MR. PLIES:

5    Q.   Okay. So starting to talk a little more detail about

6    the accused products, what are we seeing here on slide 48?

7    A.   **This slide identifies some of the elements on the**

8    **actual circuit board. And I have a -- have that exact same**

9    **circuit board in my hand.**

10    **And so it identifies where some of the, for instance,**

11    **the HDMI ports, some of the video processing is done where**

12    **the EDID EEPROMs are located and so forth.**

13    MR. PLIES: Your Honor, without objection, may he

14    continue to show the demonstrative to the jury?

15    THE COURT: Sure.

16    BY MR. PLIES:

17    Q.   And, Mr. Lamm, so is the board that you are holding,

18    is that the same one that's on the picture on the

19    projector?

20    A.   **Yes, it is.**

21    Q.   And is this one of the circuit boards from an LG TV

22    that you tested?

23    A.   **Yes, it is.**

24    Q.   Okay. And on the screen at the top, we have sort of

25    a black-looking square going to what is called a SoC.

**317**

1    What does SoC stand for?

2    A.   **SoC stands for System on Chip. And this is the**

3    **primary place where video processing is done on the board.**

4    Q.   Okay. And below SoC on the left, we have sort of a

5    red box labeled "HDMI Port" and an arrow.

6    So what is that pointing to?

7    A.   **This is pointing to the actual VGA connector that's**

8    **on the board, and this -- when the case is installed over**

9    **these, this connector shows through the case and you can**

10    **plug a cable into it.**

11    Q.   Does that connector receive any types of signals?

12    A.   **It receives analogue video signals from the video**

13    **source.**

14    Q.   And what happens to those analogue video signals from

15    the video source after they've been received by that VGA

16    port?

17    A.   **Well, you may be able to see it on the picture up**

18    **there. There are actually very tiny, little, fine wires**

19    **that are embedded in the circuit board, and they travel**

20    **from the VGA connector up to the SoC for processing.**

21    Q.   And then going to the bottom, you have sort of a

22    yellow/green box that has an arrow that says "HDMI Ports."

23    What is that pointing to?

24    A.   **These are pointing to two of the HDMI ports on this**

25    **circuit board.**

**318**

1    Q.   And what types of signals do the HDMI ports receive?

2    A.   **These are receiving digital video signals.**

3    Q.   And after the digital video signals are input to

4    those

5    ports, where do they go?

6    A.   **They also proceed up to the SoC for video processing**

7    **there.**

8    Q.   After the SoC has processed the video, what does it

9    do with it?

10    A.   **The SoC does a lot of various processing functions,**

11    **like scaling and color corrections, enhancements to the**

12    **signals.**

13    **And once it's done with its job, then it comes up to**

14    **one of these output connectors where it's actually**

15    **connected to the LCD panel.**

16    Q.   And, Mr. Lamm, on the left-hand side of slide 48, you

17    have sort of an orange box. At the top it says "EDID

18    EEPROMs."

19    What is that pointing to?

20    A.   **These are the actual memories that house the EDID**

21    **data. And in these cases, these particular EDID EEPROMs**

22    **also had the communications controller built into them.**

23    **It's basically one integrated circuit that includes both**

24    **functions in there. I can --**

25    Q.   And how many EDID EEPROMs are there?

**319**

1    A.   **Well, there's actually three that we've identified on**

2    **this board because you can see the connectors. There's**

3    **actually one more connector on the side over here, and**

4    **there's an EDID EEPROM for that input port also.**

5    **It's not identified on the picture on the screen.**

6    Q.   So is there an EDID EEPROM chip associated with each

7    of the video inputs?

8    A.   **Yes, there is.**

9    Q.   Do all of the accused products have SoCs?

10    A.   **Yes, they do.**

11    Q.   And do all of the accused televisions have the

12    EDID EEPROM chips?

13    A.   **In one form or another, yes.**

14    Q.   Now, is the circuit board that is being shown in

15    Mondis 0262, the one you're holding as a demonstrative, is

16    that representative of the circuit boards in the accused

17    products?

18    A.   **Yes, it is.**

19    Q.   All right, Mr. Lamm, why don't we turn to more

20    details about your infringement opinions.

21    First, what is your understanding of the standard to

22    show that the accused products infringe the '180 patent?

23    A.   **The standard is that every claim requirement is**

24    **literally present in the accused TVs.**

25    Q.   And how did you interpret the meaning of the claim

Appx15082

**320**

1 language when you were comparing it to the accused
2 products?
3    **A.** **Well, the Court in this case has offered an opinion**
4 **of certain -- I'm sorry -- has offered a definition of what**
5 **certain terms in the claims mean. And for those claims**
6 **where the Court has provided a definition, I've used the**
7 **Court's definition.**
8    **For the other terms in the claims, I use what's**
9 **called the ordinary meaning to a person, to a person**
10 **holding ordinary skill in the art as of the date of the**
11 **patent filing, which was February 1993.**
12    **Q.** And do you have an opinion as to what level of skill
13 and experience a person of ordinary skill would have in
14 February of '93?
15    **A.** **Yes, the standard that I've applied here is that the**
16 **person would hold a bachelor's degree in electrical**
17 **engineering, plus two to four years of experience,**
18 **engineering experience, with display or communication**
19 **systems or equivalent education and experience.**
20    **Q.** And what was your level based on?
21    **A.** **My level was based on during this timeframe I had the**
22 **opportunity to hire a number of engineers and work with**
23 **other engineers, and so I knew basically what I expected**
24 **those engineers to understand and comprehend with this**
25 **level of experience. And I thought that this was an**

**321**

1 **appropriate level for somebody that could really understand**
2 **what was going on here.**
3    **Q.** And did you yourself have at least this level of
4 skill as of February 1993?
5    **A.** **Yes. I had a bachelor's degree in electrical**
6 **engineering, and I also had about 16 years experience by**
7 **this time.**
8    **Q.** All right, Mr. Lamm, we are looking at Claim 14 of
9 the '180 patent. Do you understand this to be one of the
10 asserted claims in this case?
11    **A.** **Yes, it is.**
12    **Q.** And on slide 52, we have what looks like a table or
13 chart.
14    What is slide 52?
15    **A.** **Table -- I'm sorry, Page 52 here is what's called a**
16 **claim chart. And we've basically broken the patent claim**
17 **into a number of different elements so that it is**
18 **convenient to talk about them one by one.**
19    **And then there are a couple more columns where we**
20 **provide -- where we've identified certain features and**
21 **whether those features were present.**
22    **Q.** All right. So, Mr. Lamm, are you prepared to go
23 through each of these claim elements of Claim 14 one by
24 one?
25    **A.** **Yes.**

**322**

1    **Q.** Mr. Lamm, let's take the preamble, or the first
2 portion of Claim 14, which reads: A display unit for
3 displaying an image based on video signals inputted from an
4 externally connected video source.
5    Do you see that?
6    **A.** **I do.**
7    **Q.** And the claim begins with the term "Display unit."
8    Do you see that?
9    **A.** **I do.**
10    **Q.** Do you recall Mr. McKeon during opening pointing to a
11 CRT display at counsel table?
12    **A.** **Yes.**
13    **Q.** What are CRT displays?
14    **A.** **CRTs are a technology that has been around for a**
15 **number of years, and it basically -- CRT stands for cathode**
16 **ray tube. And it's basically a big hunk of glass that**
17 **forms kind of a bottle, and there's an electron gun at one**
18 **end and a phosphor at the other end, and as that electron**
19 **gun imparts energy into the phosphor, the phosphor lights**
20 **up and you get a picture.**
21    **Q.** Now, looking at Claim 14, is there anything in the
22 claim saying that the display unit must be a CRT?
23    **A.** **No, there is nothing there.**
24    **Q.** Does the word "CRT" even appear in the claim
25 anywhere?

**323**

1    **A.** **No, it does not.**
2    **Q.** Did the Court construe Claim 14 to be limited to only
3 CRTs?
4    **A.** **No, it didn't.**
5    **Q.** Does the '180 patent disclose other types of displays
6 besides CRTs?
7    **A.** **The patent also discloses LCD displays.**
8    **Q.** Do the accused LG televisions have display screens?
9    **A.** **Yes, they do.**
10    **Q.** And what type are they?
11    **A.** **Most of the accused products are what's called the**
12 **liquid crystal display technology. There are a few units**
13 **that are what's called plasma display panel, or plasma**
14 **technology.**
15    **Q.** Now, are the accused LG televisions considered to be
16 display units?
17    **A.** **Yes, they are.**
18    **Q.** And how do you know?
19    **A.** **Well, a display unit is a screen that lights up for**
20 **displaying something. And the other hint that is in this**
21 **paragraph is that it's connected to an externally connected**
22 **video source.**
23    **And so those two things together kind of tell me that**
24 **a display unit -- I mean, a television can certainly be a**
25 **display unit.**

**324**

1  Q.  Have you seen anything in LG's documentation that
2  confirms your opinion?
3  A.  Yes.  LG's own owners' manuals also talk about using
4  the term "TV" and "display" in the same manner.  For
5  instance, this is a paragraph in an owner's manual that
6  says:  Positioning your display, indicating that LG thought
7  of televisions as being a type of display.
8  Q.  And you are referring to Exhibit MON-0663?
9  A.  Yes.
10  Q.  Do the LG TVs have input ports for inputting video
11  signals from an external source?
12  A.  Yes.  The owners' manuals go into detail about how to
13  hook up one of their televisions to an external HDMI
14  source.  So if you notice what's happening here, we -- they
15  show hooking up either the HDMI port 1 or HDMI port 2 to a
16  HDMI output of some kind of a video source.
17  Q.  All right.  And so what we are seeing on slide 56
18  right now is the HDMI connection, correct?
19  A.  That's correct.
20  Q.  And I think you testified earlier, all the LG
21  products have the HDMI, correct?
22  A.  Yes.
23  Q.  And is there another type of input connection that
24  many of the accused products have?
25  A.  Yes.  As we have been talking about, the -- many of

**325**

1  the products also have a VGA connection on them.
2  Q.  How many of the accused TV models have an VGA input
3  port?
4  A.  I believe I counted up about 89 percent of the
5  360 units -- I'm sorry -- 630 units also have VGA
6  connections.
7  Q.  Is there somewhere that indicates which of the 630
8  models have VGA ports in addition to the HDMI ports?
9  A.  The spreadsheet of documentary evidence
10  identifies whether a particular model has a VGA port also.
11  Q.  And are you referring to Mondis Exhibit 0259?
12  A.  Yes.
13  Q.  And then with respect to your opinion that
14  televisions are considered to be display units, did you see
15  any prior art or other patents that kind of use those
16  terminologies synonymously?
17  A.  Yes, I did.
18  Q.  And what do we see here on slide 55?
19  A.  This is a patent that came out in the similar kind of
20  timeframe, whereas basically describing a display unit such
21  as a common television, colloquially referred to as a TV.
22  And this was just a general use of the term.
23  Q.  All right.  So, Mr. Lamm, coming back to our claim
24  chart, have you been able to form an opinion as to whether
25  the accused televisions are display units for displaying an

**326**

1  image based on video signals inputted from an externally
2  connected video source?
3  A.  Yes.  Well, basically the evidence is that a TV is a
4  display unit, and a TV has HDMI/VGA inputs for connecting
5  to an externally connected video source.
6  So, yes, the LG accused products in this case all
7  meet this claim requirement.
8  Q.  And because that -- is it okay if I put a checkmark
9  at the end of row indicating that that requirement is met?
10  A.  Yes.
11  Q.  Okay.  Let's turn, then, to the next requirement.
12  And we see it reads:  A video circuit adapted to
13  display an image based on the video signals sent by the
14  externally connected video source?
15  Have you performed an investigation to see if the
16  accused LG televisions meet that claim requirement?
17  A.  Yes, I have.
18  MR. PLIES:  Your Honor, if I could admit and publish
19  Exhibit MON-0490, which has been pre-admitted?
20  THE COURT:  It's admitted into evidence, and you may
21  publish it.
22  (Exhibit Number MON-0490 is received in evidence.)
23  BY MR. PLIES:
24  Q.  All right.  So, Mr. Lamm, it looks like we are
25  looking at a service manual on slide 59.

**327**

1  Can you explain what we are seeing?
2  A.  Yes.  Well, if you remember from the circuit diagram,
3  we have this large chip up at the top called the SoC.  And
4  the service manual has a page that's typical of all of the
5  service manuals where they kind of, in block diagram form,
6  show how some of the internal circuitry is hooked up.
7  And so the large vertical bar in the middle is
8  representative of the functions that are going on within
9  the SoC.
10  Q.  Do you know if the SoC contains electronic circuitry?
11  A.  Yes.  These are pretty massive, integrated circuits.
12  They have millions of transistors in them, and they are
13  performing all kinds of video processing functions.
14  So, yes, they have video circuits in them.
15  Q.  And does the video circuitry receive video signals
16  inputted from the externally connected video source?
17  A.  Yes.  If you notice on the block diagram, there is a
18  connection directly from the VGA port right into this SoC,
19  and there are also connections coming from the HDMI input
20  right over into the SoC.  And these are the -- where you
21  would hook up the external video source.
22  Q.  Now, is the video circuitry in the SoC adapted to
23  display an image based on the inputted video signals?
24  A.  Yes, it is.  It is taking the video input signals and
25  doing various processing steps, such as scaling, doing

**328**

1  conversion functions to get the signal ready to be put out
2  to the LCD module or the -- whatever the display panel is.
3     Q.   And what does the SoC do with the video signals after
4  they have been processed?
5     A.   If you look up on the upper right, it's maybe a
6  little hard to read, but it's -- there's an interface there
7  called the "LVDS interface."  And this stands for
8  low-voltage differential signaling.  And it's the common
9  technique that is used to convey the video signals over to
10  the LCD module.
11     Q.   And what happens to them when they reach the LCD
12  module?
13     A.   They are put on to -- well, they basically light up
14  all the various dots on the screen so that we can see a
15  nice picture on the front of the screen.
16     Q.   Now, would a television that has HDMI ports
17  necessarily possess a video circuit that's adapted to
18  display an image based on video signals inputted from an
19  externally connected video source?
20     A.   Yes.  The video signal format that exists on either
21  the HDMI bus or the VGA input port can't be used directly
22  by the LCD panels.  They have to be converted.
23        You know, the video information, I think I remember
24  describing to you earlier, is basically an electrical
25  representation for what each of the dots on the screen are

**329**

1  lit up to, but there is a lot of steps involved in getting
2  to that point.  And so the SoC is the piece that is doing
3  that, or doing most of that function.
4     Q.   And so, similarly, if you had a display unit that
5  implemented the VESA Plug-N-Play standard, would such a
6  display necessarily need to have the video circuit adapted
7  to display an image based on video signals inputted from an
8  externally connected source?
9     A.   Yes.
10     Q.   So turning back to the video circuit on the claim
11  chart, have you been able to form an opinion as to whether
12  the video circuit limitations have been met?
13     A.   Yes.  In summary, the SoC includes a video circuit,
14  and the video circuit outputs the image to the screen so
15  both of those requirements are met in the accused products.
16     Q.   So is it okay, then, if I put a checkmark in the
17  third column indicating that all the accused products have
18  the video circuit adapted to display an image based on the
19  video signals sent by the externally connected video
20  source?
21     A.   Yes.
22     Q.   Let's turn to the next claim element.
23        Now, this one is fairly lengthy, so I understand that
24  you have broken it up into a few discrete pieces to deal
25  with.

**330**

1     A.   Yes, I think it's a lot easier to understand this
2  way.
3     Q.   All right.  So the first portion of the requirement
4  recites:  A memory in which at least display unit
5  information is stored.
6        Where did you start your investigation to see if that
7  claim element was met?
8     A.   For this claim element, I went basically straight to
9  the EDID standard and saw what it said about the purpose of
10  it.  And it -- basically it says:  This document describes
11  the basic 128-byte data structure known as EDID 1.3.
12        And the fact that this data table is 128 bytes long,
13  the only type of structural element that can do this is a
14  memory.
15        So, basically, the EDID standard is requiring a
16  memory to store this data table.
17     Q.   Do you know where these memories are located that
18  store the EDID data?
19     A.   Yes, we have pointed out on this circuit board
20  before, there's -- well, they're highlighted with the
21  yellow boxes, and we typically call these things EDID
22  EEPROMs, EDID chips, or something like that.
23     Q.   And do you know if those memories store display unit
24  information?
25     A.   Yes.  The memory contents are where the EDID data

**331**

1  table is stored, and the EDID data table basically is
2  display unit information.
3     Q.   And can you give some examples of the kinds of
4  display unit information that are stored in the EDID
5  memories?
6     A.   Yes.  We've seen a -- kind of a preview of this
7  Table 3.1 in the EDID standard before, but this will give a
8  little more detail about what's in there.
9        It's things like the ID manufacturer name, the EDID
10  version and revision, things like the image size, the -- in
11  other words how big the screen is, feature support field.
12  There are color characteristic information in there.  And
13  then a lot of the standard also deals with established and
14  detailed timing descriptions.
15     Q.   And on slide 64 you are referring to Exhibit Mondis
16  0509, correct?
17     A.   Correct.
18     Q.   In addition to looking at the standards, did you
19  consult any LG technical documentation to confirm that they
20  were, in fact, storing VESA and EDID data in the EDID chips
21  of the televisions?
22     A.   Yes, I did.  I looked at one of the service
23  manuals -- or, actually, most of the service manuals have
24  this phrase in them.  And what's being highlighted here --
25  and remember this is a service manual so this is for the

**332**

1  factory personnel and the field service personnel.  And
2  this is basically how these memory chips get loaded with
3  their data at the factory.
4      And so it talks about certain equipment required to
5  do this and which buttons to press on the equipment and so
6  forth to actually program these devices before they have
7  any data in them.
8      Q.   Do the LG service manuals also describe the actual
9  EDID data that's going to be written into the EDID
10  memories?
11      A.   Yes, they do.  There is a description of the 128
12  bytes that make up the EDID data structure that is
13  identified in the service manual.  And what we are seeing
14  here is the -- there are actually two different types of
15  EDID in here.
16      One is describing the EDID that is used in the HDMI
17  ports, and another table that describes the EDID that is
18  used for the VGA ports.
19      There are some slight differences in the data that
20  goes in them.
21      Q.   Can you maybe just explain a little bit more what
22  these tables represent?
23      A.   Yes.  These are the actual 128 bytes of information
24  that is defined by the EDID data structures.
25      Q.   And you are referring to Exhibit MON-0476, correct?

**333**

1      A.   That's correct.  That's a TV service manual.
2      Q.   Okay.  So turning back to the claim chart, so for a
3  memory in which at least display unit information is
4  stored, is that portion of this claim requirement met by
5  all the accused products?
6      A.   Yes, it is.
7      Q.   And why is that?
8      A.   Well, basically, the HDMI and VGA ports both have
9  EDID memories on them, and the EDID data includes display
10  unit information.
11      Q.   So is it okay, then, if I put a -- well, actually,
12  let's save that for a few minutes from now.
13      Instead, let's move onto the next portion of the
14  claim requirement.  And you will see that it recites that:
15  The display information includes an identification number
16  for identifying at least a type of said display unit.
17      Do you see that?
18      A.   I do.
19      Q.   And where did you start your investigation to see if
20  that claim element is met?
21      A.   I went back to the VESA standard again.  And in this
22  case, I was looking for something that described the type
23  of the display, and within the -- what's called the
24  "Feature Support Area" of the table is a field that defines
25  what the display type is.

**334**

1      And so this is bits 3 and 4 of the feature support
2  byte are defined to be the display type.
3      Q.   Do you know if it was understood to be a requirement
4  of the EDID standard that, despite manufacturers, include
5  the feature support byte in the EDID data?
6      A.   Yes, it is.
7      Q.   Does the EDID standard provide any option to not use
8  the feature support byte?
9      A.   No, because there is no value that you can put in
10  there that would let you not include it.
11      Q.   Do you know if Table 3.11 that we are seeing on
12  Mondis 0509 applies to EDID data structure 1.3?
13      A.   Yes, it does.
14      Q.   And is that the same EDID data structure we saw being
15  required by the HDMI standard?
16      A.   It is, yes, sir.  One and the same.
17      Q.   Now, would each input port have a feature support
18  byte stored in its associated EDID memory?
19      A.   Yes.
20      Q.   And, again, did you consult any LG technical
21  documentation to confirm that, in fact, LG was implementing
22  the requirements of the standards?
23      A.   Yes, I did.  In this case, you remember these
24  descriptions of the data tables, if you go down and find
25  the particular place in the data table that we are dealing

**335**

1  with here, it's on the second row of the data and column
2  that's labeled "8."  And there's a byte there that is the
3  hexadecimal number 0A.
4      Q.   And what does 0A mean in the context of the feature
5  support byte?
6      A.   Well, the feature support byte has several different
7  things in it, but the ones we care about are bits 4 and 3.
8  So basically what you do is you look over and figure out
9  what bits 4 and 3 are being set to, and they form a binary
10  number.  In this case what we are seeing here is binary
11  number 01, which if you go down into the Table 3.11, you'll
12  see that 01 corresponds to an RGB color display.
13      Q.   And the ID number formed by bits positions 3 and 4
14  can have how many different values?
15      A.   It can have four different values.
16      Q.   And what does that ID number indicate?
17      A.   Well, the possible things that you can put in here
18  are monochrome or gray scale, RGB color display, nonRGB,
19  multicolor display, or an undefined or other.
20      And in all of the LG accused models, these two bits
21  were always set to 01, which refers to RGB color display.
22      Q.   And what's your basis for the accused LG televisions
23  have the ID number set to 01 or RGB color display?
24      A.   Primarily, the documentary evidence, the service
25  manuals, the EDID tables that say that this is what it's

Appx15086

336

1 set to, and also my personal testing of physical units

2 confirmed this.

3    Q.    Again, is there any option in the EDID standard to

4 not populate bit positions 3 and 4 of the future support

5 byte?

6    A.    No, there isn't.

7    Q.    So is there any way to not send an ID number whose

8 purpose it is to identify the display type?

9    A.    No, because you would be sending an incomplete EDID

10 and the video source would not be able to understand

11 anything in the EDID if you didn't send this byte or these

12 two bits.

13    Q.    So in your opinion, then, is it a requirement of the

14 VESA EDID standard to include the display type

15 identification number in the EDID data?

16    A.    Yes, it is.

17    Q.    And in your testing and viewing documents, are you

18 able to confirm that it's -- the ID number is set to

19 confirm RGB color displays for all the input ports on the

20 accused TVs?

21    A.    Yes, I was able to confirm that.

22          MR. PLIES:  Your Honor, I would like to admit and

23 publish what's been pre-admitted as Exhibit Mondis

24 MON-0569.

25          THE COURT:  It's admitted, and you may publish it.

337

1          (Exhibit Number MON-0569 is received in evidence.)

2 BY MR. PLIES:

3    Q.    So, Mr. Lamm, we've seen that here in the EDID

4 standard we have this identifier for display type.  And as

5 you've indicated, that identification number can indicate

6 monochrome and it can indicate various types of color.

7          Is that a fair summation?

8    A.    That's fair, yes.

9    Q.    Do you know if in the art of displays others

10 considered the distinction between a color display and a

11 monochrome display to be identifying different types of

12 display units?

13          MR. MCKEON:  Your Honor, leading.

14          THE COURT:  Overruled.

15          THE WITNESS:  Yes, it was quite prevalent in the art

16 to describe different types of display devices.  This

17 way -- in fact, we've got an example of a patent, 5136406.

18 Again, approximately the same timeframe as our -- as the

19 '180 patent that says that various display devices of a

20 monochrome type or a color type, and it goes on to talk

21 about the -- some technology stuff also.

22          But, monochrome and color was a significant

23 differentiator of display types and is prevalent in the

24 art.

25 BY MR. PLIES:

338

1    Q.    All right.  So circling back, then, to the claim

2 requirements, let's take on the last and final piece of

3 this, which is that the memory also stored display

4 information that includes characteristic information of

5 said display unit.

6          Have you performed an investigation to see if that

7 requirement is met in the accused LG televisions?

8    A.    Yes, I have.

9    Q.    And, again, where did you begin your investigation?

10    A.    Back at our old friend, the EDID Table 3.1, which

11 defines all of the various fields in the EDID data

12 structure.

13    Q.    Now, here I see that you've pulled out an excerpt of

14 certain fields.

15          Why did you identify these particular fields?

16    A.    Well, because these fields -- you know what we are

17 looking for here is characteristic information of the

18 display unit.  And so these things would be -- are things

19 that I would consider to be characteristic information.

20          Things such as the image size, the color

21 characteristics of the display, established timings, and

22 detailed timings.

23    Q.    Are the things that you just listed considered to be

24 display unit information?

25    A.    Yes, they would.

339

1    Q.    And if I understand you correctly, in addition they

2 would be considered to be characteristic information?

3    A.    That's correct.

4    Q.    Do you know if including the horizontal image size

5 and vertical image size in the EDID data was understood to

6 be a requirement when implementing the VESA EDID standard?

7    A.    Yes, it was.

8    Q.    And do you know if including the color

9 characteristics in the EDID data was understood to be a

10 requirement to implement the VESA EDID standard?

11    A.    Yes, it also was understood that way.

12    Q.    And, then, do you know if including the detailed

13 timing descriptions was an explicit requirement of the VESA

14 EDID standard?

15    A.    Yes, they are an explicit requirement.

16    Q.    And the detailed timing descriptions, can you just

17 maybe explain a little bit what those are?

18    A.    Yes.  The detailed timing descriptions are describing

19 things like the horizontal and vertical frequencies that

20 the display can understand.  Things like how long to blank

21 the display but -- as you allow for the time to be able to

22 get ready for the next row of information.

23          Things like the video dot rate.  In other words, how

24 fast the video information is coming out.

25          All of those would be, to one skilled in the art,

1 would understand those to be characteristic information of

2 and timing information.

3    Q.   Is that information that a video source could use to

4 generate compatible signals for the display unit?

5    A.   **Yes, absolutely.**

6    Q.   And just for the record, you have been discussing

7 these characteristic information from Table 3.11 of

8 Exhibit 0509. Is that correct?

9    A.   **3.1.**

10    Q.   Strike that. You are right. I'm wrong. Table 3.1.

11      And in addition to reviewing the actual standards,

12 did you, once again, look at LG's own technical

13 documentation to determine whether they are, in fact,

14 complying with the requirements of the standards?

15    A.   **Yes, I did.**

16    Q.   And what did you look at?

17    A.   **Well, I looked at the -- the description of the data**

18 **tables, and then, basically, highlighted where each of**

19 **these parts of the Table 3.1 were actually being**

20 **implemented.**

21      **And if you notice on this slide, the bytes that are**

22 **highlighted in yellow are where the image size is being**

23 **stored in the data table, and the things identified in**

24 **orange there are the color characteristics.**

25      **And let me just describe this one because I don't**

1 think I've described this yet.

2      **The color characteristics are not whether the thing**

3 **is monochrome or color. Color characteristics are a**

4 **detailed description of what the various colors are.**

5      **For instance, there is a description here for what**

6 **color of red the unit can produce. Is it fire engine red**

7 **or Coke can red or is it, you know, a dark red or whatever.**

8      **And so this is an actual value that gets looked up in**

9 **what's called a CIA chromaticity chart to be able to**

10 **actually define what the color is, so.**

11      **And then we also have the established timings and**

12 **detailed timings, and these are just two more fields for**

13 **defining, in detail, what the actual timing requirements of**

14 **the unit are.**

15      **And those, by the way, also include things like the**

16 **resolution.**

17    Q.   And, Mr. Lamm, you have been referring to

18 Exhibit MON0-476?

19    A.   **Correct.**

20    Q.   All right. So why don't we circle back to the claim

21 chart, and I think we've gone through all the pieces at

22 this point.

23      So have you been able to form an opinion as to

24 whether all the accused products include a memory in which

25 at least display unit information is stored, said display

1 unit information including an identification number for

2 identifying at least a type of said display unit, and

3 characteristic information of said display unit?

4    A.   **Yes, I have.**

5      **Basically, in summary, the HDMI and the VGA EDID is**

6 **stored in memories. The EDID basically includes display**

7 **unit information. The EDID data table includes an**

8 **identifier for display type. And the EDID data also**

9 **includes size, color and timing information of the display.**

10 **And we've seen that all of those requirements of this**

11 **element are met.**

12    Q.   All right. Is it okay, then, if in the third column

13 I put a checkmark to indicate that this claim requirement

14 is present in all the accused products?

15    A.   **Yes.**

16    Q.   Now, let's take on the penultimate claim requirement,

17 which recites: And a communication controller capable of

18 bidirectionally communicating with said video source.

19      Do you see that?

20    A.   **I do.**

21    Q.   And did you perform an investigation to see whether

22 that claim element is met?

23    A.   **Yes, I did.**

24    Q.   And where did you start your investigation?

25    A.   **For this one, I went back to the DDC manual, or DDC**

1 standard, and looked at what it said about the

2 communications data channel.

3    Q.   And the VESA E-DDC standard, is that what we're

4 seeing here at Exhibit MON-0507?

5    A.   **Yes, it is.**

6    Q.   And does that VESA E-DDC standard describe any

7 communications protocols?

8    A.   **Yes, it describes the fact that the communications**

9 **protocol is defined by a portion of the standard called the**

10 **DDC2B, and the upper paragraph says: The DDC2B provides**

11 **the base level of bidirectional communications.**

12    Q.   What is the DDC2B protocol used for?

13    A.   **It is used for communicating the contents of the EDID**

14 **memory over to the video source.**

15    Q.   So is this the protocol that must be implemented in

16 order for a video source to obtain the EDID data from an LG

17 television?

18    A.   **Yes, it is.**

19    Q.   And so will the LG television then necessarily be

20 able to implement the DDC2B protocols?

21    A.   **Right. To meet the standard and, therefore, be**

22 **compatible with all the other equipment, you have to do**

23 **this protocol. And -- yes.**

24    Q.   Okay. And is the DDC2B communications protocol for

25 reading the EDID, is that a bidirectional protocol?

1    A.    Yes, it is.  It's identified in several places in
2    these passages as being a bidirectional communications.
3    Q.    Now, you have a couple excerpts from 0507.  So can
4    you be more specific about what you're relying upon?
5    A.    Yes.  From the Paragraph 2.2, it says:  The DDC2B
6    provides the base level of bidirectional communications.
7         And then in the lower paragraph, the title of the
8    paragraph is the display data channel bidirectional
9    standard, which is DDC2B, and then it goes on to say:  A
10   protocol based on I2C and used on a bidirectional data
11   channel between the display and host.
12   Q.    Now, there's a reference there to I2C.  What is I2C?
13   A.    I2C is yet another industry standard that was
14   produced by a company called Philips in, I believe, in the
15   early 1980s.  And this is a standard that defines a 2-wire
16   bus, or 2-wire interface -- 2-wire communications channel
17   that is useful for communicating data between various
18   electronic components.
19   Q.    And so is the VESA E-DDC and DDC2B protocols built on
20   that Philips I2C protocol?
21   A.    Yes, they are.
22   Q.    And is there a specification or standard that
23   describes how to implement that Philips I2C communications
24   protocol?
25   A.    Yes.  Within this document there are details that

1    describe the DDC2B protocol.  There is also -- within the
2    Philips documentation, there is similar detail about how
3    this protocol works for communicating data.
4    Q.    In the Philips documentation where they set forth the
5    I2C protocol, do you know if they ever call it a
6    bidirectional protocol?
7    A.    Yes.  In many places within the Philips documentation
8    they also use the word "bidirectional."
9    Q.    And turning then to slide 81, I understand that you
10   have a graphic to help explain how the DDC2B protocol can
11   be used to read the data.  Is that correct?
12   A.    I do.  What we are going to see here is a bit of an
13   animation of how this protocol actually works.  And we are
14   going to highlight things in a manner such that things we
15   highlight in yellow are signals that travel from the video
16   source to the television, and things that are highlighted
17   in green are signals that travel from the television to the
18   video source.
19   Q.    All right.  So, Mr. Lamm, on slide 81, why don't we
20   start at the top left, and do you see that the word "start"
21   is written vertically on the figure?
22        And first off, for housekeeping, let me ask you,
23   where does this figure come from?
24   A.    It comes from document MON-0507, and it is
25   Figure 3.2, which is describing what's called the DDC2B

1    sequential read function.
2    Q.    And this is in the VESA E-DDC standard, correction?
3    A.    Yes, it is.
4    Q.    Okay.  So, again, starting at the top graph, what is
5    that "start" for?
6    A.    This is a signal from the video source to the
7    television that says, we want to start a communication.
8    Q.    The next item says DDCA/DDR.  What is that?
9    A.    Well, this is the -- it's called the DDC device
10   address.
11        Now, one of the things I need to explain is that in
12   the television, there are actually multiple devices
13   listening to this communication.
14        There are, you know, the EDID EEPROM chips are
15   listening to this bus because we've seen, for instance, how
16   they are actually connected right to the HDMI connector,
17   but there are also some parts of the SoC device that are
18   actually listening on this same communications channel.
19        And so they all receive the data simultaneously,
20   and -- but the data is really only wanting to go to one
21   place, and so that's what this address is used for.
22        Now, some of these other uses of this signal are
23   things like digital rights management.  When we started
24   getting high-definition televisions, we -- Hollywood got
25   involved and said, we don't want unencrypted signals to be

1    able to go to a television so somebody can record them and
2    be able to capture a program illicitly.
3         So the communications to control that encrypting
4    process is also done on this same DDC channel.
5         But in our case, this address, A0, is a command to
6    the EDID EEPROM that says, We want to talk to you.
7    Q.    And what happens if the -- well, let me ask.
8         Does the EDID EEPROM have a particular address?
9    A.    Yes.  It responds to actually two addresses.  The
10   easiest way to explain this is one of the addresses is used
11   for writing to the part, a different address is used for
12   reading from the part.  But they are both, you know, part
13   of the same address.
14        And so it uses the hexadecimal value A0 for writing
15   to the device.  And that's what we are seeing occurring
16   here.
17   Q.    Does the SoC have a different address than the EDID
18   chips?
19   A.    Yes.  The digital rights management function I
20   believe has four addresses assigned to that function, and
21   they are something other than A0.
22   Q.    So if there is a communication on the channel that is
23   bearing the address of the SoC rather than the address of
24   the EDID chip, what happens?
25   A.    The EDID chip would basically not respond.  In other

**348**

1  words, it would kind of cover its ears and say, I don't

2  care what's going on until I get -- until that

3  communication is finished.  And then he would open up and

4  start listening again.

5  Q.   And then -- all right.

6       And so turning back to Figure 3.2, so if I understood

7  you correctly, this is a command that has got the address

8  of the EDID chip.  Is that correct?

9  A.   **That's correct.**

10  Q.   All right.  Then next we have what's labeled "ACK."

11  What is that?

12  A.   **This is a -- it's called an acknowledgment signal.**

13  **Basically it's short for acknowledgement.**

14      **And this is a signal back from the television, so**

15  **it's going from the television to the video source, and**

16  **this says that the -- in this case the EDID EEPROM is the**

17  **component within the television that is responding and**

18  **says, Yes, I acknowledge receiving the address and I am**

19  **here.**

20  Q.   Next we have something called "word offset."  What is

21  that?

22  A.   **This is a basically an indication to the EDID memory**

23  **that says, I want to start reading at a certain address.**

24      **Now, typically, this is always set to 0 because in**

25  **the typical case you would basically read the entire EDID.**

**349**

1  So you start at 0, read all 128 bytes, and you are done.

2  Q.   Continuing on, then we have another acknowledgement

3  after the word "offset."  What's that for?

4  A.   **That says that the EDID EEPROM chip received the word**

5  **offset and says, Yep, I got it and I understand.**

6  Q.   Then we have another start.  And that's going from

7  where to where?

8  A.   **That's going from the video source to the television.**

9  Q.   And the purpose of that second start is what?

10  A.   **Well, the second start is where we are going to give**

11  **a new address.  And in this case, it's the read address of**

12  **the EDID memory chip.**

13  Q.   And then we have another DDC address.  And what is

14  that?

15  A.   **And if you notice, this one is now address A1, which**

16  **is the -- that least significant bit is what defines**

17  **whether it's a write or a read.  So in this case we are**

18  **saying we want to read the EDID chip.**

19  Q.   We have another ACK, acknowledgement.  And

20  that's for what?

21  A.   **That is to acknowledge the address and the chip that**

22  **is actually being addressed is responding that says, Yep, I**

23  **heard you.**

24  Q.   And then next we have what's called "data."  So what

25  is represented by that data?

**350**

1  A.   **This is where we are actually starting to transfer**

2  **the 128 bytes of EDID data back over to the video source.**

3  **And so if you notice in this case, the long transmission is**

4  **highlighted in green, indicating that it's going from the**

5  **television to the video source.**

6  Q.   Then we have another ACK, but this time it's going

7  from the video source to the TV.  Why is that?

8  A.   **Right.  This is an indication from the video source**

9  **that, I've received the first data byte and you are cleared**

10  **to send another data byte.**

11  Q.   At that point what happens?

12  A.   **Well, at this point, this operation continues 128**

13  **times in total, and, you know, is basically a combination**

14  **of data and acknowledgements until we get all 128 bytes**

15  **transferred.**

16  Q.   At the end of the graph we have what's called "stop."

17  What is sending the stop?

18  A.   **The video source is sending the stop, and it's**

19  **basically, I've received all the data that I want and now**

20  **we can tell the device that I am done talking to you and**

21  **the communication is now finished.**

22      THE COURT:  This is a good point for us to stop and

23  take a break.

24      THE DEPUTY CLERK:  All rise.

25      (Jury exits the courtroom at 3:20 p.m.)

**351**

1      THE COURT:  We'll take a 15-minute break, resume at

2  25 minutes to 4.

3  (A break is taken from 3:20 p.m. to 3:35 p.m.)

4      (Jury is brought in at 3:36 p.m.)

5      THE COURT:  Be seated.

6      Please proceed.

7      MR. PLIES:  Thank you, Your Honor.

8      One housekeeping matter.  I did inadvertently have a

9  slide with an exhibit that I would like to get published

10  and admitted.  So there was a slide that had U.S. patent

11  5136406 on it which has been pre-admitted as Mondis

12  Exhibit 0569.

13      So with your permission, if I could have that

14  admitted?

15      THE COURT:  It is admitted, and you may publish it.

16      (Exhibit Number MON-0569 is received in evidence.)

17  BY MR. PLIES:

18  Q.   Okay, Mr. Lamm, we talked about slide 81 and the

19  DDC2B protocol for the video source to obtain the EDID data

20  from the television, and we were going through some of the

21  messages, and what I was going to ask you is the -- the

22  starts commands at the beginning, there's two of those, and

23  then there's those two address commands and the word

24  "offset."

25      Do you see those at the top left?

1    A.    I do.

2    Q.    What would happen if the television did not receive

3    any of those from the video source?

4    A.    Well, the communications would break down and you

5    wouldn't be able to get the EDID data.

6    Q.    Do you consider the start to be a communication?

7    A.    Yes, I do.

8    Q.    And how about the sending of the EDID chip address by

9    the video source, do you consider that to be a

10    communication?

11    A.    Yes, I do.

12    Q.    And how about the video source sending the display,

13    the word "offset" for the location in memory to read, do

14    you consider that a communication?

15    A.    Yes, I do.

16    Q.    And if the television did not receive that final

17    stop, what would happen?

18    A.    The bus would be left in -- or the communications

19    channel would be left in a hung state and so, therefore, no

20    other communications could occur on this bus until the

21    devices there received that stop.

22    Q.    Now, based upon your discussion of the DDC2B

23    protocol, do you have an opinion as to whether that is --

24    involves bidirectional communication between the display

25    and the video source?

1    A.    Well, the communications are very definitely going in

2    both directions, so that means bidirectional.

3    Q.    Mr. Lamm, have you also formed an opinion as to

4    whether the VESA E-DDC standard requires implementation of

5    the bidirectional controller at the display in order to

6    execute the DDC2B protocols?

7    A.    Yes, it does.

8        And what I need to do is describe what a

9    communications controller is versus just a bare interface,

10    and our basic interface.

11        You know, we've gone through a pretty exhausting

12    detail about the actual communication protocol here, and

13    the level of complexity of the protocol and some of the

14    features in it are things that elevate this from being a

15    basic interface to being something that requires a

16    communications controller.

17        And just to summarize kind of some of the things

18    we've seen is that the display, or the communications

19    controller in the display, has to be able to recognize the

20    start event initiated by the video source, has to generate

21    acknowledgment signals, it has to retrieve the EDID data

22    from its memory and code it for serial transmission. It

23    has to receive and interpret the ACK signals from the video

24    source. It has to recognize the stop events to free the

25    bus.

1        And probably most importantly it has to decode and

2    parse this device address.

3        And so all of these things combined together

4    influence my opinion that this is a communications

5    controller to have to do all those functions.

6    Q.    In your opinion, is there any way for the accused LG

7    televisions to implement the VESA Plug-N-Play EDID and DDC

8    standards without using a bidirectional communication

9    controller?

10    A.    No. The standards require that you perform these

11    protocol functions, and that requires a communications

12    controller and it's clearly bidirectional.

13    Q.    And same question with respect to the HDMI standard.

14    Could you implement an HDMI capability in the television

15    without using a bidirectional communication controller to

16    implement the DDC2B protocol?

17    A.    No. The HDMI standard says you have to do it this

18    way, and there is no way to not do it this way.

19    Q.    So would it be your opinion that a bidirectional

20    communication controller is necessarily present in all the

21    accused products?

22    A.    Yes, it is.

23    Q.    Do you know where the communication controllers exist

24    in the accused products?

25    A.    Yes. They are actually colocated with the memory

1    that stores the EDID. And we typically call these EDID

2    EEPROMs or EDID chips or whatever.

3        This is an integrated circuit that integrates two

4    functions. It integrates both the memory and it integrates

5    the communications controller into one device.

6    Q.    Why would the communication controller be integrated

7    with a memory device on the same chip?

8    A.    The primary reason is cost and real estate, or how

9    much board space it takes up to perform this function. And

10    if you notice, these little EDID EEPROMs are -- it's

11    probably -- you won't be able to see it, but they only have

12    eight pins on the chip, and so they don't have very many

13    pins to do their function.

14        And so having a 2-wire DDC or I-square -- or I2C bus

15    on them is a convenient way to get a lot of functionality

16    in just a very few pins.

17    Q.    And are you familiar with the internal operation of

18    EDID EEPROM chips such as in the accused products?

19    A.    Yes, I am.

20    Q.    And how are you familiar with that?

21    A.    Well, let me back up just a little bit.

22        These EDID EEPROM chips are what we consider in the

23    industry a commodity item. They are made by a number of

24    different manufacturers, and they all have similar

25    specifications, and they are all compatible with each

**356**

1  other.

2  So a manufacturer such as LG that is building circuit

3  boards can buy these components or these integrated

4  circuits from a number of different people, and they

5  have -- would have various reasons for picking one over the

6  other. Price is usually a factor.

7  And so I've looked at the specifications for all the

8  different manufacturers that I could identify, and there

9  were quite a few, and confirmed that internally they

10  operate in a similar manner.

11  Q.  All right, Mr. Lamm, what are we seeing here on slide

12  84?

13  A.  This slide --

14  Q.  I'm sorry, before you answer.

15  MR. PLIES:  Let me request, as a housekeeping

16  measure, that we be able to admit and publish what's been

17  pre-admitted as Mondis 0511?

18  THE COURT:  So admitted.

19  THE DEPUTY CLERK:  What was that one?

20  MR. PLIES:  0511.

21  (Exhibit Number MON-0511 is received in evidence.)

22  BY MR. PLIES:

23  Q.  Okay. Mr. Lamm, again, what are we seeing on this

24  slide?

25  A.  This is a block diagram of the internal operation of

**357**

1  one of these EDID EEPROM chips, and you will notice a

2  couple of highlighted blocks.

3  On the left in yellow is a block called I/O control

4  logic.

5  Q.  And what does the I/O control logic do?

6  A.  Well, I/O is a short way of saying input/output. And

7  this is basically saying that this block inputs stuff and

8  it outputs stuff.

9  And the fact that the two pins -- if you remember on

10  the DDC channel standard, the two pins in the bus were

11  labeled -- or in the communications channel were labeled

12  SDA and SCL. Well, that's what's actually going into this

13  block on this diagram.

14  And so this becomes the input/output control logic

15  that's doing the communications. So this is where I have

16  identified the bidirectional communications controller to

17  actually reside.

18  Q.  And is that what's implementing the DDC2B and I2C

19  protocols?

20  A.  Yes, it is.

21  Q.  I also see that you have another box highlighted on

22  the slide in blue that says EEPROM array.

23  What is that?

24  A.  Yes. This is the actual memory portion of the

25  integrated circuit. The acronym EEPROM actually stands for

**358**

1  electrically erasable programmable read-only memory.

2  And so this is -- I think I mentioned earlier that in

3  the LG factory they have to be able to set the initial

4  contents of this memory so it winds up being programmable.

5  But the fact that it's a read-only memory means that it's

6  not normally written to accept for the one time at the

7  factory, and after that becomes just a memory that can be

8  read.

9  Q.  But is that where the EDID data is stored?

10  A.  Yes, it is.

11  Q.  Now, do you know from which EDID chip specification,

12  the block diagram we are seeing on the slide, came from?

13  A.  Yes, I believe this block diagram came from a vendor

14  called Microchip.

15  Q.  And do you know if Microchip was a VESA member?

16  A.  Yes, they were.

17  Q.  Were they a VESA member at the time you were there?

18  A.  This -- yes, they were.

19  Q.  Do you know if Microchip had any role in development

20  of any of the VESA standards?

21  A.  Yes, they participated in several of the committee --

22  or the work groups that I was involved in.

23  Q.  Did that include the VESA EDID standard?

24  A.  I believe they were listed as a contributor, yes.

25  Q.  Is the diagram that you have from Exhibit 0511,

**359**

1  that's slide 84, is that representative of the operation of

2  EDID chips in the accused products?

3  A.  Yes, it is.

4  Q.  So circling back, again, to the claim chart, have you

5  formed an opinion as to whether the accused products

6  include a communication controller capable of

7  bidirectionally communicating with said video source?

8  A.  Yes, I have.

9  Q.  And what's your opinion?

10  A.  Well, my opinion is that the bidirectional

11  communications controller is in the EDID EEPROMs and

12  present in the accused products.

13  Q.  In your opinion, is there anything in the plain

14  language of the claim that precludes the memory and the

15  communication controller from being located in the same

16  chip?

17  A.  No.

18  Q.  Has the Court interpreted the claims to require the

19  memory and communication controller to be in different

20  chips?

21  A.  No.

22  Q.  All right. Let's turn to the last claim requirement.

23  So the last claim recites: Wherein, said

24  communication controller is capable of communicating said

25  display unit information other than said characteristic

Appx15092

**360**

1  information to said video source.
2       Do you see that?
3  A.   I do.
4  Q.   And have you performed an investigation to see
5  whether that claim requirement is met by the accused LG
6  televisions?
7  A.   Yes, I have.
8  Q.   And where did you start your investigation?
9  A.   Started back at the EDID data table, 3.1 again.
10 Q.   And is that from Exhibit MON-0509?
11 A.   Yes, it is.
12 Q.   And this is Table 3.1?
13 A.   Table 3.1, yes.
14 Q.   Okay.  And I see that you have a callout on this
15 slide.  What's being represented in the callout?
16 A.   Well, in this case, I was looking for things that
17 would be considered display unit information that are other
18 than characteristic information and found a couple of
19 examples of things I would classify that way, such as the
20 ID manufacturer name and the version and revision of the
21 EDID data structure that we're actually storing in the
22 display.
23 Q.   So do you know if those items are display unit
24 information?
25 A.   Yes, they are information about the display unit.

**361**

1  Q.   Are those items characteristic information?
2  A.   No, they are not.
3  Q.   Do you know if the ID manufacturer name is understood
4  to be a required field to be included in the EDID data
5  according to the EDID standard?
6  A.   Yes, it is.
7  Q.   Do you know if the EDID version number and revision
8  number are explicit requirements of the EDID standard?
9  A.   Yes, they are.
10 Q.   Did you do anything to confirm that the accused LG
11 TVs are, in fact, implementing and complying with the VESA
12 standards and populating those fields in the accused
13 products?
14 A.   Yes, I did.
15     MR. PLIES:  Your Honor, with your permission, we'd
16 like to admit and publish pre-admitted Exhibit MON-816.
17     THE COURT:  You may.  Exhibit into evidence.
18     (Exhibit Number MON-0816 is received in evidence.)
19 BY MR. PLIES:
20 Q.   All right.  And, Mr. Lamm, what did you do?
21 A.   Well, I went to the EDID data tables from the LG
22 television service manuals.  In this case it's
23 Exhibit MON-0816, and identified the places in the EDID
24 data table where the ID manufacturer name is stored, and I
25 have highlighted that in yellow on the callouts.  And I

**362**

1  also identified the EDID version and revision information
2  that is stored in the EDID data tables.
3  Q.   And so LG did, in fact, populate the ID manufacturer
4  name fields?
5  A.   Yes, they did.
6  Q.   And did they also include in the EDID data the EDID
7  version and revision information?
8  A.   Yes.  The EDID version in all cases was 1. -- or 1.3,
9  or implied 1.3.  And the manufacturer name in virtually all
10 models was GSM.
11     And I think that somehow relates to Goldstar, which
12 was a previous name of LG.
13 Q.   Mr. Lamm, are the bidirectional communication
14 controllers in the accused products capable of
15 communicating that EDID version and revision information
16 and the ID manufacturer name information from the display
17 unit to the video source?
18 A.   Yes.  In fact, there are a couple of ways to do that.
19 Q.   What's the first way?
20 A.   The first way is the DDC2B sequential read, and this
21 is that long explanation that we gave before the break.
22 And I won't repeat it here, but this is where you read all
23 128 bytes of the EDID at one time.
24 Q.   Is it a requirement of the VESA standards and the
25 HDMI standard that the communication controller be capable

**363**

1  of performing sequential reads?
2  A.   Yes, it is.  It is a requirement.
3  Q.   In your testing, have you personally observed LG
4  televisions executing sequential reads of the EDID data?
5  A.   Yes.
6  Q.   In your experience, do you know if most video sources
7  use sequential reads?
8  A.   They do because they typically need to retrieve all
9  128 bytes anyway, so this is the most efficient manner to
10 retrieve all 128 bytes.
11 Q.   Now, you mentioned that there was a second way that
12 the communication controller was capable of communicating
13 the EDID version and revision information and ID
14 manufacturer name.
15     What's that second way?
16 A.   The second technique is actually called the "DDC2B
17 Random Address Read."  And this is a protocol -- if you
18 remember back to the long description of the sequential
19 read, we had this thing called, the word offset.  And
20 normally you would set that to 0 if you wanted to read the
21 entire EDID, but you also had the ability to set it to
22 something other than 0 so that we start reading at some
23 place in the table other than 0.
24 Q.   And that --
25 A.   I'm sorry, go ahead.

**364**

1    Q.   Is the communication controller, when it's executing
2   a random read, capable of sending only the EDID version and
3   revision information to the video source?
4    A.   Yes, it is.  You know, I was mentioning we can start
5   **anywhere in the EDID.  And then once we start transferring**
6   **the data, the video source has the ability to stop the**
7   **transmission at any point.  And it does this by sending a**
8   **"no acknowledgment" on the last byte that it wants to read**
9   **and then following that by the stop command.**
10       So, for instance, we could read just the two bytes
11  **that are part of the ID manufacturer name, or just the two**
12  **bytes associated with EDID version or revision, or we**
13  **could actually read them one byte at a time; in other**
14  **words, do a communications, just receive one byte, repeat**
15  **the entire process for the next byte and so forth, and pick**
16  **apart any bytes out of the EDID data table that we wanted**
17  **to transmit.**
18   Q.   Is it a requirement that the VESA standards and HDMI
19  standard, that the communication controllers would need to
20  be able to perform random read?
21   A.   **Yes, it is a requirement.**
22   Q.   And have you done any testing of your own to confirm
23  that the communication controllers in LG televisions
24  actually can perform random reads?
25   A.   **Yes, I was able to program some of my own software**

**365**

1   **that manipulated the DDC bus to actually do this short**
2   **read.  In other words, read just the ID manufacturer name,**
3   **and just the version or revision of those two bytes, and**
4   **then stop and free up the bus.**
5    Q.   All right.  So, Mr. Lamm, so let's go back to the
6   claim chart.
7        So based on your investigation, have you been able to
8   form an opinion as to whether the accused LG televisions
9   meet the final requirement wherein said communication
10  controller is capable of communicating said display unit
11  information other than said characteristic information to
12  said video source?
13   A.   Yes, I have.
14   Q.   And what's your opinion?
15   A.   **Well, all of the LG televisions have a communications**
16  **controller that is capable of sending the EDID version**
17  **revision and manufacturing ID either alone or with all the**
18  **other EDID data.**
19   Q.   Mr. Lamm, based upon what you have just said, is it
20  okay if I enter a checkmark in the third column to indicate
21  that the accused products all meet that last claim
22  requirement?
23   A.   **Yes.**
24   Q.   All right.  And now that you have provided your
25  opinions for each and every claim requirement of Claim 14,

**366**

1   do you have an opinion as to whether the accused LG
2   television infringed Claim 14 of the '180 patent?
3    A.   **Yes.  My opinion is that all 630 models of LG**
4   **televisions that have been identified in this case infringe**
5   **the '180 Claim 14.**
6    Q.   Based on the analysis and opinions that you've
7   provided today, if a display unit implements the HDMI
8   standard, do you know if it will necessarily infringe, in
9   practice, Claim 14 of the '180 patent?
10   A.   **Yes.  Basically all of the elements that are listed**
11  **on this chart as requirements for Claim 14 are met simply**
12  **by the practice of the HDMI specification.**
13   Q.   And, similarly, based on the analysis and opinions
14  you've provided today, if a display unit implements the
15  VESA Plug-N-Play standard, do you know if it will
16  necessarily infringe, in practice, Claim 14 of the '180
17  patent?
18   A.   **Yes, it will.**
19   Q.   Now, Mr. Lamm, I think you've maybe heard testimony
20  earlier in the trial, but are you aware that Mondis and LG
21  were involved in a previous lawsuit regarding infringement
22  of the '180 patent?
23   A.   **Yes.**
24   Q.   And how are you aware of that fact?
25   A.   **I was Mondis's expert on that case as well.**

**367**

1    Q.   And do you recall what the accused LG products were
2   in that case?
3    A.   **The LG products in that case were computer monitors.**
4    Q.   Did you inspect or test any of the accused LG
5   computer monitors in that earlier litigation?
6    A.   Yes, I did.
7    Q.   Do you know if those LG computer monitors that were
8   accused in the prior litigation implemented the VESA EDID
9   and DDC standards?
10   A.   **Yes, they did.**
11   Q.   And would they then also implement the VESA
12  Plug-N-Play standard?
13   A.   **Yes.**
14   Q.   Did those LG computer monitors, in the prior
15  litigation, include EDID EEPROM chips storing EDID data and
16  including a communication controller?
17   A.   **Yes, they did.**
18   Q.   Did those LG computer monitors, in the earlier
19  litigation, also include EDID data that included the
20  feature support byte with a type ID and bit positions 3 and
21  4?
22   A.   **Yes, they did.**
23   Q.   With regards to Claim 14, do you have an opinion as
24  to whether the accused TVs in this case infringe for the
25  same reasons as LG's computer monitors in the previous

Appx15094

1  case?

2  **A.   Yes, they are structurally identical.**

3  Q.   Did those computer monitors have any additional VESA

4  capabilities beyond DDC2B and --

5  **A.   Yes, they did.  They also had the -- what's called**

6  **the DDC/CI capability, which is the command interface**

7  **function, which lets a video source, like a computer,**

8  **control the brightness and contrast and those kind of**

9  **things of the display.**

10  Q.   Does the fact that the computer monitors in the

11  earlier case have that additional capability affect your

12  opinions that they, nevertheless, infringed for having

13  Plug-N-Play capability in the same manner as the accused

14  TVs in this case?

15  **A.   They were identical from an infringement standpoint.**

16  Q.   Before we leave Claim 14, I wanted to circle back a

17  little bit to the memory limitation.

18  So, as you explained earlier, the EDID standard and

19  the accused products include a type ID, correct?

20  **A.   That's correct.**

21  Q.   And they include characteristic information of the

22  display unit, correct?

23  **A.   Correct.**

24  Q.   Does a television know what video source might get

25  connected to one of its video input ports?

1  **A.   No, it doesn't.**

2  Q.   And does a television know what display unit

3  information a connected video source will need in order to

4  generate compatible signals for that television?

5  **A.   No, there's several fields within the display unit**

6  **information, and any one of those or combinations might be**

7  **used.**

8  Q.   So, historically, in the display industry, have some

9  displays used type IDs to generate compatible signals?

10  **A.   Yes, they have.**

11  Q.   And have some displays used timing or characteristic

12  information to generate compatible signals?

13  **A.   Yes, the art is full of references to inventions that**

14  **used either only type or only characteristic information.**

15  Q.   So how does the '180 invention address the issue of

16  different video sources possibly needing different display

17  unit information in order to generate compatible signals?

18  **A.   Well, it's kind of a kitchen-sink approach.  It**

19  **provides both the type information, as well as the**

20  **characteristic information, and then the -- whichever one**

21  **the video source wants to use, it's free to do that.**

22  Q.   In your experience, do video sources actually use at

23  least portions of the EDID data to generate compatible

24  video signals?

25  **A.   Yes, absolutely.**

1  Q.   Mr. Lamm, let's continue to the remaining asserted

2  claim, Claim 15.

3  What type of claim is Claim 15?

4  **A.   Claim 15 is what's called a dependent claim.  If you**

5  **notice how the claim starts out, it says:  A display unit**

6  **according to Claim 14.**

7  **So to be able to infringe this claim, we have to do**

8  **everything that Claim 14 said, plus whatever is added with**

9  **this -- with this claim.**

10  Q.   And so what was added by Claim 15?

11  **A.   Well, what was added is the "wherein" clause.  It**

12  **says:  Wherein, said display unit information is sent to**

13  **said video source in response to power on of at least one**

14  **of said display unit and said video source.**

15  Q.   And did you perform an investigation as to whether

16  that claim requirement of Claim 15 was met by the accused

17  products?

18  **A.   I did.**

19  Q.   And are the accused TVs capable and configured to

20  send a display unit information response to power on in a

21  display unit, power on in the video source, or both?

22  **A.   My investigation basically centered around the power**

23  **on of the video source.  I felt that was probably the most**

24  **representative function.**

25  Q.   And where did you start your investigation as to

1  whether Claim 15 is met?

2  **A.   The HDMI interface specification identifies a feature**

3  **that they call "hot plug detect."  And primarily this is a**

4  **technique for being able to understand if a cable is**

5  **plugged in or if one side or the other is being turned on.**

6  Q.   And is hot plug detect defined or described in any

7  standard?

8  **A.   Yes, in the HDMI interface standard, which is**

9  **MON-0516.**

10  Q.   And is hot plug detect a feature and capability

11  that's required by the HDMI standard?

12  **A.   Yes.**

13  Q.   And do you have an animation to show how the accused

14  products implement hot plug detect capability?

15  **A.   Yes, I do.  I think this will make things a little**

16  **clearer.**

17  **What we are showing here is three signals on the HDMI**

18  **cable.  Pin 18 is a signal from the video source that says,**

19  **basically, Are you a PnP display?  It's sending power to**

20  **the monitor.  The monitor, or the TV, responds with, Yes, I**

21  **have EDID available.**

22  **And at that point, the video source starts the EDID**

23  **request and transfer that long sequence, that DDC**

24  **sequential read function.**

25  **Then once that process is done, then the television**

**372**

1 can be sent a video signal that is optimum for the --
2 the television and we see a nice picture on the screen.
3     Q.  And on what line does the hot plug detect signal go
4 on?
5     A.  **The hot plug detect pin is defined as being pin 19 of**
6 **the cable, and then also pin 16 is actually the SDA or**
7 **the -- where the EDID data is being transferred.**
8     Q.  And then pin 18 is, just to reiterate, is what
9 signal?
10     A.  **Pin 18 is -- it's -- I believe it's actually labeled**
11 **EDID power or DDC power. And it's basically the signal**
12 **that's from the video source that says, I am powered up.**
13 **And it's kind of an indication for the television to**
14 **respond that says, I see that you're powered up and I have**
15 **EDID available.**
16     MR. PLIES: Your Honor, I would like to admit and
17 publish Exhibit MON-4903, which has been pre-admitted.
18     THE COURT: Yes, it's admitted and you may publish
19 it.
20     (Exhibit Number MON-4903 is received in evidence.)
21 BY MR. PLIES:
22     Q.  Mr. Lamm, did you check any LG technical
23 documentation to just to confirm that, in fact, that the
24 accused LG televisions complied with the standard and
25 implemented hot plug detect?

**373**

1     A.  **Yes, sir. What I was looking for was in the service**
2 **manual and looking to confirm that the hot plug pin 19 was**
3 **actually hooked up to -- between the interface and some**
4 **active circuitry on the -- that was on the circuit board**
5 **here.**
6        **And, basically, I found a signal called hot plug on**
7 **the SoC that is in control of the pin 19 on the HDMI**
8 **connector.**
9     Q.  All right. So, again, coming back to Claim 15, have
10 you been able to form an opinion as to whether a display
11 unit, according to Claim 14, wherein said display unit
12 information is sent to said video source in response to
13 power on of at least one of said display unit and said
14 video source is met by the accused products?
15     A.  **Yes. It's basically present because they implement**
16 **the HDMI hot plug detect feature, and so for -- and I found**
17 **that in all 630 accused TV models.**
18     Q.  So would it be okay, then, to put a checkmark in the
19 third box to indicate that that element is present?
20     A.  **Yes.**
21     Q.  And so now having completed all the additional
22 requirements that Claim 15 adds, do you have an opinion as
23 to whether Claim 15 is infringed?
24     A.  **Claim 15 is infringed because Claim 14 is infringed,**
25 **plus we have the hot plug detect capability.**

**374**

1     Q.  All right. Mr. Lamm, today you have showed the jury,
2 you know, some excerpts from LG service manuals and owners'
3 manuals.
4        Were those documents and excerpts representative of
5 the accused TV models?
6     A.  **Yes. Virtually all of the service manuals contain**
7 **the same information arranged in the same way, and there**
8 **was no contradictory information that I found.**
9     MR. PLIES: Your Honor, pass the witness.
10     THE COURT: Your witness, Mr. McKeon.
11     MR. MCKEON: Thank you, Your Honor.
12            CROSS-EXAMINATION
13 BY MR. MCKEON:
14     Q.  Good afternoon, Mr. Lamm. We haven't met before.
15 I'm Mike McKeon. Nice to meet you.
16     A.  **Good afternoon.**
17     Q.  So you're from Big Sky Country, huh?
18     A.  **Yes.**
19     Q.  I hear it's beautiful out there. I've never been
20 there, but it's on my bucket list. One of these days.
21        Now, I always like to start with something I know we
22 are going to agree on, and that's, of course, what the '180
23 patent is all about. So let's do that?
24     MR. MCKEON: And if we can get that on the screen.
25 BY MR. MCKEON:

**375**

1     Q.  And I know this is the time of day where we are
2 getting a little washed out here on that big monitor here,
3 big screen, so maybe we can use that one as well.
4     A.  **Okay.**
5     Q.  So let's look at the patent. We have -- the title is
6 very informative, right? Because it talks about a display
7 unit. Isn't that right?
8     A.  **Yes.**
9     Q.  And in the title it says: A display unit with two
10 different components. Isn't that right?
11     A.  **Yes.**
12     Q.  One component is the display unit has the
13 communication controller and the other component is a
14 memory. Isn't that right?
15     A.  **It -- yes, it uses those words.**
16     Q.  And the memory stores identification number for
17 identifying display unit. Isn't that right?
18     A.  **Yes.**
19     Q.  So, right from the title we've got display unit, and
20 we've got two different components -- communications
21 controller and a memory, and the memory is storing an
22 identification number for identifying display unit, right?
23     A.  **Those are the words, yes.**
24     Q.  Okay. And the figure -- let's look at Figure 1 of
25 the patent, which Figure 1 of the patent is actually on the

1  front cover as well.  Isn't that right?

2  **A.**  **Yes, it is.**

3  **Q.**  Okay.  And you went through this earlier, but let's

4  just take a moment to go through it together so we can

5  agree on some things.

6  On the left-hand side we have the computer.  Isn't

7  that right?

8  **A.**  **Yes.**

9  **Q.**  And on the right-hand side is the monitor.  Isn't

10  that right?

11  **A.**  **It's labeled "display device."**

12  **Q.**  Labeled "display device," but in this patent it's a

13  computer monitor.  Isn't that right?

14  **A.**  **Well, the patent actually only refers to this as**

15  **display device or display output device or something like**

16  **that.**

17  **I don't believe the patent ever uses the term**

18  **"monitor."**

19  **Q.**  Right.  But, of course, in every single figure and

20  every single description, the display device is being

21  hooked up to a computer.  Isn't that right?

22  **A.**  **In this -- in Figure 1, it's being hooked up to a**

23  **computer, yes.**

24  **Q.**  Yeah.  In fact, in every other figure it is, too.

25  Isn't that right?

1  **A.**  **I would have to double-check all the other figures,**

2  **but I think you're probably right.**

3  **Q.**  Okay.  And if it's hooked up to a computer, then it's

4  a -- it's a -- one of ordinary skill in the art at the time

5  of this invention would understand that this is a computer

6  monitor.  Isn't that right?

7  **A.**  **It probably is, yes.**

8  **Q.**  And here we see on the left, we've got the computer

9  on the right, we've got the computer monitor, and it's got

10  a number of different components inside of it that are

11  identified.  Isn't that right?

12  **A.**  **Yes.**

13  **Q.**  Okay.  For example, we see the communication

14  controller, we already talked about earlier, as a

15  component.  Isn't that right?

16  **A.**  **That's correct.**

17  **Q.**  And another separate component is the memory nine.

18  Isn't that right?

19  **A.**  **That is correct.**

20  **Q.**  And these are the same things that were in the title

21  of the patent that we talked about earlier.  Isn't that

22  right?

23  **A.**  **That's correct.**

24  **Q.**  Okay.  And what's going on here is you've got a

25  communication controller in the -- the monitor communicates

1  with the communication controller in the computer.  Isn't

2  that right?

3  **A.**  **Yes, it does.**

4  **Q.**  And the signals from the computer to the computer

5  monitor would be things like control instructions.  Isn't

6  that right?

7  **A.**  **It's also the -- it's -- with respect to the '180**

8  **patent, and Claim 14, it's just the request for the data to**

9  **be transferred.**

10  **Q.**  Okay.

11  **A.**  **There are other claims within the patent that do talk**

12  **about a control interface.**

13  **Q.**  Well, let's go to your expert report, sir, at LG 98,

14  which is in your binder.

15  You've got that in front of you?

16  Let me just tell you, sir, what we've handed to you

17  is -- we have two binders.  Binder one is prior depositions

18  and declarations, and binder two are documents that --

19  standards and things like that.

20  So look at binder one, and you will find in that

21  binder -- you should find here the exhibit we are looking

22  for, LG 98.

23  Do you see that?

24  **A.**  **I do.**

25  **Q.**  If you go to Page 35 of that exhibit, at

1  Paragraph 76, you are talking about the disclosure of the

2  '180 patent and you say here:  For instance, the computer

3  can send a control instruction to microcomputer seven in

4  order to adjust the display -- displayed picture.

5  Do you see that?

6  **A.**  **I'm sorry.  Where are you reading?**

7  **Q.**  I'm sorry.

8  **A.**  **What page?**

9  **Q.**  It's in paragraph -- Page 35, Paragraph 76.

10  Do you see that?

11  **A.**  **I see Paragraph 76, yes.**

12  **Q.**  Okay.

13  **A.**  **But I don't -- which passage are you talking about?**

14  **Q.**  In Paragraph 76 -- let's look at it together here.

15  Give me a moment to find it myself here and we can go

16  through it together.  Okay?

17  So the top of Page 36 is where I am reading from.

18  **A.**  **Okay.**

19  **Q.**  Okay.  And it says there:  For instance, the computer

20  can send a control instruction to microcomputer seven in

21  order to adjust the display picture.

22  Do you see that?

23  **A.**  **Yes.**

24  **Q.**  So that's a control instruction.  Isn't that right?

25  **A.**  **Yes, that is a control.**

**380**

1  Q.  Okay.  And the memory, going back to our figure here,
2  the memory nine here stores what the patent refers to as an
3  identification number, right?
4  **A.  Correct.**
5  Q.  And in the '180 patent, the identification number is
6  for identifying a specific monitor.  Isn't that right?
7  **A.  That is one of the possible uses of the display unit**
8  **information, yes.**
9  Q.  Well, in the patent, the disclosure of the patent, it
10  talks about a specific identification number for a specific
11  monitor.  Isn't that right?
12  **A.  The patent language -- I'm actually more familiar**
13  **with the claim languages, and some of the claims do require**
14  **what we identified as being unique numbers versus numbers**
15  **that would, for instance, be the same for an entire model**
16  **line.**
17  Q.  Okay.  We'll get to the claim.  I'm just talking
18  about the specification, the description, the patent.
19  **A.  Okay.**
20  Q.  It talks about a -- the identification number is
21  always referred to in connection with a specific monitor.
22  Isn't that right?
23  **A.  I'm sorry, could you repeat that one more time?**
24  Q.  Sure.
25      The identification number as described in the patent

**381**

1  is always in reference to a specific display device.
2  **A.  I -- I'm not sure I can completely agree with you,**
3  **but I will accept that as a premise for now.**
4  Q.  Well, let's go back to the title of the patent, start
5  there.  And the title again -- sorry about this being a
6  little washed out here.  Okay.
7      Display unit with communication controller and memory
8  for storing identification number for identifying display
9  unit.
10  **A.  Correct.**
11  Q.  Here we have a number for identifying a unit, a
12  particular unit.  Isn't that right?
13  **A.  It's for identifying a display unit, yes.**
14  Q.  So we have a number and then we have a corresponding
15  display unit, correct?
16  **A.  Correct.**
17  Q.  And then we can go to the abstract as well, and here
18  in the abstract we have -- we can highlight identification
19  number for identifying the display unit.
20      Do you see that?
21  **A.  Yes, I do.**
22  Q.  And, again, this is identification number for
23  identifying a particular display unit.  Isn't that right?
24  **A.  There is a requirement of the definition for**
25  **"particular."  In other words, does every model of the same**

**382**

1  **production line have the same number, or does every --**
2  **every display unit that is produced have a different**
3  **number?**
4  Q.  No --
5  **A.  And those are very distinct, different requirements.**
6  **A.  I'm just talking about the '180 patent here.**
7  **A.  '180 patent actually talks about both.**
8  Q.  Well, in the -- right here in the abstract it's
9  talking about an identification number for identifying the
10  display unit.  Isn't that right?
11      That's what it says.
12  **A.  Yes.**
13  Q.  Okay.
14      And the way this operates, and this is in the
15  description of the patent, is that the display unit will
16  send its identification number over to the computer, right,
17  and the computer compares that number against a list of
18  identification numbers that's stored in the computer.
19  Isn't that right?
20  **A.  That is one of the embodiments in the -- described in**
21  **the patent.**
22  Q.  Right.  And in that embodiment, it compares that
23  particular number against a list that it has to check to
24  see if it can talk to this particular display unit.  Isn't
25  that right?

**383**

1  **A.  That is correct.**
2  Q.  And when you say it's one embodiment, what you mean
3  by that is this patent discloses actually the reverse.  It
4  discloses a situation where the computer has an
5  identification number, and the computer sends its
6  identification number to the monitor and the monitor checks
7  that.  Is that right?
8  **A.  That is one of the embodiments, yes.**
9  Q.  So there are two embodiments here.
10  **A.  That's correct.**
11  Q.  But the Claim 14 only deals with the first embodiment
12  that we talked about.  Isn't that right?
13  **A.  Yes.**
14  Q.  Okay.  Now, if we go to Figure 1 again, please, we
15  talked about some of these components in Figure 1, and one
16  of the components in Figure 1 that is identified is a
17  cathode ray tube.  Isn't that right?
18  **A.  The element labeled 14 is a symbol indicative of a**
19  **display.**
20  Q.  I'm sorry, sir, I didn't understand.  The element --
21  I'm talking about the cathode ray tube.
22  **A.  Well, 14 is what you're referring to --**
23  Q.  Yes.
24  **A.  -- and it can be a cathode ray tube or some -- any**
25  **other kind of display device.**

Appx15098

**384**

1    Q.    Well, in the patent, sir, it's very clear.  Fourteen
2    is a cathode ray tube, right?
3    A.    **I think it refers to it as a cathode ray tube, yes.**
4    **Or CRT or CDT, I believe, is another term they use.**
5    Q.    Let's take a look at it.  I thought we would agree on
6    that one, but let's take a look at it.
7          Let's go to Column 4, Lines 26 to 37, please, of the
8    patent.
9          And here, if I have the bottom highlighted here,
10   where it says "14," and you see that, sir?
11   A.    **Yes.**
12   Q.    Right.  Fourteen, right, is a color cathode ray tube.
13         Do you see that?
14   A.    **And it goes onto say:  Hereinafter called a CDT, but**
15   **same thing.**
16   Q.    Fair enough.  But the point is the patent is very
17   specific that when it talks about 14, it's a cathode ray
18   tube.
19   A.    **Correct.**
20   Q.    The patent doesn't say 14 and some other technology,
21   it only talks about a cathode ray tube.  Isn't that right?
22   A.    **That's -- this is a description of the picture, and,**
23   **yes, it says cathode ray tube.**
24   Q.    Okay.  And, in fact, in every single figure in this
25   patent that has the monitor, the components that displays

**385**

1    the video image, in every single figure is a cathode ray
2    tube.  Isn't that right?
3    A.    **Yes.**
4    Q.    And why don't we take a look at that.  Let's go to
5    figure -- we did Figure 1.  Why don't we go to Figure 4,
6    which I think is the next relevant figure.  We can
7    highlight there.
8          That's the cathode ray tube, and, again, it's labeled
9    14.  Isn't that right?
10   A.    **Correct.**
11   Q.    And why don't we go to the next one that's relevant
12   here, is Figure 6.  Highlight that.
13         That's a cathode ray tube, and I believe that's 14 as
14   well.  Isn't that right?
15   A.    **Yes, it is.**
16   Q.    And why don't we go to Figure 7.  Highlight that,
17   please.
18         That's another -- that's a cathode ray tube labeled
19   14.  Isn't that right?
20   A.    **Yes.**
21   Q.    Figure 9, why don't we take a look at that one.
22   Highlight, please.
23         That's a cathode ray tube.  Isn't that right, sir?
24   A.    **Sure.**
25   Q.    Okay.  And you mentioned earlier an LCD in your

**386**

1    testimony on direct I heard you say that.  Isn't that
2    right?
3    A.    **Yes, I did.**
4    Q.    And what you were referring to is actually referring
5    to Figure 9, weren't you?
6    A.    **Figure 9 is where the inventors mention the fact that**
7    **an LCD is another type of display.**
8    Q.    Well, let's talk about that.  Figure 9, what they're
9    talking about, is this LCD 34.  Isn't that right?
10   A.    **That's correct.**
11   Q.    And this LCD is a panel that's mounted on the display
12   unit.  Isn't that right?
13   A.    **Correct.**
14   Q.    And this LCD, sir, is a secondary display for
15   displaying error and fault information of the display unit.
16   Isn't that right?
17   A.    **Yes, it is.**
18   Q.    That LCD that is indicated there, that's not
19   displaying images that are part of the computer and monitor
20   transmissions.  Isn't that right?
21   A.    **It's not hooked up to the external video source.**
22   Q.    Right.  Because it's -- the whole purpose of this is
23   just to -- it's a little LCD that gives you error or fault
24   messages of the monitor.  Isn't that right?
25   A.    **That's its use, yes.**

**387**

1    Q.    Okay.  It's not hooked up to the video source, it's
2    not putting any video out there.  Isn't that right?
3    A.    **Correct.**
4    Q.    And then we can go to Figure 10 as well.
5          Again, that's a -- 14's a cathode ray tube.  Isn't
6    that right?
7    A.    **Yes, it is.**
8    Q.    And then why don't we go to Figure 11.
9          Fourteen is a cathode ray tube.  Isn't that right?
10   A.    **Same picture.**
11   Q.    Figure 12, let's complete it, why don't we do that,
12   Figure 12.
13         Fourteen is a cathode ray tube, right?
14   A.    **Yes.**
15   Q.    Now, we agree that every figure of the patent, and
16   we're talking about displaying the images, it's always done
17   on a component that's a cathode ray tube.  Isn't that
18   right?
19   A.    **Yes.**
20   Q.    Now, the '180 patent has a long and detailed
21   specification.
22         Do you agree with that?
23   A.    **It's fairly long, yes.**
24   Q.    But there's no mention in that specification of a
25   television.  Isn't that right?

**388**

1   A.   **That's correct.**

2   Q.   No mention of television tuner.  Isn't that right?

3   A.   **Correct.**

4   Q.   And TVs, of course, were -- they existed around the

5   time of the filing date, in 1993 in Japan, for the

6   application that led to this patent.  Isn't that right?

7   A.   **Yes.**

8   Q.   They didn't disclose televisions, though, right?

9   A.   **They also never used --**

10   THE COURT:  Just answer the question.

11   BY MR. MCKEON:

12   Q.   Is that right?

13   A.   **Can you repeat the question?  I'm sorry.**

14   Q.   Televisions were around in 1993, and the inventors

15   didn't disclose televisions in the patent specification,

16   right?

17   A.   **Yes.**

18   Q.   Can we get the Elmo, please, and here I have to fight

19   this beautiful sun we are having here in the courtroom, but

20   let's see if we can do it.

21   Okay.

22   THE COURT:  We are getting an error message.

23   MR. MCKEON:  Okay.  Your Honor, if I may approach the

24   witness and the jury with this document.

25   THE COURT:  Go right ahead.

**389**

1   BY MR. MCKEON:

2   Q.   What I am about to show you, sir, is an animation

3   that you did in your direct testimony.  And I wanted to

4   show you, and I will show the members of the jury the same

5   thing, so we can talk about it without having the Elmo.

6   Do you see that?

7   A.   **I do.**

8   Q.   Figure 1 and you have a TV some device attached

9   to the TV below.

10   Do you see that?

11   A.   **Yes.**

12   Q.   Now, what you've got here on the top, you have

13   Figure 1 of the patent.  On the right you had display

14   device and on the left you had the computer, right?

15   A.   **Correct.**

16   Q.   And then you were explaining to the members of the

17   jury how the patent worked with the animation.

18   Do you recall that?

19   A.   **Yes.**

20   Q.   In the bottom you have -- and I think it's an LG TV

21   you have on the right, isn't that right, below it?

22   A.   **Yes.**

23   Q.   On the left you have a device -- and what device was

24   that?

25   A.   **I think it was probably a cable box.**

**390**

1   Q.   Cable box.

2   But, of course, a cable box in the LG TV, none of

3   that's in the patent.  Isn't that right?

4   A.   **Yes.**

5   Q.   All right.  Now, the patent, as we established, talks

6   about the computer monitors, right?

7   And one of the things that's important, sir, is that

8   this patent comes from 1993.  Isn't that right?

9   A.   **Yes.**

10   Q.   And in 1993, if we look at the patent and we look at

11   that term "display" that's used in the patent -- isn't that

12   right?

13   A.   **Yes.**

14   Q.   -- that would be understood by one of ordinary skill

15   in the art to be a monitor.  Isn't that right?

16   A.   **That's one of the devices.**

17   Q.   Well, as we know, when you discussed the meaning of

18   "display" in this case, you stated that the term "display"

19   has its closest affinity with computer monitors.  Isn't

20   that right?

21   A.   **Yes, I did say that.**

22   Q.   In fact, you said if you walk into a Best Buy store

23   and you said, well, if you asked the clerk, Hey, where are

24   your displays?  He was going to send you over in the back

25   to the computer monitor section.  Wasn't he?

**391**

1   A.   **That's probably the case, yes.**

2   Q.   He wouldn't send you to TVs, right?

3   A.   **Probably not.**

4   Q.   And you have also stated that the bare term "display"

5   would normally be associated with computer monitors,

6   correct?

7   A.   **Yes.**

8   Q.   And your opinion that even the VESA standards, so

9   that VESA uses the terms "display" and "monitor"

10   interchangeably, correct?

11   A.   **They probably did.  At least during this timeframe**

12   **that we are dealing with.**

13   Q.   Well, let's go to your report, sir.  Again, at LG 98,

14   and that was in the binder we were just looking at,

15   Page 190.  I direct your attention to that.

16   Page 190 and that is Paragraph 382.

17   Do you see that?

18   A.   **I do.**

19   Q.   Okay.  And here I am reading from your report, sir:

20   In addition, various standards promulgated by the Video

21   Electronic Standards Association appear to use the terms

22   "monitor" and "display" interchangeably.

23   Did I read that correctly?

24   A.   **Yes, you did.**

25   Q.   Okay.  And just to give the members of the jury

Appx15100

**392**

1  context, I think we all are aware of this, but when we are

2  talking about a computer, a cathode ray tube computer

3  monitor, we are talking about what we're looking at over

4  here on that table, isn't that right, in the courtroom?

5  **A.    That is a cathode ray tube monitor, yes.**

6  Q.    And that is actually a vintage 1993 cathode ray tube

7  monitor.  So they looked like that.  Isn't that right?

8  **A.    Yes.**

9  Q.    And that's the kind of thing that is disclosed in all

10  those figures in the patent that we talked about.  Isn't

11  that right?

12  **A.    Yes.**

13  Q.    Now, you understand that VESA believed that the

14  pre-2004 versions of EDID defined configuration data that

15  was appropriate for traditional CRT displays.

16  Do you recall that?

17  **A.    I believe I do remember something about that, yes.**

18  Q.    Well, let's pull up pre-admitted Exhibit LG-280.  And

19  we see here --

20  THE COURT:  That's admitted, and you may offer it

21  into evidence.

22  MR. MCKEON:  Thank you, Your Honor.

23  (Exhibit Number LG-280 is received in evidence.)

24  BY MR. MCKEON:

25  Q.    This version of E-DDC standard came out in 2004.

**393**

1  Isn't that right?

2  **A.    Yes.**

3  Q.    And the first version, just to give the jury some

4  context, the first version that we've been talking about in

5  this trial came out in 1994.  Isn't that right?

6  **A.    Yes.**

7  Q.    Okay.  And turn to page -- if we can, this is -- I

8  will have Ian, our friend back here, help us with this,

9  21731.

10  MR. MCKEON:  And can you blow up the sentence that

11  starts with "Earlier versions"?  Blow up that whole -- or

12  just highlight it, Ian.  Thank you.

13  BY MR. MCKEON:

14  Q.    It says here:  Earlier versions of DDC and EDID

15  defined communication method and configuration data

16  appropriate for traditional CRT display.

17  Isn't that right?

18  **A.    Yes.**

19  Q.    So what it's saying here in the VESA document is that

20  standards that were before 2004, those standards were doing

21  stuff and defining stuff that was really appropriate for

22  CRTs.

23  Isn't that what it says?

24  **A.    Yes.**

25  Q.    And just to remind members of the jury, the version

**394**

1  that LG uses in its products is version 1.3.  Isn't that

2  right?

3  **A.    Yes.**

4  Q.    And that's -- it was in 2000 that came out, right?

5  **A.    Either '99 or 2000, I'm not sure which, but something**

6  **along those lines.**

7  Q.    But definitely before 2004 when VESA made this

8  statement.  Isn't that right?

9  **A.    Yes.**

10  MR. MCKEON:  And if we can highlight the next part of

11  the clause.

12  BY MR. MCKEON:

13  Q.    It says:  But were limited in support for other

14  display types.

15  So what VESA is saying here is that these versions of

16  the standard before 2004 were great for CRTs but were

17  limited for other kinds of technologies.

18  That's what they say here.  Isn't that right?

19  **A.    That's -- yes.**

20  Q.    Now, sticking with this discussion of the 2004

21  standard, I believe you testified that Hitachi sent some

22  letters to VESA to notify them that it may have patent

23  claims that are similar to techniques described in that

24  particular version of DDC.

25  Isn't that right?

**395**

1  **A.    Yes.**

2  Q.    In fact --

3  MR. MCKEON:  Can we get Mr. Lamm's slide 29, please.

4  BY MR. MCKEON:

5  Q.    And this is the slide you presented in your direct

6  testimony to members of the jury, right?

7  **A.    It is.**

8  Q.    Okay.  And -- but one thing is clear here is that

9  this particular slide that you have here, it's talking

10  about the 2004 DDC standard.  Isn't that right?

11  **A.    Yes, it is.**

12  Q.    Okay.  And that's after the 1994 original DDC

13  standard, of course, right?

14  **A.    Yes.**

15  Q.    And, of course, it's after the one that LG uses that

16  we talked about, which is about 2000.  Isn't that right?

17  The 1.3.

18  **A.    Well, this is the DDC standard.**

19  Q.    This is dated 2004, though, right?

20  **A.    Yes, it is.**

21  Q.    All right.  So that means 2004 -- you referenced a

22  portion of the standard that was dated 2004, but that was

23  after the standard was issued that -- the one LG uses.

24  Isn't that right?  Which was standard version 1.3.

25  Are you with me?

396

**A.** Yes, I believe so.

**Q.** Okay. And here what we have is a statement that says -- and, again, it's getting a little washed out, but it says here -- I am having trouble reading it.

VESA makes no effort to verify these statements.

Isn't that right?

**A.** Yes.

**Q.** And what this means is that companies that are working in the standard groups, they just identify a bunch of patents to put everybody on notice, and VESA takes them and puts them in a file essentially. Isn't that right?

**A.** That is essentially the case, yes.

**Q.** They don't look at it and go, Oh, I don't know. I don't think it's covered by the standard. No, I don't think so.

They don't do any evaluation like that, right?

**A.** Correct.

**Q.** So just because someone sends a letter in doesn't mean anything about whether it actually -- it covers the standard or not, right?

**A.** It is simply a notification to implementers of the standard that there may be intellectual property associated with it.

**Q.** Right. In fact, all of these companies here, they all sent letters in. Isn't that right?

397

**A.** Yes.

**Q.** Now, I think you've stated previously that you believe the combination of the EDID and DDC standards require practicing the '180 patent. Isn't that right?

**A.** Yes.

**Q.** And, in fact, you told -- you told the Patent Office in 2015 that the EDID and DDC standards specified in the Plug-N-Play standard incorporated Claim 14 of the '180 patent.

Do you recall that?

**A.** I would have probably said that, yes.

**Q.** Okay.

MR. MCKEON: And LG-33, Your Honor, is pre-admitted, and may I move that into evidence and have it published?

THE COURT: Moved into evidence. You may publish it.

MR. MCKEON: Thank you, Your Honor.

(Exhibit Number LG-33 is received in evidence.)

MR. MCKEON: And if we can get Paragraph 35 blown up from this exhibit, which is at Page 13 of the -- okay.

BY MR. MCKEON:

**Q.** And it says here: Below is a claim chart illustrating how compliance with the EDID and DDC standards specified in the Plug-N-Play standard results infringement of Claim 14 in the '180 patent.

Do you see that?

398

**A.** I do.

**Q.** Okay. This is what you're telling the Patent Office.

And by the way, this declaration you submitted to the Patent Office, what you were trying to do is you are trying to tell the Patent Office that this '180 patent, right, is a standard, essential patent, and you wanted the Patent Office to look at that and review that evidence so it would demonstrate to the Patent Office that this is a special patent and, therefore, get over the prior art. Isn't that right?

Isn't that essentially what was happening here?

**A.** I -- probably, yes.

**Q.** Okay. And then you submitted this declaration to the Patent Office, but, however, the Patent Office disagreed with your conclusion. Isn't that right?

**A.** I'm sorry, did not agree?

**Q.** They did not agree with your conclusion.

**A.** It's hard for me to answer that with a yes or no because there were a lot of Patent Office declarations that I made. I am not sure exactly which one you are referring to, but I will agree that the Patent Office standard procedure is to say they don't agree, and then we go back and forth a few more times.

**Q.** Right. And, yeah, you actually put declarations in for not only the '180 patent but for a number of the other

399

patents that Mondis calls DDC patents. Isn't that right?

**A.** Yes, I did.

**Q.** Well, let's take a look at this particular one. Okay?

MR. MCKEON: And if we can go to LG-529.

And, again, Your Honor, this was pre-admitted. May I move it in and publish it?

THE COURT: You may.

MR. MCKEON: Thank you.

(Exhibit Number LG-529 is received in evidence.)

BY MR. MCKEON:

**Q.** And let's go to Page 12. This is the Patent Office response to the declaration you submitted.

MR. MCKEON: And if I can go to Page 12, please, and blow up the paragraph there beginning with the word "last," please. Okay?

BY MR. MCKEON:

**Q.** And this is what the Patent Office said to you, or to Mondis, in response to your declaration, right? They said: The declarant asserts that one or more computer display standards promulgated by VESA have incorporated the inventions claimed in the '180 patent. Although the declarant shows a list that the claim limitations of the '180 patent were allegedly infringed by VESA compliance with the VESA EDID and DDC/CI standards, there is no hard

**400**

1   evidence of said incorporated.

2   Do you see that?

3   A.   I do.

4   Q.   That was the Patent Office's conclusion to what you

5   said in your declaration.  Isn't that right?

6   A.   In this declaration, yes.

7   Q.   Now, you mentioned earlier that you were a member of

8   VESA from 2002 to 2006.  Isn't that right?

9   A.   That's correct.

10   Q.   And I think you testified that you were personally

11   involved in some of the standard developments.

12   A.   Yes.

13   Q.   Now, LG's version 1.3, that came out in 2000.  Isn't

14   that right?

15   A.   Yes.

16   Q.   The one that LG implements in the TVs, right?

17   A.   Yes.

18   Q.   And so you were there for 2002 to 2000- -- I think we

19   said '6, and the version that is at issue in this case is

20   1.3 which came out in 2000.  Isn't that right?

21   A.   That is correct.

22   Q.   So that was before you got to VESA.  Isn't that

23   right?

24   A.   Yes.

25   Q.   And so I guess the version that you were involved in

**401**

1   in your period of time would have been version 1.4 that

2   came out in 2006.  Isn't that right?

3   A.   That is correct.

4   Q.   So if I go to, Mr. Lamm, your slide 34, you showed

5   this to members of the jury.

6   Do you recall that?

7   A.   I do.

8   Q.   And I guess you mentioned yourself and then you had

9   Mr. Wang from Hitachi, right?

10   A.   Yes.

11   Q.   But this standard that you are showing here to

12   members of the jury, this is standard version 1.4.  Isn't

13   that right?

14   A.   It is.  That is correct.

15   Q.   Not 1.3, which is the version that is relevant in the

16   case.  Isn't that right?

17   A.   Well, if I may explain one thing.

18   Q.   Sorry, sir, you know what.  Your counsel here is

19   going to be able to do that.

20   But you agree with my -- with what I said, don't you?

21   A.   Can you repeat, just to make sure I --

22   Q.   Sure.

23   This version here was version 1.4, was not version

24   1.3 which is the version that is relevant in this case.

25   Isn't that right?

**402**

1   A.   That is correct.

2   Q.   And, in fact, your involvement in VESA didn't even

3   start until eight years after the 1994 original DDC

4   standard.  Isn't that right?

5   A.   That's correct.

6   Q.   So we can definitely agree on, you weren't involved

7   in that original 1994 standard.  Isn't that right?

8   A.   That's correct.

9   THE COURT:  And on that point, this will be a good

10   time for us to break.

11   MR. MCKEON:  Thank you, Your Honor.

12   THE COURT:  Ladies and gentlemen, thank you very

13   much.

14   Now, go home, watch TV, read a book, have some

15   refreshment.  Think about anything but DDCs and EDIDs.

16   We will see you tomorrow at 9:45.

17   THE DEPUTY CLERK:  No, you won't.

18   THE COURT:  Oh, that's right.  I'm sorry, you're off

19   tomorrow.

20   So you can spend all tomorrow thinking about all

21   sorts of other things also.

22   Friday, 9:45.  Okay?  Don't talk about the case.

23   Don't let anybody talk to you about the case.  Keep an open

24   mind.  And I have a suspicion you won't even think about

25   the case.

**403**

1   See you on Friday.

2   THE DEPUTY CLERK:  All rise.

3   (Jury exits the courtroom at 4:45 p.m.)

4   THE COURT:  All right, Mr. Lamm, you can step down.

5   All right?

6   (Witness excused.)

7   THE COURT:  Any creativity?

8   MR. MCKEON:  Nothing from us, Your Honor, just

9   maybe --

10   THE COURT:  Mr. Black is almost hidden.  Wait a

11   second.  Ah, there he is.

12   MR. BLACK:  I am coming out of the closet, Your

13   Honor.  I'll let Mr. McKeon go first.

14   MR. MCKEON:  I do have one, Your Honor, I was just --

15   THE COURT:  Get to a microphone.

16   MR. MCKEON:  We don't have any issues to present to

17   the Court.  I just want to say if you can give an

18   instruction to Mr. Lamm regarding --

19   THE COURT:  Okay, I will.

20   MR. MCKEON:  -- regarding the sequestration.

21   THE COURT:  Mr. Lamm.

22   THE WITNESS:  Yes, sir.

23   THE COURT:  Okay.  You cannot talk about the

24   substance or the subject matter of your testimony with

25   counsel or anybody else until we resume Friday, 9:45.

**404**

1    So you can also spend the evening and tomorrow
2    thinking about everything else in the world but DDCs and
3    EDIDs.
4    MR. BLACK:  Two things, Your Honor, one is I think we
5    should probably have some colloquy about scheduling.  I
6    know you are concerned about that.  I think we are on
7    schedule, but it might be worth a little back and forth at
8    this point.
9    So Mr. Lamm is our last witness.  I imagine they are,
10   obviously, going to continue with cross tomorrow.  Then we
11   will rest.
12   You have Mr. Alessi, who I expect will be brief, and
13   then their infringement expert, who will take, with direct,
14   my guess is we won't get done with cross, but we will get
15   done with -- if we get really lucky we'll get done with
16   cross with him --
17   THE COURT:  On Friday.
18   MR. BLACK:  -- Friday, but more likely that will leak
19   over into Monday morning at 11, as I understand it.
20   And then the question would be -- and then we would
21   have a rebuttal case, which would be limited, and we could
22   potentially be done with the evidence on Tuesday afternoon,
23   although it's a short day.  It would probably make sense to
24   close --
25   THE DEPUTY CLERK:  It's a full day Tuesday.

**405**

1    MR. BLACK:  I'm sorry.  I'm sorry.  I'm sorry.
2    Absolutely.
3    Monday is a short day.  We could be done with the
4    evidence then, we could close Tuesday morning.  If we
5    finish at, like, 3 on Tuesday -- on Monday, obviously we'd
6    prefer to close Tuesday morning, the liability.
7    MR. MCKEON:  That sounds about right to us, Your
8    Honor.
9    THE COURT:  Okay.  As I understand it you are pretty
10   well agreed on your jury charges, correct?
11   MR. BLACK:  Yes, with the exception of the use issue
12   that came up this morning.  There are a few things that
13   have to be sorted, but I don't think they are significant.
14   THE COURT:  Okay.
15   MR. BLACK:  Okay.  The other issue, I am not sure
16   it's still an issue, is we have Mr. Spiro on, obviously,
17   extensively.  There are some deposition designations that
18   they say they want to read into the record.  They started
19   cross-examining him on the area that's in the designation.
20   I don't know whether that's still live.
21   MR. MCKEON:  We're going to -- I don't think so, Your
22   Honor.  I don't know if we are going to be calling by
23   deposition, but we can just take a look at it based on
24   today's cross-examination.
25   MR. BLACK:  Yeah, if they are, there is an issue

**406**

1    because they covered the subject matter with him, and then
2    to play it, we'd have actually some -- need some rebuttal
3    testimony to deal with things that weren't covered in the
4    dep.  So it would be a little bit of a mess, but we'll sort
5    it out by Friday.
6    THE COURT:  Okay.
7    MR. MCKEON:  I think it will work out.
8    THE COURT:  Good.  We will see you on Friday.
9    MR. MCKEON:  Thank you, Your Honor.
10   THE DEPUTY CLERK:  You guys doing anything with Ryu,
11   Mr. Ryu, R-Y-U?
12   MR. BLACK:  What's that?
13   MR. MCKEON:  Oh, Ryu.
14   MR. BLACK:  Oh, that was -- the Judge ruled against
15   me on that so I won't be playing it.
16   THE DEPUTY CLERK:  Okay.  Fair enough.
17   MR. BLACK:  Yes.
18   THE DEPUTY CLERK:  So that's out.  Okay, thanks.
19   MR. BLACK:  Not yet.
20   THE DEPUTY CLERK:  Got you.
21   (The proceeding is adjourned at 4:49 p.m.)

**407**

I N D E X

WITNESS                  DIRECT CROSS REDIRECT RECROSS

MICHAEL B. SPIRO

By: Mr. McKeon              176       246
    Mr. Black              221

JOSEPH D. LAMM

By: Mr. Plies              270
    Mr. McKeon                     374

VIDEO DEPOSITION OF TIMOTHY ALESSI......254

VIDEO DEPOSITION OF BIEONG GEOL LEE.....262

E X H I B I T S

NUMBER            EVID

LG-508            212

MON 1564-A        230

MON 1960          231

MON-0516          295

MON-0507          298

MON-0509          302

MON-0506          304

MON-0505          305

MON-0258          308

MON-0756          309

MON-0793          311

Appx15104

**408**

E X H I B I T S  (Continued)

| | |
|---|---|
| MON-0663 | 311 |
| MON-0427 | 311 |
| MON-0259 | 312 |
| MON-0262 | 316 |
| MON-0490 | 326 |
| MON-0569 | 337 |
| MON-0511 | 356 |
| MON-0816 | 362 |
| MON-4903 | 372 |
| LG-280 | 392 |
| LG-33 | 397 |
| LG-529 | 399 |

---

**409**

FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

- - - - - - - - - - - - - -

     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/ Jacqueline Kashmer, CCR, CRCR, RMR
/S/ Joanne Sekella, CCR, CRCR, RMR          April 3, 2019
Official Court Reporters                        Date

Appx15105

410

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2

 3    _____      VOLUME 3

 4    MONDIS TECHNOLOGY, LTD.,          CIVIL ACTION NO.
                                        2:15-cv-04431-SRC-CLW
 5         Plaintiffs,
      vs.                               JURY TRIAL
 6
      LG ELECTRONICS, INC., and
 7    LG ELECTRONICS U.S.A., INC.,

 8
           Defendants.
 9    _____

10
           Frank R. Lautenberg Post Office & Courthouse
11         Two Federal Square
           Newark, New Jersey 07102
12         April 5, 2019
           Commencing at 9:45 a.m.
13

14
      B E F O R E:  THE HONORABLE STANLEY R. CHESLER,
15                  UNITED STATES DISTRICT JUDGE
                    and a Jury
16

17

18

19
           Jacqueline Kashmer, Official Court Reporter
20         Joanne Sekella, Official Court Reporter
                    jkcsr711@aol.com
21               908-200-1040

22

23

24      Proceedings recorded by mechanical stenography; transcript
              produced by computer-aided transcription
25
```

411

```
 1   A P P E A R A N C E S:

 2

 3   DECHERT LLP
     2929 Arch Street
 4   Philadelphia, PA 19104
     BY:  MARTIN BLACK, ESQ.
 5        JEFFREY PLIES, ESQ.
          JEFFREY S. EDWARDS, ESQ.
 6   Attorneys for the Plaintiffs

 7

 8   WALSH PIZZI O'REILLY FALANGA, LLP
     One Riverfront Plaza
 9   1037 Raymond Blvd.
     Suite 600
10   Newark, NJ 07102
     BY:  LIZA M. WALSH, ESQ.
11

12        and

13   FISH & RICHARDSON, PC
     1000 Maine Avenue, SW
14   Suite 1000
     Washington, DC 20024
15   BY:  MICHAEL J. McKEON, ESQ.
          ANDREW SCHWENTKER, ESQ.
16   Attorneys for the Defendants
17
18
19
20
21
22
23
24
25
```

412

```
 1       (PROCEEDINGS held in open court before the Honorable
 2   Stanley R. Chesler, United States District Judge, at 9:45
 3   a.m.)
 4       THE COURT:  Be seated.  Good morning.
 5       ALL COUNSEL:  Good morning, Your Honor.
 6       THE COURT:  Now, counsel, I have received two letter
 7   briefs.
 8       MR. BLACK:  Yes.
 9       THE COURT:  They are -- don't even bother getting up.
10   All right.  Don't even bother getting up.
11       I gave you folks explicit instructions.  I would deal
12   with any issues which you for saw arising today at 4:45 on
13   Wednesday, not at 9:30 on Friday.  I've got a jury out
14   there.  They're ready.  I'm going to bring them in.
15       If the timing is appropriate, I may hear this during
16   lunch, but when I give an instruction about how I want
17   things to be done, it's not a suggestion, it's not a
18   request.
19       I made one exception the first time at the start of
20   this trial.  This will not be presented to the jury until I
21   rule on it and I'm not ruling on it while I'm wasting the
22   jury's time.
23       Understood, counsel?
24       MR. McKEON:  Yes, Your Honor.
25       THE COURT:  Let's proceed.
```

413

```
 1           JOSEPH D. LAMM, PLAINTIFF'S WITNESS,
 2        having been duly sworn, testifies as follows:
 3             CROSS-EXAMINATION (Continued)
 4                   BY MR. MCKEON
 5           (The witness resumes the stand.)
 6          (The jury is seated in the jury box.)
 7   THE COURT:  Be seated, everybody.
 8   Good morning, ladies and gentlemen.
 9   THE JURY:  Good morning, sir.
10   THE COURT:  I trust that you all followed my
11   instructions and that you did not even think about this
12   case yesterday or the night before.  Good.  Well, back to
13   work.  We're going to proceed now.
14       Please go ahead.
15       MR. McKEON:  Thank you, Your Honor.
16   BY MR. McKEON:
17   Q.   Good morning, members of the jury and good morning to
18   you, Dr. Lamm -- Mr. Lamm.  Appreciate seeing you again.
19   So let's go right to it.
20       Now, we've heard a lot in this trial already about
21   the '180 patent really being about Plug-N-Play.  Is that
22   right?
23   A.   Yes.
24   Q.   And in fact, you were here for opening statements on
25   Tuesday.  Isn't that right?
```

Appx15106

**414**

1   A.   Yes, I was.

2   Q.   And you heard Mondis's counsel say the '180 patent is

3   Plug-N-Play.  Did you hear that?

4   A.   Yes.

5   Q.   And I believe you also had the opinion that the

6   claimed inventions described in the '180 patent form the

7   foundation of the technology we know today as Plug-N-Play.

8   Isn't that right?

9   A.   Yes.

10   Q.   And when you say the foundation, you mean Plug-N-Play

11   is built on the '180 patent.  Isn't that right?

12   A.   Yes.

13   Q.   And by analogy, a house, a house is built on the

14   foundation.  It's got one foundation.  Isn't that right?

15   A.   Yes.

16   Q.   And last time we spoke you mentioned that you put a

17   bunch of declarations into the Patent Office for a number

18   of the Mondis patents in what they call the DDC portfolio.

19   Do you recall that?

20   A.   Yes.

21   Q.   And one of those patents was 6513088.  Do you recall

22   that?

23   A.   Yes.

24   Q.   The '088 patent.  Right?

25   A.   Yes.

**415**

1   Q.   And you told the Patent Office, with respect to the

2   '088 patent, you told the Patent Office that you believed

3   the claimed inventions described in the '088 patent form

4   the foundation of the technology we know today as

5   Plug-N-Play.  Do you recall that?

6   A.   Yes, I do.

7   Q.   And you're also familiar with another patent in the

8   portfolio, 6549970.  Are you familiar with that patent?

9   A.   Yes, I am.

10   Q.   And you put a declaration in the Patent Office on

11   that patent too, didn't you?

12   A.   I did.

13   Q.   And the idea behind these declarations is you were

14   trying to tell the Patent Office something special about

15   the patent.  Isn't that right?

16   A.   I was opining about the purpose of the patent.

17   Q.   Okay.  And with respect to the '970 patent, you told

18   the Patent Office that you believed the claimed inventions

19   described in the '970 patent form the foundation of the

20   technology we know today as Plug-N-Play.  Isn't that right?

21   A.   I believe I did.

22   Q.   And you're familiar also with the patent 6639588.

23   Isn't that right?

24   A.   Yes.

25   Q.   And that actually is a patent that's in this other

**416**

1   portfolio that Mondis got from Hitachi, the '812 family.

2   Isn't that right?

3   A.   I believe it is, yes.

4   Q.   And that's a different family than the '180 family

5   that we've been talking about.  Isn't that right?

6   A.   Correct.

7   Q.   And it's got a completely different specification in

8   fact than the '180 family series of patents.  Isn't that

9   right?

10   A.   Yes, I believe it does.

11   Q.   And you also put a declaration in the Patent Office

12   on the '588 patent, didn't you?

13   A.   I most likely did.  I don't remember it exactly but I

14   most likely did.

15   Q.   Okay.  And you told the Patent Office that the

16   claimed invention described in Claim 1 of the '588 patent

17   forms the foundation of the technology we know today as

18   Plug-N-Play.  Do you recall that?

19   A.   Not explicitly, but that was the language that I used

20   in several of those.

21   Q.   Okay.  And so we've got a series of patents and, as I

22   understand the testimony today is each of the patents forms

23   the foundation of Plug-N-Play.  Is that right?

24   A.   I probably used those words, yes.

25   Q.   So, how many foundations, sir, does Plug-N-Play have?

**417**

1   A.   All of those patents had features that could be

2   considered a foundational aspect.

3   Q.   Well, you didn't say a foundation, sir.  You said the

4   foundation.  Isn't that right?

5   A.   I'm taking your word for it, yes.

6   Q.   Well, you believe, I think, sir, that the '180 patent

7   is a standard essential patent.  Isn't that right?

8   A.   Yes, it is.

9   Q.   And what we know is that Claim 14 of the '180 patent

10   requires an identification number for identifying a type of

11   display unit.  Isn't that right?

12   A.   Yes, it does.

13   Q.   And the language, at least a type of that language

14   was added to the claim in 2007.  Do you recall that?

15   A.   Yes.

16   Q.   In other words, it wasn't in the original patent

17   application as filed in the '180 patent but it was added in

18   2007, after the application was filed.  Is that right?

19   A.   Yes.

20   Q.   So, the first time that the claim included this

21   language and identification number for identifying at least

22   a type of display unit was in 2007.  Right?

23   A.   Yes.

24   Q.   And you agree that the specification of the '180

25   patent does not expressly recite an identification number

418

1  for identifying a type of display unit.  Correct?

2      A.  Yes.

3      Q.  So, between 1993, when that original Japanese patent

4  application was filed in Japan, and 2007, the patent

5  specification did not expressly recite or include an

6  identification number for identifying at least a type of

7  display unit.  Correct?

8      A.  I'm sorry.  Can you repeat that, just make sure I

9  understand.

10     Q.  Let me give it a go again.  Between 1993, when that

11  was originally -- the application was originally filed in

12  Japan, and then 2007, the specification did not expressly

13  recite an identification number for identifying at least a

14  type of display unit.  Correct?

15     A.  It did not expressly recite those words.

16     Q.  Now, Mr. Lamm, Claim 14 also requires characteristic

17  information.  Isn't that right?

18     A.  Yes.

19     Q.  And characteristic information, that language does

20  not appear in the specification.  Isn't that right?

21     A.  I believe that's correct.

22         MR. McKEON:  And if we can get Claim 14 pulled up on

23  the screen.

24     Q.  And we got our Claim 14 up here, and we can see here

25  we have an identification number for identifying at least a

420

1  characteristic information is distinct from an

2  identification number for identifying a type of display

3  unit.  Isn't that right?

4      A.  Yes, it is.

5      Q.  The identification number and characteristic

6  information are two separate things.  Right?

7      A.  The identification number for identifying type, yes,

8  is distinct from characteristic information.

9      Q.  So, we conclude from there then if something is

10  characteristic information, it can't be an identification

11  number for identifying a type of display unit.

12     A.  Correct.

13     Q.  And if something is an identification number for

14  identifying a type of display unit, it can't be

15  characteristic information?

16     A.  Correct.

17     Q.  So this debate about what those two bits are is

18  really important in this case.  Right?

19     A.  Yes.

20     Q.  Because if you're right, then under your theory then,

21  it's in the EDID table and it's in LG TVs.  That's your

22  position.  Isn't that right?

23     A.  Correct.

24     Q.  And if Dr. Stevenson is right, it's characteristic

25  information, the claim element is not satisfied, there's no

419

1  type of said display unit.

2         MR. MCKEON:  Maybe we can have Ian highlight that for

3  us.  All right.

4      Q.  And then separately we have characteristic

5  information of said display unit.  Do you see that?

6      A.  Yes, I do.

7      Q.  So the idea here is that you have a memory in which

8  at least display unit information is stored and the display

9  unit information has two things.  Right?  It has an

10  identification number as described and separately it has

11  characteristic information.  Isn't that right?

12     A.  Yes.

13     Q.  And there's a big debate in this case -- right --

14  because you point to these two bits that are in the feature

15  support byte and you say that's an identification number.

16  Isn't that right?

17     A.  Those two bits are an identification number for

18  identifying a type.

19     Q.  Right.  And that's your position.  But of course

20  there's a debate about that because Dr. Stevenson says, no,

21  no, no, that's not an identification number.  That's

22  characteristic information.  Isn't that right?

23     A.  I believe I've heard him say that.

24     Q.  Okay.  And the difference, of course, in this opinion

25  is important because the one thing we know is that

421

1  infringement.  Isn't that right?

2      A.  Correct.

3      Q.  Okay.  Now we have the debate.  Now, in your opinion

4  it's not necessary to have both characteristic information

5  and an identification number for identifying at least a

6  type of display unit to be able to generate compatible

7  signals.  Isn't that right?

8      A.  Right, you don't need both of them.

9      Q.  And you believe that having both an identification

10  number for identifying at least a type of digital unit and

11  characteristic information would be superfluous.  Isn't

12  that right?

13     A.  I think I have to disagree with that but...

14     Q.  Okay.  Well, you were deposed in this case.  Right,

15  sir?

16     A.  Yes.

17     Q.  And in your deposition you put your hand up, you

18  swore to tell the truth.  Isn't that right?

19     A.  Yes.

20     Q.  Just like you did here in the court.  Correct?

21     A.  Correct.

22     Q.  So, I want to look at your deposition, Page 102, Line

23  10 to 21, sir.  If you want to follow along it's in binder

24  one, your deposition transcript is there.  Do you see that?

25     A.  Yes, I do.  And what page?

Appx15108

422

1    Q.   Sure.  It's Page 102, line 10 to 21.  You with me?
2    Okay?
3    A.   Yes.
4    Q.   So let me read.
5         "If characteristic information can be used to get
6    signal compatibility, then there's no reason to use an
7    identification number to generate compatible signals.
8         "ANSWER:  In a lot of cases, you can use one or the
9    other and it doesn't necessarily require both.  Having both
10   gives you some flexibility, but it doesn't -- it's not
11   necessary to be able to generate compatible signals.
12        "QUESTION:  And in fact, you say that it's
13   superfluous.  Right?
14        "ANSWER:  Yes."
15        Did I read that correctly, sir?
16   A.   Yes, you did.
17   Q.   All right.
18        MR. McKEON:  And may I ask Miss Trivino for the lapel
19   mic?  Thank you.
20        THE COURT:  You may certainly use the lapel mic or
21   whatever you want, as long as you make sure that you are
22   using a mic.
23        MR. McKEON:  Thank you, Your Honor.
24   BY MR. McKEON:
25   Q.   All right.

423

1         MR. McKEON:  If I can get the ELMO please.  All
2    right.
3    Q.   Sir, I want to talk a bit now about the EDID table.
4    And this table is really important in this case.  Isn't
5    that right?
6    A.   Yes, it is.
7    Q.   And this EDID table, it's got this 128 bytes of
8    information.  Isn't that right?
9    A.   Yes.
10   Q.   And this EDID table is the table that was actually in
11   the original standard in 1994.  Isn't that right?
12   A.   Yes.
13   Q.   And it was -- the table was carried through all the
14   standards as they evolved.  Isn't that right?
15   A.   Yes.
16   Q.   But it's the same table.  Isn't that right?
17   A.   I believe so, yes.
18   Q.   And the way the table is organized is that we've got
19   the first byte at the top here where my pen is, and then it
20   goes down through the table and it goes all the way to
21   number 128 at the end.  Isn't that right?
22   A.   Yes.
23   Q.   And the way the information is communicated in actual
24   use is that it's a bunch of bits essentially going from the
25   computer monitor to the computer and it travels in serial

424

1    fashion.  Isn't that right?
2    A.   Correct.
3    Q.   So, you were here for the opening.  Right?
4    A.   Yes.
5    Q.   And I came up with a train -- do you remember the
6    train analogy I had?
7    A.   Yes, I do.
8    Q.   Is that a fair way to describe what's going on here?
9    It's got a long string of information.  Isn't that right?
10   A.   It is a long string of information, yes.
11   Q.   And the way this is organized is that we have certain
12   sections, for example, I'm going to highlight this section
13   here.  It's vendor and product identification.  Do you see
14   that?
15   A.   I do.
16   Q.   Okay.  And vendor product identification, that's the
17   second in this train that includes these identification
18   numbers that are explicitly defined in the standard.  Isn't
19   that right?
20   A.   Yes, there's few of them, yes.
21   Q.   Okay.  And we also have things down below, different
22   sections, including color characteristics.  Do you see
23   that?
24   A.   Yes.
25   Q.   And color characteristics is another section of the

425

1    table.  Isn't that right?
2    A.   Correct.
3    Q.   And below that we have something called established
4    timings, again, another section of the train.  Isn't that
5    right?
6    A.   Yes.
7    Q.   And below that we have here standard timing
8    identification.  Do you see that?
9    A.   I do.
10   Q.   That's another section of the train.  Isn't that
11   right?
12   A.   Yes.
13   Q.   And then the next page here, the top we have
14   something called detailed timing descriptions, and I
15   highlighted that.  Do you see that?
16   A.   I do.
17   Q.   And what I've highlighted in blue here in these
18   different sections, your opinion is that all that is
19   characteristic information.  Isn't that right?
20   A.   Yes.
21   Q.   And when we deal with the color characteristics, we
22   have a total of 10 bytes.  Isn't that right?
23   A.   Yes.
24   Q.   And 10 bytes, I'm going to put here 10 bytes in the
25   side, and that would be, just so it's clear, one byte is

426

1   eight bits. Isn't that right?

2   A.   Yes.

3   Q.   And in the analogy we've got, if you have a train

4   car, it's got eight seats in it. Isn't that right?

5   A.   I believe that was what you were implying.

6   Q.   Okay. So, 110 -- we've got 10 bytes and we have 80

7   seats -- is that right -- for this section?

8   A.   Yes.

9   Q.   And then we have established timing below that and

10  there we've got a total of three bytes. Isn't that right?

11  A.   Yes.

12  Q.   Let me write that down so we can keep track of this.

13  And that would have 24 bits. Isn't that right?

14  A.   Yes.

15  Q.   And then, of course, we have standard timing

16  identification and that has 16 bytes. Isn't that right?

17  A.   That's what it says, yes.

18  Q.   And that's going to be, if I have my math right,

19  128 bits. Isn't that right?

20  A.   Yes.

21  Q.   The 128 seats in the train, using our analogy. Is

22  that fair?

23  A.   Yes.

24  Q.   And then we go to detailed timing description. We

25  have -- that's a lot of stuff there, isn't it, 72 bytes.

427

1   Do you see that? Is that right?

2   A.   May I explain this a little bit further on this one?

3   Q.   Well, can you just tell me whether it's fair to say

4   that detail time descriptions has 72 bytes as indicated in

5   the standard?

6   A.   In total, yes.

7   Q.   In total. So I'm going to write down 72 bytes. And

8   72 bytes, sir, if we do the math, it's 576 bits. Isn't

9   that right?

10  A.   I'll take your word for it.

11  Q.   I've got to -- secretly, between us, I have a cheat

12  sheet over here. Okay.

13      So it says 576 on it, so I'm going to write that

14  down. Okay.

15      So, we have what we've gone through now, we've gone

16  through sections of this train, of this table, that's all

17  characteristic information. You agree with that. Right?

18  A.   Yes.

19  Q.   And if we add these bits up, what we get is you've

20  got 80 bits for color characteristics, you've got 24 for

21  established timing, you've got 128 for standard

22  identification and you've got 576 for detailed timing

23  descriptor. Is that right?

24  A.   Well, I do need to qualify the answer on the 72 bytes

25  for the detailed timing descriptor.

428

1   Q.   But at least the standard calls that -- the standard

2   calls that, all of those bytes, every one of them, detailed

3   timing descriptors. Right?

4   A.   The standard does call it that, but that's not

5   necessarily the way they're used.

6   Q.   Oh, so the way they're used. So, but we're talking

7   about the standard here, what the standard says. Isn't

8   that right?

9   A.   This table of the standard does use that term in this

10  table, yes.

11  Q.   And this is -- this is your case, sir -- this table

12  is really important to your case. Isn't that right?

13  A.   Yes.

14  Q.   Because, I mean, this table is where you point to

15  identification number and characteristic information.

16  Isn't that right?

17  A.   Correct.

18  Q.   Okay. Now, we also know, sir, that if we go back

19  into the table, we also know going up, we have something

20  here called max horizontal image size. Do you see that?

21  A.   I do.

22  Q.   And that would be characteristic information. Isn't

23  that right?

24  A.   Yes.

25  Q.   I'm going to highlight that. And we also have max

429

1   vertical image size. That's also characteristic

2   information. Correct?

3   A.   Yes.

4   Q.   And we also have something called gamma here, and

5   that's also characteristic information. Correct?

6   A.   Yes.

7   Q.   So, I've got here what we've drawn, I've got

8   characteristic information starting in the basic display

9   parameters and features block, and then I go to the -- I

10  skip over this feature support, we'll get to that in a

11  minute, but then I go to color characteristics, and from

12  then on down until I get to the next page, to the 126-byte

13  in the table, is all characteristic information. Correct?

14  A.   Again, I have to qualify, some of those 72 bytes may

15  not be characteristic information.

16  Q.   Well, but the standard defines them as characteristic

17  information. Correct?

18  A.   This table uses that word, but if you read further in

19  the standard, there are other definitions available for

20  some of those bytes.

21  Q.   But that depends on how you use it. Isn't that

22  right?

23  A.   Yes, it is.

24  Q.   Right. But the standard defines them here in this

25  table as detailed timing descriptions and that is, of

Appx15110

430

1  course, characteristic information, in your opinion.
2  Correct?
3      A.  I have to disagree.
4      Q.  Well, we just agreed and established, sir, that
5  detailed timing descriptors, that's characteristic
6  information.  Isn't that right?
7      A.  I disagree.
8      Q.  Okay.  One thing we do know, sir, is this:  We know
9  that the feature support byte that you have here --
10  right -- that's within that one byte in this table.  That's
11  the two bits.  Right?
12     A.  The type is using two bits in that table, yes, in
13  that feature support byte.
14     Q.  Okay.  So, what we know is you say that in this table
15  here, in that one byte are those two bits, and you say that
16  that's an identification number.  Correct?
17     A.  For identifying type, yes.
18     Q.  And we also know that we have this blue highlighting
19  I gave up here, that's characteristic information, and we
20  jump over the two bits and then we have color
21  characteristics, and from then on down we're talking about
22  characteristic information.  Isn't that right?
23     A.  I have to put my qualifier in one more time, yes.
24     Q.  But according to the table.  Right?
25     A.  According to the words in this table, yes.

432

1      A.  Yes.
2      Q.  Those we know and there's no debate that those are
3  identification numbers.  Isn't that right?
4      A.  Yes.
5      Q.  So, even though we have, in this table and in this
6  standard, we have explicit reference to identification
7  number, you go on towards the back of the train, you find
8  two bits in something called a feature support byte that is
9  in a sea of characteristic information and that's, to you
10  that's identification number for identifying a type of
11  display unit.  Is that right?
12     A.  Those two bits, yes.
13     Q.  Okay.  Now, let's go to this table, if we can.  It's
14  LG-367 is the document.  Of course, this is the standard
15  and this is the table you're talking about.  Right?
16     A.  Yes.
17     Q.  And in here, sir, doesn't call these two bits.  If we
18  can highlight the two bits please, doesn't call that
19  identification number, does it?
20     A.  No.
21     Q.  In fact, nowhere in this table is identification
22  number used.  Is that right?
23     A.  Probably not.
24     Q.  And in fact, in this table we know that there is
25  additional characteristic information in the table.  Isn't

431

1      Q.  Okay.  So, we basically have these two bits --
2  right -- that are really in a sea of characteristic
3  information.  Isn't that right?
4      A.  There's a lot of characteristic information in this
5  table, yes.
6      Q.  And one thing we also know is that those two bits,
7  the standard in the table here, doesn't call them
8  identification number.  Isn't that right?
9      A.  I don't know if it does or not.
10     Q.  Well, there's no -- you can see in the table there's
11  nothing that says ID number for these bits.  Isn't that
12  right?
13     A.  Well, you have to go to Table 3.11, but -- to see
14  what the --
15     Q.  We can go to the table if you want, sir, but it's not
16  in there either, is it, identification number?
17         Why don't we go to the table then.  All right.  But
18  one thing we do know, sir, is that in this table, just
19  towards the front of the train, we have a whole section
20  here that actually says ID number.  Right?  It's a whole
21  lot of ID numbers there?
22     A.  Yes.
23     Q.  Including, sir, we have an identification product
24  code, an identification serial number, identification
25  manufacturing name.  Isn't that right?

433

1  that right?
2      A.  I would need to review all the fields, but that's
3  probably the case.
4      Q.  Yeah.  In fact, we know, for example, standard
5  default color space, that's characteristic information
6  according to you.  Isn't that right?
7      A.  Yes.
8      Q.  And preferred timing mode, that's characteristic
9  information according to you.  Isn't that right?
10     A.  That -- that is more of a bit that just describes how
11  the table -- how the first detailed timing descriptor is
12  being used.
13     Q.  Okay.  But right below the two bits in the very byte
14  that's at issue here, standard default color space, that's
15  characteristic information?
16     A.  Yes.
17         MR. McKEON:  LG-367 is pre-admitted and already in
18  evidence.
19         (Exhibit LG-367 is marked in evidence.)
20  BY MR. McKEON:
21     Q.  All right.  I want to, if I can, go to -- and I'm
22  going to mark this, sir, what we've drawn here together,
23  I'm going to mark it so we can reference it later, LG-D1
24  for demonstrative.  Okay.
25         (Exhibit LG-D1 is marked for identification.)

434

1    Now, I want to turn our attention to something else.
2    This is a slide that you used in your direct testimony.  Do
3    you recall that?
4    A.    I do.
5    Q.    Okay.  And this slide is an excerpt from an LG manual
6    that has the 128 bytes listed.  Isn't that right?
7    A.    Yes.
8    Q.    And what this slide corresponds to is that table that
9    we just -- you and I just talked about.  Isn't that right?
10    A.    Yes, it does.
11    Q.    And of course, this is your slide.  You did this
12    slide.  Isn't that right?
13    A.    Correct.
14    Q.    And you're trying to be accurate on the slide.  Isn't
15    that right?
16    A.    Correct.
17    Q.    Not trying to mislead anybody in the courtroom.
18    Isn't that right?
19    A.    Sure.
20    Q.    Okay.  And we've got some things on the slide I want
21    to talk to you about.
22    Now, first let's make sure we're on the same page
23    about how the slide -- the table on your slide corresponds
24    to this table we were just talking about, the EDID table.
25    And as I understand it, I want to put my pen here.

435

1    This is the first byte in the table -- isn't that right --
2    where my pen is --
3    A.    Yes, it is.
4    Q.    -- 00.  And then I can go all the way through and the
5    last byte is there, is where my pen is.  That's 70F.
6    A.    Yes.
7    Q.    Okay.  And then we just count, going -- follow my pen
8    left to right, then down, then number 11, number 12, all
9    the way, and I can go 30, 31, 32, 40 41, 42, 50, 60, 70,
10    all the way, and I get to the end, I get to 128 bytes.
11    Right?
12    A.    Right.
13    Q.    So now we know the correspondence.  Now, what you
14    listed here, you listed detailed timings.  Do you see that?
15    A.    Yes, I do.
16    Q.    And you've got -- you start here at byte 36.  Isn't
17    that right?
18    A.    The hex number 36, yes.
19    Q.    Right.  And just so -- I'm going to pull this off and
20    put our table back on, and here we have -- there it is.
21    THE COURT:  What's the exhibit number again?
22    MR. McKEON:  Thank you, Your Honor.  Putting now our
23    demonstrative LGD-1, this is from the Exhibit 367, LG-367.
24    BY MR. McKEON:
25    Q.    And sir, the detailed timing descriptions, this is

436

1    the 36 byte listed here.  Isn't that right?
2    A.    Yes.
3    Q.    And we know that this block has a total of 72
4    bytes -- isn't that right -- according to the standard.
5    A.    There are four descriptors and the first one is
6    defined to be timing information.
7    Q.    And we have also additional ones below here.  Isn't
8    that right?  18 bytes, 18 bytes, 18 bytes.  Isn't that
9    right?
10    A.    Well, if you notice, those can also be monitor
11    descriptors and not timing descriptors.
12    Q.    Okay.  But according to the table, they can be
13    characteristic information.  Isn't that right?
14    A.    They can be, yes.
15    Q.    And this table, what you've drawn here, that detailed
16    timing would go from where my marker is here, it goes here,
17    it goes here, but then it keeps going, doesn't it?
18    A.    There are three more descriptors that can be
19    something else.
20    Q.    Well, according to the standard, EDID standard, the
21    detailed timing we just established is 72 bytes.  Isn't
22    that right?  We just read it.
23    A.    My same caveat applies.
24    Q.    And here, sir, in the table where my pen -- where
25    this pen is going, the marker, this is all detailed

437

1    timing -- isn't that right -- where my pen is going back
2    and forth from row 50, 60, 70 on your slide.  Is that
3    right?
4    A.    They can also be a monitor descriptor.
5    Q.    Could be a monitor descriptor.  But this is, of
6    course, LG televisions you're accusing of infringement.
7    Isn't that right?
8    A.    Yes.
9    Q.    And in this chart this is detailed timing
10    information.  Isn't that right?
11    A.    For instance, LG uses one of these to describe -- to
12    put up a name of the product.
13    Q.    But in the bytes that I'm talking about, detailed
14    timing.  Correct?
15    A.    LG uses these as a monitor descriptor.
16    Q.    A monitor descriptor.  Are all these bytes monitor
17    descriptors, sir?
18    A.    No.  At least one of the groups is.
19    Q.    All right.  At least one.  But this continues on its
20    detailed timing information, at least some of it is.  Isn't
21    that right?
22    A.    The first 18 bytes are a detailed timing descriptor.
23    Q.    And how about the 18 bytes after that, and the 18
24    bytes after that?
25    A.    I'm having to decode these on the fly, but it looks

Appx15112

**438**

1  like the next one in this chart also appears to be a

2  detailed timing descriptor.  The one after that is not a

3  detailed timing descriptor.

4     Q.  So where my marker is, sir, that's, starting there,

5  is a detailed timing descriptor.  Correct?

6     A.  No.  It starts with the 01 that's not highlighted,

7  right above it, that --

8     Q.  Right here?

9     A.  At hex 48, yes.

10     Q.  Right here is that detailed timing?

11     A.  That does appear to be a detailed timing descriptor

12  but, again, I'm kind of doing this on the fly.

13     Q.  Well, it continues on to this point where it's 18

14  bytes.  Isn't that right?

15     A.  No.  It actually goes over another three from where

16  you stopped.

17     Q.  Right here?

18     A.  Yes.

19     Q.  Where my blue marker is, that's additional timing

20  information.  Correct?

21     A.  I believe that's the case, yes.

22     Q.  And that's characteristic information.  Isn't that

23  right?

24     A.  Yes.

25     Q.  And we also see something here, sir, that you

**439**

1  identified here as established timings.  Isn't that right?

2  And that's the green?

3     A.  Yes.

4     Q.  And the green, this is at spot 26 where we start.

5  Isn't that right?

6     A.  Yes.

7     Q.  And now going back to the table, sir, going back to

8  our table, which is LGD-D1, it's in LG-377, spot 26, sir,

9  that's not established timing.  Correct?

10     A.  That would be the standard timing -- standard timing

11  field.

12     Q.  It's standard timing.  Right.  So the green that

13  you've marked here, sir, on your slide, all this green

14  here, that's not established timing.  That's standard

15  timing.  Correct?

16     A.  Yes, I believe that's the case.

17     Q.  Okay.  So that's an error on the slide.  Isn't that

18  right?

19     A.  Well, established timings and standard timings are

20  very similar.  It's just a different way of encoding the

21  data.

22     Q.  But the one thing we do know, sir, is that these

23  three bytes here, that's established timing.  Isn't that

24  right?

25        THE COURT:  Give the numbers please, because you're

**440**

1  not preserving the record at all as to what you're asking

2  the witness.

3        MR. McKEON:  Thank you, Your Honor.

4  BY MR. McKEON:

5     Q.  If I go to 20 on the table, 20, 3, 4 and 5, those are

6  detailed -- sorry -- established timing positions.  Isn't

7  that right?

8     A.  If we could put up the table again, I could --

9     Q.  Right here.

10     A.  Yes, those are actually established timings.

11     Q.  All right.  That's established timings.  Isn't that

12  right?

13     A.  Yes.

14     Q.  I'm going to highlight that blue.  So that's

15  characteristic information.  Isn't that right?

16     A.  Yes, it is.

17     Q.  So what you've marked in green is actually standard

18  timing and what I just marked in blue on the Slide 77 at

19  spots 23, 24, 25, that's established timing.  Isn't that

20  right?

21     A.  Yes.

22     Q.  And we also know, sir, that this spot here, this spot

23  here, 78, that's gamma.  Isn't that right?

24     A.  Yes.

25     Q.  And that's for the record 10, so 17, spot 17 is

**441**

1  gamma.  Isn't that right?

2     A.  I believe that -- if we looked at the table we could

3  confirm that.

4     Q.  I'll put the table back on.  And 17 is gamma.  Right?

5     A.  Yes, it is.  Okay.

6     Q.  And that's characteristic information?

7     A.  Yes.

8     Q.  So, everything that we've highlighted here,

9  everything we've highlighted here, we agree is

10  characteristic information.  Isn't that right?

11     A.  Yes.

12     Q.  Okay.  Now, please, for the ladies and gentlemen of

13  the jury, please identify where the two bits are that you

14  say is an identification number for identifying a type of

15  display unit.  Please identify that position on the table.

16     A.  It's in byte number hex 18, 18.

17     Q.  And that would be where my pen is.  Isn't that right?

18     A.  Yes.

19     Q.  It says 08 there?

20     A.  0A, yes.

21     Q.  Circle that.  Okay.  And within that, within that

22  byte is those two bits that you say is an identification

23  number.  Isn't that right?

24     A.  Yes.

25     Q.  And again, sir, we've got a sea of characteristic

442

1  information, some of it you left out, but we've clarified
2  that, sea of characteristic information, and those two bits
3  in that one byte you're convinced is an identification
4  number. Isn't that right?
5  A.  Yes.
6  Q.  All right.
7      MR. McKEON:  And I'm going to mark for the record,
8  I'm going to mark what we've done here as LG-D2, and that's
9  the marking of your Slide 77. All right.
10     (Exhibit Number LG-D2 is marked for identification.)
11 BY MR. McKEON:
12     Q.  Now, let's talk more about the feature support byte.
13 Now, it is true that when someone uses the term "feature
14 byte," they're referring to a byte that communicates
15 supported features. Isn't that right?
16     A.  In this case it's basically kind of a catchall byte.
17     Q.  Well, let me ask you this. You're aware of a piece
18 of prior art to Schmidt, aren't you?
19     A.  Yes, I am.
20     Q.  In fact, you submitted a declaration to the Patent
21 Office during the prosecution of the '180 patent relating
22 to the Schmidt prior art reference. Isn't that right?
23     A.  Yes, I did.
24     Q.  And again, you submitted this declaration because the
25 Patent Office was looking at this, whether to allow it or

444

1      Q.  It's the sentence above, and I think we're working on
2  that. And what you're telling the Patent Office here is,
3  Hey, Patent Office, this feature byte, it's not an
4  identification number, is what you're telling the Patent
5  Office. Isn't that right?
6      A.  It's not an identification -- well, the way Schmidt
7  uses this byte is not unlike that of the VESA standard in
8  that it's a catchall. It has numerous things in it.
9      Q.  Let's go through it, sir. Let's read together.
10     This is you saying this to the Patent Office:
11     The examiner in the Office Action relies upon byte 2
12 or byte 7 of byte 0 as meeting the limitation of
13 identification information for identifying the type, the
14 display type.
15     Do you see that? That's what you say, the first
16 sentence, the first sentence?
17     THE COURT:  The question is did you say that, yes or
18 no.
19     A.  Yes.
20     Q.  You said that to the Patent Office. And then you
21 immediately say after that, "The Patent Office says this
22 feature byte is an identification number for identifying a
23 type of display unit," and you say right there, "I
24 disagree."
25     Right? That's what you say there?

443

1  not, and you were trying to convince them to allow the
2  patent. Isn't that right?
3      A.  Yes.
4      Q.  Okay. And in one of those declarations to the Patent
5  Office, you recognized that the Schmidt prior reference has
6  something called a feature byte. Isn't that right?
7      A.  It does.
8      Q.  So let's get your declaration. This is pre-admitted.
9  It's LG-33.
10     MR. McKEON:  And can we get up Paragraph 17 of the
11 declaration, please. Okay.
12     Q.  And this is your declaration. Right, sir?
13     A.  Yes.
14     MR. McKEON:  And if we can get Paragraph 17 at Page 6
15 and blow that up please. All right. And if we can
16 highlight here in the middle here Schmidt at Table 2.
17     Q.  Even refers to byte two as the feature byte. Do you
18 see that?
19     A.  Yes.
20     Q.  Okay. And you told the Patent Office that this
21 feature byte merely identifies features of a monitor and
22 does not identify a display type. Isn't that right? And
23 if we can highlight that please, merely identifies
24 features?
25     A.  Oh, the sentence above.

445

1      A.  Yes.
2      Q.  Then you go on to explain, Hey, Patent Office, this
3  is not an identification number because it merely
4  identifies features of a monitor and do not identify a
5  display type. Do you see that?
6      A.  Yes.
7      Q.  Okay. And then you go on at the end and you have
8  here one of ordinary skill in the art would understand that
9  communication of supported features to be different than
10 the identification of a monitor type. Do you see that?
11     A.  I see that.
12     Q.  What you're telling the Patent Office, Patent Office,
13 you got it all wrong. This thing says feature byte and
14 it's not an identification number because it is
15 communicating supported features. Isn't that right?
16     A.  That's what this sentence says.
17     Q.  And that's what you told the Patent Office?
18     A.  Yes.
19     Q.  And you signed that declaration under penalty of
20 perjury. Isn't that right, sir?
21     A.  I may have expounded further in the --
22     THE COURT:  Sir, please answer the question.
23     THE WITNESS:  Okay.
24     Q.  You signed this under penalty of perjury. Isn't that
25 right?

Appx15114

**446**

1    A.    Yes, I did.

2    Q.    And now just to remind the jury again, going back to

3    our train, the EDID table that's at issue in this case,

4    what is the designation of the byte that contains the two

5    bits that are at issue?

6    A.    The VESA table calls it the feature support byte.

7    Q.    The VESA table calls it a feature support byte.  And

8    Schmidt calls it a feature byte.  Right?

9    A.    Yes.

10   Q.    And you're saying that Schmidt ID number, no good,

11   but you're telling the jury in this case, feature byte, no

12   problem, ID number.  Is that what's going on here, sir?

13   A.    Yes.

14   Q.    And one thing we do know, though, is that the feature

15   support byte in the EDID standard is also a byte that

16   communicates supported features.  Correct?

17   A.    I would have to think of each of the bits within that

18   byte.

19   Q.    It's a byte, the name of it, sir.  It's not rocket

20   science.  The name of it is feature support byte.

21   A.    Yes.

22   Q.    So, it is a byte in the standard that communicates

23   supported features.  Correct?

24   A.    I would have to disagree with that.

25   Q.    Oh, so the name of the byte here is a feature support

**447**

1    byte and you don't think that's a byte that communicate

2    supported features?

3    A.    As I've mentioned before, it's a catchall.

4    Q.    And what you told the Patent Office, you told the

5    Patent Office that feature byte, one of ordinary skill in

6    the art would understand that communication of supported

7    features to be different than the identification number of

8    a monitor's type, you told the Patent Office.  Isn't that

9    right?

10   A.    Yes.

11   Q.    Feature byte there is not identification number.  But

12   in this case for this jury, you're convinced that this

13   feature support byte in this table, that's an

14   identification number.  Is that right?  Is that right, sir?

15   You can answer yes or no.

16   A.    I would have to disagree then.

17   Q.    Well, the one thing we do know, sir, is that --

18         THE COURT:  Hold on please.  Read that question back

19   and the answer please.

20         (The requested portion is read back by the Official

21   Court Reporter.)

22         THE COURT:  Is that your answer?

23         THE WITNESS:  I'm sorry.  Could you read it one more

24   time.  I just want to make sure I'm clear on this.

25         THE COURT:  I think you should.

**448**

1         (The requested portion is read back by the Official

2    Court Reporter.)

3         THE WITNESS:  May I give a very short explanation?

4         THE COURT:  I just want to be sure that the answer

5    which you just gave which is you disagree with what counsel

6    just said is your answer.

7         THE WITNESS:  There are numbers within this feature

8    support byte, there are -- this feature support byte has a

9    number of different things in it and there is a number for

10   identifying type in there.  There are also identifiers of

11   functions of the display and bits that mean other things.

12   So the entire byte I would not classify as being an

13   identification number.

14        THE COURT:  Okay.

15        THE WITNESS:  But the field, the type field, yes, is

16   an identification number.

17        THE COURT:  Go ahead, Mr. McKeon.

18        MR. McKEON:   Thank you, Your Honor.

19   BY MR. McKEON:

20   Q.    And just so we can just wrap it up so the jury

21   understands at least what we're debating, sir, when you

22   told the Patent Office that the language of the Schmidt

23   reference feature byte which contains information inside of

24   it -- isn't that right -- the feature byte there, that was

25   a byte that communicated supported features, and then you

**449**

1    told the Patent Office that that was not an ID number.

2    Isn't that right?

3    A.    I'm sorry.  This wording is very -- I need to make

4    sure I fully understand what you're asking.

5    Q.    Well, it's right in the last sentence of the --

6    A.    The one of ordinary skill?

7    Q.    Yes.

8    A.    If I said it, then I believe it.

9    Q.    You believed that sentence.  Right?  Correct?

10   A.    Yes.

11   Q.    And just so we have the record on it, the sentence

12   reads "One of ordinary skill in the art would understand

13   the communication of supported features to be different

14   than the identification of a monitor's type."  Right?

15   A.    Yes.

16   Q.    And in this case we have a feature support byte and

17   you agree that's a byte that communicates supported

18   features.  Isn't that right?  That's the name, sir.

19   A.    That is the name.

20   Q.    And you agree that it's a byte that communicates

21   supported features.  Correct?

22   A.    In the '180 -- I mean -- I'm sorry -- in the VESA

23   table.

24   Q.    VESA table.  It says feature support byte and you

25   agree with me, and I believe you already have, let's make

Appx15115

450

1  sure it's clear for the jury, that the feature support byte
2  in the EDID table is a byte that communicates supported
3  features. Correct?
4  A.  It communicates a catchall of different things.
5  Q.  A catchall, sir? The title of the byte that the VESA
6  standard had since 1994 says feature support byte. Right?
7  They're trying to -- the standard says, hey, world out
8  there that's using this table, what we got here is
9  something called a feature support byte, and this is a byte
10 that communicates supported features. Isn't that what it
11 says?
12 A.  That is the title of it, yes.
13 Q.  All right. Now, one thing we know, though, you agree
14 that these two bits that we've been talking about here in
15 the feature support byte, these two bits are optional.
16 Right?
17 A.  No, they're not.
18 Q.  Well, you do agree that not every field in this EDID
19 table we've been talking about has to identify something
20 because there's 134 fields that are optional. Correct?
21 A.  There are some fields that are optional, yes.
22 Q.  And also, there are some fields that are not
23 explicitly required. Isn't that right?
24 A.  That's correct.
25 Q.  And we know there are some fields, though, that are

451

1  mandatory. Isn't that right?
2  A.  Yes.
3  Q.  Well, let's -- we know the VESA documentation makes
4  that clear. Isn't that right?
5  A.  Yes, it does.
6  MR. McKEON:  Let's pull up LG-258. This has been
7  pre-admitted, Your Honor.
8  THE COURT:  Okay. And it's now admitted into
9  evidence and may be displayed to the jury.
10 (Exhibit LG-258 is marked in evidence.)
11 MR. McKEON:  If we could pull that up please.
12 BY MR. McKEON:
13 Q.  And this is -- I need LG-258. This is a document --
14 you recognize this, sir?
15 A.  Yes, I do.
16 Q.  And if we go to Page 600 of this document -- I'm
17 sorry -- 614 of this document, and this is a VESA -- one of
18 the VESA standard documents. Right?
19 A.  Yes, it is.
20 Q.  And if we go to this page here, we have a table. Do
21 you see that?
22 A.  I do.
23 Q.  And in this table, it indicates different versions of
24 the EDID structure. Isn't that right?
25 A.  Yes.

452

1  Q.  And when it says EDID structure there, what it's
2  talking about is the EDID table that you and I have been
3  talking about. Right?
4  A.  Yes. And we've been typically referring to the 1.3.
5  Q.  Because that's the one that LG has in its
6  televisions. Isn't that right?
7  A.  Yes.
8  Q.  Okay. And let's focus on 1.3. We see here down
9  below -- if you can highlight please optional, that symbol
10 optional. I guess it's an "X". Is that right?
11 A.  Yes.
12 Q.  So we know some things are optional. For example,
13 the ID serial number, that's got an "X" so that's optional.
14 Isn't that right?
15 A.  Yes. And that makes sense.
16 Q.  And the ID product code, that's not mandatory,
17 either. Isn't that right?
18 A.  You said the ID product code has the Smiley Face on
19 it which is a different.
20 Q.  Yes. It's not mandatory, the ID product code.
21 Correct?
22 A.  The Smiley Face symbol says no requirement stated but
23 commonly understood to be a requirement.
24 Q.  But it's not mandatory. Isn't that right?
25 A.  It's not mandatory.

453

1  Q.  Right above that one you have a check mark, you see
2  that, that says mandatory. Right?
3  A.  Yes.
4  Q.  In fact, isn't it correct, sir, most of the -- if you
5  look at 1.3, most of the indicators there are not
6  mandatory. Isn't that right?
7  A.  There are quite a few that are not.
8  Q.  In fact, if we go to the basic display parameters and
9  features field -- highlight that please -- that's not
10 mandatory. Isn't that right?
11 A.  It's understood to be a requirement but not
12 mandatory.
13 Q.  Not mandatory. Correct?
14 A.  Correct.
15 Q.  And this is the field -- the bytes in this field
16 include the feature support byte you and I have been
17 talking about. Right?
18 A.  Yes.
19 Q.  Feature support bytes are not mandatory. Correct?
20 A.  Yes.
21 Q.  Now, let's pull up LG-367. It's pre-admitted and
22 we've been talking about already this morning. It's the
23 EDID 1.3 standard. So, this is the version, sir, that
24 corresponds to LG's televisions. Isn't that right?
25 A.  That is correct.

Appx15116

454

1    MR. McKEON:  And if we can go to Page 318, and if we
2    can blow up that table please.
3    Q.    This table contains the feature support byte, a more
4    detail of it.  Isn't that right?
5    A.    Yes.
6    Q.    And what we see here in this table, we have bits 4
7    and 3.
8    MR. McKEON:  Highlight that please.  Blow that up
9    please, Ann.
10   Q.    Okay.  And in fact, in this table, these two bits,
11   sir, one of the settings is undefined.  Isn't that right?
12   A.    Yes.
13   Q.    And so, if it's undefined, it's not -- you would
14   agree with me that's not an identification number for
15   identifying a type of display unit.  Isn't that right?
16   A.    No.
17   Q.    You think if it's undefined it's an identification
18   number for identifying a type of display unit?  Is that
19   your testimony, sir?
20   A.    Yes, it is.
21   Q.    Okay.  Well, what we do know is that bits 3 and 4,
22   sir, are meant to describe how a display displays color.
23   Isn't that right?
24   A.    Well, there are four combinations here.
25   Q.    Right.  So, monochrome, and you have RGB color and

455

1    you have another type of color, non-RGB multi?
2    A.    Yes.
3    Q.    And then you've got the undefined.
4    A.    Yes.
5    Q.    That's not color.  It's not a color designation at
6    all, is it?
7    A.    It's something different.
8    Q.    It's not defined.  There's nothing there.  There's
9    nothing useful there to anybody.  It's not defined.
10   A.    It's undefined.
11   Q.    It's not useful to anybody.  Is that fair?
12   A.    Well, to me it says it's not one of the other three.
13   Q.    Okay.  Well, we do know that whether something could
14   be set to monochrome in the VESA world, whether something
15   could be set to monochrome or color, that is characteristic
16   information.  Isn't that right?
17   A.    No, it isn't.  It's a type.
18   Q.    Okay.  Well, let's go to, if we can, pre-admitted
19   exhibit, LG-339.  You recognize this document, sir?  It's a
20   VESA document.  Correct?
21   A.    VESA EDID Version 3, yes.
22   MR. McKEON:  If we could go please to page ending in
23   267 -- I'm sorry, I take that back -- 274.
24   Q.    And this is if I blow that table up please, sir, this
25   is a table -- right -- and this is a table provided in the

456

1    VESA standard documentation.  Isn't that right?
2    A.    It's in Version 3, yes.
3    Q.    Okay.  And we have here --
4    MR. McKEON:  If you can highlight the top sentence of
5    the table.
6    Q.    It says here the major characteristics of the display
7    are described.  Do you see that?
8    A.    I do.
9    Q.    And one of the characteristics of the display
10   described in the VESA document is mono or color.  Isn't
11   that right?
12   A.    Yes.
13   Q.    So, and in fact, the table says here at the bottom
14   "major characteristics."  Isn't that right?
15   A.    That's the title of the table.
16   Q.    So, at least according to VESA in this documentation,
17   color, monochrome color is a characteristic.  Isn't that
18   right?
19   A.    I disagree.
20   Q.    So, you disagree with the VESA documentation, the
21   official promulgation document.  You agree that when they
22   say a table, major characteristics, and above it describe
23   -- let me go, if I can see the highlight, major
24   characteristic of a display, you don't think that's
25   characteristic information?

457

1    A.    No, I don't.
2    Q.    Don't agree with all the folks that were involved in
3    VESA.  You just disagree with them.  Correct?
4    A.    In this instance, yes.
5    Q.    Lot of people involved in this; IBM, Cirrus Logic,
6    all those people, you just disagree with them?
7    A.    Yes.
8    Q.    Okay.  Now, the two bits that we just talked about,
9    and going back to the feature support byte in the standard,
10   the two bits designate color or monochrome.  Isn't that
11   right?
12   A.    Yes.
13   Q.    And you say in LG televisions, you say these two bits
14   indicated -- you say that these two bits in LG's
15   televisions indicate whether the LG television is
16   monochrome or color.  Correct?
17   A.    Yes.
18   Q.    Now, you agree with me, sir, it's been a while since
19   the last -- by the way, monochrome is black-and-white.
20   Right?
21   A.    Yes.
22   Q.    Okay.  You agree, of course, that it's been a while
23   since the last black-and-white television has been around.
24   Right?
25   A.    Black-and-white television, yes.

458

1    Q.   And you also agree that color and monochrome are no
2    longer answers to the question "What type of display is
3    that?" Correct?
4    A.   There are still monochrome displays today being
5    manufactured.
6    Q.   Okay. Let's get to your deposition. You were
7    deposed again -- right, sir -- in this case?
8    A.   Yes.
9    Q.   Under oath. Correct?
10   A.   Yes.
11   Q.   Get your dep please. It's Page 71, we'll pull it up,
12   line 20 to Page 72, 4.
13        I'm going to read:
14        "QUESTION:  Is color or monochrome a technology type?
15        "ANSWER:  I guess I would have to say yes.
16        "QUESTION:  And why do you say that?
17        "ANSWER:  It's, you know, for instance, if somebody
18   in, you know, 20 years ago were to say 'What type of
19   display is that? you know, color or monochrome would be,
20   would be common answer to that question.  Not so much now
21   because, for instance, I'm not sure when the last
22   monochrome television was produced, but it's probably been
23   a while."
24        That was your testimony.  Right?
25   A.   Yes, it is.

459

1    Q.   And that's accurate.  Right?
2    A.   That is accurate.
3    Q.   Now, sir, let me have a hypothetical.  You have a
4    television in your living room at home.  Right?
5    A.   I do.
6    Q.   Big sky country, I bet it's beautiful, and if someone
7    walked in your house and said, "Hey, Mr. Lamm, I haven't
8    seen you in a while.  Walked in your living room, my God,
9    looked at your television and goes, "What type of TV is
10   that?"  And you looked at them and said, "Oh, it's color,"
11   now they would look at you like you had two heads.  Isn't
12   that right?
13   A.   They might.
14   Q.   No one talks that way now.  Right?
15   A.   That's probably true.
16   Q.   You go into a Best Buy, you don't go, "Sir, I'm
17   interested in a color TV.  Can you show me the area of the
18   store where you've got the color TVs?  I don't want the
19   black-and-white stuff.  Don't direct me there.  Go to
20   color."  No one is doing that these days.  Right?
21   A.   Probably not.
22   Q.   Now, I think we've established this already but let's
23   make sure the record is clear, is that the table that we've
24   been talking about, the EDID table, that version of the
25   table that's in EDID 1.3, the standard that LG uses, that's

460

1    all the way back, that table, back to 1994.  Isn't that
2    right?
3    A.   I believe those fields are in there, yes.
4    Q.   And in fact, that table also goes into the
5    Plug-N-Play standard -- isn't that right -- that same
6    table?
7    A.   Yes.
8    Q.   And in fact, sir, we're talking a lot about
9    Plug-N-Play.  But when we talk about Plug-N-Play in this
10   case, what's important to the issues in this case, not a
11   lot of the other things that Plug-N-Play talks about,
12   what's important about the issues in this case is that EDID
13   table.  Isn't that right?
14   A.   Yes.
15   Q.   And that's the table that goes back to 1994.
16   Correct?
17   A.   Right.
18   Q.   Now, sir, you've been working with Mondis for a
19   number of years now.  Isn't that right?
20   A.   Yes.
21   Q.   You were involved in the Texas case.  Isn't that
22   right?
23   A.   Yes.
24   Q.   And in the Texas case Mondis sued LG Electronics.
25   They didn't give them any notice, they just sued them and

461

1    accused LG Electronics of infringing a number of the
2    patents for computer monitors.  Do you recall that?
3    A.   Yes.
4    Q.   And eventually the '180 patent was added to the case
5    and, again, they just accused LG computer monitors.  You're
6    familiar with that?
7    A.   Yes.
8    Q.   Now, with respect to that case, you never did an
9    expert report dealing with LG televisions -- strike that.
10   You never did an expert report dealing with LG computer
11   monitors, did you?
12   A.   No, I did not.
13   Q.   But I think you said even on the stand yesterday, I
14   think you said that it's your opinion that LG televisions
15   accused of Claim 14 in this litigation operate in
16   substantially the same manner as the computer monitors
17   accused of infringing in the Texas case.  Isn't that right?
18   A.   With respect to '180, yes.
19   Q.   Okay.  But of course, I know you understand that in
20   the Texas case, Mondis stated that the EDID fields for
21   basic display parameters and features, Mondis said that was
22   characteristic information.  Are you aware of that?
23   A.   I'm aware that they accused different fields than I
24   did.
25   Q.   Okay.

Appx15118

462

1    MR. McKEON:  So let's pull up, if we can, LG-508 and

2   again, this has been pre-admitted.  It's the Texas

3   infringement contentions.

4    Q.   Sir, do you recognize this as the contentions?

5    A.   Yeah, I believe so.

6    Q.   Okay.  In fact, you, in your expert report, you cite

7   to these as relying on them.  Isn't that right?

8    A.   I probably did.

9    Q.   Yes.  And in these contentions that were filed in

10  Texas, just so the jury understands what we're talking

11  about here, contentions in Texas is a big deal -- right --

12  because it's when the plaintiff in the case lays out their

13  infringement theory to the defendant so the defendant can

14  see, okay, what's going on here, what am I being accused

15  of.  Is that your basic understanding of what they are?

16   A.   Yes, yes.

17   Q.   And in this case, they served on LG the infringement

18  contentions for computer monitors.  And this is what the

19  document we have here.  Isn't that right?

20   A.   Yes.

21   Q.   And if we can go -- and there was talk yesterday

22  about a claim chart.  Do you remember that?

23   A.   Yes.

24   Q.   And if we can go to -- let's just go to Page 153 of

25  this table, of this contention.  Okay.  This page, sir, you

463

1   recognize that that's Claim 14 of the '180 patent.  Do you

2   see that?

3    A.   Yes.

4    Q.   So this is part of the infringement contentions is

5   Mondis laying out to LG so LG is on notice of what's going

6   on here.  This is, We think you infringed Claim 14 and

7   here's why.  Isn't that what this is?

8    A.   That's the purpose, yes.

9    Q.   So let's go to the next page of this where it talks

10  about the memory.

11   MR. MCKEON:  I'm going to highlight that whole

12  portion of that block please.  And if you can just cut off

13  the second paragraph now and just do the first paragraph

14  there.  Go down a little more please, that first paragraph

15  there.  All right.

16   Q.   And again, this is the memory limitation and this is

17  the limitation that contains the identification number

18  we've been talking about, and the characteristic

19  information we've been talking about.  Isn't that right?

20   A.   Yes.

21   Q.   Okay.  And the same claim.  Claim hasn't changed.

22  Right?

23   A.   Claim has not changed.

24   Q.   Same claim.  We can see here, if you look down, if I

25  can highlight the sentence, last sentence of that

464

1   paragraph, that says the EDID fields for basic display

2   parameters and features, color characteristics, established

3   timings and standard timings comprise characteristic

4   information of the display unit that is stored in the EDID

5   memory.  Do you see that?

6    A.   I do see that.

7    Q.   Boy, something interesting there, sir, because basic

8   display parameters and features, that's the block that

9   contains the feature support byte we've been talking about.

10  Right?

11   A.   Yes.

12   Q.   And that's the byte that contains the two bits.

13  Isn't that right?

14   A.   Yes, it is.

15   Q.   And what Mondis is saying here, Hey, LG, you know

16  what, you're infringing this patent.  You've got to pay us

17  a lot of money because you're infringing our monitor patent

18  and the basic display parameters and features which contain

19  the feature support byte in those two bits, they're saying

20  here that's characteristic information.  Isn't that what

21  they're saying here?

22   A.   I believe that's what they're saying, yes.

23   Q.   Today in this court, sir, in front of this jury, now

24  that we're talking about something totally different,

25  televisions, the patents didn't change, the patent didn't

465

1   change.  Today now that's garbage because today it's the

2   feature support byte that contains an ID number.  Is that

3   right?

4    A.   I'm sorry.  Can you repeat that one more time?

5    THE COURT:  Read it back.

6    (The requested portion is read back by the Official

7   Court Reporter. )

8    A.   That is correct.

9    Q.   And we also know, sir, that -- if we can highlight

10  the sentence just before the sentence we've highlighted

11  here -- what Mondis said in the Texas case with respect to

12  the computer monitor, sir, let's read it together:

13   "At least the ID product code, the ID serial number,

14  the display product serial number, display product name,

15  manufacturer's display descriptors, can be used to identify

16  the type of display."

17   Do you see that?

18   A.   I do.

19   Q.   And what they're saying here, LG, you pay us a lot of

20  money, you owe us a lot of money from infringing this

21  patent because this is an identification number, according

22  to Claim 14 of the patent.  Isn't that right?

23   A.   That's what was written there, yes.

24   Q.   And it contains ID product code, doesn't it?

25   A.   Yes.

Appx15119

466

1    Q.    And ID product code, that's that ID number that's in
2    the front towards the front of the train that we talked
3    about earlier today. Isn't that right?
4    A.    Yes, it is.
5    Q.    So, in Texas in the monitor case, when they wanted
6    money for the monitors, the ID number, no question about
7    it, it was the product code, ID product code. Isn't that
8    right?
9    A.    In this original claim chart, yes.
10   Q.    Today in New Jersey in front of this jury, toss that
11   out, throw that garbage out. Today in front of this jury,
12   the ID product code is the two bits in feature support
13   byte. Isn't that right?
14   A.    Yes.
15   Q.    Sir, just remind the members of the jury that the
16   patent wasn't somehow rewritten between the Texas case and
17   this case. Isn't that right?
18   A.    No, it was not.
19   Q.    All right. Let's shift gears. One of the debates in
20   this case is the communication controller. Isn't that
21   right?
22   A.    Yes.
23   Q.    And we've got a debate. You say LG TVs, it's in
24   there. Dr. Stevenson, he says no, it's not in there.
25   That's the debate. Right?

467

1    A.    Yes.
2    Q.    Okay. Now, let's first frame up what a communication
3    controller is according to the claim of the patent. First
4    of all, it's a circuit. Isn't that right?
5    A.    Yes.
6    Q.    And as the language suggests, communication
7    controller, one of ordinary skill in the art would
8    understand that a communication controller is used to
9    control the transmission of data. Isn't that right?
10   A.    One of the functions, yes.
11   Q.    So, the claim, communication controller, in order to
12   be that controller, you have to control the transmission of
13   data. Correct?
14   A.    Yes.
15   Q.    And you also believe to be communication controller
16   of the claim, it should perform at least basic controlling
17   functions to control the flow of messages between the
18   display unit and the computer. Correct?
19   A.    It does a lot of functions related to controlling the
20   communications.
21   Q.    Well, let's get your declaration back up, LG-33,
22   which is pre-admitted. And let's go -- this is your
23   declaration we saw earlier?
24        THE COURT: It's admitted into evidence if it has not
25   been already.

468

1        (Exhibit LG-33 is marked in evidence.)
2        MR. McKEON: Thank you, Your Honor.
3    BY MR. McKEON:
4    Q.    Paragraph 22 please. You see here, sir -- can I
5    highlight here.
6        Again, this is a situation, sir, where the Patent
7    Office is saying Schmidt reference -- references the
8    Schmidt reference, and the Patent Office says, No, the
9    claim can't get through. Schmidt reference shows this.
10       And you go to the Patent Office, Hey, Patent Office,
11   you don't know what you're talking about. It doesn't show
12   this, and you explain why. Isn't that right, what's going
13   on here?
14   A.    Most likely, yes.
15   Q.    Okay. And the highlight here, the middle, says "One
16   of ordinary skill in the art would understand that a
17   communication controller is used to control the
18   transmission of data and the communication controller
19   should perform at least the basic controlling functions to
20   control the flow of messages between the display unit and
21   the computer."
22       Do you see that?
23   A.    Yes, I do.
24   Q.    And here you talk about the claimed communication
25   controller.

469

1    A.    Yes.
2    Q.    You're telling the Patent Office, Patent Office, the
3    claim requires this communication controller and Schmidt
4    doesn't have it. Isn't that right?
5    A.    Correct.
6    Q.    Okay. We also know, sir, a couple of other things
7    about this communication controller. And if we can go to
8    the '180 patent, Figure 1, and just to orientate the jury,
9    on the right here is the display unit. Isn't that right?
10   A.    Yes.
11   Q.    And the communication controller is -- highlight that
12   please -- that's item eight. Isn't that right?
13   A.    Yes.
14   Q.    And we have the communication controller and that's
15   separate from the memory that's indicated. Isn't that
16   right?
17   A.    Yes.
18   Q.    Separate blocks in this display unit described in the
19   patent. Isn't that right?
20   A.    Yes.
21   Q.    In fact, every figure of the patent, we don't need to
22   go through that again today, but every figure in the patent
23   has communication controller and separate from that a
24   memory. Isn't that right?
25   A.    I believe so.

Appx15120

**470**

1    Q.    And it's important because what we have is a
2    communication controller and the communication controller
3    in the computer, which is designated as five,  will send a
4    message over to the communication controller in the display
5    unit, and that communication controller needs to figure out
6    where to send this thing.  Isn't that right?
7    A.    Yes.
8    Q.    And it either sends it to what's designated as a
9    micro computer, seven, or the memory, eight.  Isn't that
10   right?
11   A.    Yes.
12   Q.    And in the patent, every single figure, they're
13   separate pieces of hardware, the memory and the computer
14   communication controller.  Isn't that right?
15   A.    I believe so.
16   Q.    And in fact, the claim of the '180 patent that's
17   asserted, Claim 14, has a memory limitation and a separate
18   limitation for communication controller.  Isn't that right?
19   A.    Correct.
20   Q.    We also know that the communication controller
21   requires circuitry that elevates it beyond what you call a
22   bare interface.  Isn't that right?
23   A.    Yes.
24   Q.    And you also agree that the communication controller
25   of the patent of the claim also must have address parsing

**471**

1    capability.  Correct?
2    A.    Yes.
3    Q.    Okay.
4         MR. McKEON:  If I can get slide 83 from Mr. Lamm's
5    demonstratives.
6    Q.    I want to talk now about your accusations in this
7    case.  Okay, sir?
8    A.    Okay.
9    Q.    This is a slide you presented to the members of the
10   jury yesterday.  Right?
11   A.    Yes.
12   Q.    And you have a box to the left and you have arrows
13   pointing down onto the circuit board.  Right?
14   A.    Yes.
15   Q.    And the box to the left is tending to give a blowup
16   of what the arrows point to.  Isn't that right?
17   A.    That's correct.
18   Q.    Okay.  And what we have here is, it says EDID
19   EEPROMs, got the block, and the label of the block is EDID
20   EEPROMs.  Isn't that right?
21   A.    Yes.
22   Q.    And just for the benefit of the jury, EEPROM is a
23   term of art.  What does that stand for?
24   A.    Stands for Electrically Erasable Programable
25   Read-Only Memory.

**472**

1    Q.    Okay.  So, the orange box there, that's a memory.
2    A.    It's an integrated circuit.
3    Q.    Well,it's an EEPROM and it's a memory.  Isn't that
4    right?
5    A.    That has an interface on it.
6    Q.    Right.  It's a memory and we know that this memory,
7    according to your diagram here, you have a memory and then
8    you have another memory within the memory.  Is that what's
9    going on here?
10   A.    The term EDID EEPROM is just a term used to describe
11   this integrated circuit.
12   Q.    Well, one thing we know for certain, though, is that
13   you're saying that the communication controller of the
14   claim, you're saying that's in this memory.  Isn't that
15   right?
16   A.    Yes.
17   Q.    It's not separate?
18   A.    It's co-located with the memory.
19   Q.    So, they're not separate.  They're one thing in your
20   infringement theory.  Isn't that right?
21   A.    They are both in the same integrated circuit.
22   Q.    All right.  Well, let's explore that.  Okay?
23   A.    Okay.
24   Q.    You also had a slide.  I apologize.  I can't read my
25   own notes here.  54 -- 84.  Slide 84.  That's another slide

**473**

1    you presented to the members of the jury.  Isn't that
2    right?
3    A.    Yes, it is.
4    Q.    And here what you've got is a block diagram.  So this
5    is your interpretation of what's inside of that memory.
6    Isn't that right?
7    A.    Well, this is a block diagram from one of the
8    manufacturers of these parts.  I did not create this block
9    diagram.
10   Q.    I was just going to ask you about that.  This is
11   actually an excerpt from a data sheet from a company called
12   Microchip Technology, Inc.  Isn't that right?
13   A.    Yes, it is.
14   Q.    And Microchip Technology, Inc. is a company that
15   makes EEPROM memories.  Right?
16   A.    They make a lot of things.
17   Q.    That's one thing they make?
18   A.    That is one thing, yes.
19   Q.    And you cited this to the members of the jury because
20   you wanted them to, in your view, get an understanding of
21   what was inside of LG's televisions.  Correct?
22   A.    Correct.
23   Q.    But you know, sir -- let me ask you this way.  You
24   don't know whether LG, in fact, uses the Microchip
25   Technology, Inc. memory.  Isn't that right?

474

1    A.  I have not done an exhaustive search of the products
2   to see whose manufacturer they used, but this is, I think,
3   what I described yesterday as a compatible memory.
4    Q.  Let's explore that.  So, you got a data sheet from a
5   company called Microchip Technology, Inc., and the data
6   sheet is giving details of the memory.  Isn't that right?
7    A.  It's giving details of the integrated circuit.
8    Q.  Okay.  But you don't know whether LG Electronics'
9   televisions, in fact, use anything from this company called
10  Microchip Technology, Inc.  Isn't that right?
11   A.  That's correct.
12   Q.  You're just guessing at that one.  Isn't that right?
13   A.  The industry has put a part number on this device.
14  This part number is made by a number of manufacturers.
15   Q.  Sir, this is a Microchip Technology specification.
16  Correct?
17   A.  That's correct.
18   Q.  It's a specification that LG had nothing to do with
19  putting together.  Isn't that right?
20   A.  Sure.
21   Q.  Not an LG document.  Isn't that right?
22   A.  That's correct.
23   Q.  And you don't know, sitting here on the stand in
24  front of this jury, whether LG Electronics has this chip,
25  this memory, inside of its television.  Is that right?  You

475

1   don't know?
2    A.  I do not know.
3    Q.  What we do know is that this whole block is a single
4   block of memory.  Isn't that right?
5    A.  The blue block is the memory.
6    Q.  Well, the blue block is what's called a memory array.
7   Isn't that right, sir?
8    A.  That's correct.
9    Q.  That stores all the ones and zeroes.  Isn't that
10  right?
11   A.  Yes.
12   Q.  But the whole thing is actually the EEPROM.  Isn't
13  that right?
14   A.  That is the generic name for them, yes.
15   Q.  In fact, let's go if we can to -- this is MON-511.
16  It's already been admitted, pre-admitted.  And if we can go
17  to Page 292 please.  If I can blow up the description.
18       And here it says -- if we can highlight -- the device
19  is organized as a single block of 256-by-8-bit memory.  Do
20  you see that?
21   A.  Yes.
22   Q.  And down below it has here, called an EEPROM memory.
23  Isn't that right?
24   A.  Well, the word that you've highlighted is EEPROM
25  memory.

476

1    Q.  So, if I hold this thing in my hand, according to the
2   manufacturer, I'm holding an EEPROM memory.  Isn't that
3   right?
4    A.  Yes.
5    Q.  And it's your opinion, sir, that there's a
6   communication controller in this thing because it has
7   something called an I/O control logic block.  Isn't that
8   right?
9    A.  Yes.
10   Q.  An I/O, just explain to members of the jury what I/O
11  stands for?
12   A.  Input/output.
13       MR. McKEON:  And if we can get the data sheet back up
14  please at 292, MON-511 292, and blow that diagram up
15  please.
16   Q.  And so, what you're pointing to, sir, is the I/O
17  logic here, and you're saying that's a communication
18  controller -- isn't that right -- according to the data
19  sheet?
20   A.  Yes.
21   Q.  Now, you took a different position, though, in the
22  Patent Office, didn't you?
23   A.  I don't know.
24   Q.  Let's take a look at that.
25       MR. McKEON:  Let's pull up the Schmidt reference,

477

1   which is LG-244.  And I want to go to Figure 1.
2    Q.  And this is the Schmidt -- Figure 1 of the Schmidt
3   reference.  Do you recognize this?
4    A.  Yes, I do.
5    Q.  And again, this was in the Patent Office and the
6   Patent Office was looking at this and the '180 patent was
7   trying to get through, and you put a declaration in that
8   said, Oh, Patent Office, what's identified there is an I/O.
9   That's not a communication controller, is what you told the
10  Patent Office.  Isn't that right?
11   A.  That would be correct.
12       MR. McKEON:  Can I highlight the I/O please.  Okay.
13   Q.  And here, just for the members of the jury, we have a
14  CPU.  And then above it we have what's designated as an
15  I/O.  Isn't that right?
16   A.  Yes.
17   Q.  And that's an input/output.  Correct?
18   A.  Yes.
19   Q.  And you r opinion is, what you told the Patent
20  Office, at least when it says I/O like this, this is just
21  an interface.  This is not a communication controller.  So,
22  all the things I require of a communication controller,
23  this is not it.  That's what you told the Patent Office?
24   A.  Yes.
25       MR. MCKEON:  And if I can get please side-by-side

**478**

1 this figure from Schmidt and the block diagram from the
2 Microchip Technology specification we were just looking at.
3 Can I highlight the I/O there please.
4 Q. So again, sir, this is a situation where I've got on
5 the right I/O, Patent Office, no good, junk.
6 On the left I/O, ladies and gentlemen of the jury, LG
7 is infringing this patent. Is that what's going on here?
8 A. In my opinion, the circuitry is different.
9 Q. Sir, it's got I/O. They're both an input/output
10 interface. Isn't that right?
11 A. I'd have to disagree.
12 Q. All right. Let's move on.
13 A. Okay.
14 Q. Now, you did some testing in this case. You referred
15 to as testing. Isn't that right?
16 A. Yes.
17 Q. And one thing we know is before the filing of the
18 complaint, you personally did not do any testing of LG
19 televisions. Isn't that right?
20 A. In this case?
21 Q. In this case, yes.
22 A. I believe that's correct.
23 Q. And after the filing of the claim, you did some what
24 you call testing. Isn't that right?
25 A. Yes.

**479**

1 Q. And what you did is, there's 630 televisions at issue
2 in this case. You got eight televisions and what you did
3 was pull the EDID data from the televisions. Isn't that
4 right?
5 A. I tested eight complete televisions, yes.
6 Q. What you did was you pulled the EDID data out of
7 them. Isn't that right?
8 A. Yes.
9 Q. But of course, the manuals that LG served in this
10 case, a lot of manuals that we did in discovery.
11 A. Right.
12 Q. The manuals had that table that we were looking at
13 and that has all the EDID data in it. Is that right?
14 A. That's correct.
15 Q. So, pulling the data from the television doesn't
16 really give you any information that you wouldn't otherwise
17 get from the document that LG gave you. Isn't that right?
18 A. That turned out to be the case, yes.
19 Q. And then the actual test that you performed in this
20 case was to confirm the bi-directional nature of signals
21 between the television, LG television and the computer. Is
22 that right?
23 A. I did that test also.
24 Q. And you did that test with a VGA cable. Isn't that
25 right?

**480**

1 A. I know the picture that I showed yesterday was a VGA
2 cable. I think I did the original test with an HDMI cable.
3 Q. Okay. Well, let's, sir, let's go to your deposition.
4 I'm going to go to your deposition at Page 33, line 18 to
5 Page 34, line three. And describing your test:
6 "QUESTION: Okay. And then you go on to say to
7 conduct this test, I contacted a VGA cable between the
8 display and my computer."
9 Question goes on, "In your report, you only describe
10 doing this with a VGA cable. Right?
11 "ANSWER: Let's see. That's correct."
12 Q. Okay.
13 Q. Is that correct?
14 A. I must have looked it up in the meantime, so, yeah,
15 looked like I did use a VGA cable.
16 Q. So, you didn't do the test with an HDMI cable. Isn't
17 that right?
18 A. I guess not.
19 Q. And for this test we're talking about here, of the
20 630 televisions, you only did it for one television. Isn't
21 that right?
22 A. Correct.
23 Q. Now, sir, you're being paid for your testimony in
24 this case. Isn't that right?
25 A. I'm sorry. I missed that.

**481**

1 Q. You're being paid for your testimony in this case?
2 A. Yes, I am.
3 Q. And you worked with the plaintiffs a long time.
4 Isn't that right?
5 A. Yes.
6 Q. You were involved in the Texas case and you've been
7 doing these declarations in the Patent Office working for
8 Mondis for a very long time. Isn't that right?
9 A. Yes.
10 Q. I think it's like 12 years now. Is that fair?
11 A. I believe it's 11, but something like that.
12 Q. And you've also worked separately for Hitachi. Isn't
13 that right?
14 A. Yes.
15 Q. And also for Maxell, subsidiary of Hitachi. Isn't
16 that right?
17 A. Yes.
18 Q. Only time you've ever testified was for Mondis.
19 Isn't that right?
20 A. Yes.
21 Q. Thank you, Mr. Lamm. I enjoyed our discussion.
22 MR. McKEON: Your Honor, I pass the witness.
23 THE COURT: Your witness.
24 MR. PLIES: Thank you.
25

1   REDIRECT EXAMINATION
2   BY MR. PLIES:
3   Q.   Mr. Lamm, do you recall LG's counsel asking you about
4   the Schmidt prior art reference and whether or not it has a
5   communication controller?
6   A.   Yes.
7   Q.   And do you remember explaining to the jury on
8   Wednesday why it's your opinion that the accused products
9   in this case do have communication controllers?
10  A.   Yes.
11  Q.   So just to summarize --
12       THE COURT:   Do not lead.
13  Q.   Can you explain just at a high level why it is your
14  opinion that the communication controllers in the accused
15  TVs qualify as communication controllers within the meaning
16  of the patent claims?
17  A.   Yes.   The word "communication controller," I believe
18  I used the term "elevated" above what would be considered a
19  bare interface because they do things such as all of the
20  acknowledgements, the addressing functions, the word
21  offsets within the memory and so forth, and the fact
22  they're bi-directional.
23  Q.   Does the device in the Schmidt reference do those
24  things that you just mentioned?
25  A.   There is no description in the -- there's no mention

1   in the description of that patent that those functions are
2   being performed.
3   Q.   And again, the communication controllers in accused
4   products, what protocols are they implementing?
5   A.   They are implementing the I2C protocol from Philips.
6   Q.   And do you know if they're implementing any other
7   protocols?
8   A.   Well, the basic protocol is I2C or VESA calls DDC/2B
9   protocol.
10  Q.   And in Schmidt, does Schmidt, to your knowledge,
11  implement the VESA DDC/2B protocol?
12  A.   No, they don't.
13  Q.   And do you know if the Schmidt reference implements
14  the Philips I2C communications protocol?
15  A.   No.   In fact, there's explicitly described the
16  communication and it is definitely not DDC/2B or I2C.
17  Q.   Staying on the topic of communication controller, do
18  you recall opposing counsel asking you some questions about
19  that Microchip EDID EEPROM data sheet?
20  A.   Yes.
21  Q.   And you mentioned a part number.   What part number
22  were you trying to refer to?
23  A.   The generic industry part number is 24C02, 24C02.
24  Q.   And based on your review of LG's technical
25  documentations, what part number do they use in their

1   televisions?
2   A.   Their schematic and block diagrams both call out a
3   24C02.
4   Q.   And have you reviewed data sheets concerning 24C02
5   EDID chips?
6   A.   Yes, from a number of different manufacturers.
7   Q.   And do you recall whether you testified on Wednesday
8   whether the Microchip data sheet was representative of
9   those manufacturers?
10  A.   Yes.   It is representative of those manufacturers.
11  Q.   And do you recall LG's counsel pointing you to
12  Figure 1 of the '180 patent and making the point that the
13  communication controller was in a separately labeled box
14  from the memory?
15  A.   Yes, I do.
16  Q.   Now, are the figures -- do you know if the figures
17  are intended to explain the actual circuits or just the
18  functional idea for the invention?
19  A.   They would be the functional idea of the invention.
20  Q.   And to your knowledge, do the '180 patent claims
21  require any of the actual recited elements to be physically
22  combined in a common integrated circuit?
23  A.   They are silent on that issue.
24  Q.   Or conversely, do the claims require the elements to
25  be physically separate on different integrated circuits?

1   A.   Silent on that also.
2        MR. PLIES:   Can we please pull up LG-244, the Schmidt
3   reference.   And can you please go to column 11 at the top
4   where there's Table 2.
5        And Ted, could you also side-by-side please bring up
6   Mondis 0509, and, in particular, Table 311.
7   Q.   So, Mr. Lamm, do you recall LG's counsel asking you
8   about a declaration you submitted the Patent Office where
9   you told the Patent Office that the feature byte, byte two
10  of Schmidt, was not a display type ID?
11  A.   Yes, I do.
12  Q.   And do you recall opposing counsel pointing out that
13  the display type that you're relying upon for your
14  infringement position occurs in what's called the feature
15  support byte of the VESA standard?
16  A.   Yes.
17  Q.   Now, is the feature byte in Schmidt, do you know if
18  that's referring to the VESA standard?
19  A.   No, it is not.
20  Q.   And so, what are the differences between the feature
21  byte in Schmidt compared to the feature support byte
22  defined in the VESA standards?
23  A.   The feature byte in Schmidt is made up of, basically
24  only has one bit of information in it and that is the
25  descriptor for whether the display is in a portrait or

486

1   landscape orientation.

2      Q.   And in contrast, what does a feature support byte of

3   the VESA standard as implemented in the LG TVs include?

4      A.   It includes power management information, the display

5   type that we've been talking about, whether the default

6   color space is SRGB, whether there's a preferred timing

7   mode field present, and whether the general timing formulas

8   are present.

9      Q.   So, does the quote, unquote "feature byte" of Schmidt

10  include a display type identifier as in the VESA feature

11  support byte?

12     A.   No, it does not.

13     Q.   And was that the point that you were trying to make

14  to the Patent Office?

15     A.   Yes.

16     Q.   Do you recall LG's counsel this morning asking you

17  about those detailed timing descriptors?

18     A.   Yes.

19     Q.   And do you recall that you had some caveats or

20  qualifications about how those timing descriptors that are

21  in the EDID table can be populated?

22     A.   Yes, I do.

23     Q.   And can you now provide the explanation that you sort

24  of wanted to explain about those timing descriptors in the

25  EDID table?

487

1      A.   Yes.  The timing descriptors are basically four

2   18-byte fields.  The first one is a requirement in the VESA

3   EDID standard to include what's called the preferred timing

4   descriptor.  And the other three fields can be any number

5   of different things.

6          For instance, in the LG TVs, they put the ASCII

7   phrase "LG TV" in those, in one of those, I believe it's

8   called the -- one of those 18-byte fields is called a name,

9   I think it's a product name field or something like that,

10  and they populate it with "LG TV".

11         There are other fields in there that talk about

12  monitor range limits.  There are fields where you can put a

13  detailed serial number in there.  There's maybe a dozen

14  different things that you can put in those fields and a

15  timing descriptor is just one of them.

16         MR. PLIES:  Ted, could you please pull up Mondis 262.

17  And can you please go to Page 52.  Why don't you back up

18  one page please to 51.

19     Q.   Mr. Lamm, do you recognize what's up on the overhead?

20     A.   Yes, I do.

21     Q.   And what are we seeing?

22     A.   This looks like the EDID from a 26LG30 television.

23     Q.   And is this one of the LG products that you tested?

24     A.   Yes.

25     Q.   And who generated this test report?

488

1      A.   I did.

2          MR. PLIES:  Ted, can you back out please.

3      Q.   Mr. Lamm, so at the very top of this test report,

4   what do we have?

5      A.   Well, we have the fact that it's an analog EDID and

6   the -- oh, the highlighted portion there is the raw EDID

7   table.

8      Q.   And then I would direct your attention a few lines

9   down, do you see where it says ID serial number?

10     A.   Yes, I do.

11     Q.   What is that?

12     A.   This is -- there are two places that you can put a

13  serial number.  This one let's you define a -- looks like a

14  32-bit number for describing the serial number.

15     Q.   And where is that field in the EDID data table?

16     A.   It is toward the beginning of the EDID data table,

17  looks like it's the last four bytes of the first line, so,

18  you notice that the bytes are reversed, so, it's D87B0100,

19  so, that is what's called the ID serial number field.

20     Q.   So, based on your tests, were you able to determine

21  whether or not LG has populated serial numbers in some of

22  the EDID data of their TVs?

23     A.   On this unit they have populated that field, yes.

24         MR. PLIES:  Ted, if you could please back out again.

25  And Ted, if you could please go to the next page.

489

1      Q.   And Mr. Lamm, we're seeing detailed timing

2   descriptors listed on this page, so, can you just sort of

3   at a high level explain what's going on here.

4      A.   Yes.  The detailed timing descriptor in the first

5   detailed timing descriptor is required to be what's called

6   a preferred timing mode.

7          And if you look at a couple of numbers there, the

8   resolution is one of the ones that's very important here

9   because that would be the actual number of dots that make

10  up the resolution of the screen, so 1360-by-768.  And then

11  it goes on to talk about other various characteristic

12  information of this timing.

13         MR. PLIES:  Ted, can you back out please, and if you

14  go towards the bottom where it says detailed timing

15  descriptor area four.

16     Q.   So, Mr. Lamm, what's that?

17     A.   This is where LG has populated one of these

18  descriptor blocks with the name -- with what's called the

19  monitor name and they call it an "LG TV".

20     Q.   And did you see that in all your testing?

21     A.   Every unit that I examined had this monitor name

22  field populated with these characters "LG TV".

23     Q.   And so, is the detailed timing descriptor area here

24  being used for timing data or being used for a different

25  purpose?

490

1    A.   It's for a different purpose.

2    Q.   Do you recall LG's counsel asking you about some depo

3   testimony where you gave -- where you talked about it being

4   superfluous to send both the type ID and characteristic

5   information?

6    A.   Yes.

7    Q.   Do you recall the context of the deposition

8   questioning when you were discussing that issue?

9    A.   I would have to double check the reference but I

10  believe what was going on was that, did you have to use

11  both the type and the characteristic information.

12       I think I was replying no, you don't have to use

13  both, you can use whichever one you need.

14   Q.   And Mr. Lamm, do you remember a little earlier this

15  morning LG's counsel going through some declarations that

16  you had with the PTO on some other patents where you had

17  identified them as being foundational to Plug-N-Play?

18   A.   Yes.

19   Q.   And when you made the comment in those declarations

20  that these various patents were foundational, what were you

21  trying to say?

22   A.   That if you wanted to -- well, there's two kind of a

23  two directional thing here.  Some of the patents -- I'm

24  sorry, to practice some of the patents you necessarily

25  infringe -- I'm sorry.  Let me back up.

491

1        To practice some of the standards, you necessarily

2   have to infringe some of the patents.

3    Q.   Do you know if practice of an industry standard may

4   require practice of multiple patents?

5    A.   Yes.

6    Q.   And have you provided opinions, for example, in

7   earlier cases or in declarations to the Patent Office that

8   some of these other patents that LG's counsel was pointing

9   out are also required in order to implement the Plug-N-Play

10  standard?

11   A.   Yes, they are.

12   Q.   Mr. Lamm, on Wednesday do you recall LG's counsel

13  going through the '180 specification and going through the

14  figures with you and pointing out that there were some CRTs

15  and computer video sources?

16   A.   Yes, I do.

17   Q.   Now, do you recall the judge providing instructions

18  at the outset of this trial that it is the patent claims

19  that describe the boundaries of the patent's protection?

20   A.   Yes.

21   Q.   So, as an expert that has generated infringement

22  opinions, is it your understanding that the accused

23  products are supposed to be compared to the granted patent

24  claims or are they to be compared to the figures in the

25  specification?

492

1    A.   To the granted patent claims.

2    Q.   So, when LG's counsel was showing you figures from

3   the patent that show some CRT and some computer monitors,

4   do you know if that exercise was relevant to whether the

5   LG's products infringe Claim 14?

6    A.   No.  It's defined by the patent claim language.

7        MR. PLIES:  And Ted, if you could please pull up

8   Mondis 1, Claim 14.

9    Q.   So, Mr. Lamm, asserted claim in this case, Claim 14,

10  does the term "CRT" appear anywhere in the claim language?

11   A.   No, it doesn't.

12   Q.   And do you recall the judge instructing at the

13  beginning of this trial that it's going to be the Court's

14  job to explain the meaning of the language of the patent

15  claims?

16   A.   Yes.

17   Q.   And has the Court interpreted Claim 14 to require

18  cathode ray tube displays?

19   A.   No.

20   Q.   And do you recall testifying on Wednesday that you

21  inspected and tested the LG computer monitors that were at

22  issue in the prior litigation?

23   A.   Yes, I do.

24   Q.   And what type of screens did those computer monitors

25  use?

493

1    A.   LCD screens.

2    Q.   Did any of them have CRT screens?

3    A.   No.

4    Q.   And do you know if LG nevertheless took a license to

5   the '180 patent for those LCD monitors?

6    A.   Yes, they did.

7    Q.   And does Claim 14 say anything about requiring the

8   display to be a computer monitor?

9    A.   No.

10   Q.   Okay.  Instead of the words "computer monitor," what

11  term does the '180 patent Claim 14 use?

12   A.   Uses "display unit."

13   Q.   Is there any language in Claim 14 that excludes

14  televisions from being display units?

15   A.   No.

16   Q.   Now, in preparing your opinions in this case, did you

17  rely on any documents to confirm your opinion that

18  televisions, in fact, are a type of display unit?

19   A.   Yes, I did.

20   Q.   And do you recall what some of those documents were?

21   A.   I believe there were some prior art patents that used

22  the term "display unit" and explicitly says that it can be

23  a TV.  And I also looked at LG's own service manuals where

24  they appear to use the terms interchangeably.

25       MR. PLIES:  Ted, could we please pull up Mondis 663

Appx15126

**494**

1  on the cover.

2     Q.  So Mr. Lamm, I think you may have discussed this

3  during your direct presentation but what document is this?

4     A.  This is LG television owner's manual for various

5  units.

6       MR. PLIES:  Okay.  And Ted, if you could please go to

7  Page 17.

8     Q.  And what does LG call their own televisions?

9     A.  Well, in this case they are giving descriptions about

10  how to position your display, and then the next line they

11  say "Here shown may be somewhat different from your TV."

12       MR. PLIES:  And Your Honor, I would like to admit

13  into evidence and publish Mondis 0573, which has been

14  pre-admitted.

15       THE COURT:  It's admitted into evidence.  You may

16  publish it to the jury.

17       (Exhibit MON-0573 is marked in evidence.)

18  BY MR. PLIES:

19     Q.  And Mr. Lamm, is this one of the patents that you

20  also relied upon?

21     A.  Yes.

22       MR. PLIES:  And Ted, if you could please go to Column

23  1, lines 21 to 23.  Could you please highlight a little

24  lower, 21 to 23 please.

25     Q.  And so, Mr. Lamm, why did you rely on this document?

**495**

1     A.  Well, this is just further evidence that a person of

2  ordinary skill would have viewed TVs as display units.  In

3  fact, this says "The receiver is generally an audio-visual

4  display unit such as the common television colloquially

5  referred to as TV."

6       MR. PLIES:  And Ted, can you also -- hang on a

7  second.  Your Honor, I'd also like to admit and publish

8  Mondis 0575, which has been pre-admitted.

9       THE COURT:  It's admitted into evidence.  You may

10  publish it.

11       (Exhibit MON-0575 is marked in evidence.)

12  BY MR. PLIES:

13     Q.  Mr. Lamm, is this another patent that you relied

14  upon?

15     A.  Looks like it.

16       MR. PLIES:  And Ted, could you please go to Column 7,

17  lines 8 to 11.

18     Q.  And again Mr. Lamm, what's the significance of this

19  passage that you've cited?

20     A.  Well, the passage reads, "It is noted that the

21  television or display device may comprise any various types

22  of display units, including a digital TV or high-definition

23  TV (HDTV), a computer system having a video monitor or

24  other types of display devices."

25     Q.  Do you know if the accused products in this case are

**496**

1  digital televisions?

2     A.  Yes, they are.

3       MR. PLIES:  Ted, can you please pull up LG-339.

4     Q.  So, Mr. Lamm, do you recall a little while ago LG's

5  counsel going through this 1997 version of the EDID

6  standard?

7     A.  Yes.

8       MR. PLIES:  And Ted, can you please go to Page 25.

9  All right.  And Ted, can you go a few more pages.  Keep

10  going, keep going, next, next, next.  Okay.

11     Q.  So, you recall LG's counsel asking you about this

12  table?

13     A.  Yes.

14     Q.  Okay.  And he was pointing you to this byte with the

15  color monochrome descriptor up there at the type.  Is that

16  correct?

17     A.  Yes.

18     Q.  And this table is which version of the EDID

19  structure?

20     A.  It is Version 2 of the EDID structure.

21       MR. PLIES:  And now Ted, if you could go back to 25

22  please.

23     Q.  And is that what's shown at the top of Page 25?

24     A.  Yes, it is.

25     Q.  Okay.  Do any of the accused LG TVs in this case

**497**

1  store EDID data in the EDID 2.0 data structure?

2     A.  No.

3     Q.  What EDID format do all the accused TVs use?

4     A.  All of the accused TVs use the 1.3 data structure

5  format.

6     Q.  And that table that he was showing you from the 2.0

7  version of EDID, does that table exist in the 1.3 version

8  of EDID?

9     A.  No, it doesn't.

10     Q.  So, is that table of any relevance to the actual

11  accused products in this case?

12     A.  No, it isn't.

13     Q.  Also, do you know if anything happened with EDID

14  structure Version 2 at VESA?

15     A.  It was basically disbanded or, in fact, I believe the

16  standard was even pulled at one point because the industry

17  did not adopt the EDID structure Version 2.  And while I

18  was there, there was a lot of discussion about can we just

19  ignore that it ever existed or do we have to skip over on

20  the next version to something else.

21       MR. PLIES:  Ted, can you please go to Page 16.

22     Q.  Does this table look familiar, Mr. Lamm?

23     A.  Yes, it does.

24     Q.  And so, in this 1997 version of EDID, it still

25  maintains the same table that Version 1.3 uses.  Correct?

**498**

1    A.    This table does look the same, yes.

2    Q.    And it also has the display type identifier in the

3    feature support byte.  Correct?

4    A.    Yes, it does.

5    Q.    Now, in the course of forming your opinions, did you

6    rely on any prior art to see what other people in the field

7    viewed as display types?

8    A.    Yes, I did.

9    Q.    And what sorts of documents did you refer to?

10    A.    Well, I know patents were a big part of what helped

11    form my opinion.

12    Q.    All right.

13        MR. PLIES:  Ted, if you could please pull up Mondis

14    0569.  And if you could please go to Column 4, Line 17 to

15    22.  I'll tell you what, why don't we come back to that.

16    Why don't we go to MON -- first of all, let me ask the

17    Court's permission, Your Honor, this is a pre-admitted

18    exhibit, Mondis 0646, but I'd like permission to enter it

19    and publish it.

20        THE COURT:  It's admitted into evidence.  You may

21    publish it.

22        (Exhibit MON-0646 is marked in evidence.)

23    MR. PLIES:  All right.  And Ted, if you could please

24    go to Column 7, Line 59.

25    Q.    And Mr. Lamm, is this patent one of the ones you

**499**

1    relied upon?

2    A.    Yes, it is.

3    Q.    And what do we see here in this U.S. patent with

4    respect to display types?

5    A.    Well, in this passage they're describing the possible

6    things that could be a display type are CRT, LCD, color or

7    monochrome.

8    Q.    And in your experience in the display industry over

9    42 years, do you know if it was common for people in the

10    field to refer to color and monochrome as being different

11    displays?

12    A.    Yes, definitely.

13    Q.    And do you know if that is one of the reasons it was

14    defined that way when put into the VESA standard?

15    A.    Yes.

16        MR. PLIES:  Ted, can you please pull up Mondis 001

17    again.

18    Q.    So this is -- is this the other patent that you

19    relied upon in your opinion?

20    A.    Yes.

21    Q.    Okay.  And this is an excerpt from Column 14, Line 17

22    to 22 and, again, what does that convey to you?

23    A.    Here they're talking about the various display

24    devices of a monochrome type or a color type, and I believe

25    we saw this in the direct presentation the other day, also.

**500**

1    Q.    All right.

2        MR. PLIES:  Ted, could we please go back to Mondis 1,

3    Claim 14.

4    Q.    Mr. Lamm, on Wednesday do you recall discussing two

5    embodiments of the '180 patents with LG's counsel?

6    A.    Yes.

7    Q.    And as an initial matter, when discussing patents,

8    what's an embodiment?

9    A.    An embodiment is an area in the description of the

10    patent where the inventors will describe the actual

11    circuitry they built to utilize the claimed invention.

12    Q.    Do you know if patents sometimes disclose multiple

13    embodiments?

14    A.    They very often do.

15    Q.    Do you know if the '180 patent discloses multiple

16    embodiments?

17    A.    Yes, it does.

18    Q.    Do you recall LG's counsel asking you if one

19    embodiment of the '180 patent involved an ID number being

20    sent from the display to a video source?

21    A.    Yes.

22    Q.    And did you agree that Claim 14 pertained to such an

23    embodiment?

24    A.    Yes.

25    Q.    So, looking at Claim 14, what does the claim require

**501**

1    the identification number to identify?

2    A.    Well, the identification number says for identifying

3    at least a type of said display.

4    Q.    Does Claim 14 require the identification number to

5    identify a particular display unit?

6    A.    No, it does not.

7    Q.    Does Claim 14 require the identification number to be

8    a serial number for the display unit?

9    A.    No.

10    Q.    Does Claim 14 require the identification to be a

11    model or product ID for the display unit?

12    A.    No.

13    Q.    And does Claim 14 require the identification number

14    to identify anything other than the display type?

15    A.    No.

16        MR. PLIES:  Ted, can you please pull up Lamm

17    Slide 34.

18    Q.    Mr. Lamm, on Wednesday do you recall LG's counsel

19    asking you to confirm that EDID Version 1.3 is the version

20    implemented in LG's televisions?

21    A.    Yes, I do.

22    Q.    And do you also recall LG's counsel then asking you

23    to confirm that the document that you were showing on

24    Slide 34 was for EDID Version 1.4?

25    A.    That's correct.

502

1    Q.   And do you recall LG's counsel saying as part of his
2    question that this was not Version 1.3, which is the
3    version that is relevant in this case?
4    A.   Yes.
5    Q.   And do you also recall attempting to offer an
6    explanation to explain something but LG's counsel cutting
7    you off and saying, Sorry, sir?
8    A.   Yes, I do.
9    Q.   Okay.  Now is your opportunity.  What would you like
10   to explain?
11   A.   Well, what I was wanting to explain is that the
12   acknowledgments page on the, what we call the 1.4 structure
13   version also has a section down at the bottom that also
14   acknowledges the hard work done by the group that made the
15   version preceding this one.  And I was just simply trying
16   to identify that one of the people from Hitachi
17   participated in that version, in the previous version of
18   the standard from the one that I worked on.
19   Q.   And the previous version, is that the Release A Rev.
20   1 that's up there?
21   A.   Yes.  And that's what defined the 1.3 EDID data
22   structure.
23       MR. PLIES:  In fact, Ted, if you at least pull up
24   Mondis 0509 and maybe put it side-by-side.
25   Q.   All right.  So what are we seeing on the right-hand

503

1    side, Mr. Lamm?
2    A.   On the right-hand side is the actual EDID Release A
3    Revision 1 document.
4    Q.   And that's for what version of EDID?
5    A.   1.3.
6    Q.   Okay.  And is that the same as in the
7    acknowledgements list on the left that was in the document
8    that you had on Slide 34?
9    A.   Yes.
10   Q.   So, do you know then if Hitachi participated in the
11   development of EDID structure 1.3?
12   A.   Yes.
13   Q.   And you worked on which version?
14   A.   1.4.
15   Q.   Did you have to become familiar with 1.3 to do the
16   update and generate 1.4?
17   A.   Yes, the changes were pretty minor.
18   Q.   Do you recall LG's counsel asking you a little while
19   ago about some infringement contentions that were served in
20   the litigation in Texas?
21   A.   Yes, I do.
22   Q.   Did you prepare those contentions?
23   A.   No, I did not.
24   Q.   Do you recall that opposing counsel had shown that in
25   those contentions it made a reference to the basic features

504

1    and parameters of the display as being characteristic
2    information?
3    A.   Yes.
4    Q.   Now, in your testimony on Wednesday, was one of the
5    things that you identified as characteristic information
6    the image size data?
7    A.   Yes.
8    Q.   And where is that located?
9    A.   It's part of the EDID data table.
10   Q.   Do you know if it's in the basic parameters and
11   features area?
12   A.   No, it is not.
13   Q.   Okay.  In the earlier litigation, did you prepare any
14   infringement reports?
15   A.   Yes, I did.
16   Q.   Okay.  And what types of products did those reports
17   cover?
18   A.   They covered both computer monitors and televisions.
19   Q.   And was Claim 14 of the '180 patent asserted against
20   both classes of products?
21   A.   Yes, it was.
22   Q.   In those reports, what did you identify as being --
23       MR. McKEON:  Objection, Your Honor.  Foundation, 403
24   on this.
25       THE COURT:  This is a perfectly appropriate time for

505

1    us to take our break so we can talk about this exciting
2    issue, and you can wonder what Rule 403 is, and I will tell
3    you that I won't tell you what 403 is because those legal
4    issues are not matters for your concern.
5        So, Miss Trivino, if you'll take the jury to the jury
6    room.
7        (The jury is excused.)
8        THE COURT:  Mr. Lamm, you can step down.
9        (The witness steps down.)
10       THE COURT:  Mr. McKeon, get to a mic.  Remember, if
11   Miss Kashmer doesn't get it, it is a tree which fell in the
12   forest which nobody heard.
13       MR. McKEON:  Thank you, Your Honor.  So, the line of
14   questioning now, what they're getting into is his work in
15   that Texas case on his infringement study for Innolux, for
16   Hon Hai, the other defendants, when they went into
17   televisions.
18       LG settled and the only thing that happened with LG
19   are the infringement contentions.  The witness already
20   testified he never did a report for LG.  So what they're
21   talking about now is his expert report for these other
22   companies for televisions that has nothing to do with LG
23   Electronics, so, it's a relevance issue.  It's not relevant
24   to LG televisions in this case.
25       MR. PLIES:  I think I can fix that quickly, Your

506

1  Honor. I can just lay a foundation.
2      He has in his report that the accused Innolux
3  products in that case operated the same way as LG's
4  products, so, once I establish that, then I'm just trying
5  to show that ultimately Mondis has been consistent here
6  because all his opinions in his reports and what was
7  actually presented at trial was identifying the feature
8  support byte as the type ID.
9      He was obviously putting in the contentions to show
10 that Mondis had some record of inconsistency. I'm trying
11 to be able to rebut that.
12     MR. McKEON:  With respect to LG Electronics, your
13 Honor, that's the issue here, and the only contention in
14 that case was the one that we discussed with Mr. Lamm, I
15 discussed with Mr. Lamm.
16     These infringement reports by the witness here on the
17 televisions have nothing to do with what was stated by
18 Mondis in that case with respect to LG monitors. That's
19 all that's relevant here, and there's the inconsistency.
20 And the inconsistency I was getting at was Mondis took an
21 inconsistent position, not Mr. Lamm. I never said he took
22 an inconsistent position.
23     MR. PLIES: The jury is not going to make the
24 distinction between Mr. Lamm and Mondis, and that's the
25 whole point of asking him about it, so, I'm just trying to

507

1  show with Mr. Lamm that there has been consistency, that
2  the testimony that Mr. Lamm is providing to this jury is
3  exactly the same testimony he provided on behalf of Mondis
4  in the prior trial.
5      THE COURT: Okay. Thank you. I'm going to uphold
6  and sustain the objection. This cannot be offered as a
7  prior consistent statement under Rule 801, would that be?
8  I think so.
9      MR. McKEON:  Sounds right, Your Honor.
10     THE COURT: -- under Rule 801, because this witness
11 has not been challenged or impeached as, in fact, making a
12 statement which has been challenged under Rule 801.
13     In particular, and let me find the rule, 801(d)(1)(B)
14 permits a statement to be offered and not be considered as
15 hearsay where the declarant testifies and is subject to
16 cross examination about a prior statement and the prior
17 statement is consistent with the declarant's testimony, and
18 is offered to rebut an express or implied charge that the
19 declarant recently fabricated it or acted upon a recent
20 improper motive in so testifying.
21     In short, you're offering it as a prior consistent
22 statement and that can only be offered and accepted into
23 evidence where the witness has, in fact, been challenged
24 with recent fabrication.
25     This witness is not being challenged with recent

508

1  fabrication. The testimony or the evidence offered by Mr.
2  McKeon was demonstrating an inconsistent position taken by
3  Mondis in that litigation. All right. It was not
4  challenging this witness's testimony as being a recent
5  fabrication and, therefore, the predicate under Rule
6  801(d)(1)(B) has not been established.
7      The objection is sustained.
8      Now, since we are here now, and I've got the jury
9  out, so I'm not wasting their time, I'll hear you with
10 regard to the admissibility of the withdrawn admission by
11 LG. Mr. Black.
12     MR. BLACK: Yes, Your Honor. I apologize for the way
13 this came up. I know that it's been an irritant. I was
14 trying to do the right thing.
15     It was going to come up in the context of Mr.
16 Alessi's -- Dr. Stevenson's testimony, who they're putting
17 on out of order to try to get him on the stand and off
18 today.
19     This document is an admission that they made in the
20 course of litigation that was out there for three years.
21 We built our expert reports around it.
22     We -- rather than bring it up, it's on the exhibit
23 list, rather than raise it in the middle of testimony and
24 have an explosion, I wanted to get it in yesterday. Might
25 not even be relevant until Monday.

509

1      The issue is it was an admission that the
2  communication controller is an I2C controller and every one
3  of their products has that.
4      They have contested that now. The admission was
5  made. The rule says -- there's not a lot of authority
6  because it doesn't happen that often that someone changes a
7  substantive admission.
8      Wright & Miller says we can use it. The Third
9  Circuit says admissions in pleadings can be used. We think
10 it's admissible.
11     THE COURT: I'll hear from Mr. McKeon.
12     MR. McKEON:  Ms. Walsh will cover that, Your Honor.
13     MS. WALSH:  I think most of it.
14     THE COURT: All right.
15     MS. WALSH:  First of all, we apologize for the late
16 night filing. We had no choice but to respond in the event
17 Your Honor wanted to deal with it this morning.
18     My low energy should not be interpreted as the
19 appropriate amount of outrage we have with the filing that
20 was made last night. What do they say, three strikes and
21 you're out.
22     One of the pieces of evidence that you don't have
23 before you, Your Honor, is a transcript from the October
24 hearing before Judge Waldor where this issue was addressed.
25     As Your Honor saw from the papers, we filed a formal

Appx15130

510

1  motion to withdraw the RFA. There was extensive
2  opposition. There was a reply.
3      Judge Waldor had oral argument on it and, during the
4  course of the oral argument, Mr. Black specifically wanted
5  to reserve the right to be able to use the RFA in response
6  as an evidentiary admission.
7      We strenuously -- Mr. McKeon strenuously objected,
8  outlined the prejudice of it. And certainly our
9  interpretation of Judge Waldor's comments was she certainly
10 expressed significant skepticism about Mr. Black's
11 position.
12     Before the judge had an opportunity to rule on it,
13 Mr. Black submitted a letter withdrawing the opposition and
14 with no conditions, it was unequivocal withdrawal, and we
15 proceeded.
16     Last night, as Your Honor saw from the papers, after
17 9:00 we received their position.
18     The only other point I wanted to make -- and I do
19 have a transcript, copy of the transcript here from the
20 October hearing if Your Honor wants to see it -- but the
21 only other point I wanted to make was the case law that's
22 cited there, none of it dealt with the 403 analysis and
23 none of it dealt with how you would possibly cure the
24 prejudice if it was allowed.
25     What we would have to do here is bring in witnesses

511

1  to outline the circumstances under which the original
2  admission was made, the circumstances under which the
3  admission was withdrawn, the positions that were taken
4  before Judge Waldor, the hearing before Judge Waldor and
5  then the condition -- unconditional withdrawal of the
6  opposition to our motion.
7      THE COURT: Thank you.
8      Mr. Black, anything further?
9      MR. BLACK: Just, Your Honor, that they were trying
10 to get permission to change the RFA which they needed under
11 the rules.
12     We opposed that strenuously. We pointed out there
13 would be evidentiary value. After the hearing, and we're
14 in the pretrial order phase, we said we think we can prove
15 infringement without it, but we said we will withdraw our
16 opposition to your motion to change, send us a denial and
17 we will, quote, "proceed accordingly." The rule is the
18 rule.
19     THE COURT: Okay. Thank you.
20     All right. The Court is not going to permit the
21 withdrawn admission to be offered into evidence.
22     Wright & Miller in fact does discuss this issue. The
23 exact language of Wright & Miller is, The cases have not
24 focused on this question as applies to a Rule 36 admission.
25 There would be reason to hold that an express admission

512

1  later withdrawn should be treated in the same fashion as a
2  pleading. That is not saying that Wright & Miller endorses
3  it.
4      In short, any objective reading of Wright & Miller's
5  statement on this essentially is there's an argument to be
6  made and, indeed, there may be an argument.
7      When one goes to the footnote which Wright & Miller
8  cites, one sees that the footnote, in fact, does not
9  support -- the case cited does not support Wright &
10 Miller's assumption that there would be a reason.
11     In fact, Wright & Miller cites to Footnote 32.
12 Looking at Footnote 32, one sees, "See Nicholson v. Bailey,
13 182 F.Supp. 509, Southern District of Florida, 1960"; what
14 could be characterized as an oldie but goodie, perhaps.
15     But it then goes on to say, "However, if a party
16 desires to deny the truth of his admission or admissions,
17 the burden rests upon him to explain the reason that said
18 admission was false and to establish that his subsequent
19 testimony in contradiction of the admission is in fact the
20 truth. Insofar as this case suggests that a party can
21 contradict admission without prior leave of court to
22 withdraw the admission, it is inconsistent with Rule 36(b)
23 as amended in 1970."
24     Quite frankly, the Court is not satisfied that this
25 district court opinion stands for any overwhelming

513

1  authority for the proposition that Mondis has proffered it
2  for or, indeed, that Wright & Miller cites it for.
3      From the Court's point of view, of more significance
4  is the following and, that is, that this matter was all
5  before Judge Waldor.
6      If, in fact, given the scant authority which stands
7  for the proposition that a withdrawn admission under
8  request to admit is nevertheless evidential and Mondis
9  wanted to pursue that, it is clear that this was an issue
10 which was poised for Judge Waldor to be dealing with indeed
11 in the motion to withdraw the admission.
12     Mondis' action in, in fact, withdrawing its
13 opposition obviated the potential for Judge Waldor to be
14 dealing with this issue.
15     The Court is satisfied that was the time for Mondis
16 to, in fact, pursue its contention under the unique
17 circumstances of this case that, indeed, it was still
18 evidential.
19     Quite frankly, there is virtually no case law on this
20 issue. The cases cited by Mondis support the proposition
21 that a pleading, such as a complaint, which is later
22 amended or supplemented, which contains admissions may be
23 utilized as an admission.
24     That says nothing about whether or not the
25 circumstances that were presented here, including the

514

1  reasons which LG proffered to Judge Waldor to withdraw its
2  admission and, as I understand it from the submissions
3  which have been given to me, it was predicated upon a
4  change in the position of Mondis in terms of litigating
5  this case.
6       Under those circumstances, this Court is not
7  satisfied that there is any basis for treating that type of
8  admission that was subsequently withdrawn as being the
9  equivalent of filing a complaint which contains specific
10 admissions, and then which is superseded by an amended
11 complaint which contains new or different allegations.
12      The Court is, therefore, satisfied that under the
13 circumstances of this case, it indeed would be excessively
14 prejudicial for the plaintiffs to, in fact, be able to use
15 this as an admission, and the objection filed by LG is in
16 fact upheld.
17      Thank you, counsel.  You've got five minutes.
18      MR. McKEON:  Thank you, Your Honor.
19      (A recess is taken.)
20    (The jury is seated in the jury box.)
21      THE COURT:  Be seated, everybody.  All right.  Let's
22 proceed.
23      MR. PLIES:  Ted, can you please bring up Mondis 0509
24 and go to Table 3.11, and if you can, you could break out
25 the display type.

515

1  BY MR. PLIES:
2   Q.   Mr. Lamm, how many different values can the display
3  type ID number have?
4   A.   Four different values.
5   Q.   Does the display type ID do anything more than just
6  differentiate between color and monochrome?
7   A.   Yes.
8   Q.   And what can it do?
9   A.   Well, it differentiates between monochrome or gray-
10 scale displays, RGB color displays, non-RGB multi-color
11 displays or undefined.
12  Q.   And do you know if undefined provides useful
13 information about display type?
14  A.   Yes.  It means basically that it's not one of the
15 other three.
16  Q.   And if you set the type ID to undefined, are you
17 still using a type ID?
18  A.   Yes, you are.
19  Q.   Mr. Lamm, do you recall on Wednesday LG's counsel
20 asked you several questions about statements from your
21 expert report that you have made regarding the meaning of
22 the term "display"?
23  A.   Yes.
24      MR. PLIES:  Your Honor, with your permission I'd like
25 to publish but not admit one page from Mr. Lamm's report

516

1  that he was being asked about by LG's counsel.
2       THE COURT:  Show it to Mr. McKeon first.
3       MR. McKEON:  No objection.
4       THE COURT: All right.
5      MR. PLIES:  So Ted, if you could please show Page 187
6  of Mr. Lamm's rebuttal expert report.  And if you could
7  please blow up the bottom part there and highlight, if you
8  would, the second-to-last sentence beginning "In other
9  words."
10  Q.   All right.  Mr. Lamm, do you recall on Wednesday LG's
11 counsel asked you, "Mr. Lamm, have you also stated that the
12 bare term 'display' would normally be associated with
13 computer monitors?"  Correct?
14  A.   Yes.
15  Q.   And do you see those words in the highlighted portion
16 of your record, the "bare term display would normally be
17 associated with computer monitors"?
18  A.   Yes.
19  Q.   Did LG's counsel leave something out from your
20 sentence?
21  A.   Yes.  The rest of that sentence there is -- in fact,
22 let me just read the whole thing so we have it all.
23      "In other words, it is proper to refer to televisions
24 as display but the bare term 'display' without context
25 would normally be associated with the computer monitor."

517

1       MR. PLIES:  And Ted, if you'd back out please and
2  highlight the first portion of the paragraph.
3   Q.   So, in this very same paragraph that LG's counsel was
4  referring to, do you know if you provided the relevant
5  context for the '180 patent?
6   A.   I'm sorry.  Can you repeat that?
7   Q.   Yeah, sir.  So, the sentence that Mr. McKeon is
8  referring to had left out -- he had left out that "without
9  context" portion.  Correct?
10  A.   That's correct.
11  Q.   And what I'm asking you is in that same paragraph, do
12 you provide the rationale for that context?
13  A.   Yes, I do.
14  Q.   Okay.  Thank you.
15      MR. PLIES:  Pass the witness.
16 RECROSS EXAMINATION
17 BY MR. McKEON:
18  Q.   Okay, Mr. Lamm.  We're almost done.  Just talking
19 about context and how important context is in connection
20 with this term "display," just talking with counsel on
21 that.  Right?
22  A.   Yes.
23  Q.   And I think we quoted a line from your report.  It
24 says, "The bare term 'display' without context would
25 normally be associated with computer monitors."  Isn't that

Appx15132

518

1 right?

2   A.   That's correct.

3   Q.   So, the premise here is that without context, if I

4 hear the "display," I'm talking about computer monitors.

5 That's the premise.  Isn't that right?

6   A.   There's a leaning toward the word "computer monitor,"

7 yes.

8   Q.   So, now when we take that analysis over to the '180

9 patent, and we look at the '180 patent, and we know that

10 the '180 patent is all about computer monitors.  Isn't that

11 right?

12   A.   It's all about display units.

13   Q.   Well, sir, we can go through the figures again, but

14 every single figure is a computer monitor.  Isn't that

15 right?

16   A.   I believe the figures typically use a computer as

17 part of the block diagram.

18   Q.   Computer monitor, the whole patent talks about a

19 connection between a computer and a computer monitor.

20 Isn't that right?

21   A.   A computer and a display.

22   Q.   Well, sir, the word "display" is in there.  You're

23 right about that, absolutely.  We can all agree on that.

24       But as you said with your counsel here, context is

25 important.  Right?  And the premise is when you look at the

519

1 word "display" without context, we're talking about

2 computer monitors.  Isn't that right?

3   A.   Yes.

4   Q.   And when we go to the '180 patent, every single

5 figure is a computer monitor.  Isn't that right?

6   A.   They are not labeled as computer monitors.

7   Q.   Sir, one of ordinary skill in the art reading the

8 patent, they're going to look at the patent and they see a

9 computer connected to a display.  But to one of ordinary

10 skill in the art, it's a computer monitor.  Right?

11   A.   Most likely, yes.

12   Q.   There's no most likely, sir.  It's a computer

13 monitor.  Right?

14   A.   Most likely.

15   Q.   So, we have the premise of your statement, which is

16 without context the word "display" is normally associated

17 with a computer monitor.

18       And we go over to the '180 patent, it's all about

19 computer monitors, so, in the context of the word "display"

20 in the '180 patent, we're talking about computer monitors.

21 Isn't that right?

22   A.   I believe that's going further than the words that

23 I've used.

24   Q.   All right.  Well, one thing we do know, sir, is on

25 questioning with your counsel, you were talking about

520

1 display units and you went through a bunch of prior art

2 references where they had display unit and televisions

3 associated with each other.  Do you recall that?

4   A.   Yes.

5   Q.   Okay.  And just so we're clear, these are -- this is

6 not the '180 patent you're talking about.  This is other

7 patents.

8   A.   Correct.

9   Q.   And we know that in the '180 patent, we know that

10 televisions existed at the time of that '180 patent.  Isn't

11 that right?

12   A.   Yes, they did.

13   Q.   And yet, the inventors chose not to reference a

14 television not even one time.  Isn't that right?

15   A.   That's correct.

16   Q.   The word isn't even in there.  Correct?

17   A.   Nor is the word "monitor."

18   Q.   And to go to televisions to be display unit, you go

19 to other patents.  Isn't that right?

20   A.   Yes.

21   Q.   Now, I want to ask a question about this Monnes

22 patent, M-o-n-n-e-s, and it's the exhibit MON-646, which

23 has been pre-admitted.  And you talked to counsel about

24 that.  Do you remember that?

25   A.   Yes.

521

1       MR. McKEON:  If I can get the ELMO please.

2   Q.   You see that, sir?  You had some discussions with

3 counsel about this paragraph here.  Do you see that?

4   A.   Yes, I do.

5   Q.   Can you read that?  Let me see if I can zoom in here.

6 Does that help?

7   A.   Yes, thank you.

8   Q.   And what this says here is that, what we've got is a

9 monitor, in the context of what's written here, would be a

10 display unit.  Isn't that right?

11   A.   Yes.

12   Q.   And a monitor type would be a type of display unit --

13 isn't that right -- in the context of what's written here?

14   A.   Okay.  Now that I've read the passage, can you repeat

15 your question?

16       MR. McKEON:  Just for the record, we're reading

17 Column 7, starting on Line 51.

18   Q.   And my question now is in the context of Monnes, a

19 monitor type would be -- the reference of the monitor type

20 would be a type of display unit -- isn't that right -- in

21 the context of this patent?

22   A.   I believe so.

23   Q.   And Monnes refers to display type separately from

24 monitor type.  Isn't that right?  Go down where my finger

25 is.  You see this, says display type.  Display type there.

522

1  Do you see that?

2    A.  Yes, I think I see what you're pointing to now.

3    Q.  And display type is listed under attributes, under

4  attributes of the monitor.  Isn't that right?

5    A.  Yes, in that context it is.

6    Q.  So, we have a monitor and it's got a number of

7  different attributes, and one of the attributes of this

8  monitor, which is the display unit, is the display type.

9  Isn't that right?

10   A.  Yes.

11   Q.  And in this context, it's either a CRT, LCD, etc.

12  Isn't that right?

13   A.  Yes.

14      MR. McKEON:  No further questions, Your Honor.  Thank

15  you, Mr. Lamm.

16      THE COURT:  Thank you, Mr. McKeon.

17  RE-REDIRECT EXAMINATION

18  BY MR. PLIES:

19   Q.  So, context, Mr. Lamm, is the appropriate context

20  looking at the requirements of Claim 14 or is the

21  appropriate context looking at the examples in the figures

22  of the '180 patent?

23   A.  It's looking at the text of the claim language

24  itself.

25   Q.  Thank you, Mr. Lamm.

523

1      THE COURT:  Anything further, Mr. McKeon?

2      MR. McKEON:  Nothing further.

3      THE COURT:  Mr. Lamm, you're excused.  Thank you very

4  much.

5      THE WITNESS:  Thank you, Your Honor.

6      (The witness steps down.)

7      THE COURT:  Where do we stand?

8      MR. BLACK:  Last witness, Your Honor.  Plaintiff

9  rests.

10     THE COURT:  Okay.  Thank you.

11     All right.  Let me just see counsel at side bar for

12  one moment.

13

14

15

16

17

18

19

20

21

22

23

24

25

524

1      (At side bar:)

2      THE COURT:  So, this is the appropriate time for you

3  to make your motion for me to grant judgment for defendant

4  as a matter of law.  All right.

5      MR. McKEON:  Your Honor, yes.  And in fact, we move

6  under Rule 50 for judgment as a matter of law because the

7  plaintiffs in this case have failed to produce sufficient

8  evidence to support a finding of infringement and,

9  particularly with respect to the requirement of the claim

10  that says you've got to have an identification number for

11  identifying a type of display unit.

12     And secondly, there's insufficient evidence to

13  support the conclusion that there's a communication

14  controller in the context of the Claim 14 of the '180

15  patent and, therefore, we ask for a judgment as a matter of

16  law entered in favor of LG.

17     MR. BLACK:  Both elements are clearly met.  Mr. Lamm

18  gave an unqualified opinion of infringement.  He produced

19  substantial evidence, including the VESA standard which

20  calls the display type a display type, the communication

21  controller is an I2C controller, he demonstrated that, that

22  exists in each LG television, and we believe the motion

23  should be denied.

24     THE COURT:  The Court reserves.  Thank you very much,

25  down.

525

1      MR. McKEON:  Thank you, your Honor.

2      THE COURT:  Let's go.

3      MR. BLACK:  Just on scheduling, you sent us something

4  yesterday saying we're switching the order of witnesses

5  because Stevenson had to get back by Monday?  That's not

6  even going to be possible.  You haven't even put him on yet

7  and he's got to be three hours.

8      MR. McKEON:  We're going to put him on right now.

9  It's less than two hours.

10     MR. PLIES:  Impressive.

11     MR. McKEON:  We'd like to get him done today, and

12  we've got time to do it.

13     MR. BLACK:  Okay.

14     (End of side bar discussion.)

15

16

17

18

19

20

21

22

23

24

25

526

1    (In open court:)

2        MR. McKEON:  Your Honor, Defendant LG calls its first

3    witness, Dr. Robert Stevenson.  And Your Honor, for the

4    Court, Mr. Andy Schwentker will be presenting Dr.

5    Stevenson.

6        THE COURT:  Okay.  Thank you.

7        ROBERT L. STEVENSON, called as a

8        witness in behalf of the Defendants, having

9        been first duly sworn, testifies as follows:

10   DIRECT EXAMINATION.

11   BY MR. SCHWENTKER:

12   Q.   Good afternoon, Dr. Stevenson.

13   A.   Good afternoon.

14   Q.   Can you please introduce yourself to the jury.

15   A.   Good afternoon, ladies and gentlemen.  I am Dr.

16   Robert Stevenson.  I'm a professor of electrical

17   engineering at the University of Notre Dame.

18   Q.   And did you prepare some slides to help with your

19   testimony here today?

20   A.   Yes, I did.

21   Q.   And are those slides shown on the screen here?

22   A.   Yes.

23   Q.   And going to the next slide, can you please tell the

24   jury a little bit about your education.

25   A.   Sure.  I grew up outside Philadelphia, went down the

527

1    road a little bit to the University of Delaware, where I

2    earned my bachelor's degree in electrical engineering in

3    1986.

4        From there I received a graduate fellowship from the

5    National Science Foundation and went to continue my

6    graduate studies at Purdue University, where I earned my

7    doctorate degree in electrical engineering in 1990.

8    Q.   And how long have you been a professor?

9    A.   Well, immediately after I got my doctorate degree, I

10   took a job at Notre Dame, started as an assistant

11   professor, got promoted through the ranks, received tenure,

12   and now I serve as a full professor of electrical

13   engineering, so, I've had that position or a version of

14   that position for the past 29 years.

15   Q.   What are some of the courses you teach?

16   A.   Well, over the years I teach anything from beginning

17   electrical engineering classes to sophomores to very

18   advanced classes for most advanced Ph.D. students.

19       Currently I am teaching a class for our juniors,

20   which is called Embedded Systems.  Next semester I'm

21   teaching a class for our seniors, is titled Multimedia

22   Signals and Systems.

23   Q.   Do either of those courses relate to what we'll be

24   talking about today?

25   A.   Well, pretty much all the courses I have relate to

528

1    what I do today, we're going to talk about today.

2        With regards to those two classes, the embedded

3    systems class that I'm currently teaching, embedded systems

4    is the term we use for when we put computers inside of

5    things, so, when we put digital computing devices inside of

6    other things.

7        They are all over the place, anything from remote

8    control to -- your car probably has maybe a hundred of

9    these, to a thermostat, to a TV, they have embedded

10   processes in them.  The class I'm teaching is about how to

11   design and build those things.

12   Q.   Dr. Stevenson, do you have any industry experience?

13   A.   Yes.  Extensively over my 30 years, I've worked

14   closely with industry.

15   Q.   And if we go to the next slide, I see that you are --

16   you've listed several companies here, and the first one is

17   Apple Computer.  Can you tell the jury about your work with

18   Apple.

19   A.   Sure.  So, over the years I've worked in different

20   ways with various companies.  Some of them fund my research

21   at Notre Dame.

22       Apple would be an example of one of those.  Started

23   back in the mid '90s.  They were interested in -- they had

24   a bunch of what we call imaging products, anything from

25   digital cameras to printers to monitors, and they were

529

1    interested in making the colors look right in all of them

2    and, so, I worked with Apple on some of the technology

3    associated with that.

4    Q.   And the next one is Intel.  What work did you do with

5    Intel?

6    A.   Well, Intel was a little bit different in the sense

7    that I spent some time at Intel.  I worked as part of what

8    is the Pentium group out in Oregon.  That group is charged

9    with designing the Pentium.  At that time they were trying

10   to better support multimedia audio and video on the Pentium

11   architecture and, so, I was part of a video group that was

12   looking at how to build a product and also how to evolve

13   the Pentium architecture.

14   Q.   To move things along, let's go to the bottom of the

15   slide.  And you list Air Force Research Laboratory.  What

16   did you do there?

17   A.   Well, some of my research comes from the U.S.

18   Government, some of it from Department of Defense.

19       The Air Force was a little bit unique in the sense

20   that I spent a summer at an Air Force research lab in

21   Upstate New York, and some of the work is classified so I

22   can't talk about it completely.  But I was part of an image

23   exploitation group.

24       Imagine the Air Force collects a lot of image data.

25   This group was charged with how to organize and manage that

**530**

1  data so that it can be used for strategic decisions.

2  Q.  And what sort of things do you do now?

3  A.  Well, right now kind of the biggest source of funding

4  I have is from the U.S. Navy, so, I'm working on a navy

5  project.

6  Q.  Can you tell the jury a little bit about the articles

7  you've published.

8  A.  Yes.  One of my roles as an academic is to kind of

9  develop new technology, write about it, talk about it.

10  I do that through various means, one of which is

11  publishing papers; done this consistently for 30 years now.

12  Numbers well over 150 in terms of articles I published in

13  journals, conferences I've published and presented at, so,

14  I do that.

15  I also organize conferences around the world; as

16  close as I've organized are Notre Dame and also organized

17  them in Beijing, China.

18  Q.  What kinds of people attend those conferences?

19  A.  Well, my area I work on is imaging and video

20  technology and, so, the things I write about and the

21  conferences I organize all have to do with various aspects

22  of imaging and video systems.

23  Q.  Can you tell the jury about your experience editing

24  journals.

25  A.  Well, in addition to publishing in journals, I also

**531**

1  try to help organize the journals in the sense that I try

2  to get papers submitted.

3  I -- in academia the idea of a peer review is

4  important, so, organize reviewers, send papers out for

5  review, and make final decisions about what should and

6  should not be published for other people.

7  I've done that for a couple of journals.  Probably

8  the most relevant one to here is the second one there, the

9  IEEE, Transactions for Circuits and Systems for Video

10  Technology.

11  Q.  What is the IEEE?

12  A.  IEEE is the largest professional organization for

13  electrical engineers.

14  Q.  Now, Dr. Stevenson, how many times have you served as

15  an expert?

16  A.  Many times.  I think this may be about the 20th time

17  I've testified in court.

18  Q.  And are you being paid for your work as an expert in

19  this case?

20  A.  I get paid for my time.  I try to charge normal

21  hourly consulting rate for when I'm here.

22  Q.  Does any of your compensation depend on your

23  testimony or the outcome of the case?

24  A.  No.

25  MR. SCHWENTKER:  Your Honor, at this time LG offers

**532**

1  Dr. Robert Stevenson as a technical expert in video display

2  and communication systems, including video electronics

3  communications standards and the hardware and software used

4  to implement them.

5  MR. BLACK:  We already have a stipulation on all

6  experts' qualifications.

7  THE COURT:  All right.  The witness will be qualified

8  as an expert.

9  I think I already told you about experts, which means

10  they can give opinions and you evaluate them just like you

11  evaluate anybody else's testimony.

12  Go ahead.

13  Q.  Dr. Stevenson, what were you asked to do in this

14  case?

15  A.  Well, I think if you go to the next slide, it shows

16  kind of major categories of things I'll be talking about.

17  One is I'm going to respond to Mr. Lamm's opinions

18  that he's offered about the infringement of the products

19  that he identified.

20  The other one will be I will be offering opinions

21  about the validity of the '180 patent.

22  Q.  And in performing your analysis, what information did

23  you review?

24  A.  Well, on this next slide I provided kind of a list of

25  a bunch of things.  Obviously, I started with the patent,

**533**

1  the relevant documents there, all the technical standards,

2  the technical documents about the televisions themselves, I

3  looked at everything and, of course, looked at Mr. Lamm's

4  reports.

5  Q.  Did you reach any conclusions on the question of

6  infringement?

7  A.  Yes.  I've summarized them on the next slide.

8  Q.  And what were those conclusions?

9  A.  Basic two reasons I'm going to explain to you today

10  why I don't believe the LG TVs infringe the product --

11  excuse me -- infringe the '180 patent.

12  The LG TVs do not claim the -- do not contain the

13  claimed identification number for identifying a type of

14  display unit.  That's the first one.

15  The second one is that the LG TVs do not contain the

16  claimed communication controllers that are both required by

17  the claim.

18  Q.  And did you reach any conclusions on the question of

19  validity?

20  A.  Yes.

21  Q.  And what were those conclusions?

22  A.  Summarized here, I believe the patent is invalid for

23  what is called lack of written description.

24  I believe you heard in the patent video that one of

25  the things you have to do is provide information to the

Appx15136

534

1 world about exactly what you invented. That's the deal
2 you're making with the U.S. Government that will give you
3 rights to it, but you have to describe the invention to the
4 world so that the world can use it after the patent
5 expires.
6      Not doing that is what's called lack of written
7 description, and if you don't do that description, then the
8 patent is invalid.
9 Q.   Can you give the jury a brief overview of what we'll
10 be discussing today?
11 A.   Yes. So, I tried to give you some guideposts to say
12 where we're going through. I'll come back to this slide
13 every time we kind of change topics.
14      Start with technology overview, talk about the
15 standards, talk about the '180 patent, talk about the TVs,
16 and then get to the opinions about non-infringement and
17 validity.
18 Q.   Let's start with the technology overview. And we've
19 heard from prior testimony that the alleged invention of
20 the '180 patent took place in 1993, so, let's go all the
21 way back to the early 1990, and can you tell the jury about
22 the state of technology back then.
23 A.   Well, at that time, you know, we're relatively early
24 on in the computer monitor, usage of that term, started
25 back in the '80s.

535

1      By the 90s, we had, you know, these devices. They
2 were CRT based. Certainly, if you are of a certain age,
3 which I certainly am, you remember the televisions, and
4 particularly the computer monitors at that time were these
5 big bulky things, little ones sitting over there. You
6 know, they were the CRT tubes. They were what was common
7 throughout the early '90s, was a major display component
8 you saw.
9 Q.   What sort of technical issues were there with those
10 computer monitors?
11 A.   Well, if you look at the next slide, you'll see
12 pictures. You'll notice a lot of them have that big bulky
13 thing, but they also have knobs on the front -- show that
14 on the next page graphically -- and what these knobs were
15 were an ability to manually adjust the picture. Right.
16      So, you could adjust the picture side-to-side,
17 up-and-down, kind of the size of the picture. What you're
18 actually doing there is playing with the timing settings of
19 the computer monitor and, so, that was all done manually at
20 that time. Typically knobs on the front, sometimes on the
21 back.
22 Q.   And we've heard a lot about signals already, and what
23 kind of signals needed to be generated and sent to those
24 CRT monitors?
25 A.   Well, in addition to that adjustments on the monitor,

536

1 if you go to the next slide, typically also had to make
2 adjustments on the computer device, so the computer would
3 have to generate certain signals and send them to the
4 monitor.
5      A very simple example was, you know, at that time we
6 had black-and-white monitors and we had color monitors, so,
7 if you hooked up a black-and-white monitor, the computer
8 had to be told to generate black-and-white signals in some
9 way.
10      Sometimes this was configuration of hardware,
11 sometimes it's configuration of software.
12      Alternatively, if you hooked up a color monitor, you
13 had to tell the computer something different or configure
14 it in a different way, so, it's this manual process of
15 configuration you had to go through.
16 Q.   So that was done by a person?
17 A.   Yes.
18 Q.   Okay. And did anyone try to implement that
19 automatically?
20 A.   Yes. So, engineers recognized this was a problem.
21 It wasn't easy to deal with and a lot of people didn't get
22 it set up quite right. So, engineers kind of across the
23 globe started looking at ways to solve this problem.
24      If you go to the next slide, the computer graphics
25 controller that were inside these things, this piece of

537

1 hardware were built to be kind of smarter, you know, how to
2 put some intelligence in them, how they can collect
3 information and do some of the configuration automatically.
4 So, how do we make that all automatic was kind of a topic
5 of discussion at that time.
6 Q.   And so, what are you showing on this slide?
7 A.   On this slide, the computer, this graphics card
8 inside, and if it could automatically configure itself to
9 generate the signals for the monitor, that was kind of the
10 goal.
11 Q.   Can you give us an example of someone who addressed
12 this issue?
13 A.   Yes. If you go to the next slide, I have this time
14 line again, showing -- no, I guess I don't have the time
15 line.
16      I have a patent by Mr. Sawdon that came out in
17 approximately 1990, one of many examples you can find of
18 people who are trying to address this problem of
19 automatically configuring the computer to work with the
20 computer monitor.
21 Q.   Let's look at the Sawdon patent in a little more
22 detail.
23      MR. SCHWENTKER: And Your Honor, we'll be publishing
24 pre-admitted exhibit LG-271.
25      THE COURT: Admitted into evidence. You may publish

Appx15137

**538**

1    it.

2        (Exhibit LG-271 is marked in evidence.)

3        MR. SCHWENTKER: Thank you.

4    Q.    And at a high level, what did the Sawdon patent

5    disclose?

6    A.    Well, if you could read some of the highlighting

7    there, you can see the first little section of the text

8    that is highlighted discusses the problem, which is that

9    display devices started to get a little more complex. They

10    had various modes of operation. This caused complexity in

11    configuration.

12        And then the next highlighted section talks about,

13    you know, this desire of being able to identify the type of

14    display device so that you could automatically configure

15    the computer to work with that monitor.

16    Q.    And who did Sawdon work for?

17    A.    He worked for IBM, which was one of the major

18    computer manufacturers at the time.

19    Q.    And what is the date of the Sawdon patent?

20    A.    It's May of 1990.

21    Q.    Now, moving along, let's go to the standards. And

22    we've heard a lot about standards already. Can you remind

23    the jury what a standard is.

24    A.    Well, standard is any time to kind of, may be

25    competitors, may be people are trying to cooperate, trying

**539**

1    to work together to build a bigger system out of devices,

2    there's someplace where they meet, some sort of interface,

3    and the standardization process is very common in

4    engineering, find it all over the place but, you know, we

5    kind of organize that and write up a document that says

6    this is how these two things are going to interface.

7        I think Mr. Lamm gave the example of the standard for

8    the plug that goes into the socket.

9        There's literally hundreds and thousands of standards

10    in the world that address kind of all these interfaces of

11    components that we build.

12    Q.    Have you worked on cases involving standards before?

13    A.    Yes. Like I said, standards are very common practice

14    in engineering, so, a lot of the things I do both inside

15    the courtroom and outside, I'm looking at standards and --

16    standards and figuring out how to try to work with them.

17    Q.    If someone claims to have a patent on a standard,

18    does that necessarily mean that practicing the standard

19    will infringe that patent?

20    A.    Well, a claim doesn't mean anything. It's what it

21    does and, so, you have to look at the claim itself. And

22    then quite often you have to look at the standard because,

23    even though the standard sounds like a bunch of required

24    things, a lot of it is typically optional, so, have to see

25    how maybe the standard was implemented in a particular

**540**

1    product.

2    Q.    And which standards are relevant to this case?

3    A.    I think we've heard a bunch about the standards.

4    Hopefully the names are starting to sink in.

5        It's the VESA standards relative to the DDC and the

6    EDID.

7    Q.    Okay. Turning to Slide 20, what are you saying here?

8    A.    This is just kind of updating this time line, you

9    know. This problem was identified early in the '90s.

10    People were working on it.

11        By the time '94 came around, there was enough ideas

12    that we started to standardize on something, so, generally,

13    once we start solving a problem, you know, the

14    standardization usually follows in terms of, okay, how do

15    we actually make everyone work together.

16        So, the first version of this standard came out in

17    '94.

18    Q.    And what was the purpose of that standard?

19    A.    I think if you go to -- the purpose of the standard

20    is basically this interface between a computer monitor and

21    a computer system, how to provide the information across

22    that computer monitor, from that computer monitor so that

23    the graphics controller can automatically configure itself.

24        MR. SCHWENTKER: And Your Honor, on the next slide

25    we'll be publishing is pre-admitted Exhibit LG-340.

**541**

1        THE COURT: It's admitted into evidence and you may

2    publish it.

3        (Exhibit LG-340 is marked in evidence.)

4    Q.    On Slide 21, Dr. Stevenson, what are you showing

5    here?

6    A.    Well, this is the standard that's probably most

7    central to the case, which is the EDID standard. And this

8    is the table we've heard about some. This is in Version

9    1.0, so, not the one we've been mostly focused on. It's the

10    same table we've been seeing.

11    Q.    In fact, I see you've labeled this the train. Why is

12    that?

13    A.    I think Mr. McKeon introduced this concept, this

14    analogy of the train, to describe kind of the flow of

15    information from the computer monitor to the computer

16    system.

17        This table lays out a bunch of information about a

18    train, how big it is, how big the cars are, what

19    information is contained in each car and, so, that's the

20    analogy that I'll try to also relate to.

21    Q.    And so, when was the train introduced?

22    A.    Well, it came as part of '94, this '94 standard.

23    Q.    Now, if we go to the next slide, Slide 22, what are

24    you showing on this slide?

25    A.    Well, the version of the standard that you find in

542

1  the LG TVs is Version 1.3, so, that's the standard we're
2  really looking at, which came out six years later.  Pretty
3  typical that standards evolve a little bit as the
4  technology involves.
5      MR. SCHWENTKER:  And Your Honor, on the next slide
6  we'll be publishing pre-admitted Exhibit LG-367.
7      THE COURT:  It's admitted and you may publish it.
8  Q.    Dr. Stevenson, what are you showing on this slide?
9  A.    Well, so this is the same table, corresponding table.
10 It changes a little bit from version to version, but the
11 parts we're talking about actually evolved, stayed
12 identical from Version 1 to Version 1.3 and even later.
13 So, while there's some little changes later on, they're not
14 particularly relevant to what we have to talk about.
15 Q.    And why are we talking about Version 1.3 in this
16 case?
17 A.    That's the version that's found in the LG TVs.
18 Q.    Okay.  And why don't we take a bit of a closer look
19 at this table, and can you explain to the jury what you're
20 showing here?
21 A.    So, this is just a blowup of the top just so we can
22 talk about the columns and the headings on the columns.
23 Q.    And can you describe the first column?
24 A.    The first column is what's called the address.  This
25 is basically just telling you the order of the cars in the

543

1  train.  Each of these lines relate to one or more cars.
2      And the address kind of tells you the order in which
3  it is, so, because it's laid out in the same order, you
4  just see that number progress 1, 2, 3, 4, so...
5  Q.    And if we go to the next columns, can you describe
6  those to the jury?
7  A.    These refer to kind of the size of the information.
8  Analogy, kind of how many cars are -- you need to represent
9  this part of this information table.
10     So, you could see this so-called header block
11 requires eight bytes and, so, you think of that as eight
12 cars of train to represent this information.
13 Q.    And what is a byte?
14 A.    Digging kind of deep into the digital world, but a
15 very basic part of the computer is the -- we build at
16 called a state machine that has two states.
17     It can give us true/false, yes/no.  Engineers being
18 numbers, we talk about it being 1/0, and that's a bit.
19 That's a piece of information.  Something one, something
20 zero, something true, something false.
21     There's literally billions of these bits in most
22 digital computers, so, we start grouping them together.
23     The first grouping we create is called a byte.  It's
24 just eight of these bits, so, you could think of it as
25 eight ones and zeroes, and that's a byte.

544

1  Q.    And how did the bits relate to Mr. McKeon's train
2  analogy?
3  A.    Well, so, if the cars represent a byte, inside the
4  car you could think of eight seats and, so, those eight
5  seats represent a bit.  And two states would be is it
6  occupied or not, so, it's a one or a zero; the person
7  sitting there, not sitting there, that sort of idea.
8  Q.    And moving along, what are you showing in the next
9  column?
10 A.    The next column was titled description, and this is
11 just a one line that describes the information as found
12 there.
13     You'll see there's a little bit of a hierarchy where
14 they group things into blocks.
15     This block, you could see the top line is header,
16 it's in bold, so, this entire block of information is
17 called the header block.  But then they give you more
18 detailed information on a line-by-line basis about what's
19 inside that block.
20     The header block is kind of interesting, just kind of
21 a unique pattern so that you could identify this as EDID
22 table.
23 Q.    And then to wrap up the columns here, what's the last
24 one?
25 A.    The last one is intended to tell you where to go for

545

1  more information.  This is just kind of an overview table,
2  nice summary, but you have to -- want to dig into the
3  details, if you want to dig in the details of the header,
4  go to Section 3.3 of the standard and each of those blocks
5  have more details.
6  Q.    Are there any particular sections of the train you
7  want to focus on?
8  A.    Yes.  If we go to the next slide, the very next block
9  in the EDID table is this so-called vendor/product
10 identification block.  You could see this contains a couple
11 of things that help to identify the actual device and
12 product, so, there's identification numbers for the
13 manufacturer, the actual product, serial number, things
14 like that in this block.
15 Q.    And what is the ID product code?
16 A.    The ID product code is a code that you could put in
17 to indicate what the type of the product is.  So, for
18 example, they give the example in the standard of a model
19 number.
20 Q.    And what is the ID serial number?
21 A.    The ID serial number is a serial number, so, you
22 think of a -- I think Mr. McKeon used a license, driver's
23 ID -- right -- that kind of uniquely identifies that
24 person.  Serial number would uniquely identify that
25 particular device.

550

1  we'll be publishing pre-admitted exhibit LG-283.

2        THE COURT: It's admitted into evidence and you may

3  publish it.

4        (Exhibit LG-283 is marked in evidence.)

5  Q.  Dr. Stevenson, on the next slide what are you showing

6  here?

7  A.  Well, this is talking about the Plug-N-Play.  The

8  idea of Plug-N-Play predates this particular standard by a

9  good decade.

10       If you're buying computers at that time, Microsoft

11 and their companies were advertising heavily that their

12 computers and stuff were Plug-N-Play, everything from

13 keyboards to mouses to sounds cards.  The idea was to try

14 to make them plug and play, so, that terminology kind of

15 predates the standard.

16       In 2004, VESA participated in and created this

17 Plug-N-Play standard, which was meant to do this sort of

18 thing for the graphics card and computer monitor, so, you

19 know, that's why it's -- VESA uses the same terminology as

20 what existed.

21 Q.  And what is needed for Plug-N-Play to work?

22 A.  Well, relevant to this case, what the important piece

23 is is that they require the DDC and the EDID standard, that

24 same sort of standard stuff we saw going back to '94.

25       The rest of Plug-N-Play talks about what goes on in

551

1  the graphics card.  That's not really particularly

2  interesting for our issues.

3  Q.  And within EDID for Plug-N-Play, is there anything

4  that's particularly important?

5  A.  Well, just the fact that they're using the EDID

6  standard and they point out in particular that it's the

7  timing data that they value the most because that is the

8  most useful information there.

9  Q.  Okay.  And maybe we can take a look at that.

10       THE COURT: I think this is a good point for us to

11 break for lunch.  Okay.

12       MR. SCHWENTKER: Yes, Your Honor.

13       THE COURT: We'll resume at 1:45.

14       Don't talk about the case, don't let anybody talk to

15 you about the case, and keep an open mind.

16       See you at 1:45.

17       (The jury is excused.)

18       THE COURT: You may step down.  Thank you.

19       (The witness steps down.)

20       (Luncheon recess is taken.)

21              AFTERNOON SESSION

22          (In open court 1:32 p.m.)

23            (Parties present.)

24       (Jury is brought in at 1:32 p.m.)

25       THE COURT: Be seated, everybody.

552

1        All right, let's proceed with Mr. Schwentker.

2        MR. SCHWENTKER: Thank you, Your Honor.

3  BY MR. SCHWENTKER:

4  Q.  Dr. Stevenson, before lunch we were talking about the

5  VESA Plug-N-Play standard.

6        MR. SCHWENTKER: And Ian, if I could have you pull up

7  LG-283, please.  And go to Section 3.3.2.1.

8        And if you can blow up the third paragraph in that

9  section, please, Ian.

10 BY MR. SCHWENTKER:

11 Q.  And, Dr. Stevenson, is there anything in this that

12 you wanted to point out to the jury?

13 A.  Well, this is just the point I made a moment ago,

14 which is that the timing data is what is really needed in a

15 modern system.  Some of this other data is just not, may --

16 it has legacy purposes, but it really isn't that important.

17 Q.  Now, if we go to --

18       MR. SCHWENTKER: Back to the slide deck.

19 BY MR. SCHWENTKER:

20 Q.  If we go to the next slide, what are you showing on

21 the timeline now?

22 A.  Well, there is one more standard that has been

23 mentioned.  It's not a VESA standard, but it's an HDMI, the

24 standard for the plug that we use commonly today.  And that

25 came out in 2006.

553

1        MR. SCHWENTKER: And on the next slide, Your Honor,

2  we will be publishing, Exhibit -- pre-admitted Exhibit

3  LG-281.

4        THE COURT: It's admitted in evidence and you may

5  publish it.

6        (Exhibit Number LG-281 is received in evidence.)

7  BY MR. SCHWENTKER:

8  Q.  And, Dr. Stevenson, on slide 32, what are you showing

9  here?

10 A.  Just a couple points about the HDMI standard.  It was

11 -- version 1, kind of like the EDID came out a little bit

12 earlier, it was 2002.  The relevant version also happens to

13 be 1.3, but it came out in 2006.

14       And while the standard has a lot of details about a

15 lot of things in terms of the cable and the structure of

16 the cable and everything else, really for the analysis we

17 need to do, the most relevant parts is the requirement

18 about using the DDC and the EDID standards.

19 Q.  And are those the same standards that have been

20 carried through that we've talked about before?

21 A.  Yes.

22 Q.  Now, let's turn to the '180 patent for a little bit.

23 And first of all, let's go back to our timeline.

24       And can you explain to the jury how the '180 patent

25 fits into our timeline?

554

1    A.   Well, it starts back in '93.  That's when the
2    original Japanese patent was filed.  So that's when they
3    wrote up the invention and said, This is our invention,
4    and, you know, kind of set that stamp, notified the world.
5         That was done through the Japanese patent back in
6    '93.
7    Q.   And then what comes next on the timeline with respect
8    to the '180 patent?
9    A.   Well, if we go forward, you will see the actual
10   filing of what became the '180 patent didn't happen until
11   2002.  So nine years later, after they kind of told the
12   world about the invention, they filed this particular
13   patent.
14   Q.   Then after 2002, what are you going to show next?
15   A.   Well, one of the things that becomes important, if we
16   go forward, you will see that in 2007 they -- what's called
17   "amended" the claim.  It means they changed the words some.
18        And so, you know, the claim that was filed in 2002 we
19   will see is different.  The final form of the claim
20   actually was written in 2007.
21   Q.   And will that be important for our discussion today?
22   A.   Yes.
23   Q.   After the amendment in 2007, what comes after that?
24   A.   Well, it was granted by the Patent Office in 2009.
25        So once you file something, you go with -- through

555

1    ongoing discussions with the Patent Office.  You make these
2    changes, maybe you drop claims, all sorts of things happen.
3         So that happened from 2002 through 2009.
4         And in 2009 is when the Patent Office granted the
5    patent that is at center of this case.
6    Q.   And is the '180 patent still in existence?
7    A.   No, because the whole idea of the patent system is to
8    give you a finite period of time.  It actually expired in
9    2014, which is the next marker on our timeline there.
10   Q.   All right.
11        MR. SCHWENTKER:  Now, if we go to the next slide,
12   Your Honor, we will be publishing pre-admitted Exhibit
13   LG-005.
14        THE COURT:  Admitted into evidence.  You may publish
15   issue it.
16        (Exhibit Number LG-005 is received in evidence.)
17   BY MR. SCHWENTKER:
18   Q.   And, Dr. Stevenson, what are you showing on this
19   slide?
20   A.   Well, this is the front of the '180 patent.  This,
21   you know, is a document that's kind of at the center of
22   this case.
23   Q.   And if we blow up this portion here, what are you
24   pointing out?
25   A.   This is a couple of different pieces that kind of

556

1    relate to the dates we just showed.
2         You can see at the bottom is what's called the
3    "priority date," when the invention was disclosed to the
4    world, which is, as you see, February 10th, 1993.
5         A little bit above it, you can see that 2002 date.
6    That's when it was originally filed with the U.S. Patent
7    Office.
8         And finally at the top, you can see the January 6th,
9    2009, when the Patent Office granted the actual patent.
10   Q.   Now, let's take a look at the title.  And what comes
11   first in the title of the '180 patent?
12   A.   Well, you know, the title is a nice summary of the
13   entire invention, you might say, right?  So it's useful to
14   step through.  You can see the title starts with this idea
15   of a display unit.
16        Also you'll see on the front of the patent is a
17   figure -- figure -- it happens to be Figure 1.  That's
18   normal practice to put kind of an illustration of the
19   invention on the front also.  So that's kind of the
20   illustration that the inventors picked to illustrate their
21   patent.
22        And if you walk through the title, you can see kind
23   of the major components they identified as being central to
24   their invention.
25   Q.   And you've highlighted the display unit first?

557

1    A.   Yes.  Throughout the patent, they kind of use the
2    term "display unit" and "display device" interchangeably.
3    And so in the figure you will see it's labeled "Display
4    Device," but they use the interchangeably with "display
5    unit."
6    Q.   And then what comes next after "display unit" in the
7    title?
8    A.   So, there is two pieces a display unit must have:  A
9    communication controller and memory.
10        So the communication controller is also shown in that
11   same Figure 1.  You can see it towards the bottom there,
12   that block eight.  That's an important piece of the
13   invention.
14        And then, finally, the memory, which is shown over in
15   block nine.  I have tried to color code it for you.
16   Q.   And what does the communication controller do?
17   A.   The communication controller is going to communicate
18   information to the computer.  So it's the device in the
19   display unit that is going to control the flow of data from
20   the -- the computer monitor back to the computer.
21   Q.   And what does the memory do?
22   A.   Well, the memory is where we store information.
23   Those bits, those ones and zeros that we talked about in
24   the table.  They all get put into a device that can hold
25   them and preserve them.

**558**

1    So the memory there is a special type of memory that
2    can hold that information.
3    Q.    And what comes after the memory in the title?
4    A.    Well, there's a, you know -- you know, an aspect of
5    the invention is certainly this idea that it is storing
6    information and particular information in the memory.  So
7    you can see the last part of the title talks about some of
8    the information that is stored in the memory.
9    You can see it says:  For storing identification
10    number for identifying the display unit.
11    Q.    Now, let's talk a little bit more about the display
12    unit.
13    How does the '180 patent describe the technology used
14    in the display unit?
15    A.    Well, it talks about a CRT, a cathode-ray tube.  That
16    was the display unit that was widely used at the time.
17    Q.    And can you remind the jury what a cathode-ray tube
18    is?
19    A.    Well, a tube is a -- you know, kind of -- it's a
20    piece of glass that has a vacuum in it and we can build
21    electronics in it to do certain things.  It's depicted down
22    there at the bottom.
23    If you took that little monitor part over there, you
24    would see a tube very much like that.
25    They had their problems.  They were fragile, they

**559**

1    were heavy, they got very big as you try to make the
2    monitor bigger.  But it was the -- it was the main
3    technology for displaying images at the time.
4    Q.    Is the cathode-ray tube the display unit in the '180
5    patent?
6    A.    No, the display unit is the entire device; the
7    computer monitor, you know, the product.
8    Q.    And so what is the cathode-ray tube?
9    A.    It's the display component.  It's the component of
10    the computer monitor that actually the image is going to
11    show up on.
12    Q.    Are cathode-ray tubes still used these days?
13    A.    I am sure they are around for legacy reasons, but I
14    don't think people are building too many new devices with
15    cathode-ray tubes.
16    Q.    Are there any in any of LG's accused televisions?
17    A.    No.
18    Q.    Now, if we go to the next slide, slide 37, we talked
19    about the title of the patent discusses an identification
20    number.
21    And what does the patent say about identification
22    numbers?
23    A.    Well, the -- the idea that the patent expresses in
24    terms of the invention is that the device is going to have
25    these identification numbers, they are going to be used to

**560**

1    uniquely identify a particular monitor, and it points that
2    out, kind of advantages for doing that.
3    In this illustration I point out some of the
4    advantages, or one of the ideas they had.  You know,
5    there's a unique number inside the computer monitor.  That
6    number can be communicated to a computer, along with
7    information that you might need to configure the computer
8    to work with the particular monitor.
9    And then inside the computer, if we go forward, that
10    number would be compared to a list of numbers that had been
11    preregistered.
12    And so if you found a match, you can say, Okay,
13    there's a match here.  I know what this monitor is.  I can
14    use the information and generate the proper signals.
15    If you go forward, you'll see it finds the match, it
16    generates a signal, and that signal shows up on the screen.
17    It's one of the ideas they express in the patent.
18    Q.    And if we go back, you've labeled something
19    "Characteristic Information."
20    Can you explain what that is?
21    A.    Well, that characteristic information, you can think
22    about it as the attributes or the characteristics of what
23    you -- of the signal you need.
24    What are the things you need in order to generate the
25    right sort of signal so that a signal that's transmitted to

**561**

1    the computer monitor will actually show up on the screen of
2    the device.
3    Q.    Now, if we go -- let's see.  Does the patent say
4    anything else about identification numbers?
5    A.    Yeah.  One of the things it points out, if you go to
6    the next slide, is that this idea of, you know, a
7    registered number is an idea for privacy, secrecy, right?
8    So I can't hook up any random monitor to my computer.  I
9    can provide some see secrecy by having preregistered
10    numbers in the system.
11    Q.    Now, let's turn to the patent claims next.
12    And have you studied the patent claims of the '180
13    patent?
14    A.    Yes, certainly.
15    Q.    And which of the claims are asserted in this case?
16    A.    Claims 14 and 15.
17    Q.    All right.  Let's hit just a few high points of
18    Claim 14.
19    And what are you showing to the jury now?
20    A.    Well, I took those three same words we saw in the
21    title, and, not surprisingly, they show up in the claim.
22    They were important enough to get in the title, and
23    they are also important enough to get into the claim.
24    So I have the same highlighting in the same
25    highlighting in Figure 1 shown here.

562

1    Q.   An according to the claim, what does the memory have
2    to store?
3    A.   Well, if you read the memory element, it has to store
4    what's called display unit information, and that
5    information has to consist of at least two parts.
6         The first part being an identification number for
7    identifying at least a type of said display unit.  So
8    that's one thing it has to store.
9         If we go forward, the next piece it has to store is
10   the characteristic information of said display unit.
11   Q.   What does the claim mean when it refers to an:
12   Identification number for identifying at least a type of
13   said display unit?
14   A.   Well, the display unit, think, is the entire product,
15   you know, the computer monitor here, and so we have to have
16   some sort of identifying number that allows the computer in
17   this case to identify that type of computer monitor.
18   Q.   Does the specification in the '180 patent describe an
19   identification number for identifying at least a type of
20   said display unit?
21   A.   No.
22   Q.   Will we come back to that issue later on?
23   A.   Yes, we will.
24   Q.   Okay.  Does the -- and what does the claim mean when
25   it refers to:  Characteristic information of said display

563

1    unit?
2    A.   Well, that characteristic information is that kind
3    of -- you know, timing is the one we keep on talking about
4    the most -- is that information you need in order to
5    properly generate the signal.  What are the characteristics
6    about how signals should be generated, the color
7    characteristics, things like that so that we can properly
8    generate a signal in the computer, send it to the monitor
9    and the monitor will correctly display it.
10   Q.   Now, if we turn to Claim 15 real quickly, can you
11   tell the jury just a little bit about what that claim adds?
12   A.   The Claim 15 is what is called a dependent claim.
13   And so in order to practice this claim, you have to -- all
14   the elements of Claim 14 must also be met.  So this just
15   adds one additional limitation.
16        Here it's about what happens at power on and the fact
17   that it requires that EDID information be sent -- well, at
18   least under their infringement theory, that EDID
19   information would be sent from the video source.
20   Q.   Now, let's talk about the accused LG televisions.
21        MR. SCHWENTKER:  And, let's see.  Your Honor, on
22   slide 42 we'll be publishing pre-admitted Exhibit LG-289.
23        THE COURT:  It's admitted into evidence, and you may
24   publish it.
25        (Exhibit Number LG-289 is received in evidence.)

564

1    BY MR. SCHWENTKER:
2    Q.   On this slide 42, Dr. Stevenson, I see you are citing
3    a service manual for a particular LG television, the LG
4    47LM6200 television.
5    A.   At this point it's just a graphic of the television.
6         We are going to blow it up in a moment to show some
7    of the components inside.
8    Q.   Does Mondis accuse the entire television of
9    infringing the '180 patent?
10   A.   No.
11   Q.   What do they accuse?
12   A.   Some of the components that you could find inside the
13   television.
14   Q.   Okay.  So let's talk about those components.
15        And let's see.
16        MR. SCHWENTKER:  Your Honor, on the next slide we
17   will be publishing pre-admitted Exhibit LG-292.
18        THE COURT:  That's admitted in evidence, and you may
19   publish it.
20        (Exhibit Number LG-292 is received in evidence.)
21   BY MR. SCHWENTKER:
22   Q.   So on slide 43, Dr. Stevenson, what are you showing?
23   A.   Well, it kind of starts with the ports that are on
24   the back of the television.  We are hooking up an external
25   source, and so what they are accusing is these various

565

1    ports.
2         Depending on the television, there's three types of
3    ports that you might find:  This coax port, VGA ports, or
4    HDMI ports.
5    Q.   Is Mondis accusing the coaxial ports of infringement?
6    A.   No.  This is what you hook up to an antenna or maybe
7    a cable box or something like that.  It's not -- no
8    information is sent over there so they are not accusing
9    that.
10   Q.   Do all of LG's TVs have VGA ports?
11   A.   Not all of them.
12   Q.   So which connections are we talking about in this
13   case?
14   A.   Well, for all the televisions, we are talking about
15   the HDMI ports.  For some of the televisions we are also
16   talking about a VGA port.
17   Q.   Now, let's drill down a little bit further.
18        And if we turn to slide 44, what are you showing
19   here?
20   A.   Well, this is kind of just ripping the TV apart and
21   looking at the various components and getting to the main
22   piece of electronics board.
23        Mr. Lamm held one up for you the other day.
24        All the components they're accusing are found on this
25   one board.

566

1    Q.   And which specific components is Mondis accusing?

2    A.   Well, I've kind of highlighted and broken them up

3    into four components:  The so-called system on the chip,

4    the HDMI ports, the VGA ports, and then this piece of

5    memory that holds the information.

6    Q.   And you mentioned the system on chip.  What is that?

7    A.   Well, the SoC is whenever we design something where

8    we integrate a lot of the components of a bigger system, in

9    this case a television, but, you know, whatever your

10   application, you will find system on chips in a telephone

11   that are -- or, you know, a cell phone that are pulling

12   together a lot of functionalities of the cell phone onto

13   one chip.  So whenever we do that in application, we call

14   that system on a chip.

15       This particular system on a chip is designed to help

16   you about build a television.

17       MR. SCHWENTKER:  And, Your Honor, on the next slide

18   we will be publishing pre-admitted Exhibit LG-453.

19       THE COURT:  It's admitted into evidence, and you may

20   publish it.

21       (Exhibit Number LG-453 is received in evidence.)

22   BY MR. SCHWENTKER:

23   Q.   Dr. Stevenson, is Mondis accusing all of the

24   functionality of the system on chip?

25   A.   No.  This is pretty much a lot of the functionality

567

1    you find in a TV.  So, like, say, the audio signals, this

2    patent, they made no accusations about the audio system.

3    So that's part of the same chip.  So large parts of the

4    chip are really not implicated.

5    Q.   And so if we turn to slide 45, what are you showing

6    here?

7    A.   So this was a list of features of the one particular

8    chip they pointed out on one of the TVs, and there's two

9    pieces that are kind of implicated of the main features

10   listed on the chip:  The CPU core and the HDMI receiving

11   ports.

12   Q.   And how many key features are listed here?

13   A.   Sixteen.

14   Q.   And of those 16, how many are implicated by Mondis's

15   infringement theory?

16   A.   Two.

17   Q.   Now, if we turn to the next slide, let's go into your

18   opinions on noninfringement of the '180 patent.

19       And on slide 47, what are you showing here?

20   A.   Well, these are my two opinions that I am going to

21   talk about today in the case, that I believe -- reasons why

22   I don't believe the LG TVs practice the claims.

23       The first one has to do with this identification

24   number for identifying a type of display unit.  I don't

25   believe that is found in the LG TVs.

568

1        And then also the claimed communication controller is

2    not found in the LG TVs.

3    Q.   Okay.  And let's talk first about the --

4    understanding of the claim language.

5        And did you hear Mr. Lamm testify the other day about

6    the person of ordinary skill in the art?

7    A.   Yes.

8    Q.   And what is the person of ordinary skill in the art?

9    A.   Well, I kind of put a definition up there, kind of

10   two pieces.  Kind of what sort of skills they would have,

11   and then how they would acquire them.

12       So a person of ordinary skill in the art would be a

13   person at the time of the invention, so back in '93, who

14   was -- had a good working knowledge of the video

15   electronics display identification and communication

16   standards, as well as the systems and programs that

17   implement such standards.

18       So that's the type of person that you have to kind of

19   have in mind when you read the patent and try to understand

20   what the patent means.

21   Q.   And were you a person of ordinary skill in the art in

22   1993?

23   A.   I had more than that sort of experience, so yes.

24   Q.   And have you performed your analysis from the

25   perspective of such a person?

569

1    A.   Yes.  The idea is you are supposed to put yourself in

2    that place, read the patent, read the claims, understand

3    the claims based on what that person, how that person would

4    understand those claims at that time.

5        That's what the scope of the patent is.

6    Q.   Is the -- is your definition the same or different as

7    Mr. Lamm's?

8    A.   There are some minor differences.  I don't think they

9    are particularly relevant.

10       If I used his level of skill in the art, I think I

11   would come up with the same -- I know I would come up with

12   the exact same opinions.

13   Q.   Okay.  And I see the last bullet point is the Court's

14   claim constructions.

15       Can you briefly explain that?

16   A.   Well, one other piece of the thing you have to

17   incorporate into how to understand the claims is that the

18   Court has provided some guidance with definitions about

19   what some of the phrases mean in the claim.

20       So the Court provided those definitions and I apply

21   them.

22   Q.   So have you used those constructions in forming your

23   opinions in this case?

24   A.   Yes, I did.

25   Q.   Okay.  And what's your understanding of what is

**570**

1    required for there to be infringement of a patent claim?

2    A.    Well, you know, every word in a claim is important.

3    So you have to practice every single word.  Every single

4    word must be done for you to practice the claim.  If any

5    idea is missing, then you are not infringing.

6    Q.    Now, you said -- you listed two reasons that you are

7    going to present about noninfringement.  And can you show

8    the jury where they are in the claim?

9    A.    Yes.  So my two reasons, here are the words of the

10    claims that are implicated by those two reasons.

11    You know, the first one about the identification

12    number is found in the memory kind of element.  It's one of

13    the things that has to be sorted in the memory.

14    The second one is this separate component of a

15    communication controller.

16    I don't think either of those things are going to be

17    found or are found in the LG TVs.

18    Q.    Okay.  Now, let's turn to the first one and talk

19    about the first reason.

20    And first of all, can you remind the jury generally

21    how the '180 patent describes an identification number?

22    A.    Well, if you read the specification of the '180

23    patent, you will see there's a fair amount of discussion of

24    identification number, but it's an identification number

25    that uniquely identifies a particular computer monitor or

**571**

1    display unit.

2    So, the identification number that's described as

3    telling you this is exactly this particular display unit.

4    Q.    And is there anything in the early DDC, EDID

5    standards that is similar to the identification number

6    described in the '180 patent?

7    A.    Well, we've heard some discussion of it already, the

8    serial number.  That would be an example of a type of

9    number that could uniquely identify a particular display

10    unit.  Right?

11    So everything is supposed to have a unique serial

12    number, and so that's a number that could be uniquely used

13    to identify a particular display unit.

14    Q.    Okay.  Well, let's take a look at the ID serial

15    number.

16    And turning to slide 52, I see you're citing admitted

17    Exhibit LG-367, the EDID 1.3 standard.

18    And can you tell the jury what you're showing here?

19    A.    Well, this is from our train table.  Table 3 point --

20    excuse me -- oh, yeah Table 3.1 of the 1.3 standard.

21    There is the identification block that's towards the

22    front of the train.  So this is a block that's called

23    "Vendor/Product Identification."  There's a number of ID

24    numbers in it, one of which is the ID serial number.

25    Q.    And when was the ID serial number first introduced?

**572**

1    A.    Well, it's been there from the very beginning of

2    EDID.  So it came out in the first version of the standard

3    in 1994.

4    Q.    Now, turning to slide 53, can you tell the jury what

5    you're showing here?

6    A.    Well, this is just relating that idea back to the

7    analogy of the train and talking about the size.

8    So the ID serial number is four train cars, each with

9    8 bits in it, so there are 32 seats.  That gives you an

10    ability, you know, to identify over 4 billion different

11    things.

12    Q.    Now, is the ID serial number, does that corresponded

13    to what is actually claimed by Claim 14 of the '180 patent?

14    A.    No.

15    Q.    Did it ever corresponded to that?

16    A.    Well, previous versions of the claims were -- you

17    know, did not have some of the language that you see in

18    Claim 14, and it seemed to be related to this sort of idea

19    of an ID serial number.

20    Q.    Okay.  Well let's -- you mentioned previous versions

21    of the claims.

22    What do you mean by that?

23    A.    Well, if you recall when we talked about the patent,

24    it was issued -- it was filed in 2002 and then revised in

25    2007.

**573**

1    We can go back -- and there's all that record and

2    discussions in the Patent Office is kept.  And so you can

3    go back and look at the record and see exactly what was

4    filed in 2002 when they filed their patent.

5    MR. SCHWENTKER:  And, Your Honor, on the next slide

6    we will be publishing pre-admitted Exhibit LG-504.

7    THE COURT:  It's admitted into evidence, and you may

8    publish it.

9    (Exhibit Number LG-504 is received in evidence.)

10    BY MR. SCHWENTKER:

11    Q.    So, Dr. Stevenson, on slide 54, I see you are citing

12    from the prosecution history here.

13    And can you explain to the jury what you're showing?

14    A.    Well, this is the claim as it was originally written

15    when it was filed.  And I have highlighted some text and

16    kind of the relevant text we keep on talking about.

17    And you can see it's slightly different and in an

18    important way.

19    It says:  An identification number for identifying

20    said display unit.

21    Q.    And I see that there is a number at the top.  And can

22    you explain that number to the jury?

23    A.    I guess -- yes, I can see where this could need some

24    explanation.

25    You can see originally that the number 40 is there

Appx15146

574

1    and then it's kind of scratched off and 14 is at the top.
2        As I said, you know, you file a patent, you have some
3    negotiations, maybe you change some things.
4        So as originally filed, this was Claim 40 of their
5    application. You go through and you can find what
6    happened, but, you know, at some point, the -- they removed
7    some claims and this became Claim 14.
8        So it's pretty typical of the examiner to go back to
9    the original application, scratch out that 40 and write,
10   you know, the new claim number of the claim that was
11   eventually issued to aid and you kind of walking through
12   the history, if you want.
13   Q.   And so if we see the number 40, again, what will that
14   mean?
15   A.   Well, if you look at other pieces -- he doesn't go
16   through and, you know, scratch out all the 40s and write
17   14. So it's just on the original application.
18       So other times you will see discussion of 40, but
19   they are all really talking about the same thing that
20   eventually became Claim 14.
21   Q.   Now, we will turn to the amendment to the claim in
22   just a minute, but first, do LG's accused televisions
23   include an ID serial number?
24   A.   No.
25   Q.   And how do you know that?

575

1    A.   All the TVs I have examined have not had serial
2    numbers on them.
3    Q.   And does it surprise you that LG's TVs do not have an
4    ID serial number in them?
5    A.   No, it's a little more complex to manufacture, and
6    there's just really no need to use it, so no one does it.
7    Q.   And earlier we talked about the standard and whether
8    fields are mandatory or not mandatory.
9        And can you remind the jury what the standard says
10   about the ID serial number?
11   A.   Yeah. I think I have a slide that shows -- brings
12   back that table we talked about from the 1.4 standard.
13       It shows you the -- kind of the optional features,
14   and you can see the ID serial number right from the
15   beginning it was always an optional field. It didn't have
16   to be populated with useful information.
17   Q.   Now, let's take a look at the amendment to Claim 14.
18       MR. SCHWENTKER: And on the next slide, Your Honor,
19   we will be publishing pre-admitted Exhibit LG-505.
20       THE COURT: It's admitted into evidence, and you may
21   publish it.
22       (Exhibit Number LG-505 is received in evidence.)
23   BY MR. SCHWENTKER:
24   Q.   Dr. Stevenson, on slide 56, what are you showing
25   here?

576

1    A.   So in 2007 they made this amendment. They changed
2    the language of the claim and they added the five words.
3        In the prosecution history, they underline that to
4    indicate that. I've also added some highlighting to make
5    it easier to find.
6        So they added this idea of: At least a type of.
7        So instead of just saying it's an identification
8    number for identifying said display unit, it now says:
9    Identification number for identifying at least a type of
10   said display unit.
11   Q.   And when was the amendment filed?
12   A.   2007.
13   Q.   Okay. And is this what Claim 14 looks like today?
14   A.   Yes. So this is the amendment they made. This is
15   what eventually is issued in 2009 as Claim 14 and as part
16   of this case.
17   Q.   Is there anything in the EDID standard that could
18   corresponded to this identification number as it was
19   amended?
20   A.   It seems like the most -- the only thing you can
21   really read it on in the standard would be the ID product
22   code.
23   Q.   Okay. And we talked about that earlier, but can you
24   remind the jury what the ID product code is?
25   A.   It was another one of these fields in the

577

1    identification block. It's an ID number. It indicates a
2    product type. Typically, manufacturers, if they use this,
3    would put in, like, a model number or something.
4    Q.   And if we go to slide 57, can you explain to the jury
5    what you're showing there?
6    A.   Yes. So this is part of the standard. We have the
7    table, our favorite table on the left with the ID product
8    code highlighted.
9        And then if you go to the section that discusses it
10   more, you will see it says it's an identifier for the
11   product type; for example, the model number.
12   Q.   Okay. And if we go to the next slide, 58, what are
13   you showing here?
14   A.   Well, this is just bringing it back to the train
15   analogy.
16       The ID product code is 2 bytes long, so there are 16
17   seats. And our train is towards the front of the train.
18   It's one of the very first cars of information, and so --
19   it's what it is.
20   Q.   Now, were you here in the courtroom this morning
21   during Mr. Lamm's testimony?
22   A.   Yes, I was.
23   Q.   And do you recall a discussion about the previous
24   case against LG in Texas?
25   A.   Yes.

Appx15147

578

1    Q.   And do you recall what Mondis pointed to as
2    corresponding to the identification -- the claimed
3    identification number in Claim 14 with respect to LG's
4    computer monitors?
5    A.   Yes.  On those infringement contentions that were
6    shown to you this morning and Mr. Lamm was questioned
7    about, they pointed to this particular field of the EDID
8    data.  They said this was the field that showed an
9    identification number for identifying a type of display
10   unit.
11   Q.   Now, do LG's televisions include an ID product code?
12   A.   They don't fill that field -- they do not fill that
13   field with useful information.
14   Q.   And how do you know that?
15   A.   Well, the televisions I've looked at, and the
16   televisions Mr. Lamm looked at, does not have useful
17   information in that field.
18   Q.   Does it surprise you that LG's televisions do not
19   include an ID product code?
20   A.   Not, not really.
21   Q.   Why not?
22   A.   You know, if you are hooking up to a DVD player or a,
23   you know, home entertainment system, that doesn't really
24   matter.  That sort of device does not care about what sort
25   of model television you have hooked up.

579

1    Q.   Well, if the ID product code is not populated in LG's
2    televisions, what does Mondis point to in this case for its
3    infringement theory?
4    A.   Well, they point to this piece of information further
5    back in the train, lower down on the table, this feature
6    support byte.  In particular, they pulled out a part a
7    little bit and just point to two bits that are in there.
8        So bits 3 and 4 of that feature support byte.
9    Q.   And what are you showing on this slide here?
10   A.   Well, that's the -- you know, that -- on the left is
11   the relevant section of the table.  You can see it's in the
12   block that's called the "Basic Display
13   Parameters/Features."  This is a block that contains some
14   aspects that the features found in the televisions.
15       In particular, this feature support byte -- you have
16   to dig a little further because that byte has eight seats
17   in it, right, and so they are only talking about two of the
18   seats.
19       And so if you go deeper into the standard, you get to
20   an information that is shown on the right that talks about
21   what these two bits are, bits 3 and 4.
22   Q.   And what are bits 3 and 4 of the features support
23   byte?
24   A.   They talk about -- it's labeled "Display Type."  They
25   are informing a person kind of what is the -- some of the

580

1    characteristics of the display component; in this case a
2    panel.  What is the type of panel they have in there in
3    terms of display.
4    Q.   Okay.  And if we go to slide 60, what are you showing
5    now?
6    A.   We are just going back into the train to show that
7    the feature support byte is back further.  And it is just
8    1 byte information.
9        If we go forward, we have to go into the train -- and
10   go forward in the slides -- and we have to look at the
11   eight seats.  And it's kind of seats 3 and 4 that they're
12   saying is the actual identification number.
13   Q.   And do you agree with Mr. Lamm that bits 3 and 4 of
14   the feature support byte are the claimed identification
15   number for identifying a type of display unit?
16   A.   No.
17   Q.   And why do you disagree with Mr. Lamm at a high
18   level?
19   A.   Well, this is characteristic information.  This is
20   telling you aspects of the display component, kind of like
21   timing information, kind of like color characteristics.
22   They are telling you the sort of information you need --
23   that you might need to use in order to generate the proper
24   signal.
25       It's not an identification number at all.  They are

581

1    all on a different block.
2    Q.   What did Mr. Lamm say about bits 3 and 4 in his
3    infringement report about how they, his opinion about how
4    they allegedly identified the type of display unit?
5    A.   Well, he says there, you know, there's a -- the idea
6    of an identification number is it has to identify something
7    to someone.
8        And so what he points to is that a person of ordinary
9    skill in the art would understand that because they would,
10   you know -- they would know that a particular video source
11   would use these bytes, or these bits, in order to generate
12   the right signal.
13       So he says, you know, because the fact that the --
14   that a video source would read these bits and generate a
15   video signal based on it, that's how you know it's
16   identifying.
17       MR. BLACK:  Your Honor, objection.  May I approach?
18       THE COURT:  I'm sorry?
19       MR. BLACK:  Objection.  May I approach?
20       THE COURT:  I will hear you.
21   (Continued on the next page.)
22
23
24
25

Appx15148

582

1    (Sidebar conference held on the record in the
2  presence of the Court and counsel, out of the hearing of
3  the jury.)
4    THE COURT: Yes, Mr. Black.
5    MR. BLACK: The witness said "use." We agreed the
6  other day that "use" is not a required element of the
7  claim. He said "use."
8    He is now -- he said it another way and how he is
9  going to move it into the testimony where he is going to
10  try to persuade the jury that it is going to be used. It
11  was inappropriate for him to say "used."
12    MR. SCHWENTKER: Your Honor, Dr. Stevenson was
13  summarizing what Mr. Lamm said in his expert report. He is
14  not going to testify that "use" is a requirement of the
15  claim for infringement.
16    He is going to, as was discussed the other day during
17  the argument, he is going to testify his testing is an
18  indication that these bits 3 and 4 are not an
19  identification number for identifying a type of display
20  unit.
21    MR. BLACK: And I renew my motion that this testimony
22  should not be given. It's -- it's not in comport with the
23  claim construction. It's potentially confusing, running a
24  test, how it's used when claim construction only requires
25  identification.

583

1    MR. MCKEON: We are not going to get --
2    THE COURT: We are not going to reargue the decisions
3  which I made. All right. If the witness's testimony right
4  now was simply that this is what Mr. Lamm's testimony or
5  approach was and that's all it was, then --
6    MR. BLACK: But it wasn't his approach. This is his
7  approach. Our approach is we have a number in the display,
8  that's enough. He mischaracterized the testimony. He has
9  changed the infringement test.
10    THE COURT: Let me take a look at what the testimony
11  was.
12    (Brief pause.)
13    THE COURT: I think that Mr. Spiro's testimony is
14  indeed a bit confusing in his summarization of what
15  Mr. Lamm's viewpoint is.
16    He does, in fact, indicate that Mr. Lamm says that
17  the information would be used. Mr. Black indeed is correct
18  in my ruling, which is that "use" is not required to
19  infringe. All that's required is capability of being used.
20    So what I am going to do is I am going to strike this
21  portion, this last bit of the testimony.
22    If you wish to, you can try to lead him through this
23  particular aspect of it to make sure that you do not, in
24  fact, move into the area of whether or not any information
25  which is capable of, in fact, being transmitted has to be

584

1  transmitted in order for infringement to occur.
2    All right, Mr. Black?
3    MR. BLACK: Yes, Your Honor.
4    THE COURT: Very good.
5    (Sidebar discussion is concluded, proceedings
6  continued on next page.)

585

1    THE COURT: All right, ladies and gentlemen, I think
2  Mr. Stevenson's description of Mr. Lamm's position may be a
3  bit confusing. And what I am going to do is I am going to
4  strike that testimony.
5    We are going to proceed again with some questions
6  about what Mr. Lamm's position is asserted to be.
7  BY MR. SCHWENTKER:
8    Q.  Dr. Stevenson, it's not your position that "use" is
9  required to meet the claim limitation, is it?
10    A.  No.
11    Q.  Okay. When you read Mr. Lamm's assertion about bits
12  3 and 4 of the feature support byte, what was your first
13  reaction to his assertion?
14    A.  Well, my first reaction was that those bits are not
15  an identification number. They don't indicate -- they
16  don't identify to anyone that -- the type of the display
17  unit. And so they wouldn't be -- you know, they -- no one
18  would read them and look at them for anything.
19    Q.  And did you do anything to investigate your initial
20  assumption?
21    A.  Yes.
22    Q.  And what did you do?
23    A.  Well, I used some of the TVs Mr. Lamm identified and
24  some of the video sources he identified to see if any of
25  them adapted their signal based on the presence of those

598

1   bits 3 and 4 of the future support byte correspond to the
2   claimed identification number for identifying a type of
3   display unit?
4       A.   Yes.
5       Q.   And so if we go to slide 71, what are you showing on
6   this slide?
7       A.   Well, you remember the way the claim was written,
8   there was two pieces of information that -- two types of
9   information that were kind of required as part of this
10  display unit information.  One of it was this
11  identification number; the other was characteristic
12  information.
13      Q.   And what is the significance of that?
14      A.   Well, this feature support byte is characteristic
15  information.  It's not identification number.  It fits in
16  this other category, and so it's, you know, an additional
17  reason why it's not an identification number.
18      Q.   And did you hear Mr. Lamm testify this morning about
19  characteristic information versus the claimed
20  identification number?
21      A.   Yes.
22      Q.   And what was his opinion about whether those can be
23  the same thing or something different?
24      A.   Well, he seemed to agree with me that these are
25  distinctly different things.  It's either identification

599

1   number or characteristic information.  It's not both.
2       Q.   And what is your opinion as to which of the two
3   categories, bits 3 and 4, the future support byte, fall
4   into?
5       A.   They're characteristic information.
6       Q.   Okay.  Let's talk about some of the reasons for that
7   conclusion.
8            And if we go to slide 72, what are you showing on
9   this slide in reference to already-admitted Exhibit LG-367?
10      A.   Well, you know, the EDID table's laid out in a pretty
11  organized fashion, and it's pretty clear the different
12  sections.  They kind of start -- you know, once you get
13  beyond the header, which is just the same for everything,
14  the first block of useful information is labeled, you know,
15  "Vendor Product Identification."  This is where
16  identification numbers are.
17           This is the blue section.  That's the identification
18  numbers that are in EDID.
19           If you go further, the next block doesn't really fall
20  in either category.  It's the version number of the EDID
21  data.  So it's -- because we're 1.3, it's version 1.3, so I
22  put that in this other category.
23           And then the rest of the table is all about
24  characteristic information.  The -- you know, it's -- it's
25  about display timing, it's about color characteristics,

600

1   it's about features that are found in -- inside the --
2   inside the display.
3       Q.   And we discussed the ID serial number earlier.  What
4   does the EDID standard consider this kind of information?
5       A.   The ID serial number is under the identification
6   number.
7       Q.   And if we go to the next slide, 73, are you showing
8   that here?
9       A.   Yes.
10      Q.   And so can you explain to the jury what you're
11  showing in terms of the table here?
12      A.   Well, this is just where it shows up in the table.
13  We've seen this a couple times now.  It's clearly labeled
14  an ID, identification.  It's this number that, you know, if
15  you're familiar with serial numbers, it uniquely identifies
16  the particular display unit.
17      Q.   And what is the -- what does the EDID standard say
18  about this vendor product identification block?
19      A.   Well, you see at the top there, this is a quote from
20  the standard and it says:  The vendor product ID block is
21  made up of several fields used to uniquely identify the
22  monitor.
23           So they talk about how this block is used for
24  purposes of identity.
25           The serial number, you know, gives you that kind of

601

1   unique number for a particular product; other fields give
2   you other information.
3       Q.   And we also discussed the ID product code earlier.
4            And so if we go to the next slide, 74, what does the
5   EDID standard consider that kind of information, the ID
6   product code?
7       A.   It's clearly also in this vendor/product
8   identification block.  So it's another one that can be used
9   to identify the monitor.
10      Q.   Now, Mr. Lamm has pointed to bits 3 and 4 of the
11  feature support byte.
12           And is that located in this product identification
13  section?
14      A.   No, it's not.
15      Q.   So where is that?
16      A.   It's a block further back in the train.  It's a block
17  labeled "Basic Display Parameter/Features."
18      Q.   And can you tell the jury what the EDID standard says
19  about the feature support field?
20      A.   This is another line from the standard in the section
21  that is describing this particular block.  And it says that
22  this -- and it's talking specifically about this feature
23  support byte, and it reads:  The feature support field is
24  used to indicate support for various display features.
25      Q.   And what is meant by "display features"?

**602**

1    A.    Various characteristics are -- you might think of as
2    attributes: What -- how do we kind of use this particular,
3    you know -- how could we use this particular sort of device
4    to do certain things?
5    Q.    And are these talking about the monitor as a whole?
6    A.    It's mostly talking about the display component.
7    The -- you know, that in our case, you know, a CRT in the
8    context of the patent -- excuse me.  In the context of the
9    patent, they were talking about a CRT.  In the context of
10   the LG TVs, they're talking about that LCD panel that
11   actually is the component for displaying.
12   Q.    And so what kind of -- excuse me, strike that.
13         What kind of information does the EDID standard
14   consider the feature support byte?
15   A.    Characteristic information.  It's -- I think it's
16   clearly characteristic information.
17   Q.    And if the feature support byte is characteristic
18   information, does that -- does that impact your opinion at
19   all about what bits 3 and 4 of the -- within the feature
20   support byte are?
21   A.    Well, it is just consistent with my opinion that they
22   are not identification numbers.
23   Q.    And if they are not identification numbers, what are
24   they?
25   A.    Characteristics information.

**604**

1    A.    This feature support byte, and just bits 3 and 4 in
2    it.
3    Q.    Now, is it your opinion that this is identification,
4    an identification number or characteristic information?
5    A.    It's characteristic information.
6    Q.    All right.  Now, are there any other reasons why it's
7    your opinion that bits 3 and 4 of the feature support byte
8    are characteristic information?
9    A.    Well, because what they -- they contain.  They
10   contain this idea that -- about information about the
11   panel, whether it's an RGB panel monochrome panel or
12   non-RGB panel.
13   Q.    And if we turn to slide 79, what are you showing
14   here?
15   A.    Kind of what is being talked about in this particular
16   byte.  It's information about the display component.  And
17   so it's talking about, you know, kind of what that
18   characteristic of that particular panel is.
19   Q.    And the -- so the language of the standard is
20   "display type."  Is that the same thing as a type of
21   display unit?
22   A.    No.
23   Q.    Why not?
24   A.    Well, the type of display unit is very clear, if
25   you're -- having read the patent.  Right?  The display unit

**603**

1    Q.    And if we turn to slide 76, can you tell the jury
2    what you're showing here?
3    A.    This is just going back into the, kind of the next
4    layer of the table; you know, kind of digging down into
5    this particular byte.
6         This is the bits he's talking about, bits 3 and 4,
7    and how they are identified in the standard.
8    Q.    Now, turning to slide 77, what do you show -- what do
9    you show here?
10   A.    Well, we are back to our train, our big table.
11        If we go forward, you know, they are not pointing to
12   things in the product identification block.  They are not
13   pointing to these ID numbers that are there, so that's not
14   what's being talked about.
15        What they are talking about, that clear
16   identification number stuff.  They are talking about this
17   stuff which I, you know, I think it's definitely
18   characteristic information.  It's further back in the
19   train.
20   Q.    And so sort of sum things up, did Mr. Lamm point
21   to any of the identification numbers in the vendor/product
22   identification section for the claimed identification
23   number in this case?
24   A.    No, he did not.
25   Q.    And what did he point to instead?

**605**

1    is the entire display device.  I think it was the entire
2    computer monitor.
3         They're accusing the television -- think of it is the
4    entire computer television, if that's what you think.
5         So it's a type of that computer monitor.  The
6    characteristics of the display panel don't really tell you
7    the type of computer monitor it is.
8         So it's -- they're just different things.
9    Q.    Does the display type field here identify the type of
10   display unit?
11   A.    No, it does not.
12   Q.    Now, is there anything else you would like to show
13   the jury about -- to show that bits 3 and 4 of the feature
14   support byte are not an identification number for
15   identifying the type of display unit?
16   A.    Yeah.  If we go to the next slide, there is -- I
17   think you saw this earlier today.
18        MR. SCHWENTKER:  And, Your Honor, we'll be publishing
19   pre-admitted Exhibit LG-339.
20        THE COURT:  It's admitted into evidence, and you may
21   publish it.
22        (Exhibit Number LG-339 is received in evidence.)
23        THE WITNESS:  This is the next version of the EDID
24   standard.  So, you know, it's clear that you, you know, the
25   people developing this standard viewed this idea of whether

Appx15154

**606**

1 things are monochrome or color as a characteristic.
2 　　You know, they call it a major characteristic. It's
3 in this -- in this byte in the next version of the
4 standard, it talks about major characteristics of the
5 display.
6 　　You know, that's -- that's how people think about it.
7 BY MR. SCHWENTKER:
8 　　Q.　Now, Dr. Stevenson, is this version of the EDID
9 standard 2.0 that you're citing here, is it used in LG
10 televisions?
11 　　A.　No, it's not.
12 　　Q.　Then why are you citing that?
13 　　A.　Well, just in support of this idea, you know, that at
14 this time, this is the way people talked about, you know,
15 the color characteristics of a particular display
16 component. It was certainly a major characteristic of the
17 display component. Whether the CRT was monochrome or color
18 was the major characteristic.
19 　　Q.　So to sum up, what is your conclusion regarding this
20 limitation?
21 　　A.　It's not met. It's just not found in the LG TVs.
22 The fields that might make sense are not filled with useful
23 information. And so instead of -- because they can't point
24 to those fields, they don't have useful information. And
25 they point to this other -- bits that are further back in

**607**

1 the train that are characteristic information in column and
2 identification number.
3 　　I don't think anyone -- I don't see how that's
4 used -- that is, that could be used to identify anything
5 useful.
6 　　So I don't think they are identification numbers.
7 　　Q.　And when you say what -- when you say a field that
8 might make sense, what field are you referring to?
9 　　A.　Bits 3 and 4 of the feature support byte of --
10 　　Q.　Sorry. My question was unclear. Let me ask it
11 again.
12 　　A.　Okay.
13 　　Q.　You said, I believe, that instead of pointing to a
14 field that might make sense, Mondis's -- or plaintiffs are
15 pointing to bits 3 and 4 of the feature support byte.
16 　　And which field were you referring to when you said
17 that might make sense?
18 　　A.　Something like the ID product code might make some
19 sense. Right? It's a model number. It indicates the type
20 of monitor that it is. It's just not filled with useful
21 information in the LG televisions.
22 　　Q.　Okay. Now, let's talk about the other reason for
23 noninfringement that you're presenting today, the
24 communication controller limitation.
25 　　And what is your opinion about the communication

**608**

1 controller?
2 　　A.　There is no communication controller, you know, as
3 required by the claim.
4 　　Q.　And turning to slide 84, can you remind the jury how
5 the '180 patent depicts the communication controller?
6 　　A.　Yes.
7 　　So the Figure 1 of the patent's main embodiment, the
8 main teaching of how they talk about the communication
9 controller, shows clearly -- well, it shows two
10 communication controllers here, but this is a communication
11 controller that is inside the display unit, so we are
12 talking about the one on the right, the one in green.
13 　　And what the communication controller does, not
14 surprisingly, it controls the communication. All right?
15 So it controls the flow of data between the two devices.
16 　　And so in the embodiment shown here, there is -- you
17 know, the communication controller that's found in the
18 display device can control the flow of data from either the
19 memory or the microcomputer, right, there's two pieces
20 there, and it can control the flow of information over to
21 the computer.
22 　　Q.　And what does Mr. Lamm point to in LG's televisions
23 for the communication controller requirement of the claim?
24 　　A.　He points to a memory chip that's on the board and
25 its interface.

**609**

1 　　Q.　And do you agree with Mr. Lamm's opinion that the
2 accused LG televisions include the claimed communication
3 controller?
4 　　A.　I don't agree with it, no.
5 　　Q.　And can you explain why?
6 　　A.　The interface that he points to in the memory chip --
7 first off, a point to understand that all memory has an
8 interface. The memory shown in Figure 9 has interface.
9 There's memory cells that we talk about which store bits
10 and ones and zeros, but to get to it we have to have
11 interface. So everything has an interface.
12 　　Device in 9, in the preferred embodiment of Figure 1,
13 has an interface.
14 　　So he points to a memory chip that has an interface,
15 but that interface in no way can control the flow of
16 information out of the television.
17 　　The interface there, you might think of it as kind of
18 a door that permits open and closing a door. Information
19 can come in or out. So the interface provides that kind of
20 functionality of, Can data come in? Can data go out? Do I
21 close the door? Do I open the door?
22 　　Even that door opening and closing is not controlled
23 by the chip itself. It's all controlled in the setup by
24 the video source.
25 　　So, yes, there's interface in the memory chip. It is

**610**

1   not a communication controller.  It cannot -- it's a --
2   what he refers to as a bare interface, our basic
3   interface -- I think he also used that word -- that yes, it
4   provides interface to the memory, but it in no way can
5   control any communications.
6   Q.   And, Dr. Stevenson, as we turn to slide 85, can you
7   explain to the jury what you're showing?
8   A.   Well, this is the setup he explained, and this is --
9   I don't have a problem with the setup here.  There's a
10  Blu-ray player and there's a television.  He talked about a
11  communication controller in the Blu-ray player, and I
12  believe there is one there.
13       And then he talked about two different types of
14  devices:  The memory chip, and then he also talked about
15  this other chip for data protection, the HDCP interface.
16       The standards require that it's an I2C interface.
17  There is nothing in the patent about an I2C interface.
18  This is just how they happen to implement it.  So it's not
19  like that's required to use an I2C interface, but that's
20  how the product is built so it's relevant.
21       And in the I2C interface, if you read the
22  specification for that, I think Mr. Lamm talked about the
23  Philips specification.  They are the ones who developed it,
24  they had this concept of what's called a master and a
25  slave.

**611**

1       Now, maybe I will -- I will do what I always do with
2   my class when I talked about I2C communications.
3       I apologize for the language because it's kind of
4   pretty old language, and every once in awhile I get
5   involved in a discussion if we should change it from master
6   to slave to something more, you know, acceptable.
7       The problem is the idea fits because the master has
8   complete control and the slave has to do whatever the
9   master does in this sort of language.  And that's what, you
10  know -- that's why we -- that language has stuck even
11  though people don't like it.
12       Someone suggested to me it should be parent/child,
13  and I was like, Well, I don't have that much control over
14  my child so that's not a good metaphor.  So this is the one
15  that sticks and until we come up with a better language for
16  what completely controls a communication channel, I think
17  this is what the technology is going to keep on using.
18       But this is words from the standard.  It talks about
19  this idea of a master that controls the communication and
20  it talks about slave devices.  And so the memory is an I2C
21  slave, so it's this HDCP thing.  It's an I2C slave.
22       The video source controls all the communication that
23  occurs.  The memory just -- and the HDCP just has a bare
24  interface that responds to whatever the master is saying.
25  Q.   And so what is the importance of this?

**612**

1   A.   Well, the claim requires that there's a communication
2   controller actually in the display device; the accused
3   television in this case.  There is no -- nothing in the
4   accused televisions in these components that can act as an
5   I2C master that can control the communications.
6   Q.   So if we turn to slide 86, what are you showing
7   on this slide, as to your conclusion?
8   A.   This is my conclusion.  This required communication
9   controller is not found in the '180 patent.  Excuse me, not
10  found in the accused devices.
11  Q.   And turning to slide 87, what are you showing here?
12  A.   Well, as far as I can gather what their position
13  seems to be is that because you comply with some standards,
14  you necessarily infringed the patent.  And I don't believe
15  that's true at all.
16       First off, the standards are fairly flexible devices.
17  Some parts are optional, only parts of it are mandatory.
18       So the -- you know, the fact that, you know, LG TVs
19  support HDMI, have EDID data inside them in no way means
20  that they infringed the claims.  You have to look at
21  exactly how those things are implemented inside the
22  televisions and see what information is actually there, see
23  if all that information actually meets the claim language,
24  and all the necessary components are there.
25       And because I didn't find those things, I found that

**613**

1   the '180 patent was not infringed.
2   Q.   Now, let's go to invalidity quickly.
3       And have you formed an opinion as to whether Claims
4   14 and 15 of the '180 patent are valid or invalid?
5   A.   Yes, I did.  I found that they were invalid.
6   Q.   And let's go to the reasoning for that.
7       And at a high level, what's the basis for that
8   opinion?
9   A.   Well, it's the so-called requirement for written
10  description.  Right?  The deal you strike when you get a
11  patent with the U.S. Government is that, I will tell the
12  world my invention and you are going to protect my rights
13  to that invention for a period of time.
14       That's the whole idea behind the patent process, and,
15  you know, why people get patents.
16       So there is this requirement that you write down and
17  you tell the world exactly what you invented so someone
18  knows that you invented and can learn from it, so we can
19  develop the technology.
20       If you don't do that you have this problem of lack of
21  written description.  You didn't meet that requirement and
22  getting a patent.
23  Q.   And so we talked about the amendment to Claim 14 and
24  can you remind the jury when the amendment was made?
25  A.   It was made in 2007.  So the original spec and the

614

1    spec has stayed the same since '93. The claim originally
2    written was filed in 2002, but the claim that's now in the
3    case, that's being talked about, is one that was written in
4    2007.
5    Q.    All right. And now earlier we talked about the
6    identification numbers disclosed in the '180 patent.
7         And can you give the jury a brief recap of what the
8    patent says about identification numbers?
9    A.    Well, this position kind of takes us back to one of
10   our favorite phrases: Identification number for
11   identifying the type of display unit. And that idea is not
12   expressed anywhere in the patent.
13        You can see it right from the beginning in the title.
14   The title talks about a different type of identification
15   number or a different identification number all together.
16   Right? It says: An identification number for identifying
17   a display unit. Right.
18        So this is something like a serial number. Right?
19   That's a number that would identify a particular display
20   unit. That's different language than the type of display
21   unit.
22        Even in the abstract they, again, talk about this
23   identification number for identifying the display unit.
24   Q.    And if we go to the next slide, what are you showing
25   here?

616

1    this identification number. Right? So the language read:
2    An identification number for identifying said display unit.
3         All right. So that's exactly what is being shown
4    in -- in the -- in the body of the patent, those examples
5    we just talked about. Right? You are going to identify,
6    uniquely identify that display unit so you can either send
7    information to it or you know that the right one is hooked
8    up.
9         So, you know, in terms of the EDID data, you know,
10   the serial number would do that. But, you know, that's
11   what's disclosed.
12   Q.    And then can you remind the jury what the claim was
13   amended to?
14   A.    Yes.
15        So the claim was amended to add these words: "At
16   least a type of." Right? So now the identification number
17   is for identifying at least a type of said display unit.
18        So that's no longer, you know, that kind of unique
19   identifier that says this exact monitor; that we are now
20   talking about an identification number for a particular
21   type of a computer monitor.
22   Q.    And is that change important?
23   A.    Yes, it's a different idea.
24   Q.    And does the '180 patent ever mention the
25   identification number for identifying a type of display

615

1    A.    So we talked about some of the embodiments of, you
2    know, kind of matching the identification number up and
3    deciding whether, you know, this privacy idea of if the
4    numbers match, I am going to display things.
5         There is another idea expressed, is the idea for
6    identifying the information output device. So the -- we
7    can also talk about it as identifying that output device
8    which is our display device.
9    Q.    And if we go to the next slide, what are you showing
10   here?
11   A.    So this is one of the other ideas, right, which is
12   kind of flipping it on the head a little bit. Let's have a
13   bunch of monitors with different ID numbers. Right?
14        And you can see three different monitors shown in
15   Figure 5 each with different ID numbers: ID 1, 2 and 3.
16   But they're all hooked up to one computer.
17        And so by having these unique identifiers that -- I
18   can have the computer send information to just one of the
19   monitors, right, by using the identification number, that
20   was another way they proposed this identification number
21   described in the patent can be used.
22   Q.    Now, we talked about this before, but can you remind
23   the jury what Claim 14 said when the patent application was
24   originally filed?
25   A.    Yes. So when it was originally filed in 2002, it had

617

1    unit?
2    A.    No, there's nothing -- there's one sentence that
3    mentions the idea of a display type in the background of
4    the invention. No mention of identification number there.
5         The rest of the discussion of identification number
6    is all about uniquely identifying a particular computer
7    monitor.
8         There's no discussion anywhere of an identification
9    number for identifying at least a type of said display
10   unit.
11   Q.    And you mentioned one sentence in the background.
12   And what does it say about the type of display device or
13   type of display unit?
14   A.    Maybe we can go to it. It's in column one.
15        MR. SCHWENTKER: Ian, could you pull up LG-005? And
16   go to column one, please, the second and third paragraphs
17   of the background of the invention.
18   BY MR. SCHWENTKER:
19   Q.    So, Dr. Stevenson, what does this say about the type
20   of display device?
21   A.    So this is the one sentence that uses this phrase
22   anywhere. It's a microcomputer or a memory LSI. LSI
23   stands for large scale integration. Think memory chip.
24   Microcomputer or memory chip is used to provide most
25   suitable display image for each video signal as this type

1    of display device.

2        So if you go back a little bit, it talks about this

3    type of display device being a multiscan monitor, that's

4    timing -- different timings it can support.  And so that's

5    a discussion of type of display device.

6    Q.    And does the '180 patent ever connect the notion of

7    an identification number with this type of display device?

8    A.    No, this is just in the background.

9        Beginning of column one, the identification number is

10   never talked about until the detailed description or maybe

11   in the summary of invention, which is in -- more than a

12   column later.

13   Q.    And did you read the entire patent?

14   A.    Yes, certainly.

15   Q.    And is there any mention anywhere in the patent of an

16   identification number for identifying a type of display

17   unit?

18   A.    No, there is not.

19   Q.    And is that a problem with respect to validity?

20   A.    Yes, it certainly is, because, like I said, you are

21   required -- so back in 1993, you have to have that idea out

22   there:  Tell that idea to the world that this is the --

23   this is what my invention is.

24       That idea doesn't show up until someone wrote that

25   claim in 2007.  And so that's a huge problem.

1        MR. SCHWENTKER:  Ian, if we can go back to the

2    slides, please.

3    BY MR. SCHWENTKER:

4    Q.    And so what's your conclusion with respect to

5    validity of Claim 14 of the '180 patent?

6    A.    I believe the patent is invalid because of this lack

7    of written description.

8    Q.    And is that your conclusion with respect to Claim 14?

9    A.    Yes.

10   Q.    And do you have a conclusion with respect to

11   Claim 15?

12   A.    Claim 15, because it's a dependent claim, is for the

13   same reasons as I described before.  It's not infringed for

14   at least those same reasons, and it's also invalid because

15   of the same lack of written description.

16   Q.    And so to conclude, what are your conclusions

17   regarding noninfringement?

18   A.    Well, I came to the opinion that Claims 14 and 15 are

19   not infringed because the LG TVs do not have either the

20   identification number for identifying at least a type of

21   said display unit, and they also do not have the claimed

22   communication controller.

23   Q.    And is there any doubt in your mind as to your

24   noninfringement conclusion?

25   A.    No.

1    Q.    And, finally, what's your conclusion regarding

2    invalidity?

3    A.    Well, both Claims 14 and 15 are invalid because the

4    patentor failed to describe its invention to the world.  So

5    this lack of written description.

6    Q.    And is there any doubt in your mind with respect to

7    that conclusion?

8    A.    No.

9    Q.    Thank you, Dr. Stevenson.

10       MR. SCHWENTKER:  No further questions.

11       THE COURT:  We are going to take a short break for

12   the jury, and then we will start with the cross.

13       Ladies and gentlemen, we are going to keep it down to

14   about ten minutes.

15       (Jury exits the courtroom at 3:03 p.m.)

16       THE COURT:  You can step down, Doctor.

17       Ten minutes.

18       MR. SCHWENTKER:  Thank you, Your Honor.

19   (A break is taken from 3:03 p.m. to 3:12 p.m.)

20       (Jury is brought in at 3:12 p.m.)

21       THE COURT:  Be seated, everybody.

22       All right.  Mr. Black, ready to proceed?

23       MR. BLACK:  Yes.  Can you hear me, Your Honor?

24       THE COURT:  Yes, I can.

25       MR. BLACK:  What's that?

1        THE COURT:  Loud and clear.

2        MR. BLACK:  All right.  Let's give him the binder.

3        May I approach?

4        THE COURT:  You may.

5        MR. BLACK:  Thank you.

6                    CROSS-EXAMINATION

7    BY MR. BLACK:

8    Q.    Dr. Stevenson, my name is Martin Black.  I don't

9    think we've met.

10   A.    Good afternoon.

11   Q.    You have a very famous name, actually, I noticed over

12   the lunch break.

13   A.    It's a famous author, certainly, yes.

14   Q.    Robert Louis Stevenson, right?

15   A.    Yep.

16   Q.    The writer of Treasure Island?

17   A.    Correct.

18   Q.    And the Strange Case of Dr. Jekyll and Mr. Hyde,

19   right?

20   A.    You know your literature.  Most people know the first

21   one.  Not a lot of people know the second one.

22   Q.    And you're a university professor, right?

23   A.    Correct.

24   Q.    But you also have a bit of a double identity of your

25   own, don't you?

JACQUELINE KASHMER, C.C.R.

**622**

1    A.    I'm not sure what you mean.

2    Q.    Well, you get about 70 percent of your income from

3    consulting in the legal cases and testifying, don't you?

4    A.    I mean, I don't know the number, but that's

5    reasonable.

6    Q.    And you, in fact, when you sent us your infringement

7    report, which you're required to do under the federal

8    rules, you gave us a list of all the cases that you have

9    been working on in the last five years and all the

10    consulting engagements that you have relating to legal

11    work, right?

12    A.    I know the list contains at least the first part.

13    I'm not sure if it contains the second part, but --

14    Q.    Well, your infringement report contained the second

15    part, but you stripped that out from the invalidity report.

16        Do you recall that?

17    A.    No, I can't say I really do.

18    Q.    Well, in your infringement report, you gave us a CV

19    of your litigation experience.  It looked like this.

20        Is that --

21        (Discussion held off the record.)

22    BY MR. BLACK:

23    Q.    This is your infringement report, right?

24    A.    I can't see it.  I accept your -- I mean, that's

25    something that -- that looks like my list of prior

**623**

1    litigations.

2    Q.    We've got it in there, if you want to look at it.  I

3    imagine you remember this because it says:  Robert Louis

4    Stevenson, litigation experience.

5        Do you remember that?

6    A.    Yes.

7    Q.    And you've actually reproduced this document many

8    times for many reports in the last five years.  You keep a

9    running copy of it, updating it as you go, right?

10    A.    I try to keep it as updated as possible, correct.

11    Q.    And that's important to you because you have a

12    litigation consulting business that has resulted in your

13    obtaining engagements for 21 testifying experiences in the

14    last five years.  Isn't that right?

15    A.    If that's what the number is, that's what the number

16    is.  I don't remember the exact --

17    Q.    Well, it's the number that came out of counting from

18    your report, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,

19    15, 16, 17, 18, 19 in this report, and there's an extra two

20    in the prior report.

21        Does that sound about right?

22    A.    It sounds reasonable.

23    Q.    Sixty months in a five-year period, 21 testifying

24    events.

25        That's being in the witness chair every three months,

**624**

1    right?

2    A.    I think your math is approximately right.

3    Q.    Well, you're a professor of electrical engineering.

4    You know that 60 divided by 20 is about three, right?

5    A.    Sounds right.

6    Q.    Yes.

7        And in addition to that, the matters where you worked

8    on during that time period where you did not testify, there

9    were an additional 19, right?

10    A.    Without looking at the list, I'm not going to

11    remember.

12    Q.    Go ahead, take a look at the list.  It's connected --

13    it's attached to your infringement report.

14        THE COURT:  While he is doing that, ladies and

15    gentlemen, that noise that you hear is some construction,

16    which we may be blessed with for the next several months or

17    years, ongoing near Newark Municipal Court.

18        So there is nothing which can be done about it except

19    tune it out.

20        THE WITNESS:  I am looking at the infringement

21    report.  I am not finding it there.

22    BY MR. BLACK:

23    Q.    Oh, you're right.  I'm sorry.  The infringement

24    report is the short one.  That has only 19.  I made an

25    error there.

**625**

1        Look in your -- it was your first report, which would

2    be your invalidity report, Exhibit A.

3    A.    Okay, I see that.

4    Q.    All right.  Let's start again.

5        Robert Louis Stevenson, litigation experience.

6    Expert testimony last five years 21 times, right?

7    A.    That's what we counted.

8    Q.    Right.  Every three months you are in the witness

9    chair actually testifying in a case or a deposition, right?

10    A.    Yes.

11    Q.    And the next section says:  In addition to the above

12    matters, declarations or reports that have been submitted

13    in the following matters in the last six years.

14        And I believe there are 19 of those in addition.

15    Correct?

16    A.    I trust your counting, that seems reasonable.

17    Q.    And then you have a section that says:  Additional

18    nonconfidential consulting work, and you list a bunch of

19    companies.

20        And then you have additional confidential consulting

21    work, almost all of which are litigation support.

22        And when you add all of those up, you have had about

23    82 legal matters in the last five years.  Isn't that right?

24    A.    I trust your addition, but that sounds reasonable.

25    Q.    Now, in between actually testifying in court or at

Appx15159

**630**

1  A.  Yes.

2  Q.  The folks who are responsible for the temperature in

3  this courtroom and the banging we've been hearing, right?

4  A.  Sure.

5  Q.  And they make independent decisions about what

6  patents are allowed, correct?

7  A.  Yes, that's what they attempt to do.

8  Q.  And it's important that they do that to promote

9  invention and commerce and our way of life in this country.

10  Isn't that right?

11  A.  That's the general idea, yes.

12  Q.  You have one patent of your own, right?

13  A.  Yes.

14  Q.  Just one, though, right?

15  A.  Yes.

16  Q.  And you are proud of it too, right?

17  A.  Actually, I didn't know it existed for a good six or

18  seven years until someone else also told me, so.

19  Q.  Okay.

20      The Patent Office, though -- well, you must be

21  somewhat familiar with the process, both because of your

22  litigation consulting and because as an inventor you have

23  to interact at some level with the Patent Office.  You must

24  have taken a declaration, for instance, to the Patent

25  Office stating that you were a true inventor, right?

**631**

1  A.  Yes, I did.

2  Q.  And that happens at the beginning of an application,

3  right?

4  A.  Yes.

5  Q.  So you must have known that someone was applying for

6  a patent for you?

7  A.  Yeah, I participated in the -- putting together the

8  application --

9  Q.  Okay.

10  A.  -- on a patent I have.  I just wasn't working for the

11  company anymore and no one ever told me.

12  Q.  Now, the patent in this case, you put up a timeline

13  where you showed various events in the patent application

14  process.

15      Do you remember that?

16  A.  Yes.

17  Q.  And you had on that timeline -- you called that an

18  important -- what you thought was a very important date

19  when the claim was amended to add the word "type."

20      Do you remember that?

21  A.  Yes.

22  Q.  And you put a flag up here at May 4th, 2007.

23      Do you remember that?

24  A.  Yes.

25  Q.  What happened on April 30th, 2007?

**632**

1  A.  You'd have to remind me.  I don't remember the dates

2  well enough.

3  Q.  Do you know what an interview summary is?

4  A.  Yes.

5  Q.  Do you know that when the Patent Office looks at an

6  application they almost always reject, and then there's a

7  dialogue, letters written back and forth effectively and

8  arguments going back and forth between the patentee -- the

9  would-be patentee and the office, right?

10  A.  I mean, I don't know how common it is, but I

11  certainly have seen it happened numerous times.

12  Q.  How many of these cases you've worked on in the last

13  five years were patent cases?

14  A.  Most of the cases I worked on are patent cases.

15  Q.  But you know how this process works.  You've read --

16  you've read the file history in all these cases, haven't

17  you?

18  A.  Yes.

19  Q.  So you've seen in these applications what happens.

20  The Patent Office says, Rejected.

21      Then the patentee comes back and says, Well, no, here

22  are some reasons why you should consider changing your mind

23  or we will amend the claims.

24      And there is a back and forth that can sometimes take

25  years.  Isn't that right?

**633**

1  A.  Like I said, I don't know if it happens all the times

2  because I've certainly seen cases where that has not

3  happened, but it certainly happens frequently.

4  Q.  Almost every time the Patent Office rejects the first

5  application.  Isn't that true?

6  A.  I actually don't know.

7  Q.  You don't know.  Okay.

8      In this case we had the usual back and forth, and one

9  of the options you have when you are run up against a wall

10  with the Federal Government, which is a little unusual, is

11  you can actually go down to Washington and ask for a

12  special meeting with the examiner, right?

13  A.  Correct.

14  Q.  They call that "interviewing the case," right?

15  A.  Yes.

16  Q.  And you go down, you schedule a meeting, and the

17  examiner will reserve a conference room at the United

18  States Patent Office in Washington, and you can go and you

19  can make your case to the examiner face to face.

20      Do you know that?

21  A.  I understand that can happen, certainly.

22  Q.  Have you ever been at one of those meetings?

23  A.  No, I have not.

24  Q.  Have you ever been at the Patent Office?

25  A.  Yes, but not connected with litigation.

Appx15161

**634**

1    Q.    For inter partes review?

2    A.    **No.**

3    Q.    The Patent Office will schedule these interviews,

4    invite the lawyer or patent agent who is prosecuting the

5    case to sit down and to tell the story that they want to

6    tell and so people can talk face to face and try to reach

7    an agreement, right?

8    A.    **I think that's the general objective of those**

9    **interviews.**

10    Q.    And in this case, Hitachi went to the Patent Office

11    and had one of those meetings, right?

12    A.    **I presume this is what you mean by the April meeting.**

13    **I don't remember the dates. I remember seeing some**

14    **interview summaries in some of the prosecution history.**

15    Q.    Well, you gave all this testimony to the jury about

16    the significance of adding the word "type" to the claim.

17    Do you know how the word got added and why?

18    A.    **I know it was because of the back and forth**

19    **negotiations. I am just not remembering the details.**

20    Q.    Did you read the file history in this case?

21    A.    **Yes, I did.**

22    Q.    Did you see the interview summary of April 30th?

23    A.    **I saw interview summaries connected with this case.**

24    **I don't remember the date. That's all I am saying.**

25    Q.    Isn't what happened here is that Hitachi went down to

**635**

1    the Patent Office to explain their position, and they met

2    and had an interview, and they agreed at the interview --

3    the Federal Government, represented by patent examiners,

4    two, agreed with Hitachi that if they added the word "type"

5    that they would allow this particular patent.

6         Isn't that right?

7    A.    **I don't remember the interview summary being worded**

8    **that way.**

9    Q.    You do remember the interview summary and you decided

10    not to tell the jury about it, though, right?

11    A.    **I am just trying to tell the jury the story that --**

12    **of how this came about.**

13    Q.    So are we.

14         The story of how this came about is that Hitachi went

15    to the Patent Office, they scheduled a meeting with the

16    Patent Office, and what the Patent Office does when that

17    happens is they keep a record call an interview summary,

18    right?

19    A.    **Correct.**

20    Q.    There it is. Application 10/160,022.

21         THE COURT: Mr. Black, what exhibit number is this

22    and is this agreed --

23         MR. BLACK: This is Mondis 94. I'm sorry, Your

24    Honor. It's pre-admitted.

25         THE COURT: It's admitted into evidence. You may

**636**

1    publish it.

2         (Exhibit Number MON-94 is received in evidence.)

3    BY MR. BLACK:

4    Q.    It says "Interview Summary" at the top left. It says

5    "Application 10/160022."

6         Would you please confirm that's the '180 patent

7    application?

8    A.    **I believe I recall that number, yes.**

9    Q.    On the left-hand side it says: All participants, and

10    it has four names. Raymond Phan, U.S. PTO.

11         What does that stand for?

12    A.    **U.S. Patent Trademark Office.**

13    Q.    Mark Rinehart, United States Patent Trademark Office.

14         On the right-hand side is Melvin Kraus, it's got a

15    reg. number. That means he is registered to prosecute

16    patents, right?

17    A.    **Correct.**

18    Q.    And Masashi Aoyagi, Hitachi patent engineer. Right?

19    A.    **Yes.**

20    Q.    And they met at the Patent Office, right?

21    A.    **I know they often do. They also do telephone. I am**

22    **trying to see where it says it was at the Patent Office.**

23    Q.    I believe it says "Type," and they checked the box

24    for "Personal."

25    A.    **Okay.**

**637**

1    Q.    Okay.

2         And then it says: Agreement with respect to the

3    claims was reached.

4         That box is checked, right?

5    A.    **Yes.**

6    Q.    And this is a record that the United States Patent

7    Office kept and put in the file, which all can see,

8    including you if you had read the file carefully, right?

9    A.    **I saw this. I recall seeing this now that we are**

10    **looking at it.**

11    Q.    You recall seeing it. You just decided not to tell

12    the jury about it.

13    A.    **We are talking about it now, so I think it's**

14    **perfectly fine.**

15    Q.    Yes, we are.

16         Substance of the interview, including description of

17    the general nature of what was agreed to if an agreement

18    was reached or any other comments.

19         Do you see that?

20    A.    **Yes.**

21    Q.    Examiner concurs that previous office action

22    reassembling previous rejection is incorrect.

23         So he is saying my previous rejects is incorrect.

24         Do you see that?

25    A.    **Yes.**

Appx15162

**638**

1  Q.  Then it says:  Therefore, the previous office action
2  will be vacated.  Right?
3  And then it says:  Applicant proposes to more clearly
4  specify identification number as a "type" of display unit
5  which examiner agrees will read over the previous art
6  applied regarding to the claims.
7  Do you see that?
8  A.  Yes.
9  Q.  That was an agreement that was reached between
10  Hitachi and the two representatives of the Federal
11  Government charged with reviewing this case, Raymond Phan
12  and Mark Rinehart, correct?
13  A.  That's an agreement yes.
14  Q.  And you are here to break that agreement, aren't you?
15  A.  I don't know what you mean.
16  Q.  You are here to invalidate the patent, to kill the
17  '180 patent, which the entire industry has taken a license
18  to, right?
19  A.  I don't believe what you're saying is correct, but I
20  believe the patent is invalid.
21  Q.  If you are successful, the patent will be invalid and
22  LG won't have to pay a license like everybody else in the
23  industry, right?
24  A.  Well, I'm not sure of these license issues, but I
25  certainly heard they paid a lot for the computer monitors.

**639**

1  They will not be paying one on the televisions.
2  THE COURT:  Let me see counsel at sidebar.
3  (Continued on the next page.)

**640**

1  (Sidebar conference held on the record in the
2  presence of the Court and counsel, out of the hearing of
3  the jury.)
4  THE COURT:  Mr. Black, your cross-examination is
5  argumentative.  It is also asserting facts here which are
6  not part of an appropriate cross-examination.  Tone it
7  down.  If you don't, then next time I have to discuss this
8  with you I will discuss it with you in front of the jury.
9  Understood?
10  MR. BLACK:  Yes, Your Honor.
11  THE COURT:  Good.  And Sean, this is not TV.  I don't
12  want to hear anything, all right, I don't want to hear
13  cross-examination about, You're here to invalidate the
14  patent which has been accepted by every other patentee or
15  every other consumer company.
16  That is not appropriate cross-examination.  You know
17  it.  I know it.  Tone it down.
18  Let's go.
19  (Sidebar discussion is concluded, proceedings
20  continued on next page.)

**641**

2  BY MR. BLACK:
3  Q.  There was an agreement reached between the Patent
4  Office and the patentee at this meeting on April 30th,
5  right?
6  A.  Yes.
7  Q.  And the word "type" was added to the claim as a
8  result, right?
9  A.  Yes.  It looks like to overcome the previous
10  rejection, which, I believe, was due to a prior art
11  reference.
12  Q.  And, of course, the patent examiners who made the
13  decision and entered into the agreement were aware of the
14  patent specification that was in front of them, correct?
15  A.  I would assume so, yes.
16  Q.  And it's the same patent specification that we have
17  typed up in the '180 patent today, correct?
18  A.  Correct.
19  Q.  And that's the one you say doesn't support the use of
20  the type ID, right?
21  A.  Correct.
22  Q.  You're aware that the burden on proving invalidity is
23  higher than the burden for establishing infringement,
24  right?
25  A.  Yes.

Appx15163

642

1    Q.   The burden is clear and convincing evidence I believe
2    the Judge said he was going to instruct us on.
3         Do you recall that?
4    A.   Yes.
5    Q.   And that means in order to invalidate, the testimony
6    has to be both clear and convincing, right?
7    A.   Yes.
8    Q.   On the infringement, the burden is 50/50
9    preponderance of the evidence.  Right?
10   **A.   I think it is 49/51.**
11   Q.   49/51, yes.  Fair enough.  All right.
12        Let's talk a little bit about your report preparation
13   process.
14        You didn't speak to anybody at LG in the course of
15   preparing your report, right?
16   **A.   Correct, I did not.**
17   Q.   We heard Mr. Bieong Geol Lee testify by deposition.
18        Were you in the courtroom for that?
19   **A.   Yes.**
20   Q.   He is an engineer at LG who works on their
21   televisions, right?
22   **A.   Correct.**
23   Q.   And he actually had real-world knowledge about what
24   was inside the TVs and how they were designed by LG and all
25   the technical details that we were looking for?

643

1    **A.   At least many of the technical details.**
2    Q.   Right.
3         You know the concept of a 30(b)(6) deposition?
4    **A.   Yes.**
5    Q.   And that's where you send a notice to a company
6    rather than a specific person and you say, Please send us
7    someone who can answer for certain topics?
8    **A.   Yes.**
9    Q.   And we sent the deposition notice on the technical
10   topics to LG, and they produced Mr. Lee, correct?
11   **A.   Correct.**
12   Q.   You haven't spoken to Mr. Lee, right?
13   **A.   I have not.**
14   Q.   The EDID EEPROMs that you were discussing on direct,
15   the I2C EEPROMs, each LG television has I2C EEPROMs in
16   them, correct?
17   **A.   They have at least one, yes.**
18   Q.   How many -- how many EEPROMs with EDID information do
19   you think there are in the courtroom?
20   **A.   Don't know.**
21   Q.   There's about a dozen at least or so, right?
22   **A.   There's probably at least one in each of the**
23   **monitors.**
24   Q.   That device over there, is that a television or a
25   monitor, if you can tell?

644

1    **A.   Can I get up and look at it?**
2    Q.   It's okay.
3         You can't actually tell just by looking at the form
4    factor, right?
5    **A.   No.  I look at the ports on the back.**
6    Q.   The difference between a television and a monitor is
7    that a television has a television tuner, right?
8    **A.   That's one of the differences, certainly.**
9    Q.   If you took an LG monitor and -- that had an EDID
10   memory in it and you added a television tuner to it, you're
11   probably capable of that, I'm not, but if you did that,
12   would it be a television or a monitor?
13   **A.   I understand from seeing in the courtroom that**
14   **there's actually a third category device that they call**
15   **monitor/television, I believe.**
16   Q.   Monitor/television.  Categories don't really make a
17   lot of sense today, right?
18   **A.   No, it makes perfect, fine sense.**
19   Q.   Do you know that -- you said on direct that there was
20   some testimony about connecting LG -- how many LG
21   televisions had VGA ports.
22        Do you remember that?
23   **A.   Yes.**
24   Q.   Have you seen the evidence in the case that of the
25   accused products, 89 percent of them have VGA ports?

645

1    **A.   I mean, I never calculated the percentage, but there**
2    **are certainly many.**
3    Q.   And, of course, the VGA port is used primarily, maybe
4    almost exclusively, to connect to a computer, right?
5    **A.   It has had other purposes over the years, but**
6    **probably the only device that might use it today would be a**
7    **computer.**
8    Q.   And you know that LG televisions are often connected
9    to computers.  LG has actually studied that?
10   **A.   I don't -- I am not going to dispute that.  I**
11   **personally have never done that, so outside the confines of**
12   **this case, but, you know.**
13   Q.   Would it surprise you if there's evidence later in
14   the case that shows that 80 percent -- 8 or 10 percent of
15   LG televisions in certain rooms in the house are actually
16   connected to computers on a regular basis?
17   **A.   It wouldn't surprise me.  I just haven't gone and**
18   **tried to do those sort of surveys myself.**
19   Q.   If you have an LG television, maybe they put a label
20   on it that says, if it's an LCD television, and they have a
21   model number or whatever, but someone connects it to a
22   personal computer, is it functioning as a monitor or as a
23   television?
24   **A.   It's still a television.**
25   Q.   But it's also then functioning as a monitor, right?

**658**

1    A.   I agreed that, but I -- the purpose of this test was
2  to show that it's not an identification number.
3    Q.   So what sort of thing would you consider to be
4  evidence of the type ID described in the claim?
5        I think you said a serial number would do it, right?
6    A.   Potentially could, yeah.
7    Q.   And a product ID code would suffice to meet that
8  limitation, right?
9    A.   Yeah, I believe that would be one.
10   Q.   So you showed the jury the bytes here, and you
11 highlighted one or two.  On the left-hand side -- well, the
12 far left-hand side we have the offset.
13       Do you see that?
14   A.   Those are the addresses.
15   Q.   Right.
16       And then the first -- each column is denoted by the
17 numbers which run along the top.  So if you wanted to look
18 for byte 15 you would go to the second row, the fifth one
19 in, and that would be AO.  Is that right?
20   A.   A0.
21   Q.   A0.
22       And A0 is actually -- that's called hex, right?
23   A.   Well, that representation is what's called
24 hexadecimal.
25   Q.   Hexadecimal.  Hexadecimal, because it's -- instead of

**659**

1  decimal, which would be 10, it's hexadecimal, which would
2  be 16, right?
3    A.   Correct.
4    Q.   And computers like to work with multiples of two
5  because they work in binary, right?
6    A.   Yes.
7    Q.   And 16 is a multiple of two.  It's two to the fourth
8  power, right?
9    A.   Correct.
10   Q.   And -- but when they designed these things, they kind
11 of ran out of numbers after 0, because we only have 10, so
12 they added letters.
13       So the hex system is 0, 1, 2, 3, 4, 5, 6, 7, 8, 9; A,
14 B, C, D, E, F.  Right?
15   A.   Correct.
16   Q.   So you can actually take those numbers and decode
17 them into 1s and 0s, right?
18   A.   Certainly.
19   Q.   And you can decode the A in byte 15 into a string of
20 1s and 0s, right?
21   A.   Yes.
22   Q.   I don't have -- that's called ASCII, actually, right?
23   A.   No.
24   Q.   What would you call that?
25   A.   I'm not sure what you're asking.

**660**

1    Q.   The decoding process going from --
2    A.   It's just a conversion from hexadecimal to binary.
3    Q.   I'm -- okay.
4        If you go in the other direction, you can take the
5  hex information and turn it into letters, right?  Readable
6  by human beings, right?
7    A.   Well, this sort of representation is kind of just --
8  I mean, you can print out 1s and 0s, I do that --
9    Q.   Right.
10   A.   -- sometimes, but this is a more compact
11 representation --
12   Q.   Right.
13   A.   -- that engineers get used to, you might say.
14   Q.   And these bytes can be converted into letters that
15 people can read, correct, sometimes?
16   A.   Well, there's -- I assume you're talking about an
17 ASCII code --
18   Q.   Yes.
19   A.   -- which is a pattern of 1s and 0s, which, you know,
20 there's a standard out there that we agree.  We interpret a
21 particular pattern as the capital letter A, for instance.
22   Q.   And the right-hand side, which has a lot of -- sort
23 of looks like gibberish there, what is that?
24   A.   Well, this particular program is set up to print out
25 the -- you know, it has the binary numbers and sets out and

**661**

1  prints out that table that we mostly have been focused on,
2  which is the hexadecimal representation.
3        The one on the right is the ASCII version of those
4  same numbers.  So because there's only 26 times two, you
5  know, 52 letters, maybe, you know, throw a couple numbers
6  and symbols in there, there's a lot more than that number
7  of bit patterns.
8        So some of the ASCII representation looks like
9  garbage up there, and sometimes they put periods there to
10 represent some things.
11       So it's -- the ASCII -- if this was all ASCII
12 information on the left, you would see, you know, letters
13 there.
14   Q.   There is actually some ASCII information on the
15 right-hand side, isn't there?
16   A.   Yes, there is.
17   Q.   And you didn't show this to the jury, but we focus
18 in, there are four letters there that we can read, aren't
19 there?
20   A.   Yeah, there are.
21   Q.   And those letters are LG TV, right?
22   A.   Correct.
23   Q.   And an LG is a type of television, just like a
24 Samsung or a Sony or Panasonic, right?
25   A.   I wouldn't agree that's a type of display unit as

Appx15168

**662**

1  described in the patent.

2  Q.  And a TV is a type of display product, like a monitor

3  or a projector, which also have EDIDs in them.  Isn't that

4  right?

5  A.  **I certainly don't agree that's the type of display**

6  **unit that's called for in the claim of the patent.**

7  Q.  The LG TV, that's in every one of the LG TVs in this

8  case, isn't it?

9  A.  **I certainly didn't investigate it whether it was in**

10  **every single one, but I don't see why the relevance of it.**

11  Q.  Well, you printed out a whole bunch of sheets like

12  this, and you had another program that you used to print

13  out the information.

14  And every one of them you printed had LG TV in it,

15  didn't it?

16  A.  **Well, I mean, I looked at three TVs.  I think I made**

17  **that pretty clear that way.**

18  **And in addition to that, I looked at maybe another**

19  **eight that Mr. Lamm had.**

20  **So in -- that's all I printed out, was maybe those 11**

21  **TVs.**

22  **There's over 600 TVs in this case, so that's why I am**

23  **qualifying my answers.**

24  Q.  You made a point during your direct examination, you

25  were talking about the place where the EDID standard says

**663**

1  you should put the product code, right?  And you said that

2  didn't have useful information in it, right?

3  A.  **In the LG TVs, correct.**

4  Q.  Yes.

5  And you were very careful, though, to say there was

6  no useful information there.  You didn't mention the LG TV

7  that was in a different field but is in the EDID block,

8  right?

9  A.  **I am not sure I understand your point.  I didn't**

10  **mention that because I don't see the relevance to any of**

11  **the asserted claims made by Mondis.**

12  Q.  You showed the jury all this hex information and this

13  sheet, but you also used a tool to take the EDID block and

14  download it and print it out into human readable form,

15  right?

16  A.  **Yes.**

17  Q.  And that tool was called the monitor asset manager

18  and -- from N-Tec Taiwan.  Is that right?

19  A.  **I don't know if that's what the tool's called, but I**

20  **know it prints out something like that at the top of the --**

21  **the top of that printout.**

22  Q.  So you came to Dechert's office in -- that's my firm

23  in Austin, Texas, where Mr. Plies is from -- in

24  October 2016, right?

25  A.  **Correct.**

**664**

1  Q.  Like you are, I'm actually from the Philadelphia,

2  right.

3  And you did some tests that you have described.  And

4  as part of those tests you downloaded the EDID on to

5  your -- onto a machine that allowed you to then print out

6  the EDID block data that was in the TVs, right?

7  A.  **Yes.**

8  Q.  And you created a number of these Monitor Asset

9  Manager reports, one for each printout, right?

10  A.  **Yes.**

11  MR. BLACK:  Your Honor, I would like to publish

12  LG-297 which has been pre-admitted.

13  THE COURT:  It's admitted in evidence, and you may

14  publish it.

15  (Exhibit Number LG-297 is received in evidence.)

16  BY MR. BLACK:

17  Q.  So this is the -- so the first page of the Monitor

18  Asset report is 297.

19  Do you see that?

20  A.  **Yes.**

21  Q.  And Mr. Lamm also reviewed the information from the

22  EDID blocks printed out in a very similar report, right?

23  A.  **Yes.**

24  Q.  And he just looked down the columns here and said,

25  Well, I'm looking for type information, and I see it says

**665**

1  "display type" right here, RGB color.  Correct?

2  That's what he says is the display type, is the type

3  information in this case, right?

4  A.  **That's how that program prints out that information**

5  **from those two bits.**

6  Q.  And that's an independent program.  It wasn't written

7  by you.  It was something you purchased, right?

8  A.  **I think I actually even downloaded it for free.**

9  Q.  Downloaded it for free off the internet.

10  You came to Dechert's Austin office and you printed

11  out this report, correct?

12  A.  **I printed it out and I spent a fair of amount looking**

13  **at the raw data just to make sure it printed out something**

14  **reasonable.**

15  Q.  You printed it out and you saw that it said "display

16  type RGB color," right?

17  A.  **Yes.**

18  Q.  But to you, that's not enough to establish

19  infringement, correct?

20  A.  **Definitely not.**

21  Q.  You say -- did you see the first line here where it

22  says, "Model name, LG TV"?

23  A.  **I see that.**

24  Q.  And the second line where it says "Manufacturer,

25  LGE"?

**666**

1  A.  I see that.

2  Q.  And the third line where it says "GSM 0001"?

3  You have to say "yes" or "no."

4  A.  **Yes, I see that.**

5  Q.  By the way, do you know what GSM stands for?

6  A.  **It seems to be -- I looked it up at one point because**

7  **I was curious, and it seems to be a code that was**

8  **originally given to Goldstar, which is LG's predecessor.**

9  Q.  Very good.

10  Microsoft gave codes to every company that makes

11  displays so that they can work with the Plug-N-Play

12  standards, right?

13  A.  **Correct.**

14  Q.  And they call that the Plug-N-Play ID, right?

15  A.  **I don't remember the name of it, but you might be**

16  **right.**

17  Q.  It says here Plug-N-Play ID.

18  A.  **I mean, I know that's what the program says. That's**

19  **why I suspect you might be right, but I don't recall what**

20  **Microsoft called it.**

21  Q.  And Goldstar became Lucky Goldstar, which became LG,

22  which became the LG Life's Been Good logo, it's all one --

23  A.  **I mean, I know that's the urban story. I don't**

24  **really know all the details.**

25  Q.  We'll ask Mr. Alessi more about that. He is a better

**667**

1  witness for that point.

2  And you had this report and you produced these

3  reports to us during, your lawyers did, during discovery,

4  right?

5  A.  **I presume so, yeah.**

6  Q.  And you had told me before that a serial number would

7  be a type ID, right?

8  A.  **It could be.**

9  Q.  Right. And this one has a serial number, sir,

10  doesn't it?

11  A.  **Well, there's the field there. It just -- the field**

12  **is not filled with useful information.**

13  Q.  This unit has a serial number. Could you read that

14  number off for us?

15  A.  **I mean, I know the number that's written there, if**

16  **that's what you're asking. It's --**

17  Q.  Can you read it for us?

18  A.  **Maybe. 97240.**

19  Q.  That's a serial number.

20  A.  **And --**

21  Q.  Yes?

22  A.  **No, it's not.**

23  Q.  Not a serial number. Okay.

24  Manufacturing date says 2009, ISO week three.

25  Do you see that?

**668**

1  A.  **Yes.**

2  Q.  And that is part of the standard. You're supposed to

3  put the manufacturing year and week of the year, right?

4  A.  **Those are two fields in the EDID data.**

5  Q.  Right. And the week would be from week 1 to 52,

6  right?

7  A.  **I believe that's correct.**

8  Q.  Maybe 53 in some years.

9  But the third week of January would be after

10  January 9th, 2009; wouldn't it?

11  A.  **Correct.**

12  Q.  So this is an LG TV that was manufactured somewhere

13  after the patent issued, right?

14  A.  **Looks like that, right.**

15  Q.  And it has a serial number in it, right?

16  A.  **It does not have the serial number in it.**

17  Q.  It has a number that's in the serial number block

18  that says 97240. Right?

19  A.  **There's information in that field. It's just not the**

20  **serial number. It's not useful information.**

21  Q.  And the model name is "LG TV," right?

22  A.  **That's the way it's listed there, yes.**

23  Q.  And the Plug-N-Play ID is GSM 0001, right?

24  A.  **I see that.**

25  Q.  And the display type, the type is RGB color, right?

**669**

1  A.  **There's a field labeled that way.**

2  Q.  Now, you did not give an opinion in your report that

3  display units were limited to CRTs, correct?

4  A.  **I don't believe so, no.**

5  Q.  And, therefore, you are not giving an opinion to this

6  jury that this patent is limited to CRTs because you can

7  only opine what's in your report, right?

8  A.  **I have not offered that opinion.**

9  Q.  There was a lot of discussion about the train and all

10  the bits on the train. Something like 728 bits, correct?

11  A.  **Well, altogether the train is 1,024. One of the**

12  **sections identified, I think, had 700 and --**

13  Q.  1,024.

14  You are not suggesting that the ID number to satisfy

15  the elements of this claim has to be an extended number, do

16  you?

17  A.  **I am not sure what you're referring to.**

18  Q.  It's true that the patent describes an ID number of

19  1, 2 or 3, right?

20  A.  **You'd have to refer me to the patent.**

21  Q.  You put Figure 5 before, right?

22  A.  **Yeah. If you are referring to that, yes, I remember**

23  **that.**

24  Q.  So at least in the context of the patent, which is

25  what we are here to discuss, the ID number could be 1, 2,

**674**

1  do it.
2  BY MR. BLACK:
3     Q.  One of your reports in this case, you gave an opinion
4  on the communication controller.
5      Do you recall that?
6     **A.  Yes.**
7     Q.  And at Paragraph 460 you wrote:  Indeed, Figure 1 of
8  the I2C EEPROM specification, which I have reproduced
9  below, shows a bidirectional input filter and I2C bus
10  control, which corresponded to a communication controller
11  that controls bidirectional communications from the EEPROM
12  memory drive and any other device connected directly or
13  indirectly to the I2C bus.
14      Do you see that?
15     **A.  I see that paragraph.  I am trying to understand the**
16  **context right now.**
17     Q.  Well, that's your -- it's from your report, right?
18      It's in your report, right?
19     **A.  I believe so, yes.**
20     Q.  And so when you prepared your report in this case,
21  you said that the I2C bus control corresponds to a
22  communication controller, right?
23     **A.  Well, under Mr. Lamm's interpretation of what was an**
24  **I2C controller.**
25     Q.  There's no qualification in this paragraph, is there?

**675**

1      You said:  I2C bus controller corresponds to
2  communication controller.  Right?
3     **A.  Under Mr. Lamm's definition.  It's very clear, if you**
4  **read the rest of the report, that that is the context in**
5  **which I make that paragraph, that statement.**
6     Q.  And if you look at the next page, you have a diagram
7  of the I2C bus controller, which is in every EEPROM at
8  issue in this case, right?
9     **A.  No, that controller is not in every EEPROM in this**
10  **case.**
11     Q.  Page 460 says:  I2C EEPROM Figure 1.
12      And then I am just going over to the next page and
13  there is a diagram of the EEPROM, right?
14     **A.  Yeah, I am talking about a particular piece of prior**
15  **art and what it discloses here, not about the TVs.**
16     Q.  But this -- this diagram is from the I2C standard,
17  isn't it?
18     **A.  Yes.**
19     Q.  Right.  And --
20     **I'm not talking about a particular device.**
21     Q.  Well, let's try some nomenclature and get it clear.
22      I2C is a standard, correct?
23     **A.  Yes.**
24     Q.  And I2C is the standard that VESA decided to adopt
25  for communication protocol flow on the DDC channel, right?

**676**

1     **A.  You can think of it that way, yes.**
2     Q.  If you're compliant with DDC, you need to use the I2C
3  standard, right?
4     **A.  You are using the I2C bus protocol, correct.**
5     Q.  And the I2C standard defines what has to be -- what
6  commands have to be received and sent on the I2C, right?
7     **A.  Yes.  Like a lot of standards about the interface,**
8  **how you communicate back and forth.**
9     Q.  And the block diagram you printed on Page 153 is a
10  sample of the electronics inside an EEPROM implementing the
11  I2C standard, right?
12     **A.  It's an example they have in the standard.**
13     Q.  Right.
14      And this is the sort of thing you would find in the
15  EDID chips at issue in this case, right?
16     **A.  Not necessarily, no.**
17     Q.  But probably, right?
18     **A.  No.**
19     Q.  Well, this is from the standard, which you say VESA
20  adopted, and if you look at the far left, what you see is
21  two letters:  SCL and SDA.  Right?
22     **A.  Yes.**
23     Q.  And those are the DDC lines, right?
24     **A.  Well, they are the I2C lines which the DDC builds on**
25  **top of.**

**677**

1     Q.  DDC stole them, they built on it, they said use I2C.
2  And if you look in the VESA standards, you will see those
3  pins defined as SCL and SDA, right?
4     **A.  Yes.**
5     Q.  And SCL is for -- the "CL" is for "clock" that
6  governs how the communication takes place, right?
7     **A.  Yes.  And the "S" stands for "serial," but, yeah.**
8     Q.  And SDA is serial data, right?
9     **A.  Correct.**
10     Q.  So the data that comes in and out of the chip comes
11  in over here on this SDA line, goes through the input
12  filter, and then it hits the I2C bus control, right?
13     **A.  In this particular example, that looks correct.**
14     Q.  And this is the example that you decided to put in
15  your report, right?
16     **A.  Yes, based on Mr. Lamm's use of that term.**
17     Q.  And then there are a bunch of connections here that
18  eventually go one way or the other, we won't go through it
19  all, to the memory cell array, where the data is actually
20  stored, right?
21     **A.  The data is stored in the memory cell already,**
22  **correct.**
23     Q.  And Mr. Lamm's view is that that I2C bus control is a
24  controller, right?
25     **A.  He never identified that, that I recall.**

**678**

1    Q.    Your view is that's what?  What do you call that?

2    You call it the master -- forget it, forget it.

3    A.    Well --

4    Q.    Forget it.  I withdraw it.  I withdraw it.

5    Your view is there is nothing in this figure which

6    would satisfy the control element in the claim even though

7    you're report describes that as a communication controller,

8    right?

9    A.    Under Mr. Lamm's definition it meets the same

10   definition he had.  But I don't see how this is relevant to

11   LG TVs.  LG TVs don't implement this this way.

12   Q.    Could you read 462 into the record for us?

13   A.    Thus, in my opinion, a POSITA, that stands for person

14   of ordinary skill in the art, would have understood that an

15   I2C EEPROM discloses an EEPROM memory that implements the

16   I2C communications protocol and allows the EEPROM to

17   bidirectionally communicate with any other devices that are

18   connected to the I2C bus.

19   Q.    And then, finally, please read 463.

20   A.    Accordingly, in my opinion, a POSITA would have

21   understood the I2C bus -- I2C bus -- excuse me, I2C EEPROM

22   individually or collectively disclose the use of a

23   communication controller capable of bidirectionally

24   communicating with a video source.

25   Q.    Thank you.

**679**

1    MR. BLACK:  Your Honor, if I may have a moment to

2    confer with my team here.

3    THE COURT:  Sure.

4    (Discussion held off the record.)

5    MR. BLACK:  Pass the witness.

6    THE COURT:  Mr. McKeon?

7    REDIRECT EXAMINATION

8    BY MR. SCHWENTKER:

9    Q.    Dr. Stevenson, picking up where counsel for

10   plaintiffs just left off, there was some discussion of your

11   invalidity expert report and the analysis that you provided

12   in that report.

13   Can you explain more about how you went about

14   providing that expert report on invalidity and prior art?

15   A.    Yeah.

16   So at this time I had -- when I wrote this report, I

17   had Mondis's infringement contention.  So I knew what they

18   were pointing to as meeting the claim elements.

19   And as I explained in this report, what I attempted

20   to do was say, Well, if they are correct in how this claim

21   should be applied, then things like this EEPROM would also

22   meet the communication controller, or other device.

23   So I was applying Mr. Lamm's and Mondis's, you know,

24   interpretation based on their infringement contentions when

25   writing this report.

**680**

1    Q.    And is there someplace in your report where you laid

2    out this approach?

3    A.    Yes.  It's Paragraph 135.

4    MR. SCHWENTKER:  Can I get the Elmo, please?  Thank

5    you.

6    BY MR. SCHWENTKER:

7    Q.    And, Dr. Stevenson, you referred to Paragraph 135.

8    So can you explain what it says here?

9    A.    Well, you can read the whole thing.  I think it's

10   pretty clear, but I highlighted a part here.

11   I had analyzed Mondis's infringement contentions to

12   determine how Mondis is interpreting and/or applying the

13   asserted claims.  Mondis is interpreting and/or applying

14   these certain claims for purposes of alleging infringement

15   in an overly broad manner.

16   So I am basically putting out there that I

17   disagreeing with how they are interpreting the claim.

18   At then at the end I write:  In some instances, where

19   appropriate, I have additionally collected my invalidity

20   analysis based on the broad manner in which Mondis is

21   interpreting and/or applying the asserted claims in its

22   infringement contention, or other documents.

23   Q.    Thank you, Dr. Stevenson.

24   And so is that what you were doing with respect to

25   the I2C reference in your invalidity report?

**681**

1    A.    Yes.  I believe that they are incorrect about the

2    interpretation, but for the purposes of that report and

3    what Mr. Black pointed me to, I was using what I believe is

4    the incorrect application that they did in the same way.

5    So they accused an I2C slated device, so I said, Here

6    is an I2C slated device in the prior art.

7    Q.    Now, when the I2C protocol is used is there always a

8    communication controller?

9    A.    There is always at least one.  It's in the master.

10   Q.    Is there one in the slave?

11   A.    No.

12   Q.    Now, there was some discussion of your prior work as

13   an expert and perhaps a suggestion that you're greedy.

14   Are you greedy, Dr. Stevenson?

15   A.    No.

16   Q.    What do you do with the money that you earn from

17   working as an expert?

18   A.    Well, all sorts of things, you know.  First off, or

19   course, I take care of my family.  But, you know, this pays

20   well enough that I have some spare money.  I give some

21   money to -- for high school scholarships, and I also give

22   money to support graduate students at Notre Dame to work on

23   some of the more interesting research projects I have.

24   Q.    Now, there is also some discussion with counsel for

25   plaintiffs about the ID serial number, and I want to be

**682**

1   clear.

2          Is it your opinion that an ID serial number would be

3   an identification number for identifying a type of display

4   unit?

5   **A.   Certainly no one has made that allegation. It**

6   **potentially could be if you could map the -- some serial**

7   **numbers are written so you can figure out the model number**

8   **from it. I really think it's all about the model number.**

9          **So depending on the serial number, some serial**

10  **numbers allow you to map back to the model number. So in**

11  **some cases, it may.**

12  Q.   Mr. Lamm has not offered that opinion?

13  **A.   No, they haven't pointed to his ID serial number as**

14  **anything in this case.**

15  Q.   And you mentioned that there was a serial number that

16  counsel for plaintiffs -- strike that.

17         There was a report that counsel for plaintiffs showed

18  you, and you said that it did not contain useful

19  information.

20         Can you explain that?

21  **A.   Well, I mean, I know the report showed up and it said**

22  **serial number and it gave a number. But you could actually**

23  **look at the TV and see it's not the serial number of the**

24  **TV.**

25         **So whatever that number represented, you know, it**

**683**

1   **wasn't particularly useful.**

2   Q.   All right. Now, there was some discussion of -- I

3   believe it was a report that showed what -- or what it says

4   is:  ID serial number 97240.

5          THE COURT:  First, let's identify what the exhibit

6   number is.

7          Remember, if I don't have a record of it, it's a tree

8   which fell in the forest which nobody heard.

9          MR. SCHWENTKER:  This is Exhibit MON-0262.

10         THE COURT:  Good.

11         MR. SCHWENTKER:  We are looking at Page 51.

12

13  BY MR. SCHWENTKER:

14  Q.   And if we go to Page 49, do you see here,

15  Dr. Stevenson, the serial number listed?

16  **A.   Yes.**

17  Q.   And could you read what that serial number is?

18  **A.   It's 903MXAY2V240.**

19  Q.   And is it possible to represent that in the ID serial

20  number field of the EDID standard?

21  **A.   No, it's not possible.**

22  Q.   Why not?

23  **A.   It's too much information. We have 32 bits in that**

24  **field, and I can tell by looking at that, there's too**

25  **much -- that number, you might say, is too big.**

**684**

1   Q.   And is that -- is that the same or different from

2   what shows up here?

3   **A.   It's different.**

4          THE COURT:  What exhibit number are you now referring

5   to?

6          MR. SCHWENTKER:  Sorry.

7          Same exhibit, Your Honor, Page 51.

8          THE COURT:  Okay.

9          THE WITNESS:  It's different.

10  BY MR. SCHWENTKER:

11  Q.   Okay. So that is -- so, okay. Strike that.

12         Now, I want to go to Page 45 of the same exhibit.

13  And do you see here beside serial number it says "NA"?

14  **A.   Yes.**

15  Q.   And what does that tell you?

16  **A.   That's telling you it's not applicable.**

17  Q.   So is there a serial number actually filled in the

18  EDID information?

19  **A.   No, it's not.**

20  Q.   And what did the majority of reports that you looked

21  at contain in that field?

22  **A.   It's kind of there's no information. Nothing useful.**

23         MR. SCHWENTKER:  No further questions, Your Honor.

24         THE COURT:  Thank you.

25         Mr. Black.

**685**

1          MR. BLACK:  Yes, just a couple.

2                 RECROSS-EXAMINATION

3   BY MR. BLACK:

4   Q.   You mentioned infringement contentions. I want to

5   explain what that is to the jury.

6          So early in a case, after a patent case is filed,

7   infringement contentions are served by the plaintiff,

8   correct --

9   **A.   Correct.**

10  Q.   -- in most courts.

11         And then invalidity contentions are served by the

12  defendant, right?

13  **A.   Correct.**

14  Q.   And then people go off and they take discovery, they

15  collect billions of documents in a case like this. They do

16  testing, and they retain experts like you, correct?

17  **A.   That's part of the process, certainly, yes.**

18  Q.   And then we have a big day where we go to court and

19  we have what's called a *Markman* hearing, right?

20  **A.   In sometimes, but I think that happened here as well.**

21  Q.   After a famous case, *Markman vs. Westview*, right?

22  Have you heard that name?

23  **A.   Yeah, yeah. I've participated in those at times.**

24  Q.   It's also known as a claim construction hearing,

25  right?

**686**

1  A.  I've heard it referred to that way also.

2  Q.  And that's because construing the terms of a patent

3  is like -- it's often described to defining the meets and

4  bounds of a deed, and we need to know what the meets and

5  bounds are before we can test the claim, right?

6  A.  That's kind of the idea, right.

7  Q.  And so we all get -- all the lawyers go to court and

8  we have an argument over what the language means, and the

9  judge in the case settles that for everybody, right?

10  A.  That's the idea, correct.

11  Q.  And the judge issues a claim construction order,

12  right?

13  A.  Yes.

14  Q.  And that defines the terms, right?

15  A.  Correct.

16  Q.  And then the experts have to use those definitions in

17  conducting the rest of the case?

18  A.  Correct.

19  Q.  And then it's gets interesting because the experts

20  get involved, they look at the claim construction order,

21  they look at all the millions of documents that have been

22  collected, and they draft reports, right?

23  A.  I mean, as an expert, I certainly have participated

24  in a *Markman* process so --

25  Q.  Right.

**687**

1  A.  -- not necessarily the way you laid it out.

2  Q.  Some courts have the experts that come in at *Markman*.

3  Most find them less than helpful.

4  But the point is that you don't really get to the

5  meat of the case until you've got the claim construction.

6  You can't do expert reports until then, right?

7  A.  I am not sure what you mean by the "meat of the

8  case," but certainly there are different stages of the

9  case.

10  Q.  And the stage which everybody really puts their cards

11  on the table as to what they are going to do when they go

12  to trial is when they produce the expert reports, right?

13  A.  I don't know if I'd characterize it that way.  It's

14  certainly one part of the process.

15  Q.  And then what happens is the experts go to

16  depositions so that they can be used at trials like this

17  and for other purposes, right?

18  A.  That is certainly part of the process.

19  MR. SCHWENTKER:  Objection, Your Honor.  This is

20  outside the scope.

21  THE COURT:  Overruled.

22  BY MR. BLACK:

23  Q.  And then we have a trial, right?

24  A.  That's --

25  Q.  Sometimes.

**688**

1  A.  -- for me the last stage.  Yes.

2  Q.  And that's when the -- that's when everybody puts all

3  the issues out on the table that they want the jury to

4  hear, and, as in this case, that's a narrow subset of the

5  opinions that are given in the reports, right?

6  A.  That's typically what I've seen.

7  Q.  Now, if an expert had given a report in a prior case

8  that was inconsistent with a position in this case, you

9  would expect that the lawyers for LG would have pointed

10  that out, right?

11  A.  I have no idea.  That's up to them.

12  Q.  Let's talk about serial numbers.

13  You mentioned that the information, the serial number

14  that was up on the screen, it was nine something-something,

15  it was five digits, I think, it was not useful, right?

16  A.  Correct.

17  Q.  Here is another serial number.  This is from

18  Mondis 262, Page 77.

19  MR. BLACK:  This is pre-admitted.  May I publish,

20  Your Honor?

21  THE COURT:  You may.  That's admitted into evidence.

22  (Exhibit Number MON-262 is received in evidence.)

23  BY MR. BLACK:

24  Q.  This is another one.  This one was manufactured in

25  the first week of 2012, correct?

**689**

1  THE COURT:  Yes, but get to your mic.

2  MR. BLACK:  My apologies.

3  BY MR. BLACK:

4  Q.  This is Page 77, and this is an EDID printout.

5  This is the software that Mr. Lamm was using, right?

6  A.  This looks like one of his reports, yes.

7  Q.  And it pulls the same information out.  It's just

8  formatted a little differently, right?

9  A.  Correct.

10  Q.  We can still see that LG TV up there on the right,

11  though, right?

12  There it is.  Right?

13  A.  I see that.

14  Q.  Okay.  And the serial number here is 16843009, right?

15  A.  Well, that's the binary rep -- excuse me.  That's

16  the decimal representation.  I think the next number is

17  really the serial number.

18  Q.  Oh, the 01010101H is the serial number?

19  A.  That's the binary.  That's -- I have an easier time

20  reading that.  That may surprise you, but that's more

21  representative of what's actually there.

22  Q.  Well, I hate to ask an expert a question that I don't

23  know the answer to myself, sir, but my curiosity is piqued.

24  How can 01010101 be equal to 16843009 in decimal?

25  A.  It's the difference between -- that's a hexadecimal

**720**

1  Q.   And a television that displayed monochrome, could you
2  give an example of what that would look like?
3  A.   Well, I'm old enough to remember having a black-and-
4  white TV, but that would have been a long time ago.
5  Q.   Has LG sold black-and-white televisions at any time
6  since you joined the company 15 years ago?
7  A.   No, not since I've joined the company, no.
8  Q.   Let's circle back to HDMI ports for a minute.  Were
9  they an important feature to TV consumers in the
10  2009-to-2014 time frame?
11  A.   Yes.  Having the ability to have an easy and
12  convenient connection for source devices like Blu-ray or a
13  game console, even a, you know, satellite set-top box
14  certainly is desirable.
15  Q.   And were they common on televisions at that time?
16  A.   By then, yes, they were pretty common.
17  Q.   And why did they become so common?
18  A.   Well, the main benefit for consumers was convenience.
19  Before HDMI became available, it would take up to five
20  different connections to get a high-definition source for a
21  component.  High-definition source, you'd have three
22  different plugs for red, green and blue.  Then you'd have
23  two more plugs for the left and right audio signal, and it
24  was an analog signal as well.
25        What HDMI did was put them all into one connection,

**721**

1  so, it's just one cable to deal with instead of, like I
2  said, up to five, and it provides a digital signal as well,
3  so, it's very convenient.
4  Q.   When again did LG first start selling televisions
5  with an HDMI port?
6  A.   When I joined in 2004, we were just getting ready to
7  introduce the '05 lineup and HDMI was included in those.
8  Q.   We've been talking a lot about LG television
9  products.  In your work at LG, do you also do any product
10  marketing for LG monitor products?
11  A.   Yes, I help support the monitor division well.
12  Q.   Do the same folks at LG that make LG televisions make
13  the monitors?
14  A.   No.  The monitor products, the computer monitor
15  products come out of a separate business unit in Korea.
16  Q.   Well, are there any differences in the way in which
17  you market televisions relative to monitors in the United
18  States?
19  A.   Yeah, quite a few.  A lot of it is driven by the
20  consumer who's shopping for each of those products.
21        I mentioned earlier that TVs, we're trying to provide
22  an immersive cinematic experience.
23        With monitors, there's different uses, different
24  specific uses for monitors.  There's professional or
25  prosumer type uses; people like their monitors, use them a

**722**

1  lot for video or photo editing, so they have a certain set
2  of features they'd be looking for.
3        Gamers look for different types of refresh rates or
4  higher resolution because they're going to be in front of
5  the monitor playing games all day; different connectivity
6  for the motion especially.  And there's general use
7  monitors as well.
8        But the other part of it is also how they're marketed
9  at retail, you know, if we into a Best Buy store, the
10  monitors have their own section normally by the computer
11  products because that's how they're primarily intended for
12  use, and TVs are separate in their own area as well.
13        Even the merchant teams we deal with, the buyer at
14  Best Buy who buys TVs, doesn't handle monitors and vice
15  versa, and even when I deal with product reviewers, I
16  talked about Cnet earlier, the individual who reviews TVs
17  only reviews TVs.  There's a separate guy for monitor
18  reviews, so, there's a lot of differences in the way we go
19  to market with them.
20  Q.   And were you here in court last Tuesday and Wednesday
21  to hear Mr. Spiro's testimony?
22  A.   Yes, I was here.
23  Q.   Did you hear him say that TVs and monitors have
24  merged, such that they are almost the same product?
25  A.   I heard that, yes.

**723**

1  Q.   Is that true, in your opinion?
2  A.   No.  In my experience, they are still treated as two
3  separate products for all the reasons I just listed.  Not
4  only the way that they're brought to market by retail, but
5  also how they're used by consumers.
6        There's obviously some ability to cross over a bit
7  but in my mind they're definitely two separate products.
8  Q.   Well, if I recall from one of your deposition video
9  clips last week, I think I heard you say that an LG TV can
10  be connected to a personal computer via the HDMI port.
11        Did I get that right?
12  A.   Yes, it's possible to do that.
13  Q.   If someone did that, could the TV be used as a
14  computer monitor?
15  A.   Yes.  In that instance, it would be displaying the
16  information from the computer onto the TV, so, in that
17  case, yes, it could be.
18  Q.   Does that mean that LG TVs are the same as LG
19  monitors?
20  A.   No.  As I mentioned before, there's distinct
21  differences.  It's all about the context of how they're
22  developed, for the specific purpose for which they're
23  developed.  There's physical differences, as well as
24  usually technological differences as well.
25  Q.   Now, as part of your work in marketing at LG, are you

Appx15185

744

1    (In open court:)

2    THE COURT:  All right.  Ladies and gentlemen, the

3    defense has rested their case.  Plaintiffs have indicated

4    that they have no rebuttal case to present, so, on this

5    liability phase of the case, we have concluded the

6    evidence.

7    Now, the attorneys and I have some legal matters

8    which we are going to have to deal with for the remainder

9    of the day.  That will include, among other things,

10    finalizing and discussing the instructions which will be

11    given to you for you to follow in deliberating on this

12    liability phase of the case.

13    So, we're going to adjourn for the day.  We're going

14    to resume tomorrow at 9:45.  At that time you should expect

15    that we'll be proceeding with closing arguments by counsel

16    on this liability phase, followed by my giving you legal

17    instructions, followed by your beginning deliberations on

18    this aspect of the case.

19    Until then, don't talk about the case.  Don't let

20    anybody talk to you about the case.  Don't Google what bits

21    and bytes are or anything else pertaining to this case.

22    Keep an open mind.

23    We'll see you tomorrow at 9:45.  Thank you.

24    (The jury is excused.)

25    THE COURT: Okay.  You can be seated.  Now, what

745

1    about this issue concerning what can be argued to the jury

2    relating to infringement?

3    MR. BLACK:  Sure.  So, Your Honor, we're not trying

4    to change the theory of the case here.  We do have an

5    unusual situation, though, in that they -- I'm not trying

6    to change the case.  I'm not moving to change the pretrial

7    order.

8    I just want to make sure that I can argue that to the

9    extent he made statements, that I can rebut them with the

10    statements that he made, and in response, and that's proper

11    argument.

12    I think it would be proper argument as well, but I'm

13    happy not to make it, that under Dr. Stevenson's theory,

14    there would be infringement.  I don't need to make that

15    argument because I'm biting off more than I can chew here.

16    But if the jury, based on the evidence in the case, thinks

17    that there's infringement under some other theory, I can't

18    help that and I can't -- because of the way they developed

19    the case.

20    They put on this case that you should look in this

21    part of the data field and not in the other part and it was

22    an irrelevant argument because the point was display type

23    data, and I got to be able to rebut the statements that he

24    made, which I think I can do without introducing a new

25    theory.

746

1    THE COURT:  Tell me how you're going to do that.

2    MR. BLACK:  So, first of all, I would say they put up

3    a slide and made argument that -- first of all, they talked

4    about the train.  They said that the display type is in the

5    characteristic data field area of the -- they said -- how

6    can I say this.

7    I believe what their argument will be is that the

8    train has two parts, a front where the ID information is

9    and a back where the characteristic information is.  And if

10    there was really ID information in there, it would have to

11    be up front.

12    What does that has to do with whether a display type

13    is actually -- meets display type, I don't know, but

14    they're trying to run this argument to confuse the jury.

15    We're certainly entitled to say that if there is

16    information in the front, that Dr. Stevenson's opinion on

17    that is incorrect, and we're certainly entitled to say that

18    if there is identification information in the back of the

19    bus, identification information, I don't have to say type,

20    identification information in the back of the bus, that

21    that undercuts his opinion.  And there is.  There's that LG

22    TV.  It's identification information.  It's not -- we don't

23    have to say it's type, but it undercuts his opinion that

24    anything which is ID information has to be up front.

25    The second thing that we would argue is that he has

747

1    been inconsistent in his view of what type is; that he said

2    at the various points in the trial that a serial number, a

3    product number are or could be types that, on the other

4    hand, display type is not, and that a TV is not a different

5    type from a monitor or a projector, which he said on cross,

6    but which is inconsistent with what they've tried to put on

7    at the trial.

8    I can say all of this they say directly rebuts

9    statements that were made by counsel or by the witness

10    without telling the jury find infringement because of this,

11    but I can't help it if he said there's no infringement

12    because there's no serial number in the ID number block,

13    and it turns out some of the units he tested, he didn't

14    read the report and it says serial number.  I've got to be

15    able to argue that.

16    THE COURT:  He also then testifies that there weren't

17    serial numbers, if I recall correctly.

18    MR. BLACK:  He's been inconsistent.  But if you look

19    at the report that he printed, it says serial number and

20    it's got a number in it.  And he says it doesn't count

21    because it doesn't have a use.  First of all, that's just

22    argument.  He has no basis for it.  He didn't talk to

23    anybody at LG.

24    But second of all, they put themselves in this

25    position.  They should have stuck to display type and they

Appx15191

814

1  though, is that you're saying that the communication
2  controller of the claim, you're saying that's in this memory.
3  Isn't that right?
4      "ANSWER: Yes."
5      So he's not saying it's separate, something separate.
6  He's saying it's in the memory.
7      Every embodiment of this patent has a separate
8  communication controller. The claim, when you see it --
9  you've seen it before when we presented it to you -- it's got
10  a memory and it's got a communication controller.
11      He pointed to the memory here. In fact, the matter
12  is, ladies and gentlemen, the fact of the matter is, he
13  can't -- he can't find a communication controller in our
14  products because there is none.
15      We produced in this case, ladies and gentlemen,
16  thousands, thousands of pages of technical documents, 180,000.
17  I asked for a count last night, and they told me 185,000 pages
18  of documents we produced.
19      They deposed witnesses in Korea, our technical
20  witness, including Mr. Lee. Remember Mr. Lee?
21      Mr. Lee, you saw the video last week. He was the
22  Korean gentlemen, one of the key engineers in the TV project.
23  Key engineer. He testified on the screen detail about the
24  televisions. Thousands of pages of documents. Thousands of
25  pages of documents.

815

1      Physical televisions. They've got physical
2  televisions, including the circuit board you see here. Right?
3  And they can't point you to a communication controller. All
4  they can do is draw a box on a slide and write in
5  "communication controller."
6      That's their case, ladies and gentlemen. Where is
7  it? There is none. This is why you see -- this is the
8  evidence that they present. This is why you see that.
9      But let's go on with this, ladies and gentlemen.
10  Let's go on with this.
11      Mr. Lamm testified about this document, which you see
12  on the screen here. This document is a -- it's a data sheet.
13  It's a data sheet from a company called Microchip Technology.
14  Right? And it's a data sheet.
15      And the data sheet that I have in my hands, the
16  exhibit is Mon-511. I have it in my hand here, this document.
17      And this document is a data sheet. It's a data sheet
18  not for a controller, not for a communication controller.
19  It's a data sheet for a memory. For a memory.
20      This data sheet, ladies and gentlemen, it's not LG's
21  data sheet. It doesn't come from LG. This data sheet wasn't
22  produced in the case by LG. This data sheet, Mr. Lamm went on
23  the internet and got it. Right?
24      And this describes a memory. It doesn't describe a
25  communication controller. There's not a word in here about

816

1  controller or communication controller. Nothing. It's a
2  memory.
3      But, ladies and gentlemen, it gets more -- more
4  problematic than that. Why is that?
5      Because when I asked Mr. Lamm, I go: Mr. Lamm, you
6  don't even know whether this thing is in LG's televisions.
7      So we have a data sheet for a memory, and you see
8  here -- let me -- let's look at it.
9      "QUESTION: You don't know, sitting here on the stand
10  in front of this jury, whether LG Electronics has this chip,
11  this memory, inside of its television. Is that right? You
12  don't know.
13      "I don't know."
14      I don't know. Ladies and gentlemen, they have the
15  burden of proof on infringement. They can't point to a
16  communication controller? And then they come in with a data
17  sheet that's not even a data sheet for a communication
18  controller?
19      And they have no idea whether this is even used in
20  LG's products. Thousands of pages of documents. Hours and
21  hours of deposition of Mr. Lee and the technical people.
22      And this is what they got for you? A data sheet off
23  the internet? They have no idea whether it's used in the LG's
24  televisions?
25      Doesn't add up, ladies and gentlemen. It just

817

1  doesn't add up.
2      What else do we know? Let's continue this
3  discussion.
4      Now, I continued this discussion with Mr. Lamm on the
5  stand. Okay. Let's look at your data sheet. Let's look at
6  the data sheet. You don't know if this is in LG's
7  televisions. But let's look at the data sheet.
8      And we had this discussion, me and Mr. Lamm.
9      What we see here, ladies and gentlemen, is a block
10  diagram. And the whole thing, the whole box here, is the
11  memory. Because remember, this is for a memory. It's not for
12  a communication controller. We see here a block diagram for
13  the memory.
14      And Mr. Lamm highlights this I/O control logic.
15      Do you see that there? I/O. And we had this
16  discussion.
17      Well, Mr. Lamm, I asked him, What is I/O?
18      And he says, Input/Output.
19      Okay. So now in this case, ladies and gentlemen,
20  they're pointing to a memory, not a communication controller.
21  They're pointing to a document that they got off the internet
22  not relevant in this case. No evidence that this is in LG's
23  televisions. And they point to something called an I/O,
24  input/output.
25      So the question is, well, is that a communication

Appx15210

878

1    Dr. Stevenson, however, was a bit all over the place.
2    He did not read the file history. When I told him
3 that there was an interview summary that shed light on how
4 type got into the patent, he said he vaguely -- he said
5 something like he vaguely remembered there was one, but he
6 didn't remember the contents of it.
7    And what we know from hearing and seeing the patent
8 video and from even his own testimony is that when you want to
9 resolve an issue with the Patent Office, you can go down to
10 Washington and request a special meeting.
11    And they'll reserve a room for you, and you can go
12 into the room and talk one-on-one across the table with the
13 federal representatives of the Federal Government and you can
14 reach an agreement with them.
15    And there was such a meeting. It was on April -- I
16 don't recall the date exactly. It was -- there was a meeting,
17 and there were four people at the meeting, two patent
18 examiners and two people from Hitachi, one from Hitachi Japan,
19 and a lawyer. And they reached an agreement that type could
20 be added to the claim.
21    Now, this whole area of 112, Written Description, is
22 a complicated area of patent law. The Patent Office examiners
23 are experts in that. They know when they read a specification
24 what kind of claims you can write based on it.
25    This is done with open eyes. It's not the sort of

879

1 thing described in the patent video. You will not recall it
2 because it went by so quickly, but the patent video said
3 sometimes the Patent Office doesn't have all the information
4 in front of it.
5    That happens frequently when there's prior art at
6 issue, if the Patent Office examines the patent and finds
7 50 pieces of prior art, but somebody finds something, a patent
8 in another country, for instance, that nobody knew about and
9 it didn't show up in the internet searches.
10    And then they say in court, well, the patent is
11 presumed valid, but here's this other piece of prior art the
12 Patent Office didn't know about, so you can't hold the patent
13 examiner to it.
14    That's not this case. They're saying that the Patent
15 Office didn't know how to apply the written description
16 requirement, the law, and didn't know how to read the
17 specification, and that they didn't know what they were doing
18 when they let the patentee add the words "type" to the patent.
19    They have to do that by clear and convincing
20 evidence, and Dr. Stevenson bailed it in in about five
21 minutes.
22    Excuse me. I need a sip of water.
23    Okay. So what Dr. Stevenson did say is that we asked
24 him to describe whether there's anything in the '180 patent
25 that had an identification number.

880

1    And he said: Well, I've heard some discussion of it
2 already, the serial number.
3    And then we asked him whether the serial number could
4 be the type ID of the patent, and he said it could be.
5    Now, I want to be very clear here. The only
6 assertion we're making about what the display type information
7 is is the -- that's our only basis for infringement. It's the
8 only claim of infringement we are making here.
9    We're raising this only to show that even
10 Dr. Stevenson thought there was something in the patent which
11 was an identification number.
12    It satisfies the written description requirement.
13    So that's all I have for you today.
14    You're going to hear in a few moments from the Court.
15 You're going to be charged on what the law is. And then
16 you're going to retire to deliberate in this case.
17    You'll have before you all the documents you need to
18 make a decision. You'll have the patent. You'll have the
19 test reports. You'll have whatever you need to take a
20 decision.
21    We truly respect the jury system. And on behalf of
22 my clients, we want to thank you for the time and attention
23 spent in this case. And at this point, we rest, and our fate
24 is in your hands. Thank you.
25    THE COURT: Thank you, Mr. Black.

881

1    Mr. Black, if you could do me a favor.
2    MR. BLACK: Yes.
3    THE COURT: Which is if you could move your chart --
4    MR. BLACK: Yes, Your Honor.
5    THE COURT: -- and the easel out to the side so that
6 the jury and I can look at each other.
7    Second, ladies and gentlemen, I'm going to confer
8 with counsel for just a moment at sidebar. So stretch, get
9 the kinks out. I don't think my instructions are going to be
10 too lengthy, so in a short period of time you will in fact be
11 beginning your deliberations.
12    (Continued on the next page.)

Appx15226

882

1    (Sidebar conference held on the record in the
2    presence of the Court and counsel, out of the hearing of the
3    jury.)
4        THE COURT:  I just wanted to know if there's anything
5    in my final version of the jury charge that you have a problem
6    with?
7        MR. PLIES:  Two things.
8        THE COURT:  Okay.  Let me get my copy, please.
9        Go ahead.
10       MR. PLIES:  Page 19.
11       THE COURT:  Page 19.
12       MR. PLIES:  So this is --
13       THE COURT:  Timothy, you come here also.
14       MR. PLIES:  All right.  So there was.
15       THE COURT:  19.
16       MR. PLIES:  So in the last paragraph, the first two
17   sentences were Mondis's proposal and the remainder of the
18   paragraph was LG's proposal.  And you did agree with LG's
19   proposal, so the first two sentences should probably be
20   removed so that there's not so much redundancy.
21       THE COURT:  Okay.  So whether or not LG knew it's
22   products infringed --
23       MR. PLIES:  No.
24       THE COURT:  I'm sorry?
25       MR. PLIES:  These two sentences here, Your Honor,

883

1    should probably come out.  Just in good faith, you had ruled
2    against our interpretation on that.
3        THE COURT:  Okay.  I do in fact charge that somewhere
4    else, also, I presume?
5        MR. PLIES:  Yes.  You said the alleged identification
6    number is not required to meet.
7        THE COURT:  Okay.  Good.  Thank you.  All right.  So
8    I take out that one and that.  Okay.  Good.
9        MR. PLIES:  All right.  And the only other issue is
10   on Page 9.  And this is with regards to that.  This is that
11   Connecticut State Court bifurcation instruction.
12       THE COURT:  Right.
13       MR. PLIES:  And, Your Honor, as you said, and the
14   jury is going to know, you know, what the implications are, I
15   don't think the Court reinforcing that they are going to go
16   home if --
17       THE COURT:  I thought about it.  And, quite frankly,
18   I concluded that it makes sense to in fact include it.  I have
19   told them before.  This is not going to prejudice anybody.
20       MR. PLIES:  All right.
21       THE COURT:  Despite your -- okay.
22       And does LG have anything?
23       MS. WALSH:  No.
24       MR. PLIES:  I will just note our objection, Your
25   Honor.

884

1        THE COURT:  It is noted.
2        Off the record.
3            (Discussion held off the record.)
4        (Sidebar discussion is concluded, proceedings
5    continued on next page.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

885

1            JURY CHARGE BY THE COURT
2        THE COURT:  All right, ladies and gentlemen.  We are
3    at that point where you now get the instructions on the law
4    concerning this case.
5        Now that you've heard all the evidence to be received
6    in this trial and each of the arguments of counsel, it becomes
7    my duty to give you the final instructions of the Court as to
8    the law applicable to this case and which will guide you in
9    your deliberations.
10       All the instructions of law given to you by the
11   Court, those given to you at the beginning of the trial, those
12   given to you during the trial, and these final instructions,
13   must guide and govern your deliberations.
14       It is your duty as jurors to follow the law as stated
15   in all the instructions of the Court and to apply these rules
16   to the facts as you find them from the evidence received
17   during the trial.
18       Counsel have quite properly referred to some of the
19   applicable rules of law in their closing arguments to you.
20       If, however, any difference appears to you between
21   the law as stated by counsel and that stated by the Court in
22   these instructions, you, of course, are to be governed by the
23   instructions given to you by the Court.
24       You are not to single out any one instruction alone
25   in stating the law but must consider the instructions as a

894

1  the car which is stopped near you.

2      Even though you didn't see the car stop, you may

3  properly conclude from the surrounding circumstances, the

4  squeal of the tires and the skid marks behind the stopped car,

5  that the car just skidded to a stop.

6      Circumstantial evidence is of no less value than

7  direct evidence.  There is -- no greater degree of certainty

8  is required as circumstantial as opposed to direct evidence.

9  The law makes no distinction between direct and circumstantial

10  evidence.

11      In considering evidence you have not limited to the

12  bald statements of witnesses or the bald appearance of a

13  particular exhibit.  On the contrary, you are permitted to

14  draw from the facts that you find to have been proved, such

15  reasonable inferences that seem justified to you in light of

16  your own experience and common sense.

17      In other words, you are to use your own good common

18  sense and determine what inferences, if any, are to be drawn

19  from such facts as you the jurors find to be proven.

20      What is an inference?  An inference is basically a

21  deduction or conclusion that reason and common sense lead you

22  to draw from the evidence.

23      Now, in a general sense, a civil trial such as this

24  has two issues:  Liability and damages.

25      You have heard only evidence that relates to

895

1  liability and you will decide that issue first.  I will be

2  instructing you on the law that applies to the issue of

3  liability at this time.

4      You must not let speculation as to plaintiff's claims

5  of damages enter into your deliberations on the issue of

6  liability.  If you find the plaintiffs have prevailed on the

7  liability claims, then we will proceed to trial on the issue

8  of damages.

9      If you find the plaintiffs have not prevailed on the

10  liability claims, then the case is over because the issue of

11  damages arises only if a defendant has been proven to be

12  liable.

13      Now this is a civil case.  Plaintiffs are the party

14  that brought this lawsuit.  LG is the party against whom the

15  lawsuit was filed.  Plaintiffs have the burden of proving

16  infringement by what's called a preponderance of the evidence.

17  That means plaintiffs will have to prove to you in light of

18  all the evidence that what they claim is more likely so than

19  not so.

20      To say it differently, if you were to put the

21  evidence favorable to the plaintiffs and the evidence

22  favorable to LG on opposite sides of the scales, plaintiffs

23  would have to make the evidence -- the scales tip somewhat on

24  their side.  If plaintiffs fail to meet this burden, the

25  verdict must be for LG.

896

1      If you find after considering all the evidence that

2  the claim or fact is more likely so than not so, then the

3  claim or fact has been proved by a preponderance of the

4  evidence.

5      In determining whether any fact has been proved by a

6  preponderance of evidence in the case you may, unless

7  otherwise instructed, consider the testimony of all witnesses

8  regardless of who may have called them and all exhibits

9  received in evidence regardless of who may have produced them.

10      Now you may have heard the term proof beyond a

11  reasonable doubt.  That's a stricter standard of proof and

12  applies only to criminal cases.  It does not apply in a civil

13  case such as this.  So put it out of your mind.

14      In this case you need to decide certain issues by a

15  standard called clear and convincing evidence.  Clear and

16  convincing evidence is evidence that produces in your mind a

17  firm belief or conviction that the allocations sought to be

18  proved by the evidence --

19      Wow, I really said some powerful words there, didn't

20  I?  Let the record reflect that some construction next door

21  just caused the entire building to shake.

22      Let's go back.

23      In this case you need to decide certain issues by a

24  standard called clear and convincing evidence.  Clear and

25  convincing evidence is evidence that produces in your mind a

897

1  firm belief or conviction that the allegations sought to be

2  proved by the evidence are true.  Clear and convincing

3  evidence involves a higher degree of persuasion than is

4  necessary to meet the preponderance of evidence standard.  But

5  it does not require proof beyond a reasonable doubt, the

6  standard that's applied in a criminal case.

7      In deciding what the facts are you may have to decide

8  what testimony you believe and what testimony you do not

9  believe.  You are the sole judges of the credibility of the

10  witnesses.

11      Credibility means whether or not a witness is worthy

12  of belief.  You may believe everything a witness says -- a

13  witness says or only part of it or none of it.

14      In deciding what to believe you may consider a number

15  of factors including the following:  The opportunity and

16  ability of the witness to see or hear or know the things the

17  witness testifies to, the quality of the witness's

18  understanding and memory, the witness's manner while

19  testifying, whether the witness has an interest in the outcome

20  of the case or any motive, bias or prejudice, whether the

21  witness is contradicted by anything the witness said or wrote

22  before trial or by other evidence, how reasonable the

23  witness's testimony is when considered in light of the other

24  evidence that you do believe, any other factors that bare on

25  believability.

898

1   The weight of the evidence to prove a fact does not
2   necessarily depend on the number of witnesses who testify.
3   What is more important is how believable the witnesses were
4   and how much weight you think the testimony deserves.

5   Now, a witness may be discredited or impeached by
6   contradictory evidence or by evidence that some other time --
7   at some other time the witness has said or done something or
8   failed to say or do something which is inconsistent with a
9   witness's present testimony.

10  If you believe any witness has been impeached, and
11  thus discredited, it is your exclusive province to give that
12  testimony of that witness such credibility, if any, as you may
13  think it deserves.

14  If a witness is shown to knowingly have testified
15  falsely concerning any material matter, you have a right to
16  distrust such witness's testimony and other particulars, and
17  you may reject all the testimony of that witness or give it
18  such credibility as you may think it deserves.

19  An act or omission is done knowingly if it is done
20  voluntarily or intentionally, and not because of mistake,
21  accident or an innocent reason.

22  If a person is shown to have knowingly testified
23  falsely considering any important material matter, you
24  obviously may distrust the testimony of such an individual
25  concerning other matters.  You may reject all the testimony of

899

1   that witness or give it such weight or credibility as you may
2   think it deserves.

3   Now the Rules of Evidence do not normally or
4   ordinarily permit a witness to testify as to opinions or
5   conclusions.  An exception to this rule exists as to those
6   whom we call "expert witnesses."

7   These are witnesses who by education or experience
8   have become expert in some art, science, profession, or
9   calling, and may state opinion as to relevant and material
10  matters in which they profess to be an expert.  And they may
11  also state the reasons for their opinion.

12  You should consider such expert opinion received in
13  evidence in this case and give it such weight as you think it
14  deserves.  If you decide the opinion of an expert is not based
15  upon sufficient education or experience, or if you should
16  conclude that the reasons given in support of the opinion are
17  not sound or that the opinion is outweighed by other evidence,
18  you may disregard the opinion entirely.

19  Your decision on the facts in this case should not be
20  determined by the number of witnesses testifying against a
21  party.  You should consider all the facts and circumstances in
22  evidence to determine which of the witnesses to believe.  The
23  testimony of a single witness which produces in your mind a
24  belief and a likelihood of truth is sufficient for the proof
25  of any fact.

900

1   It is your exclusive function to determine the
2   persuasive value or weight that you will attribute to the
3   testimony of all witnesses whom you have heard testify.  Each
4   of you is a judge in this case and collectively you are the
5   Seoul judges of the facts.

6   Now let me go over the meaning of some of the claim
7   terms.  Before you decide whether LG has infringed the claims
8   of the patent or whether the claims are invalid, you will need
9   to understand the patent claims.

10  As I mentioned at the beginning of the case, the
11  patent claims are numbered sentences at the end of the patent
12  that describe the boundaries of the patent's protection.

13  It is my job as the Judge to explain to you the
14  meaning of any language in the claims that needs
15  interpretation.  I have interpreted the meaning of some of the
16  language in the patent claims involved in this case.

17  You must accept these interpretations as correct.  My
18  interpretation of the language should not be taken as
19  indication that I have a view regarding the issues of
20  infringement and invalidity.  The decisions regarding
21  infringement and invalidity are yours to make.

22  If I did not provide you -- if I did not provide to
23  you an interpretation of language appearing in the asserted
24  claims, you must afford that language its ordinary meaning as
25  understood to one of ordinary skill in the art at the time of

901

1   the invention.

2   The preamble of Claim 14 which recites a display unit
3   for displaying an image based on video signals inputted from
4   an externally connected video source is not a claim
5   limitation.

6   The part of Claim 14 that reads, "display unit
7   information" should be given its plain and ordinary meaning.
8   That is information pertaining to a display unit.

9   The part of Claim 14 that says, "display unit
10  information including an identification number for identifying
11  at least a type of said display unit and characteristic
12  information of display unit" should be given its plain and
13  ordinary meaning.  That is, the display unit information
14  includes, first, an identification number for identifying at
15  least a type of said display unit; and second, characteristic
16  information of said display unit.

17  The part of Claim 14 that reads "identification
18  number" should be given its plain and ordinary meaning.  That
19  is a number for the purpose of identifying something.

20  The part of Claim 14 that reads "display unit
21  information other than said characteristic information to said
22  video source," and that portion was in quotes, should be given
23  it's plain and ordinary meaning.

24  I will now instruct you on the rules you must follow
25  in deciding whether plaintiffs have proven that LG has

902

1  infringed one or more of the asserted claims of the '180
2  patent.  To prove infringement of any claim, plaintiffs must
3  persuade you that it is more likely than not that LG infringed
4  that claim.
5        A patent's claim defined what is covered by the
6  patent.  A product directly infringes a patent if it is
7  covered by at least one claim of the patent.  Deciding whether
8  a claim has been directly infringed is a two-step process.
9  The first step is to decide the meaning of the patent claims.
10  I have already made this decision and I have already
11  instructed you as to the meaning of the asserted patent
12  claims.
13        The second step is to decide whether LG has sold,
14  offered for sale, or imported to the United States a product
15  covered by the claim -- by a claim of the '180 patent.  If it
16  has, it infringes.  You the jury make this decision.
17        With one exception, you must consider each of the
18  asserted claims of the patent individually and decide whether
19  LG's product infringed that claim.  The one exception to
20  considering the claims individually concerns dependent claims.
21  A dependent claim includes all the requirements of a
22  particular independent claim plus additional requirements of
23  its own.
24        As a result, if you find that an independent claim is
25  not infringed, you must also find that a dependent -- that its

903

1  dependent claims are also not infringed.
2        In other words, if you find that an independent claim
3  has been infringed, you must still separately decide whether
4  the additional requirements of its dependent claims have also
5  been infringed.
6        Whether or not LG knew its product infringed, or even
7  knew of the patent, does not matter in determining direct
8  infringement.
9        One of the claims -- one of the requirements of
10  Claim 14 of the '180 patent is "an identification number for
11  identifying at least a type of said display unit."
12        Use of the alleged identification number is not
13  required to meet this requirement of the claim.  Nevertheless,
14  plaintiffs must prove that the alleged identification number
15  is a number that is for the purpose of identifying a type of
16  display unit.
17        To decide whether LG's products infringe a claim of
18  the '180 patent you must compare that product with a patent
19  claim to determine whether every requirement of the claim is
20  included in that product.
21        If so, LG's products infringe that claim.
22        If, however, LG's products do not have every
23  requirement in the patent claim, LG's products do not infringe
24  that claim.  You must decide infringement for each asserted
25  claim separately.

904

1        If the patent claim uses the term "comprising," that
2  patent claim is to be understood as an open claim.  An open
3  claim is infringed as long as every requirement in the claim
4  is present in LG's patent.
5        The fact that LG's products also include other parts
6  will not avoid infringement as long as it has every
7  requirement of the patent claim.
8        I will now instruct you on the rules you must follow
9  in deciding whether LG has proven that Claims 14 and 15 of the
10  '180 patent are invalid.
11        Before discussing the specific rules, I want to
12  remind you about the standard of proof that applies to this
13  defense.  To prove invalidity of any patent claim, LG must
14  persuade you by clear and convincing evidence that the claim
15  is invalid.
16        The question of invalidity of a patent is determined
17  from the perspective of a person of ordinary skill in the art
18  in the field of the asserted invention as of the effective
19  filing date of the patent.
20        In deciding the level of ordinary skill you should
21  consider all the evidence introduced in trial, including the
22  levels of education and experience of person's working in the
23  field, the types of problems encountered in the field and the
24  sophistication of the technology.
25        The patent law requires -- the patent law contains

905

1  certain requirement for the part of the patent called the
2  specifications.  LG contends that Claims 14 and 15 of
3  plaintiffs' '180 patent are invalid because the specification
4  of the '180 patent does not contain an adequate written
5  description of the invention.
6        To succeed, LG must show by clear and convincing
7  evidence that the specification fails to meet the law's
8  requirements for written description of the invention.
9        In the patent application process, the applicant may
10  keep the originally filed claims or change the claims between
11  the time that patent application is first filed and the time
12  the patent is issued.
13        An applicant may amend the claims or add new claims.
14  These changes may narrow or broaden the scope of the claims.
15  The written description requirement ensures that the issued
16  claims correspond to the scope of the written description that
17  was provided in the original application.
18        In deciding whether or not -- in deciding whether the
19  patent satisfies the written description requirement, you must
20  consider the description from the viewpoint of a person having
21  ordinary skills in the field of technology of the patent when
22  the application was filed.
23        The written description requirement is satisfied if a
24  person having ordinary skill reading the original patent
25  application would have recognized it as describes the full

Appx15232

906

1  scope of the claimed invention as it is finally claimed in the
2  issued patent, and that the inventor actually possessed that
3  full scope by the filing date of the original application.
4        The written description requirement may be satisfied
5  by any combination of the words, structures, figures,
6  diagrams, formulas, et cetera, contained in the patent
7  application.
8        The full scope of the claim or any particular
9  requirement in a claim need not be expressly disclosed in the
10  original patent application.  If a person having ordinary
11  skill in the field of technology of the patent at the time of
12  filing would have understood that the full scope or missing
13  requirement is in the written description in the patent
14  application.
15        Now, let me tell you a little bit about your
16  deliberations.  When you retire to the jury room to deliberate
17  you may take with you -- withdrawn.
18        As I told you, when you retire to the jury room, you
19  will have with you the exhibits that the Court has admitted
20  into evidence.  And let me interrupt for a second.
21        You have also seen during argument and opening
22  statements and even during some of the proceedings what are
23  referred to as demonstrative exhibits; for example, the charts
24  which counsel had up during their arguments.  Some of them,
25  maybe all of them, were not admitted into evidence.  Those

907

1  will not be going in.
2        Only those items of evidence that the Court has
3  specifically admitted into evidence will be with you in the
4  jury room.  And they -- those documents and items you will
5  have.
6        Additionally, you will have notes, pens, and papers
7  to take notes.
8        When you go in, you should select one member of the
9  jury as your foreperson.  That person will preside over the
10  deliberations and speak for you here in open court.
11        You have two main duties as jurors.  The first one is
12  to decide what the facts are from the evidence that you saw
13  and heard in court.  Deciding what the facts are is your job,
14  not mine.  And nothing that I have said or done during this
15  trial was meant to influence your decision about the facts in
16  any way.  Your second duty is to take the law that I give you,
17  apply it to the facts and decide if, under the appropriate
18  burden of proof, the parties have established their claims.
19        It is my job to instruct you about the law and that
20  you are bound by that -- by that oath that you took at the
21  beginning of the trial to follow the instructions that I give
22  you, even if you personally disagree with them.
23        This includes the instructions I gave you before and
24  during the trial and these instructions.  All the instructions
25  are important and you should consider them all together.

908

1        Perform these duties fairly.  Do not let any bias,
2  sympathy or prejudice that you may feel towards one side or
3  the other influence your decision in any way.
4        As jurors you have a duty to consult with each other
5  and to deliberate with the intention of reaching a verdict.
6  Each of you must decide the case for yourself, but only after
7  a full and impartial consideration of all the evidence with
8  your jurors.  Listen to each other -- your fellow jurors.
9  Listen to each other carefully.
10        In the course of your deliberations you should feel
11  free to re-examine your own views and to change your opinion
12  based on the evidence.  But you should not give up your honest
13  convictions about the evidence just because of the opinions of
14  your fellow jurors.  Nor should you change your mind just for
15  the purpose of obtaining enough votes for a verdict.
16        When you start deliberating, do not talk to the jury
17  officer, to me, or to anyone but each other about the case.
18  During your deliberations you must not communicate with or
19  provide any information to anyone by any means about this
20  case.
21        You may not use any electronic device or media such
22  as a cell phone, smart phone or a computer of any kind, the
23  internet or any internet service or any text or instant
24  messaging service or any internet chat room, blog, website or
25  social networking service such as Facebook, Instagram,

909

1  LinkedIn, YouTube, to communicate to anyone any information
2  about this case or to conduct any research about this case
3  until I accept your verdict.
4        You may not use these electronic means to investigate
5  or communicate about the case, because it's important that you
6  decide the case based solely on the evidence presented in this
7  courtroom.  Information on the internet or available through
8  social media might be wrong, incomplete or inaccurate.
9        Information that you might see on the internet or
10  social media has not been admitted into evidence and the
11  parties have not had a chance to discuss it with you.
12        You should not seek or obtain such information and
13  must not let it influence your decision in this case.
14        Now if you have any questions or messages for me, you
15  must write them down on a piece of paper.  Have the foreperson
16  sign them and give it to the jury officer.  The deputy marshal
17  who will be outside the jury room.  The officer will give them
18  to me and I will respond as soon as I can.  I may have to talk
19  to the lawyers about what you've asked, so it may take some
20  time to get back to you.
21        One more thing about messages, never write down or
22  tell anyone how you stand on your votes.  For example, don't
23  write down or tell anyone that a certain number is voting one
24  way or another.  Your vote should stay secret until you are
25  finished with your deliberations.

Appx15233

**944**

1    And at the end of the case, you'll get another jury
2    form which will ask you to decide the amount of damages and
3    will ask you to check a box for willfulness, after which
4    Judge Chesler will deal with that issue and there will be
5    no further obligations from you.
6        We do sincerely thank you for your time. We are
7    going to be much briefer in this phase. We don't have a
8    lot of technical information. It's mostly about the
9    licensing program, how things move forward, and how to
10   calculate damages.
11       So, there are a number of things that we were not
12   able to tell you in the liability phase and, therefore,
13   there were some holes in the story -- maybe you noticed,
14   maybe you didn't -- some time periods and gaps and things
15   like that. Now we can fill those in and that's what I'm
16   going to do right now.
17       So, the first thing you should know is that the case
18   that we've discussed so far is the Mondis vs. LG case, and
19   you may have heard that there were some other defendants
20   involved, and that's true. There were, in fact, three
21   other defendants who were involved in the Texas litigation:
22   A company called ████, which is the largest monitor
23   manufacturer in the world, and they had taken a license in
24   2004. They also make a large number of TVs. And we were
25   suing them on their TVs; ████████, is also known as ████,

**945**

1    a company you might have heard of, very large Chinese and
2    Taiwanese company; and ██████, a very large Taiwanese
3    company which also makes computer monitors and televisions.
4        The reason why there was a gap in the time lines
5    before in 2009 to 2011, and LG suggested is because Mr.
6    Spiro was being dilatory or had forgotten about the claim
7    or really didn't care about it, the actual reason was both
8    sides were waiting to see what was going to happen in
9    litigation.
10       LG had decided to settle and fix its liability, and
11   the other defendants decided to move forward. And they did
12   move forward and we had a trial.
13       A trial took place in June of 2011, and of course, it
14   wouldn't have been right for us to tell you about that
15   trial because it might have impacted your deliberations.
16       Had we lost the trial, we would not be here because
17   LG would have gotten a free license for its televisions.
18   But that's not what happened.
19       So, as in this case, we had jury selection. Jury
20   selection took place on June 13, 2001, that was a Thursday.
21   In Texas in that particular case we picked the jury the
22   week before.
23       Now, the parties then arrived on Monday. The plan
24   was to open on Monday. ████ settled on Friday, June 14th,
25   and

**946**

1    We went to trial, started on June 17th. We had
2    openings, just like we did in this case, and the testimony
3    proceeded through the week.
4        We got to the end of the week. We got to the
5    weekend. The jury was out, and ████ came and knocked on
6    the door and we settled with them and they took a license.
7        Both the ██ and the ██████ settlements were at the
8    rate of ██ percent for their televisions.
9        Innolux went to verdict, and there was a verdict in
10   that case against Innolux on monitors and on televisions,
11   most on monitors, but there were many televisions involved
12   in the case, and we won that case and we got a verdict of
13   .75 percent on the televisions based on three patents; the
14   '180, the '342 and the '090.
15       Now, we give you that information now because it's
16   relevant to the other issues in this case, specifically,
17   willfulness.
18       After 2011 and the verdict, Mr. Spiro went to Korea.
19   He had tried to arrange a meeting with LG before the trial
20   to tell them, look, let's set up on televisions before the
21   trial. That's going to be a significant event for
22   everybody. They weren't able to arrange the meeting in
23   time but Mr. Spiro went back to Korea in July of 2011,
24   shortly after the trial, and said to LG, okay, we've got a
25   jury verdict now on televisions. They work the same way as

**947**

1    your televisions. It's time for us to resolve this issue.
2        He was willing to negotiate. And that's where he got
3    the runaround that you heard about in the first part of the
4    case, the 11 meetings between July of 2011 and ultimately
5    the service of the lawsuit in this case.
6        And he's going to tell you that story in his own
7    words. I'm not going to tell you. I think it will be
8    better coming from him that you hear what LG did to him.
9        Now, at this point we have to calculate damages, and
10   the law says that the damages in a patent case are
11   calculated based on a "reasonable royalty". And there's a
12   formula for doing that, and you have to decide the facts
13   and you have to decide what the reasonable royalty is.
14       The way we do it is we assume -- imagine a
15   hypothetical negotiation between LG and Mondis, in which
16   both sides are trying to reach a deal and all cards are on
17   the table. Everybody knows all the information that the
18   other side knows. They call it the Book of Wisdom.
19       They even know things they wouldn't have known in
20   2009, like how many units LG is going to sell of the
21   technology, what other rates are, what other agreements
22   are. All that stuff is on the table. And you look at it
23   and try to come up with a fair number of what the royalty
24   is.
25       Both sides are going to have experts who are going to

**988**

1  A.  Yes.  If you calculate it out, it was ███████,

2  and that's what they paid ██████████.

3  Q.  Okay.  So, the process of the trial continued?

4  A.  Yes.

5  Q.  And then openings took place on June 17, 2011.  Is

6  that right?

7  A.  Yes.

8  Q.  And did the case try through that week?

9  A.  Yes, the whole week.

10  Q.  What happened the following weekend?

11  A.  Well, the jury went out to deliberate, as you did

12  yesterday, and it was a Friday, so, they reached Friday and

13  they hadn't reached a verdict yet and we had the weekend,

14  in Texas is very exciting weekend.  Over that weekend ███

15  ██ settled with us.

16  Q.  And what was the accused product against ██████?

17  A.  That was televisions.  Sorry.  At that time that was

18  televisions and monitors, both of them.

19  Q.  If you would look at Mondis-248 and 249 in your

20  binder and identify them for the record, I'd appreciate it.

21  A.  Yes.  248 is the settlement agreement that we entered

22  into on the weekend dated June 25th.  And 249 is the

23  license agreement that we entered into that followed the

24  settlement agreement with ██████.

25     MR. BLACK:  Your Honor, we move to admit Mondis-248

**989**

1  and 249.

2     MR. McKEON:  Your Honor, these are all pre-admitted

3  so we have no objection.

4     THE COURT:  It's admitted into evidence and you may

5  publish it.

6     (Exhibits Mondis-248 and Mondis-249 are marked in

7  evidence.)

8     MR. BLACK:  We move to admit 247 also.

9     THE COURT:  Also stipulated?  Fine.  It's admitted

10  into evidence.  You may publish it.

11     (Exhibit Mondis-247 is marked in evidence.)

12  Q.  What was the financial arrangement with ██████ that

13  you negotiated over the weekend?

14  A.  ██████ paid ████████ to cover their past -- the

15  past exposure that was in the case, and they agreed to pay

16  ██████ for each television that they sold going forward.

17  Q.  All right.  So, there are three defendants when the

18  trial started and we're down to one defendant.  Who's that

19  defendant?

20  A.  We were left just with Innolux.

21  Q.  And on June 27, 2011, what happened?

22  A.  We got a verdict.

23  Q.  And what was the rate that the jury determined for

24  televisions in that case?

25  A.  That was three-quarters of a percent.

**990**

1  Q.  And which patents did the verdict for televisions

2  cover?

3  A.  They covered the 2B patents.  That was the three that

4  I mentioned before, all the 2B patents.

5  Q.  Which just -- do you know the patent numbers that

6  were actually --

7  A.  Yes.  Again, based on the last three numbers, it's

8  the '180, the '342 and the '090.

9  Q.  Okay.  Did Innolux appeal the award, the jury

10  verdict?

11  A.  Yes, they did.  But they eventually settled it.

12  Q.  Did the settlement ██████████████████

13  ██████████

14  A.  ████████████████████████████████████

15  ████████████████████

16  Q.  So, under the agreement with Innolux, what royalty

17  rate did Innolux pay Mondis for the DDC patents for its

18  televisions?

19  A.  It was ████████████████████.

20  Q.  Did the agreement also relate to monitors?

21  A.  Yes.

22  Q.  And what was the rough percentage of split between

23  televisions and monitors in that case?

24  A.  Well, it was about -- in value terms, it was, they

25  don't dispute that, about ten percent was TVs, I think, and

**991**

1  roughly 90 percent monitors.

2  Q.  Okay.  So let's get back to LG.  You had told LG that

3  you wanted to meet before the trial, but that didn't take

4  place.  Is that right?

5  A.  That's right.

6  Q.  Did you try to connect with LG after the jury

7  verdict?

8  A.  Yes, we did connect.  I tried to connect before but

9  that failed, so, we did afterwards.

10  Q.  And if you would take a look at exhibit --

11     MR. BLACK:  Actually, let's put up the Spiro time

12  line number three.  You had that up before.  Okay.

13  Q.  So, we've amended this slide now to show the jury

14  verdict and the Innolux settlement.  But let's go into

15  little bit more depth with how that interacted with your

16  discussions with LG.

17  A.  Okay.

18  Q.  So, in March you renewed the license discussion

19  because you wanted to see if you could talk to them before

20  the Texas decision?

21  A.  Yes.  I thought it was timely.  We were coming on to

22  June.  It was March.  It was an opportunity.  There was

23  still uncertainty in the case and it was an opportunity to

24  try and settle the TV element before anything was

25  determined, for better or for worse, but that was the

**992**

1  thought and the attempt that was made in March, before the
2  trial.
3      Q.   And did you meet with LG after the verdict?
4      A.   Yes, they -- they couldn't -- they couldn't meet
5  before so we met afterwards.  We met about three weeks
6  after the verdict.
7      Q.   And what happened at the meeting?
8      A.   Well, we, of course, we were quite happy.  We told
9  them about what happened in Texas.  We went over where we
10 were on the licensing before the offers and the proposals
11 and we invited them to take a license.
12          We told them about the jury verdict.  We told them
13 about the 0.75 percent, and told them that, obviously, it
14 was good news for us and there'll be implications on the
15 licensing discussions that we could have.
16     Q.   Was the theory at the Innolux trial presented and
17 tried on the '180 patent relating to the display type two
18 bits?
19     A.   Yes.
20     Q.   What did Mr. Choi say in response to your proposal to
21 restart negotiations?
22     A.   Yeah.  He said he understood the situation and the
23 position.  He asked for a proposal and he said he would get
24 some information for us because, based on the proposal that
25 he was wanting, there was maybe a lump sum, so, we had to

**993**

1  address that point, so we needed information.  He said he
2  would get that information to us.
3      Q.   And did you give him a proposal?
4      A.   Yes.  A few weeks later I sent him a proposal as
5  agreed.
6      Q.   And what was the response to the proposal?
7      A.   Well, they suggested that they meet with us in London
8  to discuss the proposal.
9      Q.   And did that meeting take place?
10     A.   Yes, it did, in October.
11     Q.   And who came to that meeting?
12     A.   Well, that was Miss Lee and another gentleman, Mr.
13 Bae.  I can't recall the first name.  B-a-e is the second
14 name.
15     Q.   Had you met him before?
16     A.   No.  And I think he's called, according to his card,
17 he was the patent analyst -- manager in the patent analyst
18 department of LG.
19     Q.   Did he suggest that the patents were not infringed?
20     A.   No, he didn't.
21     Q.   What happened at the meeting?
22     A.   Well, Mr. Choi wasn't there.  Miss Lee told us that
23 Mr. Choi is now not going to be with us anymore, which was
24 a bit of a shame, and introduced Mr. Bae as the person
25 who's replacing him.

**994**

1          It wasn't a substantive meeting.  It was just an
2  introductory meeting, that's what they wanted to have, and
3  to pave the way for further discussions.
4      Q.   Did they promise to be responsive to you at the next
5  meeting, to come prepared?
6      A.   Yes.  They said that they would do it before this
7  meeting and as it wasn't -- as they didn't have anything
8  available and the personnel changed, they said they would
9  have everything by the time we meet next.
10     Q.   So then, the next meeting was in December of 2011 in
11 Korea.  What happened?
12     A.   Well, there again, there were more people at this
13 meeting.  There were two further people other than Miss Lee
14 and Mr. Bae.
15          There was a gentleman Ju Sup Kim and another one, Mr.
16 Sung.  Ju Sup Kim was a VP in the intellectual property of
17 LG.  And Mr. Sung was the senior manager in the IP
18 department, intellectual property department, same as Mr.
19 Choi.
20     Q.   Did Mr. Kim leave you with any impression as to his
21 seniority and importance within the LG organization?
22     A.   Yes.  Other than his title, he indicated that he was
23 the most senior person in LG in the intellectual property
24 whole environment.
25     Q.   Okay.  Did Mr. Kim respond to the proposal as they

**995**

1  had promised you they would?
2      A.   No.  He came up with a theory saying that they didn't
3  really need a license for anything because, as far as he
4  knew, they had already had a license from Hitachi.
5          He said he knew Mr. Suzuki, he was the head of the
6  intellectual property there, he said he knew Mr. Suzuki and
7  they don't need a license for the televisions and they
8  don't need also for the monitors, which was odd because
9  they already had one from Mondis.
10     Q.   At this meeting did Mr. Kim, the most senior person
11 in the intellectual property department at LG, tell you
12 that they didn't infringe?
13     A.   No, not at all.
14     Q.   Did you manage to clear up Mr. Kim's claim that LG
15 already had a license?
16     A.   Well, we had to because it was clear we weren't going
17 anywhere without clearing that up.  So, after the meeting,
18 we had to clear it up, and we did.
19          It involved further bother and further work.  We had
20 to contact Hitachi and we contacted actually Mr. Suzuki,
21 who we knew well, who we were working with at the time, and
22 he got back to Mr. Kim and told him that it's -- that LG
23 does not have a license.  In fact, he had to do it twice
24 because Mr. Kim, after the first time being told by Mr.
25 Suzuki that Hitachi has got nothing to do with it and they

**996**

1  should carry on, he still insisted that they got something
2  to do with it possibly, and Mr. Suzuki had to go back and
3  say yet again that that's nothing.
4      Q.   All right.  So, after clearing up that excuse, what
5  happened at the February 2012 meeting?
6      A.   Well, at that meeting, after that was cleared up,
7  this was really weird, but he decided that what we spoke
8  about at that meeting was then the monitor agreement.  He
9  decided that LG overpaid on the monitor agreement and he
10  was seeking a refund, a refund on what they'd already paid
11  in the past.
12      So, I explained that that -- it's strange that
13  they're even asking for it, but actually the deal that they
14  got was a lot better than what was determined in Texas, and
15  it was a very strange meeting.
16      Q.   And what did Mr. Kim respond?
17      A.   He said it doesn't really matter anything about Texas
18  anyway because Innolux had appealed and there's probably,
19  or possibly the patents will be invalidated at the Federal
20  Circuit so he wasn't worried about that.  Texas didn't
21  matter.
22      Q.   All right.  So, with being told that definitively by
23  Mr. Kim, that he didn't care, did you take a break from the
24  negotiations at that point?
25      A.   Shortly after that, we still tried to bridge all

**997**

1  these issues and made some proposals and tried to sort out
2  all these uncertainties, but it's clear that we weren't
3  getting anywhere with that and, yes, we did have a break.
4      Q.   All right.  And then did you resume discussions in
5  December of 2013, after the Innolux settlement?
6      A.   Yes, we did.
7      Q.   And what happened at the April 2014 meeting in Korea?
8      A.   Well, of course we said that everything was cleared
9  now with Innolux and all the uncertainty was gone.
10      We presented some further summary of where we were
11  and made proposals.  When we went to the meeting, they
12  hadn't read or considered anything and it was clear that we
13  weren't making progress.
14      Q.   And what step did you then take to try to get their
15  attention?
16      A.   Well, we filed the lawsuit.  It was this lawsuit,
17  eventually what became this lawsuit, but then we filed the
18  lawsuit.
19      Q.   Did you serve it right away?
20      A.   No.  We met a few times after filing it but before
21  serving.
22      Q.   At any time during this entire chronology of 11
23  meetings, did they tell you that they didn't infringe the
24  '180 patent?
25      A.   Not once, never.

**998**

1      Q.   Are you asking for the same rate in this case that
2  Innolux also went to trial and lost, had to pay?
3      A.   Yes, I am.
4      Q.   And what is that rate?
5      A.   That's the three-quarters of a percent, 0.75 percent.
6      Q.   Thank you.
7      MR. BLACK:  Pass the witness.
8      THE COURT:  Thank you.
9      Mr. McKeon.
10      MR. McKEON:  Thank you, Your Honor.
11  CROSS EXAMINATION
12  BY MR. McKEON:
13      Q.   Good morning, Mr. Spiro.  Nice to see you again.
14      A.   Good morning.
15      Q.   Let's start with the threshold issue that you
16  testified about.  Now, you testified that Mondis had a
17  threshold policy and practice with respect to the '180
18  patent.  Is that right?
19      A.   In respect of licensing.
20      Q.   Okay.  So, generally with respect to licensing, you
21  had a policy and practice of something called a threshold.
22  Isn't that right?
23      A.   Yes.
24      Q.   And with respect to the '180 patent, we all know
25  that's part of a larger portfolio of patents.  Isn't that

**999**

1  right?
2      A.   It's part of the 2B family, yes.
3      Q.   And then just so we can agree on that, when you say
4  2B, you mean the '090 family of patents.  Right?
5      A.   Yes.
6      Q.   And of course, in this case we know at this point in
7  the case, there's only one patent at issue, the '180
8  patent.  Right?
9      A.   Yes.
10      Q.   So, the '090 family includes eight patents but at
11  issue now in this case is just one.  Right?
12      A.   That's the issue in the case.
13      Q.   Indeed, just two claims of the 29 claims of the '180
14  patent are at issue.  Isn't that right?
15      A.   Right.
16      Q.   And you've never granted a license involving the '090
17  patent family covering less than the entire family.  Isn't
18  that right?
19      A.   Whatever the family exists at the time of licensing,
20  that was what was covered.
21      Q.   Right.  So, you've never once in the history of your
22  licensing ever had one patent that you granted a license
23  for from the family and not the others.
24      A.   Well, all the licenses cover the family.  There isn't
25  one that states just the one patent.

**1004**

1    A.   That was, yes, it was.

2    Q.   In fact, that was the rate that was used in the LG-

3  Mondis monitor agreement.  Isn't that right?

4    A.   That's correct.

5    Q.   And then that rate was discounted down.  Isn't that

6  right?

7    A.   No.  That was the discounted.  There was a portion of

8  the discount for the prepayment amount.

9    Q.   Right.  So --

10    A.   Yes.

11    Q.   -- they came out to be ▓▓.  Do you remember that?

12    A.   For part of it.

13    Q.   Well, it was ▓▓▓▓▓▓▓.  The part of it was

14  ▓▓▓▓▓▓▓.  Isn't that right?

15    A.   Yeah.  The part they committed and paid for in

16  advance, yes.

17    Q.   And then they went on and paid, I think you testified

18  earlier in this case, ▓▓▓▓▓▓▓?

19    A.   Yes.

20    Q.   So, ▓▓▓▓▓ of the money was at a rate of

21  ▓▓▓ percent for both families of patents.  Correct?

22    A.   If they had --

23    Q.   Sir, correct?

24    A.   Yes, that's correct, yes.  I'm sorry.

25    Q.   And as I understand, this rate card, if there's

**1005**

1  litigation, there's litigation, then you ▓▓▓ the rate up

2  to ▓▓▓▓▓.  Isn't that right?

3    A.   Yes.  The agreement, the 5.8 agreement says if they

4  --

5    Q.   Sir, I'm talking about the rate card?

6    A.   No.  The rate card doesn't refer to if there's

7  litigation it will be ▓▓▓▓▓.  You're not saying it

8  correctly.  That's not what the rate card says.

9    Q.   Sir, I'm just looking at the rate card.  All I see is

10  ▓▓▓▓▓▓▓ is pre-litigation.

11    A.   That's right.

12    Q.   Then I see ▓▓▓▓▓▓ indicative post-litigation

13  rate.  Isn't that right?

14    A.   Yes.

15    Q.   So, what your rate card says that pre-litigation,

16  it's ▓▓▓▓▓, and if we go into litigation, we're going

17  to charge you ▓▓▓▓▓▓.  Isn't that what the rate card

18  says?

19    A.   Yes, it does.

20    Q.   So, according to the rate card, there's a possibility

21  that someone pays ▓▓▓▓▓ for both portfolios of

22  patents.  Isn't that right?

23    A.   Yes.  Well, nothing if we lose.

24    Q.   No one's ever paid ▓▓▓▓▓ ever for your

25  portfolio.  Isn't that right?

**1006**

1    A.   No, nobody took us this far.

2    Q.   No.  And not even Innolux paid ▓▓▓▓▓ for the

3  portfolio.  Isn't that right?

4    A.   No.

5    Q.   And so, this rate card is a negotiation tool that you

6  use.  Isn't that right?

7    A.   Well, it's what we use when we discuss licensing,

8  yes.

9    Q.   Of course.  Everyone's got negotiation tools.  They

10  go into rooms and put up rate cards and say this and say

11  that to drive up the number.  Isn't that what negotiation

12  is all about?

13    A.   Yes.

14    Q.   And this is your version of that.  It's the rate card

15  that you put on the table.  Isn't that right?

16    A.   Yes, it is.

17    Q.   And likewise, other companies come in, right, and

18  they might say to you, Oh, you know what, for your patents

19  we pay $0.02 a unit, but if you sue us, it's going to be

20  $0.01 a unit.  That's going to be a negotiation that goes

21  on everyday when people talk about these issues.  Isn't

22  that right?

23    A.   I don't know.  I haven't been party to such a

24  discussion, but that's a negotiation.

25    Q.   Okay.  All we know, though, is that LG -- you sued LG

**1007**

1  in Texas.  Isn't that right?

2    A.   Yes.

3    Q.   And you didn't give them any notice before you filed

4  the lawsuit.  You just went and sued them.  Isn't that

5  right?

6    A.   That's right.

7    Q.   And then you had a bunch of meetings with them.

8  Isn't that right?

9    A.   Yes.

10    Q.   In fact, you had eight meetings before you signed the

11  settlement agreement.  Isn't that right?

12    A.   Yes.

13    Q.   And LG signed and agreed with you that they were

14  going to take a license, and what they decided to do was

15  pay you the rate of ▓▓▓▓▓▓ for both as discounted in

16  the agreement.  Isn't that right?

17    A.   Part was discounted.  They had an option to discount

18  as many as they want.  It was all based on ▓▓▓▓▓ and

19  they could choose to prepay some at a discounted rate to

20  encourage the prepayment.

21    Q.   ▓▓▓▓▓

22    A.   Yes.

23    Q.   -- the total, just over ▓▓▓▓▓, was at the

24  ▓▓ percent rate for both portfolios.  Correct?

25    A.   Well, the ▓▓ was at ▓▓ and everything, the rest,

CONFIDENTIAL MATERIAL REDACTED

**1012**

1   Q.   Sir, it's in your folder, if you go to the black

2   binder.  And the exhibit number is MON-1521.  Do you see

3   that?

4       THE COURT:  Now, Mr. McKeon, let him read the whole

5   thing.  Then you can ask him questions.

6       THE WITNESS:  Yes, I see.

7   Take your time.

8   **A.   I see what I was looking for.  It was the under A,**

9   **it's the aggregate royalty would be** [REDACTED]**.**

10   **That is the** [REDACTED] **that's already discounted by**

11   [REDACTED]**, as you put it.  That is the** [REDACTED]**, and on**

12   **top of that we were offering** [REDACTED]

13   Q.   But in this -- this proposal that you have here, the

14   pre-litigation discount was [REDACTED] -- isn't that right

15   -- what you indicate here in the document?

16   **A.   No, it's not.  That's what I'm saying.  That's**

17   [REDACTED] **on top of the** [REDACTED]**.  Here, A --**

18   Q.   Sir, I'm talking about now the discount associated

19   with the litigation uncertainty.

20   **A.   Yes.**

21   Q.   That's what I'm talking about now.

22   **A.   Yes.  Me, too.**

23   Q.   And with respect to that, we can go back to that and

24   have Ian highlight that again.  Discount for pertinent

25   uncertainties, do you see that -- we can get it

**1013**

1   highlighted -- on the next page?

2   **A.   Yes.**

3   Q.   And it says there [REDACTED].  Isn't that right?

4   **A.   Yes.**

5   Q.   Okay.  All right.  We can move on, sir.

6   Now, in 2009, when -- well, in 2009 time frame, the

7   two portfolios of patents that Mondis had, all the patents

8   were alive and kicking.  Isn't that right?

9   **A.   Yes.**

10   Q.   And with respect to the LG agreement, of course, all

11   the patents were alive and kicking in 2009.  Isn't that

12   right?

13   **A.   Yes.**

14   Q.   But the date of our hypothetical negotiation in 2009

15   for this case, all the patents were alive and kicking.

16   Correct?

17   **A.   Yes.**

18       MR. McKEON:  Can we get please the MON-10, which is

19   the agreement between LG and Mondis.  Do you have your

20   binder, sir?  But I'm just going to pull up one paragraph

21   that you talked about with your counsel.

22       THE COURT:  Is that already in evidence?

23       MR. McKEON:  It's in evidence, Your Honor.

24   Q.   And if you can go to Paragraph 5.9, which is on the

25   Bates Page 702, Page 14 of the agreement.  I believe, sir,

**1014**

1   you talked to Mr. Black about this.  Do you recall that,

2   this paragraph?

3   **A.   Yes, I do.**

4   Q.   And this paragraph says that [REDACTED]

5   [REDACTED]

6   [REDACTED]

7   [REDACTED]

8   Do you see that?

9   **A.   Yes.**

10   Q.   And basically, it's a [REDACTED]

11   [REDACTED] Is that kind of what's going on here?  Do you know

12   what I mean by that?

13   **A.   I do.  We don't generally do** [REDACTED]

14   [REDACTED]

15   [REDACTED] **--**

16   Q.   Right.  Because I think you testified on direct that

17   it's important for competitors, they want to get the same

18   deal as their competitors because, otherwise, they're

19   disadvantaged.  Isn't that right?

20   **A.   Yes.  Similar behavior.**

21   Q.   Wouldn't be in business if they had to pay more than

22   competitors were paying.  Isn't that fair?

23   **A.   If they came to the table the same as every other**

24   **competitor, it wouldn't be fair.**

25   Q.   And this clause here requires LG to [REDACTED]

**1015**

1   [REDACTED].  Isn't that

2   right?

3   **A.   It allows for a mechanism to show that, yes.**

4   Q.   But LG has to have that knowledge in order to

5   implement this clause.  Isn't that right?

6   **A.   They have to have** [REDACTED]

7   [REDACTED]

8   [REDACTED]

9   [REDACTED]

10   Q.   Now, sir, we also had testimony from you -- first of

11   all, I think we established already in this trial that as

12   of 2017, you hadn't even read the '180 patent.  Isn't that

13   right?

14   **A.   Yes.**

15   Q.   You hadn't read the claim.  Isn't that correct?

16   **A.   Yes.**

17   Q.   And we also, I believe, had testimony that the '180

18   patent in all these meetings that you discussed with LG,

19   that you were talking about these various meetings and Ju

20   Sup Kim's name came up, you never presented them with the

21   '180 patent specifically?

22   **A.   That is correct.**

23   Q.   Never presented them with a claim chart?

24   **A.   That's right.**

25   Q.   And so, at that point in all these meetings over

Appx15261

**1016**

1   multiple years, you never told them specifically what the
2   allegations were with respect to the '180 patent.  Isn't
3   that right?
4   A.   Those were not the nature of the meetings I had, so,
5   no, I didn't.
6   Q.   And LG didn't find out about those allegations until
7   this lawsuit was filed.  Isn't that right?
8   A.   It's possible, yes.
9   Q.   Now, you said earlier that -- you said that the '180
10  patent was the heart of the '090 family.  Did you say that?
11  A.   I did say that, yes.
12  Q.   You're not a technical person.  Isn't that right?
13  A.   That's right.
14  Q.   You have no basis to say whether that, as a technical
15  matter, is the heart of the family or not, do you?
16  A.   I don't have a personal technical knowledge of it but
17  I have people with me who brief me on what's going on.
18  Q.   So, you have no personal knowledge whether that
19  patent, the '180 patent, is the heart of the '090 family or
20  not.  Isn't that correct?
21  A.   That's correct.
22  Q.   And you never said anywhere in negotiations with LG
23  that the '180 patent was the heart of the '090 family, did
24  you?
25  A.   No.

**1017**

1   Q.   Now, I want to talk about the Innolux case.  Now,
2   this is the litigation that LG settled.  Right?
3   A.   Yes.
4   Q.   Right?  LG shook your hand and settled the case with
5   you and paid your license fee.  Isn't that right?
6   A.   Correct, yes.
7   Q.   So, they weren't at the trial.  Correct?
8   A.   Yeah.
9   Q.   You had some talk about on Friday something happened
10  and on Monday something happened and on Wednesday something
11  happened, but LG wasn't there.  They weren't involved in
12  that trial.  Isn't that right?
13  A.   They weren't involved, no.
14  Q.   Now, in that case, isn't it the case, sir, that the
15  overwhelmingly -- strike that.
16      The trial against Innolux overwhelmingly concerned
17  computer monitors rather than televisions.  Isn't that
18  right?
19  A.   I don't know overwhelmingly, but the majority was
20  computer monitors.
21  Q.   Let's go to your binder, sir.  There's a document in
22  there.  It's an interrogatory response, LG-11.  It should
23  be on Page 23 of the document.  And when you get there, let
24  me know and we can talk about it.
25  A.   Did you say Page 23?

**1018**

1   Q.   23 of that document.  Do you see that?
2   A.   Yes.
3   Q.   And do you see there's an interrogatory number six?
4   Do you see that?
5   A.   Yes.
6   Q.   And this interrogatory LG asks in this discovery,
7   this case, asks what the differences were between LG-
8   accused products and the accused televisions at issue in
9   the Texas case.  Do you see that?  It's interrogatory
10  number six?
11  A.   I'm just reading it.  I don't recall seeing it.
12  Q.   Take your time.
13  A.   Yeah, I see that.
14  Q.   And if you look down to the response that Mondis
15  gave, do you see what it says there, and I can read this.
16  "Mondis notes that the trial against these defendants," and
17  was talking there about Innolux.
18  A.   I'm sorry.  I'm not with you.  I'm just looking for
19  "Mondis knows."  Which line are you reading from?
20  Q.   I'm reading, start of the answer, says "Subject to
21  without waiving."  Do you see that?  I'm going to read down
22  here.  I'll read it:
23      "Mondis notes that the trial against these defendants
24  overwhelmingly concerned" --
25  A.   I'm sorry.  I'm just not there.  I'm on Page 23.  I'm

**1019**

1   not --
2       THE COURT:   Walk up to the witness and point it out.
3       MR. McKEON:   Thank you.
4   Q.   Let me just direct your attention.  Here's where I'm
5   reading from.  Okay.
6   A.   Page 24.  Sorry.
7       THE COURT:  Page 24.
8       MR. McKEON:  Yes.  23 was the answer.  The answer
9   went on, Your Honor.  On my notes here indicated 23.  I
10  apologize to Mr. Spiro.
11  Q.   Are we on the same page now, Mr. Spiro?
12  A.   Starting "Mondis notes."  Is that correct?
13  Q.   Yes.  Let me read that.
14      "Mondis notes that the trial against these defendants
15  overwhelmingly concerned computer monitors rather than
16  televisions because these companies primarily manufactured
17  and sold computer monitors.  Indeed, at trial there were
18  283 accused computer monitors and only 11 accused
19  televisions.  Because 96 percent of the accused products
20  were computer monitors, the asserted patents and the
21  asserted patent claims were focused on computer monitor
22  features as opposed to television features."
23      Did I read that correctly?
24  A.   Yes.
25  Q.   That's what Mondis said in this case in response to

**1040**

1  characteristic information to have the video source

2  generate compatible signals?

3  A.  Yes.  I've examined video sources that also use that

4  information.  In fact, that is in general a more prevalent

5  use today.

6  Q.  But at the time of the '180 invention, why was both

7  types of information going to be included in the memory?

8  A.  Well, the inventors realized that using type

9  information was eventually going to run out of types, and I

10  think we've probably hit that threshold by now in 2019.

11  The display type was commonly used in the industry at

12  that time but they know that -- but they knew they wanted

13  to transition over to using characteristic information

14  instead.

15  Q.  Now, have you previously called the '088, '970 and

16  '342 patents foundational to Plug-N-Play?

17  A.  Yes, I have.

18  Q.  And why did you say that?

19  A.  Well, they are foundational because if you implement

20  the VESA DDC and EDID standards, you necessarily infringe

21  the claims of those patents that have been asserted

22  previously.

23  Q.  Do all patents that are required to implement the

24  VESA standards have equal value?

25  A.  No, they do not.

**1041**

1  Q.  And in this case, which of the DDC2B patents has the

2  most value for implementing Plug-N-Play?

3  A.  Well, for implementing Plug-N-Play, what we're after

4  is being able to generate compatible video signals, and the

5  '180 is the one that gives you that.

6  Q.  And is that the reason you've called it the heart of

7  the DDC family?

8  A.  Yes.

9  Q.  Now, Mr. Lamm, there's been some talk about the

10  earlier litigation in Texas.  Were you involved in that

11  earlier litigation?

12  A.  I was.

13  Q.  And what was your role in that litigation?

14  A.  I prepared expert reports concerning infringement of

15  televisions and computer monitors, and I also testified at

16  trial.

17  Q.  And do you recall what parties were involved in that

18  case?

19  A.  Yes.  Innolux, Hon Hai, and TPV were in the case all

20  the way up to the trial, and LG was an original part of

21  that case but settled very early in the process.

22  Q.  Was Claim 14 of the '180 patent asserted in that

23  prior Texas case?

24  A.  Yes, it was.

25  Q.  Against what products?

**1042**

1  A.  Both computer monitors and televisions.

2  Q.  Did you perform any testing on the accused

3  televisions in that case?

4  A.  Yes, I did.

5  Q.  What sorts of tests?

6  A.  These were television sets made by both Innolux and

7  Hon Hai -- and TPV,  rather.

8  Q.  And what did you test them for?

9  A.  I tested them for basically the same thing that I

10  tested units for in this case, and that is the presence of

11  display type information.

12  Q.  Did any of the accused televisions in the Texas case

13  include EDID data?

14  A.  Yes, they did.  They were -- those units were also

15  EDID 1.3 compliant units, and they included the feature

16  support byte with the bits 4 and 3 describing display type,

17  and they also had characteristic information and the other

18  things that are important here.

19  Q.  And those televisions in the Texas litigation, what

20  were bits 4 and 3 of the feature support byte set to?

21  A.  Those were all set to 01, which indicated RGB color

22  display.

23  Q.  And for the accused televisions in the Texas case,

24  what was the theory as to how they satisfied the

25  identification number for identifying at least a type of

**1043**

1  display requirement of Claim 14?

2  A.  It was the bits 4 and 3 of the feature support byte

3  which defined the display type.

4  Q.  And do you know if the Innolux and Hon Hai

5  televisions in the Texas case practiced any of the same

6  industry standards that the LG televisions accused in this

7  case implement?

8  A.  Yes.  They were also HDMI-compliant units and so,

9  therefore, practiced the DDC and EDID standards, and they

10  also had the VGA inputs which practiced the DDC and EDID

11  standard.

12  Q.  For purposes of infringement of Claim 14, were there

13  any meaningful differences between the Innolux and Hon Hai

14  televisions in the Texas case and the LG televisions in

15  this case?

16  A.  No.

17  Q.  And do you know if the issue of infringement of the

18  Innolux and Hon Hai televisions was tried to the jury in

19  that case?

20  A.  Yes, they were.

21  Q.  And did the jury reach a verdict in that case as to

22  whether the accused televisions infringed Claim 14?

23  A.  Yes.  They reached a verdict that those units did

24  infringe.

25  Q.  And did you testify at that trial?

**1052**

1  HDMI. You'd agree to that?

2  **A.** **Yes.**

3  **Q.** And similarly, with Plug-N-Play, the Plug-N-Play

4  standard, a bunch of companies in a room developed that.

5  Isn't that right?

6  **A.** **No.**

7  **Q.** Okay. Well, let's get more specific. Plug-N-Play

8  was a standard that was promulgated by VESA, right?

9  **A.** **That's correct.**

10  **Q.** Okay. So there were various companies that were

11  involved in -- maybe not a room, but over time that

12  developed the Plug-N-Play standard. Isn't that right?

13  **A.** **Plug-N-Play standard was developed by a consortium,**

14  **yes.**

15  **Q.** A consortium that -- companies like -- I don't know.

16  Maybe give some examples of companies that were in the

17  consortium. Do you have examples?

18  **A.** **HP, Dell. Those kinds of companies were typically**

19  **present.**

20  **Q.** Okay.

21  **A.** **Compaq.**

22  **Q.** Compaq, okay.

23  And with respect to the Plug-N-Play standard and

24  these companies, you wouldn't be surprised if those

25  companies had patents that you had to have in order to

**1053**

1  practice Plug-N-Play. Isn't that right?

2  **A.** **I am not aware of any.**

3  **Q.** You're not aware of any, but you don't know one way

4  or the other. Isn't that right?

5  **A.** **That's correct.**

6  **Q.** Okay. Okay. Thank you, Mr. Lamm.

7  **A.** **Thank you.**

8  THE COURT: Your witness.

9  REDIRECT EXAMINATION

10  BY MR. PLIES:

11  **Q.** Just a couple quick followups.

12  Do you recall LG's counsel asking you about the '181

13  patent?

14  **A.** **Yes.**

15  **Q.** Do you know if the '181 patent has ever ultimately

16  been asserted by Mondis against televisions?

17  **A.** **No, it has not.**

18  **Q.** And have you ever formed any opinions, for example in

19  expert reports, on the '181 patent?

20  **A.** **No, I have not.**

21  **Q.** And do you recall LG's counsel referring to two other

22  patents in the DDC2B family that were not on your slide?

23  **A.** **Yes.**

24  **Q.** Do you know if those two patents have ever been

25  asserted by Mondis?

**1054**

1  **A.** **No, they have not.**

2  MR. PLIES: Thank you, Mr. Lamm.

3  MR. MCKEON: Nothing further, Your Honor.

4  THE COURT: Thank you very much, Mr. Lamm.

5  THE WITNESS: Thank you.

6  MR. BLACK: We need to switch people.

7  (Pause.)

8  THE COURT: We have finished shuffling?

9  MR. BLACK: We are finished.

10  THE COURT: Okay.

11  MR. BLACK: And now will move much more

12  expeditiously.

13  THE COURT: All right.

14  MS. PATEL: Your Honor, at this time plaintiff calls

15  by deposition Mr. Ju Seong Ryu, who is a chief engineer at

16  LG Electronics Inc. Included in this deposition excerpt

17  are references to Ryu Exhibit Numbers 1 and 2, which are

18  Plaintiff's Exhibits MON-0177 and MON-1394A.

19  THE COURT: Okay. Let's go ahead.

20  MS. PATEL: Thank you, Your Honor.

21  (Video deposition of Ju Seong Ryu played.)

22  MR. BLACK: Thank you, Your Honor.

23  Plaintiffs move for the admission of Mondis-177 and

24  Mondis-1394A, which were used with the examination.

25  MR. MCKEON: No objection, Your Honor.

**1055**

1  THE COURT: They're admitted into evidence.

2  (Exhibit No. Mondis-177 is received in evidence.)

3  (Exhibit No. Mondis-1394A is received in evidence.)

4  MR. BLACK: Your Honor, plaintiffs call their next

5  and last witness, Walter Bratic.

6  THE COURT: Let me see counsel.

7  (Sidebar conference held on the record in the presence of

8  the Court and counsel, out of the hearing of the jury.)

9  MS. WALSH: We didn't want to interrupt, but when

10  your associate started to get into the transcript, I think

11  that the jury needs to know that the video contains both

12  excerpts designated by you and by LG, by Mondis and LG, and

13  vice versa.

14  MR. BLACK: We didn't do that with the other one.

15  MS. WALSH: We should have.

16  MR. BLACK: Well, fine. I will say it.

17  THE COURT: I will tell the jury that.

18  MR. BLACK: Tell them all the depositions contain --

19  THE COURT: That both sides have designated.

20  MS. WALSH: Have designated it.

21  THE COURT: What else?

22  MR. MCKEON: We want to renew our Daubert motion on

23  Mr. Bratic. We just heard the testimony from Mr. Lamm.

24  And what we heard, Your Honor, is that at least four of the

25  patents known in that family are block manufacturers'

Appx15271

**1198**

1    A.   If you require license to the patent to be able to
2    practice the Plug-N-Play technology, that's a blocking
3    patent and so that's the value.  That's the benefit that
4    the licensee is receiving.

5         And based on my analysis, there were at least six
6    patents that provided that same or similar benefit, so, at
7    least six patents would have equivalent value.  So I
8    determined that it would be reasonable to assume that the
9    six patents, since they have the same value, you could
10   divide by six.

11   Q.   So, let's look at how you applied this conclusion.
12   Using Slide 38, can you please explain to the jury how you
13   went about calculating a proper reasonable royalty rate
14   based on this agreement?

15   A.   Yes.  This is my analysis of the computer monitor
16   agreement but for use with TVs.  So I started with average
17   selling price of ███ for a monitor.  If you recall, that
18   would have resulted in ████ royalty rate for monitors.
19   What LG actually paid was ████.

20        There's also been some discussion about additional
21   products that were sold at the ████ level.  It was a very
22   small amount.  If you included those, the total royalty,
23   effective royalty that was paid would be ████, but I
24   didn't start with that.

25        I started with ████ here as the price for the

**1199**

1    monitor.

2    ████████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████

7         So I started with the ████ ASP and I multiplied that
8    by the ████████ that Mondis has claimed was its standard
9    rate for the entire '090 patent family.

10   Q.   And so, in using this ████████ royalty rate for
11   the '090 patent family, are you agreeing that there is an
12   established rate for that family?

13   A.   No, I'm not.

14   Q.   And why?

15   A.   Again, there's only two licenses that actually
16   include that rate and, as we've seen, there's typically
17   discounts and deductions from that, so, every party paid a
18   little bit different rate.

19   Q.   So, what did you do next to calculate the value of a
20   license for just the '180 patent instead of the rest of the
21   family?

22   A.   So, after figuring out the per-unit royalty for a
23   license to the entire patent family, I divided that by the
24   six patents that have been asserted to be standard
25   essential and that have also been asserted against other

**1200**

1    manufacturers, to come out to a per-patent rate, so, ███
2    if the license you're being granted is limited to just the
3    '180 patent.

4    Q.   So, by dividing by six rather than by eight, were you
5    trying to be conservative?

6    A.   I was trying to identify the patents that had value.

7    Q.   Thank you.  So, is ████ that you calculated based on
8    the monitor agreement one of the data points for the jury
9    to consider in this case?

10   A.   Yes.

11   Q.   Now, you also mentioned that you looked at other TV
12   agreements with Mondis.  Can you please remind the jury why
13   they are instructive?

14   A.   Yes.  They include Mondis granting the license.  The
15   license is included in the '180 patent, as well as other
16   patents, And the licensed products are televisions like
17   they are in this case.

18   Q.   Thank you.

19        MR. CHU:  Your Honor, on the next page we'll be
20   publishing MON-247 that has already been received into
21   evidence.

22        THE COURT:  You may proceed.

23   Q.   On Slide 41, can you please summarize for the jury
24   the key terms of the Mondis-████ license agreement?

25   A.   Yes.  Very briefly, high-level summary was effective

**1201**

1    in 2011.  Licensed products were televisions.  It included
2    a license to the eight patents in the '812 family and the
3    eight patents in the '090 family, so, 16 total patents.
4    And ████████████████████████████████████, so,
5    they agreed to pay that royalty up front.

6    Q.   So, Mr. Hansen, on the next page there's an exhibit
7    that has not yet been received.  Can you please look in
8    your binder at LG-500, and can you please identify it?

9    A.   This is the complaint in the Mondis' litigation
10   against ████.

11   Q.   Is it a true and accurate copy?

12   A.   It appears to be, yes.

13        MR. CHU:  Your Honor, at this time we offer LG-500
14   into evidence.

15        THE COURT:  Any objection?

16        MR. BLACK:  No, Your Honor.

17        THE COURT:  It's admitted into evidence.

18        (Exhibit LG-500 is marked in evidence.)

19        MR. CHU:  And let's publish it.

20   Q.   With respect to this Mondis-████ agreement, did you
21   take any steps to isolate the value of just the '180
22   patent?

23   A.   Yes.  As I mentioned before, I looked at the patents
24   from the '090 patent family that were asserted against
25   ████ televisions and they asserted six patents, including

**1226**

1  because there is an agreement that both you and Mr. Bratic

2  agreed was of paramount importance in this case, and that's

3  the Mondis-LG agreement.  Right?

4  A.  I do think that's an instructive license, yes.

5  Q.  It's not just instructive, it's actually the most

6  important piece of evidence on damages in this case, isn't

7  it?

8  A.  I found it to be the most instructive license, but I

9  also considered the other factors I mentioned.

10  Q.  And in that license, it's true that if the '180

11  patent was the only license left in the family, just like

12  in this courtroom, it's the only patent left, that the

13  royalty rate that LG would have to pay would be the full

14  ███████.  Isn't that right?

15  A.  Yes, that's how the license reads.  They paid for the

16  rights to practice and use all of the inventions consistent

17  with Mondis' past assertions, but if it's only one patent

18  that they need, they would still be subject to the terms of

19  the agreement.

20  Q.  I just want to be clear, if it's only one patent, if

21  it's only the '180 patent that's at issue under the Mondis-

22  LG agreement which was negotiated in the real world, LG

23  pays the full price.  Right?  Yes or no?

24  A.  That's right.  They have the right to use the others,

25  but that would be the payment.

**1227**

1  Q.  All right.  Your calculations, you had various

2  numbers up there, but I want to make sure the jury

3  understands that you assume that in the negotiation, that

4  the parties would use the monitor average price of ███ and

5  not the TV average price of ███.  Isn't that right?

6  A.  For the computer monitor analysis, that's correct.

7  The other agreements that I looked at were based on the

8  television rates, as well as the excess sales was based on

9  a television price.

10  ████████████████████████████

   ████████████████████████████

   ████████████████████████████

   ████████████████████████████

   ████████████████████████████

   ████████████████████████████

   ████████████████████████████████

   ████████████████████████████

   ████████████████████████████████

   ████

23  Q.  The parties sit down at the negotiation with the

24  television business on the line and Mr. Spiro says, Last

25  time we did this, we got the ASP of your monitors and then

**1228**

1  we applied a rate, so we need to do that analysis again.

2  Mr. Spiro, of course, would say, What is the average

3  price of your televisions?  Correct?

4  A.  He may make that inquiry, yes.

5  Q.  Do you have any doubt that he would have said, What's

6  your average sales price of your televisions? in that

7  negotiation; any doubt at all?

8  A.  That would be up to Mr. Spiro and his negotiating

9  tactics.

10  Q.  And LG is going to do what, convince him to use the

11  ███████ monitor price for a television agreement?  Is that

12  your testimony?

13  A.  In the hypothetical negotiation, the parties have all

14  relevant knowledge and, so, the value of that invention to

15  LG, ███████████████████████████████████, but

16  that's for the whole patent family because LG would

17  recognize that the increase in sales price for televisions

18  isn't attributable to the practice of the '180 patent, so

19  they wouldn't want to pay for that because the value is not

20  related to that.

21  Q.  Look, it's a negotiation.  We know they wouldn't want

22  to pay.  That's why we're here.  And we know that Mr. Spiro

23  would like to collect a royalty.  That's also why we're

24  here.

25  But my question is a simple one.  You're supposed to

**1229**

1  draw a hypothetical negotiation, and I'm just asking you

2  from a common sense perspective, isn't it true that if the

3  parties were talking about a television deal, that they

4  would have been working off of the ███ television average

5  price, not the monitor price?

6  A.  Not in my opinion, no.

7  Q.  Okay.  You heard Mr. Bratic's opinions that there

8  would be a difference between the rate that would be

9  charged in the real world and the rate that would be

10  charged in the hypothetical negotiation because you have to

11  assume validity and infringement in the hypothetical

12  arrangement.  Correct?

13  A.  You do.

14  Q.  And Mr. Spiro told LG something similar.  He said it

15  can't be heads I win, tails you lose.  Right?

16  A.  I don't recall if he said that or not.

17  Q.  It's true that in this case LG decided to roll the

18  dice twice because if Mondis had lost the Innolux trial, we

19  wouldn't be here today.  Right?

20  A.  I don't know that.

21  Q.  Well, if Mondis had lost the Innolux trial while LG

22  waited around after taking the monitor license, we wouldn't

23  be here today because the '180 patent wouldn't be available

24  to file a lawsuit on.  Right?

25  A.  I'm not sure why you're saying it wouldn't be

**1250**

1   agreement was on everybody's mind.  It's part of the
2   hypothetical negotiation.  They knew about that agreement.
3   So certainly that agreement is going to be a basis for
4   moving forward in the discussions between the parties.
5         And likewise, you heard about ██████████.  And
6   what did this LG-Mondis agreement say?  What did that say?
7         Well, the analysis, the economic analysis in that
8   agreement is very straightforward.  It was ████ a unit
9   that the parties did as an agreement.  ████ a unit for all
10  16 patents.  For all 16 patents was ████
11        That was the agreement that they reached.  ████ for
12  16 patents.  ████ for 16 patents.  They shook hands on
13  this.  They shook hands on this.
14        And we also see confirmation of this ██████████

**1251**

21        So we have undisputed points.  We know that the
22  Mondis norm, their norm in their licensing program, was ████
23  for all the eight patents in the family.
24        We also know that we have the monitor agreement
25  between LG and Mondis.  What do we know about that?  We

**1252**

1   know that there was ████ a unit for all 16 patents.
2         So what are the parties disputing?  You can't just go
3   with those because it's all the portfolio.  So we have a
4   dispute between the parties.  Do you go up from there or do
5   you go down from there?
6         Because remember, ladies and gentlemen, where they
7   end up is .75 percent for the one patent.
8         The analysis just doesn't call for that.  You've got
9   to go down from there.  Because we have a portfolio of
10  18 -- 8 and 8, 16 patents.  And the rate that was used in
11  those portfolio licenses was ████ for the '090.  So you go
12  down from there.
13        You heard from Mr. Bratic.  And with respect to
14  Mr. Bratic, his analysis was essentially adopting
15  Mr. Spiro's analysis.  I mean, that's really what he did.
16        He said ████, I don't care how many patents you got,
17  and ████ based on this rate card you heard about.  That
18  was Mr. Bratic's analysis.
19        No drilling down into the agreements and trying to
20  get -- isolate the value of this one patent.  He adopted
21  Mr. Spiro's position on this.
22        But where do you end up if you do that, ladies and
23  gentlemen?  Where do you end up?
24        You end up with LG in a room back in 2009 having to
25  sign a deal for this one patent.  And everyone else is

**1253**

1   getting all these rights, and LG is getting this one
2   patent.
3         It's disadvantaged as a competitor.  Why is that?
4   Because it doesn't get freedom of operation.  It doesn't
5   get freedom to practice these standards.
6         And it's no longer free from litigation.  Why is
7   that?  Because there's other patents in the portfolio.
8   And, remember, the hypothetical negotiation, we end up with
9   a license that is one patent.
10        So what they want you to believe, they want you to
11  believe that we're going to pay not only ██████████ for
12  the one patent, we're going to pay .75 percent for the one
13  patent, and then the very next day they can go and sue us
14  on the other patents.
15        On a Tuesday, sue us on one of them.  On a Wednesday,
16  sue us on another one.
17        And you heard some suggestion this morning about, oh,
18  they would never do that.  They absolutely have done that.
19        Remember in the Texas case, which started with the
20  first complaint when LG got sued on New Year's Day -- New
21  Year's Eve.  LG got sued and then, later, got sued again on
22  the '180 patent.
23        Of course they filed multiple lawsuits.  They did it
24  against LG in the monitor case, multiple lawsuits.
25        So that's exactly the scenario.  They want you to

**1286**

1  analysis of all the Georgia-Pacific factors, but we also
2  have, and you are entitled to consider, not for punitive
3  damages or anything like that, just you're entitled to
4  consider the verdict in the Innolux case.
5      But just like we wanted you to decide this case on
6  the merits of the evidence presented here on liability, and
7  therefore didn't tell you about the Innolux verdict, we
8  want you -- Mondis wants you to make your own decision here
9  about what the right number is.  It's entirely up to you.
10     But we think the evidence shows that the right number
11  is .75 percent.  And when you do the math, .75 times
12  ██████ times ██████ units, the reasonable royalty is
13  ██████
14     That's a lot of money, but it's for a massive amount
15  of TVs, and it's because LG didn't resolve this case
16  earlier when it could have.
17     It's because they could have paid on a quarterly
18  basis or a semiannual basis, and then it wouldn't have
19  been -- it would have been like a drop in the bucket.
20     But when you add it all up over a five-year period
21  with their massive sales in the U.S., that's what the
22  number is.  That's what the math is.
23     Now, we had some argument about the technology not
24  being used.  We had all this discussion in the closing here
25  about these tests.

**1287**

1      But Mr. Lamm said that, in this case, which of the
2  DDC2B patents has the most value for implementing
3  Plug-N-Play technology.
4      And he said, "Well, for implementing Plug-N-Play,
5  what we're after is being able to generate compatible video
6  signals, and the '180 is the one that gives you that.
7      "And is that the reason you've called it the heart of
8  the DDC family?
9      "Yes."
10     You heard the testimony that the '090 related to a
11  serial number, which was something that LG doesn't use.
12  The '342 model number and serial number, neither of them
13  are as important as being able to send characteristic
14  information and the type information, which is what the
15  '180 covers, which is why it took the longest to get out of
16  the Patent Office.  It's the crown jewel of the family.
17     Now, LG tried to address this with the apartment
18  analogy.  I'm not going to go over that again.  But like
19  the simple analogy provided by Dr. Stevenson of the train,
20  the analogy just breaks and falls apart.
21     The reality is the real world.  People took licenses
22  to this family.  The Innolux verdict was supported on
23  televisions only by the '090, the '342 and the '180, just
24  three patents.
25     All right.  Finally, willful infringement.

**1288**

1      So the standard which you're going to hear, and I
2  want to read it:  To prove willful infringement of a claim,
3  plaintiffs must persuade you that it is more likely true
4  than not true that LG intentionally ignored or recklessly
5  disregarded that claim.
6      So the burden is on us, has to be more likely than
7  not.  All we have to show is that they intentionally
8  ignored the risk or that they recklessly disregarded the
9  claim.
10     We have all of that here.  This is not a surprise to
11  them.  They knew about the patents because of the monitor
12  agreement.  Mr. Spiro met with them 11 times.
13     The arguments that they made on liability in this
14  case that there was no display type or communication
15  controller were arguments that were never made to Mr. Spiro
16  in any meetings because, had they been made in a meeting
17  with engineers who understood this stuff, they would have
18  been laughed out of the room.
19     They were willful.  They took a risk.  And that means
20  their infringement is willful.
21     Now, all you have to do is check the box.  Once we're
22  done, there's no third phase of this trial.  It has meaning
23  in this case.  It's very important to us.  We need you to
24  consider the evidence, which we think overwhelmingly shows
25  willfulness, and check that box.

**1289**

1      So in addition to the discussions between Mr. Kim and
2  Mr. Spiro, the runaround, the refusal of the license, ██████
3  ████████████████████████████████████████████
4  ████████████████████████████████████████████
5  ████████████████████████████████████████████
6  ████████████████████████████████████████████
7  ████████████████████████████████
8  ████████████████████████████████████████████
9  ████████████████████████████████████████████
10  ████████████████████████████████████████████
11  ████████████████████████████████████████████
12  ████████████████████████████████████████████
13  ████████████████████████████████████████████
14  ████████████████████████████████████████████
15  ████████████████████████████████████████████
16  ████████████████████████████████████████████
17  ████████████████████████████████████████████
18  ████████████████████████████████████████████
19  ████████████████████████████████████████████
20  ████████████████████████████████████████████
21  ██████████████████████████████████████
22  ████████████████████████████████████████████
23  ████████████████████████████████████████████
24  ████████████████████████████████████████████
25  ████████████████████████████████████████████

**1290**

1  That's willfulness.

2  So here's the bottom line. LG says ████ is a

3  reasonable royalty for selling ████ televisions.

4  They say that had they been negotiating with Mr. Spiro,

5  that that's the deal they would have reached, that

6  Mr. Spiro would have accepted a ████ royalty.

7  You have to decide whether that makes any sense. You

8  have to decide whether common sense says that's right.

9  It's not "heads I win, tails you lose." The choice

10 you have, you've heard all the evidence, you can reach any

11 decision. We respectfully request that you award

12 ████ to Mondis for the infringement in this case

13 and check the box on willfulness. Thank you.

14 THE COURT: Thank you, Mr. Black.

15 All right. Ladies and gentlemen, before I start, get

16 up and stretch a little bit, move around a little bit.

17 Then you can buckle yourselves into your airplane seats and

18 hang on. But relax a little bit for just a moment.

19 (Brief pause.)

20 JURY CHARGE BY THE COURT

21 THE COURT: All right. First, before I start giving

22 the instructions, all the instructions which you've gotten

23 up until now in terms of evaluating the believability of

24 evidence, what constitutes evidence and what does not

25 constitute evidence and so on, is equally applicable to

**1291**

1  this portion of the case.

2  Now in this case, plaintiffs argue that LG willfully

3  infringed plaintiff's patent. To prove willful

4  infringement of a claim, plaintiffs must persuade you that

5  it is more likely than not true that LG intentionally

6  ignored or recklessly disregarded that claim.

7  You must base your decision on LG's knowledge and

8  actions at the time of the infringement. Evidence that LG

9  had knowledge of the patent at the time of infringement by

10 itself is not sufficient to show willfulness. Rather, to

11 show willfulness you must find that LG engaged in

12 additional conduct evidencing deliberate or reckless

13 disregard of plaintiff's patent rights.

14 In deciding whether LG willfully infringed, you

15 should consider all the facts surrounding the infringement,

16 including whether LG intentionally copied plaintiff's

17 patented technology in developing the accused product, or

18 that LG knew or should have known that its conduct involved

19 an unreasonable risk of infringement, and whether LG had a

20 reasonable belief that at the time of the infringement that

21 its patents did not infringe the asserted patent or that

22 the patent was invalid.

23 I am going to instruct you now about the measure of

24 damages. You must determine the amount of money damages to

25 be awarded to plaintiffs to compensate it for the

**1292**

1  infringement. The amount of those damages must be adequate

2  to compensate plaintiffs for the infringement. A damages

3  award should put the patent holder in approximately the

4  financial position it would have been if the infringement

5  had not occurred.

6  But in no event may damages -- may the damages award

7  be less than a reasonable royalty. You should keep in mind

8  that the damages you award are meant to compensate the

9  patent holder and not to punish the infringer.

10 Plaintiffs had the burden to persuade you of the

11 amount of its damages. You should award only those damages

12 that plaintiffs more likely than not suffered.

13 While plaintiffs are not required to prove its

14 damages with mathematical precision, they must prove them

15 with reasonable certainty. Plaintiffs are not entitled to

16 damages that are remote or speculative.

17 The damages period in this case runs from April 2nd

18 of 2009 to February 3rd of 2014.

19 Now, a royalty is a payment made to a patent holder

20 in exchange for the right to make use or sell the claimed

21 invention. This right is called a license. A reasonable

22 royalty is the payment for the license that would have

23 resulted from a hypothetical negotiation between the patent

24 holder and the alleged infringer, taking place at the time

25 when the infringing activity first began.

**1293**

1  Considering the nature of this negotiation, you must

2  assume that both parties would have acted reasonably and

3  would have entered into a license agreement. You must also

4  assume that both parties believe the patent was valid and

5  infringed.

6  Your role is to determine what the result of that

7  negotiation would have been. The tests for damages is what

8  royalty would have resulted from the hypothetical

9  negotiation and not simply what either party would have

10 preferred.

11 A royalty can be calculated in several different

12 ways, and it is for you to determine which way is the most

13 appropriate based upon the evidence you've heard.

14 You should consider all the facts known or available

15 to the parties at the time the infringement began. Some of

16 the factors you may consider in making a determination are:

17 1: Any royalties received by the licensor for the

18 licensing of the patent-in-suit proving or tending to prove

19 an established royalty.

20 2: The rates paid by LG to license other patents

21 comparable to the '180 patent.

22 3: The nature and scope of the license as exclusive

23 or nonexclusive or as restricted or non-restricted in terms

24 of its territory or with respect to whom the manufacture --

25 who the manufactured product may be sold.